UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| In re ORGANIC POWER LLC | ) | Chapter 11 Case |
| | ) | Bankr. Case No.: 19-01789(EAG) |
| Debtor, | ) | |
| —————————————————— | ) | |
| | ) | |
| ORGANIC POWER LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding |
| | ) | No. 20-00055 (EAG) |
| SMALL BUSINESS ADMINISTRATION AND | ) | |
| JOVITA CARRANZA, in her capacity as | ) | |
| Administrator for the U.S. Small | ) | |
| Business Administration, | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES' OPPOSITION TO ORGANIC POWER, LLC'S MOTION FOR A
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

The United States of America (the "United States"), on behalf of the Small Business

Administration and Jovita Carranza in her capacity as Administrator for the U.S. Small Business

Administration (SBA), files this opposition to Plaintiff Organic Power LLC's Motion for a

Temporary Restraining Order and Preliminary Injunction ("Plaintiff's Motion") (Doc. 4 in 20-

00055).[1]

---

[1] Plaintiff styles the Motion in Document 4 as a Motion for Preliminary Injunction. In Plaintiff's
Motion to expedite hearing on this Motion, Plaintiff styles the motion as seeking a temporary
restraining order and preliminary injunction. Given that this District applies the standard in
reviewing motions for a temporary restraining order and preliminary injunctions, *see Servicos
Legales De Puerto Rico, Inc. v. Union Independiente De Trabajadores De Services Legales*, 376
F. Supp. 3d 163, 166 (D.P.R. 2019) ("The standard for issuing a TRO is 'the same as for a
preliminary injunction.'"), the United States responds to this motion as an opposition to Plaintiff's
Motion seeking either form of relief.

## INTRODUCTION

Plaintiff's request for a temporary restraining order and preliminary injunction raises broad challenges to the SBA's implementation and administration of the CARES Act Payroll Protection Program (PPP), a $659 billion loan guarantee program that must extend hundreds of thousands of loans to small businesses and non-profits across the nation in a matter of days. Specifically, Plaintiff asks the Court to overturn the SBA's stated, explicit policy of excluding bankrupt entities from the PPP.  Granting the injunctive relief Plaintiff seeks risks disrupting the administration of the PPP, in the middle of loan distribution.  Such a drastic result would only be justified by a strong showing that Plaintiff's claims are likely to succeed on the merits, that Plaintiff will be irreparably harmed absent injunctive relief, and that the requested injunction is in the public interest.  Plaintiff cannot demonstrate any of these requirements.

Plaintiff cannot demonstrate that it is likely to succeed on its claims, because its claims are facially invalid.  First, the injunctive relief plaintiff seeks against the SBA is barred by sovereign immunity. Second, Plaintiff's anti-discrimination claim under 11 U.S.C. § 525 fails because, by its plain terms, section 525 does not apply to loans or loan guarantees.  Third, Plaintiff cannot obtain a temporary restraining order through its Administrative Procedure Act (APA) claims because those claims are non-core, and thus the bankruptcy court lacks jurisdiction to order injunctive relief on them.  Plaintiff's APA and mandamus claims otherwise fail on their merits because the SBA acted wholly within its delegated authority in implementing the PPP. The bankruptcy exclusion was addressed in two separate agency rules.  And Congress, through the CARES Act and Small Business Act, explicitly delegated authority to the Administrator to issue those rules.

2

Plaintiff also fails to proffer all but the barest conclusory assertions to support its claim for irreparable harm, which is far from sufficient to support its claim for injunctive relief. Further, awarding an injunction here would be against the public interest. In implementing the PPP, the SBA made a policy decision to limit PPP loans to those who had not filed for bankruptcy; in essence indicating a preference in distributing limited funding. Plaintiff asks the Court to replace the SBA's stated policy with the Plaintiff's own policy preferences. Doing so would eviscerate Congress' choice to vest with the SBA the authority to implement the PPP and oversee its own lending program.

## BACKGROUND

### A.      The Small Business Administration

Through the Small Business Act, 15 U.S.C. § 631 *et seq.*, Congress created the SBA to "aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns," in order to preserve the system of free competitive enterprise that is "essential" to the economic well-being and security of the Nation. 15 U.S.C. § 631(a). To promote that objective, Congress placed the SBA under the management of a single Administrator, *id.*, § 633(a), (b)(1), who is given "extraordinarily broad powers" under section 7(a) of the Act, 15 U.S.C. § 636(a), to provide a wide variety of technical, managerial, and financial assistance to small-business concerns. *See SBA v. McClellan*, 364 U.S. 446, 447 (1960); *see generally* 15 U.S.C. § 636(a) (describing numerous varieties of general small-business loans the Administrator is "authorized" and "empowered" to make); 13 C.F.R. § 120.1. In the performance of these authorized functions, the Administrator is further empowered to "make such rules and regulations as [she] deems necessary to carry out the authority vested in [her]," and in addition to "take any and all

actions . . .  [that] [she] determines . . . are necessary or desirable in making . . . loans."  15
U.S.C. § 634(b)(6),(7).

### B.    Section 7(a) Lending

The section 7(a) loan program is the SBA's primary program for providing financial
assistance to small businesses.  Under the terms of the Small Business Act, SBA financial
assistance to a small business under section 7(a) may take the form of a direct loan, an immediate
participation (joint) loan with a lender, or a deferred participation (guaranteed) loan initiated by a
lender but a portion of which the SBA will purchase from the lender in the event of a borrower
default.  13 C.F.R. § 120.2(a); *see Valley Nat'l Bank v. Abdnor*, 918 F.2d 128, 129 (10th Cir.
1990); *California Pac. Bank v. SBA*, 557 F.2d 218, 219 (9th Cir. 1977).  In practice, however, the
SBA ordinarily guarantees loans made by private lenders rather than disbursing funds directly to
borrowers, *see United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 719 (1979), thus "reduc[ing]
risk for lenders … mak[ing] it easier for them to access capital," and thereby "mak[ing] it easier
for small business to get loans."  *See* https://www.sba.gov/funding-programs/loans.

### C.    Section 7(a) Loan Underwriting

Ordinarily, to qualify for an SBA general business loan an applicant must be an operating
business organized for profit that is located in the United States, 13 C.F.R. § 120.100(a)-(c);
meet the size standards for a "small" business set forth under the statute and SBA rules (usually
stated in terms of number of employees, or average annual receipts), *see* 15 U.S.C. § 632(a)(2);
13 C.F.R. § 120.100(d); 13 C.F.R. Part 121; and demonstrate that the desired credit is not
available elsewhere on reasonable terms, 15 U.S.C. § 632(h); 13 C.F.R. §§ 120.100(e), 120.101.

