1

IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OREGON

In Re:                              )
                                    )   Lead Case No.
PPV, INC. AND                       )   19-34517-dwh11
BRAVO ENVIRONMENTAL NW, INC.,       )
                                    )   Case No. 19-34518-dwh11
            Debtors.                )
                                    )   Portland, Oregon
------------------------------- )   May 20, 2020
PPV, INC. AND BRAVO                 )   1:30 p.m.
ENVIRONMENTAL NW, INC.,             )
                                    )   Adv. Proc. 20-03054-dwh
            Plaintiffs,             )
     v.                             )
                                    )
U.S. SMALL BUSINESS                 )
ADMINISTRATION AND JOVITA           )
CARRANZA, SOLELY AS THE             )
ADMINISTRATOR OF THE U.S. SMALL     )
BUSINESS ADMINISTRATION,            )
                                    )
            Defendants.             )
------------------------------- )

TRANSCRIPT OF HEARING ON

(2) MOTION FOR TEMPORARY RESTRAINING ORDER
(4) MOTION TO EXPEDITE HEARING ON MOTION FOR TEMPORARY
RESTRAINING ORDER
(3) MOTION FOR PRELIMINARY INJUNCTION AND ORDER TO SHOW CAUSE.

BEFORE THE HONORABLE DAVID W. HERCHER

UNITED STATES BANKRUPTCY COURT


Transcription Services:            eScribers, LLC
                                   7227 North 16th Street
                                   Suite #207
                                   Phoenix, AZ 85020
                                   (973) 406-2250

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE

```
 1   APPEARANCES:

 2   For the Debtor:              CHRISTOPHER N. COYLE, ESQ.
                                  (TELEPHONICALLY)
 3                                DOUGLAS R. RICKS, ESQ.
                                  (TELEPHONICALLY)
 4                                VANDEN BOS & CHAPMAN LLP
                                  319 SW Washington Street
 5                                Suite 520
                                  Portland, OR 97204
 6
     For U.S. Small Business      KEVIN P. VANLANDINGHAM, ESQ.
 7   Administrator:               (TELEPHONICALLY)
                                  UNITED STATES DEPARTMENT OF
 8                                JUSTICE
                                  P.O. Box 875
 9                                Ben Franklin Station
                                  Washington, DC 20044
10
     For U.S. Small Business      KATHLEEN L. BICKERS, ESQ.
11   Administrator:               (TELEPHONICALLY)
                                  UNITED STATES ATTORNEY'S OFFICE
12                                1000 SW 3rd Avenue
                                  Suite 600
13                                Portland, OR 97204

14   For U.S. Small Business      WESLEY NELL, ESQ.
     Administration:              (TELEPHONICALLY)
15                                U.S. SMALL BUSINESS
                                  ADMINISTRATION
16

17

18

19

20

21

22

23

24

25
```

1           THE COURT:  Good afternoon.  This is Judge Hercher.

2   This is the time set for hearing in the adversary proceeding,

3   PPV, Inc. et al. v. Carranza, et al., 20-03054.

4           Is Christopher Coyle on the phone?

5           MR. COYLE:  Good afternoon, Your Honor.  Chris Coyle.

6           THE COURT:  Thank you.

7           Is Kathleen Bickers on the phone?

8           MS. BICKERS:  Yes, Your Honor.

9           THE COURT:  Thank you.  And Ms. Bickers, is there

10  other counsel for the Government who will be appearing today?

11          MS. BICKERS:  Yes, Your Honor.  And I will let them

12  speak and announce themselves.

13          THE COURT:  Very good.

14          MR. VANLANDINGHAM:  Thank you, Your Honor.  This is

15  Kevin VanLandingham from the Department of Justice here to

16  speak on behalf of the SBA and Ms. Carranza as its

17  administrator, today.

18          THE COURT:  Very good.

19          Anybody else?

20          MS. NELL:  Yes, Your Honor, this is Wesley Nell.  I'm

21  field counsel for the SBA.

22          THE COURT:  Very good.  Okay.  I have -- and is there

23  anybody else on the phone?

24          MR. RICKS:  Yes, Your Honor.

25          THE COURT:  Oh, I'm sorry.

1          MR. RICKS:  This is Doug Ricks for the debtor.

2          THE COURT:  Thank you.

3          MR. SULLIVAN:  Yes, Your Honor.  This is George

4   Sullivan.  I work for PPV and Bravo, the debtor.

5          THE COURT:  Thank you.  Anyone else?

6          I request that the non-lawyers -- Mr. Sullivan, put

7   your phone on mute.  And for the lawyers, please put your

8   phones on mute until I call on you.  And I'll certainly call

9   on everyone as to each issue.

10          So I have read the motion for the temporary

11   restraining order and the order to -- the motion for order to

12   show cause.  And I've read the Government's responses.  And

13   Mr. Coyle, I'll let you start.

14          MR. COYLE:  Thank you, Your Honor.  I'm going to let

15   Doug Ricks argue this.

16          THE COURT:  Oh, very good.

17          Mr. Ricks?

18          MR. RICKS:  Thank you, Your Honor.  I want to start

19   off by expressing appreciation for the Court hearing this on

20   an expedited basis.  As set out in our moving papers and the

21   complaint, this is an issue of real need for the debtor in its

22   reorganization efforts.  And the issues presented are probably

23   one of the hottest and most contentious issues to come out of

24   the COVID-19 pandemic, as it relates to bankruptcy

25   proceedings.

1       Having heard that the Court has read our briefing, I

2   won't set out a full-throated recitation of all the arguments

3   made therein.  I'll focus on what I think are the issues

4   raised in the Government's responding papers.  The Government

5   argues that this Court can't enter any sort of injunctive

6   relief because it's barred by sovereign immunity.  I think

7   that argument is without merit, Your Honor.

8       The Bankruptcy Code itself contains its own waiver of

9   sovereign immunity at Section 106 of the Bankruptcy Code.  It

10  expressly references claims under Section 525, which is one of

11  the exact claims asserted by the plaintiff in this adversary

12  proceeding.

13      I think the most considered approach I've seen on

14  this exact issue came out of a decision by the bankruptcy

15  court in Maine, expressly finding that the injunction in the

16  SBA statute is designed to protect the SBA from attachments of

17  its assets or interference in its internal workings.  This

18  requested temporary restraining order does no such thing.  It

19  simply asks that the Court order that the debtors be allowed

20  to submit an application for the Payment (sic) Protection

21  Program without having to make the statement about it being

22  involved in a bankruptcy proceeding.

23      This doesn't interfere with their internal workings

24  or jeopardize the SBA's assets.  It simply requires that it

25  deal with an application like it has done with countless other

1    applications that have been submitted under this program.

2              And just for the Court's reference, the case I'm

3    referring to that addressed this is the In re Penobscot Valley

4    Hospital.  It's a May 1, 2020 decision; Lexis cite is 2020

5    Bankr. LEXIS 1213.

6              So I think on the sovereign immunity front, I think

7    the Court is well within its power to issue injunctive relief

8    in favor of the plaintiffs and for the temporary restraining

9    order, as has been requested here, and it is not barred by

10   sovereign immunity when there's been a clear waiver of that in

11   the bankruptcy court (sic) itself.

12             The only potential challengeable issue I can think of

13   on that front is whether or not the SBA is a governmental

14   unit.  But I don't think there's been any serious contention

15   that the SBA is not a governmental unit.

16             Similarly, the Government argues that the Court does

17   not have jurisdiction to issue an injunction in this matter,

18   as requested in the form of a temporary restraining order.

19   Again, I think from the pleadings and from the relevant case

20   law, it's clear that the Section 525 claims plaintiffs have

21   asserted, those are core matters.  Claims related to the

22   Administrative Procedures Act, those are likely non-core, but

23   a finding that it is not core doesn't rob the Court of

24   jurisdiction to administer and hear those claims.  It simply

25   acts as a prohibition on the Court entering a final

1    disposition on the merits.  That's the heart of the Stern v.

2    Marshall decision.

3            And this, a temporary restraining order, is not a

4    final determination or adjudication on the merits.  We're

5    asking for preliminary relief, which this Court is adequately

6    disposed and has jurisdiction to hear and rule upon, just like

7    it would a discovery matter or any other pre-trial relief that

8    is requested.

9            The Government's made it clear that it doesn't

10   consent to a final order, and that's fine.  If we get to the

11   point of a final disposition on this, then the Court can make

12   findings and recommendations and submit that matter to the

13   district court for consideration and entry of an order on --

14   or a final judgment on.

15           The case that the Government cites where it indicates

16   the Court lacks jurisdiction to award injunctive relief is a

17   bankruptcy court decision from 1996, Aintree (ph.) Co. v. AT&T

18   Corporation.  I think the citation there is not exactly

19   correct.  I think that case actually went on to say that the

20   bankruptcy court needed to -- needed to make findings and

21   recommendations before an entry of a final injunction on a

22   non-core proceeding, but I think certainly the refresh from

23   the Supreme Court in the Stern v. Marshall decision makes it

24   clear the lines of decision there.

25           So with those preliminary matters, I think the Court

1    is not barred by sovereign immunity; it has jurisdiction to

2    issue a temporary restraining order; and that leads to the

3    question of whether it should.

4           And the plaintiffs maintain that the Court should do

5    so for the reasons set out in our memorandum and because this

6    request feeds all of the points that the Court should weigh in

7    deciding whether to issue a temporary restraining order.

8           When we're looking at likelihood of success on the

9    merits, the claims under Section 525 have three elements:

10   whether or not the actor is a governmental unit; whether or

11   not the refusal to issue a grant was solely because of the

12   bankruptcy filing; and a final question here would be whether

13   or not the Paycheck Protection Program is a grant sitting

14   within the rubric of Section 525 or it is not.

15          I think on the first two points, whether or not the

16   SBA is a governmental units, and whether or not the rejection

17   here was solely because of the bankruptcy filing, those

18   things, I don't believe are under serious contest.  The

19   question of whether or not this is a grant, I think we

20   adequately describe in our memorandum supporting the motion as

21   to why it is a grant rather than strictly a loan.

22          This is a program designed to provide funding to

23   small businesses to retain employees with a provision that any

24   such amounts provided would be forgiven, one hundred percent,

25   if they are spent on permitted expenses.  For the reasons set

Colloquy                                                                    9

1   out in the opinion from the bankruptcy court in New Mexico and

2   with regards -- and in the bankruptcy court in Maine that I

3   cited earlier, these decisions come down on the side that this

4   is not a loan, this is a grant program.

5          And most importantly, the decision-making process on

6   whether to advance funds isn't subject to any determination on

7   creditworthiness.  As we set out in our memorandum, the

8   threshold determination isn't a loan-making decision in the

9   slightest.  There's not an underwriting procedure.  There's

10  not personal guarantees sought.  There's not collateral

11  sought.  There's virtually no creditworthiness inquiry

12  whatsoever.  It relies on a certification that the debtor fits

13  the bill and funding is made.

14         There may be situations where a debtor uses the funds

15  for an unauthorized purpose and has to repay them, but that's

16  not dissimilar from other grant programs administered by the

17  government.

18         Certainly in the 525 context, there's been decisions

19  made on other government programs, for example, housing

20  programs, housing lending programs, where the government's

21  actions in denying someone access to that program because of a

22  prior bankruptcy filing, was found to be violative of Section

23  525.  And I think the same holds true here.

24         When turning to the claims under the administrative

25  procedures --

Colloquy                                                    10

1          THE COURT:  I'm sorry to interrupt you there.  I'm

2     sorry to interrupt you there.  But can you give me your

3     specific citations on the cases that you believe support the

4     notion that this would be a grant, subject to Section 525(a)?

5          MR. RICKS:  Certainly.  So I would cite to Rose v.

6     Connecticut Housing Authority; In re Rose 23 B.R. 662.  That

7     concluded that a state may not exempt debtors from a state-

8     sponsored home financing program solely because of bankruptcy.

9     Stoltz v. Brattleboro Housing Authority; that's 315 F.3d 80

10    (2d Cir. 2002).  That was an eviction case from a public

11    housing unit solely based on the failure to pay discharged

12    pre-petition rent debt.

13         And then again, I would turn to the Roman Catholic

14    Archdiocese case out of New Mexico that was recently decided

15    that's cited in the brief, and the Penobscot Valley Hospital

16    case that I referenced earlier, as all being indicative of why

17    this program is subject to 525's restriction on government

18    denying a grant due to a bankruptcy filing.

19         THE COURT:  Thank you.  Go ahead.

20         MR. RICKS:  Thank you, Your Honor.  Under the

21    Administrative Procedures Act, again, I think that what the --

22    what the Court should focus on in looking at the likelihood of

23    success on the merits is what did Congress actually do in the

24    CARES Act when it relates to bankruptcy.  The CARES Act

25    certainly has a specific section devoted to bankruptcy, where

Colloquy                                                              11

1    it expanded access to Subchapter 5 of Chapter 11 and made

2    other changes to the Bankruptcy Code.

3          And similarly, under Section 4003 of the CARES Act,

4    which is referenced in our memorandum in support, when dealing

5    with a loan program for entities with more than 500 but less

6    than 1,000 employees, the -- Congress specifically said that

7    bankruptcy debtors were ineligible to participate in that

8    program.

9          In looking at the text of the statute under the

10   Payment (sic) Protection Program, you find no such

11   restriction.  And the qualification standards are explicitly

12   set out, and they're relatively few:  an applicant must employ

13   less than 500 people; economic uncertainty must make the loan

14   necessary; the funds will be used for payroll and other

15   authorized uses; the applicant does not duplicative

16   application pending; and the applicant has not already

17   received a Payment (sic) Protection Program grant.

18         So I think when Congress speaks in one section and

19   they provide a restriction on bankruptcy debtors and doesn't

20   speak in the other section about a restriction on bankruptcy,

21   I think the Court should interpret that as being intentional,

22   that they intended to provide that level of restriction in one

23   area, and they did not in another.

24         And it is contrary to that Congressional authority

25   when a -- when an agency creates a new restriction that wasn't

Colloquy                                                                        12

1   within the bounds of the text of the statute itself.  And I

2   think that Congress' intent should be discerned by examining

3   the enactment in its entirety and not looking at things in

4   isolation; that misses the forest from the trees and colors

5   the interpretation of the statute in a way that provides

6   agency discretion where none exists.

7           The Payment (sic) Protection Program, looking at it

8   specifically, as I said before, does not contain any

9   creditworthiness rating or underwritings, and the proffered

10  explanation for the Government's restriction on the Payment

11  (sic) Protection Program, from debtors, is exactly that.  It

12  states that, well, we're worried that bankruptcy debtors won't

13  be able to pay this money back if it's used for improper

14  purposes, that it imposes a risk.

15          That seems to me, to be sort of a -- well, in the

16  words of the Roman Catholic Archdioceses decision, that seems

17  to be a completely frivolous argument.  Nowhere would there be

18  more scrutiny or tracking of what the payments were used for

19  than in a bankruptcy proceeding.

20          Again, as we indicated in the memo and as cited in

21  the opinion, the Chapter 11 system is a hundred-eyed Argus.

22  The funds can be simply segregated.  They can be accounted for

23  and subject to the Court's control and oversight by the United

24  States Trustee.

25          This simply doesn't have the same sort of oversight

Colloquy                                                                 13

1   that you would have for a nonbankruptcy debtor, where payments

2   could -- payments under the Payment (sic) Protection Program

3   could be used for all sorts of purposes and not be found out

4   until after the fact.

5           Having not done any creditworthiness investigation

6   before giving the grant, the government would be left in the

7   same sort of situation that it would be in a bankruptcy case.

8   The funds would have been used, and there would be little to

9   no recourse other than chasing down to try to recoup those

10  funds.

11          There could be secured creditors with liens on the

12  bank account where funds were advanced.  If a default happened

13  then the secured creditor could very easily use those funds to

14  repay its debt instead of having it used for the express

15  purpose that Congress intended, which is the payment of

16  payroll expenses.

17          Here, of course, the Court could make such a

18  determination that the funds were not subject to liens of

19  creditors and were otherwise protected and needed to be

20  accounted for.

21          So in summary, I think both on the 525 claims and the

22  APA-related claims, there's a likelihood of success on the

23  merits for the -- for those claims, by the plaintiffs, and

24  weigh in favor of granting a temporary restraining order.

25          Moving to the other elements, the irreparable harm

1    that's going to come from not granting a temporary restraining
2    order is pretty well recited.  I will highlight three points.
3    One is that the Payment (sic) Protection Program is a program
4    with limited funding that's done on a first-come-first-serve
5    basis.  Without getting its name in the hat and getting a
6    place in line, there's simply no assurance that the debtor
7    would be able to -- debtors would be able to access these
8    funds.

9          And it's got a limited duration.  It will expire on
10   June 30th unless otherwise extended.  And when the door
11   closes, there won't be any access; and waiting for a final
12   determination is simply not likely to occur before the
13   expiration of that time line.

14         On the third front, I would point out what the Court
15   has heard previously in hearings on this case concerning the
16   debtors' cash flow.  The debtors' cash flow is managed through
17   a revolving line of credit from its primary secured lender,
18   Crestmark Bank, that depends on having eligible accounts to
19   borrow against.  When the State of Washington closed down
20   construction operations and the State of Oregon issued its
21   stay-at-home order, construction activity in both states
22   pretty well ground to a halt if not entirely ground to a halt.

23         The economic stress from the COVID-19 pandemic placed
24   stress on the debtors' customers, making what would have been
25   an ordinary good-paying client into maybe a more shaky client.

1   This, in turn, impacts its ability to access cash and pay for

2   its basic necessity -- basic business expenses, such as

3   payroll, which if it's unable to access cash to do so, would

4   constitute an irreparable harm to the debtor in its

5   reorganization efforts.

6        On the final two points:  whether or not granting a

7   temporary restraining order is in the public interest and

8   balancing the equities here, we have a debtor with sixty

9   employees, within the bounds of the statutory targeted

10  audience for Payment (sic) Protection Program grants.  And it

11  seems to me that it meets the other standards that Congress

12  spelled out for beneficiaries of these funds.

13       Its only defect is one that wasn't spelled out by

14  Congress, which is that it's in bankruptcy.  Certainly

15  bankruptcy is not a place where reality dare not tread.  The

16  debtors' business, like many other businesses, have been

17  impacted by the COVID-19 crisis.  And Congress intended to use

18  these funds to help financially distressed business that have

19  been impacted by COVID-19.

20       It is certainly true that the debtors are two of

21  those business, and the public interest would support having

22  those funds be made available to the debtors and companies

23  similarly situated, in order to shore up their financial

24  resources and allow them to retain five dozen employees and

25  keep them employed.

Colloquy                                                              16

1          The fallout from a failed business like this is

2    obvious, that it would cause the lack of all those folks'

3    employment and greater costs to the State as those folks fall

4    under the unemployment rules or otherwise require assistance

5    to meet their basic needs.

6          Looking at it from the other perspective, the impact

7    to the government is very, very little.  It simply has to

8    process one more application for another debtor who -- for

9    another applicant who otherwise meets the standards set out in

10   the statute for obtaining this benefit, and it ostensibly gets

11   better protections in terms of oversight of the money and

12   insurance of compliance with the process, because it's got a

13   court actively involved in a case and monitoring the debtors'

14   finances.

15         So with that, I would say that the debtors and

16   plaintiffs have made a showing for issuance of a temporary

17   restraining order.  The Court's not barred from doing so.  And

18   we would ask for the Court to grant the motion for a temporary

19   restraining order and set the hearing on the order to show

20   cause.  Thank you, Your Honor.

21         THE COURT:  Thank you.

22         Mr. VanLandingham?

23         MR. VANLANDINGHAM:  Thank you, Your Honor.  Again,

24   this is Kevin VanLandingham from the DOJ, on behalf of the

25   defendants today.

1          I'd first like to thank you for allowing me to appear

2   telephonically on short notice here.  And I hope you'll let me

3   know if you have trouble hearing me.

4          I'd like to first start by noting some recent

5   developments.  I think it's no secret that cases raising these

6   issues are pending throughout the country.  I think there are

7   somewhere between forty and fifty cases like this being heard

8   in bankruptcy courts, largely, throughout the country.

9          Surprisingly, there's not yet been a decision

10  until -- in the Ninth Circuit, at least until this morning.

11  And so I'd like to draw your attention to that, in the Ninth

12  Circuit, in the bankruptcy court, in the Central District of

13  California this morning, in the case called NIA Capital,

14  Incorporated v. Carranza.  And that's number -- adversary

15  number 20-1051.

16         Judge Saltzman there denied a TRO on nearly identical

17  arguments that the plaintiff is raising here today.  And she

18  did so on the record, and we of course don't have that

19  transcript before us yet.  But we're getting that as soon as

20  we can.  And so that's a recent development.  That's, again,

21  the only decision we have in the Ninth Circuit.  There are a

22  number of pending cases, including this one.

23         The other major development is one of the cases

24  relied on by the plaintiff and really relied on by many of the

25  courts that have granted relief was this Hidalgo case out of

Colloquy                                                              18

1   the bankruptcy court in the Southern District of Texas.  And a
2   development there is that the Government sought -- after the
3   court granted a preliminary injunction in favor of the
4   plaintiff, the Government sought a stay pending appeal and
5   received that.  And that was on May 11th.  And the decision
6   there in Hidalgo County Emergency Services Foundation v.
7   Carranza, the number -- the district court number for the stay
8   order is 20-108.  And that's in the District Court in the
9   Southern District of Texas.

10          The order doesn't say a lot.  It's a summary order
11  saying that stay is granted.

12          The standard there to get a stay is basically the
13  opposite of a preliminary injunction, where we have to show a
14  likelihood of success on the merits and irreparable harm,
15  unless the stay is granted.  And again, raising nearly
16  identical arguments as raised here, or really identical
17  arguments, the district court granted a stay in the Hidalgo
18  case.

19          And the Hidalgo case was, again, referenced in many
20  decisions and is relied on heavily by especially the
21  bankruptcy court in the district of New Mexico in the Roman
22  Catholic Church case.  And so we're calling into question now
23  whether that ruling is going to survive appeal to the district
24  court.

25          So with that -- those recent developments, I'll get

Colloquy 19

1    to the main pieces of argument here. And I'd first like to

2    start briefly with the sovereign immunity issue, and then I'm

3    going to move to the merits. And I hope to convince Your

4    Honor that there's really no clear showing here of likelihood

5    of success on the merits.

6          I'm going to talk briefly about the claim under

7    Section 525 of the Bankruptcy Code -- I think that's a pretty

8    clear issue -- and then talk a little bit more about the APA

9    claim, and then finally end with the two other injunction

10   factors.

11         So beginning, again, with sovereign immunity, so we

12   can start with the defendants' position. There are basically

13   two courses that the courts have followed here. One is our

14   position and one is the position the plaintiff is suggesting

15   the Court follow.

16         So beginning with our position, and that follows the

17   plain language of the Small Business Act; and the Small

18   Business Act has a waiver of immunity. It allows the SBA to

19   be sued. But in clear, plain terms, it says "there shall be

20   no attachment, injunction, garnishment, or other similar

21   processes, mesne or final" -- and I had to look up "mesne", I

22   didn't know what that meant, but that means intermediate. So

23   that would apply here. So none of those things shall be

24   issued against the Agency or its property.

25         And if that clear language weren't enough, that clear

1    reading has been adopted by nearly every circuit that has

2    addressed the issue.  In the First Circuit, in a case called

3    Driscoll v. Adner (ph.); in the Fifth Circuit Enplanar v.

4    Marsh; in the Tenth Circuit in Mel's Lockers.  And those are

5    all cited in our brief.

6            The Tenth Circuit tells us why this is so.  The

7    language is too clear for misunderstanding.  There is no

8    waiver by Congress as to injunction suits.

