UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION


| | |
|---|---|
| TRUDY'S TEXAS STAR, INC, | ) CASE NO:  20-01026-HCM |
| | ) ADVERSARY |
| Plaintiff, | ) |
| | ) Austin Texas |
| vs. | ) |
| | ) Thursday, May 7, 2020 |
| JOVITA CARRANZA, IN HER CAPACITY | ) |
| AS ADMINISTRATOR OF THE U.S. | ) 1:02 p.m. to 1:58 p.m. |
| SMALL BUSINESS ADMINISTRATION, | ) 2:17 p.m. to 2:49 p.m. |
| | ) |
| _____Defendant._____ | ) |

LEAD CASE:  20-10108-HCM
TRUDY'S TEXAS STAR, INC, ET AL


HEARING RE:

PLAINTIFF'S EMERGENCY APPLICATION
FOR TEMPORARY RESTRAINING ORDER


BEFORE THE HONORABLE H. CHRISTOPHER MOTT,
UNITED STATES BANKRUPTCY JUDGE




Appearances:              See page 2


Courtroom Deputy:         Ronda Farrar

Court Recorder [ECRO]:    Laurie Boyd

Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 8365
                          Corpus Christi, TX 78468
                          361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>**APPEARANCES FOR:**</u>

| | |
|---|---|
| **Plaintiff:** | **STEPHEN W. SATHER, ESQ.** |
| | **Barron & Newburger** |
| | **7320 N. MoPac Expy., Suite 400** |
| | **Austin, TX 78731** |
| | |
| **Defendant:** | **MARC S. SACKS, ESQ.** |
| | **United States Department of Justice** |
| | **1100 L Street NW, Room 7020** |
| | **Washington, DC 20005** |
| | |
| **Horizon Bank:** | **DAN ROBERTS, ESQ.** |
| | |
| **Woodgen, LLC:** | **KELL MERCER, ESQ.** |

1          **Austin, Texas; Thursday, May 7, 2020; 1:02 p.m.**

2                    **(Call to order)**

3          **THE COURT:**  I'm going to call the adversary

4  proceeding of Trudy's Texas Star, Inc. as Plaintiff versus

5  Jovita Carranza as administrator of the U. S. Small Business

6  Administration, Defendant.  It's adversary proceeding 20-01026.

7  This is a hearing on Plaintiff's emergency application for

8  temporary restraining order.  So we will start by getting

9  appearances of counsel.  I think we'll do it this way.  Is

10  counsel for the Plaintiff, Trudy's, on the line?

11          **MR. SATHER:**  Stephen Sather for the Plaintiff,

12  Trudy's.  I am on the line.

13          **THE COURT:**  Thank you.  Is counsel for the United

14  States and the SBA on the line?

15          **MR. SACKS:**  Yes, your Honor.  This is Marc Sacks and

16  the Department of Justice.  Good afternoon.

17          **THE COURT:**  Very good.  Is there anyone else that

18  wants to make a formal appearance at this hearing?  If so,

19  please state your name, spell your last name, and who you

20  represent.  Go ahead.

21          **MR. ROBERTS:**  Your Honor, this is Dan Roberts,

22  R-O-B-E-R-T-S, representing Horizon Bank S.S.B.

23          **THE COURT:**  Very good.

24          **MR. MERCER:**  Good afternoon, your Honor.  This is

25  Kell Mercer, M-E-R-C-E-R, on behalf of Woodgen, LLC.  That's

4

1  W-O-O-D-G-E-N, LLC.  And I'm just observing the hearing.  I

2  don't plan on participating.  And I may need to go at some

3  point to join another hearing.

4       **THE COURT:**  That's fine, Mr. Mercer.  And as I

5  mentioned, if you need to go, just hang up.  You don't need to

6  interrupt.  Thank you.  Anybody else that wants to make an

7  appearance?

8       (No audible response)

9       Very good.  So, for the parties, I want you to know

10  that I have reviewed the complaint with the application for TRO

11  filed by Trudy's.  I've reviewed the declarations, the

12  exhibits, the supplemental exhibits with authorities that was

13  submitted by Trudy's, the opposition and the exhibits submitted

14  by the Department of Justice for the SBA.  Basically everything

15  that's been filed I've reviewed.  I would suggest that we focus

16  on the likelihood of success on the merits.  To me that seems

17  to be the key thing.  What I would propose is that I'll let

18  Mr. Sather go first for Trudy's and then I'll hear from

19  Mr. Sacks for the SBA.  Are there any preliminary matters that

20  we want to get covered before we get started?

21       (No audible response)

22       Very good, silence is golden.  So, Mr. Sather, since

23  it's your request, I'll let you go first when you're ready.

24       **MR. SATHER:**  Stephen Sather for the Plaintiff, thank

25  you, your Honor.  This is our request for a temporary

1   restraining order to prohibit the SBA from requiring that a

2   party applying for a Paycheck Protection Program grant affirm

3   that they are not in bankruptcy.  When Congress passed the

4   CARES Act, it included the Paycheck Protection Program.  And

5   that statute did not give the SBA the discretion to impose a

6   creditworthiness condition and therefore we believe that the

7   SBA has exceeded its authority and that this Court has the

8   jurisdiction to remedy that.

9           First, I would like to point out a few provisions of

10  the PPP statute.  The first is in Section 1102(a)(2)(F) there

11  are several permissible uses for these covered loans.  That

12  includes payroll costs, costs related to healthcare, employees'

13  salaries, payments of interest on any mortgage obligation,

14  rent, utilities, and interest on any other debt obligations.

15  And in our declaration, we spelled out that the Debtor is

16  currently delinquent on these obligations as a result of the

17  shutdown order and will be having additional obligations

18  arising in the future.  Now, one thing that is significant

19  about the PPP program is that Congress expressly set out the

20  qualifications to participate.  And in Section 1102(f)

21  romanette double "I," it says that in evaluating the

22  eligibility of a borrower for covered loans, a lender shall

23  consider whether the borrower was in operation on February 15,

24  2020 and had employees for whom borrower paid salaries and

25  payroll taxes.  Debtor in this case meets both of those tests.

1    In section 1102(a)(2)(G), it contains a list of certifications

2    to be made by a borrower.  Number one, that the uncertainty of

3    current economic conditions makes necessary the loan request to

4    support the ongoing operations of the eligible recipient, that

5    the funds will be used to retain workers and maintain payroll

6    or make mortgage payments, lease payments, and utility

7    payments, that the eligible recipient does not have an

8    application pending for a loan under this subsection, and that

9    during the period beginning on February 15, 2020, and ending on

10   December 31, 2020, that the eligible recipient has not received

11   any amounts under this subsection for the same purpose and

12   duplicative of amounts applied for and received under a covered

13   loan.  Now, notably absent there is any consideration of

14   creditworthiness.  And in fact the statute specifically states

15   that several normal procedures are not required.  In subsection

16   "I," it says that the requirement that a small business concern

17   is unable to obtain credit elsewhere shall not apply to a

18   covered loan.  There is a waiver of the guarantee requirement.

19   There is even a waiver of requiring collateral.  And so I

20   believe that congressional intent was that if you are a

21   business that meets these conditions, namely you were in

22   business on February 15, 2020 and that you had employees and

23   that you were -- had less than 500 employees, that you're

24   entitled to participate in the PPP program.

25           Now, under Section 1114 of the CARES Act, it said

1   that the SBA was authorized to put out rules to implement the

2   section.  It did not say rules to vary or amend the statute but

3   rather it spoke to rules to implement it.  The SBA has acted on

4   that rulemaking authority and two of the requirements that they

5   have imposed are, first of all, that a recipient not be a

6   debtor in bankruptcy and, number two, that a recipient not be

7   delinquent on an existing SBA loan.  We believe that neither

8   one of those requirements is permissible under the CARES Act.

