UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION


| | |
|---|---|
| ASTERIA EDUCATION, INC, | ) CASE NO:  20-05024-CAG |
| | ) ADVERSARY |
| Plaintiff, | ) |
| | ) San Antonio, Texas |
| vs. | ) |
| | ) Thursday, April 30, 2020 |
| JOVITA CARRANZA, IN HER CAPACITY | ) |
| AS ADMINISTRATOR FOR THE SMALL | )  9:33 a.m. to 11:00 a.m. |
| BUSINESS ADMINISTRATION, | ) 11:05 a.m. to 11:58 a.m. |
| | ) |
| Defendant. | ) |

LEAD CASE: 20-50169-CAG
  ASTERIA EDUCATION, INC


HEARING RE:

APPLICATION FOR TEMPORARY RESTRAINING ORDER [NO.5];

ORDER FOR JOVITA CARRANZA OR AUTHORIZED REPRESENTATIVE
WITH THE UNITED STATES SMALL BUSINESS ADMINISTRATION TO APPEAR
AND SHOW CAUSE (WHY ASTERIA'S APPLICATION FOR TRO
SHOULD NOT BE GRANTED) [NO.11]


BEFORE THE HONORABLE CRAIG A. GARGOTTA,
UNITED STATES BANKRUPTCY JUDGE


DISCLAIMER:          SEE CERTIFICATION PAGE

APPEARANCES:         See page 2

Clerk:               Maria Esquivel

Court Reporter:      Recorded; FTR

Transcribed by:      Exceptional Reporting Services, Inc.
                     P.O. Box 8365
                     Corpus Christi, TX 78468
                     361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**APPEARANCES FOR:**


Plaintiff:                          EDWIN P. KEIFFER, ESQ.
                                    Rochelle McCullough, LLP
                                    325 N. Saint Paul St., Suite 4500
                                    Dallas, TX 75201


Defendant:                          DOMINIQUE V. SINESI, ESQ.
                                    United States Department of Justice
                                    1100 L Street NW, Room 7020
                                    Washington, DC 20005


Cadence Bank:                       MICHAEL COLVARD, ESQ.

Mammen Investments:                 DAVID GRAGG, ESQ.
                                    Langley & Banack
                                    745 E. Mulberry, Suite 900
                                    San Antonio, TX 78212


K&L Gates:                          DAVID WEITMAN, ESQ.

| | |
|---|---|
| 1 | **San Antonio, Texas; Thursday, April 30, 2020; 9:33 a.m.** |
| 2 | **(Attorneys appear telephonically)** |
| 3 | **Call to Order** |
| 4 | **THE COURT:**  This is by telephonic hearing, Adversary |
| 5 | Number 20-05024, *Asteria Education, Inc. versus* -- and I should |
| 6 | know how to pronounce this, but I'm probably going to |
| 7 | mispronounce it, and I apologize, *Jovita Carranza, in her* |
| 8 | *Capacity as Administrator of the SBA*. |
| 9 | There are two matters on the Court's Docket this |
| 10 | morning, Number 5, ECF Number 5, the Application for TRO filed |
| 11 | by the Plaintiff. |
| 12 | And then ECF Number 11, the Order for Ms. Carranza as |
| 13 | Authorized Representative of the United States Small Business |
| 14 | Administration to appear and show cause. |
| 15 | As an initial matter would Plaintiff's counsel |
| 16 | identify themselves and state your name for the record? |
| 17 | **MR. KEIFFER:**  Good morning, your Honor, Paul Keiffer |
| 18 | for the Debtor. |
| 19 | **THE COURT:**  Thank you.  And for the Defendant? |
| 20 | **MS. SINESI:**  Good morning, your Honor.  This is |
| 21 | Dominique Sinesi, I'm an attorney with the Department of |
| 22 | Justice representing the SBA on this matter. |
| 23 | **THE COURT:**  Could you spell your name for the record, |
| 24 | please? |
| 25 | **MS. SINESI:**  Yes, your Honor, the last name is |

1    Sinesi, S as in Sam, I-N-E-S as in Sam, I; first name

2    Dominique, D-O-M-I-N-I-Q-U-E.

3             **THE COURT:**  Thank you.  Is there any other parties

4    appearing on the phone?

5             **MR. COLVARD:**  Your Honor, this is Michael Colvard

6    (phonetic), I'm the Chair for Cadence Bank.

7             **THE COURT:**  And you're just listening in,

8    Mr. Colvard?

9             **MR. COLVARD:**  Yes, your Honor, principally listening

10   in, although I understand from Mr. Keiffer that the scope of

11   the TRO may have some impact on financial institutions.

12            **THE COURT:**  Thank you.  Anyone else?

13            **MR. GRAGG:**  Yes, your Honor, Judge David Gragg here

14   for creditor and landlord Mammen Investments.  I intend to just

15   listen in, Judge.

16            **THE COURT:**  That's fine, sir.

17            Anyone else --

18            Oh, Mr. Gragg, could you spell the name of your

19   client, please?

20            **MR. GRAGG:**  MAMN -- I'm sorry, M-A-M-M-E-N

21   Investments.

22            **THE COURT:**  Thank you.  Any other parties on the

23   phone?

24            **MR. WEITMAN:**  Yes, good morning, your Honor, David

25   Weitman, K&L Gates.  I do not have a client per se, but this is

1    of interest to many of our clients.  Thank you.

2            **THE COURT:**  All right, thank you.

3            Any other parties?

4        **(No audible response)**

5            **THE COURT:**  All right, thank you.  Before we get

6    started let's kind of set the stake, Mr. Keiffer, if I could.

7            Is it Ms. Sinesi, am I pronouncing your name

8    correctly, ma'am?

9        **MS. SINESI:**  Sorry for the brief pause, I kind of

10   take it on and off mute, the name is pronounced Sinessi s/l.

11           **THE COURT:**  Sinesi.

12       **MS. SINESI:**  But I respond to most versions of it.

13           **THE COURT:**  No, we want to get it right, so for

14   purposes of the record I have had an opportunity to read your

15   brief, Ms. Sinesi.

16           Mr. Keiffer, obviously I have had a chance to

17   consider the original application that was filed, the Amended

18   Application that was filed, the Supplement.

19           I was aware -- and let me commend you, you have been

20   very transparent in this process, Mr. Keiffer, in advising the

21   Court as best you can about the status of these matters that

22   are cropping up both in Bankruptcy and District Court.  I want

23   to compliment you for your notification on the Adversary cover

24   sheet about the matter pending in Arizona before Judge Collins,

25   and then the matter pending in the, I think it's the Western

1   District of New York, I can't recall the District Court Judge's

2   name in that case, it escapes me right now, and we have looked

3   into that.

4          I also was aware, and my law clerk was in close

5   contact with Judge Jones' law clerk on the matter pending in

6   the Southern District of Texas, so we're aware of those

7   proceedings and have followed them and have tried to glean what

8   those courts have done in terms of having an understanding of

9   what the relative positions of the parties are.

10          So let me save you-all a little bit of time.  I say

11   this somewhat in a joking manner, but I couldn't be more

12   serious, I just want you to understand, Mr. Keiffer, that this

13   isn't the Ninth Circuit, this is the Fifth Circuit, I am not

14   going to issue any type of national broad sweeping TRO to the

15   extent I grant one.

16          As Judge Jones noted in his case, in the *Hidalgo

17   Ambulance* case, I would have said the same exact thing he did,

18   even if he hadn't said it and this is the first time you're

19   hearing it, the relief that you're going to receive today, to

20   the extent you receive relief, is going to be tailored to your

21   client.  I'm not going to issue some sort of national

22   injunction or a requirement that the loan application process

23   be changed because I don't think it's warranted in this

24   circumstance, and as I indicated I carefully read the brief of

25   the SBA and I agree with their arguments that it should be

1   narrowly tailored.

2            I will highlight for you, to the extent that you are

3   granted relief you're going to have to explain to me why and

4   how I can require the SBA to allocate $700,000 and set it aside

5   for your client; and, second, you have asked the Court to put

6   your client back into the queue as all of the parties recognize

7   the first tranche of money is gone, so we're now in the second

8   tranche of money and we're all acutely aware, based upon

9   reports that we receive daily, that that money is being

10  allocated for businesses as they apply.  So certainly I'll

11  entertain argument on that, but you're going to have to explain

12  to me how I'm going to do that to, Number 1, order the SBA to

13  set aside $700,000; and second, how I'm supposed to put your

14  client, to the extent I grant the relief requested, back in the

15  queue.

16           The other thing I'll just share with you-all just as

17  an initial matter, while I don't claim to be an administrative

18  law expert, these issues are not foreign to me.  When I was an

19  Assistant United States Attorney I litigated some of these

20  cases, so let's just say I have a working knowledge of it.  I

21  don't assert that I have any claim of expertise, but the

22  concepts aren't foreign to me in terms of some of the arguments

23  that are being made to the Court.  So with that on the record,

24  Mr. Keiffer, I'll hear from you first.

25           Am I going to get any evidence from you today, or am

1    I going to rely upon the affidavit that was submitted by

2    Ms. Wexler?

3              **MR. KEIFFER:**  Your Honor, Paul Keiffer for the

4    Debtor.

5              We will rely upon the Amended Declaration of

6    Ms. Wexler and its context at this time which was not

7    anticipated to be an evidentiary hearing, but argument on the

8    evidence submitted by paper.

9              We understand that this is not a broad TRO, sweeping

10   national scales.  To the extent that there is any implication

11   that that's what may have been sought in the Complaint that

12   will be cured shortly in an Amended Complaint, this is only to

13   deal with the specific situation with this specific

14   circumstance with regard to this specific Debtor's

15   circumstance.

16             We also have read through Judge Jones' admonitions

17   regarding to the extent to which he would be able to -- that

18   his court would be able to act and we have no qualms with those

19   points.  We're not seeking to go beyond the nature and the

20   circumstances of this particular case.

21             **THE COURT:**  All right.

22             **MR. KEIFFER:**  As far as -- I'll address the first

23   come, first serve element in regards to this and the reason why

24   we ask to be put back in the queue at the place, in effect,

25   where we were, and in this sense because the Debtor -- it is

1    our understanding that, at least, to in effect refuel and the

2    refilling of the tank, that is the loan fund, the debt

3    loan/land fund, is going to pick up and take on where people

4    were since then.  We would try in each instance, you know, we

5    tried on April 3rd, we tried as noted in the Amended

6    Declaration, to get an application in.

7              The SBA's (indisc.) addition of this bankruptcy

8    standard, the denial of its ability to participate, has left

9    the Debtor with no way to functionally get into the program.

10   There is no other methodology by which you can get to this

11   program.  Delay will, in effect, cause it to have no relief, no

12   remedy.  It is without having an ability to get to -- back to

13   where it was, or at least be seen as a proper applicant, it

14   seen as a proper applicant, the bar that kept it from getting

15   there, the fact that it received two notifications through its

16   processes to qualify for 700 and 706,000 dollars.  Those are --

17   that's the reason why we want to get back where we were because

18   we were properly and promptly before the SBA -- actually we

19   went through our lender to get this loan, to get this

20   loan/grant.

21             If your Honor -- with regards to the second element,

22   how can the SBA -- compel the SBA to allocate $700,000 with

23   regard to this?

24             That's just a difficult question I would like the

25   opportunity to brief on that.  I don't have any other answer

1   than it basically means that there is no remedy to the Debtor,

2   there's nothing that can happen here if there is no allocation

3   set aside.  It means that the Debtor's ability to participate

4   in a PPP under wrongful circumstances is wholly after the fact

5   and that those were hardly adequate -- an adequate remedy at

6   law for a debtor that could likely 9:43:42 without having this

7   relief.

8          Your Honor, if I may I'll proceed to my argument if

9   that's what the Court would like unless the Court has a

10  questions before I get into that?

11         **THE COURT:**  No, sir, thank you.  You may proceed and

12  take your time.

13         **MR. KEIFFER:**  Thank you.  I don't intend on spending

14  an inordinate amount of time addressing the Debtor's line of

15  business, but it is education materials and test preparation

16  generally.

17         Or that the Debtor's employees are working hard to

18  keep its business afloat and is following the requirements in

19  the detailed Final Cash Collateral Order with its modified

20  sales procedures and monthly budgets and user funds, approve

21  the process, go along with the Debtor's obligation to file

22  Monthly Operating Reports which was done timely and properly.

23         What I do intend to go into -- what I do intend to do

24  is to ask the Court to note the more detailed description of

25  the Debtor's business, what has happened to the Debtor on

1    account of COVID-19 significantly reductions in payments to

2    staff and offices, as well as slow account receivable

3    collections, needing to sell an asset at discount to continue

4    towards meeting its requirements to move to a new facility, to

5    adjust lease and to address the likely sale of the -- of

6    Asteria in July 2020.

7              I also want the Court to note, as Ms. Wexler noted in

8    her Declaration about the Debtor, sought the PPP loan/grant

9    that started on April the 3rd, the first day that software and

10   forms were available.  Since Cadence -- through the SBA lender,

11   the Debtor went through Cadence through the SBA interface

12   performed by SmartGroup.com and the Debtor also tried to apply

13   for PPP loans through PayPal, another pre-petition lender for

14   the Debtor.

15             I want the Court to note that the application process

16   via Smart Group and PayPal did not let the Debtor's application

17   proceed to completion.  Both denied such application solely,

18   solely because the Debtor was a Chapter 11 -- the applicant was

19   a Chapter 11 debtor.

20             The automatic denial was on account of the specific

21   provisions in the SBA/PPP application form which noted that

22   "Answering yes to any of these two questions would result in a

23   denial of any rights to a PPP loan/grant."

24             I'll refer the Court to Exhibit G, Mrs. Wexler's

25   Amended Declaration, see Docket 18:

1           "If questions 1 or 2 below are answered 'yes,' the

2           loan will not be approved."

3           "QUESTION:  Is the business or any owner … presently

4           involved in any bankruptcy?"

5           Debtor, of course, had to answer yes, it was a

6    Chapter 11 Debtor-in-possession.

7           As noted in Ms. Wexler's Declaration there is no

8    other aspect to the Questions on Exhibit G which would have

9    disqualified the Debtor.