In addition to these requirements, the Small Business Act requires that "[a]ll loans made
under this subsection *shall* be of such sound value or so secured as reasonably to assure

repayment." 15 U.S.C. § 636(a)(6) (emphasis added).  For regular 7(a) loans, the factors to

reasonably assure repayment are described in general terms in 13 C.F.R. § 120.150. Further

factors are described in greater detail on the official application form for 7(a) loans.  *See* SBA

Form 1919 (attached hereto as Exhibit A).  Among other considerations, Official Form 1919 also

considers whether the applicant has "ever filed for bankruptcy protection."  *Id*.  By regulation,

requirements listed on Form 1919, and other official SBA forms, comprise part of the "Loan

program requirements."  13 CFR Sec. 120.10.  Lenders in turn agree to abide by these Loan

program requirements when joining the section 7(a) lending program.  13 C.F.R. Sec. 120.10;

*see also* SBA Forms 3506 and 3507 (addressing new PPP lenders) (attached hereto as Exhibits B

and C).

      **D.**     **The Coronavirus Aid, Relief, and Economic Stimulus ("CARES") Act**

On March 27, 2020, President Trump signed into law the Coronavirus Aid, Relief, and

Economic Stimulus ("CARES") Act, Pub. L. 116-136, 134 Stat. 281, passed by Congress to

provide an unprecedented package of emergency economic assistance and other support to help

individuals, families, businesses, and health-care providers cope with the enormous economic

and public health crises—unlike any experienced in the lifetime of the Nation—triggered by the

worldwide coronavirus (COVID-19) pandemic.  *See* SBA, Interim Final Rule, "Business Loan

Program Temporary Changes; Paycheck Protection Program" (the "First Interim Final Rule"),

Fed. Reg. Vol. 85 No. 73 at 20811 (attached hereto as Exhibit D).

Among the numerous measures taken by the CARES Act to address the COVID-19

crisis, of concern here is the Paycheck Protection Program ("PPP"), CARES Act. § 1102,

enacted to extend relief to small businesses experiencing economic hardship as a result of the

public-health measures being taken to minimize the public's exposure to the COVID-19 virus.

*See* First Interim Final Rule at 20811.  Specifically, section 1102(a)(2) of the CARES Act adds a new paragraph (36) to section 7(a) of the Small Business Act, 15 U.S.C. § 636(a)(36), to extend loans to eligible small businesses for certain covered uses, including "payroll costs," the "payment of interest on any mortgage obligation," and "rent," among other approved uses. CARES Act 1102(a)(2); 15 U.S.C. § 636(a)(36)(F)(i).

Otherwise, the existing section 7(a) requirements and limitations remain unaltered and apply to PPP lending. The CARES Act provides that "*[e]xcept as otherwise provided in this paragraph*, the [SBA] *may* guarantee [PPP] covered loans"—not make loans directly, however—"under the same terms, conditions, and processes as a loan made under this subsection," i.e., section 7(a). 15 U.S.C. § 636(a)(36)(B) (emphasis added).

The PPP then sets forth in extensive detail the precise ways in which PPP covered loans differ from other section 7(a) loans. *Id*. § 636(a)(36)(D)-(R). Among these differences, the PPP authorizes the SBA to make covered loans to various non-profit organizations, independent contractors, and self-employed individuals, as well as to small business concerns, *id*. § 636(a)(36)(D)(i), (ii); relaxes size limitations to allow businesses with as many as 500 employees (or more, depending on the industry in which they operate) to receive assistance, *id*. § 636(a)(36)(D)(i)(I); and (iii) selectively waives certain of the SBA's affiliation rules used to make small business "size."

The CARES Act leaves unaltered the requirement that "[a]ll loans made under this subsection *shall* be of such sound value or so secured as reasonably to assure repayment." 15 U.S.C. § 636(a)(6) (emphasis added).

The CARES Act initially allocated $349 billion to guarantee PPP loans. CARES Act § 1102(b)(1). After that funding was exhausted, Congress passed the Paycheck Protection Program

6

and Health Care Enhancement Act (CARES Act 2) on April 24 to add an additional $310 billion

to the PPP. PL 116-139 § 101(a)(1). The SBA posted notice on its website that it would begin

accepting new PPP applications from participating lenders on Monday, April 27, 2020 at 10:30

am. *See* "Notice: PPP Resumes April 27, 2020," *available at* https://www.sba.gov/funding-

programs/loans/coronavirus-relief-options/paycheck-protection-program#section-header-0.

### E. Emergency Rulemaking Authority

The CARES Act authorizes the Administrator of the SBA to issue emergency regulations

to implement the PPP without complying with typical notice and comment requirements.

CARES Act § 1114. The Administrator of the SBA posted its First Interim Final Rule on the

SBA website on April 3, 2020. The First Interim Final Rule was subsequently published in the

Federal Register on April 15. Fed. Reg. Vol. 85 No. 73 at 20811. The First Interim Final Rule

"streamlin[es] the requirements of the regular 7(a) loan program." *Id.* at 20812. For instance,

the rule states that lenders need not comply with case by case underwriting requirements of 13

CFR 120.150. *Id.* at 20812. Instead, under a section titled "What Do Lenders Have to Do in

Terms of Loan Underwriting," the rule states that "[e]ach lender's underwriting obligation under

the PPP is limited to [the enumerated] items above and reviewing the 'Paycheck Protection

Application Form.'" The Paycheck Protection Application Form itself requires the borrower to

certify, among other things, that it is "not presently involved in a bankruptcy." SBA Form 2483

(attached hereto as Exhibit E).

On April 24, concurrent with Congress' extension of additional funding for the PPP, SBA

posted a new interim final rule, which was subsequently published in the Federal Register on

April 28, 2020. "Business Loan Program Temporary Changes; Paycheck Protection Program –

Requirements – Promissory Notes, Authorizations, Affiliation, and Eligibility" (the "Fourth

Interim Final Rule[2]) (attached hereto as Exhibit F).  The Fourth Interim Final Rule provides

additional information regarding a number of eligibility requirements.  Section III(4) of the

Fourth Interim Final Rule specifically addresses entities in bankruptcy.  It provides:

> *4. Eligibility of Businesses Presently Involved in Bankruptcy Proceeding.*
>
> *Will I be approved for a PPP loan if my business is in bankruptcy?*
>
> No.  If the applicant or the owner of the applicant is the debtor in a bankruptcy proceeding, either at the time it submits the application or at any time before the loan is disbursed, the applicant is ineligible to receive a PPP loan.  If the applicant or the owner of the applicant becomes the debtor in a bankruptcy proceeding after submitting a PPP application but before the loan is disbursed, it is the applicant's obligation to notify the lender and request cancellation of the application.  Failure by the applicant to do so will be regarded as a use of PPP funds for unauthorized purposes.
>
> The Administrator, in consultation with the Secretary, determined that providing PPP loans to debtors in bankruptcy would present an unacceptably high risk of an unauthorized use of funds or non-repayment of unforgiven loans.  In addition, the Bankruptcy Code does not require any person to make a loan or a financial accommodation to a debtor in bankruptcy.  The Borrower Application Form for PPP loans (SBA Form 2483), which reflects this restriction in the form of a borrower certification, is a loan program requirement.  Lenders may rely on an applicant's representation concerning the applicant's or an owner of the applicant's involvement in a bankruptcy proceeding.