9            So the plaintiff here raises another approach.  And

10   they raise it as was described in the In re Penobscot

11   decision.  And that's another one of these PPP challenges that

12   was recently decided in the bankruptcy court in Maine.  And

13   they were following a First Circuit case.  And so that's the

14   only circuit that has taken a different approach than the

15   plain-language approach adopted in these other cases.  And

16   that's the Ulstein decision that Penobscot is relying on.

17           And so in that decision it says well, sure, there's

18   no injunction except wherein the agency exceeds its authority,

19   and then maybe there's an exemption -- an exception for that.

20   But the Ulstein goes on to define what exactly that means,

21   because there has to be some limitation, or that exception

22   could end up swallowing the rule.  And the Ulstein court tells

23   us that its rule it's adopting is intended to keep creditors

24   or others from suing the government, from hindering or

25   obstructing Agency operations through mechanisms such as

Colloquy                                                       21

1  attachment of funds.

2          And it further says, "The no-injunction language

3  protects the agency from interference with its internal

4  workings by judicial orders attaching agency funds."

5          So again, this is not the majority position.  This is

6  the First Circuit's position.  It's not been adopted by the

7  Ninth Circuit.  I don't believe the Ninth Circuit has

8  addressed this at all.

9          But even under this standard, it says that the no-

10 injunction language protects the agency from interference with

11 its internal workings and from orders attaching agency funds.

12 And so the no-injunction language would continue to apply, in

13 that case.

14         And so we look to what the plaintiff is asking to do

15 here.  They're asking to alter the way the Agency is

16 processing the PPP loans, and they're asking for money to be

17 set aside to satisfy their loan application.

18         Now, what does the SBA do?  The core business of the

19 SBA is to extend loans.  And so if that's not interfering with

20 the internal workings of the Agency, I'm not sure what would

21 be.

22         And then asking the Agency to set aside funds, that's

23 really an attachment.  I don't know how you get around that.

24 So even under the Ulstein decision, which again, is not the

25 law of this circuit, that's the law of the First Circuit which

Colloquy                                                        22

1  the Penobscot decision was relying on -- so again, even under

2  that more relaxed standard, it doesn't apply here.

3          But again, I think the --

4          THE COURT:  Can I interrupt you for a second?  This

5  is --

6          MR. VANLANDINGHAM:  Sure.

7          THE COURT:  -- it's interesting.  The notion of

8  internal workings suggest that there's something other than

9  internal workings, such as external workings.  And what is

10 your theory on what external workings would be?  In other

11 words, under this -- under the language of that case, as you

12 read it, what would be subject to an injunction under that

13 theory?  In other words, what would be something that would be

14 external workings of the agency, rather than internal?

15         MR. VANLANDINGHAM:  That's a great question, Your

16 Honor.  And when you look -- you look for this in the

17 opinions, and you just don't see additional meat added there.

18 I can tell you what the Ulstein court was addressing when it

19 came up with this exception.  It was addressing a sort of one-

20 off contract that the SBA was entering with a contractor.  And

21 it barred a contractor from applying -- or from receiving that

22 contract.

23         And so perhaps that could be an external working of

24 the Agency.  It was hiring somebody to do some work for them.

25 That's not really the core of what the Agency does.  It's just

Colloquy                                                        23

1    kind of something it was doing in one particular instance, and

2    so there wasn't really a threat that, well, if we allow

3    somebody to enjoin this kind of thing, it's going to open up

4    the agency to plaintiffs trying to halt the core of their

5    work, which I think is what it -- exactly what would happen

6    here if we allow people to halt Agency making small business

7    loans.

8              Well, I'm not sure what the injunction -- the no-

9    injunction language would end up protecting if it doesn't

10   protect that.

11             THE COURT:  Thank you.  Go ahead.

12             MR. VANLANDINGHAM:  Thank you, Your Honor.  So again,

13   I -- so that's the Ulstein case.  That's the exemption.

14   Again, we're back to the plain language of the Small Business

15   Act.  There's really no ambiguity there to resolve, and that's

16   the standard most circuits have adopted.

17             Now, the plaintiff raised the Bankruptcy Code as a

18   possible other waiver.  And certainly the Bankruptcy Code has

19   a waiver, and that waiver covers 525 claims.  And so the

20   question is, does that waiver -- does that waiver overcome

21   this "no-injunction" language.

22             And 106(a)(4) answers this directly.  It says you

23   can't get relief that is barred by a law govern -- a

24   nonbankruptcy law governing the agency.  And so the

25   nonbankruptcy law governing the agency here is the Small

1    Business Act.  And it says you can't get injunctive relief.

2              So even under 106, that waiver doesn't give you an

3    additional grounds to get an injunction, because it says we

4    aren't giving you any more relief than you could otherwise

5    get.  And again, the 106 waiver would only go to the 525.  And

6    there's really -- plaintiff has not pointed to anything else

7    that would allow the Court to hear the APA claim.

8              So that's the sovereign immunity issue.  So I now

9    want to move to the merits.  I'm going to start with the 525

10   claim.  And I'm going to briefly address it, and I think it's

11   pretty clear.

12             Simply put, Section 525 just doesn't apply to the

13   PPP.  And how do we know that?  Well, one, we know it from the

14   plain language of Section 525.  We know it from the history of

15   that section.  And we know it from the case law of every

16   circuit that has addressed it.

17             So we start with the plain language of 525.  It says

18   a government unit cannot deny, revoke, suspend, or refuse to

19   renew a license, a permit, charter, franchise, or other

20   similar grant solely because such debtor is or has been a

21   debtor in bankruptcy.

22             So we know 525 covers four specific things:  license,

23   permit, charters, franchises.  And we know it covers grants

24   that are similar to those four things.  So the question is, is

25   the PPP similar to a license, permit, charter, or franchise?

1   And the answer is no.  And we know that for a few reasons.

2          First, we know that 525(a) doesn't apply to lending

3   programs.  And we know that specifically because Congress

4   amended 525 to add a subsection (c) in 1994.  And that

5   subsection contains the only reference to lending at all,

6   within 525.  And it applies only to a specific type of

7   government lending, and that's student loans.

8          So if 525(a) already covered subsidized government

9   lending programs, there would be no reason to add subsection

10   (c).  And if Congress really intended for subsection -- for

11   525(a) to cover all lending, it could have added to -- when it

12   was adding subsection (c), it could have added language to

13   address government-subsidized lending in general.  But it

14   didn't do that.  It only addressed student loans.

15          So that's one reason we know 525(a) doesn't apply.

16   Another reason is that the case law -- and this is very

17   clear -- it doesn't apply to subsidized loan programs.  So I'm

18   going to talk a bit more about what the -- sort of what the

19   PPP is, but basically it's a loan guarantee program.

20          An applicant applies for a bank for a loan.  The bank

21   then disburses the money to fund the loan.  And the SBA

22   guarantees that loan, and it sets aside funds allocated to

23   cover that loan.  If there's a default or forgiveness

24   conditions that are met, the SBA then pays the bank.  So it's

25   a loan guarantee program.

Colloquy                                                                    26

1          So have courts addressed whether 525 applies to

2    government loan guarantee programs?  Yes, they specifically

3    have.  And we cited a number of circuit decisions addressing

4    that.  There's the Watts (ph.) decision in the Third Circuit

5    addressing emergency home loans.  There's the Ayes decision in

6    the Fourth Circuit addressing veteran loan guarantee program.

7    There's the Toth in the Sixth Circuit addressing home loans.

8    And then one that's particularly important is the Goldrich

9    decision in the Second Circuit.  There they addressed student

10   lending programs -- and this was before the amendment was

11   added in 1994.

12         And so it's just addressing the basic language of

13   525(a), which was the same back then.  And the court held, "A

14   credit guarantee is not a license, permit, charter, or

15   franchise;" nor is similar to any of those grants.  "Had

16   Congress intended to extend this section to cover loans or

17   other forms of credit, it could have included some term that

18   would have supported such an extension."

19         And so we have, again, a clear -- a circuit court

20   speaking clearly to this issue.  And on the other side,

21   there's simply no authority.  There's no authority saying

22   otherwise, that in fact, 525(a) can extended to loan guarantee

23   programs.

24         And so the plaintiff is asking to extend this to a

25   new area of law.  And I just don't see how he could make a

Colloquy                                                          27

1   showing of likelihood of success on the merits when he can't

2   point to any controlling authority that says that you will

3   succeed when you're arguing instead, by analogy, to other

4   cases that perhaps this is more like -- perhaps more like --

5   and the plaintiff cited two cases here.  One was the In re

6   Stoltz decision in the Second Circuit.  And again, the

7   controlling law of the Second Circuit is that 525 doesn't

8   cover loan guarantee programs.  But the plaintiff cites to the

9   Stoltz decision, which was addressing public housing.

10         And the holding of that is you can't evict somebody

11   from a public housing unit based on their bankruptcy status.

12   I just don't see how that's comparable to getting a money loan

13   from the government.  And to say, yes, it is, is a pretty big

14   leap to make on a motion for TRO, to suggest a clear

15   likelihood of success on the merits.

16         The other --

17         THE COURT:  Let me ask you -- let me ask you:  the

18   circuit decisions you rely on have a common theme.  I think

19   several of them refer to this notion -- I don't have it in

20   front of me -- of a government acting as a gatekeeper for an

21   occupation or endeavor.  I believe that's a summary of the

22   language they use.  And I can see that argument.

23         How do you square that with public housing the Stoltz

24   case?  In the Stoltz case, that was later in time than the

25   Goldrich case; isn't that correct?

Colloquy                                                                    28

1          MR. VANLANDINGHAM:  That's correct, Your Honor.  But

2     Goldrich is still cited as controlling case law in the Second

3     Circuit.  But there is a sole case --

4          THE COURT:  But to the extent Stoltz -- I mean, you

5     have to square Stoltz with Goldrich in some fashion.  Or at

6     least you -- I guess what you're saying is that Goldrich still

7     is good law because Stoltz wasn't a loan decision, and

8     Goldrich says 525 doesn't apply to loans, period.  Is that

9     your argument?

10         MR. VANLANDINGHAM:  Yes, Your Honor.  And --

11         THE COURT:  Okay.

12         MR. VANLANDINGHAM:  -- I think there are other

13    reasons to distinguish Stoltz.  There, they were talking about

14    a protected grant, a property interest that the debtor there

15    had, which was a lease that they had -- a preexisting lease

16    prior to the bankruptcy.  And the Court called it a protected

17    grant.  And that was akin to a -- that was property interest

18    for essential services.

19         And here, the debtor obviously doesn't have a PPP

20    loan and has no property interest in it.  And it certainly has

21    no protected grant.  What they're asking for is merely the

22    opportunity to apply.  They have no guarantee that -- and

23    certainly no right to receive one.  They have, at most, an

24    ability to apply, is what they're asking for.  And so --

25         THE COURT:  So --

Colloquy                                                              29

1          MR. VANLANDINGHAM:  -- and again --

2          THE COURT:  -- in Stoltz -- and I'm going back to

3  your point that statutorily, in 525(a), one needs to point to

4  some similarity between the government action at issue and any

5  of the four enumerated permit, license, franchise, and so

6  forth.

7          So which would the public housing lease be similar to

8  in that case?

9          MR. VANLANDINGHAM:  Yeah, I think you can make

10  analogies both to a franchise -- if you think about different

11  franchises may include a lease within them.  And it's

12  basically an opportunity to engage in a certain type of

13  business.  And that -- and so this is an opportunity to engage

14  in public housing.  That might be similar to a franchise or

15  even similar to a license, in that there's -- a license is a

16  contract or it can be a contract.

17          And here, in Stoltz, there was a contract at issue, a

18  lease, and a property interest -- like a license could be a

19  property interest.

20          THE COURT:  Okay, I understand.  Thank you; go ahead.

21          MR. VANLANDINGHAM:  Okay.  And then I guess the last

22  point I -- oh, the plaintiff had also raised this Rose v.

23  Housing Authority case.  And that's a -- sort of decided on

24  similar lines as Stoltz.  That was another home -- guarantee

25  for a home lending program.  And that was from a bankruptcy

1  court in the District of Connecticut and distinguishable on

2  the same grounds.

3           The last point is -- and this is a point that the

4  plaintiff made in reference to a decision from the bankruptcy

5  court in New Mexico -- that while these are -- PPP is really

6  not a loan program at all; it's a grant program.

7           Well, first, that doesn't answer the question.  The

8  question is whether it's a grant that's similar to one of the

9  four things:  a permit, a license, a charter, or franchise.

10  But also, just concluding that it's a grant program isn't

11  correct.  And we know that for a few reasons.

12          We know the CARES Act itself describes it as a loan

13  program, consistently, throughout.  And it speaks in terms of

14  covered loans.  It creates an interest rate.  And there is a

15  promissory note that must be signed.

16          And when debtors in bankruptcy have sought these

17  loans, they had to obtain permission from the bankruptcy court

18  to obtain post-petition financing and give protections to the

19  lenders who would extend those loans.  That's because they are

20  loans.

21          Clearly the PPP are subsidized, much as many

22  government loan programs are subsidized.  And it has a

23  generous forgiveness option.  But that's not assured.  You

24  have to satisfy the conditions of spending seventy-five

25  percent of your payroll -- or of the PPP on payroll.  And some

Colloquy                                                    31

1    debtors will choose not to do that or be unable to do that.

2    But more importantly, Congress chose to implement this as a

3    loan program, and presumably for a reason, because it wanted

4    to give some incentive to use this money on payroll.  And

5    that's the method it chose to.  It would extend the loan.  You

6    could keep it as a loan if you wanted to and use it on other

7    covered -- other covered expenditures or mortgage or interest

8    on debt.  But it wanted to encourage you to spend it on

9    payroll.  And so it gave a generous forgiveness option.

10           And so to call this merely a grant would frustrate

11   that purpose that the Congress enacted to the CARES Act.

12           THE COURT:  Can I ask you a question here?  I know

13   that this whole -- the COVID epidemic is -- I'll say it --

14   I'll use the word we're not supposed to use -- unique.  It's

15   very difficult to compare it to anything else the nation has

16   experienced.  But we've experienced other national emergencies

17   before, such as weather-related emergencies.

18           Has Congress ever enacted a program of massive

19   support for, let's say, victims of natural disaster, and where

20   the funds are intended to be entirely or largely a grant, but

21   that Congress wanted to make sure they're spent for certain

22   purposes?  And if so, has Congress previously used the SBA as

23   a conduit or are there other modes which Congress has chosen

24   to have funds like that distributed?

25           MR. VANLANDINGHAM:  That's an excellent question.

Colloquy                                                                    32

1   And I have to say I just don't know whether it's ever been --

2   whether the SBA lending program has ever been used on a one-

3   off emergency basis like this.

4          And I can't think of any examples.  I'm just not

5   aware of whether that's been done before.  I know Congress has

6   responded with broad stimulus programs before, with the Jobs

7   Act after the great recession.  But I'm not sure whether there

8   was -- I believe that contained loan programs.  I don't know

9   how comparable, or how those were implemented.  So I don't --

10  I'm sorry, Your Honor, I just don't know the answer to that.

11         THE COURT:  Okay, thanks.  Go ahead.

12         MR. VANLANDINGHAM:  Um-hum.  So I now want to turn to

13  the APA claims.  And I'm going to start with kind of a basic

14  description of the PPP program.

15         So the CARES Act begins by created the Paycheck

16  Protection Program.  It's at the very head of the Act.  In the

17  PPP, Congress allocated about 660 billion dollars, now, for

18  SBA loan guarantees, for loans to small businesses affected by

19  the pandemic.

20         The PPP was created by amending an existing statute,

21  and that's, as Your Honor noted -- that's the 7(a) lending

22  program for the SBA.  And that's in 15 U.S.C. 636(a).

23         The CARES Act basically temporarily adds the PPP to

24  the Section 7(a) lending program.  In other words, the PPP is

25  now a part of 7(a).  It's now a 7(a) lending program.

1          The SBA has broad recognized authority over its

2    lending program.  I believe the Supreme Court said:  has

3    extraordinarily broad powers over its lending programs.

4    Congress knew that when it was creating the PPP and knew that

5    when it chose to put the program there, empowering the SBA to

6    implement the PPP with the SBA's broad powers.

7          But then Congress took it further, even still.  It

8    expanded upon those broad powers by giving the SBA the power

9    and also the responsibility to issue emergency rules and

10   regulations without the typical notice and comment that is

11   required in doing so.  And that's in Section 1114 of the CARES

12   Act.

13         So in other words, Congress wanted to empower the

14   administrator to adjust the PP Program, midstream, without

15   delays, to make this program happen -- to get the money out

16   there.

17         So we begin with the topic of --

18         THE COURT:  Let me just interrupt.  Sorry.  That

19   really just goes to the question of process, notice and

20   comment, as opposed to the preexisting limitations on

21   implementing regulations; isn't that correct?

22         MR. VANLANDINGHAM:  Well, I would say it does two

23   things.  So Congress knew the SBA had these broad powers.  And

24   it recognizes, at the top of the CARES Act in Section 1102(b),

25   that -- and it recognized that even within this PPP, the

1    typical -- except where it's specifically altering the

2    language of the Section 7(a) program, otherwise the same

3    terms, conditions and processes under the 7(a) program

4    continue to apply.

5              And the SBA has broad discretion over those

6    processes.  And I would say that in extending -- you're right,

7    it is a process question.  But extending emergency rule-making

8    powers, when Congress knew that the SBA had broad authority

9    over its lending program, is adding additional deference to

10   the SBA's authority over those programs.

11             So the CARES Act then goes on to amend Section 7(a)

12   in specific ways.  One way is by broadening the size

13   requirements.  And that's in 36(d).  In other ways, it opens

14   the programs up to nonprofit entities, where regulations had

15   specifically precluded that before.

16             But otherwise, the CARES Act tells us that the other

17   Section 7(a) terms, conditions, and processes, continue to

18   apply.  And one of those provisions of the existing 7(a)

19   conditions is the provision that says that loans must be of

20   sound value so as to reasonably assure repayment.  The CARES

21   Act did not amend that requirement, and that's a statutory

22   requirement in 15 U.S.C. 636(a)(6).

23             So that's the background of the CARES Act.  And so we

24   come to the plaintiffs' claims.  So plaintiff asserts two

25   claims under the APA.  One is that the Agency exceeded its

Colloquy                                                          35

1    authority under the CARES Act, and the other is that the

2    Agency acted in an arbitrary and capricious way.

3              Plaintiffs rely on a ready on the CARES Act that I

4    don't think is really tenable and doesn't really conform with

5    the principles of administrative law.  And so we start with

6    that.

7              Administrative law begins with the Chevron standard.

8    And Chevron tells us first we look to the language of Congress

9    and we ask if -- has Congress spoken directly to the precise

10   issue that's -- the precise question at issue?  If so, that

11   answers the question.  An agency can't act contrary to precise

12   language of Congress.

13             So now, do we have here precise language of Congress?

14   Well, the plaintiff doesn't really allege that.  They say

15   Congress didn't say anything about a bankruptcy exclusion.

16   And that's just not what Chevron tell us.  It says we look for

17   specific precise language.  And there's nothing here that says

18   that the SBA cannot consider bankruptcy.  That would be

19   precise language.

20             So the question -- the next question is well, is

21   there anything else specific in the CARES Act that would

22   preclude the SBA from considering bankruptcy status?  Well,

23   again, what does the CARES Act say?  It begins by saying that

24   the SBA may extend loans.  And that's in 1102(36) section (b).

25   That's right at the top of the provisions enacting the PPP.

Colloquy                                                      36

1       So again, SBA may extend loans.  Already delegating

2   discretion.  It doesn't say "shall extend loans".

3       Then it says it may do so subject to the terms,

4   conditions -- terms and conditions of the preexisting 7(a)

5   program.  And one condition of the 7(a) program is that loans

6   be of sound value.  And the CARES Act -- there's no provision

7   in the CARES Act addressing that.

8       And otherwise there's simply nothing in the CARES Act

9   addressing creditworthiness, addressing whether the loans must

10  be of sound value.  And so those provisions continue to apply.

11  And so the question is then, well, is the Agency's

12  interpretation of this statute, by implementing it in a way

13  that excluded bankrupt entities, is that reasonable?

14       So again, the PPP was placed in the 7(a) lending

15  program.  In the existing 7(a) lending program, the SBA

16  required banks to perform case-by-case underwriting.  And that

17  was, again, to satisfy the statutory requirement that loans be

18  of sound value.

19       One thing that was specifically considered under that

20  existing underwriting was whether a debtor had ever been in

21  bankruptcy.  And you'll see that on the official loan

22  application form that we attached.  And it specifically asks

23  about bankruptcy history.

24       Now, that didn't require an absolute prohibition on

25  bankrupt entities, but we know that from the declaration we

1    filed, that in fact, we can't think of any instance where a

2    7(a) loan had ever been extended to a debtor actively in

3    bankruptcy.  So under the traditional 7(a) lending program,

4    the banks performed this case-by-case underwriting, and they

5    considered bankruptcy history, as directed by the SBA.  And

6    they had time to do that.  They had time to make those case-

7    by-case underwriting decisions.

8           Here, where the SBA is guaranteeing more than a

9    million loans across the country in a short period of time,

10   there simply cannot be that traditional case-by-case

11   underwriting.  So how did the SBA seek to balance looking at

12   bankruptcy and the 7(a) -- the normal 7(a) program with the

13   need to guarantee vast quantities of loans across the country

14   quickly?  Well, the SBA did that by saying we're going to

15   exclude bankrupt entities.

16          And I know that the plaintiffs certainly don't agree

17   with that decision.  I think a lot of bankruptcy practitioners

18   would disagree with that policy.  But it's not arbitrary and

19   capricious.  This isn't the Agency saying I want to exclude my

20   arch-nemesis from the program, and he's in bankruptcy, so I'm

21   going to do that.  It's not doing something arbitrary like

22   that.

23          The Agency told us why it was doing it.  And that's

24   explained in the Fourth Interim Rule.  I think that we cited

25   the Cosi decision from the bankruptcy court in the District of

Colloquy 38

1   Delaware. I think he explained it very well, why this was a

2   reasonable decision, even if personally he didn't disagree --

3   he personally disagreed with it. He said there are

4   circumstances attendant to making loans to a debtor that do

5   not exist when dealing with a nondebtor. There is at least

6   the possibility here that PPP funds could go to uses that were

7   not intended by the CARES Act, for example, to a secured

8   lender, in the event of a post-loan default.

9        And similarly, bankrupt entities may be getting PPP

10   money for financial stresses that predate and are unrelated to

11   the pandemic that the CARES Act was not intended to address.

12        So again --

13        THE COURT: If I can interrupt you there.

14        MR. VANLANDINGHAM: Sure.

15        THE COURT: I agree with what you're saying, but I'd

16   be interested in your thoughts as to whether or not those

17   factors that are risks for bankruptcy debtors are relatively

18   greater for the body of bankruptcy debtors as opposed to the

19   body of nonbankruptcy borrowers. I mean, the notion --

20        MR. VANLANDINGHAM: Well that --

21        THE COURT: -- that the proper -- the money could be

22   used for purposes of paying a secured creditor, or it could be

23   taken involuntarily by a secured creditor, or that there's

24   preexisting financial stress, what is the logic behind

25   assuming that that risk is greater for the bankruptcy borrower

1     community than the rest of the borrower community?

2              MR. VANLANDINGHAM:  So again, Your Honor, Chevron

3     tells us not to substitute our judgment for the Agency's.  So

4     I'd first start there.

5              Certainly, we can think about all the protections

6     that a bankruptcy court might afford a debtor and the

7     protections it could extend to a lender to that debtor, with

8     post-petition financing.  But the Agency has chosen to make a

9     different decision, and based on its own policy decisions.