9          So how do we get to the Court issuing a temporary

10  restraining order?  The first requirement is that the -- or let

11  me back up.  There have been a number of courts across the

12  country that have considered this issue already.  I am aware of

13  seven cases.  In five cases, the court granted the requested

14  temporary restraining order, and in two instances the court did

15  not.  The courts that have granted the TRO include the Southern

16  District of Texas in two separate cases, the Districts of Maine

17  and Vermont, and the District of New Mexico.  The courts that

18  have denied the requests include Judge Gargotta in our district

19  and the District of Delaware.  And in these cases, several

20  issues come up time and time again.  The first is does the

21  Court have jurisdiction.  And under 28 USC, Section 1334, I

22  believe it's abundantly clear that the Court does have

23  jurisdiction.  This is a proceeding that arises in a case under

24  Title 11.  Our claim of discrimination under Section 525 is a

25  claim arising under the Bankruptcy Code.  And at the very

1   least, this is a matter related to a bankruptcy proceeding.  So

2   jurisdiction is present.  And I would echo the finding of the

3   District Court of New Mexico that this is a core proceeding

4   under section -- 28 USC, Section 157(b)(2)(A) for the reason

5   that it is a matter affecting the administration of the estate.

6           Now, the government argues that there is not

7   jurisdiction based on several different provisions.  There is

8   the Anti-Injunction Act that says that you may not enjoin the

9   SBA or its property.  Several of the courts that have looked at

10  it have said that that is to be interpreted narrowly and that

11  the SBA is not immune from being required to follow the law.  A

12  court simply cannot interfere in the internal workings of the

13  SBA.  Additionally, in this case the government has argued that

14  the Debtor lacks standing and therefore that the Court has no

15  jurisdiction.  And their argument is that there were two

16  questions that the Debtor checked "yes" on, the one about being

17  in bankruptcy and the one about having a delinquent SBA loan.

18  And the fact that there is another argument that might preclude

19  relief does not mean that the Debtor is not an entity that is

20  affected in a negative way and therefore has standing to seek

21  relief from the Court.  And I would submit that both of these

22  questions have the result in the same analysis, that is that

23  Congress did not enact a creditworthiness test and it is not

24  within the power of the SBA to enforce one.  Now, the question

25  is, how do we get to determining that the SBA may not enforce

1    these requirements?  First, we're able to go under the

2    administrative procedures act which says that where there is

3    not an ability to appeal and rulemaking is arbitrary and

4    capricious that a rule may be challenged.  And Judge David

5    Jones in the Hidalgo EMS case said that the argument that the

6    SBA was entitled to engraft creditworthiness requirements was

7    taken so far out of context as to be frivolous.  And that same

8    language was picked up on by the Bankruptcy Court for the

9    District of New Mexico.  We're also able to get there under

10   Section 525 which says that a grant -- another grant cannot be

11   denied based upon status in bankruptcy.  And the SBA has

12   pointed out that these PPP advances are referred to as covered

13   loans.  However, both Judge Jones and Judge Thuma in the

14   District of New Mexico have said these are in fact grants.

15   They are a social program meant to replace lost income during a

16   national pandemic, and if used for the appropriate purposes,

17   they are completely forgivable.  And so I believe that these

18   are not loans but grants which may not be discriminated against

19   under Section 525(a).  Now, the United States correctly points

20   out that in my application I did not cite any Fifth Circuit

21   law.  I was not able to find any Fifth Circuit cases directly

22   on point but I did find one that was reasonably close.  In the

23   *Exquisito Services* case, a party had received a government

24   contract under Section 8A of the <u>Small Business Act</u> and that

25   contract was canceled based upon the party being a debtor in

1    bankruptcy.  And the Fifth Circuit at 823 F.2d 151 ruled that

2    that was a violation of Section 525.  Now, that is why I

3    believe that the Debtor is likely to prevail upon the merits

4    because, number one, there is jurisdiction to hear this

5    dispute; number two, because the SBA's rulemaking authority was

6    arbitrary and capricious; and, number three, that this is a

7    case of prohibited discrimination under Section 525(a).

8         And in fact I would think that this is exactly the

9    type of case in which a PPP grant would be most appropriate.

10   This is a debtor who, according to our declaration, had over

11   200 employees prior to the shutdown order being announced and

12   then dropped into the twenties as a result.  And the State of

13   Texas is now allowing restaurants to partially reopen but this

14   debtor lacks the funds to do so.  Our declarations also

15   establish that the Debtor went to its bank, Horizon Bank, which

16   said that it would not process the application because the

17   Debtor was in bankruptcy.  And one thing that we have that I've

18   not seen in any of the other cases is that we have a

19   declaration from the bank officer saying that Horizon Bank

20   makes PPP loans, including one to my firm, that they did not

21   consider the application because the Debtor was in bankruptcy,

22   and that if that condition did not apply, they would consider

23   and process the application.  And so we have an artificial

24   impediment being placed on the ability of the Debtor to rehire

25   employees and stimulate the economy based on an arbitrary and

1   capricious use of the rulemaking authority.

2          Briefly addressing the other elements, the Debtor has

3   shown irreparable injury.  The Debtor is unable to make its

4   current expenses at the present time.  The Debtor could -- has

5   significant use -- permitted uses for these funds.  And the

6   Debtor with the loosening of the shelter at home restrictions

7   would have the ability to bring more employees back.

8          Now, I want to address -- well, and then balance of

9   harms, this is a first come, first serve program so if the SBA

10  is not able to enforce this restriction, it is not going to

11  harm the SBA.  And I would submit it is in the public interest

12  for the program to be used for its intended purpose.

13         I want to address two final issues before I turn the

14  floor over to the United States.  The first is the reason

15  stated by the administrator of the SBA for why they imposed

16  this rule was that there was a higher risk of funds being

17  misused and/or not being repaid by debtors in bankruptcy.  And

18  I think that's just a -- not the case.  Debtors in bankruptcy

19  are under the supervision of the Court and the U. S. Trustee.

20  This is not something that would be done frivolously.  And more

21  importantly, if you look at the other kinds of entities that

22  can get these loans, there is an equal risk of misuse.

23  Churches are eligible for these loans, felons can get these

24  loans as long as it has been a certain number of years after

25  they've completed their sentence.  And so this requirement is

1    completely inconsistent.

2            Now I would like to address the requirement that the

3    Debtor not be in default on an existing SBA loan.  I believe

4    that this is also an example of arbitrary and capricious

5    rulemaking by the SBA since Congress set out specific grounds

6    and that is not one of them.  But in the alternative, I would

7    suggest that you have to ask what it is to be in default.  And

8    in 13 CFR section -- I don't remember the specific cite but it

9    was in the supplemental authorities I filed this morning.  The

10   definition of "default" is not making a payment within the time

11   set forth in a demand letter or the stated term unless other

12   arrangements for payment -- other satisfactory arrangements for

13   payment are made.  And our declaration establishes that the

14   demand -- one demand letter that was received was not received

15   until after bankruptcy.  At that time, the Debtor was unable to

16   pay the SBA loans because it is prohibited by law from doing

17   so.  However, we are in a proceeding which allows the Debtor to

18   modify its obligations and become current upon its debts.  And

19   in the context of a Chapter 11 where the debtor is seeking to

20   restructure its debts and is prohibited from paying them

21   without court order, that I think it is appropriate to consider

22   the debtor as not being in default.  And then part of the irony

23   here of refusing to allow the Debtor to receive these funds is

24   that one of the permissible purposes is to make payments of

25   mortgage interest which could be made to the IRS -- I mean not

1    to the IRS, I'm sorry, to the SBA.  And so the very restriction

2    that the SBA is arguing for hurts the SBA.  And that doesn't

3    seem right.  And so, your Honor, that is why we are requesting

4    that the Court grant a temporary restraining order prohibiting

5    the IRS -- or the SBA, excuse me, prohibiting the SBA from

6    enforcing the no debtors in bankruptcy rule, that the Court set

7    this matter for a preliminary injunction, and that upon final

8    hearing that the Debtor be granted declaratory and final

9    injunctive relief.  Thank you, your Honor.

10          **THE COURT:**  Very good.  Thank you, Mr. Sather.  This

11    is Judge Mott.  I've got a few questions, Mr. Sather.