10          In using the SmartGroup.com application the Debtor

11   was able to press ahead with filling out the remainder of that

12   form and submitted data for calculating its PPP loan/grant

13   amount it could seek based upon 2.5 times payroll as limited by

14   the statute.

15          See Exhibit D from April the 8th, Smart (indisc.)

16   told the Debtor it qualified for a $706,000 program, please

17   continue.

18          Also to Exhibit C which Smart (indisc.)  on 04/10,

19   9:00 a.m.  He indicated to Debtor that it was eligible for a

20   700 K PPP loan/grant, please continue.

21          I want to note this quickly, the Debtor is not

22   pursuing, has no qualms or gripes with Smart (indisc.), PayPal,

23   Cadence or any other of the lenders in their faithful carrying

24   out of what the SBA told them they had to carry out.  This is

25   an SBA issue, it's not an issue with the lender.

1          As noted in Ms. Wexler's Declaration that did not

2     last long because on April 11th at 10:03 p.m. Debtor was told

3     it was denied for one of four reasons.  See Exhibit E.

4          If presently involved in any bankruptcy questions,

5     one of the two automatic outs is the only one that the Debtor

6     had to answer yes to.

7          It is clear that but for the effects of Question 1

8     above the Debtor could have been sent $700,000 and would be

9     able to convert that obligation of those grants if not 100

10    percent, then likely a very, very high percentage.

11         As the Court knows and has alluded to in the Amended

12    TRO application, the initial round of funding that the SBA

13    hoped to administer over 340 billion was allocated and sent out

14    to millions of entities.

15         The Debtor filed its eighth Adversary proceeding

16    against the SBA on April 21st, the initial trans (indisc.)

17    funds save for some returns was capped by April 16th, 2020,

18    less than two weeks later.

19         The Debtor, as detailed in Ms. Wexler's Declaration,

20    started seeking funds on April 3rd at the very beginning of

21    this process -- of the program.  As the Court recalls the

22    Debtor sought authority to seek the PPP loan/grant on March

23    27th, (indisc.) Docket 112, secure the authority so to -- to

24    seek a PPP loan/grant insofar as doing so would not generate a

25    default under the Final Cash Collateral Order requirement that

1    the Debtor not use unauthorized credit.  That Order was entered

2    on April 8th with the Motion and Order noted to be able to get

3    those funds still required a further Order that made clear that

4    the PDP (s/l) loan didn't violate the protection -- the

5    priorities that the lender enjoyed to the Debtor's pre and

6    post-petition collateral.

7            Not a real problem, though, it's not a real problem

8    as the PPP loan/grant is an unsecured no collateral transfer of

9    funds.  There are no guarantee requirements and there is no

10   recourse for the owners of the entity as to repayment.

11           You're going to hear a lot from the SBA about a sound

12   policy regarding lending.  There's nothing about these changes

13   that Congress made for this specific circumstance that has

14   anything to do with sound lending.  This is a grant, in effect,

15   this is large S (phonetic) of the Government only, no one can

16   do this but the Government.

17           Neither the CARES Act nor the SBA Interim Final Rule

18   at that juncture made any -- prohibited any applicant for a PPP

19   loan/grant from seeking same on account of it being a Chapter

20   11 debtor.

21           If you look at the prior version, the April 3rd

22   version converted to C.F.R. on April 15th the requirement for a

23   loan program participation was suspended.

24           Now in the subsequent revision that happened after

25   this application went through they took that provision out.  I

1    don't know why they took it out, but they did it when they made

2    their bankruptcy changes last week.

3            Nevertheless, Debtor was denied a timely, otherwise

4    qualified application because the SBA imposed a requirement on

5    distributing PPP loans and funds to businesses presently

6    involved in any bankruptcy.

7            Subsequent to the enactment of the amendment to the

8    CARES Act which added another 300 billion plus to the SBA

9    lender to administer the SBA issued its fourth Interim Final

10   Rule, see footnote 2, Docket 17 in the Adversary proceeding.

11           So the SBA expressed its rationale for why it added

12   the (indisc.) exclusion on account of involvement in any

13   bankruptcy.  After noting that any applicant (indisc.)

14   condition is ineligible, the SBA made these assertions as to

15   why:

16           PPP loan/grants, the Debtor presents an unacceptably

17   high risk of unauthorized use of funds and nonpayment of

18   unforgiven loans.

19           The SBA had another rationale, but that was only

20   applicable to applicants who secured a loan, but had not filed

21   -- had funds dispersed, had then filed bankruptcy, generally

22   consistent with 355(c)(2), at least facially, but it is not

23   applicable here.  The Debtor was not with -- was a debtor in

24   possession before it applied and that rationale has no basis,

25   it cannot apply here.

1          Regardless the issue is the SBA, in adding the

2    gatekeeper function of "involved in any bankruptcy" exceeded

3    statutory authority and in exceeding that statutory authority

4    the SBA violates Section 525 of the Bankruptcy Code, first

5    which addressed the issue of whether the SBA exceeded its

6    authority.

7          As noted in the Amended TRO Application, and as noted

8    in its main case Motion previously referenced, the CARES Act

9    addresses bankruptcy issues.  The CARES Act timely addressed

10   bankruptcy issues directly and forcefully.  Section 1113

11   revises Subchapter (5) and Chapter 11 of the Bankruptcy Code

12   temporarily allowing business debt limits to rise from 2.7

13   million to 7.5 million stating which cases could use that limit

14   increase.

15         Modified current monthly income requirements to

16   exclude (indisc.) funds of any source.  The $1,200 check to

17   individuals was made no part of its currently monthly income

18   determination in a Chapter 13.  However, Congress specifically,

19   in Section 4003 of the CARES Act explicitly does not allow mid-

20   sized 500 plus employees and more any CARES Act funding if they

21   are a Debtor in a bankruptcy proceeding.

22         Congress can make these decisions, Congress had a

23   specific exception for the Packers and Stockyards Act

24   (phonetic).  It can make these revisions, Congress can do this

25   if SBA is not able to take that next step.

1        Solvency is an issue in the Federal Reserve's role

2    with regards to large enterprises.  Congress did not prohibit

3    Chapter 11 debtors with under 500 employees from participating.

4    Unlike mid-sized and large firms that access the capital market

5    Congress did not impose such restriction on the small business

6    tier.  Congress made bankruptcy insolvency an issue for mid and

7    large sized enterprises.  Congress also knew that it was not

8    making a bankruptcy a disqualifier for the small business tier.

9        Congress addressed bankruptcy issues throughout the

10    CARES Act as noted when it did not put a bankruptcy prohibition

11    of small business entities.

12        So what are the qualifiers and restrictions of the

13    Small Business and PPP loan/grants?

14        First, businesses had to have no greater than 500

15    employees.

16        Second, considerations in evaluating eligibility the

17    borrower could have covered loans at the times described in the

18    paragraph, however, shall consider whether the borrower is in

19    operation on February the 15th, check, Debtor meets that

20    requirements.

21        Had employees, when borrower pays salaries and taxes,

22    Check, Debtor meets that requirement.

23        Or paid -- and/or paid independent contractors as

24    reported on Form 1099 Miscellaneous, check, the Debtor meets

25    that as well.

1          No where in the SBA is the SBA granted any

2   exclusionary authority.  Look at the borrower requirements in

3   G, certifications.  Debtor meets or will meet all of those as

4   well.

5          Credit, elsewhere requirements, gone.

6          Where does the SBA draw its authority for for the PPP

7   loan program application procedure to prohibit an application,

8   an applicant, a business or itself or a business who has an

9   owner or matter their percentage of ownership.

10         The SBA has now stated "we did it in our other form,"

11  in a prior existing form and I believe they filed it this

12  morning at 6:10.

13         I will address those particularly when I go into the

14  -- the position specifically but I want to finish my

15  presentation first.

16         **THE COURT:**  All right.  Go ahead, sir.

17         **MR. KEIFFER:**  Pardon me.  SBA has noted in the

18  Seventh District of Texas matter that the SBA has broad

19  authority to construe a statute that may be silent as long as

20  it is based upon a permissive construction of the statute.  But

21  there must be a permissive construction available to latch

22  onto.  There isn't one, not in the CARES Act Subsection 36

23  which is a self-contained program, but whether or not authority

24  is here in this Adversary proceeding as noted in the main case,

25  there is no nexus to rule out bankruptcy debtors for PPP

1    loan/grants when Congress, when setting up the CARES Act and

2    amendments, specifically excluded debtors-in-possession or had

3    insolvency protection the midsize and large debtors but did not

4    add such a provision to the small business debtors.  It's not

5    an invitation to fill in the gaps, it was a decision not to

6    have the bankruptcy -- not to have bankruptcy be a bar to small

7    business enterprises.  This means that the bankruptcy addition

8    was an arbitrary and capricious act grounded after the fact in

9    a rationale that holds no water whatsoever.  This stated

10   rationale is that Chapter 11 debtors are prone to unauthorized

11   use of funds, that somehow those funds, by coming into the

12   estate, (indisc.) status of an administrative expense fund.

13   But even that strange statement, so antithetical to Chapter 11

14   practice, is not enough to take these actions taken on April

15   2nd out of the realm of arbitrary and capricious actions.  That

16   is so because the loan, (quote), to a Chapter 11 debtor per a

17   PPP is easily converted wholly or largely to a grant.  Paid

18   salaries in full get money in the hands of employees, pay

19   landlords, pay other lessors, pay interest on debt, all of

20   those in the context of a debtor with roughly 250,000 a month

21   in full -- at full load for employees, interest accruing at

22   over 21,000 a quarter on the first lienholder, rent due at

23   39,000 for May to a soon to become a landlord, all of these

24   were argued towards being -- this loan being converted into a

25   grant is functionally a grant if it was given.

1          But the issue is not that specific and is very

2    constructive -- in a very construction of the program itself.

3    It is the only type of funding of its kind.  No funding in a

4    small business commercial tier is made on an unsecured basis

5    without guarantees from principals and no (indisc.) to owners

6    (indisc.) fraud or criminal activities.

7          The PPP loan/grant is a broad-based stimulus to the

8    economy to help cope with the massive economic effect that the

9    -- the steps taken to address COVID-19's rumble through our

10   populous has generated.  This is not a guarantee of a loan.  At

11   some portion of -- (indisc.)  collateralized and guarantees and

12   otherwise similar to commercial lending circumstances that

13   (indisc.) the SBA's charge up to this point.  A boost for small

14   businesses who need a (indisc.) to go and to help regarding

15   normal financial circumstances, that is not what is before us.

16          No, this is a broad and general life-preserver thrown

17   out to small businesses with very few restrictions.  Here the

18   only restriction affecting the debtor is its status as a

19   Chapter 11 debtor-in-possession, that and nothing more.

20          As noted in our authorities, there is no direct or

21   detailed requirement in the (indisc.) SBA (indisc.) program

22   that mentions bankruptcy save for a question that is noted in

23   the SBA brief, Number 6 and Number 24 on a form, but nothing in

24   any of this and the C.F.R. that we found, there is nothing in

25   the statute itself, that in this massive distinction between

21

1    the Form 1919 and the form we're looking at here, in those

2    instances is the question "Did you file bankruptcy?" either the

3    entity or the affiliate or the principal.

4            And those were not absolutely, on their face, to be a

5    disqualifier, they were merely a part of the credit worthiness

6    standard that the lenders administered that pre-CARES Act

7    program would use to otherwise cull out any Chapter 11 debtor

8    because in that concept it doesn't violate Section 525 in its

9    discrimination.  It doesn't discriminate on them, it's just the

10   factor of a credit assessment.

11           This is a different kettle of fish that you're in

12   bankruptcy you can't do it, you can't apply.  There is no

13   credit worthiness standard, a non-debtor, small business can't,

14   be insolvent.  Whether your shut its doors.  And yet, if it

15   uses the funds to stay open for eight or so weeks,  you're

16   still insolvent, non-debtor entity gets a grant instead.

17   Nontaxable at that while an entity that utilizes the processes

18   and requirements to Title 11 of the U.S. Code.  Well, sorry,

19   your bankruptcy status alone is the basis for refusal to allow

20   a PPP loan/grant to be issued.

21           Under Section 525 Jurisprudence this is the key,

22   that the Government, the gatekeeper, the one who determines who

23   may pursue a livelihood or who may survive the pandemic effect,

24   these PPP loan/grants are to be given indiscriminately to any

25   entity suffering from the effects that COVID-19 has on the

1    economy, just have less than 500 employees.  This is an

2    educational support business, (indisc.) tutoring, all functions

3    that have been blasted by school closings by mid-March through

4    the end of the school year, this is an affected qualified

5    business, but solely because it is a debtor in bankruptcy, not

6    based on (indisc.) decisions, but merely is cited as a debtor

7    bars them from getting a PPP loan/grant.

8             Why else would Congress, 100 percent guaranteed

9    lenders, why would Congress require the Feds to pump in

10   liquidity in the capital markets and send support to lenders

11   under this program?

12            Why let lenders only have to verify certain nominal

13   points, none of which are normal commercial loan standard

14   requirements if this is merely an adjunct to an existing

15   financial system or just a modification of the SBA's normal

16   (indisc.) program?  It clearly is not.

17            This only happens in an egregious national emergency.

18   The (indisc.) the SBA says no Chapter 11 debtor can get a PPP

19   loan -- sorry, a PPP loan/grant.  Why?  Because of their

20   involvement in a bankruptcy, Section 525 discrimination

21   couldn't be clearer.  But the SBA acted in such an arbitrary

22   and capricious fashion adding a requirement nowhere in the

23   emergency statute that is meant to help all American small

24   business affected by the necessary responses to COVID-19

25   assault on our citizens, now having killed more people in three

1    to four months than seven years in the Vietnam War, to decide

2    to exclude debtors when Congress expressly excluded  mid-size

3    and large size entities is the height of arbitrary and

4    capricious fashion.  That is not -- there's a few things here.

5           That removes the restrictions on injunctive relief

6    which courts can impose on the SBA.  It can't be sued and can't

7    sue in any court (indisc.) anti-injunction provision just like

8    any other party in this context.

9           But the SBA acted blatantly beyond the scope of the

10   intended CARES Act that any injunction shield disappeared.