Fourth Interim Final Rule, Fed. Reg. 85 Vol. 82 at 23451.

## ARGUMENT

## I.    LEGAL STANDARD

A preliminary injunction, like a temporary restraining order, is an "extraordinary and

drastic remedy" that is "never awarded as of right," *Munaf v. Geren*, 553 U.S. 674, 689-90

(2008) (citation omitted), and "may only be awarded upon a clear showing that the plaintiff is

entitled to such relief," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *see also*,

---

[2] The SBA also issued a second interim final rule addressing affiliation rules, 85 Fed. Reg. 20817, and a third interim final rule addressing the way in which self-employment income of partners and independent contractors should be handled.  85 Fed. Reg. 21747.

*e.g.*, *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012) ("A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right."). Thus, a plaintiff seeking a temporary restraining order must establish that (1) he or she is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Peoples Fed. Sav. Bank*, 672 F.3d at 8-9.  Moreover, the party seeking the injunction carries the burden of persuasion to demonstrate, by a clear showing, that the necessary elements are satisfied.  *Id.* at 9; *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007). Injunctions that disrupt the status quo are disfavored and "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2005); *see also Braintree Labs., Inc. v. Citigroup Glob. Markets Inc.,* 622 F.3d 36, 40–41 (1st Cir. 2010) (similar).  An injunction disrupts the status quo when it changes the "last peaceable uncontested status existing between the parties before the dispute developed." *Schrier*, 427 F.3d at 1260.  In such instances, the district court may not grant relief such as a temporary restraining order or a preliminary injunction unless the plaintiff makes a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms.  *See*, *e.g.*, *Braintree Labs, Inc.*, 622 F.3d at 40-41; *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 976 (10th Cir. 2004) (en banc).  This heightened standard accords with the historic purpose of the preliminary injunction, which is to "preserve the relative positions of the parties until a trial on the merits can be held." *O Centro*, 389 F.3d at 977; *Braintree Labs, Inc.*, 622 F.3d at 40-41.

9

Here, the status quo is that the Plaintiff is excluded from the PPP program because it is in active bankruptcy. The Plaintiff has not received any PPP loan and the money Plaintiff seeks is available to guarantee loans for eligible applicants. Because Plaintiff seeks to disrupt this status quo, it bears a heightened standard of "mak[ing] a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *O Centro*, 389 F.3d at 976.

For the reasons that follow, Plaintiff has not carried these heavy burdens.

## II.    PLAINTIFF FAILS TO ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS.

### A.    The Small Business Act's Narrow Sovereign Immunity Waiver Precludes The Injunctive Relief Plaintiff Seeks.

While the Small Business Act does contain a waiver of sovereign immunity, that waiver is limited. It provides that the SBA may:

> sue and be sued in any court of record of a State having general jurisdiction, or in any United States district court, and jurisdiction is conferred upon such district court to determine such controversies without regard to the amount in controversy; *but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the [agency] or [its] property[.]*

15 U.S.C. § 634(b)(1) (emphasis added).

This statute waives sovereign immunity for suits seeking damages or declaratory relief, but precludes suits seeking injunctive or any similar relief against the SBA. *See*, *e.g.*, *J.C. Driskill, Inc. v. Abdnor*, 901 F.2d 383, 386 (4th Cir. 1990) (explaining that "courts have no jurisdiction to award injunctive relief against the SBA"); *Enplanar, Inc. v. Marsh*, 11 F.3d 1284, 1290 (5th Cir. 1994) (same); *United States v. Mel's Lockers, Inc.*, 346 F.2d 168, 170 (10th Cir. 1965) ("The provisions in the Small Business Act which permit the Administrator to  be sued, specifically provide that no injunction shall be issued against the Administrator or his property.

10

This language is too clear for misunderstanding that there is no waiver by Congress as to injunction suits.") (waiver of sovereign immunity in Bankruptcy Act did not override prohibition on injunctions); *Mar v. Kleppe*, 520 F.2d 867, 869 (10th Cir. 1975) ("The decisions have uniformly considered that this statute effectively precludes injunctive relief against the Administrator.") (collecting cases).

As the Fourth Circuit has explained in *J.C. Driskill, Inc.*:  "courts have no jurisdiction to award injunctive relief against the SBA.  Congress apparently included *this limitation to avoid potential interference with and obstruction of the SBA's operations*, and the prohibition extends not only to attachment, injunction, and garnishment, but also to 'other similar process.'"  901 F.2d at 386 (emphasis added).  The Fourth Circuit distinguished the language in the SBA waiver of immunity from other agencies sovereign immunity waiver provisions, such as the Postal Service, which did not exempt such injunctions.  *Id.*  Accordingly, because Congress has removed authority to enjoin the SBA, Plaintiff's request for a temporary restraining order must be denied.

Plaintiff may contend that the First Circuit's decision in *Ulstein Mar., Ltd. v. United States*, 833 F.2d 1052 (1st Cir. 1987) or the Federal Circuit's decision in *Cavalier Clothes, Inc. v. United States*, 810 F.2d 1108 (Fed. Cir. 1987) compel a different result.  That is incorrect.  These courts have held that in certain limited situations there is no absolute bar on suits for injunctions against the SBA.  Specifically, these courts have permitted certain suits for an injunction against the SBA in two situations, neither of which are applicable here:  (1) when the Administrator exceeds his or her authority or (2) the suit involves a matter that does not interfere with the internal workings of the agency or seek to attach agency funds.  As the First Circuit in *Ulstein* made clear, "[w]hile the specific legislative history of § 634(b)(1) is silent on the purpose of this

11

language, the legislative history of earlier statutes containing the identical wording indicates that it was intended to keep creditors or others suing the government *from hindering and obstructing agency operations through mechanisms such as attachment of funds.*"  833 F.2d at 1056-57 (emphasis added).  Thus, "[t]he no-injunction language *protects the agency from interference with its internal workings by judicial orders attaching agency funds, etc.*, but does not provide blanket immunity from every type of injunction."  *Id.* (emphasis added).  Here, the relief Plaintiff is seeking directly interferes with the internal workings of an SBA program (as detailed below *infra* at 28-30).  That is precisely what section 634(b)(1) was designed to stop.  And, as further developed below, the SBA Administrator is statutorily authorized to "make such rules and regulations" and "take any and all actions … [that] [she] determines . . . are necessary or desirable in making . . . loans."  15 U.S.C. § 634(b)(6), (7).  In specifying the rules for banks to make loans under the section 7(a) program, including PPP loans, the Administrator acted well within her lawful authority in excluding bankrupt entities from the PPP.  Accordingly, neither *Ulstein*, nor *Cavailer Clothes* provides Plaintiff any support for its contention that injunctive relief is available against the SBA.