10             And so if we're talking about weighing those policy

11    decisions, Chevron says that's not our goal.  Our goal is to

12    decide whether it's arbitrary.  And the bankruptcy court here

13    in Delaware is saying well, it's at least theoretical that --

14    or I can think of instances where if you're extending a loan

15    to a creditor who has liens against all of its assets, where

16    if the -- those funds aren't used for payroll, where the

17    Agency would be unable to recover that.  That's certainly a

18    thing that could happen.  And that's a reasonable decision

19    to -- a reasonable basis not to extend these loans to a debtor

20    in bankruptcy.  And that's what the District of Delaware is

21    saying.

22             Now, their people may think that --

23             THE COURT:  Let me just interrupt you there.  I guess

24    I'm trying to figure out the logic there.  Implicit in that --

25    I guess I don't have the Cosi decision in front of me --

1   implicit in that has to be the notion that a company in

2   bankruptcy is more likely to have preexisting liens against

3   it, otherwise the logic -- there's no logic to separating the

4   bankruptcy borrower community from the rest of the borrower

5   community.  Am I -- is that correct?

6           MR. VANLANDINGHAM:  Well, I understand your

7   reasoning, Your Honor, but again, we're talking about

8   basically the wisdom of the policy, whether it's logical --

9           THE COURT:  So yeah, so I'm sorry to interrupt you.

10  And I concede, you probably can guess that I and many

11  bankruptcy practitioners are relatively new to administrative

12  law.  But doesn't there a basis -- foundationally, have to be

13  at least a logic to the policy decision?

14          In other words, if the Agency says your hair is blue,

15  therefore you can't get a loan, there's no logical connection.

16  Now, to say that somebody's in bankruptcy, there's the

17  implicit judgment that you've been irresponsible with your

18  financial affairs, and therefore you're in bankruptcy, is that

19  what we're supposed to rely on?

20          Because the notion of preexisting liens being

21  justification or a logic for it really collapses when you look

22  at the language of the Bankruptcy Code.  Section -- I can't

23  remember my sections now -- but the preexisting liens,

24  especially with post-petition financing do not automatically

25  attach in bankruptcy, whereas they do attach -- automatically

Colloquy                                                              41

 1    attach outside of bankruptcy.  So it's hard for me to come up

 2    with even a kind of a low-level logic to the -- to the

 3    distinction, unless it is that people who end up in bankruptcy

 4    are just irresponsible and let themselves get into this

 5    situation.

 6           And maybe that's good enough.  Is that your position

 7    or is there more to it?

 8           MR. VANLANDINGHAM:  Well, Your Honor, I would -- what

 9    I would say, is I would go back to what Chevron directs us to

10    do.  And if we're talking about -- really, if we're talking

11    about whether this decision is wise or not, we would have to

12    get into things like, well, is a debtor more likely -- is this

13    more money more likely to be repaid from a nondebtor and a

14    debtor?  And you would have to consider it would be a factual

15    issue.  And you would have to consider there would be whole

16    bodies of study on the likelihood of debtors reorganizing and

17    then the likelihood of a post-petition financer being

18    protected.

19           And if we're going down that route, we're simply

20    going beyond what Chevron requires.  And I think the example

21    Your Honor gave of whether excluding a blue-haired person from

22    a loan, that's precisely right.  There's no -- you can't at

23    all say there's any reasonable basis for that.  That's

24    arbitrary and capricious.

25           But where if we're asking questions like, well,

Colloquy                                                      42

 1    whether this risk is greater for a nondebtor or a debtor, then
 2    we're entering the realm of policy-making.
 3          There's no allegation here that this is done in bad
 4    faith.  It was simply the SBA's decision that it was going to
 5    prioritize nondebtors to debtors.  And it did so for policy
 6    reasons that Chevron is instructing us not to delve into to
 7    decide whether those are correct or not, just whether it was
 8    arbitrary or not.  And it's simply not arbitrary.
 9          Now, I can think of a whole host of things -- whole
10    host of reasons why that might be a wise decision.  One thing
11    is, while there are protections a court can give you in the
12    bankruptcy sphere, the SBA is extending millions of loans, and
13    they simply require the SBA a type of post-petition financer
14    in every small business bankruptcy in America.  And so those
15    protections are a conundrum as much as a protection, having to
16    enter every single bankruptcy action to protect its interests.
17          Another thing -- and Your Honor is aware of this --
18    is that post-petition lenders have an extraordinary amount of
19    leverage, and they can negotiate extraordinary guarantees.
20    They SBA wouldn't have that here, because they would be, in
21    essence, being forced to be a post-petition financer over its
22    stated preference not to be.  And so it would get the
23    protections that the debtor and the bankruptcy court would
24    extend it, and it wouldn't have the leverage that a
25    traditional post-petition finance lender would have.

1          But again, all of these things are really policy
2    concerns that we would have to, I guess, sit down and write a
3    White Paper about the probabilities of reorganizing and
4    everything else.  But that's not what Chevron tells us to do.
5    It simply says:  is there a reasonable basis; is there a basis
6    for a decision that isn't arbitrary?  And there is a basis.
7    And the Fourth Interim Rule describes it, and this is what the
8    District of Delaware is saying, that you can't dismiss those
9    out-of-hand.  You can't say that there's no risk of error and
10   you can't say that there's -- that it's irrational to want to
11   prioritize nondebtors to debtors.

12         And so simply, the Court has no power to replace its
13   reasoning, its policy, for the policy of the SBA.  So whether
14   or not we agree with that decision, the question is:  did the
15   SBA have that authority and did it act capriciously?  And I
16   just don't see that there's any way that we could say that
17   this is a capricious law, just a decision, perhaps, a lot of
18   bankrupt debtors don't agree with.

19         THE COURT:  Thank you.  Go ahead.

20         MR. VANLANDINGHAM:  Okay.  So I also want to
21   address -- the plaintiff raised an argument under -- an
22   argument that the language of CARES Act should prevent the SBA
23   from considering bankruptcy status.  It cited Section 403 of
24   the CARES Act.

25         And so if we look at Section 403 -- and the CARES Act

1 does a lot of things. It extends small business loans through

2 the PPP; it expands access to bankruptcy; it expands

3 unemployment benefits; it expands access to medical supplies;

4 access to Medicare and Medicaid. And it ends with Title IV,

5 which is an economic support program overseen by the

6 Department of Treasury. And that's where this Section 403

7 falls in. That part of the CARES Act is titled as a separate

8 act. It's titled the Coronavirus Economic Stabilization Act

9 of 2020.

10 And in that act, the Congress is creating a new law,

11 whereas through the PPP Congress was amending a specific

12 statute. And that's 15 U.S.C. 636.

13 So under this Title IV program, which is overseen by

14 the Department of Treasury, not by the SBA, the Treasury is

15 authorized to make 454 billion dollars of loans. And those

16 are -- it's an emergency lending program under the Federal

17 Reserve Act.

18 Section 13(3) of the Federal Reserve Act authorizes

19 these kind of emergency lending programs. And Dodd-Frank

20 specifically amended that lending program after the financial

21 crisis to include a bankruptcy exclusion from these emergency

22 loans through this Federal Reserve program.

23 And so that's where we see in 403 it's simply copying

24 this language from the Federal Reserve Act as amended by Dodd-

25 Frank. And that's just simply not applicable to the PPP.

Colloquy                                                    45

1   It's not the equivalent of a mid-sized lending program for

2   mid-sized businesses.  It's a completely separate program

3   overseen by the Treasury, not the SBA, created through a new

4   law, not created through the 7(a) lending program.  And it's

5   implementing itself on top of a completely different body of

6   law, which is the Federal Reserve Act and Dodd-Frank.

7          And the money it's spending there, the 454 billion

8   dollars, it doesn't come from an appropriation of Congress, it

9   comes from the Federal Reserve, which is different than the

10  money here that under the PPP comes from a direct

11  appropriation from Congress.

12         So any argument that 403 is somehow comparable or

13  controls how you should the PPP, simply doesn't hold water.

14  It's just a completely separate program overseen by a

15  different agency, spending different funds from a different

16  source, and enacted on a completely different body of law.

17         THE COURT:  One thing in Mr. Ricks' argument that --

18  and I don't know the exact -- what is the subsection of

19  4003(b) (sic) that he was referring to?  I'm trying to

20  remember.  Oh, here on page -- I'm looking at the act -- let's

21  see, is it the reference to the recipient not being a debtor

22  in bankruptcy.  I think his argument was Congress knew how to

23  exclude debtors in bankruptcy from facilities in this Act.

24         And your argument is they're apples and oranges.  You

25  can't confer that from the choice of the language in Title IV

1   compared with the PPP?

2          MR. VANLANDINGHAM:  Well, that's exactly right, Your

3   Honor.  And I think certainly that kind of statutory analysis

4   makes sense, if there was some other part of -- the PPP,

5   again, amends 15 U.S.C. 636 -- if there was some other

6   provision in that portion of the Code or within even that

7   title of the Code, that talked about bankruptcy in this way

8   then maybe you could make that kind of inference.

9          But this Title IV program isn't anywhere in the U.S.

10  Code.  It's a completely separate new law that's being created

11  for a different agency.  And so I just don't think it's

12  reasonable to say, well, this language here should be inferred

13  back to the PPP program, which is doing something completely

14  different.

15         And again, that language about bankruptcy status

16  comes from Dodd-Frank, which is addressing Federal Reserve

17  programs.  It simply parrots that language; where in

18  implementing the PPP, Congress was relying on the body of law

19  governing the Section 7(a) program.  And under that body of

20  law, the agency had preexisting discretion to consider

21  bankruptcy status, and it did consider that under the 7(a)

22  program, as it preexisted.  And so Congress knew that when it

23  was creating the PPP through that body of law.

24         And finally, Your Honor, I just want to note, very

25  briefly, on irreparable harm and public interest.  Irreparable

Colloquy                                                          47

1   harm, I'd just note that we don't have very much of a showing

2   here.  We don't have any evidence before us that describes the

3   need.  More or less it's that the plaintiff is arguing that if

4   they don't get a TRO today that they won't have access to the

5   PPP program.

6          And I don't think that's enough.  I think you need to

7   show some harm that will occur.  And Your Honor certainly

8   knows the status of the assets and liabilities and cash flow

9   much better than I do.  But there's really been no showing of

10  evidence on this motion as to what would happen to the debtor

11  if it doesn't get a PPP loan or an opportunity to apply.

12         Then on the public interest, basically it comes down

13  to -- I know it can seem like, well, this is a small amount of

14  money from a huge bucket, and so what's the harm here to the

15  government if we get this loan.  And the harm here is that

16  it's a limited program and that if the Court extends the loan

17  here today to the debtor -- or gives them an opportunity to

18  apply, that money won't be available to someone else.

19         And I think those are offsetting harms.  And so I

20  don't see how you could say that the harm to the debtor here

21  is greater than to somebody else who was, in fact, eligible to

22  receive a loan, and why they should be prioritized, when in

23  fact, the SBA has stated the exact opposite policy to

24  prioritize nondebtors, and Congress had chose (sic) to put

25  this program in the SBA lending program, where they knew the

Colloquy                                                                48

1     SBA had broad authority over, and chose do defer to that

2     authority.

3            And I think that overturning that would be simply

4     replacing the plaintiffs' preference to get a loan ahead of

5     the public policy-making of Congress and the SBA.

6            And if there are no further questions, that's all I

7     have.

8            THE COURT:  Okay, thank you.  I'm looking at the

9     clock, and I do want to take a break by at least 3.  Mr.

10    Ricks, do you think you're going to need more than seventeen

11    minutes?  If so, we can take a break now.  Otherwise I could

12    hear from you, and then take a break then.

13           MR. RICKS:  I don't envision I need more than

14    seventeen minutes, Your Honor.

15           THE COURT:  Okay, why don't we -- I plan on taking a

16    break after Mr. Ricks' comments, and then I can hear further

17    from others.

18           Go ahead, Mr. Ricks.

19           MR. RICKS:  Thank you, Your Honor.  I guess I would

20    just point out a few things in rebuttal.

21           One is, there's great reliance being placed by the

22    Government in the fact that this is a -- the PPP is a program

23    that was created within the SBA's existing 7(a) loan program.

24    And while it's true that's the vehicle by which Congress chose

25    to engage in funding for the PPP, obtaining money through the

Colloquy                                                                  49

1    PPP is very, very different than anything the SBA is doing on

2    a 7(a)loan.

3              And if the basis for the rule-making is that, well,

4    SBA has the authority to make rules in order to make sure

5    we're not making bad loans, in shorthand, I don't see how that

6    squares with the PPP's stated structure and objectives, which

7    is to get money out quickly, to do no underwriting before

8    making a distribution to an application.  And it is entirely

9    forgivable if the money is spent on permitted usage.

10             Therefore, if everything goes swimmingly, if every

11   applicant gets exactly the right amount, uses it for exactly

12   the right reasons, then the amount of repayment that will be

13   made in this program is zero.

14             So I think it's hard to square the notion that we

15   need this sort of line-drawing to protect the interest of a

16   program where the intended repayment, if everything goes

17   exactly according to plan, is nothing.  I think that the line-

18   drawing -- which again, I think the Government wants to say we

19   can't -- we can't second-guess the Agency's discretion.  But

20   that's exactly what Chevron asks us to do, which is they've

21   supplied us a reason; the Court has the authority to decide

22   whether that reason was arbitrary and capricious or an abuse

23   of discretion, or, as a threshold question, whether it runs

24   counter to the statute itself.

25             And again, I think that there's ample authority

1  within -- or there's ample -- there's a showing in this case

2  that the SBA has acted in an arbitrary and capricious manner

3  in excluding bankruptcy debtors for a reason that really

4  doesn't make sense on its face.  And --

5  THE COURT:  Mr. Ricks?  I'm sorry, Mr. Ricks -- I'm

6  sorry, let me interrupt you.  But a critical question here is

7  whether or not there's -- it may not be technical -- but

8  basically any rational basis for an across-the-board policy

9  decision to exclude bankruptcy debtors.

10  And it's hard to disagree, in my mind, with the

11  Government's position that if they, for example, rely -- if

12  they were to make a categorical inclusion, let's say, of

13  Chapter 11 debtors, on the basis that 364 allows certain

14  protections for post-petition lending -- it's hard to agree

15  with Mr. VanLandingham's observation that to really take

16  advantage of that, as is done in the ordinary day-to-day

17  practice, requires a lot of specific attention on a

18  particular-loan basis.

19  And if they're trying to make a policy decision that

20  they can administer and apply uniformly across the country,

21  with essentially almost no supervision, isn't is fair to say

22  that the Agency can say we're not in a position to do the

23  individualized attention to the loan that would be necessary

24  to take advantage of -- make sure we get the protections of

25  Section 364 and all the things that you and I know make an

Colloquy                                                           51

1    ordinary post-petition loan perhaps safer than a pre-petition

2    loan?

3            MR. RICKS:  Well, Your Honor, I guess I'd have two

4    responses to that.  First is, that specific articulation is

5    not what the SBA said when enacting this categorical

6    exclusion.  And I guess the second piece of this would be that

7    we could think of all sorts of underwriting criteria that

8    might be advantageous or disadvantageous.  The question is

9    whether or not the rationale supplied bears any sort of basis

10   or has any sort of reasonable basis.  And here it just

11   doesn't.

12           I mean, the risk to any borrower -- when you're

13   saying go give out money without any underwriting, the risk of

14   loss is substantial whether we're talking about somebody

15   inside of bankruptcy or outside of bankruptcy.

16           And there hasn't been an articulation that well, we

17   did that because really we need to make sure we would get the

18   364 protections.  That's not the articulated basis for it.

19   It's just well, we just don't want to do it for bankruptcy

20   debtors.

21           THE COURT:  Okay, thank you.  Go ahead.

22           MR. RICKS:  All right.  And again, I think the

23   discussion on -- just to revisit some of the points that were

24   addressed by the Government.  The issue on sovereign immunity

25   that the focus that the Government would like the Court to

Colloquy                                                    52

1    hone in on is the provision of 106 that deals with enforcement

2    of an order has to comply with applicable nonbankruptcy law.

3            But the subsection preceding that says that the Court

4    can issue orders.  That may be a fine point to draw, but that

5    is the mechanism that exists in the statute, which is the

6    Court can issue an order, it's just simply the enforcement of

7    it has to comply with nonbankruptcy law.

8            The Government would ask the Court to read that

9    further to say well, no, this is an exclusion on orders

10   altogether, which I don't think is consistent with the

11   language in 106 and the intent of the SBA's anti-injunction

12   provision and its waiver of sovereign immunity.

13           I think that the more appropriate reading is that the

14   Court can issue an order, it's just that we can't use some

15   mechanism that's not consistent with non-applicable law to

16   enforce it.  And there's no argument that we would use some

17   sort of extra-legal power to enforce the order.  We're asking

18   for a temporary restraining order, which again, I believe is

19   within the realm of powers that are allowed when Congress

20   chose to waive sovereign immunity as to a governmental unit.

21           And I think -- and finally, to the extent we are

22   talking about what was the -- is the relief narrowly tailored,

23   the Court could certainly fashion narrow tailoring to make

24   sure that it's not imposing an additional risk.  You can -- we

25   can segregate an account for funds.  There's plenty of tools

 1   in the toolbox for the Court to fashion relief that would

 2   afford protections consistent with the PPP program, as it's

 3   set up, in this particular case.

 4           So in summary, I think the lending program, as it's

 5   described, is -- under PPP, is wholly different than the 7(a)

 6   loan program.  The rule that they've made excluding bankruptcy

 7   debtors would simply not withstand scrutiny of the given

 8   rationale, which is what the APA permits.  And it is in

 9   discongruence with the rest of the CARES Act in terms of how

10   it treats bankruptcy issues.

11           And I don't think the Court is barred by

12   jurisdictional or sovereign immunity grounds from granting the

13   orders, and the plaintiffs would ask that the Court to so.

14   Thank you.

15           THE COURT:  Okay, thank you.

16           Mr. VanLandingham, I note -- we've heard from Mr.

17   Ricks twice.  Do you want to be heard again?

18           MR. VANLANDINGHAM:  Your Honor, I really have nothing

19   further to say --

20           THE COURT:  Okay.

21           MR. VANLANDINGHAM:  -- that would be unique.  Thank

22   you.

23           THE COURT:  Very good.  So here's what I'd like to

24   do.  And I appreciate, Mr. VanLandingham, I guess you're in

25   the Eastern time zone.  I'd like to try to give you a decision

Colloquy                                                                54

1    today.  I'd like to consider my notes and take a break till

2    3:15 Pacific Time.  It would be 6:15 your time.  Can you stay

3    with us, Mr. VanLandingham, until then?

4              MR. VANLANDINGHAM:  Yes, Your Honor.

5              THE COURT:  Okay, so everybody can hang up and call

6    back in right before 3:15 Pacific.  And if I can give you a

7    decision, I will then.  Is there anything else we should

8    address before we adjourn right now?

9              Okay, I'll talk to you at 3:15.  Thanks.

10        (Recess from 2:51 p.m. until 3:15 p.m.)

11             THE COURT:  Good afternoon, this is Judge Hercher.

12   We're back on the record.  Do I have Mr. Ricks?

13             MR. RICKS:  Yes, Your Honor.  I'm here.

14             THE COURT:  Thank you.

15             And Mr. VanLandingham?

16             MR. VANLANDINGHAM:  Yes, Your Honor.

17             THE COURT:  Very good.  Well, I appreciate all the

18   hard work and the excellent professional presentations the

19   parties have given on short and difficult circumstances.

20             I recognize that this matter is extremely important

21   to these debtors and to the Government and to other persons as

22   well, arguably the other potential borrowers.  So I'm going to

23   give you my decision, and then I'm going to give you my

24   explanation for it.

25             So I will deny the motion, and here are my reasons.

1          Chapter 11 debtors PPV, Inc. and Bravo Environmental
2    NW, Inc. filed a complaint against Jovita Carranza in her
3    official capacity as the administrator of the Small Business
4    Administration and against the SBA itself.  They seek
5    injunctive and declaratory relief against the defendants based
6    on the Administrative Procedure Act and Section 525(a) of the
7    Bankruptcy Code.  They also seek administrative mandamus under
8    28 U.S.C. Section 1361.

9          The factual basis of all of the claims is that the
10   SBA has promulgated official SBA Form 2483, Exhibit 1 to
11   docket item 5, a form of application for a Paycheck Protection
12   Program loan guarantee.

13         The application includes a certification that neither
14   the applicant nor any of its owners is involved in any
15   bankruptcy.  The form goes on to say that the application will
16   be rejected if the certification is not made.

17         PPV and Bravo have attempted to obtain PPP loans, but
18   the bank rejected them because they could not make the
19   required certification.

20         Plaintiffs argue that the certification requirement
21   is unlawful for three reasons:  it is in excess to the SBA's
22   statutory authority, because the enabling statute, the CARES
23   Act, does not make eligibility for a PPP loan contingent on
24   such certification; second, it is arbitrary and capricious
25   because the exclusion of bankruptcy debtors from the PPP is

1    unwarranted and baseless; third, it is a violation of Section

2    525(a) of the Bankruptcy Code, which prohibits governmental

3    entities from withholding certain kinds of privileges from

4    bankruptcy debtors.

5           Plaintiffs therefore seek declaratory and injunctive

6    relief requiring the SBA to permit them to apply for a PPP

7    loan without making the certification.  They also seek

8    mandamus against the SBA requiring it to do the same thing.

9           The complaint is within the federal court and

10   jurisdiction of 28 U.S.C. Section 1334, because it arises, in

11   part, under the Code and because it is related to the PPV and

12   Bravo bankruptcy cases, in that the availability of funds will

13   affect the debtors' abilities to reorganize.

14          Plaintiffs have filed a motion for temporary

15   restraining order and for a preliminary injunction, both

16   seeking to compel the SBA to permit an application without the

17   certification, pending further proceedings.

18          Under F.R.C.P. 65, there's no difference between a

19   TRO and a preliminary injunction, except that a TRO is issued

20   without oral or written notice, and it is limited in duration

21   to fourteen days.  In this case, the distinction doesn't

22   matter, because obviously the matter was done on notice to the

23   Government, because the Government appeared and argued and did

24   not object to the setting of the hearing.

25          A plaintiff seeking a TRO or preliminary injunction

Colloquy                                                        57

must show:  1) likelihood of success on the merits; 2) that
the plaintiff will suffer irreparable harm without preliminary
relief; 3) that the balance of equities tips in the
plaintiff's favor; and 4) that the TRO or preliminary
injunction is in the public interest.

        Because the Government is the defendant, factors 3
and 4 merge, according to a Ninth Circuit case called Nken v.
Holder -- let's see, hold on one second.  For some reason I
don't have the cite.  I apologize.

        When the plaintiff seeks an injunction that requires
the defendant to take action rather than simply seeking to
maintain the status quo pending trial, the standard under the
first factor is especially strict, that being the likelihood
of success on the merits; Garcia v. Google, 786 F.3d 733, 740
(9th Cir. 2015).

        I will discuss first the probability of success with
respect to each of the plaintiffs' theories of relief,
beginning with the one that I consider the strongest.  First,
however, I will address some threshold issues that the
defendants have raised.

        The first is whether the SBA and its administrator,
in her official capacity, have sovereign immunity.  With
respect to Section 525(a), I consider it unlikely that they
do.  Section 106(a)(1) of the Bankruptcy Code waives sovereign
immunity with respect to claims under Section 525, and the

Colloquy                                                    58

1    Administrative Procedure Act expressly authorized actions for

2    judicial review against agencies.

3            Mr. VanLandingham mentioned Section 106(a)(4).  Based

4    on my review of that section today, it appears to be a section

5    that requires compliance with procedural requirements for

6    enforcing orders against the government but does not replace

7    the waiver of sovereign immunity that the Code does in Section

8    106(a)(1).