12          **MR. SATHER:**  Yes, your Honor.

13          **THE COURT:**  So under your Section 525(a) of the

14    Bankruptcy Code argument, which of the four things that are

15    listed in the statute are you saying a PPL loan is similar to?

16    Are you saying it's similar to a license, a permit, a charter,

17    or a franchise?

18          **MR. SATHER:**  There's also a reference to other

19    grants, and that is what the courts that have said that Section

20    525 is the hook that brings it in.

21          **THE COURT:**  Right, the statute says "similar grants."

22          **MR. SATHER:**  Yes.

23          **THE COURT:**  And the Fifth Circuit says needs to be

24    similar to one of those four things:  license, permit, charter,

25    or franchise.  That's the other thing that *Exquisito* case said.

1   So my question is, this PPL loan, which if those things is it

2   similar to, a license, permit, charter, or franchise?

3           **MR. SATHER:**  It is not similar to a permit or charter

4   I don't believe.  And I guess my best argument is that it is

5   similar to a license in that a license allows a person to

6   receive certain rights, and in this case the license would be

7   to receive the grant of funds under the PPP.

8           **THE COURT:**  All right, then the other question I had,

9   and I generally understand what you're saying about the CARES

10   Act and no mention of creditworthiness of the borrower.  And so

11   my question's a little more focused in that does the CARES Act

12   say that the SBA cannot consider the creditworthiness of a

13   borrower?

14           **MR. SATHER:**  It is silent.  Stephen Sather for the

15   Plaintiff.  However, there is one other provision that

16   pertained to making non-PPP loans which said -- expressly said

17   that debtors shall not be considered.  And so under the canon

18   of statutory interpretation, that if you mention it

19   specifically once and you're silent in another place, you're --

20   you intended not to apply it in the other one.  I know there's

21   a Latin phrase for it but I don't have that at the tip of my

22   tongue.

23           **THE COURT:**  I know what you're talking about there,

24   thank you.  This is Judge Mott.  All right, thank you,

25   Mr. Sather.  Okay, Mr. Sacks, I'm ready to hear from you when

1    you're ready.

2           **MR. SACKS:**   Thank you, your Honor.   Again, Marc Sacks

3    on behalf of the SBA and the administrator.

4           We obviously recognize the incredible hardships that

5    result from COVID-19.   Your Honor, you and I are the lucky

6    ones.   We have stable government salaries that are unaffected

7    by this when millions of people in this country are facing

8    unprecedented economic difficulties, the likes of which

9    individually as a country we've never seen before.   My brother

10   is a sole proprietor business, he's gotten the PPP loan.   Our

11   child is in daycare, they've gotten the PPP loan.   So we

12   understand, you know, what's involved here.

13          Congress and the SBA, as you know, moved very quickly

14   to try to help small businesses.   And (indisc.) will explain,

15   you know, really the reason here for the bankruptcy exclusion,

16   and we're going to get to that in detail.

17          There were six things I want to address in my

18   argument today.   First, I want to touch briefly on standing.

19   Then I want to touch on the issue of why, regardless of the

20   circumstances, the law does not permit the Court to enjoin the

21   SBA here.   And then we'll address the meat, the likelihood of

22   success and the two legal issues, 525 and the APA.   And then

23   briefly I'll address the other components of that injunctive

24   relief test and then address the appropriate scope of any TRO

25   here should the Court be inclined to grant one.

1                 On standing, I don't want to belabor this point.

2    It's a little complicated but based on what we know now and

3    based on this new declaration, I think the Debtor could have

4    properly checked "no" to question two, which would mean that

5    the only issue here is the checking "yes" to question one.

6    Mr. Sather said something to the effect of, well, it doesn't

7    matter if you wouldn't get the relief another way as long as

8    this is one barrier to it, that's enough to get you standing.

9    That is not the law.  I mean, there has to be an injury in

10   fact.  If there's another reason you wouldn't be able to get

11   the relief, then you can't waste the Court's time on an issue

12   that wouldn't change the ultimate outcome.  But I don't think

13   that's what the Debtor is doing.  We didn't know why the Debtor

14   checked question number two before this declaration.  There may

15   have been other things in the Debtor's past that would have

16   made that "yes" the correct answer.  But if it's only the SBA

17   loans in bankruptcy, because those are now subject to discharge

18   in the bankruptcy, we do believe that he could have checked

19   "no" to number two.  So I think we're not going to press the

20   standing (indisc.) I think this is legitimately before the

21   Court on that basis.  And of course we haven't broadly argued

22   in our pleadings the Court's overall jurisdiction so I'm not

23   going to contest or talk about that now.

24                 But let me know turn to the second issue, which is

25   whether or not a Court can enjoin the SBA.  And so we start

1    with the statute 15 USC 6341(b)(1), no injunction shall be

2    issued against the SBA.  We have binding Fifth Circuit

3    authority on this point, Implinar (phonetic) case that we cite

4    in our briefing.  Many other circuits agree with this.  I'll

5    note that Judge Jones in the Hidalgo case in the Southern

6    District did not address Section 634 or (indisc.) I don't know

7    what his thinking was on that.  The Debtors rely on two cases

8    not in -- from this circuit, Clepp (phonetic) and Olstein

9    (phonetic) I think a Tenth and maybe a first second -- First

10   Circuit court cases.  We address those at page 14 and 15 of our

11   brief.  The Clepp case the court didn't enjoin the SBA and

12   refused to do so.  Olstein, the Court did permit an injunction

13   of the SBA but noted that it wouldn't in something that would

14   hinder and obstruct agency operations through a mechanism such

15   as the attacks on the funds (phonetic).  And that's what the

16   Debtor seeks to do here with the TRO, which in a sense a

17   mandatory preliminary injunction.  So especially within this

18   circuit I don't think there's a way for the Court to get around

19   15 USC, Section 634(b)(1).  Doesn't mean the Court couldn't

20   ultimately on the merits enter relief on behalf of the Debtor,

21   but I think it does mean that Congress has said an injunction

22   is not permitted by law.

23          So let me now turn to Section 525, and I'll address

24   the two merits issues followed by the APA.  And obviously your

25   Honor I think got immediately to the key issue here.  Which of

1   the four things the PPP loan similar to?  And so I'll talk

2   about that.  And your Honor started at the place that we all

3   should start, the plain language of the statute.  It lists

4   those four items and then similar grants, right?  So we know

5   that -- we don't know what "grant" means except that it must be

6   similar to a license, permit, charter, franchise.  How do we

7   know that that language does not include loans like the PPP

8   loans?  We know that in a few ways.  First we know it because

9   Congress amended Section 525 to add subsection "C" for a

10  specific type of loan, student loans.  So if the language as is

11  already covered loans from the government, there would be no

12  need to add a specific amendment to account for a certain type

13  of loan.  But Congress did that because it recognized that a

14  loan in its normal course would not be included under 525.  We

15  also know from the legislative history as we cited in our

16  brief.  And this is -- Mr. Sather told you that he thought that

17  other grant was most similar of those four items to a license.

18  Unfortunately I don't think that's the case because we know the

19  entire reason that 525 was passed came out of the 1971 Supreme

20  Court Perez case where the court faced a situation where

21  Arizona denied a driver's license to individuals who were

22  involved in bankruptcy.  And the court used (indisc.) clause to

23  say, no, you can't do that.  The bankruptcy gives you a fresh

24  start and denying a driver's license prohibits that and so,

25  therefore, the Bankruptcy Code trumps.  And that led Congress

1  then to pass 525 to recognize that decision and expand it a bit

2  to cover those other items in there:  permits, charters,

3  franchises, and similar grants.  But we know exactly where the

4  term "license" come from -- came from, and it has nothing to do

5  with a PPP loan that we are involved with here.  We cite ample

6  authority from other circuits, Third Circuit, Watts (phonetic),

7  Fourth Circuit (indisc.) sixth (indisc.) second, *Goldrich*, all

8  questioning whether or not money, loans, and (indisc.) programs

9  the debtors in bankruptcy fall within 525.  All of those courts

10 were clear that it was not.