11          Judge Jones in *Hidalgo* said it well and you noted,

12   Page 59, Dockets Number 17, lines 9 through 21.

13          "I simply do not accept that when I have evidence of

14          bankruptcy discrimination that I can do nothing about

15          it.  And if I am wrong about that, I am very certain

16          my (indisc.) colleagues will tell me that I'm wrong

17          and I will accept that criticism, but this can't be

18          what Congress intended.  This can't be the way that

19          we are supposed to treat our fellow man in this town.

20          It's inconceivable to me that this distinction can be

21          drawn.  The people that need the most help and have

22          sought protection under our laws are the people who

23          are targets of discrimination in the government

24          support (indisc.).  This can't possibly be."

25          Now to deal with the Court the last issue, that the

1    SBA is not instructed to hold aside $700,000, the debtor will

2    not -- will be a tattered and twisting -- will be tattered and

3    twisting in the wind, employees to be furloughed and the

4    business will likely fail for a pittance of its real worth once

5    a new normal can be established, all because it is a debtor in

6    Chapter 11 (indisc.) an arbitrary and capricious wholly

7    unauthorized (indisc.) without any rational relationship in the

8    fact of how Chapter 11's are conducted and supervised.

9            Something more than a (indisc.) is required here.

10   The SBA needs to be required to set aside 700,000 and this

11   matter certainly needs to be moved to a proper conclusion, the

12   debtor being a PPP loan/grant recipient because it applied

13   timely, is qualified to get the loan and it -- it convert all

14   or practically all of this into a grant.  Debtor played by the

15   rules, filed timely, it should not be punished for being a

16   debtor in bankruptcy when similarly challenged, likely equally

17   insolvent entities can get the money and the SBA only gets to

18   look at that entity as the unsecured debt holder as to any non-

19   grant portion.

20           I'd like now to (indisc.) to point out the SBA's

21   (indisc.) and make some responses specifically to points made

22   in the brief.

23           **THE COURT:**  Okay, but take your time.

24           **MR. KEIFFER:**  Thank you, your Honor.  The SBA notes

25   on Page 4 of their brief that they extended operating

1  procedures that exist on SBA Form 1919.

2          But those were all, as noted, (indisc.) having look

3  at that Form 1919, there is a series of -- hold on just a

4  second, your Honor ---

5          **THE COURT:**  Sure.

6          **MR. KEIFFER:**  -- I'm checking my computer -- there it

7  goes.

8          On 1919, Question Number 6 is a series of questions:

9          "Unless stated otherwise if any of the questions

10          below are answered yes, please provide details on a

11          separate sheet."

12          (indisc.) as a small business applicant or its

13          affiliates ever filed for bankruptcy protection

14          (question mark)?

15          It's one of 11 questions.  The remainder of these

16  questions talk about "Have you obtained a SBA loan?"  "What

17  type of operations do you run?," normal credit-related

18  circumstances.

19          The second question is Number 24 in its reference is

20  regards to the same thing:

21          "Have you or any business you control -- this is

22          regarding the principal -- ever filed for bankruptcy

23          protection?"

24          Again, all decisions -- all are elements to be able

25  to touch upon credit decisions, credit determinations that

26

1   would need to be made in determining whether to grant the loan.

2        Moreover, if the Court would note, the Interim Final

3   Rule Number 2 on the April 3rd version, also in the C.F.R. on

4   04/15 but subsequently removed, indicated that the -- stated

5   the suspension of the requirements under 13 C.F.R. 120.10 on

6   loan -- let me make sure if that describes loan -- pardon me,

7   your Honor, just a second --

8        **THE COURT:**  That's fine.

9        **MR. KEIFFER:**  I'm trying to find the specific

10  language in that former and then final rule --

11       **THE COURT:**  That's fine, sir, take your time,

12  Mr. Keiffer, I'll wait.

13       **(Pause)**

14       **MR. KEIFFER:**  Here it is.

15       On Page 5 of that document that was issued on April

16  3rd and put in the federal (indisc.) (indisc.) federal register

17  -- federal regulations, it stated:

18           "Lender must comply with the applicable lender

19           obligations set forth in this Interim Final Rule but

20           will be held harmless to borrower's failure to comply

21           with program (indisc.).  (indisc.)

22           None of these (indisc.) borrowers violations of

23           fraud (indisc.) interim final rule.

24           The program requirements of the PPP identified in

25           this Rule temporarily supersede any conflicting loan

1          program requirements as defined in 13 C.F.R. 120.10."

2          As we noted at the hearing previously regarding the

3   -- pardon me, your Honor -- and in securing the approval of the

4   loan/grant those loan program requirements suspension is a very

5   significant point.  At the time that the submission was noted

6   there was nothing in there that would have in any way, shape or

7   form restricted bankruptcy except for the application element

8   that was modified from a previous Form 1919 from a credit

9   worthiness element to an absolute bar.

10          There is nothing that Congress did that gave the SBA

11   that broad grant of authority in this context to add new

12   requirements when Congress itself, in doing this, adopted the

13   (indisc.) for what the active state stated itself, in

14   particular --

15          Hold on just a second here.

16          Under said Part B under 1102, (indisc.), entitled

17   "Increased  eligibility for certain small business and

18   organizations.

19          In general, wherein in the covered period, in

20   addition to small business concerns, any business concern,

21   nonprofit organization, veterans organizations, travel

22   business, et cetera "shall be eligible to receive a covered

23   loan (indisc.) the business concern, nonprofit or private

24   business concern employs not more than 500 employees."

25          "Further, borrower requirements:  Borrower must

1       certify or applicant applying for a covered loan

2       Shall make a good-faith certification that

3       uncertainty of current economic conditions made

4       necessary the loan request to support the ongoing

5       operations of the eligible recipient.

6       2.   Acknowledging that the funds will be used to

7       retain workers, maintain payroll and make mortgage

8       payments, leases and utility payments.

9       3.   That the eligible  recipient does not have

10      an application pending for a loan under this

11      subsection or for the plain purpose of duplicative

12      amounts applied for or received under a separate

13      loan.   And

14      4.   During the period beginning on February 15, 2020

15      and ending on December 31st, 2010, if the eligible

16      recipient has not received amounts under this

17      subsection for the plain purpose (indisc.) amount."

18      Then there's the sense of the Senate, this is

19  actually in the statute:

20      "Sense of the Senate.  It is the sense of the Senate

21      that administrators should issue guidance to lenders

22      and agents to ensure that the processing of (indisc.)

23      covered loans prioritize small business concerns and

24      entities and under reserved and rural markets

25      including veterans and members of the military, small

1             business concerns owned and controlled by socially

2             and economically disadvantaged individuals as defined

3             under 8(b)(3)(C), when in business and operation less

4             than two years."

5          This Debtor is a minority-owned business.  But that

6     didn't -- the Senate is being bypassed and overrun by the fact

7     that the SBA proved in its former form to go from a credit

8     worthiness standard to a gatekeeper standard -- bankruptcy

9     (indisc.).  If I may just present more, I have a little bit

10    more to review, your Honor, real quickly.

11         **THE COURT:**  That's fine.  Again, take your time,

12    Mr. Keiffer, I'll patiently wait to hear everything you want to

13    say, sir.

14         **MR. KEIFFER:**  Thank you, your Honor.

15         And I'll use the pauses in these circumstances.

16         **THE COURT:**  You can.

17      **(Pause)**

18         **MR. KEIFFER:**  The SBA relies upon this particular

19    requirement that they assert it's not affected by (indisc.).

20    And it is our assertion that that is not disingenuous.

21         The argument about sound value to reassure payment is

22    disingenuous, it's such a huge, huge portion of the PPP loan/

23    grant will become grants and repayments can only come from the

24    entity itself at unsecured status.

25         The SBA has no particular ability to assure itself of

```
 1    repayment here.  This isn't a circumstance with sound loan

 2    practices can be sound value which secured as reasonably to

 3    assure repayment is involves.  This is (indisc.) in, dump into

 4    the economy of significant funds to keep people afloat, to keep

 5    people alive, to enable business to continue, and that it

 6    doesn't -- there's no reason and as Congress spoke, it made it

 7    clear that it was going to restrict those for mid and large

 8    sized companies.  You can't if you're insolvent (indisc.) if

 9    you had solvency issues if you're a large corporate entity,

10    mid-size, over 500, if you're in a bankruptcy proceeding.

11             But under that there is nothing that Congress said

12    you could do that would prohibit it.

13             Past lending, here in bankruptcy, past lending has

14    higher priority than what is (indisc.).  Let's look at this in

15    the other context (indisc.) on sound value for (indisc.) to

16    reasonably assure repayment.

17             Outside of bankruptcy, all of the existing debt

18    structure remains where it is.  You have a circumstance where

19    you likely have large, over-secured creditors -- I mean under-

20    secured creditors.  In a normal context, it would be

21    competitors for those funds.  There's nothing about these

22    (indisc.) the loan grant that gives the SBA any particular

23    precedent, priority, position, benefit over any other creditor

24    that exists of this (indisc.) that entity.  This is merely a

25    payment to make sure that people can stay afloat during this
```

1   pandemic.  And this pandemic relief, this pandemic life

2   preserver is being denied to small business debtors without any

3   authority.  The SBA argues that what it has, it has a resident

4   capacity based upon that sound value standard to add these.

5   But 836 controls the program and it is not -- and has no such

6   assessment requirement to assure repayment.  It has loan

7   statements and circumstances (indisc.) up to ten years.  The

8   qualifications are clearly non-commercially based.  This is a

9   government benefit, this is a government stimulus.  This is not

10  the accompanying and support of the nurturing of small business

11  which is the general practice and obligation of the Small

12  Business Administration since its inception.  These are

13  peculiar and bizarre times.  And to be able to try to refashion

14  this circumstance and to somehow fit into that by virtue of the

15  ostensible authority of the SBA to impact or to make

16  regulations to implement what Congress has given it the power

17  to do so runs wholly squarely against what Congress basically

18  said on the issues of bankruptcy.  Large firms, no; small

19  firms, yes; midsized firms, no; small firms, yes.  There's

20  nothing in there that prohibits bankruptcy -- bankrupt debtors

21  in bankruptcy or individuals who are involved in bankruptcy for

22  that matter from being able to seek PPP lending.

23          Regarding the preclusion of injunctive relief, the

24  answer to preclusion of injunctive relief is pretty

25  straightforward.  When you exceed your authority, you have the

1    ability to enjoin.  And the -- what we have here is that -- and

2    (indisc.) the SBA responds particularly around page 11.

3    Conditioning a loan on whether a party receiving loans in

4    bankruptcy does not violate Section 525 because the loan is not

5    a grant.  In each of those instances that are cited that I've

6    had the opportunity in the short time to be able to review,

7    which has been almost nil, these are loan guarantees or loan

8    assistance programs that you had to go through an application

9    process that had -- that I see no citations for specific

10   bankruptcy -- the statute that tells you that parties in

11   bankruptcy do not -- are not able to apply.  I do not see any

12   indication that something similar to a gatekeeper function in

13   this instance the SBA has cited because you're in bankruptcy,

14   you're not qualified.  They make a stipulation that it needs to

15   be similar to a license, permit, charter, or franchise

16   (indisc.) Section 525.  But this is a similar grant.  This is a

17   grant to small businesses.  This is -- it may be a hybrid but

18   it's largely, it's almost exclusively a grant to most all

19   businesses out there that are going to follow this.  And

20   (indisc.) remainder, all of these are all in a circumstance

21   regarding programs that are specifically dealing with

22   disparate, pre-CARES programs that were (indisc.) that Congress

23   had made decisions on how to address the effects of the market

24   in regard to certain parties and the policies needed to resolve

25   those.  But none of those deal with something as broad as a

1   grant here (indisc.) CARES Act.  I think that their application

2   is beyond that.  There's not (indisc.) similar argument that

3   somehow it needs to be like a driver's license to be like -- to

4   be (indisc.) similar grant.  In this instance, this is clearly

5   a grant to the whole public of the United States, I mean all

6   small businesses, the only exclusionary (indisc.) if you're in

7   bankruptcy.  This makes it -- because it's filed as a 525, this

8   makes it a core proceeding and this bankruptcy court may submit

9   an order.  Bankruptcy court necessarily then has jurisdiction.

10          The paragraph on page 15 of 24, the SBA notes

11   regarding a case (indisc.) Oklahoma (indisc.) unless Congress

12   has directly spoken to the precise (indisc.) issue (indisc.)

13   only whether (indisc.) answer is based on permissible

14   construction of the statute.  But Congress did speak in the

15   CARES Act.  It addressed BK (phonetic) multiple times,

16   excluding BK by statute, something it alone expressly can do.

17   It goes further to say that Congress has explicitly left a gap

18   for the agency to fill, and that is a supposition here.  That

19   is a supposition.  This is not a gap left for the agency to

20   fill.  There is an express delegation of authority to elucidate

21   a (indisc.) provision of the statute by regulation.  There is

22   nothing to that effect.  Some legislative delegation on an

23   agency to a particular question is implicit rather than

24   explicit.  In such places, the Court may not (indisc.)

25   construction of the statutory provision (indisc.) reasonable

1   interpretation made by the administrator or agency.  And here

2   there is no gap to fill.  This is a loan grant available to

3   help the companies (indisc.) pandemic effect on the whole of

4   the economy in the United States, and the only bar (phonetic)

5   here that applies to debtors (indisc.) status as a Chapter 11

6   debtor.  And that was not the hole that was left to be filled.

7   That was something that the SBA took upon itself.

8           Carrying out this title is not a call to modify or

9   add limitations to what Congress said was to be an expanded no

10  credit (indisc.) as a whole.  Congress addressed solvency in

11  bankruptcy in mid and large entities and expanded it to small.

12  Until the SBA added its arbitrary exclusion filter (indisc.)

13  sound value when all hallmarks of sound value are statutorily

14  removed.  This discretion is not so broad as to enable the SBA

15  to add conditions to programs that Congress added to other

16  (indisc.) economy but clearly did not do here.  Exigencies

17  (phonetic) in this crisis are not a basis to overcome the CARE

18  Act -- CARES Act specific (indisc.) prohibition -- specific

19  non-prohibition.  This is in response to the CARES Act did not

20  amend or otherwise limit this authority (indisc.) 634(b)(6) of

21  Title 15.  The SBA goes on to say instead Congress explicitly

22  included PPP and Section 7A lending programs, thus (indisc.)