Any argument by Plaintiff that sections 105 and 106 of the Bankruptcy Code waive sovereign immunity and vest this Court with jurisdiction lacks merit for the same reason.  Only Congress can waive sovereign immunity.  *United States v. Sherwood*, 312 U.S. 584, 589 (1941).  And statutory waivers of sovereign immunity must be express and unequivocal.  *See*, *e.g.*, *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003); *Lane v. Pena*, 518 U.S. 187 (1996); *United States v. Nordic Vill., Inc.*, 503 U.S. 30 (1992).  Because sovereign immunity waivers must be explicit and should be narrowly construed, any ambiguity must be resolved in the government's favor.  *Nordic Vill., Inc.*, 503 U.S. at 34; *Department of the Army v. Blue Fox,*

*Inc.*, 525 U.S. 255, 260 (1999).  Accordingly, although section 106(a) waives sovereign

immunity for claims under certain Bankruptcy Code provisions, including section 525, it does

not generally waive sovereign immunity for suits under the APA just because they are filed in

bankruptcy cases.  Notably, Congress purposely excluded section 541 from the list of

Bankruptcy Code sections falling within the waiver of sovereign immunity under section

106(a)(1), clarifying that the waiver does not broadly permit suits against the government just

because they constitute property of the estate.[3]  140 Cong. Rec. H10, 766 (daily ed. Oct. 4, 1994)

("This allows the assertion of bankruptcy causes of action, but specifically excludes causes of

action belonging to the debtor that become property of the estate under section 541.").

Moreover, the sovereign immunity waiver in section 106 does not "unequivocally"

permit claims against SBA for injunctions that would not be permissible under 15 U.S.C. 634(b),

because section 106(a)(4) of the Bankruptcy Code limits the sovereign immunity waiver to

exclude claims for relief that are  not available against agencies outside of bankruptcy.  11

U.S.C. § 106(a)(4) ("The enforcement of any such order, process, or judgment against any

governmental unit shall be consistent with appropriate nonbankruptcy law applicable to such

governmental unit."); *In re Rivera Torres*, 432 F.3d 20 (1st Cir. 2005) (concluding that (1)

Congress had not "definitively and unequivocally" waived sovereign immunity under Section

106(a) for emotional distress damages and, therefore, sovereign immunity bars awards for

---

[3] Also, section 106(a)(5) clearly provides that this sovereign immunity waiver does not provide a
substantive claim for relief or subject matter jurisdiction where it does not otherwise lie.  11 U.S.C.
§ 106(a)(5) ("Nothing in this section shall create any substantive claim for relief or cause of action
not otherwise existing under this title, the Federal Rules of Bankruptcy Procedure, or
nonbankruptcy law.").  As the Tenth Circuit held in *In re Franklin Services Corp.*, 385 F.3d 1279
(10th Cir. 2004):  "By its express terms, however, Bankruptcy Code § 106 does not provide a
substantive or independent basis for asserting a claim against the government . . . Thus, a plaintiff
such as Franklin seeking to use the waiver in § 106 must demonstrate that a source outside of §
106 entitles it to the relief sought."  *Id.* at 1286.

emotional distress damages against the federal government under section 105(a) for any willful

violation of section 524 and (2) recognizing a waiver of sovereign immunity for emotional

distress damages "would run afoul of § 106(a)(5) which forbids the creation of any substantive

claim for relief 'not otherwise existing under this title, the Federal Rules of Bankruptcy, or non-

bankruptcy law"). Here, the governing law provides that injunctive relief against the SBA is

barred because there is no waiver of sovereign immunity for claims sounding in an injunction.

Section 106, therefore, does not expand the scope of the waiver of sovereign immunity.

Moreover, any contention by Plaintiff that the All Writs Act, 28 U.S.C. § 1651, provides

a basis for this Court to issue the injunctive relief it seeks on its claims under the Administrative

Procedures Act (*see infra* at 21-26) also fails. The All Writs Act, to the extent it provides any

powers to this Court, does not give this Court any rights other than to provide remedies where

there is a claim for relief under other statutes. *Id.* The All Writs Act does not waive sovereign

immunity and does not provide for a substantive cause of action. *See*, *e.g.*, *Holt v. Davidson*, 441

F. Supp. 2d 92, 96 (D.D.C. 2006) ("the All Writs Act, 28 U.S.C. § 1651 . . . does not operate as

a waiver of sovereign immunity). Therefore, because section 634(b)(1) only waives sovereign

immunity for relief other than injunctive relief, and is more specific with respect to its

jurisdictional limitations, it should govern any claim. Finally, even if the Court had authority to

grant an injunction for a violation of section 525, that argument fails on the merits for the reasons

set forth below (*see infra* at 14-20).

### B.    Plaintiff's Anti-Discrimination Claim Will Fail Because Section 525 of the Bankruptcy Code Does Not Apply to Loans.

Section 525(a) of the Bankruptcy Code prohibits a governmental unit from denying,

revoking, suspending, or refusing to renew "a license, permit, charter, franchise, or other similar

grant" on the basis of being or having been a debtor in bankruptcy. By its plain language, the

14

prohibition in 525(a) does not apply to lending or loan guarantees.  Indeed, the only mention of

lending in Section 525 is found in subsection (c), added in 1994 to address government student

loan programs.  103 P.L. 394 § 313.  Subsection (c) provides: "[a] governmental unit that

operates a student grant or loan program . . . may not deny a grant, loan, loan guarantee, or loan

insurance to a person that is or has been a debtor under this title or . . . under the Bankruptcy Act

. . . " 28 U.S.C. § 525(c).  If Section 525 applied to government guaranteed loans more broadly,

Congress would not have needed to amend the law to include government student loan programs.

And in amending the law to address government student lending, Congress could have addressed

other government lending programs, but chose not to.

Each Circuit that has addressed this issue has determined that a government entity

conditioning a loan on whether the party receiving the loan is in bankruptcy *does not* violate

section 525 because a loan is not "grant" that is similar to a "license, permit, charter, [or]

franchise."  *See*, *e.g.*, *Watts v. Pennsylvania Housing Fin. Co.*, 876 F.2d 1090, 1094 (3d Cir.

1989) (holding that an emergency home loan assistance program in which payments were

suspended if an entity filed for bankruptcy and the automatic stay was not lifted did not violate

section 525); *Ayes v. U.S. Department of Veterans Affairs*, 473 F.3d 104, 110 (4th Cir. 2006)

(holding that veteran loan guarantee was not within the scope of section 525); *Toth v. Michigan

State Housing Development Authority*, 136 F.3d 477, 480 (6th Cir. 1998) (holding that section

525 does not apply to state issued home improvement loans). In *In re Goldrich*, 771 F.2d 28 (2d

Cir. 1985), the Second Circuit reached the same conclusion in a case concerning student loans

prior to the amendment of section 525 in 1994 to include 525(c).  It held that omission of post-

discharge credit arrangements from language of § 525 was intentional and declined to extend §

525 to student loan guarantees, explaining:  "*A credit guarantee is not a license, permit, charter*

15

*or franchise; nor is it in any way similar to those grants.* Had Congress intended to extend this

section to cover loans or other forms of credit, it could have included some term that would have

supported such an extension." *Id.* at 30 (emphasis added).