9            The second related question is whether 15 U.S.C.

10   Section 634(b) prohibits the issuance of any injunction

11   against the SBA.  The plain language of Section 634(b) seems

12   to say so, however, the courts of appeal appear to be split on

13   whether the section means what it says, with at least three

14   circuits, the First, Federal, and DC circuits, holding that

15   Section 634(b) should not be interpreted as a bar to the

16   judicial review of agency actions that exceed agency

17   authority, where the remedies would not interfere with

18   internal agency operations; Cavalier Clothes v. United States,

19   810 F.2d 1108, 1112 (Fed. Cir. 1987); Oklahoma Aerotronics v.

20   United States, 661 F.2d 976, 977 (D.C. Cir. 1981); and Ulstein

21   Maritime Ltd. v. United States, 833 F.2d 1051, 1057 (1st Cir.

22   1987).

23           Although the issue is challenging, there is fairly

24   strong -- there is a fairly strong chance that Section 634(b)

25   will not bar injunctive relief.  Even if it does, it doesn't

Colloquy                                                              59

1    bar declaratory relief, so the plaintiffs might prevail, even

2    if they cannot get an injunction.

3         11 U.S.C. Section 525(a) of the Bankruptcy Code

4    prohibits governmental units, of which the SBA is one, from

5    denying a license, permit, charter, franchise, or other

6    similar grant, because the applicant is or has been a debtor

7    in bankruptcy.

8         Now a PPP loan is not a license, permit, or charter,

9    nor is it a franchise in the usual business sense of the word.

10   The SBA argues that a PPP loan is not a grant, because it is a

11   loan.  Plaintiffs argue that while called loans, the funds

12   advanced are part of a grant or support program.

13        I don't think that any technical distinction between

14   loan and grant is dispositive here.  Section 525(a) uses the

15   word "grant" to refer not to monetary gifts, the everyday

16   sense of the word "grant", but to any act by which the

17   government bestows some privilege on a citizen.  This is clear

18   from the wording of the statute, which refers to a license,

19   permit, charter, franchise or other similar grant.

20        Licenses, permits, charters, and franchises are not

21   grants in the monetary sense.  They are special privileges

22   granted by the government.  I agree that an ordinary business

23   loan would not fall under Section 525(a).

24        Apart from the oddness of comparing an arm's-length

25   business transaction to the other Section 525(a) categories,

Colloquy                                                                          60

1   this conclusion is supported by Section 525(c) which expressly

2   extends anti-discrimination protection to student loans but

3   not other loans.  If all loans were similar to grants, Section

4   525(c) would be superfluous.

5           But a PPP loan is far from an ordinary business loan.

6   For practical purposes, it is closer to a gift.  The question

7   is not whether the PPP loan is a loan or grant, it's whether

8   it's a similar grant under Section 525(a).  I'm inclined to

9   follow the four courts of appeals that have read that section

10  not to apply to all grants or conveyances by the government.

11          The first is, most recently, Ayes v. U.S. Department

12  of Veterans Affairs, 473 F.3d 104 (4th Cir. 2006).  In that

13  case dealing with a veteran home loan guarantee entitlement,

14  the court held that licenses, permits, charters, and

15  franchises are all governmental authorizations that typically

16  permit an individual to pursue some occupation or endeavor

17  aimed at economic betterment.

18          The second case is Toth v. Michigan State Housing

19  Development Authority, 136 F.3d 477 (6th Cir. 1998).  At page

20  480 that court says that the terms enumerated in the statute

21  are benefits conferred by the government that are unrelated to

22  the extension of credit.  And it also refers to the policy of

23  Section 525(a) as barring the governmental entity from denying

24  permission to pursue certain occupations or endeavors.

25          The third case is Exquisito Services Inc. v. United

Colloquy                                                             61

1    States, 823 F.2d 151, 152-3 (5th Cir. 1987); and Goldrich v.

2    New York State Higher Education Services Corporation, 771 F.2d

3    28 (2d Cir. 1985).

4            I find that plaintiffs are unlikely to prevail on the

5    Section 525(a) claim.

6            The defendants argue that plaintiffs are unlikely to

7    prevail on their APA claims because they are -- these claims

8    are not core claims or that they are core but Stern claims,

9    and therefore -- and I therefore lack authority to enter a

10   final judgment on those claims.  I agree at least tentatively

11   that the claims are noncore or Stern.  But I disagree with the

12   conclusion that their noncore or Stern nature makes the

13   plaintiffs any less likely to prevail.

14           The core versus noncore or Stern nature of the claim

15   determines only whether an Article I or Article III

16   adjudicator must finally decide it.  The plaintiffs are no

17   more or less likely to prevail on a claim just because it is

18   noncore or Stern.

19           5 U.S.C. Section 706(2)(c) addresses actions --

20   agency actions in excess of statutory authority.  Plaintiffs'

21   argument under this section is that the application form the

22   SBA promulgated was in excess of statutory jurisdiction,

23   authority, or limitations, or short of statutory right,

24   because it imposes a condition that is not found in the

25   enabling statute.

Colloquy                                                                62

1          The difficulty with this theory is that plaintiffs
2     have not attempted to establish that the enabling statute
3     requires, as opposed to merely permits, the SBA to approve
4     loans to every eligible applicant.  As plaintiffs themselves
5     have emphasized, PPP loans are limited and it is virtually
6     certain that some statutorily eligible applicants will go home
7     empty-handed.  Given that inevitable act, it's easy to believe
8     that Congress merely intended to set the minimum standards of
9     eligibility while giving the SBA the discretion to decide
10    which of many eligible applicants should receive funds.
11         I therefore consider it relatively unlikely that
12    plaintiffs will prevail on this claim.
13         5 U.S.C. Section 706(2)(a) addresses the question of
14    whether or not an agency action is arbitrary, capricious, an
15    abuse of discretion, or otherwise not in accordance with law.
16    Plaintiffs' argument under this section is that SBA's
17    inclusion of the certification requirement was arbitrary,
18    capricious, an abuse of discretion, or otherwise not in
19    accordance with law.
20         This subsection allows only a deferential review
21    under which the agency's action carries a presumption of
22    regularity.  The standard of review is a narrow one.
23         And here I'm quoting from San Luis & Delta-Mendota
24    Water Authority v. Locke, 776 F.3d 971, 994 (9th Cir. 2014).
25    "Even when an agency explains its decision with less than

1  ideal clarity, a reviewing court will not upset the decision

2  on that account if the agency's path may be reasonably

3  discerned.  It is not the reviewing court's task to make its

4  own judgment about the appropriate outcome.  Congress has

5  delegated that responsibility to the agency.  The court's

6  responsibility is narrower:  to determine whether the agency

7  complied with the procedural requirements of the APA."  That's

8  the end of my quotation from the San Luis case.

9         Still, an agency's action is arbitrary and capricious

10  if it relied on factors which Congress has not intended it to

11  consider, entirely failed to consider an important aspect of

12  the problem, offered an explanation for its decision that runs

13  counter to the evidence before the agency, or is so

14  implausible that it could not be ascribed to a difference in

15  view or the product of agency expertise.  That's a quotation

16  from Motor Vehicle Manufacturers Association of the U.S., Inc.

17  v. State Farm Mutual Auto Insurance Co., 463 U.S. 29, 43

18  (1983).

19         In the September 28, 2020 (sic) Federal Register, I

20  think, rule publication, which I believe is referred to as the

21  Fourth Interim Rule, I find the following quotation:  " he

22  Administrator, in consultation with the Secretary," being the

23  Secretary of the Treasury, "determined that providing PPP

24  loans to debtors in bankruptcy would present an unacceptably

25  high risk of an unauthorized use of funds or nonrepayment of

Colloquy                                                64

1    unforgiven loans.  In addition, the Bankruptcy Code does not

2    require any person to make a loan or a financial accommodation

3    to a debtor in bankruptcy.  The Borrower Application Form for

4    PPP loans (SBA Form 2483), which reflects this restriction in

5    the form of a borrower certification, is a loan program

6    requirement."  That's the end of that quotation.

7            The defendants have submitted a declaration of John

8    Miller, the head of the SBA's Office of Capital Access.  He

9    explains that the PPP is a modification of the SBA's

10   longstanding Section 7(a) loan program.  Historically the SBA

11   has required participating lenders to underwrite Section 7(a)

12   loans, and part of that process was to inquire whether the

13   applicant had ever been in bankruptcy.

14           According to Miller, in paragraph 9 of his

15   declaration, he has never heard of a lender extending a 7(a)

16   loan to a bankruptcy debtor.  And if one did so, the SBA would

17   have considered it cause for stricter scrutiny of the loan,

18   perhaps even to dishonor the guarantee.

19           Miller also says in paragraph 21 that the PPP purpose

20   would not be served in a Chapter 11 liquidation or a Chapter 7

21   case.  Certain creditors, including administrative creditors,

22   could assert claims to the PPP loan funds that would interfere

23   with its authorized uses and the requirements for PPP loan

24   forgiveness.

25           The SBA, in consultation with the Department of

Colloquy                                                                    65

1    Treasury, determined that there should be one streamlined rule

2    that applies to all debtors in bankruptcy to avoid the need

3    for case-by-case reviews.

4           Although I don't necessarily agree with the SBA's

5    analysis of the risk of making loans to bankruptcy debtors or

6    the appropriateness of its across-the-board solution, I'm

7    reluctant to say that its decision is arbitrary or capricious.

8    I therefore conclude that plaintiffs have not shown a high

9    enough probability of success on this claim.

10          The next claim is under 28 U.S.C. Section 1361.

11   Under this section, plaintiffs request that I grant relief in

12   the nature of mandamus, to compel the SBA to remove the

13   certification requirement.  Section 1361's in nature of

14   mandamus remedy does not expand the generally recognized scope

15   of mandamus.  Its remedy remains extraordinary and it is

16   appropriate only when the plaintiff's claim is clear and

17   certain and the duty of the officer is ministerial and so

18   plainly prescribed as to be free from doubt.  That's a

19   quotation from Nova Stylings Inc. v. Ladd, 695 F.2d 1179, 1180

20   (9th Cir. 1983).

21          Moreover, administrative mandamus is never available

22   when there is an alternative remedy.  Same case as the

23   citation.  Here, the obvious alternative remedy is an action

24   for judicial review under the Administrative Procedure Act,

25   which plaintiffs are also pursuing.

Colloquy                                                          66

1        For both of these reasons, I consider the plaintiffs

2   unlikely to prevail on this claim.

3        Because I believe that the weakness of the

4   plaintiffs' merits argument could not be outweighed by any

5   other factor, I won't separately address the other factors

6   except to say that if I were able to find the plaintiffs were

7   likely to succeed on the merits, I would be inclined to find

8   that irreparable harm and the balance of hardship factors

9   weigh in favor of relief, and that the public interest factor

10  is neutral.

11       In conclusion, having found that the plaintiffs are

12  unlikely to prevail on either of their claims, I will deny the

13  motion for temporary restraining order.

14       I want to make another observation here, and this may

15  not be news to the parties, but several other courts have

16  either granted dismissal or abatement of Chapter 11 cases or

17  have invited an emergency hearing on whether to do so.  I

18  cannot prejudge whether I would approve either approach or

19  whether it would get the debtors what they want in this case.

20  But I wanted to raise the possibility.

21       And Mr. Ricks, you don't have to respond today if

22  you're not prepared, but you may wish to consider whether or

23  not you want to pursue something like that.

24       One of the courts that has done that recently is the

25  Central District of California Bankruptcy Court, in the Joffee

Colloquy                                                    67

1   case, which is 20-bk-12802.  Again, I make no indication of

2   how I would rule or whether or not that would be effective to

3   get what the debtors want.

4           So with that in mind, any questions, Mr. Ricks?

5           MR. RICKS:  No questions, Your Honor.  I appreciate

6   the comments on dismissal or suspension.  That's certainly an

7   avenue that debtors have contemplated.  And I suspect if

8   that's where this is heading, you'll have a chance to take

9   that up in due course.

10          THE COURT:  Mr. VanLandingham, any questions?

11          MR. VANLANDINGHAM:  No, Your Honor.  Thank you for

12  hearing from us today.

13          THE COURT:  And would you or Ms. Bickers lodge an

14  order denying the motion?

15          MR. VANLANDINGHAM:  We will, Your Honor.

16          THE CLERK:  Judge, this is --

17          THE COURT:  Very good.  Is there anything else we

18  should -- Denali, go ahead.

19          THE CLERK:  Yes.  Also set for today was the motion

20  to expedite the hearing, and it sounds like that's essentially

21  been granted.

22          THE COURT:  Oh, okay.  That's being granted, thank

23  you.

24          So I can get orders on -- well, let's see.  We'll

25  just note in the minutes that the matter was expedited,

Colloquy                                                                68

1   mooting the motion to expedite.  So I'll just need the one

2   order from the Government denying the motion for TRO.

3           I suppose -- now, that I think essentially moots the

4   motion for the order to show cause why a preliminary

5   injunction should not be issued.  Mr. Ricks do you disagree

6   with that?

7           MR. RICKS:  Well, I think, as the Court pointed out,

8   this was done with the benefit of notice and an appearance

9   from the opposing party, so for all intents and purposes we've

10  had a hearing on the order to show cause.

11          I suppose the only possible reservation there would

12  be if the Court would be aided by further evidence.  But I

13  take it from the Court's ruling that it's ruling on issues of

14  law, so more evidence would not necessarily be aided by having

15  a further hearing on the order to show cause.

16          THE COURT:  I won't disagree with your take on that.

17  I've been focused primarily on the law, and I've not -- I've

18  not focused on the facts, because the law, I find, doesn't

19  permit me to.

20          Now, so if that's the case, then I believe it would

21  be appropriate for the Government also to lodge an order

22  denying the motion for the order to show cause why a

23  preliminary injunction should not issue.

24          The adversary proceeding will remain pending.  We

25  have an answer deadline and a pre-trial conference, I believe,

Colloquy                                                    69

1   in July.  And parties can take whatever steps they wish to in

2   the remaining -- what remains of the adversary proceeding.

3           I don't think we need to address any of that today.

4           Mr. VanLandingham, any questions?

5           MR. VANLANDINGHAM:  No, Your Honor.

6           THE COURT:  Okay, Mr. Ricks, any further questions?

7           MR. RICKS:  No, Your Honor.

8           THE COURT:  Okay.  I want to again thank the parties

9   and the principals.  I know this is a difficult -- it's not

10  the answer you wanted, and it was a difficult matter that was

11  ably argued on the part of both parties, and I want to thank

12  the parties for that.

13          And with that, we are adjourned.  Thank you.

14      (Whereupon these proceedings were concluded at 3:37 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2

3

4     RULINGS:                                       PAGE   LINE
      Motion for temporary restraining order           54     25
5     is denied.
      Order to show cause denied.                      68     21

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               C E R T I F I C A T I O N

2

3          I, Penina Wolicki, the court approved transcriber, do

4    hereby certify the foregoing is a true and correct transcript

5    from the official electronic sound recording of the

6    proceedings in the above-entitled matter.

7

8

9                                   May 26, 2020

10   _____   _____
     PENINA WOLICKI, CET-569              DATE

11   AAERT Certified Transcriber

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PPV, INC. AND BRAVO ENVIRONMENTAL INC. v.
U.S. SMALL BUSINESS ADMINISTRATION, et al.

May 20, 2020

## A

**abatement (1)**
66:16
**abilities (1)**
56:13
**ability (2)**
15:1;28:24
**able (4)**
12:13;14:7,7;66:6
**ably (1)**
69:11
**absolute (1)**
36:24
**abuse (3)**
49:22;62:15,18
**access (11)**
9:21;11:1;14:7,11;
15:1,3;44:2,3,4;47:4;
64:8
**accommodation (1)**
64:2
**accordance (2)**
62:15,19
**according (3)**
49:17;57:7;64:14
**account (3)**
13:12;52:25;63:2
**accounted (2)**
12:22;13:20
**accounts (1)**
14:18
**across (3)**
37:9,13;50:20
**across-the-board (2)**
50:8;65:6
**Act (52)**
6:22;10:21,24,24;
11:3;19:17,18;
23:15;24:1;30:12;
31:11;32:7,15,16,23;
33:12,24;34:11,16,
21,23;35:1,3,11,21,
23;36:6,7,8;38:7,11;
43:15,22,24,25;44:7,
8,8,10,17,18,24;45:6,
20,23;53:9;55:6,23;
58:1;59:16;62:7;
65:24
**acted (2)**
35:2;50:2
**acting (1)**
27:20
**action (7)**
29:4;42:16;57:11;
62:14,21;63:9;65:23
**actions (5)**
9:21;58:1,16;
61:19,20
**actively (2)**
16:13;37:2
**activity (1)**

14:21
**actor (1)**
8:10
**acts (1)**
6:25
**actually (2)**
7:19;10:23
**add (2)**
25:4,9
**added (4)**
22:17;25:11,12;
26:11
**adding (2)**
25:12;34:9
**addition (1)**
64:1
**additional (4)**
22:17;24:3;34:9;
52:24
**address (8)**
24:10;25:13;
38:11;43:21;54:8;
57:19;66:5;69:3
**addressed (8)**
6:3;20:2;21:8;
24:16;25:14;26:1,9;
51:24
**addresses (2)**
61:19;62:13
**addressing (12)**
22:18,19;26:3,5,6,
7,12;27:9;36:7,9,9;
46:16
**adds (1)**
32:23
**adequately (2)**
7:5;8:20
**adjourn (1)**
54:8
**adjourned (1)**
69:13
**adjudication (1)**
7:4
**adjudicator (1)**
61:16
**adjust (1)**
33:14
**administer (2)**
6:24;50:20
**administered (1)**
9:16
**Administration (1)**
55:4
**Administrative (12)**
6:22;9:24;10:21;
35:5,7;40:11;55:6,7;
58:1;64:21;65:21,24
**administrator (5)**
3:17;33:14;55:3;
57:21;63:22
**Adner (1)**
20:3
**adopted (4)**

20:1,15;21:6;
23:16
**adopting (1)**
20:23
**advance (1)**
9:6
**advanced (2)**
13:12;59:12
**advantage (2)**
50:16,24
**advantageous (1)**
51:8
**adversary (5)**
3:2;5:11;17:14;
68:24;69:2
**Aerotronics (1)**
58:19
**affairs (2)**
40:18;60:12
**affect (1)**
56:13
**affected (1)**
32:18
**afford (1)**
39:6;53:2
**afternoon (3)**
3:1,5;54:11
**Again (36)**
6:19;10:13,21;
12:20;16:23;17:20;
18:15,19;19:11;21:5,
24;22:1,3;23:12,14;
24:5;26:19;27:6;
29:1;35:23;36:1,14,
17;38:12;39:2;40:7;
43:1;46:5,15;49:18,
25;51:22;52:18;
53:17;67:1;69:8
**against (11)**
14:19;19:24;
39:15;40:2;55:2,4,5;
56:8;58:2,6,11
**agencies (1)**
58:2
**agency (41)**
11:25;12:6;19:24;
20:18,25;21:3,4,10,
11,15,20,22;22:14,
24,25;23:4,6,24,25;
34:25;35:2,11;37:19,
23;39:8,17;40:14;
45:15;46:11,20;
50:22;58:16,16,18;
61:20;62:14,25;63:5,
6,13,15
**Agency's (6)**
36:11;39:3;49:19;
62:21;63:2,9
**agree (8)**
37:16;38:15;
43:14,18;50:14;
59:22;61:10;65:4
**ahead (9)**

10:19;23:11;
29:20;32:11;43:19;
48:4,18;51:21;67:18
**aided (2)**
68:12,14
**aimed (1)**
60:17
**Aintree (1)**
7:17
**akin (1)**
28:17
**al (2)**
3:3,3
**allegation (1)**
42:3
**allege (1)**
35:14
**allocated (2)**
25:22;32:17
**allow (4)**
15:24;23:2,6;24:7
**allowed (2)**
5:19;52:19
**allowing (1)**
17:1
**allows (3)**
19:18;50:13;62:20
**almost (1)**
50:21
**alter (1)**
21:15
**altering (1)**
34:1
**alternative (2)**
65:22,23
**Although (1)**
58:23;65:4
**altogether (1)**
52:10
**ambiguity (1)**
23:15
**amend (2)**
34:11,21
**amended (3)**
25:4;44:20,24
**amending (2)**
32:20;44:11
**amendment (1)**
26:10
**amends (1)**
46:5
**America (1)**
42:14
**amount (4)**
42:18;47:13;
49:11,12
**amounts (1)**
8:24
**ample (2)**
49:25;50:1
**analogies (1)**
29:10
**analogy (1)**

27:3
**analysis (2)**
46:3;65:5
**announce (1)**
3:12
**anti-discrimination (1)**
60:2
**anti-injunction (1)**
52:11
**APA (7)**
19:8;24:7;32:13;
34:25;53:8;61:7;
63:7
**APA-related (1)**
13:22
**Apart (1)**
59:24
**apologize (1)**
57:9
**appeal (3)**
18:4,23;58:12
**appeals (1)**
60:9
**appear (2)**
17:1;58:12
**appearance (1)**
68:8
**appeared (1)**
56:23
**appearing (1)**
3:10
**appears (1)**
58:4
**apples (1)**
45:24
**applicable (2)**
44:25;52:2
**applicant (10)**
11:12,15,16;16:9;
25:20;49:11;55:14;
59:6;62:4;64:13
**applicants (2)**
62:6,10
**application (13)**
5:20,25;11:16;
16:8;21:17;36:22;
49:8;55:11,13,15;
56:16;61:21;64:3
**applications (1)**
6:1
**applies (4)**
25:6,20;26:1;65:2
**apply (18)**
19:23;21:12;22:2;
24:12;25:2,15,17;
28:8,22,24;34:4,18;
36:10;47:11,18;
50:20;56:6;60:10
**applying (1)**
22:21
**appreciate (3)**
53:24;54:17;67:5
**appreciation (1)**

Case:20-00055-EAG   Doc#:44-8   Filed:06/08/20   Entered:06/08/20 19:33:49   Desc:
Exhibit 8   Page 73 of 87

PPV, INC. AND BRAVO ENVIRONMENTAL NW, INC. v.
U.S. SMALL BUSINESS ADMINISTRATION, et al.