11            And, again, this program is a loan guarantee program,

12 right?  The PPP does not give the SBA authority to give money.

13 It just sets aside money for a guarantee to the banks who are

14 making a loan.  Let me read you from the Second Circuit in

15 *Goldrich*.  "A credit guarantee is not a license, permit,

16 charter, or franchise; nor is it any way similar to those

17 grants."  And the same thing here, this is a credit guarantee

18 and that's not what is covered by 525.  And, again, Trudy's can

19 still operate without this money.  It (indisc.) operate as well

20 but they can still operate.  It's not like the government is

21 withholding a permit to serve alcohol because Trudy's is in

22 bankruptcy.  If that were the case, perhaps there's an argument

23 that they could not operate as a restaurant without that

24 permit.  But that's not what's at issue here.

25            So there's been a little talk about the *Exquisito*

1    *Services* case, 823 F.2d 151, and that is binding on the Court.

2    And the Fifth Circuit there said that it interprets Section 525

3    narrowly and only to situations analogous to those enumerated

4    in the statute.  We don't unfortunately yet have the transcript

5    from Judge Gargotta's decision in the *Asteria* case.  From

6    talking to my colleague who argued that case where he denied

7    the TRO, she noted that he specifically referred that binding

8    limitation on his authority in denying a TRO.  And so I think

9    this Court is bound there.  The facts of *Exquisito* was that an

10   entity had a contract to provide services to an Army base from

11   the SBA.  And the government refused to remove that contract

12   once the bankruptcy started.  And that's a very different

13   situation (indisc.) akin to a franchise (indisc.) existing

14   contracts coming into bankruptcy.  We have nothing like that

15   here.  I won't repeat it but in Delaware, Judge Shannon, who

16   denied a TRO -- and I'll note that was the only other case of

17   all the cases involved that involves a restaurant.  It is a

18   restaurant called Cosi that we actually had in Washington, D.C.

19   I don't think they're outside the east coast.  But that's the

20   only other restaurant case.  We've had some hospital cases,

21   some ambulance cases where the TROs have been issued.  But the

22   only other restaurant case Judge Shannon denied a TRO and he

23   essentially made the conclusion in response to the question

24   your Honor asked.  Grant isn't any one of those things.  So

25   I'll leave 525 with that.  Unfortunately I understand the

1    desire of the Debtor to access these funds but there's just no

2    legal basis to suggest that 525(a) applies to the PPP loan

3    (indisc.) there just isn't.

4            Okay, so let's turn to the APA.  In his complaint,

5    Plaintiff referred only to exceeding statutory authority;

6    didn't call it an APA claim.  I think now the Plaintiff has

7    made -- the Debtor has made clear that this is an APA claim

8    that also encompasses an argument that the Secretary acted in

9    arbitrary and capricious manner.  That's what the other debtors

10   have argued, that's an entirely appropriate argument, that's

11   the argument that we've addressed and responded to in our

12   briefing.  So that's what I'm going to talk a little bit about

13   now.  I'm (indisc.) address in this oral presentation the fact

14   that we've made an argument, page 23 to page 24 of our brief

15   that if the bankruptcy court (indisc.) only to rely upon the

16   APA claim as a basis for the injunction, then it should not be

17   able to enter that relief on a non-core claim without sending

18   findings of fact and conclusions of law to the district court.

19   But I'm not going to (indisc.) than we've talked about that in

20   our briefing.

21           So let's talk about the foundational issue here and

22   how we analyze administrative law.  And again I think your

23   Honor, you know, went right to this point.  Mr. Sather said,

24   and let me see if I can find this, let's see.  He said --

25           THE COURT:  So, Mr. Sacks, --

1     **MR. SACKS:** -- that Congress quote --

2     **THE COURT:** -- Mr. Sacks, this is Judge Mott.  I'm

3 going to ask you --

4     **MR. SACKS:** I'm sorry.

5     **THE COURT:** -- just to slow down a little bit because

6 I am trying to take notes and follow what you're saying so --

7     **MR. SACKS:** I will, your Honor.  I apologize.  That's

8 a problem I often have especially when I get excited --

9     **THE COURT:** We --

10     **MR. SACKS:** -- in our position.  But I will --

11     **THE COURT:** We --

12     **MR. SACKS:** -- do my best.  And feel free to

13 interrupt me again if I go too fast.  I apologize.

14     **THE COURT:** I will.  And it's a --

15     **MR. SACKS:** So --

16     **THE COURT:** -- common problem that I suffer from as

17 well as many lawyers.  But anyway, go ahead.

18     **MR. SACKS:** But I feel like down in Texas where

19 people have a drawl, it's a little bit easier to talk more

20 slowly.  For us on the east coast, it may be a little more

21 difficult.  But I will certainly try.

22     So turning to the AP (phonetic) argument, really it's

23 a fundamental question of how administrative law works.  And

24 Mr. Sather with all due respect starts from the absolute wrong

25 perspective.  He said Congress, "did not give the SBA

1  discretion to impose a creditworthiness condition."  That's not

2  how we work at administrative law.  He did not mention, you

3  know, the Chevron (phonetic) analysis which the Supreme Court

4  had established and of course every circuit, including the

5  Fifth Circuit, follows for how we look at what Congress did and

6  what the agencies are allowed and entitled to do.  And so we

7  first have to determine whether Congress directly spoke to the

8  precise question at issue.  If Congress had said you may not

9  consider whether an entity is in bankruptcy and given these

10  loans, that is direct speech.  And were the SBA to in any way

11  act in contravention to that, then any regulatory action by the

12  SBA is void.  They cannot act contrary to Congress.  But, and

13  this is the question your Honor asked, if Congress has not

14  directly addressed the precise question at issue, we ask

15  whether the agency's interpretation was based on a permissible

16  construction of the statute.  And in response to your question,

17  Mr. Sather said the law is "silent," and that's exactly right,

18  it is.  And so when the law is silent, that means the agency

19  has discretion as long as it does not act arbitrarily and

20  capriciously to regulate in that area.  And that's why the

21  courts say we will not substitute our own preference for a

22  reasonable alternative devised by an agency.  That is Chevron

23  (indisc.) and if you read the transcript from Judge Shannon in

24  Delaware, he said point blank, I disagree with what the SBA has

25  done.  I don't think it's right.  But I don't have the power as

1   a court to say that I know better.  In a sense, that is what

2   the Debtor here is saying.  And it's what Mr. Sather said

3   explicitly, that I think -- he said, I think the -- my company

4   is the type of company that the SBA wanted to give money to.

5   And that's what the Court may think.  But the SBA made a

6   reasoned decision that it is not because it is bankruptcy.  And

7   if that's not in contravention to a statutory directive, then

8   this Court has no power to replace its own judgment with that

9   of the agency.

10          How do we know the agency has authority to make those

11   kind of determinations here?  First of all, the SBA

12   administrator is explicitly empowered to make such rules and

13   regulations as she deems necessary to carry out the authority

14   vested in her.  That's 15 USC 634(b)(6) and (b)(7).  And we

15   know that authority applies here.  And this is important

16   because the CARES Act in passing the Payment Protection Program

17   did not create an entirely new legal statute.  It placed the

18   PPP within existing SBA 7A lending program.  That was a choice

19   Congress made because it wanted to take advantage of the

20   processes in place and the legislation in place for that

21   program.  And that program has the authority from the Secretary

22   to make the law that she believes is -- to make regulations she

23   believes carry out the directive given to her by Congress.

24          Now, how has she done that here?  Well, we know from

25   the fourth interim final rule.  What does that mean?  So as you

1    know from the CARES Act, there's specific authority in section

2    I believe 1102 that the -- I may be getting that wrong, I

3    apologize, your Honor.  Actually, I'm sorry, 1114 where the

4    administrator was allowed to issue regulation under the PPP

5    without (indisc.) the typical notice (indisc.) requirements.