23  administrative broad discretion over the PPP indeed rather than

24  preparing administration -- administrative discretion of the

25  PPP, the CARES Act expanded it by giving administrative

1    authority (indisc.) regulations and rules to implement the PPP

2    without complying with typical notice procedures.  But that

3    exigency, that circumstance in regard to (indisc.) basically

4    give you the (indisc.) to what the statute references in regard

5    to issuing regulations, let me find that, your Honor, hold on.

6    Pardon me, your Honor.

7             THE COURT:  That's fine, Mr. Keiffer.

8             MR. KEIFFER:  Just letting you know I'm not done.

9             THE COURT:  I beg your pardon?

10            MR. KEIFFER:  Just letting you know I am not done.

11            THE COURT:  All right.

12            MR. KEIFFER:  Section 1114, emergency rulemaking

13    authority, not later than 15 days after the enactment of this

14    Act, the administrator shall issue regulations to carry out

15    this title and the amendments made by this title without regard

16    to notice requirements under 553 of Title 5, United States

17    Code.  That did not say fill in gaps that we didn't -- that we

18    intentionally didn't have, didn't ask you to fill in.  It just

19    said to carry out this title, follow the instructions, don't

20    add your own elements.  We added bankruptcy prohibition, "we"

21    being Congress, where it was necessary.  It was signed into law

22    that bankruptcy became an issue only at the mid and large-sized

23    level.  It was not to be an issue at the small level.  Congress

24    knew what it was doing.  Congress didn't do this.  And this

25    regulatory instruction is to carry out this title, not to

1    modify.

2           Again, it's boggling that the continued statement as

3    to the basis for this is sound value.  But Congress made

4    determination that no credit issues would exist, there's no

5    credit assessment, none whatsoever.  The sole requirements are

6    to (indisc.) program enabling (indisc.) I'm sorry and the loan

7    -- and that loan program (indisc.) enabling legislation.  The

8    SBA notes the SBA was required to make decisions about how to

9    reconcile shall (indisc.) incurring the sound value of loan

10   (indisc.) within the overall concept of the CARES Act.  That is

11   such a strained and flawed basis.  There is no recognition

12   (indisc.) functional that the loan can functionally be a grant,

13   that there is no assessment of sound value loan making when

14   $650 billion is disbursed in less than a month.

15          The Debtor -- I mean, the SBA cites the case of

16   *PROFILES* about the potentially unknown effects and the Congress

17   has determined the SBA's implementation cannot be subject to

18   injunction.  The *PROFILES* case is a non-bankruptcy matter where

19   the lending institution, Bank of America, was sued for not

20   accepting a non-customer (phonetic) application.  There is no

21   statutory (indisc.) such as 525 for such an action.  Private --

22   plaintiffs asserted a private right of action against Bank of

23   America and the SBA is not even a party.  The court denied the

24   request.  The Debtor has no quarrel with its lenders in this

25   matter and has no quarrel with the *PROFILES* case, but it is

1    inapplicable in this case.  This case (indisc.) 525 (indisc.) a

2    similar grant should not be conditioned, should not be

3    discriminated against based upon the debtor's status as a

4    chapter -- as a debtor in possession (indisc.) bankruptcy in

5    the first place.  Debtor (indisc.) SBA notes the SBA has a

6    clear policy to exclude bankrupt entities from PPP lending

7    because such lending (indisc.) unacceptable risk of

8    unauthorized use of funds for non-repayment (phonetic) of

9    forgiven loans.  Again, there is no basis for such (indisc.)

10   high risk.

11          It is the (indisc.) top of page 22, the SBA makes a

12   note (indisc.) Congress's statutory (indisc.) preliminary

13   injunctive relief altering the scheme (phonetic) in addition to

14   noting we're only asking relief for this specific debtor.  It

15   is the SBA that altered the statutory scheme, not the Debtor.

16   While adding a bankruptcy question to worthy --

17   creditworthiness applications is consistent with sound lending

18   policy for a real loan for a real loan, for a (indisc.) grant

19   given without credit determination making a bankruptcy --

20   making for a bankruptcy exclusion when Congress chose not to is

21   beyond the administrative authority.  Your Honor, that's the

22   end of the presentation that I have, your Honor, (indisc.) an

23   opportunity to rebut (indisc.)

24          **THE COURT:**  Couple housekeeping matters and then a

25   couple questions.  You indicated that Ms. Wexler is not on the

1  phone; is that correct?

2        **MR. KEIFFER:**  That is correct.

3        **THE COURT:**  All right, so let me -- you had

4  attachments to your TRO, her declaration, her affidavit, and

5  then some exhibits that attached to that.  Do you, one, want to

6  make that part of the record?  And then, second, I'll ask

7  opposing counsel whether or not she objects to their admission.

8  So do you want to include the affidavit or declaration, I'm

9  sorry I don't recall what it is, with the attached exhibits

10 indicating Ms. Wexler's efforts in trying to obtain a PPP loan?

11       **MR. KEIFFER:**  Yes, your Honor, it is at Docket 17 and

12 18; 18 is the correction and 17 filed the amended declaration

13 without the exhibits, 18 filed the declaration with the

14 exhibits.  And, yes, I do want the admission of the declaration

15 as well as the admission of the exhibits attached.

16       **THE COURT:**  Ms. Sinesi, the declarant is not

17 available on the phone.  Do you object to the admission of

18 these documents and her declaration?

19       **MS. SINESI:**  Good morning, your Honor.  This is

20 Dominique Sinesi on behalf of the SBA.  Yes, we object to the

21 declaration as we have not had the opportunity to cross examine

22 or depose this witness.

23       **THE COURT:**  All right, so --

24       **MR. KEIFFER:**  (Indisc.)

25       **THE COURT:**  -- if I may, so, Mr. Keiffer, what's your

1  response to that?

2        **MR. KEIFFER:**  Well my response to that, your Honor,

3  is that generally speaking temporary restraining order on

4  notice hearing in this context is appropriate to be done by

5  declaration.  If it's necessary to get -- there's been never --

6  no communication regarding whether the client would be needed

7  at this matter.  We didn't even know when the SBA was going to

8  respond until this morning at 6:00 o'clock this morning that

9  they were going to -- that we had an idea (indisc.) didn't know

10  that there was any issue regarding the declaration of

11  Ms. Wexler.  There's been no objection whatsoever made it in

12  the papers, the 24-page long papers, there's any objection to

13  the declarant's testimony.

14        **THE COURT:**  Before I hear from --

15        **MR. KEIFFER:**  (Indisc.)

16        **THE COURT:**  If I may, Mr. Keiffer, before I hear from

17  Ms. Sinesi, couple things.  Number one, it was set on an

18  expedited basis.  And I agree with you, I would have preferred

19  to have been favored with a brief sooner than 6:10 this

20  morning, but that's the -- I'm sure the SBA is very busy

21  because they're dealing with a number of these lawsuits.  But,

22  second, it's not the responsibility of the Defendant to ensure

23  whether or not your client has admissible evidence; that's your

24  responsibility.  And as you know, it's pretty straightforward

25  from an evidentiary perspective that if I'm going to admit the

1   declaration of a party, then that declarant has to be available

2   for cross examination.  So, again, what's the basis for the

3   admission of the declaration inasmuch as the declarant is not

4   available?

5          **MR. KEIFFER:**  Your Honor, I don't know that I have a

6   decent response to that other than I would ask the Court for an

7   opportunity to get Ms. Wexler on the phone.

8          **THE COURT:**  Ms. Sinesi, what's your position on that,

9   please?

10         **MS. SINESI:**  Your Honor, the nature of temporary

11  restraining orders, you know, is what dictates this unusually

12  fast hearing.  Our delayed response, because we are dealing

13  with a number of similar matters throughout the country in

14  large numbers at this point.  And I will say that I do not

15  dispute the material fact of the fact that Asteria applied for

16  one of these PPP loans and that it was denied.  And that to the

17  extent that there are any factual issues beyond that that are

18  needed for your Honor's consideration of the TRO, this is

19  exactly why we would assert that the TRO should be denied but

20  that a scheduling order be put in place and an opportunity to

21  prepare and cross examine witnesses by deposition in advance of

22  a hearing on a preliminary injunction should be the next course

23  of action.

24         **THE COURT:**  All right.  But to your point, and I

25  appreciate your recognition that the factual allegations

1    regarding the attempts that Ms. Wexler made about attempting to

2    get a PP loan and what you were told really aren't in dispute;

3    would you agree with that?

4            MS. SINESI:  Yes, your Honor, I would agree with

5    that.

6            THE COURT:  All right.  So, Mr. Keiffer, what I'll do

7    is I will allow both the -- is it an affidavit or declaration?

8    I'm sorry, I don't have it up on my screen.

9            MR. KEIFFER:  Declaration, your Honor.

10           THE COURT:  All right, I'll allow the declaration

11   with the attachments, I'll admit them for the limited purpose

12   of demonstrating the efforts that the Debtor undertook to

13   acquire a PP loan and that it was denied and that the

14   consideration, the sold consideration was that the Debtor was

15   in bankruptcy.  I'll do that, all right?

16       **(Declaration with attachments received in evidence)**

17           MR. KEIFFER:  Thank you, your Honor.  But I think it

18   would be just as easy (indisc.) convene in just a short bit and

19   have Ms. Wexler to come on to deal with the other issue

20   regarding the effect of it on the Debtor itself, even though I

21   think the Court has already seen enough information in the case

22   in itself to know what the effect of the COVID-19 has been on

23   this Debtor.

24           THE COURT:  I think that's correct.  Regrettably I

25   can't accommodate your request because I have an emergency

1    matter right after this hearing and several matters this

2    afternoon.  And inasmuch as the TRO, there's time of essence,

3    I'd prefer not to do that.  But, yes, I'm acutely aware.  And

4    you'd have to be in a cave without any outside access to what's

5    going on and what the effect it's had on business.  So I'm

6    aware of that.  Let me ask you a couple questions if I may.

7    You sort of addressed these but I just want to make sure

8    they're on the record.  First of all, with regard to the issue

9    of whether or not I can enjoin the SBA, the opposition details

10   a number of circuit court opinions, including the Fifth

11   Circuit, that say I don't have that authority.  And as I

12   understand it, your response to that is I can enjoin the SBA

13   because they've exceeded their authority; is that correct?

14           **MR. KEIFFER:**  That is correct.

15           **THE COURT:**  All right.  Second thing is, under

16   525(a), the way I understand at least how the Fifth Circuit has

17   construed this in other cases I have is that I have to construe

18   525(a) narrowly.  And inasmuch as the statutory language does

19   not contain an express reference to "loan," my understanding of

20   your argument is, is that effectively this loan is a grant; is

21   that correct?

22           **MR. KEIFFER:**  That is correct, your Honor.

23           **THE COURT:**  All right.  And then there was one other.

24   Let me check my notes here, sir, so I can make sure there's not

25   anything else that I'm missing.  Bear with me for one minute.

1    I took a number of notes about things that you've said.  Let's

2    talk briefly for the benefit of Ms. Sinesi, just so she has a

3    little bit of the lay of the land.  You would acknowledge as it

4    relates to your prior motion with the Court under 364 of the

5    Bankruptcy Code that you had asked this Court and this Court

6    had approved you obtaining financing through the PPP program

7    and you asked for an indication from this Court that as best

8    the Court can understand at that time, and this was last month

9    I believe it was or earlier this month, that the Debtor's

10   application, that the process, that there was no prohibition as

11   you understood it under the CFR regulations, the interim rules

12   that were implemented at that time, that precluded the Debtor

13   from participating and getting a loan under the PPP program; is

14   that correct?

15        **MR. KEIFFER:**  That is correct.  We did not find out

16   about the PPP loan application form until after loan

17   applications were actually being reviewed and submitted.  And

18   it wasn't until approximately April the 10th did the Debtor

19   find out and counsel find out that there was this specific

20   exclusion in the format.

21        **THE COURT:**  All right.  And so just from a

22   chronological perspective, you asked the Court to, under the

23   364 requirements, indicating the Court that you had no other

24   access to credit, that you wanted to avail yourself of the PPP

25   program.  I approved that and then subsequent to that you were

1    denied.  And by the time that this matter was set, when you

2    filed your adversary complaint and requested the TRO, the first

3    tranche of funding had gone out and now we're in the context of

4    the second funding; is that accurate?

5              MR. KEIFFER:  That is correct.  And to get to the

6    point of being in the queue, it is our understanding that

7    people that had already applied didn't get funded would be the

8    ones that would be next in the queue, which brought forth the

9    request saying realistically we should have been in the queue

10   (indisc.) inappropriate and capriciously added standard.

11             THE COURT:  No, I understand that point.  And finally

12   to where we are again chronologically that what has occurred --

13   what has transpired between when you filed your original

14   application for a TRO and filed your amended application is

15   that the SBA, for lack of a better word, promulgated new

16   regulations, they're interim rules, they're not subject to the

17   usual process of being published for comment before they become

18   final, and in those interim regulations, I think it's Rule 4,

19   there's that prohibition against debtors being eligible for the

20   PP loans; is that correct?

21             MR. KEIFFER:  Yes, your Honor.

22             THE COURT:  All right, thank you.  All right,

23   Ms. Sinesi, I'll hear from you now.

24             MS. SINESI:  Just checking the time.  Yes, it's good

25   morning still, your Honor.  I'm ahead of you by an hour since I

1   am calling in from Washington, D.C.  And I am very grateful for

2   your Honor's patience and for the quick scheduling of this.

3   This is a very unprecedented time in our country with this

4   pandemic and that it is impacting a number of legal

5   jurisdictions on a number of fronts.  So thank you, your Honor,

6   for your time and attention to this matter.