A number of district and bankruptcy courts have reached the same conclusion. *See, e.g.*,

*In re Jasper*, 325 B.R. 50, 55 (Bankr. D. Me. 2005) (revoking credit union privileges on the basis

of filing for bankruptcy did not violate section 525); *United States v. Cleasby*, 139 B.R. 897, 900

(Bankr. W.D. Wis. 1992) (holding a loan is not a "similar grant" within the meaning of § 525 and

declining to extend § 525 protection to applications for debt restructuring); *Lee v. Yuetter*, 106

B.R. 588, 592 (Bankr. D. Minn.1989) (declining to extend § 525 protection to applications for debt

restructuring program and analogizing program to extensions of credit), *aff'd*, 917 F.2d 1104 (8th

Cir.1990).

An instructive review of the statutory history of 11 U.S.C. § 525 and existing case law

was conducted by the bankruptcy court in the District of Utah. *In re Rees*, 61 B.R. 114, 116-24

(Bankr. D. Utah 1986). The court explained that 11 U.S.C. § 525 "intended to codify the rule of

*Perez v. Campbell*, 402 U.S. 637 (1971), which held that a state could not frustrate the

Congressional policy of a fresh start for a bankrupt by refusing to renew a driver's license based

on a discharged judgment resulting from an automobile accident." *In re Rees*, 61 B.R. at 116-17.

An early proposal for the provision contained broad language prohibiting "discriminatory

treatment because he, or any person with whom he is or has been associated, is or has been a

debtor or has failed to pay a debt discharged in a case under the Act. *Id.* "The credit industry

was extremely concerned about the wording . . . , and urged that it be redrafted to limit its

application to *Perez*-type situations and prevent its application in the field of credit granting." *Id.*

at 118. The provision was subsequently redrafted to hue more closely to the *Perez* decision,

16

prohibiting discrimination in the issuance of "a license, permit, charter, franchise, or other similar grant." *Id.*

The PPP is in no way like the archetypal driver's license in *Perez*, nor the other items enumerated in Section 525(a). The PPP does not provide a right to engage in a specific activity or profession, like a license, permit, charter or franchise." 11 U.S.C. § 525(a); *see Ayes*, 473 F.3d at 109 (the enumerated items in 525(a) "implicate 'government's role as a gatekeeper in determining who may pursue certain livelihoods' . . . and show that Congress intended § 525(a)'s protections to be limited to situations sufficiently similar to *Perez*") (quoting *Toth*, 136 F.3d at 480). The PPP operates to provide emergency funding to certain eligible small businesses. Business that are excluded from funding are not prohibited from operating, as with a refusal to provide a license, permit, charter or franchise. And, unlike the archetypal driver's license, where the state is the sole entity to provide licensing, the PPP is not the sole source of funding. Indeed, entities in active bankruptcy may be eligible for other relief under the CARES Act itself, including an Emergency Economic Injury Disaster Loan. *See* CARES Act § 1110.

In addition, although Plaintiff attempts to shoehorn the PPP loans and loan guarantees into other categories – subject to section 525, the PPP is indisputably a lending and loan guarantee program. The gravamen of Plaintiff's argument is that PPP loan guarantees are so generous as to be effectively "grants." This argument rests upon a factual error that the loans and loan guarantees at issue under the PPP will necessarily be 100% forgiven at some point in the future. But to qualify for complete or partial loan forgiveness, a recipient of the PPP, must meet certain requirements, such as utilizing 75% of the funds for payroll. *See* First Interim Final Rule § 2(o). It is only at a later date that all or part of the loan would become forgivable. Even if some of the loan is forgiven (a fact yet to be determined for any particular loan), it is possible that some portion might not be,

and that remaining portion will continue to be payable as a loan.  In other words, there is no question that funds provided pursuant to the PPP are currently in the first instance structured as loans and loan guarantees -- and no decision on whether to forgive these loans will be made until there is a subsequent determination that the loan recipient complied with PPP requirements to make all or part of the loan forgivable.  The circumstances may make recipients unable or unwilling to meet these requirements for complete or partial loan forgiveness.  Plaintiff simply ignores these aspects of the program and the Administrator's interpretation and application of the CARES Act as a loan program in contending that the PPP is not a loan.

Furthermore, the contention that the PPP is a "grant" and not a loan is directly contrary to the conclusions reached by Congress and the SBA Administrator.  Congress explicitly referred to the PPP as a loan program in the CARES Act. *See e.g.*, CARES Act § 1102(a)(2) (addressing "covered loans"), § 1102(b) (appropriated funding available "for commitments for general business loans authorized under section 7(a) of the Small Business Act, including loans made under paragraph (36) of such section [PPP loans]."  And the SBA Administrator has resolved any ambiguity as to whether funds disbursed under the PPP are loans.  For example, Section 1(a) of the Fourth Interim Final Rule provides guidance on promissory notes and refers back to guidance dated April 8, 2020 that sets forth that lenders can use the SBA Standard Form 147 (Ex. G) for a promissory note, which is the same form that lenders use for a standard non-PPP section 7(a) loan.  The First Interim Final Rule further made clear that PPP loans can be sold into a secondary market.  First Interim Final Rule Section 4(c).  Thus, both Congress and the SBA Administrator have concluded that the PPP program was a loan and loan guarantee program.  This Court should afford deference to the conclusions of Congress and the SBA rather than adopt the construction of the PPP offered in litigation by Plaintiff.

Beyond that, even if Plaintiff were correct that the PPP provides "grants" and not loans or loan guarantees, the PPP still would not fall within the scope of section 525(a). The proper question is not whether the PPP is a grant, but whether it is a grant "similar to a license, permit, charter, [or] franchise." 11. U.S.C. § 525(a). Notably, the plaintiffs in *Goldrich*, *Watts*, *Ayes*, and *Toth* (discussed *supra* at 15-16), all attempted to make a similar argument that the loan program at issue constituted a "grant." But these courts rejected such a framing, explaining that even if the loan program at issue was considered a "grant," it was not a grant similar to "a license, permit, charter, [or] franchise." *See, e.g.*, *Goldrich*, 771 F.2d at 30 ("A credit guarantee is not a license, permit, charter or franchise; nor is it in any way similar to those grants."); *Watts*, 876 F.2d at 1093 ("[A] HEMAP loan simply is not a 'license, permit, charter, franchise or other similar grant.' Indeed, it seems perfectly clear that the items enumerated are in the nature of indicia of authority from a governmental unit to the authorized person to pursue some endeavor."). The Third Circuit in *Ayes* explained this conclusion is further supported by the fact that the rest of section 525(a)'s text refers to discrimination in the *employment* context:

> Unfortunately for Appellants, the veteran guaranty entitlement bears no such resemblance to the items listed in § 525(a). Licenses, permits, charters, and franchises are all governmental authorization that typically permit an individual to pursue some occupation or endeavor aimed at economic betterment. For example, governmental entities issue real-estate, driver's, and medical licenses; building and business permits; corporate charters; and utility franchises. All of these implicate "government's role as a gatekeeper in determining who may pursue certain livelihoods," and show that Congress intended § 525(a)'s protections to be 'limited to situations sufficiently similar to *Perez*." *This interpretation of "other similar grant" is supported by the remainder of § 525(a), which forbids governmental discrimination in employment decisions based on an individual's discharge in bankruptcy*.