May 20, 2020

4:19
**approach (5)**
  5:13;20:9,14,15;
  66:18
**appropriate (4)**
  52:13;63:4;65:16;
  68:21
**appropriateness (1)**
  65:6
**appropriation (2)**
  45:8,11
**approve (2)**
  62:3;66:18
**arbitrary (15)**
  35:2;37:18,21;
  39:12;41:24;42:8,8;
  43:6;49:22;50:2;
  55:24;62:14,17;
  63:9;65:7
**Archdiocese (1)**
  10:14
**Archdioceses (1)**
  12:16
**arch-nemesis (1)**
  37:20
**area (2)**
  11:23;26:25
**arguably (1)**
  54:22
**argue (4)**
  4:15;55:20;59:11;
  61:6
**argued (2)**
  56:23;69:11
**argues (3)**
  5:5;6:16;59:10
**arguing (2)**
  27:3;47:3
**argument (15)**
  5:7;12:17;19:1;
  27:22;28:9;43:21,
  22;45:12,17,22,24;
  52:16;61:21;62:16;
  66:4
**arguments (4)**
  5:2;17:17;18:16,
  17
**Argus (1)**
  12:21
**arises (1)**
  56:10
**arm's-length (1)**
  59:24
**around (1)**
  21:23
**Article (2)**
  61:15,15
**articulated (1)**
  51:18
**articulation (2)**
  51:4,16
**ascribed (1)**
  63:14

**aside (3)**
  21:17,22;25:22
**aspect (1)**
  63:11
**assert (1)**
  64:22
**asserted (2)**
  5:11;6:21
**asserts (1)**
  34:24
**assets (4)**
  5:17,24;39:15;
  47:8
**assistance (1)**
  16:4
**Association (1)**
  63:16
**assuming (1)**
  38:25
**assurance (1)**
  14:6
**assure (1)**
  34:20
**assured (1)**
  30:23
**AT&T (1)**
  7:17
**attach (3)**
  40:25,25;41:1
**attached (1)**
  36:22
**attaching (2)**
  21:4,11
**attachment (3)**
  19:20;21:1,23
**attachments (1)**
  5:16
**attempted (2)**
  55:17;62:2
**attendant (1)**
  38:4
**attention (3)**
  17:11;50:17,23
**audience (1)**
  15:10
**Authority (25)**
  10:6,9;11:24;
  20:18;26:21,21;
  27:2;29:23;33:1;
  34:8;10;35:1;43:15;
  48:1,2;49:4,21,25;
  55:22;58:17;60:19;
  61:9,20,23;62:24
**authorizations (1)**
  60:15
**authorized (4)**
  11:15;44:15;58:1;
  64:23
**authorizes (1)**
  44:18
**Auto (1)**
  63:17
**automatically (2)**

40:24,25
**availability (1)**
  56:12
**available (3)**
  15:22;47:18;65:21
**avenue (1)**
  67:7
**avoid (1)**
  65:2
**award (1)**
  7:16
**aware (2)**
  32:5;42:17
**Ayes (2)**
  26:5;60:11

**B**

**back (8)**
  12:13;23:14;
  26:13;29:2;41:9;
  46:13;54:6,12
**background (1)**
  34:23
**bad (2)**
  42:3;49:5
**balance (3)**
  37:11;57:3;66:8
**balancing (1)**
  15:8
**bank (6)**
  13:12;14:18;
  25:20,20,24;55:18
**Bankr (1)**
  6:5
**bankrupt (5)**
  36:13,25;37:15;
  38:9;43:18
**bankruptcy (103)**
  4:24;5:8,9,14,22;
  6:11;7:17,20;8:12,
  17;9:1,2,22;10:8,18,
  24,25;11:2,7,19,20;
  12:12,19;13:7;15:14,
  15;17:8,12;18:1,21;
  19:7;20:12;23:17,
  18;24:21;27:11;
  28:16;29:25;30:4,16,
  17;35:15,18,22;
  36:21,23;37:3,5,12,
  17,20,25;38:17,18,
  25;39:6,12,20;40:2,
  4,11,16,18,22,25;
  41:1,3;42:12,14,16,
  23;43:23;44:2,21;
  45:22,23;46:7,15,21;
  50:3,9;51:15,15,19;
  53:6,10;55:7,15,25;
  56:2,4,12;57:24;
  59:3,7;63:24;64:1,3,
  13,16;65:2,5;66:25
**banks (2)**
  36:16;37:4

**bar (3)**
  58:15,25;59:1
**barred (7)**
  5:6;6:9;8:1;16:17;
  22:21;23:23;53:11
**barring (1)**
  60:23
**based (5)**
  10:11;27:11;39:9;
  55:5;58:3
**baseless (1)**
  56:1
**basic (5)**
  15:2,2;16:5;26:12;
  32:13
**basically (8)**
  18:12;19:12;
  25:19;29:12;32:23;
  40:8;47:12;50:8
**basis (17)**
  4:20;14:5;32:3;
  39:19;40:12;41:23;
  43:5,5,6;49:3;50:8,
  13,18;51:9,10,18;
  55:9
**bears (1)**
  51:9
**begin (1)**
  33:17
**beginning (3)**
  19:11,16;57:18
**begins (3)**
  32:15;35:7,23
**behalf (2)**
  3:16;16:24
**behind (1)**
  38:24
**beneficiaries (1)**
  15:12
**benefit (2)**
  16:10;68:8
**benefits (2)**
  44:3;60:21
**bestows (1)**
  59:17
**better (2)**
  16:11;47:9
**betterment (1)**
  60:17
**beyond (1)**
  41:20
**Bickers (5)**
  3:7,8,9,11;67:13
**big (1)**
  27:13
**bill (1)**
  9:13
**billion (3)**
  32:17;44:15;45:7
**bit (2)**
  19:8;25:18
**blue (1)**
  40:14

**blue-haired (1)**
  41:21
**bodies (1)**
  41:16
**body (7)**
  38:18,19;45:5,16;
  46:18,19,23
**borrow (1)**
  14:19
**borrower (7)**
  38:25;39:1;40:4,4;
  51:12;64:3,5
**borrowers (2)**
  38:19;54:22
**both (6)**
  13:21;14:21;
  29:10;56:15;66:1;
  69:11
**bounds (2)**
  12:1;15:9
**BR (1)**
  10:6
**Brattleboro (1)**
  10:9
**Bravo (4)**
  4:4;55:1,17;56:12
**break (5)**
  48:9,11,12,16;54:1
**brief (2)**
  10:15;20:5
**briefing (1)**
  5:1
**briefly (4)**
  19:2,6;24:10;
  46:25
**broad (9)**
  32:6;33:1,3,6,8,23;
  34:5,8;48:1
**broadening (1)**
  34:12
**bucket (1)**
  47:14
**business (19)**
  15:2,16,18,21;
  16:1;19:17,18;
  21:18;23:6,14;24:1;
  29:13;42:14;44:1;
  55:3;59:9,22,25;60:5
**businesses (4)**
  8:23;15:16;32:18;
  45:2
**by-case (1)**
  37:7

**C**

**California (2)**
  17:13;66:25
**call (4)**
  4:8,8;31:10;54:5
**called (5)**
  17:13;20:2;28:16;
  57:7;59:11

Case:20-00055-EAG   Doc#:44-8   Filed:06/08/20   Entered:06/08/20 19:33:49   Desc:
Exhibit 4 Page 74 of 87

PPV, INC. AND BRAVO ENVIRONMENTAL NW, INC. v.
U.S. SMALL BUSINESS ADMINISTRATION, et al.

May 20, 2020

**calling (1)**
18:22
**came (2)**
5:14;22:19
**can (36)**
6:12;7:11;10:2;
12:22,22;17:20;
19:12;22:4,18;
26:22;27:22;29:9,
16;31:12;38:13;
39:5,14;40:10;42:9,
11,19;47:13;48:11,
16;50:20,22;52:4,6,
14,24,25;54:2,5,6;
67:24;69:1
**capacity (2)**
55:3;57:22
**Capital (2)**
17:13;64:8
**capricious (11)**
35:2;37:19;41:24;
43:17;49:22;50:2;
55:24;62:14,18;
63:9;65:7
**capriciously (1)**
43:15
**CARES (28)**
10:24,24;11:3;
30:12;31:11;32:15,
23;33:11,24;34:11,
16,20,23;35:1,3,21,
23;36:6,7,8;38:7,11;
43:22,24,25;44:7;
53:9;55:22
**Carranza (5)**
3:3,16;17:14;18:7;
55:2
**carries (1)**
62:21
**case (42)**
6:2,19;7:15,19;
10:10,14,16;13:7;
14:15;16:13;17:13,
25;18:18,19,22;20:2,
13;21:13;22:11;
23:13;24:15;25:16;
27:24,24,25;28:2,3;
29:8,23;50:1;53:3;
56:21;57:7;60:13,18,
25;63:8;64:21;
65:22;66:19;67:1;
68:20
**case- (1)**
37:6
**case-by-case (4)**
36:16;37:4,10;
65:3
**cases (10)**
10:3;17:5,7,22,23;
20:15;27:4,5;56:12;
66:16
**cash (5)**
14:16,16;15:1,3;

47:8
**categorical (2)**
50:12;51:5
**categories (1)**
59:25
**Catholic (3)**
10:13;12:16;18:22
**cause (8)**
4:12;16:2,20;
64:17;68:4,10,15,22
**Cavalier (1)**
58:18
**Central (2)**
17:12;66:25
**certain (8)**
29:12;31:21;
50:13;56:3;60:24;
62:6;64:21;65:17
**certainly (17)**
4:8;7:22;9:18;
10:5,25;15:14,20;
23:18;28:20,23;
37:16;39:5,17;46:3;
47:7;52:23;67:6
**certification (11)**
9:12;55:13,16,19,
20,24;56:7,17;62:17;
64:5;65:13
**challengeable (1)**
6:12
**challenges (1)**
20:11
**challenging (1)**
58:23
**chance (1)**
58:24;67:8
**changes (1)**
11:2
**Chapter (7)**
11:1;12:21;50:13;
55:1;64:20,20;66:16
**charter (7)**
24:19,25;26:14;
30:9;59:5,8,19
**charters (3)**
24:23;59:20;60:14
**chasing (1)**
13:9
**Chevron (10)**
35:7,8,16;39:2,11;
41:9,20;42:6;43:4;
49:20
**choice (1)**
45:25
**choose (1)**
31:1
**chose (7)**
31:2,5;33:5;47:24;
48:1,24;52:20
**chosen (2)**
31:23;39:8
**Chris (1)**
3:5

**Christopher (1)**
3:4
**Church (1)**
18:22
**Cir (11)**
10:10;57:15;
58:19,20,21;60:12,
19;61:1,3;62:24;
65:20
**Circuit (26)**
17:10,12,21;20:1,
2,3,4,6,13,14;21:7,7,
25,25;24:16;26:3,4,
6,7,9,19;27:6,7,18;
28:3;57:7
**circuits (3)**
23:16;58:14,14
**Circuit's (1)**
21:6
**circumstances (2)**
38:4;54:19
**citation (2)**
7:18;65:23
**citations (1)**
10:3
**cite (3)**
6:4;10:5;57:9
**cited (9)**
9:3;10:15;12:20;
20:5;26:3;27:5;28:2;
37:24;43:23
**cites (2)**
7:15;27:8
**citizen (1)**
59:17
**claim (12)**
19:6,9;24:7,10;
61:5,14,17;62:12;
65:9,10,16;66:2
**claims (24)**
5:10,11;6:20,21,
24;8:9;9:24;13:21,
22,23;23:19;32:13;
34:24,25;55:9;
57:25;61:7,7,8,8,10,
11;64:22;66:12
**clarity (1)**
63:1
**clear (16)**
6:10,20;7:9,24;
19:4,8,19,25,25;
20:7;24:11;25:17;
26:19;27:14;59:17;
65:16
**clearly (2)**
26:20;30:21
**CLERK (2)**
67:16,19
**client (2)**
14:25,25
**clock (1)**
48:9
**closed (1)**

14:19
**closer (1)**
60:6
**closes (1)**
14:11
**Clothes (1)**
58:18
**Co (2)**
7:17;63:17
**Code (17)**
5:8,9;11:2;19:7;
23:17,18;40:22;46:6,
7,10;55:7;56:2,11;
57:24;58:7;59:3;
64:1
**collapses (1)**
40:21
**collateral (1)**
9:10
**colors (1)**
12:4
**comment (2)**
33:10,20
**comments (2)**
48:16;67:6
**common (1)**
27:18
**community (4)**
39:1,1;40:4,5
**companies (1)**
15:22
**company (1)**
40:1
**comparable (3)**
27:12;32:9;45:12
**compare (1)**
31:15
**compared (1)**
46:1
**comparing (1)**
59:24
**compel (2)**
56:16;65:12
**complaint (3)**
4:21;55:2;56:9
**completely (7)**
12:17;45:2,5,14,
16;46:10,13
**compliance (2)**
16:12;58:5
**complied (1)**
63:7
**comply (2)**
52:2,7
**concede (1)**
40:10
**concerning (1)**
14:15
**concerns (1)**
43:2
**conclude (1)**
65:8
**concluded (2)**

10:7;69:14
**concluding (1)**
30:10
**conclusion (3)**
60:1;61:12;66:11
**condition (2)**
36:5;61:24
**conditions (5)**
25:24;30:24;34:3,
17,19;36:4,4
**conduit (1)**
31:23
**confer (1)**
45:25
**conference (1)**
68:25
**conferred (1)**
60:21
**conform (1)**
35:4
**Congress (43)**
10:23;11:6,18;
13:15;15:11,14,17;
20:8;25:3,10;26:16;
31:2,11,18,21,22,23;
32:5,17;33:4,7,13,
23;34:8;35:8,9,12,
13,15;44:10,11;45:8,
11,22;46:18,22;
47:24;48:5,24;
52:19;62:8;63:4,10
**Congress' (1)**
12:2
**Congressional (1)**
11:24
**Connecticut (2)**
10:6;30:1
**connection (1)**
40:15
**consent (1)**
7:10
**consider (13)**
35:18;41:14,15;
46:20,21;54:1;57:18,
23;62:11;63:11,11;
66:1,22
**consideration (1)**
7:13
**considered (4)**
5:13;36:19;37:5;
64:17
**considering (2)**
35:22;43:23
**consistent (3)**
52:10,15;53:2
**consistently (1)**
30:13
**constitute (1)**
15:4
**construction (2)**
14:20,21
**consultation (2)**
63:22;64:25

Case:20-00055-EAG    Doc#:44-8    Filed:06/08/20    Entered:06/08/20 19:33:49    Desc:
Exhibit H    Page 75 of 87

PPV, INC. AND BRAVO ENVIRONMENTAL NW, INC. v.
U.S. SMALL BUSINESS ADMINISTRATION, et al.

May 20, 2020

**contain (1)**
12:8
**contained (1)**
32:8
**contains (2)**
5:8;25:5
**contemplated (1)**
67:7
**contention (1)**
6:14
**contentious (1)**
4:23
**contest (1)**
8:18
**context (1)**
9:18
**contingent (1)**
55:23
**continue (4)**
21:12;34:4,17;
36:10
**contract (5)**
22:20,22;29:16,16,
17
**contractor (2)**
22:20,21
**contrary (2)**
11:24;35:11
**control (1)**
12:23
**controlling (3)**
27:2,7;28:2
**controls (1)**
45:13
**conundrum (1)**
42:15
**conveyances (1)**
60:10
**convince (1)**
19:3
**copying (1)**
44:23
**core (8)**
6:21,23;21:18;
22:25;23:4;61:8,8,14
**Coronavirus (1)**
44:8
**Corporation (2)**
7:18;61:2
**Cosi (2)**
37:25;39:25
**costs (1)**
16:3
**counsel (2)**
3:10,21
**counter (2)**
49:24;63:13
**countless (1)**
5:25
**country (5)**
17:6,8;37:9,13;
50:20
**County (1)**

18:6
**course (3)**
13:17;17:18;67:9
**courses (1)**
19:13
**COURT (122)**
3:1,6,9,13,18,22,
25;4:2,5,16,19;5:1,5,
15,19;6:7,11,16,23,
25;7:5,11,13,16,17,
20,23,25;8:4,6;9:1,2;
10:1,19,22;11:21;
13:17;14:14;16:13,
18,21;17:12;18:1,3,
7,8,17,21,24;19:15;
20:12,22;22:4,7,18;
23:11;24:7;26:13,
19;27:17;28:4,11,16,
25;29:2,20;30:1,5,
17;31:12;32:11;
33:2,18;37:25;38:13,
15,21;39:6,12,23;
40:9;42:11,23;43:12,
19;45:17;47:16;
48:8,15;49:21;50:5;
51:21,25;52:3,6,8,
14,23;53:1,11,13,15,
20,23;54:5,11,14,17;
56:9;60:14,20;63:1;
66:25;67:10,13,17,
22;68:7,12,16;69:6,8
**courts (8)**
17:8,25;19:13;
26:1;58:12;60:9;
66:15,24
**Court's (6)**
6:2;12:23;16:17;
63:3,5;68:13
**cover (4)**
25:11,23;26:16;
27:8
**covered (4)**
25:8;30:14;31:7,7
**covers (3)**
23:19;24:22,23
**COVID (1)**
31:13
**COVID-19 (4)**
4:24;14:23;15:17,
19
**Coyle (5)**
3:4,5,5;4:13,14
**created (6)**
32:15,20;45:3,4;
46:10;48:23
**creates (2)**
11:25;30:14
**creating (3)**
33:4;44:10;46:23
**credit (4)**
14:17;26:14,17;
60:22
**creditor (4)**

13:13;38:22,23;
39:15
**creditors (5)**
13:11,19;20:23;
64:21,21
**creditworthiness (5)**
9:7,11;12:9;13:5;
36:9
**Crestmark (1)**
14:18
**crisis (2)**
15:17;44:21
**criteria (1)**
51:7
**critical (1)**
50:6
**customers (1)**
14:24

## D

**dare (1)**
15:15
**days (1)**
56:21
**day-to-day (1)**
50:16
**DC (2)**
58:14,20
**deadline (1)**
68:25
**deal (1)**
5:25
**dealing (3)**
11:4;38:5;60:13
**deals (1)**
52:1
**debt (3)**
10:12;13:14;31:8
**debtor (31)**
4:1,4,21;9:12,14;
13:1;14:6;15:4,8;
16:8;24:20,21;28:14,
19;36:20;37:2;38:4;
39:6,7,19;41:12,14;
42:1,23;45:21;47:10,
17,20;59:6;64:3,16
**debtors (34)**
5:19;10:7;11:7,19;
12:11,12;14:7;15:20,
22;16:15;30:16;
31:1;38:17,18;
41:16;42:5;43:11,
18;45:23;50:3,9,13;
51:20;53:7;54:21;
55:1,25;56:4;63:24;
65:2,5;66:19;67:3,7
**debtors' (6)**
14:16,16,24;
15:16;16:13;56:13
**decide (5)**
39:12;42:7;49:21;
61:16;62:9

**decided (3)**
10:14;20:12;29:23
**deciding (1)**
8:7
**decision (45)**
5:14;6:4;7:2,17,
23,24;9:8;12:16;
17:9;21:18;5:20;11,
16,17;21:24;22:1;
26:4,5,9;27:6,9;28:7;
30:4;37:17,25;38:2;
39:9,18,25;40:13;
41:11;42:4,10;43:6,
14,17;50:9,19;53:25;
54:7,23;62:25;63:1,
12;65:7
**decision-making (1)**
9:5
**decisions (8)**
9:3,18;18:20;26:3;
27:18;37:7;39:9,11
**declaration (3)**
36:25;64:7,15
**declaratory (3)**
55:5;56:5;59:1
**default (3)**
13:12;25:23;38:8
**defect (1)**
15:13
**defendant (2)**
57:6,11
**defendants (5)**
16:25;55:5;57:20;
61:6;64:7
**defendants' (1)**
19:12
**defer (1)**
48:1
**deference (1)**
34:9
**deferential (1)**
62:20
**define (1)**
20:20
**Delaware (4)**
38:1;39:13,20;
43:8
**delays (1)**
33:15
**delegated (1)**
63:5
**delegating (1)**
36:1
**Delta-Mendota (1)**
62:23
**delve (1)**
42:6
**Denali (1)**
67:18
**denied (1)**
17:16
**deny (3)**
24:18;54:25;66:12

**denying (7)**
9:21;10:18;59:5;
60:23;67:14;68:2,22
**Department (5)**
3:15;44:6,14;
60:11;64:25
**depends (1)**
14:18
**describe (1)**
8:20
**described (2)**
20:10;53:5
**describes (3)**
30:12;43:7;47:2
**description (1)**
32:14
**designed (2)**
5:16;8:22
**determination (5)**
7:4;9:6,8;13:18;
14:12
**determine (1)**
63:6
**determined (2)**
63:23;65:1
**determines (1)**
61:15
**development (4)**
17:20,23;18:2;
60:19
**developments (2)**
17:5;18:25
**devoted (1)**
10:25
**difference (2)**
56:18;63:14
**different (13)**
20:14;29:10;39:9;
45:5,9,15,15,16;
46:11,14;49:1;53:5
**difficult (4)**
31:15;54:19;69:9,
10
**difficulty (1)**
62:1
**direct (1)**
45:10
**directed (1)**
37:5
**directly (2)**
23:22;35:9
**directs (1)**
41:9
**disadvantageous (1)**
51:8
**disagree (6)**
37:18;38:2;50:10;
61:11;68:5,16
**disagreed (1)**
38:3
**disaster (1)**
31:19
**disburses (1)**

Case:20-00055-EAG   Doc#:44-8   Filed:06/08/20   Entered:06/08/20 19:33:49   Desc:
Exhibit H   Page 76 of 87
PPV, INC. AND BRAVO ENVIRONMENTAL NW, INC. v.
U.S. SMALL BUSINESS ADMINISTRATION, et al.