6    That is why you have a series of interim final rules to show

7    how the administrator as this program evolves is implementing

8    it.  And of course the fourth interim final rule speaks

9    directly to the reason why the administrator decided to exclude

10   bankruptcy entities.  And that's something that when Judge

11   Jones made his decision was not -- it was before him in

12   discussion but it was not yet in the Federal Register.  His

13   decision came out -- his -- the argument before him was April

14   24; the fourth internal final rule was published on April 28.

15   So that was not something before him.  And if you saw, he spent

16   a lot of time talking about what (indisc.) needs and talks

17   about anyone in bankruptcy, he feared that would exclude

18   someone who filed a proof of claim in a bankruptcy from getting

19   a PPP loan.  We now know from the SBA's clarification that's

20   obviously not what question one does.  It means are you as an

21   applicant for a loan in bankruptcy.  And so really the fourth

22   interim final rule makes clear that the SBA's action here was

23   not arbitrary and capricious.  Contrast with the situation

24   where the SBA said, you know what, we're (indisc.) this program

25   but we're not going to give any money to a company whose name

1   begins with "T."  So Trudy's, I'm sorry, you're excluded.

2   There could never be a reasoned basis for that, your Honor.

3   And so that of course could not withstand arbitrary and

4   capricious analysis.  But as to excluding entities that are

5   bankruptcy, again, whether the Court agrees or not, that

6   certainly is not arbitrary or capricious, and there's no way it

7   could be in contravention of the statutory authority given to

8   the SBA.

9            But let me talk a little bit about why we know even

10  further that it's a reasonable regulation.  So again the PPP

11  was put into the 7A lending program.  The 7A lending program

12  has a more rigorous underwriting standard where banks take a

13  little bit longer to look at a loan before giving it.  And the

14  regulations specifically require banks to look at

15  creditworthiness.  That's a shall look at creditworthiness.

16  And they must consider whether or not an entity is within

17  bankruptcy in making the loan.  Now, it's not an absolute

18  prohibition on bankruptcy.  But, again, in that case, banks

19  have the time and the ability to make a more reasoned

20  underwriting decision so there may be cases where an entity in

21  bankruptcy is deserving of a loan versus times when it wouldn't

22  be.  Well, as you know, your Honor, there is no underwriting

23  here and this is a very fast-paced process.  So how did the SBA

24  decide to balance the looking at bankruptcy in the regular 7A

25  program with the quickness of this program and who's entitled

1   to get the money?  The SBA did that by saying we're going to

2   exclude entities in bankruptcy from being eligible to apply.

3   Again, you may not agree with it but it's not arbitrary or

4   capricious.  And remember that not all bankruptcies are Chapter

5   11 reorganization.  There's other bankruptcies that are

6   liquidations.  And so there presumably would be more of a

7   reason in those cases not to give money to an entity

8   liquidating.  But, again, whether that's better or worse, the

9   question is, was the SBA within its authority to act, did it

10  act capriciously?  And I don't think there's any way to say

11  that it did not.  So that's my argument on the two merit issues

12  essentially.  I think it's overwhelming here that there is no

13  likelihood of success on the merit for the Debtor.  There's not

14  any facts left to be decided -- discovered here.  The law is

15  abundantly clear, particularly in the circuit, on those two

16  issues.

17          I'll just very briefly touch on the other factors

18  involved in the preliminary injunction test.  As to irreparable

19  harm, your Honor, you're overseeing the bankruptcy, you know

20  this far better than I do.  I did look at a February statement

21  of assets and liabilities that suggested I think a $10 million

22  gap in those two numbers.  The loan here is for $1.7 million.

23  We recognize of course, you know, one of the arguments that

24  debtors have made here and then the courts have agreed with is

25  that, look, you know, this loan goes to somebody not in

1    bankruptcy and no one has control over how it's spent.  At

2    least in bankruptcy, judges have control over how it's spent.

3    That should be more of a reason to give money to those

4    entities.  That's a very fair point.  But it's not one the SBA

5    thought was a point that merited giving loans to the entities

6    in bankruptcy.  And, again, that has to be respected.

7             As to the public interest here, you know, I think

8    from the government's perspective, it is extreme and that the

9    resolution of complex and competing policy interests at stake

10   and who gets PPP money is best left to the SBA and not to

11   plaintiffs who think they're the ones who should be entitled to

12   the money.  It's the SBA who should make those determinations.

13            And then my last point, your Honor, is that if the

14   Court is inclined to grant TRO here, if you look at the

15   proposed order that the Plaintiff has filed, it is sweeping and

16   nationwide (indisc.) the Court should -- is going to issue

17   relief, it would immediately render the application due for the

18   PPP void because they (indisc.) question where it's

19   impermissible.  I think the Court most likely recognizes that

20   if it's going to grant a TRO, it's got to be specific to the

21   relief this Plaintiff needs at this stage of the proceedings.

22   And if the Court wants to go there, we can talk more about what

23   that would be.  But thank you for your time, your Honor.

24            **THE COURT:**  Very good.  So, Mr. Sacks, this is Judge

25   Motto, thank you.  I have a couple of questions for you.  With

1 respect to Trudy's Section 525(a) argument, the bankruptcy

2 discrimination argument, are you saying that this Court would

3 not have authority to enjoin the SBA if the Court found there

4 was a likelihood of success on this bankruptcy discrimination

5 argument?

6        **MR. SACKS:**  No, your Honor.  The -- you know, let me

7 make two points.  I do think that the Section 634 applies even

8 within bankruptcy and the powers given to the Court under

9 Section 106.  I understand some courts disagree with that.  I

10 think it is not a settled question.  There's arguments on the

11 side of the Debtor here that if 525, you know, if the

12 governments discriminate, how can the Court not have the power

13 under the Bankruptcy Code to enjoin the agency.  Our position

14 is that it doesn't because of what Congress has said in Section

15 634 as it relates to the SBA.  But we understand that the

16 courts have seen it differently under the basis (indisc.) see

17 it differently.

18        **THE COURT:**  Well isn't that what the Fifth Circuit

19 did in that *Exquisito* case?

20        **MR. SACKS:**  (No audible response)

21        **THE COURT:**  The one with the Air Force contract --

22        **MR. SACKS:**  I believe that is what the court did.

23 Yeah, I believe that's what the court did there.  And, again,

24 we could accept that the Court may have the authority to do

25 that; although our argument, we don't believe that we see the

1   courts say that -- in this circuit that specifically that

2   Section 634 wouldn't allow an injunction.  It would allow an

3   injunction, I'm sorry.

4          **THE COURT:**  All right, thank you.  Okay, Mr. Sather,

5   do you have anything else to add?

6          **MR. SATHER:**  Stephen Sather for the Plaintiff.  Yes,

7   I do.  Addressing the Implinar case first with regard to

8   whether the Court may enjoin the SBA, that case appears to rely

9   on a decision to award minority contracts to some specific

10  vendors.  That is the type of interference in the innerworkings

11  of the SBA that the Olstein case from the First Circuit

12  distinguished from what you can and cannot enjoin the SBA from.

13  If you take the position that the SBA can never be enjoined,

14  then the SBA is not subject to law.  And every part of the

15  government has to be subject to the laws of the United States.

16         Now, as far as whether the statute granted the SBA

17  the authority to impose creditworthiness requirements, I would

18  submit that the statute is specific that it says that if you

19  are a business with under 500 employees who was in business on

20  February 15, 2020 and who pays wages and who can make the

21  specific certifications that do not include not being in

22  bankruptcy, you are entitled to participate in the program.  I

23  believe that what the SBA has done is not act within their

24  discretion but rather has imposed a substantive requirement

25  that goes beyond what the statute provided.  And this brings up

1    separation of powers in that Congress said this is what you do

2    to get one of these; they did not say you do -- you can come up

3    with more requirements.

4         And finally I would just echo the findings of the

5    courts which have granted TRO's that say this is not a loan,

6    this is a social program to replace income lost due to the

7    COVID-19 virus.  And therefore I would ask the Court to grant

8    the TRO.

9         **THE COURT:**  Very good, thank you, Mr. Sather.  All

10   right, so this is Judge Mott --

11        **MR. SACKS:**  Your Honor, this is --

12        **THE COURT:**  Go ahead.