7          This complaint raises challenges to the SBA's

8   implementation and administration of the CARES Act currently

9   funded with $659 billion.  This is unprecedented as Plaintiff's

10  counsel has indicated.  And in his complaint, he wants to

11  overturn the SBA's explicit policy of excluding bankrupt

12  entities from participation.  The injunction relief that is

13  sought is barred under the concept of sovereign immunity.  And

14  for purposes of the record, I would like to state that on this

15  -- on the outset, that the United States does not waive its

16  objection to jurisdiction by the bankruptcy court with respect

17  to this action.  We seek to preserve our rights on this issue

18  and are appearing today to argue against the grant of a TRO in

19  this matter.  We do not consent to the entry of any final order

20  by this Court and we assert that it does not have

21  constitutional authority to enter it.  To the extent that your

22  Honor requires briefs on this, I would ask that we be allowed

23  time to do so.

24          THE COURT:  All right, I'll --

25          MS. SINESI:  Regardless of my -- go ahead, your

1    Honor, sorry.

2         **THE COURT:**  I'll come back to -- let me just ask you

3    on that point, we'll come back to that to the extent we need

4    to.  You would acknowledge that I at least have jurisdiction to

5    make a determination of whether or not a TRO should be granted;

6    do you agree or disagree with that statement?

7         **MS. SINESI:**  Not to the extent the TRO is premised on

8    the SBA's authority so not premised on any APA type of

9    argument.

10         **THE COURT:**  Please continue.

11         **MS. SINESI:**  Thank you, your Honor.  Okay, so the

12    three broad prongs of my argument are that injunctive relief is

13    barred under concepts of sovereign immunity, that 11 USC

14    Section 525(a) does not apply to loans or loan guarantees,

15    which is what is at issue today, and that the concepts of APA

16    mandamus failed as the SBA has issued rules addressing the

17    exclusion.  Both the CARES Act and the SBA Act explicitly

18    delegates that authority to the administrator.

19         The CARES Act provides, as has already been

20    discussed, unprecedented emergency economic assistance to help

21    individuals and businesses and healthcare providers to cope

22    with the COVID-19 crisis.  One portion of the economic

23    assistance is what's at issue this morning, the payroll

24    protection program under Section 1102, which adds paragraph 36

25    to Section 7A.  Under interim rules that the administrator has

1    issued, loans for covered uses are added to Section 7A.  And

2    these types of loans are itemized as to their purpose.  They

3    can be used for payroll costs, interest on mortgage, rent,

4    utilities, and certain other explicitly itemized purposes.

5    Otherwise, Section 7A is unaltered and has the same limitations

6    that it had prior to the CARES Act being put in place.  It

7    provides that the SBA may guarantee.  It does not say "shall;"

8    it says "may."  So that's an important aspect of this that I

9    would ask the Court to keep in mind.

10          Section 636(a)(36)(D) through (R) details the precise

11   way in which the payroll protection program, I'll refer to it

12   as "PPP," covers loans that differs from other 7A loans.  It

13   relaxes size limitations, says it's okay to lend to nonprofits,

14   etcetera.  And it's selectively waives SBA applications and

15   rules used to -- with respect to small business sizes.  But it

16   leaves unaltered the provision that loans shall be of sound

17   value and so secured as to reasonably assure repayment, 15 USC

18   636(a)(6).

19          The first I heard somebody refer to it as tranche,

20   the first amount, allocated to the PPP was $349 billion.  As we

21   are all familiar, that amount of money went very quickly and it

22   has now been replenished with an additional $310 billion.  And

23   it's sometimes referred to as the CARES Act Two.  SBA started

24   accepting applications under this second CARES Act Two on April

25   27th, so just a short time ago.  The CARES Act authorizes the

1    administrator of SBA to issue emergency regulations to

2    implement the PPP without the usual notice and comment

3    procedures that normally the administrator would go through.

4        The first rule was posted on April 3rd and added to

5    the Federal Register on April 15th, and it allowed for a

6    streamlined process so that lenders did not need to comply with

7    the usual case underwriting requirements.  The PPP application

8    requires the borrower to certify that it is not in bankruptcy.

9    And this application was part of this rule.  The second interim

10   rule also published on -- passed and also published on the same

11   date of April 28th added some temporary changes related to the

12   PPP with additional eligibility requirements and specifically

13   addresses applicants in bankruptcy.  And that's found at 85 CFR

14   20817.

15       The legal standard that the Court is faced with today

16   is asking for a review of an extraordinary and drastic relief.

17   It is -- an injunction is not awarded as a right.  It is only

18   awarded if the plaintiff can show a clear showing that it is

19   entitled.  It has to show that they're likely to succeed at a -

20   - at hearing.  It is that there's irreparable harm, and that

21   the balance of equity is in its favor, and that the injunction

22   is in the public interest.  Injunctions that disrupt the status

23   quo are disfavored.  And here the status quo is that an

24   applicant is not allowed to apply to and participate in this

25   PPP program.  I would ask the Court to remember that Asteria

1    filed for bankruptcy.  This is not an involuntary.  They chose

2    to be in bankruptcy and it's their actions that have therefore

3    had the consequences of excluding them from participation in

4    this program.

5        **THE COURT:**  So if I may, and I'm not going to ask a

6    lot of questions of either one of you all because I want to

7    hear what you have to say, so you're -- are you telling the

8    Court that if Asteria dismissed their Chapter 11 case, if the

9    Court allowed them to do that and reapply, they might be

10   eligible for a loan?

11       **MS. SINESI:**  I am not aware of anything that would

12   restrict them from being eligible.  The question on the

13   application form is addressed as are you presently in

14   bankruptcy.

15       **THE COURT:**  So what you're telling me is but for the

16   fact that they're in bankruptcy right now at this minute,

17   they're not eligible.  And I know there's more to your legal

18   argument than that.  But specifically if tomorrow Mr. Keiffer

19   said, you know what, we're going to take our chances and go for

20   this financing, they could simply dismiss the case with Court

21   permission and reapply, they might be eligible for these loans.

22       **MS. SINESI:**  Your Honor, I am not reviewing these

23   forms but if you go through the eligibility requirements on the

24   form, the question is very specific and it is the question that

25   knocks out Asteria, which is are you presently in bankruptcy.

1    So, yes, I would imagine that the answer is yes.  There's not

2    currently a regulation in place that would somehow -- it

3    doesn't ask have you ever been in bankruptcy.  It doesn't ask

4    if you've been in bankruptcy within the past seven years.  It

5    asks -- it was a very limited provision in terms of eligibility

6    that was placed into this form because they were trying to

7    streamline the process --

8             THE COURT:  Please continue.

9             MS. SINESI:  -- and get the money rolling.  Let's

10   see.  I'm sorry, your Honor, I lost my place.

11            THE COURT:  We're talking about the elements for a

12   TRO, that the injunction disrupts the status quo, and that's

13   when I asked you a question.

14            MS. SINESI:  Thank you for your forbearance.  Okay,

15   so the Small Business Act does not contain a waiver of

16   sovereign immunity and -- but it is limited, as has been

17   discussed by my opposing counsel here.  The SBA statute

18   effectively precludes injunctive relief against the

19   administrator.

20            THE COURT:  Does that apply even when it's --

21            MS. SINESI:  And I --

22            THE COURT:  I'm sorry, and I -- last time I'll try.

23   On that point, does that apply even if I think that the

24   administrator's acts are arbitrary and capricious?

25            MS. SINESI:  Your Honor, I would assert that, yes,

1   the -- this Court -- at this level, the bankruptcy court does

2   not have authority because the plain language of the <u>Small</u>

3   <u>Business Act</u>, the waiver of immunity is to district courts.  It

4   is not to all Federal Courts, it is simply to district courts

5   and above.  So that is the primary basis for why we are

6   asserting that this Court does not have the authority over the

7   SBA to enjoin the SBA on this point.

8            The Section 525(a) argument does not apply to loans.

9   That's been discussed at length in my brief.  It is plain

10  language it -- this reading of Section 525(a) is very explicit

11  and does not include the use of the term "grant."  Grant has

12  been the argument that the Debtor has relied on, that this is

13  in the nature of a grant.  Congress, when it wrote this -- the

14  CARES Act, is fully aware of the difference between a grant and

15  a loan.  And this program provided for a guarantee by the SBA,

16  not a direct loan, a guarantee of loans by community and

17  national level banks.  As a result, we do not feel that there -

18  - that 525(a) applies.  Section 525(a) is very specific.  And

19  the PPP program I think acknowledges the fact that while the

20  funds are advanced for a specific purpose, and that if they are

21  used for that specific purpose, that there would be a

22  forgiveness of collection of the debt.  It also encompasses

23  that and realizes that an applicant might not use the funds as

24  itemized under the <u>Payroll Protection Act</u>, and that in that

25  event it has to be repaid.  So the waiver portion, the

1   forgiveness of debt portion rather is very limited and clear by

2   Congress.  This is a loan under this program and it is a loan

3   by banks that is guaranteed by the SBA.  And that is not in any

4   way encompassed within 525(a).  This is not a right, this is

5   not a license, this is not a permit.  It's not put in place as

6   a guaranteed program.  It is not similar to the checks that

7   individuals were to receive under different portions of the

8   CARES Act that, you know, were direct receipt of payments.

9   This is completely different.  You do still have to apply,

10  there's a specific amount of money that is available, and only

11  if the funds are used in a very specific, limited way would

12  there be a forgiveness of that debt.  And very clearly if it is

13  not used in that way, it must be repaid.  Now, yes, it is

14  repaid under very generous terms but it must be repaid.  So,

15  no, this is not a grant, this is not a giveaway, this is not

16  free money from the government.

17          And I would draw your Honor's attention to we cited

18  quite a few cases on this point but the preeminent case on this

19  point is *Toth versus Michigan State Housing Development*

20  *Authority*, 136 F.3d 477; 525 does not apply to state-issued

21  home improvement loans.  And I would say that this is a very

22  similar type of concept.

23          The PPP does not provide a right.  It is noteworthy

24  that entities in bankruptcy may be eligible for other relief

25  under the CARES Act.  And there are similar programs such as

1    the emergency EIDL grant under the CARES Act.  Congress was

2    very thoughtful in how they put together the CARES Act and how

3    they wanted to very quickly bring these types of programs to

4    availability to individuals and businesses.

5            With respect to APA claims, the United States may not

6    be sued without its consent.  Sovereign immunity waivers are

7    forum-specific, and waivers of sovereign immunity are strictly

8    construed.  The United States can waive immunity of process and

9    it has not in this case with respect to the SBA.  Challenges to

10   SBA authority do not in any way manifest before the Bankruptcy

11   Court as an appropriate forum.  That should be in the district

12   court and above.  The Plaintiff has pointed to the limited

13   waiver of immunity clause in the SBA.  But as I pointed out to

14   the Court earlier, this applies only to district court and it

15   does not include the bankruptcy court.  Congress was well aware

16   of how to make a broader waiver and has done so in other

17   statutes, such as the Fannie Mae waiver found in 12 USC,

18   Section 723(a), where there's a waiver of sovereign immunity

19   for any court of competent jurisdiction.  That is not the type

20   of waiver that we are dealing with here.

21           The CARES Act is silent on bankruptcy eligibility.

22   And here Plaintiff's counsel wants us to substitute his opinion

23   and that of similarly situated debtors before Congress.  Silent

24   does not mean that any of the provisions that are otherwise

25   applicable outside of the CARES Act under 7A should simply be

1    ignored.  Section 17(a) requirement under 15 USC, Section 636

2    still stands, that loans shall be of sound value and to assure

3    that repayment is made.  It has been completely untouched by

4    the CARES Act.  The SBA administrator is explicitly empowered

5    to make sure that such rules as are necessary to enforce the

6    provisions of the SBA Act and the CARES Act are made.  And she

7    did issue rules on these points.  As is referenced in my brief

8    and was touched on briefly by Plaintiff, the first interim rule

9    explicitly incorporates the PPP application and the bankruptcy

10   exclusion on that form.  And the fourth interim rule further

11   addresses the ineligibility of entities in bankruptcy with

12   policy rationale.  So the fact that the Plaintiff is arguing

13   that SBA was capricious or arbitrary I think is completely

14   refuted by the very explicit and narrowly enacted regulations

15   that have been put in place.  Only applicants that are

16   presently insolvent have been deemed to be an unacceptably high

17   risk under this program.  Again, I would point your Honor to

18   the fact that the usual underwriting requirements were

19   eliminated because under this program.  So having one very

20   narrow element that is a restriction is not capricious nor is

21   it unreasonable.

22          A bankruptcy petition does establish a baseline of

23   insolvency on behalf of whoever it is that's in bankruptcy, in

24   case this Asteria Education.  Asteria Education is based on

25   information --

1          **THE COURT:**  But, Ms. Sinesi, --

2          **MS. SINESI:**   -- that's in its filing --

3          **THE COURT:**  Ms. Sinesi.

4          **MS. SINESI:**  Yes, your Honor.

5          **THE COURT:**  I am terribly sorry to ask you, but could

6   you hold that train of thought for like five minutes?

7          **MS. SINESI:**  Sure.

8          **THE COURT:**  I need to step away, if you catch my

9   drift.  And --

10         **MS. SINESI:**  Yes.

11         **THE COURT:**  -- we'll continue.  You can have -- I

12  have a matter at 11:30 but if we go beyond that, that's

13  perfectly fine because, you know, I intend to rule this

14  morning.  But I need like five minutes if we could, please.

15         **MS. SINESI:**  Yeah, I'm almost at the end, your Honor.

16         **THE COURT:**  If you'll bear with me, I'll come back

17  and then you'll finish up and I'll have some questions for you.

18  And then I'll let Mr. Keiffer respond, okay?  So short --

19         **MS. SINESI:**  Yes, your Honor.

20         **THE COURT:**  -- recess, thank you.

21     **(Recess taken from 11:00 a.m. to 11:05 a.m.)**

22         **THE COURT:**  Judge Gargotta.  We're back on the

23  record.

24         My apologies to you, Ms. Sinesi, that we had to stop.

25  We were talking about why the arbitrary and capricious standard

**EXCEPTIONAL REPORTING SERVICES, INC**

1   didn't apply, and my last note says because the rule addresses

2   this, and I assume you're referring to interim rule four.  Is

3   that correct?

4           **MS. SINESI:**  Yes, your Honor.  That is correct.