473 F.3d at 108-09 (emphasis added).

Finally, the decision of the Second Circuit in *In re Stoltz* does not compel a different result.  In *In re Stoltz*, 315 F.3d 80 (2d Cir. 2002), the Second Circuit held that the public housing *lease* at issue fell within the contours of section 525(a).  But nothing in *Stoltz* suggests that the Second Circuit was receding from well-established case law developed above that *government loan programs and extensions of credit* are outside the contours of section 525(a).  In particular, in *Stoltz*, the court noted that Congress had extended the anti-discrimination protections to certain student loan programs in section 525(c), but nowhere recedes from its previous holding in *Goldrich* that section 525(a) does not apply to "extensions of credit."  315 F.3d at 86 n.2.  The Court in *Stoltz* defined the subsidized housing lease as a "grant" because it found that the lease was a "property interest."  *Id*. at 89-90.  A public housing lease, like a "license, permit, charter, or franchise" obtained from a governmental unit, is a "grant" of a property right for "essential services," *i.e.*, housing.  "An individual qualifies for public housing because he or she cannot afford housing at prevailing market rates."  *Id*. at 90.  The *Stoltz* court extended Section 525(a) to a public housing lease because that section was intended to protect debtors against discrimination by governmental units that provide "property interests," such as a lease, for "essential services," such as housing and are akin to a driver's license, a real estate license or a transcript.  The loan programs and extensions of credit, such as PPP, are not property interests, are excluded from the reach of Section 525 under *Goldrich*, and are therefore distinguishable from the public housing lease that was at issue and determined to be "a similar grant" in *Stoltz*.  Likewise, Plaintiff's contention that the Court should analogize the PPP to the lease at issue in *Stoltz* because the generous terms of the PPP would not be available in private credit markets also misfires.  The question is not whether or not an entity could obtain the government benefit at issue in the private market, but rather whether the government program at issue plays the role of a gatekeeper

in a manner similar to the driver's license at issue in *Perez*.  The record in this case makes clear

that the PPP in no way prevents Plaintiff from obtaining credit from other parties.  Nor has

Plaintiff established any basis in the record to contend that the PPP somehow impacted the

availability of loans in the private market at all, much less to the extent of making it the

equivalent to a gatekeeper function.

For all of these reasons, Plaintiff has not established a likelihood of success on its claims

under Section 525(a).

### C.      Plaintiff's APA Claims Will Fail

1.      <u>The Bankruptcy Court Lacks Authority to Adjudicate the Validity of Agency Rulemaking.</u>

Although bankruptcy courts have jurisdiction pursuant to 28 U.S.C. §1334(b) to hear

matters that are related to a case arising under Chapter 11, they possess authority only to enter

findings of fact and conclusions of law if the matters being heard are non-core proceedings.  28

U.S.C. § 157(c)(1).  "[B]ankruptcy judges do not enter final orders or judgments in non-core

proceedings.  Rather, they submit proposed findings of fact and conclusions of law to the district

court, which enters final orders and judgments after de novo review.  *Arellano v. Montoya (In re

Arellano)*, 2007 WL 1746246, *4, No. 07-ap-1024 (Bankr. D. N.M. June 14, 2007); *accord ADT

Sec. Servs., Inc. v. Firstline Sec., Inc.*, 2008 WL 5226376, *3, No. 08-cv-00466 (D. Colo. Dec.

12, 2008).  Core matters are defined in 28 U.S.C. § 157(b)(2).  Non-core proceedings are those

that do not depend on the bankruptcy laws for their existence and that could proceed in another

court even in the absence of bankruptcy.

Plaintiff's APA claims do not arise in or under Title 11, but rather arise from the

Plaintiff's assertion that the SBA lacked rulemaking authority here because, Plaintiff argues, the

CARES Act prohibits it.  As such, the Bankruptcy Court may, at most issue findings of fact and

conclusions of law, which must then be reviewed by the District Court before any order may be

entered.  This Court thus lacks jurisdiction to award injunctive relief on the APA claims.

*Aimtree Co. v. AT & T Corp. (In re Aimtree Co.)*, 202 B.R. 154, 156 (D. Kan. 1996) (noting

"bankruptcy court lacked statutory authority to enter an injunction in this 'non-core'

proceeding").

> Moreover, the United States does not consent to this Court's entry of a final order on

Plaintiff's APA or mandamus claims, which exceed the Court's Constitutional authority as an

Article I court.  Under the Supreme Court's decision in *Stern v. Marshall*, 564 U.S. 462 (2011),

this Court lacks the constitutional authority to issue any final order on Plaintiff's APA or

mandamus claims because they seek adjudication of private law claims to augment the estate

and, because SBA has not filed claims in this case, are not compulsory counterclaims that must

be adjudicated in the claims resolution process.  *Id.* at 499; s*ee also In re Millennium Lab*

*Holdings II, LLC*, 945 F.3d 126, 134 (3d Cir. 2019).  The Court's lack of Constitutional authority

is particularly apparent here where Plaintiff asks the Court to arrogate the Congressionally-

granted authority of an Article I federal agency, the SBA, to interpret and implement the section

7(a) loan guarantee program.  Accordingly, any request by Plaintiff for a final order on either its

APA or its mandamus claim should be rejected.

> 2.    The Bankruptcy Exclusion is Authorized by Explicit Rules and Congress
> Delegated the Administrator Broad Discretion to Issue Those Rules.

> Plaintiff is also unlikely to succeed on its claim that the SBA exceeded statutory authority

because the claim lacks any merit.  Plaintiff appears to contend that the bankruptcy exclusion

from the PPP must be unlawful because it is not specifically described in the CARES Act.  But

the fact that the CARES Act is silent on bankruptcy ineligibility[4] is far from dispositive.  The

Court instead "reviews the interpretation of statutes the [Administrator] is entrusted to administer

under the principles articulated in *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837 (1984)."

*Comanche Nation of Okla. v. Zinke*, 754 Fed. Appx. 768, 772-73 (10th Cir 2018).  "Unless

Congress has directly spoken to the precise question at issue, we ask only whether the agency's

answer is based on a permissible construction of the statute."  *Id.* at 773 (internal quotations

marks omitted).  The agency's interpretation then receives "controlling weight unless it is

arbitrary, capricious, or manifestly contrary to the statute."  *Id.*  "If Congress has explicitly left a

gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a

specific provision of the statute by regulation. . . . Sometimes the legislative delegation to an

agency on a particular question is implicit rather than explicit.  In such a case, a court may not

substitute its own construction of a statutory provision for a reasonable interpretation made by

the administrator of an agency."  *Harbert v. Healthcare Servs. Group, Inc.*, 391 F.3d 1140, 1147

(10th Cir. 2004) (quoting *Chevron*, 467 U.S. at 843-44).