May 20, 2020

25:21
**discerned (2)**
  12:2;63:3
**discharged (1)**
  10:11
**discongruence (1)**
  53:9
**discovery (1)**
  7:7
**discretion (9)**
  12:6;34:5;36:2;
  46:20;49:19,23;62:9,
  15,18
**discuss (1)**
  57:16
**discussion (1)**
  51:23
**dishonor (1)**
  64:18
**dismiss (1)**
  43:8
**dismissal (2)**
  66:16;67:6
**disposed (1)**
  7:6
**disposition (2)**
  7:1,11
**dispositive (1)**
  59:14
**dissimilar (1)**
  9:16
**distinction (3)**
  41:3;56:21;59:13
**distinguish (1)**
  28:13
**distinguishable (1)**
  30:1
**distressed (1)**
  15:18
**distributed (1)**
  31:24
**distribution (1)**
  49:8
**district (14)**
  7:13;17:12;18:1,7,
  8,9,17,21,23;30:1;
  37:25;39:20;43:8;
  66:25
**docket (1)**
  55:11
**Dodd- (1)**
  44:24
**Dodd-Frank (3)**
  44:19;45:6;46:16
**DOJ (1)**
  16:24
**dollars (3)**
  32:17;44:15;45:8
**done (9)**
  5:25;13:5;14:4;
  32:5;42:3;50:16;
  56:22;66:24;68:8
**door (1)**

14:10
**doubt (1)**
  65:18
**Doug (2)**
  4:1,15
**down (6)**
  9:3;13:9;14:19;
  41:19;43:2;47:12
**dozen (1)**
  15:24
**draw (2)**
  17:11;52:4
**drawing (1)**
  49:18
**Driscoll (1)**
  20:3
**due (2)**
  10:18;67:9
**duplicative (1)**
  11:15
**duration (2)**
  14:9;56:20
**duty (1)**
  65:17

**E**

**earlier (2)**
  9:3;10:16
**easily (1)**
  13:13
**Eastern (1)**
  53:25
**easy (1)**
  62:7
**economic (5)**
  11:13;14:23;44:5,
  8;60:17
**Education (1)**
  61:2
**effective (1)**
  67:2
**efforts (2)**
  4:22;15:5
**either (3)**
  66:12,16,18
**elements (2)**
  8:9;13:25
**eligibility (2)**
  55:23;62:9
**eligible (5)**
  14:18;47:21;62:4,
  6,10
**else (11)**
  3:19,23;4:5;24:6;
  31:15;35:21;43:4;
  47:18,21;54:7;67:17
**emergencies (2)**
  31:16,17
**Emergency (9)**
  18:6;26:5;32:3;
  33:9;34:7;44:16,19,
  21;66:17

emphasized (1)
  62:5
**employ (1)**
  11:12
**employed (1)**
  15:25
**employees (4)**
  8:23;11:6;15:9,24
**employment (1)**
  16:3
**empower (1)**
  33:13
**empowering (1)**
  33:5
**empty-handed (1)**
  62:7
**enabling (3)**
  55:22;61:25;62:2
**enacted (3)**
  31:11,18;45:16
**enacting (2)**
  35:25;51:5
**enactment (1)**
  12:3
**encourage (1)**
  31:8
**end (6)**
  19:9;20:22;23:9;
  41:3;63:8;64:6
**endeavor (2)**
  27:21;60:16
**endeavors (1)**
  60:24
**ends (1)**
  44:4
**enforce (2)**
  52:16,17
**enforcement (2)**
  52:1,6
**enforcing (1)**
  58:6
**engage (3)**
  29:12,13;48:25
**enjoin (1)**
  23:3
**enough (4)**
  19:25;41:6;47:6;
  65:9
**Enplanar (1)**
  20:3
**enter (3)**
  5:5;42:16;61:9
**entering (3)**
  6:25;22:20;42:2
**entirely (4)**
  14:22;31:20;49:8;
  63:11
**entirety (1)**
  12:3
**entities (7)**
  11:5;34:14;36:13,
  25;37:15;38:9;56:3
**entitlement (1)**

60:13
**entity (1)**
  60:23
**entry (2)**
  7:13,21
**enumerated (2)**
  29:5;60:20
**Environmental (1)**
  55:1
**envision (1)**
  48:13
**epidemic (1)**
  31:13
**equities (2)**
  15:8;57:3
**equivalent (1)**
  45:1
**error (1)**
  43:9
**especially (3)**
  18:20;40:24;57:13
**essence (1)**
  42:21
**essential (1)**
  28:18
**essentially (3)**
  50:21;67:20;68:3
**establish (1)**
  62:2
**et (3)**
  3:3,3
**even (14)**
  21:9,24;22:1;24:2;
  29:15;33:7,25;38:2;
  41:2;46:6;58:25;
  59:1;62:25;64:18
**event (1)**
  38:8
**everybody (1)**
  54:5
**everyday (1)**
  59:15
**everyone (1)**
  4:9
**evict (1)**
  27:10
**eviction (1)**
  10:10
**evidence (5)**
  47:2,10;63:13;
  68:12,14
**exact (4)**
  5:11,14;45:18;
  47:23
**exactly (9)**
  7:18;12:11;20:20;
  23:5;46:2;49:11,11,
  17,20
**examining (1)**
  12:2
**example (4)**
  9:19;38:7;41:20;
  50:11

**examples (1)**
  32:4
**exceed (1)**
  58:16
**exceeded (1)**
  34:25
**exceeds (1)**
  20:18
**excellent (2)**
  31:25;54:18
**except (4)**
  20:18;34:1;56:19;
  66:6
**exception (3)**
  20:19,21;22:19
**excess (3)**
  55:21;61:20,22
**exclude (4)**
  37:15,19;45:23;
  50:9
**excluded (1)**
  36:13
**excluding (3)**
  41:21;50:3;53:6
**exclusion (5)**
  35:15;44:21;51:6;
  52:9;55:25
**exempt (1)**
  10:7
**exemption (2)**
  20:19;23:13
**Exhibit (1)**
  55:10
**exist (1)**
  38:5
**existing (5)**
  32:20;34:18;
  36:15,20;48:23
**exists (2)**
  12:6;52:5
**expand (1)**
  65:14
**expanded (2)**
  11:1;33:8
**expands (1)**
  44:2,2,3
**expedite (2)**
  67:20;68:1
**expedited (2)**
  4:20;67:25
**expenditures (1)**
  31:7
**expenses (3)**
  8:25;13:16;15:2
**experienced (2)**
  31:16,16
**expertise (1)**
  63:15
**expiration (1)**
  14:13
**expire (1)**
  14:9
**explained (2)**

37:24;38:1

**explains (2)**
62:25;64:9

**explanation (3)**
12:10;54:24;63:12

**explicitly (1)**
11:11

**express (1)**
13:14

**expressing (1)**
4:19

**expressly (4)**
5:10,15;58:1;60:1

**Exquisito (1)**
60:25

**extend (11)**
21:19;26:16,24;
30:19;31:5;35:24;
36:1,2;39:7,19;42:24

**extended (3)**
14:10;26:22;37:2

**extending (5)**
34:6,7;39:14;
42:12;64:15

**extends (3)**
44:1;47:16;60:2

**extension (2)**
26:18;60:22

**extent (2)**
28:4;52:21

**external (4)**
22:9,10,14,23

**extra-legal (1)**
52:17

**extraordinarily (1)**
33:3

**extraordinary (3)**
42:18,19;65:15

**extremely (1)**
54:20

---

**F**

---

**F2d (6)**
58:19,20,21;61:1,
2;65:19

**F3d (5)**
10:9;57:14;60:12,
19;62:24

**face (1)**
50:4

**facilities (1)**
45:23

**fact (6)**
13:4;26:22;37:1;
47:21,23;48:22

**factor (3)**
57:13;66:5,9

**factors (6)**
19:10;38:17;57:6;
63:10;66:5,8

**facts (1)**
68:18

**factual (2)**
41:14;55:9

**failed (1)**
16:1;63:11

**failure (1)**
10:11

**fair (1)**
50:21

**fairly (1)**
58:23,24

**faith (1)**
42:4

**fall (2)**
16:3;59:23

**fallout (1)**
16:1

**falls (1)**
44:7

**far (1)**
60:5

**Farm (1)**
63:17

**fashion (3)**
28:5;52:23;53:1

**favor (5)**
6:8;13:24;18:3;
57:4;66:9

**Fed (1)**
58:19

**Federal (10)**
44:16,18,22,24;
45:6,9;46:16;56:9;
58:14;63:19

**feeds (1)**
8:6

**few (4)**
11:12;25:1;30:11;
48:20

**field (1)**
3:21

**Fifth (1)**
20:3

**fifty (1)**
17:7

**figure (1)**
39:24

**filed (3)**
37:1;55:2;56:14

**filing (4)**
8:12,17;9:22;
10:18

**final (11)**
6:25;7:4,10,11,14,
21;8:12;14:11;15:6;
19:21;61:10

**finally (4)**
19:9;46:24;52:21;
61:16

**finance (1)**
42:25

**financer (3)**
41:17;42:13,21

**finances (1)**

16:14

**financial (6)**
15:23;38:10,24;
40:18;44:20;64:2

**financially (1)**
15:18

**financing (4)**
10:8;30:18;39:8;
40:24

**find (6)**
11:10;61:4;63:21;
66:6,7;68:18

**finding (2)**
5:15;6:23

**findings (2)**
7:12,20

**fine (2)**
7:10;52:4

**first (19)**
8:15;17:1,4;19:1;
20:2,13;21:6,25;
25:2;30:7;35:8;39:4;
51:4;57:13,16,18,21;
58:14;60:11

**first-come-first-serve (1)**
14:4

**fits (1)**
9:12

**five (1)**
15:24

**flow (3)**
14:16,16;47:8

**focus (3)**
5:3;10:22;51:25

**focused (2)**
68:17,18

**folks (1)**
16:3

**folks' (1)**
16:2

**follow (2)**
19:15;60:9

**followed (1)**
19:13

**following (2)**
20:13;63:21

**follows (1)**
19:16

**forced (1)**
42:21

**forest (1)**
12:4

**forgivable (1)**
49:9

**forgiven (1)**
8:24

**forgiveness (4)**
25:23;30:23;31:9;
64:24

**form (9)**
6:18;36:22;55:10,
11,15;61:21;64:3,4,5

**forms (1)**

26:17

**forth (1)**
29:6

**forty (1)**
17:7

**found (4)**
9:22;13:3;61:24;
66:11

**Foundation (1)**
18:6

**foundationally (1)**
40:12

**four (5)**
24:22,24;29:5;
30:9;60:9

**fourteen (1)**
56:21

**Fourth (4)**
26:6;37:24;43:7;
63:21

**franchise (10)**
24:19,25;26:15;
29:5,10,14;30:9;
59:5,9,19

**franchises (4)**
24:23;29:11;
59:20;60:15

**Frank (1)**
44:25

**FRCP (1)**
56:18

**free (1)**
65:18

**frivolous (1)**
12:17

**front (5)**
6:6,13;14:14;
27:20;39:25

**frustrate (1)**
31:10

**full-throated (1)**
5:2

**fund (1)**
25:21

**funding (4)**
8:22;9:13;14:4;
48:25

**funds (29)**
9:6,14;11:14;
12:22;13:8,10,12,13,
18;14:8;15:12,18,22;
21:1,4,11,22;25:22;
31:20,24;38:6;
39:16;45:15;52:25;
56:12;59:11;62:10;
63:25;64:22

**further (10)**
21:2;33:7;48:6,16;
52:9;53:19;56:17;
68:12,15;69:6

---

**G**

---

Garcia (1)
57:14

**garnishment (1)**
19:20

**gatekeeper (1)**
27:20

**gave (2)**
31:9;41:21

**general (1)**
25:13

**generally (1)**
65:14

**generous (2)**
30:23;31:9

**George (1)**
4:3

**gets (2)**
16:10;49:11

**gift (1)**
60:6

**gifts (1)**
59:15

**given (3)**
53:7;54:19;62:7

**gives (1)**
47:17

**giving (4)**
13:6;24:4;33:8;
62:9

**goal (2)**
39:11,11

**goes (6)**
20:20;33:19;
34:11;49:10,16;
55:15

**Goldrich (7)**
26:8;27:25;28:2,5,
6,8;61:1

**Good (12)**
3:1,5,13,18,22;
4:16;28:7;41:6;
53:23;54:11,17;
67:17

**good-paying (1)**
14:25

**Google (1)**
57:14

**govern (1)**
23:23

**governing (3)**
23:24,25;46:19

**Government (37)**
3:10;5:4;6:16;
7:15;9:17,19;10:17;
13:6;16:7;18:2,4;
20:24;24:18;25:7,8;
26:2;27:13,20;29:4;
30:22;47:15;48:22;
49:18;51:24,25;
52:8;54:21;56:23,
23;57:6;58:6;59:17,
22;60:10,21;68:2,21

**governmental (9)**

Case:20-00055-EAG Doc#:44-8 Filed:06/08/20 Entered:06/08/20 19:33:49 Desc:
Exhibit 8 Page 78 of 87

PPV, INC. AND BRAVO ENVIRONMENTAL NW, v.
U.S. SMALL BUSINESS ADMINISTRATION, et al.

May 20, 2020

6:13,15;8:10,16;
52:20;56:2;59:4;
60:15,23
**Government's (6)**
4:12;5:4;7:9;9:20;
12:10;50:11
government-subsidized (1)
25:13
**grant (30)**
8:11,13,19,21;9:4,
16;10:4,18;11:17;
13:6;16:18;24:20;
28:14,17,21;30:6,8,
10;31:10,20;59:6,10,
12,14,15,16,19;60:7,
8;65:11
**granted (9)**
17:25;18:3,11,15,
17;59:22;66:16;
67:21,22
**granting (4)**
13:24;14:1;15:6;
53:12
**grants (6)**
15:10;24:23;
26:15;59:21;60:3,10
**great (3)**
22:15;32:7;48:21
**greater (5)**
16:3;38:18,25;
42:1;47:21
**ground (2)**
14:22,22
**grounds (3)**
24:3;30:2;53:12
**guarantee (13)**
25:19,25;26:2,6,
14,22;27:8;28:22;
29:24;37:13;55:12;
60:13;64:18
**guaranteeing (1)**
37:8
**guarantees (4)**
9:10;25:22;32:18;
42:19
**guess (10)**
28:6;29:21;39:23,
25;40:10;43:2;
48:19;51:3,6;53:24

**H**

**hair (1)**
40:14
**halt (4)**
14:22,22;23:4,6
**hang (1)**
54:5
**happen (4)**
23:5;33:15;39:18;
47:10
**happened (1)**
13:12

**hard (5)**
41:1;49:14;50:10,
14;54:18
**hardship (1)**
66:8
**harm (11)**
13:25;15:4;18:14;
46:25;47:1,7,14,15,
20;57:2;66:8
**harms (1)**
47:19
**hat (1)**
14:5
**head (2)**
32:16;64:8
**heading (1)**
67:8
**hear (5)**
6:24;7:6;24:7;
48:12,16
**heard (6)**
5:1;14:15;17:7;
53:16,17;64:15
**hearing (10)**
3:2;4:19;16:19;
17:3;56:24;66:17;
67:12,20;68:10,15
**hearings (1)**
14:15
**heart (1)**
7:1
**heavily (1)**
18:20
**held (2)**
26:13;60:14
**help (1)**
15:18
**Hercher (2)**
3:1;54:11
**here's (1)**
53:23
**Hidalgo (4)**
17:25;18:6,17,19
**high (2)**
63:25;65:8
**Higher (1)**
61:2
**highlight (1)**
14:2
**hindering (1)**
20:24
**hiring (1)**
22:24
**Historically (1)**
64:10
**history (3)**
24:14;36:23;37:5
**hold (2)**
45:13;57:8
**Holder (1)**
57:8
**holding (2)**
27:10;58:14

**holds (1)**
9:23
**home (7)**
10:8;26:5;7;29:24,
25;60:13;62:6
**hone (1)**
52:1
**Honor (40)**
3:5,8,11,14,20,24;
4:3,14,18;5:7;10:20;
16:20,23;19:4;
22:16;23:12;28:1,
10;32:10,21;39:2;
40:7;41:8,21;42:17;
46:3,24;47:7;48:14,
19;51:3;53:18;54:4,
13,16;67:5,11,15;
69:5,7
**hope (2)**
17:2;19:3
**Hospital (2)**
6:4;10:15
**host (2)**
42:9,10
**hottest (1)**
4:23
**housing (12)**
9:19,20;10:6,9,11;
27:9,11,23;29:7,14,
23;60:18
**huge (1)**
47:14
**hundred (1)**
8:24
**hundred-eyed (1)**
12:21

**I**

**ideal (1)**
63:1
**identical (3)**
17:16;18:16,16
**III (1)**
61:15
**immunity (16)**
5:6,9;6:6,10;8:1;
19:2,11,18;24:8;
51:24;52:12,20;
53:12;57:22,25;58:7
**impact (1)**
16:6
**impacted (2)**
15:17,19
**impacts (1)**
15:1
**implausible (1)**
63:14
**implement (2)**
31:2;33:6
**implemented (1)**
32:9
**implementing (4)**

33:21;36:12;45:5;
46:18
**Implicit (3)**
39:24;40:1,17
**important (3)**
26:8;54:20;63:11
**importantly (2)**
9:5;31:2
**imposes (2)**
12:14;61:24
**imposing (1)**
52:24
**improper (1)**
12:13
**Inc (6)**
3:3;55:1,2;60:25;
63:16;65:19
**incentive (1)**
31:4
**inclined (2)**
60:8;66:7
**include (2)**
29:11;44:21
**included (1)**
26:17
**includes (1)**
55:13
**including (2)**
17:22;64:21
**inclusion (2)**
50:12;62:17
**Incorporated (1)**
17:14
**indicated (1)**
12:20
**indicates (1)**
7:15
**indication (1)**
67:1
**indicative (1)**
10:16
**individual (1)**
60:16
**individualized (1)**
50:23
**ineligible (1)**
11:7
**inevitable (1)**
62:7
**inference (1)**
46:8
**inferred (1)**
46:12
**injunction (23)**
5:15;6:17;7:21;
18:3,13;19:9,20;
20:8;18;21:10;
22:12;23:8,9;24:3;
56:15,19,25;57:5,10;
58:10;59:2;68:5,23
**injunctive (7)**
5:5;6:7;7:16;24:1;
55:5;56:5;58:25

**inquire (1)**
64:12
**inquiry (1)**
9:11
**inside (1)**
51:15
**instance (2)**
23:1;37:1
**instances (1)**
39:14
**instead (2)**
13:14;27:3
**instructing (1)**
42:6
**insurance (2)**
16:12;63:17
**intended (12)**
11:22;13:15;
15:17;20:23;25:10;
26:16;31:20;38:7,
11;49:16;62:8;63:10
**intent (2)**
12:2;52:11
**intentional (1)**
11:21
**intents (1)**
68:9
**interest (14)**
15:7;21;28:14,17,
20;29:18,19;30:14;
31:7;46:25;47:12;
49:15;57:5;66:9
**interested (1)**
38:16
**interesting (1)**
22:7
**interests (1)**
42:16
**interfere (3)**
5:23;58:17;64:22
**interference (3)**
5:17;21:3,10
**interfering (1)**
21:19
**Interim (3)**
37:24;43:7;63:21
**intermediate (1)**
19:22
**internal (9)**
5:17,23;21:3,11,
20;22:8,9,14;58:18
**interpret (1)**
11:21
**interpretation (2)**
12:5;36:12
**interpreted (1)**
58:15
**interrupt (8)**
10:1;2;22:4;33:18;
38:13;39:23;40:9;
50:6
**into (5)**
14:25;18:22;41:4,

Case:20-00055-EAG   Doc#:44-8   Filed:06/08/20   Entered:06/08/20 19:33:49   Desc:
Exhibit 8   Page 79 of 87

PPV, INC. AND BRAVO ENVIRONMENTAL NW, INC. v.
U.S. SMALL BUSINESS ADMINISTRATION, et al.

May 20, 2020

12;42:6
**investigation (1)**
13:5
**invited (1)**
66:17
**involuntarily (1)**
38:23
**involved (3)**
5:22;16:13;55:14
**irrational (1)**
43:10
**irreparable (7)**
13:25;15:4;18:14;
46:25,25;57:2;66:8
**irresponsible (2)**
40:17;41:4
**isolation (1)**
12:4
**issuance (2)**
16:16;58:10
**issue (26)**
4:9,21;5:14;6:7,
12,17;8:2,7,11;19:2,
8;20:2;24:8;26:20;
29:4,17;33:9;35:10,
10;41:15;51:24;
52:4,6,14;58:23;
68:23
**issued (4)**
14:20;19:24;
56:19;68:5
**issues (7)**
4:22,23;5:3;17:6;
53:10;57:19;68:13
**item (1)**
55:11
**IV (4)**
44:4,13;45:25;
46:9

**J**

**jeopardize (1)**
5:24
**Jobs (1)**
32:6
**Joffee (1)**
66:25
**John (1)**
64:7
**Jovita (1)**
55:2
**Judge (4)**
3:1;17:16;54:11;
67:16
**judgment (5)**
7:14;39:3;40:17;
61:10;63:4
**judicial (4)**
21:4;58:2,16;
65:24
**July (1)**
69:1

**June (1)**
14:10
**jurisdiction (7)**
6:17,24;7:6,16;
8:1;56:10;61:22
**jurisdictional (1)**
53:12
**Justice (1)**
3:15
**justification (1)**
40:21

**K**

**Kathleen (1)**
3:7
**keep (3)**
15:25;20:23;31:6
**Kevin (2)**
3:15;16:24
**kind (7)**
23:1,3;32:13;41:2;
44:19;46:3,8
**kinds (1)**
56:3
**knew (5)**
33:4,4,23;34:8;
45:22;46:22;47:25
**knows (1)**
47:8

**L**

**lack (2)**
16:2;61:9
**lacks (1)**
7:16
**Ladd (1)**
65:19
**language (30)**
19:17,25;20:7;
21:2,10,12;22:11;
23:9,14,21;24:14,17;
25:12;26:12;27:22;
34:2;35:8,12,13,17,
19;40:22;43:22;
44:24;45:25;46:12,
15,17;52:11;58:11
**largely (2)**
17:8;31:20
**last (2)**
29:21;30:3
**later (1)**
27:24
**law (32)**
6:20;21:25,25;
23:23,24,25;24:15;
25:16;26:25;27:7;
28:2,7;35:5,7;40:12;
43:17;44:10;45:4,6,
16;46:10,18,20,23;
52:2,7,15;62:15,19;
68:14,17,18

**lawyers (1)**
4:7
**leads (1)**
8:2
**leap (1)**
27:14
**lease (5)**
28:15,15;29:7,11,
18
**least (8)**
17:10;28:6;38:5;
39:13;40:13;48:9;
58:13;61:10
**left (1)**
13:6
**lender (5)**
14:17;38:8;39:7;
42:25;64:15
**lenders (3)**
30:19;42:18;64:11
**lending (27)**
9:20;25:2,5,7,9,11,
13;26:10;29:25;
32:2,21,24,25;33:2,
3;34:9;36:14,15;
37:3;44:16,19,20;
45:1,4;47:25;50:14;
53:4
**less (6)**
11:5,13;47:3;
61:13,17;62:25
**level (1)**
11:22
**leverage (2)**
42:19,24
**Lexis (2)**
6:4,5
**liabilities (1)**
47:8
**license (12)**
24:19,22,25;
26:14;29:5,15,15,18;
30:9;59:5,8,18
**Licenses (2)**
59:20;60:14
**liens (6)**
13:11,18;39:15;
40:2,20,23
**likelihood (11)**
8:8;10:22;13:22;
18:14;19:4;27:1,15;
41:16,17;57:1,13
**likely (8)**
6:22;14:12;40:2;
41:12,13;61:13,17;
66:7
**limitation (1)**
20:21
**limitations (2)**
33:20;61:23
**limited (5)**
14:4,9;47:16;
56:20;62:5

**line (3)**
14:6,13,17
**line- (1)**
49:17
**line-drawing (1)**
49:15
**lines (2)**
7:24;29:24
**liquidation (1)**
64:20
**little (3)**
13:8;16:7;19:8
**loan (62)**
8:21;9:4;11:5,13;
21:17;25:17,19,20,
21,22,23,25;26:2,6,
22;27:8,12;28:7,20;
30:6,12,22;31:3,5,6;
32:8,18;36:21;37:2;
39:14;40:15;41:22;
47:11,15,16,22;48:4,
23;50:23;51:1,2;
53:6;55:12,23;56:7;
59:8,10,11,14,23;
60:5,5,7,7,13;64:2,5,
10,16,17,22,23
**loan-making (1)**
9:8
**loans (42)**
21:16,19;23:7;
25:7,14;26:5,7,16;
28:8;30:14,17,19,20;
32:18;34:19;35:24;
36:1,2,5,9,17;37:9,
13;38:4;39:19;
42:12;44:1,15,22;
49:5;55:17;59:11;
60:2,3,3;62:4,5;
63:24;64:1,4,12;65:5
**Locke (1)**
62:24
**Lockers (1)**
20:4
**lodge (2)**
67:13;68:21
**logic (7)**
38:24;39:24;40:3,
3,13,21;41:2
**logical (2)**
40:8,15
**longstanding (1)**
64:10
**look (8)**
19:21;21:14;
22:16,16;35:8,16;
40:21;43:25
**looking (9)**
8:8;10:22;11:9;
12:3,7;16:6;37:11;
45:20;48:8
**loss (1)**
51:14
**lot (5)**

18:10;37:17;
43:17;44:1;50:17
**low-level (1)**
41:2
**Ltd (1)**
58:21
**Luis (2)**
62:23;63:8

**M**

**main (1)**
19:1
**Maine (3)**
5:15;9:2;20:12
**maintain (2)**
8:4;57:12
**major (1)**
17:23
**majority (1)**
21:5
**makes (3)**
7:23;46:4;61:12
**making (7)**
14:24;23:6;38:4;
49:5,8;56:7;65:5
**managed (1)**
14:16
**mandamus (6)**
55:7;56:8;65:12,
14,15,21
**manner (1)**
50:2
**Manufacturers (1)**
63:16
**many (6)**
15:16;17:24;
18:19;30:21;40:10;
62:10
**Maritime (1)**
58:21
**Marsh (1)**
20:4
**Marshall (2)**
7:2,23
**massive (1)**
31:18
**matter (8)**
6:17;7:7,12;54:20;
56:22,22;67:25;
69:10
**matters (2)**
6:21;7:25
**May (15)**
6:4;9:14;10:7;
18:5;29:11;35:24;
36:1,3;38:9;39:22;
50:7;52:4;63:2;
66:14,22
**maybe (4)**
14:25;20:19;41:6;
46:8
**mean (3)**

Case:20-00055-EAG   Doc#:44-8   Filed:06/08/20   Entered:06/08/20 19:33:49   Desc:
Exhibit H   Page 80 of 87

PPV, INC. AND BRAVO ENVIRONMENTAL NW, INC. v.
U.S. SMALL BUSINESS ADMINISTRATION, et al.