13        **MR. SACKS:**  This is Mr. Sacks.  May I make one point

14   that I should have made in my presentation?  I apologize.  Is

15   that okay?

16        **THE COURT:**  That's fine, Mr. Sacks.  Go ahead.

17        **MR. SACKS:**  Yeah, I want to -- the last point

18   Mr. Sather made about eligibility under the CARES Act, and I

19   think what he's arguing is that as long as an entity meets the

20   eligibility (indisc.) Congress wrote in the Act, then they have

21   an absolute right to the money.  But that does not take into

22   account Section 1102(a)(2) which says the administrator may

23   guarantee covered loans under the PPP (indisc.) may guarantee,

24   not a shall.  And if you need any more evidence that Congress

25   allowed the administrator to decide who's entitled to the money

1   consistent with the law, that language should provide it.

2   Thank you.

3          **THE COURT:**  All right, thank you.  This is Judge

4   Mott.  I am going to give you a ruling today.  What we're going

5   to do is we're going to take a recess of about 15 minutes,

6   until 2:15 Central Time.  If you -- this conference line will

7   remain open.  If you want to stay on the line, that's fine.  If

8   you want to hang up and dial back in, that's fine.  We'll be --

9   but we'll be in recess until 2:15 Central Time.  Thank you.

10  We'll go off the record.

11         **(Recess taken from 1:58 p.m. to 2:17 p.m.)**

12         **THE COURT:**  This is Judge Mott.  So we're going to go

13  back on the record.  If you would please put your phones on

14  mute.

15         This is the Court's ruling on the emergency

16  application for a temporary restraining order, filed by Trudy's

17  Texas Star, Inc. as Plaintiff, who the Court will call,

18  "Trudy's."

19         Trudy's is a Debtor in this Chapter 11 case, and

20  operates several well-known Tex-Mex restaurants in the Austin

21  area.

22         The TRO has been sought against Jovita Carranza in

23  her capacity as administrator of the United States Small

24  Business Administration, as Defendant, who the Court will call,

25  "The SBA."

1          To start with, I would like to thank both Counsel for

2   their professionalism and their excellent presentations on

3   these important issues.

4          The Court has carefully considered the application

5   filed by Trudy's; the opposition filed by the SBA; the

6   declarations and supplemental declarations; decided legal

7   authorities, opinions, and rulings of other Courts on these

8   issues; and the exhibits that were submitted in the arguments.

9          This Court has been looking at these legal issues

10  over the last week, as they have been coming up in Courts

11  around the country recently.  So this ruling by the Court is

12  not off the cuff.  Considerable research and thought has gone

13  into it.  At the same time, the Court recognizes this is a

14  hearing on a TRO.

15         The Court has been working on it because the parties

16  need an answer immediately, like today, since the PPP program

17  is a first-come, first-served program that will likely be out

18  of funding soon.  And an emergency TRO was requested.

19         The Court will start at the end.  The Court must deny

20  the request for a TRO by Trudy's.  In short, the Court agrees

21  that excluding a Chapter 11 Debtor like Trudy's from the PPP

22  loan program is likely discriminatory.

23         But the Court does not agree that this type of

24  discrimination is prohibited by Section 525 of the Bankruptcy

25  Code.  And this Court does not agree that the action of the SBA

1    administrator, in excluding bankruptcy debtors, is improper

2    under the deferential legal standard by which a Court must

3    review actions of an administrative agency.

4            In substance, these are policy decisions made by a

5    Federal agency in Congress.  The Court's function is not to set

6    policy even if, on a personal level, I strongly disagree with

7    the policy.

8            First, the general TRO requirements will be set forth

9    by the Court.  The requirements for issuance of a temporary

10   restraining order, under Rule 65, are effectively the same as a

11   preliminary injunction.

12           Basically, a Movant, here, Trudy's, must prove:

13           One, a substantial likelihood that Movant will

14   prevail on the merits;

15           Two, a likelihood that Movant will suffer irreparable

16   harm if an injunction is not granted;

17           Three, the balance of the equities are in favor of

18   the Movant; that is, the threatened injury to Movant outweighs

19   the threatened harm to the parties sought to be enjoined; and

20           Four, granting the injunction will be in the public

21   interest.

22           Preliminary injunctive relief is an extraordinary

23   remedy that should not be granted unless the Movant makes a

24   clear showing on all four of these factors.

25           For those basically low principles pals, see the

1   cases of Winter versus Natural Resources Defense Council, a

2   Supreme Court decision, 555 U.S., at page 20, and Lake Charles

3   versus General Motors, a Fifth Circuit decision, 328 F.3d, at

4   pages 195 and 196.

5           Here in this situation, the burden on Trudy's is

6   probably even higher.  As in substance, Trudy's is seeking a

7   mandatory-type TRO.

8           Basically, Trudy's is requesting the Court to order

9   the SBA to take specific action; remove the bankruptcy

10  exclusion question from the PPP Application form; and to

11  instruct lending institutions that there is no exclusion from

12  the PPP program due to an applicant's bankruptcy.

13          This would definitely change the *status quo*.

14  According to the Fifth Circuit, a mandatory-type injunction,

15  which goes beyond maintaining the *status quo*, is particularly

16  disfavored and may be granted only if the Movant shows a clear

17  entitlement to relief under the facts and the law.

18          For those basic legal principles, see the Fifth

19  Circuit cases of Justin Industries versus Choctaw Securities,

20  920 F.2d, at page 268, note 7 and Martinez v Mathews, 544 F.2d,

21  at page 1243.  Those are Fifth Circuit decisions from 1990 and

22  1976.

23          Here, the Court does not believe that Trudy's has a

24  substantial likelihood of prevailing on the merits primarily

25  because of three reasons, which the Court will now set forth.

1   The first reason, Section 525 of the Bankruptcy Code.

2           First, the Court will address Trudy's arguments that

3   the anti-discrimination provision of Section 525 of the

4   Bankruptcy Code has been violated by the SBA.

5           As relevant here, Section 525(a) provides that a

6   Governmental unit may not deny a, quote, license, permit,

7   charter, franchise, or other similar grant, end quote, or

8   discriminate with respect to, quote, such a grant, end quote,

9   against a debtor in bankruptcy solely because the debtor has

10  been or is a debtor under the bankruptcy code.

11          Here, the key phrase in Section 525(a) is, quote,

12  similar grant, end quote.

13          To fall within the anti-discrimination provision of

14  Section 525, it must be a license, permit, charter, franchise,

15  or other similar grant.

16          Unfortunately, the Court must conclude that the PPP

17  loan program administered by the SBA is not a grant that is

18  similar to a license, permit, charter, or franchise.  Thus, a

19  PPP loan is outside the scope of Section 525(a).

20          The PPP program, under the CARES Act is a loan.  It

21  is called a loan under the CARES Act.

22          Yes, it is a forgivable loan if certain requirements

23  are ultimately met by the borrower.  But that does not mean it

24  is not a loan.  There is a promissory note and an obligation to

25  pay, and loans are simply not covered by the Section 525(a)

1    anti-discrimination requirement.

2              It is understandable why some Bankruptcy Courts have

3    found that the funds dispersed under the PPP program are really

4    grants or even social grants and that such PPP loans may be

5    forgiven.

6              These Courts have also focused on the PPP's

7    underlying social purposes to support businesses and their

8    employees during a national crisis.

9              This is a compelling argument.  But where the

10   argument breaks down, in my view, is that Section 525(a)

11   requires that the grant be, quote, similar, end quote, to a

12   license, permit, charter, or franchise to even fall within the

13   scope of the anti-discrimination provision.

14             And the PPP loan program is not similar to a license,

15   permit, charter, or franchise.

16             For these reasons, the PPP program does not fall

17   within the anti-discrimination provision of Section 525(a) of

18   the Bankruptcy Code.