5           **THE COURT:**  Go ahead, please.

6           **MS. SINESI:**  I wanted to draw the Court's attention

7   to the fact that -- and I don't know why there's an echo.

8           **THE COURT:**  I don't know either.  You're coming in on

9   our end perfectly.

10          **MS. SINESI:**  Okay.  Asteria -- the nature of

11  Asteria's business, according to the declaration that was filed

12  at the time that the petition was lodged with the Court, is

13  that it develops software to digital platform with contents --

14  contents and materials for teachers and tutors with respect to,

15  among other things, SAT performance, maximizing students' SAT

16  performance.  This is the type of business that is ideally able

17  to transition to a remote learning platform, which is what we

18  are facing as a society right now.  There are some businesses

19  that it's very difficult to make the transition to continue

20  operations remotely.  But a software company, a developer of

21  software, etcetera, educators seem to be making that

22  transition.  While with difficulty, I would acknowledge,

23  they're still able to make the transition better than, say, a

24  barber.  And, you know, and given that situation, the fact that

25  Asteria is making the assertion that it will be harmed,

1    irreparably harmed, if it does not get this loan, I do not feel

2    that it has met the standard or presented sufficient evidence

3    in support of that assertion.

4            There are -- they are still able to operate because

5    it's a digital platform, by their own statements made in this

6    case, I'm sure with alterations to their business, but they are

7    still able to operate.  They have not presented any evidence --

8    it's all been, basically, speculative that -- although they do

9    acknowledge somewhere in their complaint that there is a

10   natural dip in its business over the summer months, since it's

11   an SAT prep business.  And since I have two children that have

12   gone through the process, I'm sure that the summer is the sigh

13   of relief time from parents and students alike, and then it

14   starts ginning up more work and pressure on these students as

15   they prepare during the school year prior to college

16   applications.  That can be done remotely, and there are various

17   platforms that are remote.  So, while I'm sure that there is an

18   adjustment that this company needs to make because of the

19   current pandemic, it's possible to make that adjustment, and

20   they have not put forth any evidence or information before this

21   Court to indicate why they could not do that.

22           Further, it is my understanding that in Texas that

23   the stay-at-home, shelter-in-place orders will start to be

24   relaxed in early May.  There has been no testimony or

25   information presented as to how that might benefit or be

1   negative to the business.  Essentially, I would argue that

2   there is just insufficient evidence on the irreparable harm

3   portion that the plaintiff has to prove in order to prevail

4   before the Court this morning.

5          I would also like to point out the fact that if you

6   assume for one moment that it would be appropriate for this

7   debtor to get a PPP loan, there have been no assurances offered

8   or made to the SBA that would provide adequate protection.

9   We've (indisc.) -- no ways in which SBA has been offered post-

10  petition security in any way.  And bankruptcy is an unusual

11  situation that is outside the norm of lending, which is why

12  they just removed it from consideration under this exigent

13  program that is in place.

14          **THE COURT:**  Interrupt you on that point.

15          **MS. SINESI:**  Um --

16          **THE COURT:**  May I interrupt you on that point,

17  please?

18          **MS. SINESI:**  Yes, your Honor.

19          **THE COURT:**  I'm a little confused by that statement,

20  because, as we understand the program works, there is no need

21  for collateral or assurance of repayment as long as the monies

22  are allocated for such things as payroll, rent, things of that

23  nature.  So, what would be the SBA's -- let's assume -- we're

24  in the bankruptcy context.  What could the SBA assert that

25  they're entitled to in terms of cash collateral protections if

1    the whole premise to the program is, is to give the money

2    essentially unencumbered?  I don't quite follow your argument

3    on that.

4         **MS. SINESI:**  Well, they could be entitled to some

5    kind of administrative status.  And it's exactly the point that

6    I very, obviously, inartfully made.  This is silent.  This act

7    is silent on this point, and yet there is an impact because

8    this debtor is in bankruptcy and asking for this loan when

9    normally, if there was a loan made post-petition to a debtor,

10   they would be -- that lender would be entitled to various

11   protections under the Bankruptcy Code.  And, in this case, SBA

12   is one step removed as a guarantor.  It's the fact that this

13   act is silent -- Congress is silent, excuse me, on this point,

14   and yet the debtor wants this loan to be made, and there's no

15   discussion of how that would be done in this act in terms of

16   this bankruptcy impact.  To me, it supports SBA's point of why

17   this is a reasonable and non-capricious exclusion.

18        **THE COURT:**  All right.  So, let me follow up that

19   point with you, because this is a question that I'll ask

20   Mr. Keiffer to address when I give him a chance to briefly

21   respond.  You may or may not be aware that the whole premise of

22   this case was, prior to the pandemic reaching its severity, was

23   that the debtor intended to sell its business.  And, so -- and

24   was going to market it through a broker and attempt to sell it

25   to a third party.  And, of course, what interrupted this was

1  the fact that COVID-19 happened, and the debtor needs

2  financing, as represented to this Court, for things as I

3  pointed out, payroll and things of that nature.

4          So, let's assume that, number one, I grant the TRO

5  and ultimately the debtor is awarded this money under the PPP

6  program, and, second, the debtor is sold to a third party.

7  What happens?  Is there any remaining obli- --if the debtor

8  does everything it says it's going to do, follows the program

9  to a tee, but, nonetheless, the debtor is sold to a third

10  party, what's the effect of that when a third party takes over

11  as it relates to the obligations that were extinguished because

12  the debtor used the money as intended?  Does it matter or not?

13          **MS. SINESI:**  Um -- well, first, it's presuming that

14  the money will be spent as itemized.  Clearly, the PPP program

15  realizes that it cannot control how the money is spent.  It can

16  simply say, if you spend it on these six items and can prove

17  that you spent it on these six items, then there is no

18  obligation for repayment.  However, if you don't, then we'll

19  give you some time period of forbearance and a reduced interest

20  rate and you must repay it.

21          And this is just a -- again, it's one step removed.

22  It's a guarantee by SBA.  It is not the direct loan by the

23  lender.  So, you know, there is an impact being made here on

24  two parties, the financial institution as well as SBA, in terms

25  of the outcome of collection, if there's any necessary

```
 1    collection, at the conclusion of a case.

 2            And I'm assuming your Honor is referring to, you

 3    know, a sale that would be free and clear to a third party with

 4    appropriate notice under the Bankruptcy Code and would,

 5    therefore, be -- you know, one of the things that the SBA would

 6    require, obviously, in that scenario in order to not object to

 7    such a sale is that the purchaser step into the shoes of the

 8    debtor in terms of any obligations on this guarantee and loan.

 9            THE COURT:  All right.  It -- and --

10            MS. SINESI:  But it's the -- it's the very uncertain

11    nature of this.  You know, once we hand them the money, once

12    the bank hands them the money, we don't know that they're going

13    to spend it appropriately, and clearly Congress realized that.

14    That's how they -- that's why they phrased it the way they did.

15            THE COURT:  Help you out on that.  I really don't buy

16    that point because I think the advantage -- and I think Judge

17    Jones acknowledged this -- is that a bankruptcy court can

18    supervise what a debtor does and does not do with its cash

19    collateral.  I mean, there could be -- obviously, there's going

20    to be monthly operating reports that are going to be filed with

21    the Court.  The Court could easily mandate some sort of

22    accounting, if you will, from the debtor that details how the

23    money is spent.  So, while I understand your argument, I think

24    actually it's the opposite.  In the bankruptcy context there is

25    more supervision, whether it be from the Court, the creditor
```

1   constituency, or even the U.S. Trustee's office.  So, I

2   appreciate your argument, but it's not one I'm going to buy, so

3   why don't you move on to your next point.

4        **MS. SINESI:**  All right, your Honor.  Thank you.  Bear

5   with me one second.

6        **(Pause)**

7        **MS. SINESI:**  The mechanism for the Payroll Protection

8   Program has been automated and set up in such a way to speed

9   funds to applicants.  And one of the concerns that was raised

10  in our brief and that I would draw your Honor's attention to is

11  unexpected complications and consequences from variation of

12  this process.  It's very difficult to pull out and reserve and

13  replace this applicant's end line (indisc.) when funds -- when

14  there is a limited pool of money and it's been disbursed, and

15  when there has not been an adequate showing from this debtor

16  that there is no other way for them to get a loan, there is no

17  other way for them to reorganize this business, and there is no

18  other way for them to proceed.  There has not been an adequate

19  showing by this debtor of irreparable harm.

20        Let's see.  That's really all I had, your Honor.

21        **THE COURT:**  All right.  I have a couple follow-up

22  questions before I let Mr. Keiffer -- so, let's -- let's talk

23  about jurisdiction.  One of the things I've always remarked is

24  district courts -- the first thing a district court always

25  looks at is whether or not it has jurisdiction over a

1   particular matter before it and is not reticent in making a

2   finding that it does not.  Bankruptcy courts have a tendency

3   that they'll look to have jurisdiction wherever they can find

4   it.  So, let's talk briefly about this.

5            As I understand it, you would agree that this is not

6   a matter arising under or arising in under the Bankruptcy Code.

7   Would you agree with that statement?

8            **MS. SINESI:**  Yes.

9            **THE COURT:**  So, at best, it's related to.  So, it's

10  related to.  Would you agree, at least initially, that this is

11  a related-to the bankruptcy -- the main bankruptcy case, that

12  is has a relationship in that regard?  Would you agree or

13  disagree with that?

14           **MS. SINESI:**  Your Honor, I'm not authorized to

15  concede that that would be our position.  In fact, I would ask

16  that we could brief that point, because we do not believe it is

17  related to, but -- I mean, but for the argument being made that

18  the administrator exceeded her authority and was arbitrary and

19  capricious, this matter would not arise before your Honor.

20           **THE COURT:**  Thank you.  And, so, you sort of answered

21  my question.  So, would the -- and, look, we're on very, very

22  tight timelines.  But would the appropriate way to have dealt

23  with that would have been to withdraw the reference on this?

24           **MS. SINESI:**  Um, yeah, that would be one approach,

25  your Honor.  Yeah, absolutely, that would be one approach.

1          **THE COURT:**  I know you don't know me from Adam.  I'm

2    not offended when someone tells me I don't have jurisdiction

3    over a particular matter.  I understand that it's part and

4    parcel of the process.  So, you don't need to be apologetic

5    about the position you're taking.

6          So, as I understand it from a jurisdictional

7    perspective, you're not certain that we have related-to

8    jurisdiction, and absent the Court finding that it has some way

9    to have jurisdiction, as you understand the applicable statutes

10   and case law, that this is a matter that really should be

11   decided by an Article III court.  Is that correct?

12         **MS. SINESI:**  That is correct.

13         **THE COURT:**  All right.  So, if you can tell me, we

14   have tried to be mindful of what other courts are doing.

15   Again, as I indicated at the beginning of the hearing, I know

16   that there is a matter pending in the Arizona bankruptcy court

17   that they've continued, I think, the briefing on that, and that

18   there is a matter in the district court, in the Western

19   District of New York, where there is a related bankruptcy, and

20   I think they have asked the district court to rule on this.  I

21   also, as I indicated, know about Judge Jones and his decision

22   recently in the Southern District in the bankruptcy court

23   there.

24         Have other courts dealt with this, to your knowledge,

25   and how have they ruled?

1          **MS. SINESI:**  Your Honor, this is changing hourly and

2     daily, but there have been courts that have declined to issue

3     TROs.  Just in the times that this hearing has been taking

4     place, I've had 54 notifications of things changing throughout

5     the country.  So, this is a very fluid situation, but there

6     have been decisions made denying TROs, I can say to the Court.

7          **THE COURT:**  And I won't ask for a percentage basis,

8     because it really doesn't matter.  I'm just trying to get a

9     sense of things.  I'm going to make my own independent

10    determination.  But, if you can -- and if you can't, that's

11    fine; I can have an appreciation of the -- are you handling

12    these matters?  Are you sort of on the forefront of all this?

13         **MS. SINESI:**  We have a team of attorneys that are

14    handling these, and these are coming up in states and

15    territories throughout the country.  So, this is a very hot and

16    fluid situation.  So, I apologize that I cannot bring you up to

17    date, but literally between yesterday and today things have

18    changed.  I can say that to the Court.

19         **THE COURT:**  Do you have a sense, of those courts that

20    have declined to issue a TRO, what their reasoning, just in

21    summary form, is?

22         **MS. SINESI:**  A failure to show irreparable harm, lack

23    of jurisdiction by the Court.  Those are the two prongs that

24    I'm aware of.  Again, I'm scanning emails literally as I'm

25    sitting here and trying not to read them, because I'm trying to

1    focus on this argument.  It's literally changing as we speak --

2         **THE COURT:**  That's fine.

3         **MS. SINESI:**  -- you know, in terms of input of

4    information.  I wish I could be more specific, but this is a

5    very fluid situation.

6         **THE COURT:**  I can have an appreciation for the

7    magnitude of what you're dealing with.

8         So, let -- now, let me circle back to, just in real

9    terms, what we're dealing with.  You may have not had the

10   chance to read Judge David Jones' ruling in the *Hidalgo* case,

11   and -- and Judge Jones spent a great deal of time, and it

12   seemed evident to me, just based upon the print on the paper,

13   that he was deeply concerned about how this would adversely

14   affect debtors in bankruptcy and the harm that would be visited

15   on him, and he made it -- he made this point at great length

16   repeatedly in the transcript, which I have read -- I had read

17   prior to Mr. Keiffer so graciously providing it -- that this

18   could not be what Congress intended, that it would -- it would

19   allow lending to non-debtor entities and allow them to go

20   through the process and preserve their business but would not

21   extend the same possibility to debtors in bankruptcy.  So, the

22   debtors in bankruptcy are adversely impacted by the

23   administrator's decision.

24        As a judge sitting here that's going to have to make

25   this determination, is it just a matter of law?  Is there no

1   equity in this, or is there any equity that I can consider?

2          MS. SINESI:   I am familiar with the *Hidalgo*

3   situation, and I do have the transcript in front of me, and as

4   a -- prior to your Honor being on the bench, long term

5   attorney, you know that there are decisions that you agree with

6   and decisions you don't agree with based on the law.   Congress

7   did not discuss this point.   Congress is silent on this point.