 The SBA was delegated broad authority to implement its lending programs and the

bankruptcy exclusion falls within this authority.  The SBA Administrator is explicitly

empowered to "make such rules and regulations as [she] deems necessary to carry out the

authority vested in [her]," and in addition to "take any and all actions … [that] [she] determines .

. . are necessary or desirable in making . . . loans."  15 U.S.C. § 634(b)(6), (7).  The CARES Act

did not amend or otherwise limit this authority.  Instead, Congress explicitly placed the PPP

within the section 7(a) lending program, thus vesting the Administrator with broad discretion

---

[4] The PPP Application Form includes other limitations not specifically addressed in the CARES
Act.  For instance, the PPP excludes entities that have been debarred from federal programs.

23

over the PPP.  Indeed, rather than curtailing the Administrator's discretion over the PPP, the
CARES Act expanded it, by giving the Administrator authority to issue new regulations and
rules to implement the PPP without complying with typical notice and comment requirements.
CARES Act § 1114.

The Administrator exercised this explicit delegation of authority to issue two rules
addressing the bankruptcy exclusion.  The First Interim Final Rule incorporated the PPP
application form and the bankruptcy exclusion provided on that form.  First Interim Final Rule at
20815.  The Fourth Interim Final Rule further addresses ineligibility of entities in active
bankruptcy and describes the policy reasons animating that agency decision. Fourth Interim Rule
at 23451.  Issuing these rules was well within the authority Congress delegated to the SBA.

First, nothing in the CARES Act precludes excluding bankrupt entities from the PPP; the
law instead gives the Administrator broad discretion.  Second, the CARES Act builds upon
section 7(a) lending program, which explicitly considers the borrower's bankruptcy history to
ensure that loans be of "sound value . . . as reasonably to assure repayment."  15 U.S.C.
636(a)(6); SBA Form 1919 (Questions 6 and 24, considering whether applicant, its owners,
affiliates or any business controlled by applicants principals have "ever" been in bankruptcy).

The bankruptcy exclusion in the PPP stems from these pre-existing section 7(a)
requirements.  The pre-existing bankruptcy questions of section 7(a) were "streamlined" for the
PPP to meet SBA's determination that PPP loans must be processed "expeditiously."  First
Interim Final Rule at 20811.  To streamline the processing, the SBA eliminated the requirement
to perform individual credit review for each PPP loan, as with other 7(a) loans.  Instead, the PPP
program imposed a bright line rule to exclude those in bankruptcy through its official application
form.

This streamlining of the consideration of bankruptcy status through the PPP application form is wholly within the SBA's delegated discretion. The CARES Act did not amend the "shall" requirement in 15 U.S.C. § 636(a)(6) that loans be of "sound value." The CARES Act instead explicitly left that provision unaltered, along with Section 7(a) lending procedures more broadly, except where specifically altered. CARES Act § 1102(a)(2) (providing that "[e]xcept as otherwise provided in this paragraph, the Administrator may guarantee covered loans under the same terms, conditions, and processes as a loan made under this subsection."); 15 U.S.C. § 636(a)(36)(B). The bankruptcy exclusion reasonably reconciles the "shall" requirement concerning the sound value of loan-making under 15 U.S.C. § 636(a)(6) with the obligation to expeditiously process CARES Act PPP loans by replacing the case-by-case consideration of bankruptcy history with a bright line rule on the application form.

Plaintiff asks this court to impose its own preferred solution to these statutory requirements. But Congress delegated the SBA authority to implement the PPP, and otherwise gave the SBA broad discretion over its lending programs. The Court must defer to that discretion. *See Harbert*, 391 F.3d at 1147 ("[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator.").

**D.    Plaintiff's Claim for Mandamus Will Fail Because Congress Delegated Discretion to Implement the PPP.**

"Mandamus relief is an appropriate remedy to compel an administrative agency to act where it has failed to perform a nondiscretionary, ministerial duty." *Marathon Oil Co. v. Lujan*, 937 F.2d 498, 500 (10th Cir. 1991). However, "the remedy of mandamus is a drastic one, to be invoked only in extraordinary circumstances." *Wilder v. Prokop*, 846 F.2d 613, 620 (10th Cir. 1988) (citations omitted). The Court, in evaluating a writ of mandamus action, must consider three prerequisites before exercising its discretion in determining whether to issue the writ: (1) plaintiffs

25

must have "a clear right to relief," (2) the Defendants' "duty to perform the act in question is plainly defined and peremptory," as well as non-discretionary and ministerial, and (3) plaintiffs have "no other adequate remedy." *Schoenrogge v. Rooney*, 255 F. App'x 324, 325-26 (10th Cir. 2007) (citing *Rios v. Ziglar*, 398 F.3d 1201, 1206 (10th Cir. 2005)). Further, "[g]eneral claims of agency overreaching are simply insufficient to create a legal duty under the Mandamus Act." *Dunn-McCampbell Royalty Interest, Inc. v. National Park Service*, 112 F.3d 1283, 1288 (10th Cir. 1997).

Plaintiff has not even attempted to establish any of these elements and thus cannot demonstrate entitlement to the drastic remedy of mandamus. Moreover, implementing the PPP is far from a ministerial, non-discretionary act. The CARES Act, for instance, does not describe the application form or process in any detail. Congress instead created the PPP through the existing section 7(a) lending program, over which the Administrator has broad discretion. *See supra* at 3-8. Congress then gave the Administrator emergency rule making authority to implement the PPP. *Id*. This discretion delegated by Congress defeats any claim to mandamus.

## III.   PLAINTIFF HAS NOT ESTABLISHED IRREPARABLE HARM.

Plaintiff fails to allege facts demonstrating that it would be irreparably injured by Defendants' actions in the absence of prospective injunctive relief. Instead Plaintiff alleges only the barest conclusory statements. This does not suffice.

"A showing of irreparable harm is perhaps considered the single most important requirement in satisfying the standard." *Shady v. Tyson*, F. Supp. 2d 102, 105 (S.D.N.Y. 1998); *see also Reuters Ltd. v. United Press Int'l. Inc*., 903 F.2d 904, 907 (2d Cir. 1990) (recognizing that "irreparable harm is the single most important prerequisite for the issuance of a preliminary, injunction"). "The applicant must establish more than a mere 'possibility' of irreparable harm." *Shady*, 5 F. Supp. 2d at 105. Rather, he must show that irreparable harm is "likely" to occur. *Id*.

In other words, "[t]o constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003).  "Irreparable harm is not harm that is 'merely serious or substantial.'" *Id.* at 1189 (quoting *Prairie Band,* 253 F.3d at 1250 and *A.O. Smith Corp. v. FTC,* 530 F.2d 515, 525 (3d Cir.1976)).  "The party seeking injunctive relief must show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm."  *Id.* (quoting *Prairie Band* at 1250). "It is also well settled that simple economic loss usually does not, in and of itself, constitute irreparable harm."  *Id.* (citing 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2948.1, at 152–53 (2d ed.1995)).