May 20, 2020

28:4;38:19;51:12

**means (3)**
19:22;20:20;58:13
**meant (1)**
19:22
**meat (1)**
22:17
**mechanism (2)**
52:5,15
**mechanisms (1)**
20:25
**Medicaid (1)**
44:4
**medical (1)**
44:3
**Medicare (1)**
44:4
**meet (1)**
16:5
**meets (2)**
15:11;16:9
**Mel's (1)**
20:4
**memo (1)**
12:20
**memorandum (4)**
8:5,20;9:7;11:4
**mentioned (1)**
58:3
**merely (4)**
28:21;31:10;62:3,
8
**merge (1)**
57:7
**merit (1)**
5:7
**merits (15)**
7:1,4;8:9;10:23;
13:23;18:14;19:3,5;
24:9;27:1,15;57:1,
14;66:4,7
**mesne (2)**
19:21,21
**met (1)**
25:24
**method (1)**
31:5
**Mexico (4)**
9:1;10:14;18:21;
30:5
**Michigan (1)**
60:18
**mid-sized (2)**
45:1,2
**midstream (1)**
33:14
**might (5)**
29:14;39:6;42:10;
51:8;59:1
**Miller (3)**
64:8,14,19
**million (1)**
37:9

**millions (1)**
42:12
**mind (2)**
50:10;67:4
**minimum (1)**
62:8
**ministerial (1)**
65:17
**minutes (3)**
48:11,14;67:25
**misses (1)**
12:4
**misunderstanding (1)**
20:7
**modes (1)**
31:23
**modification (1)**
64:9
**monetary (2)**
59:15,21
**money (18)**
12:13;16:11;
21:16;25:21;27:12;
31:4;33:15;38:10,
21;41:13;45:7,10;
47:14,18;48:25;49:7,
9;51:13
**monitoring (1)**
16:13
**mooting (1)**
68:1
**moots (1)**
68:3
**more (23)**
11:5;12:18;14:25;
16:8;19:8;22:2;24:4;
25:18;27:4,4;31:2;
37:8;40:2;41:7,12,
13,13;47:3;48:10,13;
52:13;61:17;68:14
**Moreover (1)**
65:21
**morning (2)**
17:10,13
**mortgage (1)**
31:7
**most (6)**
4:23;5:13;9:5;
23:16;28:23;60:11
**motion (15)**
4:10,11;8:20;
16:18;27:14;47:10;
54:25;56:14;66:13;
67:14,19;68:1,2,4,22
**Motor (1)**
63:16
**move (2)**
19:3;24:9
**moving (2)**
4:20;13:25
**much (4)**
30:21;42:15;47:1,
9

**must (7)**
11:12,13;30:15;
34:19;36:9;57:1;
61:16
**mute (2)**
4:7,8
**Mutual (1)**
63:17

**N**

**name (1)**
14:5
**narrow (2)**
52:23;62:22
**narrower (1)**
63:6
**narrowly (1)**
52:22
**nation (1)**
31:15
**national (1)**
31:16
**natural (1)**
31:19
**nature (4)**
61:12,14;65:12,13
**nearly (3)**
17:16;18:15;20:1
**necessarily (2)**
65:4;68:14
**necessary (2)**
11:14;50:23
**necessity (1)**
15:2
**need (11)**
4:21;37:13;47:3,6;
48:10,13;49:15;
51:17;65:2;68:1;
69:3
**needed (3)**
7:20,20;13:19
**needs (2)**
16:5;29:3
**negotiate (1)**
42:19
**neither (1)**
55:13
**Nell (2)**
3:20,20
**neutral (1)**
66:10
**New (11)**
9:1;10:14;11:25;
18:21;26:25;30:5;
40:11;44:10;45:3;
46:10;61:2
**news (1)**
66:15
**next (2)**
35:20;65:10
**NIA (1)**
17:13

**Ninth (6)**
17:10,11,21;21:7,
7;57:7
**Nken (1)**
57:7
**no- (2)**
21:9;23:8
**no-injunction (3)**
21:2,12;23:21
**non-applicable (1)**
52:15
**nonbankruptcy (6)**
13:1;23:24,25;
38:19;52:2,7
**noncore (4)**
61:11,12,14,18
**non-core (2)**
6:22;7:22
**nondebtor (3)**
38:5;41:13;42:1
**nondebtors (3)**
42:5;43:11;47:24
**none (2)**
12:6;19:23
**non-lawyers (1)**
4:6
**nonprofit (1)**
34:14
**nonrepayment (1)**
63:25
**nor (3)**
26:15;55:14;59:9
**normal (1)**
37:12
**note (5)**
30:15;46:24;47:1;
53:16;67:25
**noted (1)**
32:21
**notes (1)**
54:1
**notice (6)**
17:2;33:10,19;
56:20,22;68:8
**noting (1)**
17:4
**notion (7)**
10:4;22:7;27:19;
38:19;40:1,20;49:14
**Nova (1)**
65:19
**Nowhere (1)**
12:17
**number (6)**
17:14,15,22;18:7,
7;26:3
**NW (1)**
55:2

**O**

**object (1)**
56:24

**objectives (1)**
49:6
**observation (2)**
50:15;66:14
**obstructing (1)**
20:25
**obtain (3)**
30:17,18;55:17
**obtaining (2)**
16:10;48:25
**obvious (2)**
16:2;65:23
**obviously (2)**
28:19;56:22
**occupation (2)**
27:21;60:16
**occupations (1)**
60:24
**occur (2)**
14:12;47:7
**oddness (1)**
59:24
**off (3)**
4:19;22:20;32:3
**offered (1)**
63:12
**Office (1)**
64:8
**officer (1)**
65:17
**official (4)**
36:21;55:3,10;
57:22
**offsetting (1)**
47:19
**Oklahoma (1)**
58:19
**one (37)**
4:23;5:10;8:24;
11:18,22;14:3;
15:13;16:8;17:22,
23;19:13,14;20:11;
23:1;24:13;25:15;
26:8;27:5;28:23;
29:3;30:8;34:12,18,
25;36:5,19;42:10;
45:17;48:21;57:8,
18;59:4;62:22;
64:16;65:1;66:24;
68:1
**one- (2)**
22:19;32:2
**only (12)**
6:12;15:13;17:21;
20:14;24:5;25:5,6,
14;61:15;62:20;
65:16;68:11
**open (1)**
23:3
**opens (1)**
34:13
**operations (3)**
14:20;20:25;58:18

Case:20-00055-EAG   Doc#:44-8   Filed:06/08/20   Entered:06/08/20 19:33:49   Desc:
Exhibit H   Page 81 of 87
PPV, INC. AND BRAVO ENVIRONMENTAL INV., et v.
U.S. SMALL BUSINESS ADMINISTRATION, et al.

May 20, 2020

**opinion (2)**
9:1;12:21
**opinions (1)**
22:17
**opportunity (5)**
28:22;29:12,13;
47:11,17
**opposed (3)**
33:20;38:18;62:3
**opposing (1)**
68:9
**opposite (2)**
18:13;47:23
**option (2)**
30:23;31:9
**oral (1)**
56:20
**oranges (1)**
45:24
**order (38)**
4:11,11,11;5:18,
19;6:9,18;7:3,10,13;
8:2,7;13:24;14:2,21;
15:7,23;16:17,19,19;
18:8,10,10;49:4;
52:2,6,14,17,18;
56:15;66:13;67:14;
68:2,4,10,15,21,22
**orders (7)**
21:4,11;52:4,9;
53:13;58:6;67:24
**ordinary (5)**
14:25;50:16;51:1;
59:22;60:5
**Oregon (1)**
14:20
**ostensibly (1)**
16:10
**others (2)**
20:24;48:17
**otherwise (13)**
13:19;14:10;16:4,
9;24:4;26:22;34:2,
16;36:8;40:3;48:11;
62:15,18
**out (21)**
4:20,23;5:2,14;
8:5;9:1,7;10:14;
11:12;13:3;14:14;
15:12,13;16:9;
17:25;33:15;39:24;
48:20;49:7;51:13;
68:7
**outcome (1)**
63:4
**out-of-hand (1)**
43:9
**outside (2)**
41:1;51:15
**outweighed (1)**
66:4
**over (7)**
33:1,3;34:5,9,10;

42:21;48:1
**overcome (1)**
23:20
**overseen (4)**
44:5,13;45:3,14
**oversight (3)**
12:23,25;16:11
**overturning (1)**
48:3
**own (3)**
5:8;39:9;63:4
**owners (1)**
55:14

## P

**Pacific (2)**
54:2,6
**page (2)**
45:20;60:19
**pandemic (4)**
4:24;14:23;32:19;
38:11
**Paper (1)**
43:3
**papers (2)**
4:20;5:4
**paragraph (2)**
64:14,19
**parrots (1)**
46:17
**part (7)**
32:25;44:7;46:4;
56:11;59:12;64:12;
69:11
**participate (1)**
11:7
**participating (1)**
64:11
**particular (2)**
23:1;53:3
**particular-loan (1)**
50:18
**particularly (1)**
26:8
**parties (6)**
54:19;66:15;69:1,
8,11,12
**party (1)**
68:9
**path (1)**
63:2
**pay (3)**
10:11;12:13;15:1
**Paycheck (3)**
8:13;32:15;55:11
**paying (1)**
38:22
**Payment (9)**
5:20;11:10,17;
12:7,10;13:2,15;
14:3;15:10
**payments (3)**

12:18;13:1,2
**payroll (8)**
11:14;13:16;15:3;
30:25;25;31:4,9;
39:16
**pays (1)**
25:24
**pending (7)**
11:16;17:6,22;
18:4;56:17;57:12;
68:24
**Penobscot (5)**
6:3;10:15;20:10,
16;22:1
**people (4)**
11:13;23:6;39:22;
41:3
**percent (2)**
8:24;30:25
**perform (1)**
36:16
**performed (1)**
37:4
**perhaps (6)**
22:23;27:4,4;
43:17;51:1;64:18
**period (2)**
28:8;37:9
**permission (1)**
30:17;60:24
**permit (13)**
24:19,23,25;
26:14;29:5;30:9;
56:6,16;59:5,8,19;
60:16;68:19
**permits (4)**
53:8;59:20;60:14;
62:3
**permitted (2)**
8:25;49:9
**person (2)**
41:21;64:2
**personal (1)**
9:10
**personally (2)**
38:2,3
**persons (1)**
54:21
**perspective (1)**
16:6
**ph (3)**
7:17;20:3;26:4
**phone (4)**
3:4,7,23;4:7
**phones (1)**
4:8
**piece (1)**
51:6
**pieces (1)**
19:1
**place (2)**
14:6;15:15
**placed (3)**

14:23;36:14;48:21
**plain (6)**
19:17,19;23:14;
24:14,17;58:11
**plain-language (1)**
20:15
**plainly (1)**
65:18
**plaintiff (21)**
5:11;17:17,24;
18:4;19:14;20:9;
21:14;23:17;24:6;
26:24;27:5,8;29:22;
30:4;34:24;35:14;
43:21;47:3;56:25;
57:2,10
**plaintiffs (27)**
6:8;20:8;4;13:23;
16:16;23:4;35:3;
37:16;53:13;55:20;
56:5,14;59:1,11;
61:4,6,13,16;62:1,4,
12;65:8,11,25;66:1,
6,11
**plaintiffs' (6)**
34:24;48:4;57:17;
61:20;62:16;66:4
**plaintiff's (2)**
57:4;65:16
**plan (2)**
48:15;49:17
**pleadings (1)**
6:19
**please (1)**
4:7
**plenty (1)**
52:25
**pm (3)**
54:10,10;69:14
**point (10)**
7:11;14:14;27:2;
29:3,3,22;30:3,3;
48:20;52:4
**pointed (2)**
24:6;68:7
**points (5)**
8:6,15;14:2;15:6;
51:23
**policy (13)**
37:18;39:9,10;
40:8,13;42:5;43:1,
13,13;47:23;50:8,19;
60:22
**policy-making (2)**
42:2;48:5
**portion (1)**
46:6
**position (9)**
19:12,14,14,16;
21:5,6;41:6;50:11,22
**possibility (2)**
38:6;66:20
**possible (2)**

23:18;68:11
**post-loan (1)**
38:8
**post-petition (10)**
30:18;39:8;40:24;
41:17;42:13,18,21,
25;50:14;51:1
**potential (2)**
6:12;54:22
**power (4)**
6:7;33:8;43:12;
52:17
**powers (6)**
33:3,6,8,23;34:8;
52:19
**PP (1)**
33:14
**PPP (53)**
20:11;21:16;
24:13,25;25:19;
28:19;30:5,21,25;
32:14,17,20,23,24;
33:4,6,25;35:25;
36:14;38:6,9;44:2,
11,25;45:10,13;46:1,
4,13,18,23;47:5,11;
48:22,25;49:1;53:2,
5;55:17,23,25;56:6;
59:8,10;60:5,7;62:5;
63:23;64:4,9,19,22,
23
**PPP's (1)**
49:6
**PPV (5)**
3:3;4:4;55:1,17;
56:11
**practical (1)**
60:6
**practice (1)**
50:17
**practitioners (2)**
37:17;40:11
**preceding (1)**
52:3
**precise (6)**
35:9,10,11,13,17,
19
**precisely (1)**
41:22
**preclude (1)**
35:22
**precluded (1)**
34:15
**predate (1)**
38:10
**preexisted (1)**
46:22
**preexisting (8)**
28:15;33:20;36:4;
38:24;40:2,20,23;
46:20
**preference (2)**
42:22;48:4

Case:20-00055-EAG   Doc#:44-8   Filed:06/08/20   Entered:06/08/20 19:33:49   Desc:
Exhibit 4   Page 82 of 87

PPV, INC. AND BRAVO ENVIRONMENTAL NW, INC. v.
U.S. SMALL BUSINESS ADMINISTRATION, et al.
May 20, 2020

**prejudge (1)**
66:18
**preliminary (11)**
7:5,25;18:3,13;
56:15,19,25;57:2,4;
68:4,23
**prepared (1)**
66:22
**pre-petition (2)**
10:12;51:1
**prescribed (1)**
65:18
**present (1)**
63:24
**presentations (1)**
54:18
**presented (1)**
4:22
**presumably (1)**
31:3
**presumption (1)**
62:21
**pre-trial (2)**
7:7;68:25
**pretty (5)**
14:2,22;19:7;
24:11;27:13
**prevail (8)**
59:1;61:4,7,13,17;
62:12;66:2,12
**prevent (1)**
43:22
**previously (2)**
14:15;31:22
**primarily (1)**
68:17
**primary (1)**
14:17
**principals (1)**
69:9
**principles (1)**
35:5
**prior (2)**
9:22;28:16
**prioritize (3)**
42:5;43:11;47:24
**prioritized (1)**
47:22
**privilege (1)**
59:17
**privileges (2)**
56:3;59:21
**probabilities (1)**
43:3
**probability (2)**
57:16;65:9
**probably (2)**
4:22;40:10
**problem (1)**
63:12
**procedural (2)**
58:5;63:7
**procedure (4)**

9:9;55:6;58:1;
65:24
**Procedures (1)**
6:22;9:25;10:21
**proceeding (7)**
3:2;5:12,22;7:22;
12:19;68:24;69:2
**proceedings (3)**
4:25;56:17;69:14
**process (6)**
9:5;16:8,12;33:19;
34:7;64:12
**processes (4)**
19:21;34:3,6,17
**processing (1)**
21:16
**product (1)**
63:15
**professional (1)**
54:18
**proffered (1)**
12:9
**Program (76)**
5:21;6:1;8:13,22;
9:4,21;10:8,17;11:5,
8,10,17;12:7,11;
13:2;14:3,3;15:10;
25:19,25;26:6;
29:25;30:6,6,10,13;
31:3,18;32:2,14,16,
22,24,25;33:2,5,14,
15;34:2,3,9;36:5,5,
15,15;37:3,12,20;
44:5,13,16,20,22;
45:1,2,4,14;46:9,13,
19,22;47:5,16,25,25;
48:22,23;49:13,16;
53:2,4,6;55:12;
59:12;64:5,10
**programs (19)**
9:16,19,20,20;
25:3,9,17;26:2,10,
23;27:8;30:22;32:6,
8;33:3;34:10,14;
44:19;46:17
**prohibition (2)**
6:25;36:24
**prohibits (3)**
56:2;58:10;59:4
**promissory (1)**
30:15
**promulgated (2)**
55:10;61:22
**proper (1)**
38:21
**property (6)**
19:24;28:14,17,
20;29:18,19
**protect (4)**
5:16;23:10;42:16;
49:15
**protected (5)**
13:19;28:14,16,

21;41:18
**protecting (1)**
23:9
**Protection (13)**
5:20;8:13;11:10,
17;12:7,11;13:2;
14:3;15:10;32:16;
42:15;55:11;60:2
**protections (11)**
16:11;30:18;39:5,
7;42:11,15,23;50:14,
24;51:18;53:2
**protects (2)**
21:3,10
**provide (3)**
8:22;11:19,22
**provided (1)**
8:24
**provides (1)**
12:5
**providing (1)**
63:23
**provision (6)**
8:23;34:19;36:6;
46:6;52:1,12
**provisions (3)**
34:18;35:25;36:10
**public (13)**
10:10;15:7,21;
27:9,11,23;29:7,14;
46:25;47:12;48:5;
57:5;66:9
**publication (1)**
63:20
**purpose (4)**
9:15;13:15;31:11;
64:19
**purposes (6)**
12:14;13:3;31:22;
38:22;60:6;68:9
**pursue (3)**
60:16,24;66:23
**pursuing (1)**
65:25
**put (5)**
4:6,7;24:12;33:5;
47:24

**Q**

**qualification (1)**
11:11
**quantities (1)**
37:13
**quickly (2)**
37:14;49:7
**quo (1)**
57:12
**quotation (5)**
63:8,15,21;64:6;
65:19
**quoting (1)**
62:23

**R**

**raise (2)**
20:10;66:20
**raised (6)**
5:4;18:16;23:17;
29:22;43:21;57:20
**raises (1)**
20:9
**raising (3)**
17:5,17;18:15
**rate (1)**
30:14
**rather (3)**
8:21;22:14;57:11
**rating (1)**
12:9
**rational (1)**
50:8
**rationale (2)**
51:9;53:8
**re (4)**
6:3;10:6;20:10;
27:5
**read (6)**
4:10,12;5:1;22:12;
52:8;60:9
**reading (2)**
20:1;52:13
**ready (1)**
35:3
**real (1)**
4:21
**reality (1)**
15:15
**really (22)**
17:24;18:16;19:4;
21:23;22:25;23:2,
15;24:6;25:10;30:5;
33:19;35:4,4,14;
40:21;41:10;43:1;
47:9;50:3,15;51:17;
53:18
**realm (2)**
42:2;52:19
**reason (8)**
25:9,15,16;31:3;
49:21,22;50:3;57:8
**reasonable (8)**
36:13;38:2;39:18,
19;41:23;43:5;
46:12;51:10
**reasonably (2)**
34:20;63:2
**reasoning (2)**
40:7;43:13
**reasons (11)**
8:5,25;25:1;28:13;
30:11;42:6,10;
49:12;54:25;55:21;
66:1
**rebuttal (1)**

48:20
**receive (3)**
28:23;47:22;62:10
**received (2)**
11:17;18:5
**receiving (1)**
22:21
**recent (3)**
17:4,20;18:25
**recently (4)**
10:14;20:12;
60:11;66:24
**Recess (1)**
54:10
**recession (1)**
32:7
**recipient (1)**
45:21
**recitation (1)**
5:2
**recited (1)**
14:2
**recognize (1)**
54:20
**recognized (3)**
33:1,25;65:14
**recognizes (1)**
33:24
**recommendations (2)**
7:12,21
**record (2)**
17:18;54:12
**recoup (1)**
13:9
**recourse (1)**
13:9
**recover (1)**
39:17
**refer (2)**
27:19;59:15
**reference (4)**
6:2;25:5;30:4;
45:21
**referenced (3)**
10:16;11:4;18:19
**references (1)**
5:10
**referred (1)**
63:20
**referring (2)**
6:3;45:19
**refers (2)**
59:18;60:22
**reflects (1)**
64:4
**refresh (1)**
7:22
**refusal (1)**
8:11
**refuse (1)**
24:18
**regards (1)**
9:2

Case:20-00055-EAG    Doc#:44-8    Filed:06/08/20    Entered:06/08/20 19:33:49    Desc:
Exhibit H    Page 83 of 87
PPV, INC. AND BRAVO ENVIRONMENTAL NW, INC.
U.S. SMALL BUSINESS ADMINISTRATION, et al.