19             This analysis is based on reading of the plain text

20   of Section 525(a).  But this reading is also supported by

21   Circuit Courts that have interpreted Section 525(a) of the

22   Bankruptcy Code.

23             For example, the Fifth Circuit has stated that it

24   interprets Section 525(a), quote, narrowly, end quote.  And

25   that Section 525(a) only applies to, quote, situations

38

1    analogous to those enumerated in Section 525(a).

2            See the Fifth Circuit case of In re Exquisito

3    Services, 823 F.2d, at page 154, a Fifth Circuit decision from

4    1987.

5            Here, the PPP loan program is not analogous or

6    similar to the categories set forth in Section 525(a).  It is

7    not like a license, permit, charter, or franchise.

8            In Exquisito, the Fifth Circuit found that an SBA

9    program under Section 8-A for minority-owned businesses was in

10   the nature of a franchise because the Debtor had an existing

11   contract through the SBA to supply services to the Air Force.

12           The PPP loan program is nothing like a franchise and

13   there is no existing supply contract between the SBA and

14   Trudy's regarding a PPP loan.

15           Other Circuit Courts have squarely dealt with and

16   addressed this issue and have held that loans are simply not

17   within the scope of the anti-discrimination provision of

18   Section 525(a).

19           Those other Circuit decisions include the cases of

20   Hayes versus U.S. Department of Veterans Affairs, 473 F.3d, at

21   page 110, a Fourth Circuit decision, 2006; Toth versus Michigan

22   State Housing Authority, on 36 F.3d, at page 480, a Sixth

23   Circuit decision from 1998; and Watts versus Pennsylvania

24   Housing, 876 F.2d, at page 1094, a Third Circuit decision in

25   1989.

1          Finally, Section 525(c) of the Bankruptcy Code deals

2     with loans, but it only applies to student loans.

3          If Congress wanted the Bankruptcy Anti-Discrimination

4     Provision to apply to non-student loans, it could have drafted

5     Section 525 that way.  But Congress did not draft the

6     Bankruptcy Code that way.  And this Court cannot rewrite the

7     Bankruptcy Code for Congress.  It must follow the Bankruptcy

8     Code as written.

9          So for these reasons and with much regret, the Court

10    must conclude that Trudy's does not have a substantial

11    likelihood of success on its argument under Section 525 of the

12    Bankruptcy Code.

13         The second reason is the action of the SBA

14    administrator is entitled to deference.

15         Next, the Court will address Trudy's argument that

16    the SBA administrator has improperly and without authority

17    excluded bankruptcy debtors from the PPP loan program under the

18    CARES Act.

19         The Small Business Act, which the Court will call,

20    "The Act," has been around for a long time.  It was originally

21    enacted in 1953.  The Act is codified at 15 U.S.C., Section 631

22    *et seq*.

23         The Act places the SBA under the management of a

24    single administrator.  The SBA has been given what the Supreme

25    Court has described as, quote, extraordinarily broad powers,

1    end quote, under the Act.  That's the Supreme Court decision of

2    SBA versus McClellan, 364 U.S., at page 447.

3            The Act requires that loans made or guaranteed by the

4    SBA, under Section 7(a) of the Act, shall be, quote, of sound

5    value or so secured as reasonably to ensure repayment, end

6    quote.

7            See 15 U.S.C., Section 636(a)(6).

8            By preexisting Section 7(a) loan requirements and

9    regulations, the SBA has considered whether an applicant for a

10   Section 7(a) loan has filed for bankruptcy in deciding whether

11   to guarantee a loan.

12           See 13 CFR, Sections 120.10 and 120.150 and SBA 7(a)

13   Borrower Form 1919.

14           Recently, in late March 2020, Congress enacted, and

15   President Trump signed into law, the CARES Act.

16           The CARES Act included a paycheck protection program

17   loans for small businesses, which the Court has been calling,

18   "a PPP loan."

19           The CARES Act initially provided about 349 billion to

20   fund and guarantee PPP loans, which was quickly exhausted.

21           Later, in April 2020, an additional 310 billion was

22   added to the fund and guaranteed PPP loans through a second

23   CARES Act.

24           Generally, the CARES Act authorizes the SBA to

25   guarantee PPP loans made by lenders to small businesses.

1    Repayment of a PPP loan is deferred for six months.

2              The PPP loans will ultimately be forgiven if the loan

3    proceeds are used for specific purposes; basically, 75 percent

4    for payroll costs and 25 percent for non-payroll costs, such as

5    rent, utilities, mortgage, and other specific expenses, and if

6    employee and compensation levels are maintained by the

7    borrower.

8              The CARES Act did not completely do away with the

9    lending requirements of Section 7(a) of the Act.  The CARES Act

10   made specific modifications to the lending requirements of the

11   Act, such as expanding the definition of small businesses that

12   would be eligible for PPP loans.

13             The CARES Act did not expressly change the

14   requirement under Section 7(a) of the Act that loans be of

15   sound value as reasonably to assure repayment.

16             The CARES Act authorized the SBA administrator to

17   issue emergency regulations to implement PPP loans.

18             Under this authority, the SBA administrator has

19   issued a series of interim final rules which, in part,

20   streamline the requirements for a Section 7(a) loan under the

21   PPP program.

22             For example, under the SBA rules, lenders making PPP

23   loans do not have to comply with typical underwriting

24   requirements for a Section 7(a) loan.

25             Instead, the lenders' underwriting requirements were

1   limited to a few specific items and reviewing the paycheck

2   protection application form.

3           This form application was promulgated by the SBA as

4   Form 2483.  And the Court has a will call it, "The PPP

5   Application."

6           The PPP Application, Question One, requires that the

7   borrower certify whether the borrower is, quote, presently

8   involved in any bankruptcy, end quote.

9           The PPP Application further states, "If this Question

10  Number One is answered, 'Yes,' then the PPP loan will not be

11  approved."

12          This required certification on the PPP Application by

13  a borrower is the source of this instant dispute and has

14  created much controversy recently in the bankruptcy world.

15          Basically, if a borrower checks the box on the PPP

16  Application that, yes, it is presently involved in a

17  bankruptcy, the PPP loan for the borrower will not be approved.

18          Here, Trudy's checked the box, "yes," on its PPP

19  Application, as Trudy's is a Debtor in this bankruptcy case.

20          On April 24, 2020, the SBA issued what has been

21  called a "fourth interim final rule" under the CARES Act, which

22  was published in the Federal register on April 28, 2020.

23          In part, this rule provides as follows:

24          Quote, will I be approved for a PPP loan if my

25  business is in bankruptcy, question mark.

1            No.  If the applicant or the owner of the applicant

2    is the debtor in a bankruptcy proceeding either at the time it

3    submits the application or any time before the loan is

4    dispersed, the applicant is ineligible to receive a PPP loan,

5    end quote.

6            The rule goes on to provide, quote, the

7    administrator, in consultation with the secretary, determined

8    that providing PPP loans to debtors in bankruptcy would present

9    an unacceptably high risk of an unauthorized use of funds or

10   non-repayment of unforgiven loans.

11           In addition, the Bankruptcy Code does not require any

12   person to make a loan or financial accommodation to a debtor in

13   bankruptcy.  The borrower application form for PPP loans, SBA

14   Form 2483, which reflects this restriction in the form of a

15   borrower's certification, is a loan program requirement, end

16   quote.

17           So do I personally think this rule and the PPP

18   Application created by the administrator was fair?

19           No, I do not think it is fair.  And some other

20   bankruptcy Judges feel the same frustration.

21           How can the SBA do away with almost all loan

22   underwriting and credit-worth requirements and guarantee

23   billions of dollars in PPP loans based on a two-page

24   application, but at the same time, exclude debtors in Chapter

25   11 cases?  It just doesn't seem fair.

1        But whether it is fair is not the legal test.  A

2   Court must review the actions of an administrative agency, like

3   the SBA, under a very deferential standard, the so-called --

4   with so-called Chevron Deference.

5        This standard was set forth by the Supreme Court in

6   the case of Chevron versus Natural Resources Defense Council,

7   467 U.S. 837, at pages 842 and 843, a 1984 decision of the

8   Supreme Court.

9        Basically, the Supreme Court established a two-step

10  standard of Court review for evaluating an agency's

11  interpretation of a statute that the agency administers.