8   It is up to Congress to -- should they choose to resolve this.

9   It is not -- it is our position that it is not for the courts

10  to resolve this.   Congress could have been very explicit and

11  stated that the Payroll Protection Program should be extended

12  to Chapter 11 debtors.   It did not.   Instead, it left it to the

13  SBA administrator, and I've already explained at length the

14  process that she went through and why we do not feel that it is

15  arbitrary or capricious.   It is very narrow, and, yes, it's

16  impacting Chapter 11 debtors.   I understand your Honor's

17  concern.   I understand the concern that Judge Jones has.

18          I would point to the fact that you do have a

19  different set of facts in terms of the irreparable harm.   You

20  do -- Hidalgo County Emergency Service Foundation -- I think

21  that was EMTs -- that's not something that can be transitioned

22  to a online, social-distancing type of platform, which is a

23  very different type of business over and above what this debtor

24  does.   So, I do think your Honor needs to take the facts of the

25  case into consideration, along with what Congress intended or

1   didn't intend.

2          **THE COURT:**  All right.  Thank you.

3          Before, Mr. Keiffer, I turn to you for a response,

4   let me note on the record that it's 11:26.  I set on an

5   emergency basis the Lone Star Brewery matter at 11:30.  I can

6   tell the parties that we're not going to be done by 11:30, so

7   you're going to need to be patient.  It's critical for my

8   benefit and the parties here on the Asteria matter that you

9   mute your phones.

10          I don't anticipate that I'm going to get to you all

11   any sooner than -- and this is very optimistic -- quarter to

12   12, if not 12:00 o'clock, so you just may want to stand down.

13   If you have the luxury of being in your office and can grab a

14   sandwich, I would encourage you to do that.  But I want to make

15   sure that the parties in Asteria are fully vetted on the issues

16   and their arguments.

17          So, go ahead, Mr. Keiffer.  A laser-like, if you

18   will, response to what the Court has heard.

19      **(Pause)**

20          **THE COURT:**  Go ahead, Mr. Keiffer.

21      **MR. KEIFFER:**  Had to take it off mute.

22          **THE COURT:**  Go ahead, sir.

23      **MR. KEIFFER:**  I'd like to note, your Honor, that

24   Ms. Wexler is on the line if there is any reason for any cross

25   examination.

1          **THE COURT:**  Okay.

2          **MR. KEIFFER:**  She has a very short window, as well,

3  but if counsel needs to ask any questions, I think it was

4  merely a technicality; she is available.  I don't think there

5  is going to be anything about the declarant's statement and her

6  declaration that are really at issue, that there's really any

7  real concern about what she has said about what her position is

8  on the facts and the circumstances in regard to the debtor.

9          **THE COURT:**  Go ahead.

10          **MR. KEIFFER:**  I just want to make note of that --

11          **THE COURT:**  Thank you.

12          **MR. KEIFFER:**  -- that she is available.  At this very

13  minute she is on line.  She's on the phone.

14          **THE COURT:**  Go ahead, Mr. Keiffer.

15          **MR. KEIFFER:**  I want to comment regarding the

16  following.  The case underwriting requirements were not changed

17  by the SBA.  It was done by Congress.  The SBA has been told to

18  implement this act.  It didn't implement this act; it added to

19  this act.  It discriminated against small business debtors when

20  Congress expressly made decisions that bankruptcy or insolvency

21  would be a problem for midsize and large corporations and

22  entities.  It made by doing that, in that same statute, in that

23  same circumstance where it made all of these provisions and

24  changes, that lack of statement of the bankruptcy being a bar,

25  is telling beyond measure.  It is not a normal circumstance

1    where you have to look for some sort of relationship between

2    one act and another act and there is no mention of bankruptcy

3    when you're trying to expand into the realm of what bankruptcy

4    can do, an ability to -- that somehow this is applicable.  But

5    this act is not like any of the other acts we've been dealing

6    with.

7              None of these other acts that you look through,

8    throughout those cases that they talked about, were at the same

9    time, in the same bill; provisions regarding bankruptcy,

10   bankruptcy debtors that are individuals, bankruptcy debtors

11   with small business, bankruptcy debtors -- what counts as

12   income, all of these type of things were in the act.  There

13   were prohibitions in the act for midsized businesses.  There

14   were prohibitions regarding solvency in the act regarding large

15   corporations.  There are none regarding small.  It stretches

16   credulity to say that this is the SBA doing this.  The Congress

17   said, here's what you need to do, go implement it, don't add to

18   it.

19             "Involved in any bankruptcy" is not a streamline --

20   streamlining function.  It is actually, just on its very face,

21   a hugely expansive, poorly written statement.  What does

22   involved in any bankruptcy mean?  Proof of claim?  Debtor in

23   possession -- (indisc.) in a executory contract?  A landlord

24   who happens to have a client -- I mean has a tenant that's in

25   bankruptcy, who has to go protect their rights?

1           "Must be repaid" is a hollow statement here.  Quite

2    hollow.  That restaurants, that education service, all those

3    other folks that are outside bankruptcy, all of the entities

4    (indisc.) unsecured (indisc.) entities without any funds, the

5    SBA on the loan guarantee must pay.  That is because lenders

6    never would have done this.  This is a mechanism, not based

7    upon the fact that the SBA guaranteed (indisc.) lending.  It's

8    because the SBA, and because of our government structure, is

9    not large enough to cope with all of these -- with this

10   pandemic.  The SBA is doing the guarantee function because if

11   they (indisc.) then utilize this huge network that is out there

12   (indisc.).  And they understandingly can use that huge network

13   to be able to get funds out to small businesses.  It made no

14   provision that, oh, by the way, you should stop with this

15   Chapter 11 debtor that comes your way, or you should stop

16   anybody who happens to have an ownership interest that happens

17   to be in a bankruptcy context.  None of that was stated.  Not

18   in the act, nor in the (indisc.) senate.  Nothing.  But it is

19   bankruptcy is the only (indisc.) who can't get this grant.

20           As far as the loosening of things out there,

21   ostensibly loosening things, a dangerous thing to play with

22   here.  No schools are being reopened.  Thankfully.  No schools

23   are being reopened.  They will be closed for the rest of this

24   year.

25           Again, bankruptcy, if you (indisc.) Congress, this is

1   not a cash collateral type circumstance.  Look at the

2   circumstance if the money comes in.  Let's just make an

3   assumption that it comes in.  This money will come in as -- not

4   as cash collateral.  It will come in with no -- with

5   statutorily no capacity to get to anything that's out there.

6   There is no existing provisions in this about what (indisc.)

7   becoming the bank's collateral necessarily.  All that is, is

8   it's a fund for the estate to be utilized for this purpose.

9   Moreover, the bank has no real benefit in doing this.  It wants

10  to have the debtor be able to get this to pay these things up,

11  to get the grant qualifications, to move forward in this case.

12  I think that was -- I think that's not -- not really a concern

13  in those circumstances.  If all of those elements stopped the

14  normal lending practice, any issues about protecting the SBA

15  now leaves, it isn't getting any of it out there for the

16  general public.  The entities that are filing that are using it

17  will -- many, many will surely (indisc.).  Many, many surely

18  will never be able to repay.  Well, they've gotten an

19  opportunity.  Bankruptcy debtors in Chapter 11, nope, you don't

20  get a chance, just because you're in Chapter 11.  The (indisc.)

21  doesn't matter that there are regulations regarding

22  circumstances on a sale in regard to a loan that that party may

23  take over that.  Fine.  I'm sure that's something that could be

24  negotiated in that circumstance (indisc.) to deny.  The

25  (indisc.) is an arbitrary and capricious act by the (indisc.)

73

1  secretary or the administrator to add provisions into this act

2  by regulations that do not exist and are contrary to explicit

3  intent.

4          Your Honor, again, I offer Galina Wexler's affidavit,

5  declaration.  She is present.  I offer it into evidence for all

6  of its purposes.  Moreover, the SBA has cited from various

7  elements of her declaration, as well as the declaration of

8  David Cumberbatch in the case.  So, I think some of those

9  points have been raised.  Your Honor, I'll ask for admission of

10 Ms. Wexler's declaration.  I realize the Court has a lot on its

11 plate.  I hate hearing the fact that Lone Star Beer is up next.

12 Sorry to hear about that, but I hope that they are able to

13 maintain.

14          Thank you, your Honor.

15          **THE COURT:**  They were bought out by Pabst many years

16 ago, and it's been a non-functioning plant.  The intention is

17 to sell it and for redevelopment, but I don't want to comment

18 further.

19          So, Ms. Sinesi, do you wish to examine Ms. Wexler on

20 any points in her affidavit?  Or declaration, excuse me.

21          **MS. SINESI:**  No, your Honor.

22          **THE COURT:**  All right.  So --

23          **MS. SINESI:**  No, your Honor.  Not at this time.

24          **THE COURT:**  Thank you.

25          So, I think it's important, Mr. Keiffer, before I

1    rule, walk me through the four elements that you need to meet

2    that entitle you to TRO, and explain to me very briefly why you

3    think you've met your burden on each one.  So, go through it

4    for me, please.

5              **MR. KEIFFER:**  Hold on a second, your Honor, and I'll

6    get an applicable recitation of it in front of me.

7              **THE COURT:**  That's fine.

8              **MR. KEIFFER:**  And, by the way, was the declaration

9    admitted, nevertheless?  While I'm looking?

10             **(Pause)**

11             **MR. KEIFFER:**  Here we go.

12             Debtor is likely to succeed on the merits.  (indisc.)

13   the grant, it is structured this way so that the money can be

14   sent out to the public to qualified parties with virtually no

15   qualifications (indisc.), none of them being commercially

16   required.  This is an -- this is where the certificate, the

17   administrator exceeded her authority and acted in an arbitrary

18   and capricious manner.

19             Likely to suffer irreparable injury in the absence of

20   preliminary relief.  There will be no CARES Act funds available

21   if we go 10, 15 days from now.  There will be none.  The debtor

22   will, in effect, be left out there without this opportunity to

23   be like every -- the remainder of the other small businesses in

24   the United States.  That irreparable harm is a likely to

25   suffer.  It isn't that I'll have to prove that we have

1  suffered; it is that I am likely to suffer.  And the

2  circumstance of not having $700,000 when we're already in a

3  situation where we're cutting and furloughing more people

4  coming May, if not the end of May, and then cutting more people

5  in June and July, and having a significant loss in this regard,

6  there is no other methodology.  There is nothing else out here

7  than this program, this grant program, that the debtors are

8  being denied the opportunity to participate in.

9          As far as balance of the equities tipping in the

10 debtor's favor, clearly, the SBA here is acting beyond its

11 capacity and beyond -- in an arbitrary and capricious manner.

12 That alone has a significant impact upon the equities.  We can

13 go through ostensible rationales one way or the other, but that

14 gives to the SBA something that it doesn't deserve here, and

15 that is the credence that this was done within the confines of

16 the statutes.  It's outside the confines of the statutes, they

17 weren't authorized to do this, those reserved elements that

18 have been (indisc.) from sound policy are hollow.  They have

19 nothing there.

20         And in the public interest.  In this instance, the

21 public interest is served by virtue of this specific debtor --

22 we're not asking for anything more than this specific debtor --

23 having an ability to continue its education program.  There is

24 a mischaracterization as to the nature of this debtor.  It has

25 facilities.  It has a print shop.  It has other things.  It

1    supplies printed materials.  It contracts with other people to

2    supply printed materials.  We have not, but for the fact of our

3    weak and sad funding of public education, had ourselves

4    converted to map an easy internet world.  There is still paper

5    out there.  And these folks are involved in that element, and

6    they need to have the ability to take care of those things and

7    (indisc.) that out.  It is a lot of adjustments to be made, but

8    the debtor is prohibited from doing that.

9              In this context, the public interest is that the SBA

10   follows the rule -- what Congress told it to do and not add in

11   new things.  It did not get a carte blanche to go in and start

12   adding provisions contrary to the lack of credit requirements

13   that exist in the act.  And the repayment circumstances here,

14   without any recourse to human beings whatsoever, means that

15   this is known by Congress to likely engender a significant

16   amount of non-repayment and that that sound policy is merely

17   something -- a vestige from a past circumstance and not

18   something that is here dealing with functionally attaining and

19   pump into the economy.

20             Thank you, your Honor.

21             **THE COURT:**  All right.  Thank you.

22             All right.  I'm going to rule from the bench.  A

23   couple things before I rule.

24             Obviously, it's not lost on me or any other citizen

25   the difficult times we live in and how the pandemic has

1    affected our daily lives, the tremendous loss of jobs, people's

2    concerns daily about their ability to make -- pay rent, pay

3    their mortgage, pay their car bill, pay their utilities,

4    children are unable to go to school.  We are in unique times,

5    and I acknowledge that as an initial matter.

6          Let me first deal sort of with some of the elements

7    that I need to deal with.  As you know, I have subject matter

8    jurisdiction under 28 U.S.C. Section 1334.  This matter has

9    been referred to me under the district court's order of

10   reference.  Having said that, though, I do agree with the SBA

11   that this is a non-core matter.  At best, this is related to.

12   I'll come back to that in just a minute, as that affects the

13   Court's ability to issue -- first of all, to have jurisdiction

14   over this matter, and then, secondarily, the aspect of whether

15   or not I can issue a final order.

16         Venue is proper.  There is no dispute about that.  I

17   have considered in full.  I will admit the declaration in full

18   of Ms. Wexler and the accompanying exhibits.

19         **(Declaration of Ms. Wexler and accompanying exhibits were**

20   **received in evidence)**

21         **THE COURT:**  What that evidence tells the Court, that

22   this debtor did everything this debtor could have done with

23   regard to applying for a loan under the PPP program, they made

24   the requisite applications, and the evidence is unequivocally

25   clear that the reason why that they were denied was because of

1    the fact that they're in bankruptcy.  So, factually, there is

2    really not much in dispute as it relates to this case, and I

3    don't think there is little doubt -- I don't think the SBA

4    challenges the fact that the reason why this debtor was

5    precluded from participating and potentially receiving a loan

6    was because of their status as a Chapter 11 debtor.  So,

7    factually, that's where we are.