Plaintiff does not even make a serious attempt in its pleadings to demonstrate the consequences to Plaintiff if an injunction is denied.  Rather, Plaintiff's Motion simply asserts that its injury is "irreparable" because the PPP may be depleted of funding in a matter of days.  Pl.'s Mot. at 17.  But simply stating that the PPP may run out of money is not sufficient to meet Plaintiff's burden.  Plaintiff does not explain how failure to get a PPP loan will impact the bankruptcy estate or alter the Chapter 11 administration, nor does Plaintiff explain why that effect is irreparably harmful.  At a minimum, Plaintiff needs to flesh out these allegations beyond a one-sentence summary statement.  Moreover, in the underlying bankruptcy, Organic Power, LLC has not filed operations reports since January 2020.  Accordingly, the Court is currently in no position to consider Plaintiff's proposed Plan and there is no basis for the Court to evaluate whether or not Plaintiff will be irreparably harmed.  Thus, in short, even if Plaintiff can prove the assertions it has made, those assertions do not come close to demonstrating irreparable harm.

## IV.     THE PUBLIC INTEREST WEIGHS AGAINST ENJOINING THE SBA.

Finally, to obtain a temporary restraining order in a case against the United States, Plaintiff must show that the sweeping injunction they seek would be in the public interest. *Nken*,

556 U.S. at 435.  Plaintiff cannot make that showing for at least three reasons: (1) the resolution

of complex and competing policy interests at stake in administering the PPP is best left to

Congress and the SBA; (2) the SBA has already determined that it should apply eligibility

restrictions contrary to those Plaintiff prefer when administering the PPP and Congress has

determined that the SBA's implementation of the PPP should not be subject to injunction; and

(3) the relief Plaintiff seeks has "potentially unknowable effects." *Profiles, Inc. v. Bank of Am.*

*Corp.*, 2020 WL 1849710, at *11 (D. Md. Apr. 13, 2020).

First, if granted, Plaintiff's proposed injunction would short-circuit the rapidly-evolving

political and administrative landscape of responding to COVID-19.  During this unprecedented

situation, the public interest is best served by permitting the SBA to carry out the duties

Congress assigned it, namely ensuring the swift flow of loan guarantees that Congress has

deemed essential to protecting small businesses and the overall economy, in accordance with the

law.  As one court has already observed, "given the competing policy interests, the need to

balance the desire to assist the widest swath of small businesses with the need to incentivize

lender participation, and the overall fluidity of this epidemic, Congress is better positioned to

remedy any defects in the CARES Act, and to pass the supplemental legislation it believes best

aimed at ameliorating the effects of the COVID-19 crisis." *Profiles*, 2020 WL 1894970 at *12.

In short, Plaintiff's TRO "may undermine Congress's goal to maximize relief for American

small businesses" and therefore run directly counter to the public interest. *Profiles,* at *11; *see*

*Am. Ass'n of Political Consultants v. SBA*, 2020 WL 1935525, at *7 (D.D.C. Apr. 21, 2020)

(denying a TRO motion seeking to overturn the prohibition on political or lobbying groups from

receiving section 7(a) loans).

28

Second, imposing Plaintiff's requested injunction would reverse the SBA's stated policy preference, which Congress chose to make immune from injunction. The SBA has a clear policy to exclude bankrupt entities from PPP lending because such lending "would present an unacceptably high risk of an unauthorized use of funds or non-repayment of unforgiven loans." Fourth Interim Final Rule at 23451. The Plaintiff wishes to replace this judgment with its own policy preference. But, as explained above, Congress chose to empower the SBA to implement the PPP, thus its policy carries the force of law. Congress also chose to immunize the SBA from injunctive relief. Issuing an injunction here would run directly against that public policy, which provides further proof that the balance of the equities must be struck in the Government's favor. Thus, issuing the injunction Plaintiff seeks would represent precisely the sort of interference with Defendants' statutory obligations that runs contrary to the public interest.

Third, as another court has already explained, the broad injunctive relief Plaintiff seeks could "have consequences reaching far beyond the litigants in this particular case." *Profiles, Inc.*, 2020 WL 1849710, at *11. Its impacts would cost "valuable time" for both Congress and Defendants to effectively respond to changing circumstances and for small businesses applying for current or potential future PPP loans to receive funds. *Id.* In short, a temporary restraining order here would throw a wrench into policymakers' evolving responses to the pandemic's economic fallout and would adversely affect thousands of small businesses that need help now. In these circumstances, "[t]he proper balance between the competing and compelling public interests implicated in this incredibly complex situation must be struck by the legislative branch." *Id.* at *4. Under these unprecedented circumstances, the Court should strike the balance in the Government's favor and deny Plaintiff's unprecedented requests for a temporary restraining order.

29

## V.   PLAINTIFF MAY NOT SEEK RELIEF ON BEHALF OF OTHERS.

Plaintiff seeks relief that potentially impacts all PPP applicants.  But, even if Plaintiff were entitled to relief -- it is not -- Plaintiff lacks standing to seek an injunction on behalf of others.  *See Gill v. Whitford*, 138 S. Ct. 1916 (2018) ("[A] plaintiff's remedy must be limited to the inadequacy that produced his injury in fact." (internal quotation marks omitted)) (rejecting standing for a statewide gerrymandering challenge because a plaintiff's remedy must be limited to his injury).

Further, "[i]t is well settled an injunction must be narrowly tailored to remedy the harm shown."  *Garrison v. Baker Hughes Oilfield Operations, Inc.*, 287 F.3d 955, 962 (10th Cir. 2002) (collecting cases).  The requested nationwide injunction goes far beyond the minimum necessary to preserve Plaintiff's claims until a final decision is entered on the merits, and thus should be denied.

## CONCLUSION

For the foregoing reasons, Plaintiff's request for a temporary restraining order or preliminary injunction should be denied.

Dated: May 4, 2020                    Respectfully submitted,

UNITED STATES OF AMERICA

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

*W. STEPEHEN MULDROW*
United States Attorney

*s/Rafael J. López-Rivera*
Rafael J. López-Rivera
Assistant United States Attorney
USDC-PR No. 221213
UNITED STATES ATTORNEY'S OFICE
Torre Chardón, Suite 1201

350 Carlos Chardón Street
San Juan, Puerto Rico 00918
Phone Number: (787)766-5656
Facsimile: (787)766-6219
rafael.j.lopez@usdoj.gov

Pedro Jaime López-Bergollo
Special Assistant US Attorney
USDC No. 231412
273 Ponce de León Ave., Suite 510
Plaza 273
San Juan, PR 00917-1930
Tel.: 787-766-5269
Email: pedro.lopez-bergollo@sba.gov

RUTH A. HARVEY
Director
MARGARET M. NEWELL
Assistant Director
MICHAEL TYE
Trial Attorney (G03112)
United States Department of Justice
Commercial Litigation Branch,
Civil Division
P.O. Box 875, Ben Franklin Station
Washington, DC 20044-0875
 (202) 305-2419
Michael.Tye@usdoj.gov