May 20, 2020

**Register (1)**
　63:19
**regularity (1)**
　62:22
**regulations (3)**
　33:10,21;34:14
**rejected (2)**
　55:16,18
**rejection (1)**
　8:16
**related (3)**
　6:21;56:11;58:9
**relates (2)**
　4:24;10:24
**relatively (4)**
　11:12;38:17;
　40:11;62:11
**relaxed (1)**
　22:2
**relevant (1)**
　6:19
**reliance (1)**
　48:21
**relied (4)**
　17:24,24;18:20;
　63:10
**relief (19)**
　5:6;6:7;7:5,7,16;
　17:25;23:23;24:1,4;
　52:22;53:1;55:5;
　56:6;57:3,17;58:25;
　59:1;65:11;66:9
**relies (1)**
　9:12
**reluctant (1)**
　65:7
**rely (4)**
　27:18;35:3;40:19;
　50:11
**relying (3)**
　20:16;22:1;46:18
**remain (1)**
　68:24
**remaining (1)**
　69:2
**remains (2)**
　65:15;69:2
**remedies (1)**
　58:17
**remedy (4)**
　65:14,15,22,23
**remember (2)**
　40:23;45:20
**remove (1)**
　65:12
**renew (1)**
　24:19
**rent (1)**
　10:12
**reorganization (2)**
　4:22;15:5
**reorganize (1)**
　56:13

**reorganizing (2)**
　41:16;43:3
**repaid (1)**
　41:13
**repay (2)**
　9:15;13:14
**repayment (3)**
　34:20;49:12,16
**replace (2)**
　43:12;58:6
**replacing (1)**
　48:4
**request (3)**
　4:6;8:6;65:11
**requested (4)**
　5:18;6:9,18;7:8
**require (4)**
　16:4;36:24;42:13;
　64:2
**required (4)**
　33:11;36:16;
　55:19;64:11
**requirement (7)**
　34:21,22;36:17;
　55:20;62:17;64:6;
　65:13
**requirements (4)**
　34:13;58:5;63:7;
　64:23
**requires (6)**
　5:24;41:20;50:17;
　57:10;58:5;62:3
**requiring (2)**
　56:6,8
**reservation (1)**
　68:11
**Reserve (7)**
　44:17,18,22,24;
　45:6,9;46:16
**resolve (1)**
　23:15
**resources (1)**
　15:24
**respect (3)**
　57:17,23,25
**respond (1)**
　66:21
**responded (1)**
　32:6
**responding (1)**
　5:4
**responses (2)**
　4:12;51:4
**responsibility (3)**
　33:9;63:5,6
**rest (3)**
　39:1;40:4;53:9
**restraining (15)**
　4:11;5:18;6:8,18;
　7:3;8:2,7;13:24;
　14:1;15:7;16:17,19;
　52:18;56:15;66:13
**restriction (8)**

10:17;11:11,19,20,
22,25;12:10;64:4
**retain (2)**
　8:23;15:24
**review (6)**
　58:2,4,16;62:20,
22;65:24
**reviewing (2)**
　63:1,3
**reviews (1)**
　65:3
**revisit (1)**
　51:23
**revoke (1)**
　24:18
**revolving (1)**
　14:17
**RICKS (26)**
　3:24;4:1,1,15,17,
18;10:5,20;48:10,13,
18,19;50:5,5;51:3,
22;53:17;54:12,13;
66:21;67:4,5;68:5,7;
69:6,7
**Ricks' (2)**
　45:17;48:16
**right (11)**
　28:23;34:6;35:25;
41:22;46:2;49:11,
12;51:22;54:6,8;
61:23
**risk (9)**
　12:14;38:25;42:1;
43:9;51:12,13;
52:24;63:25;65:5
**risks (1)**
　38:17
**rob (1)**
　6:23
**Roman (3)**
　10:13;12:16;18:21
**Rose (3)**
　10:5,6;29:22
**route (1)**
　41:19
**rubric (1)**
　8:14
**rule (10)**
　7:6;20:22,23;
37:24;43:7;53:6;
63:20,21;65:1;67:2
**rule-making (2)**
　34:7;49:3
**rules (3)**
　16:4;33:9;49:4
**ruling (3)**
　18:23;68:13,13
**runs (2)**
　49:23;63:12

## S

**safer (1)**

51:1
**Saltzman (1)**
　17:16
**same (8)**
　9:23;12:25;13:7;
26:13;30:2;34:2;
56:8;65:22
**San (2)**
　62:23;63:8
**satisfy (1)**
　21:17;30:24;36:17
**saying (11)**
　18:11;26:21;28:6;
35:23;37:14,19;
38:15;39:13,21;
43:8;51:13
**SBA (66)**
　3:16,21;5:16,16;
6:13,15;8:16;19:18;
21:18,19;22:20;
25:21,24;31:22;32:2,
18,22;33:1,5,8,23;
34:5,8;35:18,22,24;
36:1,15;37:5,8,11,
14;42:12,13,20;
43:13,15,22;44:14;
45:3;47:23,25;48:1,
5;49:1,4;50:2;51:5;
55:4,10,10;56:6,8,
16;57:21;58:11;
59:4,10;61:22;62:3,
9;64:4,10,16,25;
65:12
**SBA's (11)**
　5:24;33:6;34:10;
42:4;48:23;52:11;
55:21;62:16;64:8,9;
65:4
**scope (1)**
　65:14
**scrutiny (1)**
　12:18;53:7;64:17
**second (10)**
　22:4;26:9;27:6,7;
28:2;51:6;55:24;
57:8;58:9;60:18
**second-guess (1)**
　49:19
**secret (1)**
　17:5
**Secretary (2)**
　63:22,23
**Section (65)**
　5:9,10;6:20;8:9,
14;9:22;10:4,25;
11:3,18,20;19:7;
24:12,14,15;26:16;
32:24;33:11,24;34:2,
11,17;35:24;40:22;
43:23,25;44:6,18;
46:19;50:25;55:6,8;
56:1,10;57:23,24,25;
58:3,4,4,7,10,11,13,

15,24;59:3,14,23,25;
60:1,3,8,9,23;61:5,
19,21;62:13,16;
64:10,11;65:10,11,
13
**sections (1)**
　40:23
**secured (6)**
　13:11,13;14:17;
38:7,22,23
**seek (5)**
　37:11;55:4,7;56:5,
7
**seeking (3)**
　56:16,25;57:11
**seeks (1)**
　57:10
**seem (1)**
　47:13
**seems (4)**
　12:15,16;15:11;
58:11
**segregate (1)**
　52:25
**segregated (1)**
　12:22
**sense (5)**
　46:4;50:4;59:9,16,
21
**separate (4)**
　44:7;45:2,14;
46:10
**separately (1)**
　66:5
**separating (1)**
　40:3
**September (1)**
　63:19
**serious (2)**
　6:14;8:18
**served (1)**
　64:20
**Services (4)**
　18:6;28:18;60:25;
61:2
**set (14)**
　3:2;4:20;5:2;8:5,
25;9:7;11:12;16:9,
19;21:17,22;53:3;
62:8;67:19
**sets (1)**
　25:22
**setting (1)**
　56:24
**seventeen (2)**
　48:10,14
**seventy-five (1)**
　30:24
**several (2)**
　27:19;66:15
**shaky (1)**
　14:25
**shall (3)**

Case:20-00055-EAG   Doc#:44-8   Filed:06/08/20   Entered:06/08/20 19:33:49   Desc:
Exhibit I   Page 84 of 87

PPV, INC. AND BRAVO ENVIRONMENTAL NW, INC. v.
U.S. SMALL BUSINESS ADMINISTRATION, et al.

May 20, 2020

19:19,23;36:2

**shore (1)**
    15:23
**short (4)**
    17:2;37:9;54:19;
    61:23
**shorthand (1)**
    49:5
**show (9)**
    4:12;16:19;18:13;
    47:7;57:1;68:4,10,
    15,22
**showing (6)**
    16:16;19:4;27:1;
    47:1,9;50:1
**shown (1)**
    65:8
**sic (12)**
    5:20;6:11;11:10,
    17;12:7,11;13:2;
    14:3;15:10;45:19;
    47:24;63:19
**side (2)**
    9:3;26:20
**signed (1)**
    30:15
**similar (14)**
    19:20;24:20,24,
    25;26:15;29:7,14,15,
    24;30:8;59:6,19;
    60:3,8
**similarity (1)**
    29:4
**Similarly (4)**
    6:16;11:3;15:23;
    38:9
**simply (26)**
    5:19,24;6:24;
    12:22,25;14:6,12;
    16:7;24:12;26:21;
    36:8;37:10;41:19;
    42:4,8,13;43:5,12;
    44:23,25;45:13;
    46:17;48:3;52:6;
    53:7;57:11
**single (1)**
    42:16
**sit (1)**
    43:2
**sitting (1)**
    8:13
**situated (1)**
    15:23
**situation (2)**
    13:7;41:5
**situations (1)**
    9:14
**Sixth (1)**
    26:7
**sixty (1)**
    15:8
**size (1)**
    34:12

**slightest (1)**
    9:9
**small (11)**
    8:23;19:17,17;
    23:6,14,25;32:18;
    42:14;44:1;47:13;
    55:3
**sole (1)**
    28:3
**solely (5)**
    8:11,17;10:8,11;
    24:20
**solution (1)**
    65:6
**somebody (5)**
    22:24;23:3;27:10;
    47:21;51:14
**somebody's (1)**
    40:16
**somehow (1)**
    45:12
**someone (2)**
    9:21;47:18
**somewhere (1)**
    17:7
**soon (1)**
    17:19
**sorry (8)**
    3:25;10:1,2;32:10;
    33:18;40:9;50:5,6
**sort (11)**
    5:5;12:15,25;13:7;
    22:19;25:18;29:23;
    49:15;51:9,10;52:17
**sorts (2)**
    13:3;51:7
**sought (5)**
    9:10,11;18:2,4;
    30:16
**sound (4)**
    34:20;36:6,10,18
**sounds (1)**
    67:20
**source (1)**
    45:16
**Southern (1)**
    18:1,9
**sovereign (15)**
    5:6,9;6,6,10;8:1;
    19:2,11;24:8;51:24;
    52:12,20;53:12;
    57:22,24;58:7
**speak (3)**
    3:12,16;11:20
**speaking (1)**
    26:20
**speaks (2)**
    11:18;30:13
**special (1)**
    59:21
**specific (10)**
    10:3,25;24:22;
    25:6;34:12;35:17,

21;44:11;50:17;51:4
**specifically (9)**
    11:6;12:8;25:3;
    26:2;34:1,15;36:19,
    22;44:20
**spelled (2)**
    15:12,13
**spend (1)**
    31:8
**spending (3)**
    30:24;45:7,15
**spent (3)**
    8:25;31:21;49:9
**sphere (1)**
    42:12
**split (1)**
    58:12
**spoken (1)**
    35:9
**sponsored (1)**
    10:8
**square (3)**
    27:23;28:5;49:14
**squares (1)**
    49:6
**Stabilization (1)**
    44:8
**standard (7)**
    18:12;21:9;22:2;
    23:16;35:7;57:12;
    62:22
**standards (4)**
    11:11;15:11;16:9;
    62:8
**start (10)**
    4:13,18;17:4;19:2,
    12;24:9,17;32:13;
    35:5;39:4
**state (7)**
    10:7;14:19,20;
    16:3;60:18;61:2;
    63:17
**state- (1)**
    10:7
**stated (3)**
    42:22;47:23;49:6
**statement (1)**
    5:21
**states (7)**
    12:12,24;14:21;
    58:18,20,21;61:1
**status (7)**
    27:11;35:22;
    43:23;46:15,21;
    47:8;57:12
**statute (15)**
    5:16;11:9;12:1,5;
    16:10;32:20;36:12;
    44:12;49:24;52:5;
    55:22;59:18;60:20;
    61:25;62:2
**statutorily (2)**
    29:3;62:6

**statutory (8)**
    15:9;34:21;36:17;
    46:3;55:22;61:20,22,
    23
**stay (7)**
    18:4,7,11,12,15,
    17;54:2
**stay-at-home (1)**
    14:21
**steps (1)**
    69:1
**Stern (7)**
    7:1,23;61:8,11,12,
    14,18
**still (4)**
    28:2,6;33:7;63:9
**stimulus (1)**
    32:6
**Stoltz (12)**
    10:9;27:6,9,23,24;
    28:4,5,7,13;29:2,17,
    24
**streamlined (1)**
    65:1
**stress (3)**
    14:23,24;38:24
**stresses (1)**
    38:10
**strict (1)**
    57:13
**stricter (1)**
    64:17
**strictly (1)**
    8:21
**strong (2)**
    58:24,24
**strongest (1)**
    57:18
**structure (1)**
    49:6
**student (4)**
    25:7,14;26:9;60:2
**study (1)**
    41:16
**Stylings (1)**
    65:19
**Subchapter (1)**
    11:1
**subject (7)**
    9:6;10:4,17;12:23;
    13:18;22:12;36:3
**submit (2)**
    5:20;7:12
**submitted (2)**
    6:1;64:7
**subsection (8)**
    25:4,5,9,10,12;
    45:18;52:3;62:20
**subsidized (4)**
    25:8,17;30:21,22
**substantial (1)**
    51:14
**substitute (1)**

39:3
**succeed (2)**
    27:3;66:7
**success (11)**
    8:8;10:23;13:22;
    18:14;19:5;27:1,15;
    57:1,14,16;65:9
**sued (1)**
    19:19
**suffer (1)**
    57:2
**suggest (2)**
    22:8;27:14
**suggesting (1)**
    19:14
**suing (1)**
    20:24
**suits (1)**
    20:8
**SULLIVAN (3)**
    4:3,4,6
**summary (4)**
    13:21;18:10;
    27:21;53:4
**superfluous (1)**
    60:4
**supervision (1)**
    50:21
**supplied (2)**
    49:21;51:9
**supplies (1)**
    44:3
**support (6)**
    10:3;11:4;15:21;
    31:19;44:5;59:12
**supported (2)**
    26:18;60:1
**supporting (1)**
    8:20
**suppose (2)**
    68:3,11
**supposed (2)**
    31:14;40:19
**Supreme (2)**
    7:23;33:2
**sure (11)**
    20:17;21:20;22:6;
    23:8;31:21;32:7;
    38:14;49:4;50:24;
    51:17;52:24
**Surprisingly (1)**
    17:9
**survive (1)**
    18:23
**suspect (1)**
    67:7
**suspend (1)**
    24:18
**suspension (1)**
    67:6
**swallowing (1)**
    20:22
**swimmingly (1)**

Case:20-00055-EAG   Doc#:44-8   Filed:06/08/20   Entered:06/08/20 19:33:49   Desc:
Exhibit H   Page 85 of 87

PPV, INC. AND BRAVO ENVIRONMENTAL NW, INC.
U.S. SMALL BUSINESS ADMINISTRATION, et al.

May 20, 2020

49:10
system (1)
12:21

**T**

tailored (1)
52:22
tailoring (1)
52:23
talk (4)
19:6,8;25:18;54:9
talked (1)
46:7
talking (7)
28:13;39:10;40:7;
41:10,10;51:14;
52:22
targeted (1)
15:9
task (1)
63:3
technical (2)
50:7;59:13
telephonically (1)
17:2
tells (6)
20:6,22;34:16;
35:8;39:3;43:4
temporarily (1)
32:23
temporary (15)
4:10;5:18;6:8,18;
7:3;8:2,7;13:24;
14:1;15:7;16:16,18;
52:18;56:14;66:13
tenable (1)
35:4
tentatively (1)
61:10
Tenth (2)
20:4,6
term (1)
26:17
terms (9)
16:11;19:19;
30:13;34:3,17;36:3,
4;53:9;60:20
Texas (2)
18:1,9
thanks (2)
32:11;54:9
theme (1)
27:18
theoretical (1)
39:13
theories (1)
57:17
theory (3)
22:10,13;62:1
therefore (8)
40:15,18;49:10;
56:5;61:9,9;62:11;

65:8
therein (1)
5:3
third (4)
14:14;26:4;56:1;
60:25
thoughts (1)
38:16
threat (1)
23:2
three (4)
8:9;14:2;55:21;
58:13
threshold (3)
9:8;49:23;57:19
throughout (3)
17:6,8;30:13
till (1)
54:1
tips (1)
57:3
Title (5)
44:4,13;45:25;
46:7,9
titled (2)
44:7,8
today (12)
3:10,17;16:25;
17:17;47:4,17;54:1;
58:4;66:21;67:12,
19;69:3
told (1)
37:23
took (1)
33:7
toolbox (1)
53:1
tools (1)
52:25
top (3)
33:24;35:25;45:5
topic (1)
33:17
Toth (2)
26:7;60:18
tracking (1)
12:18
traditional (3)
37:3,10;42:25
transaction (1)
59:25
transcript (1)
17:19
tread (1)
15:15
Treasury (6)
44:6,14,14;45:3;
63:23;65:1
treats (1)
53:10
trees (1)
12:4
trial (1)

57:12
TRO (8)
17:16;27:14;47:4;
56:19,19,25;57:4;
68:2
trouble (1)
17:3
true (3)
9:23;15:20;48:24
Trustee (1)
12:24
try (2)
13:9;53:25
trying (4)
23:4;39:24;45:19;
50:19
turn (3)
10:13;15:1;32:12
turning (1)
9:24
twice (1)
53:17
two (9)
8:15;15:6,20;19:9,
13;27:5;33:22;
34:24;51:3
type (3)
25:6;29:12;42:13
typical (2)
33:10;34:1
typically (1)
60:15

**U**

Ulstein (7)
20:16,20,22;
21:24;22:18;23:13;
58:20
Um-hum (1)
32:12
unable (3)
15:3;31:1;39:17
unacceptably (1)
63:24
unauthorized (2)
9:15;63:25
uncertainty (1)
11:13
under (43)
5:10;6:1;8:9,18;
9:24;10:20;11:3,9;
13:2;16:4;19:6;21:9,
24;22:1,11,11,12;
24:2;34:3,25;35:1;
36:19;37:3;43:21;
44:13,16;45:10;
46:19,21;53:5;55:7;
56:11,18;57:12,25;
59:23;60:8;61:21;
62:16,21;65:10,11,
24
underwrite (1)

64:11
underwriting (9)
9:9;36:16,20;37:4,
7,11;49:7;51:7,13
underwritings (1)
12:9
unemployment (2)
16:4;44:3
unforgiven (1)
64:1
uniformly (1)
50:20
unique (2)
31:14;53:21
unit (7)
6:14,15;8:10;
10:11;24:18;27:11;
52:20
United (5)
12:23;58:18,20,
21;60:25
units (2)
8:16;59:4
unlawful (1)
55:21
unless (3)
14:10;18:15;41:3
unlikely (6)
57:23;61:4,6;
62:11;66:2,12
unrelated (2)
38:10;60:21
unwarranted (1)
56:1
up (12)
15:23;19:21;
20:22;22:19;23:3,9;
34:14;41:1,3;53:3;
54:5;67:9
upon (2)
7:6;33:8
upset (1)
63:1
usage (1)
49:9
USC (11)
32:22;34:22;
44:12;46:5;55:8;
56:10;58:9;59:3;
61:19;62:13;65:10
use (10)
13:13;15:17;
27:22;31:4,6,14,14;
52:14,16;63:25
used (10)
11:14;12:13,18;
13:3,8,14;31:22;
32:2;38:22;39:16
uses (5)
9:14;11:15;38:6;
49:11;59:14;64:23
usual (1)
59:9

**V**

Valley (2)
6:3;10:15
value (4)
34:20;36:6,10,18
VANLANDINGHAM (38)
3:14,15;16:22,23,
24;22:6,15;23:12;
28:1,10,12;29:1,9,
21;31:25;32:12;
33:22;38:14,20;
39:2;40:6;41:8;
43:20;46:2;53:16,18,
21,24;54:3,4,15,16;
58:3;67:10,11,15;
69:4,5
VanLandingham's (1)
50:15
vast (1)
37:13
vehicle (2)
48:24;63:16
versus (1)
61:14
veteran (2)
26:6;60:13
Veterans (1)
60:12
victims (1)
31:19
view (1)
63:15
violation (1)
56:1
violative (1)
9:22
virtually (2)
9:11;62:5

**W**

waiting (1)
14:11
waive (1)
52:20
waiver (13)
5:8;6:10;19:18;
20:8;23:18,19,19,20,
20;24:2,5;52:12;
58:7
waives (1)
57:24
wants (1)
49:18
Washington (1)
14:19
water (2)
45:13;62:24
Watts (1)
26:4
way (7)

Case:20-00055-EAG    Doc#:44-8    Filed:06/08/20    Entered:06/08/20 19:33:49    Desc:
Exhibit 8    Page 86 of 87
PPV, INC. AND BRAVO ENVIRONMENTAL NW, INC. v.
U.S. SMALL BUSINESS ADMINISTRATION, et al.

May 20, 2020

12:5;21:15;34:12;
35:2;36:12;43:16;
46:7
**ways (2)**
34:12,13
**weakness (1)**
66:3
**weather-related (1)**
31:17
**weigh (3)**
8:6;13:24;66:9
**weighing (1)**
39:10
**weren't (1)**
19:25
**Wesley (1)**
3:20
**what's (1)**
47:14
**whatsoever (1)**
9:12
**whereas (2)**
40:25;44:11
**wherein (1)**
20:18
**Whereupon (1)**
69:14
**White (1)**
43:3
**whole (4)**
31:13;41:15;42:9,
9
**wholly (1)**
53:5
**wisdom (1)**
40:8
**wise (2)**
41:11;42:10
**wish (2)**
66:22;69:1
**withholding (1)**
56:3
**within (12)**
6:7;8:14;12:1;
15:9;25:6;29:11;
33:25;46:6;48:23;
50:1;52:19;56:9
**without (10)**
5:7,21;14:5;33:10,
14;51:13;56:7,16,20;
57:2
**withstand (1)**
53:7
**word (4)**
31:14;59:9,15,16
**wording (1)**
59:18
**words (6)**
12:16;22:11,13;
32:24;33:13;40:14
**work (4)**
4:4;22:24;23:5;
54:18

**working (1)**
22:23
**workings (10)**
5:17,23;21:4,11,
20;22:8,9,9,10,14
**worried (1)**
12:12
**write (1)**
43:2
**written (1)**
56:20

**Y**

**York (1)**
61:2

**Z**

**zero (1)**
49:13
**zone (1)**
53:25

**1**

**1 (3)**
6:4;55:10;57:1
**1,000 (1)**
11:6
**104 (1)**
60:12
**1051 (1)**
58:21
**1057 (1)**
58:21
**106 (5)**
5:9;24:2,5;52:1,11
**106a1 (2)**
57:24;58:8
**106a4 (2)**
23:22;58:3
**11 (7)**
11:1;12:21;50:13;
55:1;59:3;64:20;
66:16
**110236 (1)**
35:24
**1102b (1)**
33:24
**1108 (1)**
58:19
**1112 (1)**
58:19
**1114 (1)**
33:11
**1179 (1)**
65:19
**1180 (1)**
65:19
**11th (1)**
18:5
**1213 (1)**

6:5
**133 (1)**
44:18
**1334 (1)**
56:10
**136 (1)**
60:19
**1361 (2)**
55:8;65:10
**1361's (1)**
65:13
**15 (5)**
32:22;34:22;
44:12;46:5;58:9
**151 (1)**
61:1
**152-3 (1)**
61:1
**1981 (1)**
58:20
**1983 (2)**
63:18;65:20
**1985 (1)**
61:3
**1987 (3)**
58:19,22;61:1
**1994 (2)**
25:4;26:11
**1996 (1)**
7:17
**1998 (1)**
60:19
**1st (1)**
58:21

**2**

**2 (1)**
57:1
**2:51 (1)**
54:10
**2002 (1)**
10:10
**20-03054 (1)**
3:3
**2006 (1)**
60:12
**20-1051 (1)**
17:15
**20-108 (1)**
18:8
**2014 (1)**
62:24
**2015 (1)**
57:15
**2020 (4)**
6:4,4;44:9;63:19
**20-bk-12802 (1)**
67:1
**21 (1)**
64:19
**23 (1)**
10:6

**2483 (2)**
55:10;64:4
**28 (5)**
55:8;56:10;61:3;
63:19;65:10
**29 (1)**
63:17
**2d (2)**
10:10;61:3

**3**

**3 (3)**
48:9;57:3,6
**3:15 (4)**
54:2,6,9,10
**3:37 (1)**
69:14
**30th (1)**
14:10
**315 (1)**
10:9
**364 (3)**
50:13,25;51:18
**36d (1)**
34:13

**4**

**4 (2)**
57:4,7
**4003 (1)**
11:3
**4003b (1)**
45:19
**403 (5)**
43:23,25;44:6,23;
45:12
**43 (1)**
63:17
**454 (2)**
44:15;45:7
**463 (1)**
63:17
**473 (1)**
60:12
**477 (1)**
60:19
**480 (1)**
60:20
**4th (1)**
60:12

**5**

**5 (4)**
11:1;55:11;61:19;
62:13
**500 (2)**
11:5,13
**525 (21)**
5:10;6:20;8:9,14;
9:18,23;13:21;19:7;

23:19;24:5,9,12,14,
17,22;25:4,6;26:1;
27:7;28:8;57:25
**525a (18)**
10:4;25:2,8,11,15;
26:13,22;29:3;55:6;
56:2;57:23;59:3,14,
23,25;60:8,23;61:5
**525c (2)**
60:1,4
**525's (1)**
10:17
**5th (1)**
61:1

**6**

**6:15 (1)**
54:2
**634b (4)**
58:10,11,15,24
**636 (2)**
44:12;46:5
**636a (1)**
32:22
**636a6 (1)**
34:22
**65 (1)**
56:18
**660 (1)**
32:17
**661 (1)**
58:20
**662 (1)**
10:6
**695 (1)**
65:19
**6th (1)**
60:19

**7**

**7 (1)**
64:20
**7062a (1)**
62:13
**7062c (1)**
61:19
**733 (1)**
57:14
**740 (1)**
57:14
**771 (1)**
61:2
**776 (1)**
62:24
**786 (1)**
57:14
**7a (25)**
32:21,24,25,25;
34:2,3,11,17,18;
36:4,5,14,15;37:2,3,
12,12;45:4;46:19,21;

PPV, INC. AND BRAVO ENVIRONMENTAL NW, INC v.
U.S. SMALL BUSINESS ADMINISTRATION, et al.

May 20, 2020

48:23;53:5;64:10,11,
15
**7aloan (1)**
49:2

## 8

**80 (1)**
10:9
**810 (1)**
58:19
**823 (1)**
61:1
**833 (1)**
58:21

## 9

**9 (1)**
64:14
**971 (1)**
62:24
**976 (1)**
58:20
**977 (1)**
58:20
**994 (1)**
62:24
**9th (3)**
57:15;62:24;65:20