12       First, a Court should determine whether Congress

13  spoke to the precise question at issue.  And if the intent of

14  Congress is clear, then the Court and the agency must give

15  effect to the unambiguously expressed intent of Congress.

16       However, if Congress did not directly address the

17  precise question at issue, a Court may inquire if the agency's

18  interpretation is based on a permissible construction of the

19  statute.

20       In this situation where Congress has implicitly or

21  explicitly left a gap for the agency to fill and there is an

22  expressed or implicit delegation of authority to the agency to

23  clarify the statute by regulation, such agency regulations are

24  quote, given controlling weight unless they are arbitrary,

25  capricious, or manifestly contrary to the statute, end quote.

1        That's the words of the Supreme Court, in <u>Chevron,</u>

2    <u>467 U.S., at page 844</u>.

3        Here, the CARES Act does not expressly address

4    whether or not a company the size of Trudy's is eligible for a

5    PPP loan if the company is in bankruptcy.

6        The CARES Act is silent on whether the credit

7    worthiness of a borrower may be considered by the SBA when the

8    SBA is deciding whether it will guarantee a PPP loan.

9        The SBA has been granted broad express authority by

10    Congress to implement its loan guarantee programs.

11        Under the Act, the SBA administrator is specifically

12    authorized to make rules and regulations and to take any and

13    all actions that the administrator determines is necessary or

14    desirable in making or guaranteeing such loans.

15        See <u>15 U.S.C., Sections 634(b)(6) and (b)(7)</u>.

16        The CARES Act did not amend or limit the SBA

17    administrator's authority under the Act.  Instead, Congress

18    explicitly included the PPP into the existing Section 7(a) loan

19    program covered by the ACT.

20        And the CARES Act expressly granted the SBA

21    administrator additional authority to issue new regulations and

22    rules to implement the PPP without typical notice and comment

23    requirements given the need for speed.

24        See the <u>CARES Act, Section 1114</u>.

25        So under Chevron Deference, the SBA's rules and

1   regulations regarding the PPP under the CARES Act must be given

2   controlling weight by a Court unless they are arbitrary,

3   capricious, or manifestly contrary to the statute.

4          The SBA's three stated reasons for the bankruptcy

5   exclusion from PPP loans are set forth in its fourth interim

6   final rule.

7          First, the SBA states that a PPP loan for a

8   bankruptcy debtor may result in a risk of unauthorized use of

9   funds.  It is true that in bankruptcy cases, including Trudy's

10  bankruptcy case, there are layers of claim payment priorities

11  set forth by the Bankruptcy Code.

12         These steps toward payment priorities can range from

13  numerous types of administrative claims to super priority

14  claims, and include pre-petition, post-petition, and sometimes

15  super-priority liens, granted to secured creditors and DIP

16  lenders.

17         It is possible that 75 percent of a PPP loan may not

18  be able to be used for payroll in a bankruptcy case, given

19  bankruptcy claim payment priorities and liens.

20         Second, the SBA states in its rule that a PPP loan to

21  a bankruptcy debtor presents an unacceptable risk of non-

22  payment of unforgiven loans.  It is true that sometimes debtors

23  in Chapter 11 cases end up in Chapter 7 liquidation and

24  creditors are not paid.

25         Third, the SBA states in its rule that the Bankruptcy

47

1    Code does not require any person to make a loan or a financial

2    accommodation to a debtor in bankruptcy.

3            This is also basically true in what Section 365(c)(2)

4    of the Bankruptcy Code generally says.

5            The SBA administrator has decided, in her discretion,

6    to exclude bankruptcy debtors from the PPP loan program as a

7    loan program requirement.

8            The SBA administrator has created a bright-line rule

9    excluding debtors from PPP loans and made a policy choice that

10   debtors should be excluded from the limited PPP funds made

11   available by Congress for small businesses nationwide.

12           This is a very harsh result given the severe pandemic

13   restrictions that Trudy's and other Chapter 11 debtors are

14   enduring and is not a result that I personally like.

15           But Congress delegated that discretion to the SBA

16   administrator.  Congress did not delegate that discretion to

17   me, as a Bankruptcy Judge.

18           As a result, this Court cannot find that the SBA

19   administrator's actions and rulemaking excluding bankruptcy

20   debtors from PPP loans to be arbitrary, capricious, or contrary

21   to statute.

22           This Court and other Bankruptcy Judges may find that

23   the reasons for the SBA administrator's rules are misguided and

24   its application is not fair.  But that is not the deferential

25   legal test that this Court must use in reviewing the actions of

1   the SBA administrator.

2           In conclusion, the Court cannot find that the SBA

3   administrator acted arbitrarily and capriciously in excluding

4   bankruptcy debtors from the PPP loan program under the

5   deferential standard of review of an agency's actions.

6           As a result, Trudy's does not have a substantial

7   likelihood of success on its argument that the SBA improperly

8   and without authority excluded a bankruptcy debtor like Trudy's

9   from a PPP loan under the CARES Act.

10          The third reason the Court cannot grant the TRO is

11  that a Federal statute prohibits a Court from issuing an

12  injunction against the SBA.

13          Section 634(b)(1) of the Small Business Act provides,

14  in relevant part, that the SBA, quote, may sue and be sued in

15  any Court of record of estate having general jurisdiction or in

16  any United States District Court, but no injunction or similar

17  process shall be issued against, end quote, the SBA

18  administrator.

19          See 15 U.S.C. Section 634(b)(1).

20          This is an extraordinarily broad anti-injunction

21  provision in favor of the SBA.

22          Some Circuit Courts have held that this statute

23  precludes jurisdictions in suits seeking injunctive relief

24  against the SBA.  Other Circuit Courts have held that this

25  statute is narrow and does not preclude all injunctive relief.

49

1          For this Court, the Circuit that counts is the Fifth

2     Circuit Court of Appeals.   That is because this Court is

3     located within the Fifth Circuit.

4          This Court is bound by decisions of the Fifth

5     Circuit.   And the Fifth Circuit has repeatedly concluded that

6     injunctive relief directed at the SBA is prohibited by this

7     statute

8          See the Fifth Circuit cases of Enplanar versus Marsh,

9     11 F.3d, at page 1290; Valley Construction versus Marsh, 714

10    F.2d, at page 29; and Romeo versus United States, 462 F.2d, at

11    page 1038 -- all Fifth Circuit decisions.

12         So this Court does not have jurisdiction to enjoin

13    the SBA as requested by Trudy's, even if the Court had agreed

14    with Trudy's that the SBA was violating the CARES Act by

15    excluding debtors from the PPP loan program.

16         The Court must note that, if this Court had

17    determined that the SBA was likely violating Section 525(a) of

18    the Bankruptcy Code, this Court would probably have

19    jurisdiction and authority to enjoin the SBA under Section 105

20    of the Bankruptcy Code.

21         But for the reasons already stated by the Court,

22    Trudy's does not have a substantial likelihood of success on

23    its Section 525(a) claim.

24         Conclusion:   It is difficult for me to deny Trudy's

25    the injunctive relief that it seeks.   I am very sympathetic to

50

1    the plight of Trudy's and its employees.  I am painfully aware

2    of the lost jobs at stake.

3              If I was in charge of the world, Trudy's would

4    definitely get a PPP loan.  But I am not in charge of the

5    world.

6              As a Judge, I am bound to apply and interpret the law

7    as it is written to the best of my ability even if I do not

8    personally like the outcome.

9              I have carefully reviewed the law and have reached

10   the conclusion that Trudy's is not entitled to the injunctive

11   relief under the law.

12             The Court will prepare and enter an order denying the

13   application for temporary restraining order for the reasons

14   stated in this oral ruling.

15             An audio file of this ruling will be made and

16   attached to the docket in this adversary proceeding.

17             The parties are excused, and Court is adjourned.

18        **(Proceedings Concluded)**

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    **May 9, 2020**

           **Signed**                                              **Dated**


*TONI HUDSON, TRANSCRIBER*