8            So, the question is, legally, where are we?  And when

9    I came in this morning -- and you actually touched upon this,

10   Ms. Sinesi.  My law clerk said to me, "I'm glad I'm not you

11   today, and you have to make these kind of decisions."  But that

12   comes with the robe, and it's not a question of popularity;

13   it's a question of following the law.  So, let's begin with the

14   law, because the law dictates what I should do.

15           The case law is very consistent in this area about

16   whether or not the administrator can be enjoined.  And the

17   circuit law on this, including the Fifth Circuit, is abundantly

18   clear.  Generally, a Court does not have the jurisdiction to

19   enjoin the SBA administrator.  That's not really in dispute.

20   Notwithstanding the very difficult circumstances we're in, I'm

21   bound by what the Fifth Circuit says, and the Fifth Circuit --

22   and there is a case cited to this effect -- has made it

23   abundantly clear whether or not I have the authority to enjoin

24   the SBA, and I don't.

25           So, now we step to the issue, well, was the SBA

1   administrator's actions as it related to the implementation and

2   application of the PPP program arbitrary and capricious.  As

3   you all know -- I should note, as an initial matter, that I

4   have to give what's referred to as "Chevron deference" to what

5   the administrator does.  In other words, that I have to give a

6   fair amount of deference to how the administrator administers

7   the regulations and the statutes regarding the SBA program.

8   And, as Ms. Sinesi correctly pointed out, while this is a new

9   version, if you will, of SBA lending, it still comes under 7

10  section (a) of the act, and so those limitations and the

11  considerations that the administrator has in implementing this

12  program are still the governing statute, notwithstanding the

13  implementation of the CARES Act.

14          So, as an initial matter, it's a very difficult

15  burden for a debtor in this instance to overcome the fact that

16  there is case law out there, including the Fifth Circuit, that

17  clearly states that I don't have the authority, as an Article I

18  judge, to enjoin the SBA.  But moving beyond that, the

19  corollary to that is, well, did the administrator act

20  arbitrarily and capriciously.  And, as I indicated, under the

21  Supreme Court's decision in *Chevron*, I have to give a great

22  deal of deference to what -- the administrator's actions in

23  this regard.

24          So, let's talk about chronology and to the

25  implementing regulations and how I should construe those.  I

1   was careful to point out on the record with regard to

2   Mr. Keiffer, you know, the chronology of events.  Mr. Keiffer

3   approached the Court back in March and said:  We're going to

4   need, essentially -- my words -- a bridge loan to get the

5   debtor from where it is now to where it can effectuate a sale

6   given the fact that we're not going to have a need for STAAR

7   education because the schools are closed and, as he correctly

8   pointed out, the STAAR program is not going to be administered

9   for a period of roughly a year.  And, so, we're going to need

10  some ability to be able to keep our debtor, our client,

11  operational, keep the lights on, pay employees, and be able to

12  effectuate a sale.

13          And I did approve on that basis under 364 of the

14  Bankruptcy Code that based upon the evidence that was provided

15  to the Court, and that there was no other way in which the

16  debtor could obtain any kind of post-petition financing, that

17  the best way to go was to apply for a PPP loan.  And -- or --

18  and I approved that.  And I was careful to point out -- and

19  Mr. Keiffer pushed me on this -- that I didn't see anything at

20  that time under the first tranche and under the application

21  that precluded the debtor from applying.  But I also said that

22  I'm not going to (indisc.; audio glitch) my discretion to

23  dictate how the SBA administrator administrates the acceptance

24  or rejection of these loans.  And, so, I made that abundantly

25  clear.

1          So, Ms. Wexler, based upon her affidavit, applied,

2   and it's unequivocally clear, as I indicated, that she was

3   denied based upon the fact that the debtor is in bankruptcy.

4   At the time that the first application was filed, there was not

5   any rule in effect that specifically dealt with -- and when I

6   talk about rule, I'm talking about a regulation -- that

7   specifically dealt with this quandary of there are no

8   implementing regs that said that a debtor could be precluded

9   from participating in the program, other than what was listed

10  on the application.  And, so, the debtor, obviously, argued at

11  that point in time:  Gee, we don't understand why we're being

12  excluded.  We don't understand -- that there is no implementing

13  regulation that suggests to the administrator that she can do

14  this.

15         The application was filed.  Mr. Keiffer has impressed

16  me repeatedly throughout this case with his forthrightness and

17  his ability to react, if you will, to changes in the law.  He

18  amended the application to point out that, as it relates to the

19  second tranche of the funding under the CARES Act, that the SBA

20  implemented a rule without notice and comment, which they had

21  to do under the context of this situation, that now precluded

22  debtors in bankruptcy from participating in this loan program.

23  And, so, obviously, it is -- you could use the language, is it

24  discriminatory as it relates to debtors in bankruptcies.

25         Importantly, as Ms. Sinesi points out, the CARES Act

 1   is still under the confines of section 7(a).  And, as a

 2   result -- and also under 636.  And, so, there are -- it does

 3   give the administrator, in my judgment, under those statutory

 4   provisions, the ability to implement regulations to

 5   implement -- or, rather promulgate regulations to implement the

 6   PPP program.  The administrator, in her discretion, decided

 7   that these type of loans should not be awarded to debtors,

 8   which I think is, obviously, an incredibly harsh result.  It's

 9   not a result I personally like, but that's the -- that's the

10   discretion that's been delegated to the administrator by

11   Congress.  And for this Court to step in and say, well, no,

12   that's not what Congress should have done, or this is what

13   Congress should have done, I don't view that's my role,

14   particularly as an Article I judge.  Congress, it seems to me,

15   delegated this authority under very difficult times to the

16   administrator.  It did, in my judgment, notwithstanding the

17   very cogent arguments that have been advanced by the debtor,

18   somehow preclude the administrator's authority or discretion to

19   implement regulations that restrict it to debtors.

20          So, let's move on to 525(a).  The debtor makes a

21   strong argument that this is discriminatory.  But if you look

22   at the operative language under 525(a) of the code, it does not

23   apply to loans.  And notwithstanding what the debtor has argued

24   this morning, that this is effectively a grant, it's not a

25   grant.  It's a loan as defined under the applicable SBA

1    statutes and regulations.  So, while it might arguably be

2    discriminatory because it's a governmental action, I don't

3    think it meets under the statute the qualifying language.

4    There is nothing in there that the statute speaks to about a

5    loan, and as was addressed in a number of filings with this

6    Court, when Congress amended this 525(a), it did make an

7    allowance for student loans, but certainly not for loans of

8    this type of nature.  Moreover, I think the case law that's

9    been provided to the Court by the SBA, I think is more

10   compelling than the arguments that have been advanced by the

11   debtor as to whether or not this is a violation of 525(a).

12          I'll also note, for the record, that there is Fifth

13   Circuit precedent that indicates to this Court that this Court

14   should narrowly apply 525(a).  And, as a result, I think I'm

15   constricted or confined by the court, by the Fifth Circuit, in

16   terms of how I construe the statute.

17          So, now let's talk about the elements under a TRO.

18   So, I've got the evidence -- there is no doubt in my mind that

19   there could be a horrible, horrible effect on the debtor if I

20   don't allow the debtor to go forward and be eligible or apply

21   for these loans.  But the question is, should I do that.  So,

22   before I address whether or not the debtor has met its

23   burden -- and it is on the debtor to meet their burden on the

24   TRO -- let me circle back to where we started.

25          Now, I was being somewhat flippant, but also being

1   somewhat serious.  I clearly recognize that I'm an Article I

2   Court of limited jurisdiction.   And in reviewing the initial

3   application and then the amended application for a TRO, several

4   things stood out that my learned colleague, Judge Jones, also

5   focused on.  This has to be limited in application.  I can't --

6   I don't have the authority, as an Article I judge in San

7   Antonio, Texas, to dictate how the administrator administrates

8   its loan process across the United States or nor can I

9   necessarily dictate to banks how they effectuate or consider

10  these types of loans.  It's really a function of what the

11  administrator tells the banks to do.  So, to the extent I would

12  even grant a TRO today, it would be limited by the realization

13  that my authority is limited, at best, and could only apply to

14  the debtor here.

15          So, what has the debtor asked the Court to do?  The

16  debtor has asked the Court to do two things.  Number one, the

17  debtor has asked the Court to essentially strike the language

18  on the PPP application and instruct the banks and the SBA to

19  disregard that language and to process the loans.  As I have

20  indicated earlier, I don't think I can do that under the

21  statute that governs the SBA and the applicable law.

22          The second thing is that the debtor has asked -- and

23  I don't blame the debtor for asking me to do this -- is to

24  instruct the SBA to allocate or put aside $700,000 that the

25  debtor believes it would be otherwise entitled to money if it

1    was properly considered for a loan.  I don't think I have the

2    authority to do that either.

3            Finally, the debtor asked -- and, again, I understand

4    perfectly why the debtor would ask for this type of relief --

5    has asked me to require -- that I instruct the SBA, to the

6    extent I was going to grant this TRO, to put the debtor -- to

7    use the parlance that was indicated in the application -- back

8    into the queue.  I can't do that either.  I don't think I have

9    the authority to do that.  At best, if I were going to grant

10   the TRO, the most relief I could give is sort of what Judge

11   Jones -- the relief he gave in his case, which is to strike the

12   language and instruct the SBA to consider the loan on its terms

13   at the time it's being submitted.  But for the reasons that I

14   have indicated today, I am not going to grant the TRO, with due

15   recognition of my learned colleague, and I'll explain why in

16   just a minute.

17           Number one, I don't think, as a matter of law, I can

18   grant the -- I don't think there is a likelihood of success on

19   the merits, for the reasons that I have explained.  I don't

20   think under the statutory scheme that's been promulgated, and

21   notwithstanding these -- the expedient nature of things, that I

22   have the requisite authority to grant this relief.  I think I'm

23   constrained by Fifth Circuit law in the statute.  Furthermore,

24   I don't think I can enjoin the administrator, as I've

25   indicated; and, furthermore, I don't think I can substitute my

1   judgment -- it wouldn't be my judgment -- for her discretion in

2   how she administers the PP loans.  I just simply don't think I

3   have the authority to do that.

4         Second, I question whether or not I have the

5   authority under a related-to scenario to enjoin the

6   administrator.  I think probably that's more in the context of

7   an Article III judge, but, for purposes of the record, even

8   finding under related-to jurisdiction that I have the ability

9   to make this determination, I don't think it's warranted in

10  this circumstance.  I don't think, based upon the discretion

11  that's afforded the administrator under this context, that,

12  while it's going to operate as a severe burden on this debtor

13  and other debtors, I can make the requisite finding that it's

14  arbitrary and capricious for the reasons I have explained.  So,

15  on that basis alone, I don't think that I can approve the TRO,

16  because I don't think the debtor has met its burden.

17        Finally, as to irreparable injury, sure, this will

18  have a dramatic effect on the debtor.  And if the debtor

19  doesn't get this loan, there is a real possibility that this

20  debtor may not be able to proceed in Chapter 11.  So, I

21  recognize that there could be irreparable injury to the debtor

22  in this context.

23        And, then, finally, as to the public aspect of this,

24  I don't know, necessarily -- there are two ways to look at

25  this.  The administrator has the responsibility to administer

1    the PP -- the CARES Act as she thinks is appropriate.  It will

2    adversely affect debtors; I recognize that, but I have to,

3    again, in these difficult times, acknowledge that the

4    administrator does have the overall arching authority to do

5    this in consultation with the treasury secretary.  And she has

6    implemented these programs.  While there is an adverse effect

7    on this debtor, my concern is, is that I -- were I to adopt the

8    debtor's position, as was indicated by Ms. Sinesi at the

9    beginning of her presentation to the Court, I think it would

10   have a negative effect on the administrator's ability to

11   administer the PPP program.

12           So, notwithstanding what Judge Jones said in his

13   case, I think it's factually different than this case, inasmuch

14   as now we have the implementing regulation, and the debtor in

15   that case was providing emergency ambulatory services.  While

16   this debtor has an important business, it's not of a critical

17   nature.  I simply don't think I, for the reasons I've stated on

18   the record, that I can approve the granting of the TRO.  I

19   would add, reluctantly, it doesn't make me happy to do this,

20   because I have a great deal of sympathy for the position that

21   the debtor is in, but based upon the law and the statutes, I am

22   constrained to apply them as best I can.  So, for the reasons

23   I've stated on the record, the TRO is denied.

24           So, Ms. Sinesi, you can prepare an order that simply

25   recites that the TRO is denied, and we'll proceed forward in

1    this case prospectively, but I'm not going to grant the TRO.

2             As for purposes of the show cause, I'm going to find

3    that the administrator through her counsel has appeared and has

4    provided cause, so they've made the requisite appearance and

5    made the requisite arguments.  I don't think I need to make any

6    other determinations, other than the administrator for the SBA,

7    through its counsel of record, has made the appropriate

8    appearance and made the appropriate argument.  So, there is no

9    other -- show causes has been -- on that matter has been shown.

10            Ms. Sinesi, any else from your perspective?

11            **MS. SINESI:**  No, your Honor.  Thank you.

12            **THE COURT:**  Mr. Keiffer?

13            **MR. KEIFFER:**  Reluctantly, no.

14            **THE COURT:**  All right.  I know it's very

15   disappointing to you, Mr. Keiffer.  As I indicated previously,

16   sometimes I make decisions that I'm not particularly happy

17   about.  This is clearly one of them.  But I think I'm

18   constrained by the law.

19            So, let me thank you all for some very good argument,

20   some very good briefing.  I've done the best I can do under the

21   circumstances.  I realize that I am in disagreement with

22   probably a number of jurists on this, but I have applied the

23   law and the facts as best I can under the circumstances.

24            So, the parties in *Asteria* are excused.  You may step

25   off the line.

(Proceeding was adjourned at 11:58 a.m.)


## CERTIFICATION


### DISCLAIMER:

The integrity of this transcript may be adversely affected due to unclear telephonic transmission of Mr. Keiffer's argument.


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    **May 9, 2020**

              Signed                                    Dated


*TONI HUDSON, TRANSCRIBER*

EXCEPTIONAL REPORTING SERVICES, INC