## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>ORGANIC POWER, LLC,<br><br>               Debtor. | Chapter 11<br><br>Bankruptcy Case No. 19-01789 (EAG) |
| ORGANIC POWER, LLC.<br><br>               Plaintiff,<br><br>    v.<br><br>THE U.S. SMALL BUSINESS ADMINISTRATION and JOVITA CORRANZA, solely as Administrator of the United States Small Business Administration,<br><br>               Defendants. | Adv. No. 20-00055-EAG |

## UNITED STATES' SUPPLEMENTAL MEMORANDUM
## OF LAW REGARDING PLAINTIFF'S CLAIMS

The United States of America, on behalf of the U.S. Small Business Administration (SBA) and Jovita Carranza in her capacity as SBA Administrator (the "United States" or "Defendant"), in accordance with this Court's May 20, 2020 pretrial order (Doc. 37) files this brief explaining why each of Plaintiff's claims fail as a matter of law.

The United States had the opportunity to brief many of these issues previously in the context of its Motion to Dismiss (Doc. 44) (filed June 8, 2020)[1] and its Opposition to Plaintiff's Emergency Motion for a Temporary Restraining Order (Doc. 19) (filed May 4, 2020). The United States incorporates all of those arguments herein and focuses this brief on the case law that has developed since this Court issued its temporary restraining order on May 8, 2020, and the application of Plaintiff's claims to the standard for a permanent injunction.[2]

When this Court issued its orders granting Plaintiff's motion for a temporary restraining order, the conclusions reached by courts in PPP cases involving bankrupt entities seeking similar interim injunctive relief were mixed. However, since then, the tide has taken a significant and dramatic turn. Since this Court's Order on May 8, 2020, courts in at least **twenty cases** have refused to grant injunctive relief to debtors.[3] In particular, in an authoritative 41 page decision,

---

[1] The United States filed a Motion to Dismiss on June 8, 2020 because that was the deadline for the United States to answer or otherwise respond to Plaintiff's Complaint. Plaintiff declined the United States' suggestion to extend the deadline for the filing of motion to dismiss or answer beyond that deadline.

[2] As set forth in its Motion to Dismiss, the United States does not consent to entry of final orders or judgment by the bankruptcy court, including enjoinment, money damages, and any relief under the Administrative Procedure Act (APA), 5 U.S.C. § 701, *et seq.*, or any relief under 28 U.S.C. § 1361, which exceeds this Court's Article I constitutional authority. Thus, the United States requests that the Court enter propose conclusions of law for dismissal of Counts I, II, and IV.

[3] *See The Diocese of Rochester v. SBA*, No. 20-CV-06243, 2020 WL 3071603 (W.D.N.Y. June 10, 2020); *Eisenga v. SBA*, Adv. Proc. No. 20-00048 (Bankr. E.D. Wis. June 9, 2020); *iThrive Health, LLC v. Carranza*, Adv. Proc. No. 20-00151 (Bankr. D. Md. June 8, 2020); *Henry Anesthesia Assoc. LLC v. Carranza*, Adv. No. 20-6084, 2020 WL 3002124 (Bankr. N.D. Ga. June 4, 2020); *Calais*

1

Judge Fagone of the United States Bankruptcy Court for the District for Maine issued an order

rejecting plaintiffs' claims on the merits.[4]  Importantly, Judge Fagone had previously granted a

motion for a temporary restraining order.  Similarly, the district court in the Western District of

New York recently rejected these claims. *See Diocese of Rochester v. SBA*, No. 20-cv-6243

(EAW), 2020 WL 3071603 (W.D.N.Y. June 10, 2020).  In that case, like here, the debtors

asserted that the SBA's bankruptcy exclusion rule violated Section 525 of the Bankruptcy Code,

and that it was arbitrary and capricious in violation of the APA.  *See id.* at *1.  Judge Elizabeth

---

*Reg. Hosp. v. Carranza (In re Calais Reg. Hosp.)*, Adv. No. 20-1006, 2020 WL 3032939 (Bankr. D. Me. June 3, 2020) (denying PI after previously granting TRO); *Penobscot Valley Hosp. v. Carranza (In re Penobscot Valley Hosp)*, Adv. No. 20-1005, 2020 WL 3032939 (Bankr. D. Me. June 3, 2020) (same); *Hartshorne Mining, LLC. v. Carranza (In re Hartshorne Hold., LLC)*, Adv. No. 20-4012 (Bankr. W.D. Kent. June 1, 2020); *Schuessler et al. v. SBA (In re Schuessler et al.)*, Adv. No. 20-2065, 2020 WL 2621186 (Bankr. E.D. Wis. May 21, 2020); *Steffen et al. v. SBA (In re Steffen et al.)*, Adv. No. 20-2068, 2020 WL 2621186 (Bankr. E.D. Wis. May 21, 2020); *Thull Farms, LLC v. SBA (In re Thull Farms, LLC)*, Adv. No. 20-2069, 2020 WL 2621186 (Bankr. E.D. Wis. May 21, 2020); *Jack Cty. Hosp. Dist. v. SBA*, Adv. No. 20-04035 (Bankr. N.D. Tex. May 21, 2020); *Starplex Corp. v. Carranza*, Adv. No. 20-00095 (Bankr. D. Ariz. May 21, 2020); *NAI Cap., Inc. v. Carranza (In re NAI Cap., Inc.)*, Adv. No. 20-01051 (Bankr. C.D. Cal. May 20, 2020); *PPV, Inc. v. Carranza (In re PPV, Inc.)*, Adv. No. 20-03054 (Bankr. D. Or. May 20, 2020); *Inland Family Practice Ctr., LLC v. SBA (In re Inland Family Practice Center, LLC)*, Adv. No. 20-06016 (Bankr. S.D. Miss. May 15, 2020); *Okorie v. SBA (In re Okorie)*, Adv. No. 20-06015 (Bankr. S.D. Miss. May 15, 2020); *Abe's Boat Rentals, Inc. v. Carranza (In re Abe's Boat Rentals, Inc.)*, Adv. No. 20-01029 (Bankr. E.D. La. May 13, 2020); *J.H.J., Inc. v. Carranza (In re J.H.J., Inc.)*, Adv. No. 20-05014 (Bankr. W.D. La. May 12, 2020); *Areway Acquisition, Inc. v. SBA (In re Areway Acquisition, Inc.)*, Adv. No. 20-01037 (Bankr. N.D. Ohio May 12, 2020); *Breda, LLC v. Carranza (In re Breda, LLC)*, Adv. No. 20-01008 (Bankr. D. Me. May 11, 2020);

    Prior to May 8, 2020, courts denied relief to debtors in *Trudy's Texas Star, Inc. v. Carranza (In re Trudy's Texas Star, Inc.)*, Adv. No. 20-01026 (Bankr. W.D. Tex. May 7, 2020); *Asteria Educ., Inc. v. Carranza (In re Asteria Educ., Inc.)*, Adv. No. 20-05024 (Bankr. W.D. Tex. Apr. 30, 2020); *Cosi, Inc. v. SBA (In re Cosi, Inc.)*, Adv. No. 20-50591 (Bankr. D. Del. Apr. 30, 2020).

    Copies of these decisions were attached as Exhibits 1 to 18 of Defendant's Motion to Dismiss (Doc. 44).  Defendant does not reattach these decisions here, but is happy to provide them to the Xourt upon request.

[4] *Penobscot Valley Hosp. v. Carranza (In re Penobscot Valley Hosp)*, Adv. No. 20-1005, 2020 WL 3032939 (Bankr. D. Me. June 3, 2020).

A. Wolford, however, denied the plaintiffs' motion for preliminary injunction and granted

summary judgment to SBA on those claims. *See id.* at *5-12.  Written opinions explaining in

detail why similar claims fail as a matter of law have also been issued by the United States

Bankruptcy Court for the Northern District of Georgia[5] and the United States Bankruptcy Court

for the Eastern District of Wisconsin.[6]  Weighing against these 20 decisions are just seven

decisions since May 8, 2020 granting plaintiffs' relief (all outside the First Circuit).[7]

       In addition to this new legal authority, since this Court's prior order, the parties also

exchanged witness and exhibit lists on June 12, 2020.[8]  These witness and exhibit lists confirm

that the only factual issue remaining for the Court's adjudication is the issue of irreparable

harm.[9]  There are no factual issues remaining concerning Plaintiff's claims under the APA,

section 525, and mandamus, which present pure legal issues for this Court's adjudication.  For

---

[5] *Henry Anesthesia Assoc. LLC v. Carranza*, Adv. No. 20-6084, 2020 WL 3002124 (Bankr. N.D. Ga. June 4, 2020).

[6] *Schuessler et al. v. SBA (In re Schuessler et al.)*, Adv. No. 20-2065, 2020 WL 2621186 (Bankr. E.D. Wis. May 21, 2020).

[7] *PCT Int'l, Inc. v. Carranza*, Adv. Proc. No. 20-00118 (Bankr. D. Ariz. June 12, 2020); *USA Gymnastics v. SBA*, Adv. Proc. No. 20-50055 (Bankr. S.D. Ind. June 12, 2020); *Gateway Radiology Consultants, P.A. v. Carranza*, Adv. Proc. No. 20-00330 (Bankr. M.D. Fla. June 8, 2020); *Alpha Visions Learning Academy, Inc. v. Carranza*, Adv. Proc. No. 20-00071 (Bankr. W.D. Tenn. June 3, 2020); *Astria v. SBA*, Adv. Proc. No. 20-20016 (Bankr. E.D. Wash. June 3, 2020); *NRP Lease Holdings LLC v. Carranza*, Adv. Proc. No. 20-00055, Bankr. M.D. Fla. May 27, 2020); *Weather King Heating & Air, Inc. v. Carranza*, Adv. Proc. No. 20-5023 (Bankr. N.D. Ohio May 21, 2020).  These decisions are collectively attached as Exhibit 1.

[8] The only factual witness disclosed by Plaintiff was Miguel Perez, who will testify on the issue of Organic Power's harm.  *See* Pl.'s Exhibit and Witness List (Ex. 2).  Because there are no factual issues concerning Plaintiff's claims for relief under the Administrative Procedures Act or section 525 (or mandamus), Defendant is not planning to present direct testimony from any witness.

[9] Plaintiff has filed a motion to compel certain written discovery responses.  *See* Doc. 46.  That motion to compel provides no basis for any additional discovery in this case.  Defendant will separately file a response to Plaintiff's Motion to Compel by June 17, 2020.

the reasons set forth below, those claims fail as a matter of law.  Moreover, as further explained

below, beyond the failure of these claims on the merits, Plaintiff's claims also fail because they

are barred by the doctrine of sovereign immunity, and because Plaintiff cannot meet the elements

required for the injunctive relief it seeks.

## INTRODUCTION

In response to the unprecedented public health and economic challenges created by the

coronavirus pandemic, Congress passed the Coronavirus Aid, Relief, and Economic Stimulus

(CARES) Act, which was signed into law on March 27, 2020. The CARES Act created the

Paycheck Protection Program (PPP), a $659 billion loan program administered by the SBA and

which must extend loans to small businesses and nonprofits throughout the United States as

expeditiously as possible. Section 1102(a)(2) of the CARES Act adds a new paragraph (36) to

Section 7(a) of the Small Business Act, 15 U.S.C. § 636(a)(36), to extend loans to eligible small

businesses for certain covered uses, including "payroll costs," the "payment of interest on any

mortgage obligation," and "rent," among other approved uses. In order to achieve the goals of

the CARES Act, with its capped funding, while also acting consistent with the Small Business

Act the Section 7(a) loan program, the SBA conditioned eligibility for a PPP loan on

borrower's certification that it is not currently a debtor in bankruptcy. Plaintiff was not approved

for a PPP loan based on its current status as a debtor in bankruptcy. (Compl. ¶ 42.)

Plaintiff has filed suit against the United States for declaratory and injunctive relief under

the Administrative Procedures Act and section 525(a) of the Bankruptcy Code, and for writ of

mandamus under 28 U.S.C. § 1361. Under Count I, Plaintiff asserts the SBA exceeded its

"statutory jurisdiction, authority, or limitations," in implementing the PPP "in a manner that

causes debtors in bankruptcy . . . to be ineligible," in violation of the APA. (Compl. ¶ 56.)

4

Under Count II, Plaintiff asserts the SBA's PPP implementation was "arbitrary, capricious, [or] an abuse of discretion," in violation of APA. (*Id.* ¶ 77.) Under Count III, Plaintiff seeks declaratory judgment that its disqualification from receiving PPP loans based on its status as a debtor in bankruptcy is discriminatory in violation of section 525(a) of the Bankruptcy Code. (*Id.* ¶ 96). Under Count IV, Plaintiff seeks a writ of mandamus to compel the SBA to remove the bankruptcy disqualification from all PPP Lender Applications. (*Id.* ¶ 105.)

Plaintiff's APA claims fail as a matter of law. SBA's decision to exclude debtors in bankruptcy from eligibility for the PPP was well within its statutory authority to implement the PPP, and, as demonstrated by the Administrative Record,[10] this Court should defer to the agency's decision, which was based upon consideration of relevant factors. Likewise, Plaintiff's claim for declaratory judgment and injunctive relief on the ground that the SBA violated 11 U.S.C. § 525(a) fails as a matter of law. Section 525(a) does not explicitly cover loan guarantees; nor do SBA's guarantees of PPP loans fall within even the broadest application of section 525(a) because they are in no way similar to the grants that do fall under section 525(a)'s anti-discrimination protection. Finally, Plaintiff's claim for a writ of mandamus is without merit.

## BACKGROUND

## I.    THE SMALL BUSINESS ADMINISTRATION

Through the Small Business Act, 15 U.S.C. § 631 *et seq.*, Congress created the SBA to "aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns," in order to preserve the system of free competitive enterprise that is "essential" to the economic

---

[10] The Administrative Record includes public record documents and the attached Declaration of SBA Deputy Associate Administrator for Capital Access John A. Miller (Miller Decl.), Exhibit 3), who has been duly authorized by the SBA to "to explain the basis for the SBA's determination to exclude debtors in bankruptcy from obtaining PPP loan guarantees."  Miller Decl. ¶ 1.

well-being and security of the Nation. 15 U.S.C. § 631(a). To promote that objective, Congress

placed the SBA under the management of a single Administrator, *id*., § 633(a), (b)(1), who is

given "extraordinarily broad powers" under section 7(a) of the Act, 15 U.S.C. § 636(a), to

provide a wide variety of technical, managerial, and financial assistance to small-business

concerns. *SBA v. McClellan*, 364 U.S. 446, 447 (1960); *see generally* 15 U.S.C. § 636(a)

(describing numerous varieties of general small-business loans the Administrator is "authorized"

and "empowered" to make); 13 C.F.R. § 120.1. In the performance of these authorized functions,

the Administrator is further empowered to "make such rules and regulations as [she] deems

necessary to carry out the authority vested in [her]," and to "take any and all actions . . . [that

she] determines . . . are necessary or desirable in making . . . loans." 15 U.S.C. §§ 634(b)(6)−(7).

SBA also has the power to establish general policies "which shall govern the granting and denial

of applications for financial assistance by the Administration." 15 U.S.C. § 633(a).

## II.      SECTION 7(a) LENDING

The section 7(a) loan program is the SBA's primary program for providing financial

assistance to small businesses. Under the terms of the Small Business Act, assistance under

section 7(a) may take the form of loans or loan guarantees. 13 C.F.R. § 120.2(a); *see Valley Nat'l*

*Bank v. Abdnor*, 918 F.2d 128, 129 (10th Cir. 1990); *Cal. Pac. Bank v. SBA*, 557 F.2d 218, 219

(9th Cir. 1977). In practice, the SBA ordinarily guarantees loans made by private lenders rather

than disbursing funds directly to borrowers, *see United States v. Kimbell Foods, Inc.*, 440 U.S.

715, 719 (1979), thus reducing risk for lenders and making it easier for them to access capital

and for small business to obtain loans. https://www.sba.gov/funding-programs/loans.

## III.     SECTION 7(a) LOAN UNDERWRITING

6

Ordinarily, to qualify for an SBA general business loan an applicant must be an operating business organized for profit that is located in the United States, 13 C.F.R. § 120.100(a)−(c); meet the size standards for a "small" business set forth under the statute and SBA rules (usually stated in terms of number of employees, or average annual receipts), *see* 15 U.S.C. § 632(a)(2); 13 C.F.R. § 120.100(d); 13 C.F.R. Part 121; and demonstrate that the desired credit is not available elsewhere on reasonable terms, 15 U.S.C. § 632(h); 13 C.F.R. §§ 120.100(e), 120.101. Additionally, the Small Business Act requires that "[a]ll loans made under this subsection *shall* be of such sound value or so secured as reasonably to assure repayment." 15 U.S.C. § 636(a)(6) (emphasis added). Form 1919 (attached as Exhibit 4) serves as the application for section 7(a) loans. It asks whether the applicant has "ever filed for bankruptcy protection." *See also* Standard Operating Procedure 50-10 at 39 (allowing lenders to consider "bankruptcy history"). By regulation, requirements listed on Form 1919 and other official SBA forms comprise part of the "Loan program requirements." 13 C.F.R. § 120.10. Lenders agree to abide by these requirements when joining the section 7(a) lending program. *Id.*; *see also* SBA Forms 3506 (Ex. 5) and 3507 (Ex. 6) (addressing new PPP lenders).

## IV.    THE CORONAVIRUS AID, RELIEF, & ECONOMIC STIMULUS (CARES) ACT

On March 27, 2020, the President signed into law the Coronavirus Aid, Relief, and Economic Stimulus (CARES) Act, Pub. L. 116-136, 134 Stat. 281, providing an unprecedented package of emergency economic assistance and other support to assist businesses and Americans coping with the enormous economic and public health crises triggered by the worldwide coronavirus (COVID-19) pandemic. *See* SBA, Interim Final Rule, "Business Loan Program Temporary Changes; Paycheck Protection Program" (the First Interim Final Rule), 85 Fed. Reg. 20,811 (April 15, 2020). Section 1102 of the CARES Act established the PPP to assist eligible

small businesses experiencing economic hardship as a result of COVID-19 measures. *See id*.

Section 1102(a)(2) adds a new paragraph (36) to section 7(a) of the Small Business Act, 15

U.S.C. § 636(a)(36), extending loans to eligible small businesses for certain covered uses,

including among other things payroll costs. CARES Act § 1102(a)(2); 15 U.S.C. §

636(a)(36)(F)(i).

Otherwise, the existing section 7(a) requirements and limitations remain unaltered and

govern PPP lending. The CARES Act provides, "*Except as otherwise provided in this*

*paragraph*, the [SBA] *may* guarantee [PPP] covered loans"—not make loans directly,

however—"under the same terms, conditions, and processes as a loan made under this

subsection," *i.e.*, section 7(a).  15 U.S.C. § 636(a)(36)(B) (emphasis added). The CARES Act

then sets forth in extensive detail the precise ways in which PPP covered loans differ from other

section 7(a) loans by authorizing the SBA to guarantee covered loans to particular types of

businesses not previously eligible for section 7(a) loans under the SBA's rules. *Id*. §

636(a)(36)(D)–(R). Specifically, it allows SBA to guarantee PPP loans to various nonprofit

organizations, independent contractors, and self-employed individuals, as well as to small

business concerns, *id*. § 636(a)(36)(D)(i), (ii); relaxes size limitations to allow businesses with as

many as 500 employees (or more, depending on the industry in which they operate) to receive

assistance, *id*. § 636(a)(36)(D)(i)(I); and (iii) selectively waives certain of the SBA's affiliation

rules used to determine small business "size." Notably, while expanding eligibility to those

specified types of businesses, the CARES Act leaves unaltered the requirement that "[a]ll loans

made under this subsection *shall* be of such sound value or so secured as reasonably to assure

repayment."  15 U.S.C. § 636(a)(6) (emphasis added).

8

The CARES Act initially allocated $349 billion to guarantee PPP loans. CARES Act § 1102(b)(1). On April 16, 2020, the SBA announced PPP was closed to new applications. Congress then passed the Paycheck Protection Program and Health Care Enhancement Act (CARES Act II) on April 24, 2020 to add $310 billion to the PPP. PL 116-139 § 101(a)(1).

## V.    EMERGENCY RULEMAKING AUTHORITY

The CARES Act authorizes the Administrator of the SBA to issue emergency regulations to implement the PPP more rapidly than it could under typical notice and comment requirements. CARES Act § 1114. The Administrator of the SBA posted her First Interim Final Rule on the SBA website on April 3, 2020, which was subsequently published in the Federal Register on April 15, 2020. 85 Fed. Reg. 20,811. The First Interim Final Rule "streamlin[es] the requirements of the regular 7(a) loan program." *Id.* at 20,812. The rule states that lenders need not comply with case-by-case underwriting requirements of 13 C.F.R. § 120.150.  *Id.* Instead, under a section titled "What Do Lenders Have to Do in Terms of Loan Underwriting," it states: "Each lender's underwriting obligation under the PPP is limited to [the enumerated] items above and reviewing the 'Paycheck Protection Application Form.'"  The Paycheck Protection Application Form itself requires the borrower to certify, among other things, that it is "not presently involved in a bankruptcy."  SBA Form 2483 (Ex. 7).

On April 24, concurrent with Congress' extension of additional PPP funding, SBA posted a new interim final rule, which was subsequently published in the Federal Register on April 28, 2020, entitled "Business Loan Program Temporary Changes; Paycheck Protection Program – Requirements – Promissory Notes, Authorizations, Affiliation, and Eligibility" (the Fourth

Interim Final Rule) (attached as Exhibit 8).  85 Fed. Reg. 23,450.[11]  The Fourth Interim Final

Rule provides additional information regarding a number of eligibility requirements. Section

III(4) of the Fourth Interim Final Rule specifically addresses applicants in bankruptcy. It

provides:

> *4. Eligibility of Businesses Presently Involved in Bankruptcy Proceeding.*
>
> *Will I be approved for a PPP loan if my business is in bankruptcy?*
>
> No. If the applicant or the owner of the applicant is the debtor in a bankruptcy
> proceeding, either at the time it submits the application or at any time before the
> loan is disbursed, the applicant is ineligible to receive a PPP loan. . . .
> . . .
> The Administrator, in consultation with the Secretary, determined that providing
> PPP loans to debtors in bankruptcy would present an unacceptably high risk of an
> unauthorized use of funds or non-repayment of unforgiven loans.  In addition, the
> Bankruptcy Code does not require any person to make a loan or a financial
> accommodation to a debtor in bankruptcy.  The Borrower Application Form for
> PPP loans (SBA Form 2483), which reflects this restriction in the form of a
> borrower certification, is a loan program requirement.  Lenders may rely on an
> applicant's representation concerning the applicant's or an owner of the applicant's
> involvement in a bankruptcy proceeding.

Fourth Interim Final Rule. 85 Fed. Reg. at 23,451.

## VI.    THE PAYCHECK PROTECTION FLEXIBILITY ACT OF 2020

On June 5, 2020, the President signed into law the Paycheck Protection Program

Flexibility Act of 2020. *See* P.L. No. 116-142. The new act establishes a minimum maturity of

five years for PPP loans with a remaining balance after forgiveness, § 2(a), extends the covered

period for loans, § 3(a)−(b), alters certain requirements for loan forgiveness for employers

unable to rehire employees or individuals similarly qualified, or unable to return to the same

level of business as prior to the COVID-19 outbreak, § 3(b)(7), requires that recipients use at

---

[11] The SBA's second and third interim final rules addressed affiliation rules, additional eligibility
criteria, and certain pledges of loans. 85 Fed. Reg. 20,817, 21,747.

least sixty percent of the covered loan amount for payroll costs and up to forty percent for

payment of interest on covered mortgage obligations, rent, or utilities, to be eligible for

forgiveness, § 3(b)(8), revises the deferral period for PPP loans, § 3(c), and eliminates a

provision that rendered loan recipients with a PPP debt that is ultimately forgiven ineligible to

defer payroll tax payments. § 4. The Paycheck Protection Flexibility Act of 2020 does not,

however, alter the sound value requirement in 15 U.S.C. § 636(a)(6). Nor does it alter SBA Form

2483 excluding debtors in bankruptcy.

## VI.   PLAINTIFF'S ALLEGATIONS

Plaintiff filed its Chapter 11 petition in this Court on April 1, 2019. (Compl. ¶ 11.) On

April 14, 2020, Plaintiff submitted PPP loan requests to two banks. (Compl., Ex. 1.) Both

responded that Plaintiff did not qualify because Plaintiff currently is in bankruptcy. (*Id.*)

## ARGUMENT

## I.   PLAINTIFF'S CLAIM FOR RELIEF UNDER THE APA FAILS AS A MATTER OF LAW BECAUSE THE SBA ACTED WELL-WITHIN ITS STATUTORY AUTHORITY AND THE BANKRUPTCY EXCLUSION IS NEITHER ARBITRARY NOR CAPRICIOUS

Counts I and II of Plaintiff's Complaint allege that the SBA's PPP implementation in a

manner that excludes debtors in bankruptcy "is in excess of statutory jurisdiction, authority, or

limitations, or short of statutory right" and "arbitrary, capricious, [or] an abuse of discretion," in

violation of sections 702(2)(A) and (C) of the APA. (Compl. ¶¶ 56, 77.)

At the outset, Plaintiff's APA claims are appropriate for resolution as a matter of law. *See*

*Am. Bioscience, Inc. v. Thompson* 269 F.3d 1077, 1083−84 (D.C. Cir. 2001) ("[W]hen a party

seeks review of agency action under the APA, the district judge sits as an appellate tribunal. The

'entire case' on review is a question of law."); *Bates v. Donley*, 935 F. Supp. 2d 14, 17 (D.D.C.

2013) ("[W]hen faced with a motion to dismiss in the APA context, a court may consider the

administrative record and public documents without converting the motion into a motion for summary judgment . . . .") (citing *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009)).

As noted above, the Administrative Record includes public record documents and the Miller Declaration. A declaration is an accepted form of presentation of the Administrative Record. *See, e.g.*, *Olivares v. Transp. Sec'y Admin.*, 819 F.3d 454, 463−64 (D.C. Cir. 2016) ("TSA submitted the Vara Declaration and other internal agency documents that, together, offer a clear statement of the grounds and rationale upon which TSA relied in denying Petitioner's application for flight training."); *Rhea Lana, Inc. v. U.S. Dep't of Labor*, No. 1:14-cv-00017 (CRC), 2016 WL 10932817, at *2 (D.D.C. 2016) ("The Darling Declaration sets forth the reasons for DOL's finding of wage-and-hour violations . . . . As such, the declaration belongs in the administrative record because it furnishes an explanation of the administrative action that is necessary to facilitate effective judicial review.") (internal quotations omitted); *TOMAC v. Norton*, 240 F. Supp. 2d 45, 48−49 (D.D.C. 2003) (accepting declaration as additional explanation for the agency decision and concluding it was not a post-hoc rationalization) (quotation omitted).  Thus, this Court has a complete factual record upon which to decide this issue as a matter of law.

Moreover, where allegations implicate "an agency's interpretation of a statute which it administers," courts must apply the principles of deference described in *Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984). "[The Sixth Circuit] reviews the propriety of agency action under the two-step framework set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 . . . (1984)." *Tenn. Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1037 (6th Cir. 2018). *Chevron* articulates a two-step process. *Id.* The first step asks whether Congress "had an intention on the precise question at issue.'" *Id.* (quoting *Chevron*,

467 U.S. at 843 n.9). "'If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *Id.* (quoting *Chevron*, 467 U.S. at 842−43).  "But if the statute is instead 'silent or ambiguous with respect to the specific issue,' we then ask, at step two of the analysis, 'whether the agency's answer is based on a permissible construction of the statute.'" *Id.* at 1037−38 (quoting *Chevron*, 467 U.S. at 843). "'[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the Administrator of an agency." *Atrium Med. Ctr. v. U.S. Dept. of Health and Human Servs.*, 766 F.3d 560, 566 (6th Cir. 2014) (quoting *Chevron*, 467 U.S. at 844).

### A. Plaintiff Does Not Assert Sufficient Allegations That The SBA Exceeded Its Authority.

Plaintiff's claim that SBA exceeded its authority (which is distinct from its claim that the SBA acted in an arbitrary and capricious manner) is insufficient as a matter of law.  Plaintiff fails to point to any statutory provision in which Congress expressly prohibited the SBA from excluding debtors in bankruptcy. To the contrary, Congress has given the SBA Administrator "extraordinarily broad powers" under section 7(a) of the Small Business Act, 15 U.S.C. § 636(a), to provide a wide variety of assistance to small-business concerns. *McClellan*, 364 U.S. at 447. The Administrator is authorized to "make such rules and regulations as [she] deems necessary to carry out the authority vested in [her]," and to "take any and all actions . . . [that she] determines . . . are necessary or desirable in making . . . loans." 15 U.S.C. § 634(b)(6)−(7). But the Administrator must comply with the Small Business Act requirement that "[a]ll loans made under this subsection shall be of such sound value or so secured as reasonably to assure repayment." 15 U.S.C. § 636(a)(6). SBA's decision "concerning the granting of a loan . . . is one firmly committed to agency discretion." *DiFillipo v. Quaker State Certified Dev. Co., Inc.*, 1987

13

WL 11221, at *3 (E.D. Pa. May 19, 1987) (citing *SGA Fin. Corp. v. SBA*, 509 F. Supp. 392, 397

(D.N.J.), *aff'd* 673 F.2d 1301 (3d Cir. 1981)).

   As described above, Congress placed the PPP within the existing architecture of the 7(a)

loan program and gave the SBA "EMERGENCY RULEMAKING AUTHORITY" requiring

that, "[n]ot later than 15 days after the date of enactment . . . [the SBA] issue regulations to carry

out this title and the amendments made by this title without regard to the notice requirements" of

5 U.S.C. § 553(b). CARES Act § 1114. Consistent with (a) her broad authority under the section

7(a) loan program, (b) Congress's specific mandate that the Administrator issue emergency PPP

regulations within fifteen days, (c) the sound value requirement of 15 U.S.C. § 636(a)(6), and (d)

Congress's intent that the SBA ensure distribution of PPP funds to America's small businesses

expeditiously, the Administrator excluded debtors in bankruptcy from obtaining PPP loans.

Plaintiff does not, and cannot, identify any statutory language in the CARES Act in which

Congress *required* the Administrator to guarantee PPP loans to debtors in bankruptcy.

   Plaintiff misunderstands the APA by equating congressional silence with agency

overreach. In order to state a claim for relief that the SBA exceeded its statutory authority,

Plaintiff must identify a specific statutory provision prohibiting the SBA from excluding debtors

in bankruptcy from the PPP. Plaintiff's concession that nothing in the statute addresses the issue

ends this Court's inquiry.

   Specifically, as Judge Fagone explained in his recent decision:

   In common parlance, the word "eligible" carries a connotation of choice. The Court
   does not believe that Congress would have infused the PPP with [the] concept of
   "eligibility" if the intention was for the SBA to have no ability to choose which
   individuals and businesses would benefit from loan guarantees. Congress did not
   explicitly say whether debtors in bankruptcy are categorically excluded from the
   PPP. . . . [But the statutory language and CARES Act structure suggests] that
   Congress intended the SBA to fill a statutory gap and determine whether debtors in
   bankruptcy would be eligible for the PPP.

14

*Penobscot*, 2020 WL 3032939, at *8. Judge Ludwig reached a similar conclusion:

> Plaintiffs are correct that the CARES Act does not itself directly provide that
> bankrupt debtors are ineligible for PPP participation. Indeed, defendants concede
> the statute is silent on this specific issue. But statutory silence does not mean that
> the SBA is acting outside its authority. The relevant issue is whether the SBA's
> promulgation of a rule that bars bankrupt debtors from participating in the PPP
> exceeds the agency's authority. Nothing in the statutory text suggests that the
> Congress was intending to limit the SBA's rulemaking authority or that Congress
> was providing an exhaustive list of eligibility requirements that the SBA could not
> augment through rulemaking.

*Schuessler*, 2020 WL 2621186, at *10; *see Diocese of Rochester*, 2020 WL 3071603, at *8 ("the

Court concludes at step one of the *Chevron* analysis that the CARES Act is silent regarding the

eligibility of debtors in bankruptcy to participate in the PPP. Put differently, nothing in the

CARES Act requires that a bankrupt debtor be eligible for participation in the PPP—this detail

was left by Congress for determination by the SBA."). Congress delegated to the Administrator

broad powers, and Plaintiff fail to identify any statute to support their allegation that the SBA

exceeded its authority.  Thus, this claim fails as a matter of law.

### B.  Plaintiff Does Not Assert Sufficient Allegations That The SBA Acted Arbitrarily Or Capriciously In Excluding Bankrupt Debtors From The PPP.

Plaintiff also alleges that the SBA's determination was arbitrary, capricious or an abuse

of discretion. (Compl. ¶¶ 67−86.)  This claim, too, fails as a matter of law. Under *Chevron*'s step

two, courts must defer to an agency's reasonable interpretation of an ambiguous statute. *Atrium*,

766 F.3d at 566 ("'[A court may not substitute its own construction of a statutory provision for a

reasonable interpretation made by the Administrator of an agency.") (quoting *Chevron*, 467 U.S.

at 843).  If an agency regulation "represents a reasonable accommodation of conflicting policies

that were committed to the agency's care by the statute, [the court] should not disturb it unless it

appears from the statute or its legislative history that the accommodation is not one that Congress

would have sanctioned." *Chevron*, 467 U.S. at 845.

The Administrative Record demonstrates the SBA's decision to exclude debtors.  Like

*Chevron* step two, APA arbitrary and capricious review under section 706(2)(A) is narrow and

deferential, requiring only that the agency "articulate[] a rational relationship between the facts

found and the choice made.'" *Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Auto. Ins. Co.*, 463

U.S. 29, 43 (1983)). A court's role under section 706(2)(A) simply is to review agency action to

determine whether the decision "was based on a consideration of the relevant factors and

whether there was a clear error of judgment." *Id.* at 43. Under this framework, the agency must

only "examine the relevant data and articulate a satisfactory explanation for its action including a

rational connection between the facts and the choice made." *Id.* An agency's decision normally

will be arbitrary and capricious if it: (1) "has relied on factors which Congress has not intended it

to consider"; (2) "entirely failed to consider an important aspect of the problem"; (3) "offered an

explanation for its decision that runs counter to the evidence before the agency"; or (4) "is so

implausible that it could not be ascribed to a difference in view or the product of agency

expertise." *Id.* Otherwise, courts do not "broadly require an agency to consider all policy

alternatives in reaching [its] decision." *Id.*

### 1.    The SBA's bankruptcy exclusion is a reasonable interpretation.

At the outset, the SBA's bankruptcy exclusion is a reasonable interpretation of the

CARES Act. Congress has not directly spoken to the precise question at issue and has instead

delegated broad emergency rulemaking authority to the Administrator to expeditiously carry out

the PPP without regard to notice requirements. As Judge Fagone found:

> The SBA's bankruptcy exclusion was a reasonable effort to accommodate the
> conflicting policies committed to the SBA's care, and one that Congress might

16

> reasonably have sanctioned. . . . [T]he reality [is] that the SBA had very little time
> to implement this program and that standard underwriting would have been
> impractical. Under the circumstances, in light of Congress' intent to see the PPP
> funds distributed quickly, the SBA relaxed its underwriting standards. The SBA did
> not, however, eliminate all underwriting; viewed together, the questions on SBA
> Form 2483 represent at least a minimal effort to learn something about whether a
> covered loan will be repaid if not forgiven.

*Penobscot*, 2020 WL 3032939, at \*9. Congress placed the PPP under the SBA's section 7(a) loan

program, mandated that the Administrator issue emergency regulations without typical notice

and comment to rapidly guarantee PPP loans, and left unaltered the requirement that "[a]ll loans

made under this subsection shall be of such sound value or so secured as reasonably to assure

repayment." 15 U.S.C. § 636(a)(6). The bankruptcy exclusion "represents a reasonable

accommodation of conflicting policies" committed to the SBA's care, *Chevron*, 467 U.S. at 845,

and nothing in Plaintiff's Complaint casts doubt on the reasonableness of the SBA's decision.

In fact, the recent passage of the Paycheck Protection Flexibility Act of 2020 bolsters the

reasonableness of the SBA's interpretation. As the Supreme Court has explained, deference to an

agency's interpretation "is particularly appropriate where, as here, an agency's interpretation

involves issues of considerable public controversy, and Congress has not acted to correct any

misperception of the statutory objectives." *United States v. Rutherford*, 442 U.S. 544, 554

(1979). Although congressional silence, in and of itself, is not necessarily dispositive of an

agency's interpretation, "once an agency's statutory construction has been fully brought to the

attention of the public and the Congress, and the latter has not sought to alter that interpretation

although it has amended the statute in other respects, then presumably the legislative intent has

been correctly discerned." *Id.* at 554 n.10 (internal quotations omitted).

At a minimum, Congress's failure to correct an allegedly unauthorized interpretation of landmark legislation at the forefront of national debate,[12] while altering the legislation in other respects several times over, is at least persuasive evidence the agency's interpretation is reasonable. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 600−01 (1983) (holding Congress acquiesced to the IRS's interpretation by repeatedly not overturning it in the face of "vigorous and widespread debate and discussion in and out of Congress" on the issue); *United. Airlines, Inc. v. Brien*, 588 F.3d 158, 173 (2d Cir. 2009) ("Congress's repeated amendment of the relevant provisions of the statute 'without expressing any disapproval reinforces the strength of the [agency's] interpretation,' because it 'is persuasive evidence that the [agency's] interpretation is the one intended by Congress.'") (quoting *CFTC v. Schor*, 478 U.S. 833, 846 (1986)).

In light of Congress's intent that PPP loans be made expeditiously, the emergency rulemaking authority Congress gave to the SBA to implement the PPP, the broad overall discretion Congress granted the SBA over its lending programs, and the mandatory "sound value" obligation Congress placed on PPP (as part of section 7(a)) loans, this Court must defer to the agency's interpretation of the CARES Act.  As Judge Fagone concluded: "[T]he better view is that the [SBA]—armed with a mandate from Congress and facing an economic crisis of unprecedented magnitude—made reasonable choices about how to allocate a large but finite amount of aid among struggling businesses. Those choices may produce seemingly harsh results, but they are not illegal." *Penobscot*, 2020 WL 3032939, at *1.

---

[12] As Judge Ludwig noted, the SBA's bankruptcy exclusion has resulted in "a deluge of section 525(a) challenges." *Scheussler*, 2020 WL 2621186, at *9.

## 2.  The Administrative Record shows the SBA considered the relevant factors and satisfies minimum standards of rationality.

The Administrative Record establishes rational grounds for the SBA's decision and demonstrates that the SBA considered the relevant factors in determining to exclude debtors from the PPP. The CARES Act builds upon the section 7(a) lending program, in which the SBA explicitly considers the borrower's bankruptcy history to ensure that loans be of "sound value . . . as reasonably to assure repayment."  15 U.S.C. § 636(a)(6); SBA Form 1919 (Questions 6 and 24, considering whether applicant, its owners, affiliates or any business controlled by applicants principals have "ever" been in bankruptcy); Miller Decl. ¶¶ 6−13. Mr. Miller explains he is "not aware of any lender that has extended section 7(a) loans to an entity in active bankruptcy. If such were the case, it would be very unusual and would cause the Agency to provide more scrutiny of the loan during oversight of the lender's decision to make the loan and perhaps lead to refusal of the Agency to honor its guaranty." *Id.* ¶ 13.

The bankruptcy exclusion in the PPP stems from these preexisting section 7(a) requirements. The preexisting bankruptcy questions of section 7(a) were "streamlined" for the PPP to accomplish Congress's and the SBA's objective that PPP loans be processed "expeditiously." First Interim Final Rule, 85 Fed. Reg. at 20,811; Miller Decl. at ¶ 5 ("SBA determined that the intent of the [CARES] Act is that SBA provide relief to America's small businesses expeditiously"). Unlike other section 7(a) loans, the SBA eliminated the requirement to perform individual credit review for each PPP loan. Instead, the PPP program imposed a bright line rule to exclude those in bankruptcy through its official application form. As the SBA explains:

> The reason for including the bankruptcy exclusion in form 2483 was that SBA in consultation with Treasury determined that in order to meet the challenge of rescuing the economy from the effects of the Covid-19 virus pandemic, loan

assistance authorized by the CARES Act had to be provided as expeditiously as possible with as little as possible underwriting. Since a company in bankruptcy required an inquiry into the state of the proceeding and possibly a court order for DIP financing, as well the possible resolution of a host of other issues and the prospect of the incurring of fees by the lender in monitoring the bankruptcy proceeding, it was determined that the wording of Form 2483 would be expeditious and less likely to slow the administration of the program and less likely to require the expenditure of additional time, effort and other resources. The purpose of a PPP loan is to help small businesses pay their employees and maintain operations to allow them to restart quickly over the next few months. SBA decided that this purpose would not be served by including all bankruptcies. Certain creditors, including administrative creditors, could assert claims to the PPP loan funds that would interfere with its authorized uses and the requirements for PPP loan forgiveness. SBA, in consultation with the Department of Treasury, determined there should be one streamlined rule that applies to all debtors in bankruptcy to avoid the need for case by case reviews.

Miller Decl. ¶ 17. This streamlining of the consideration of bankruptcy status through the PPP application form is wholly within the SBA's delegated discretion. The CARES Act did not amend the "shall" requirement in 15 U.S.C. § 636(a)(6) that loans be of "sound value." The CARES Act instead explicitly left that provision unaltered, along with section 7(a) lending procedures more broadly, except where specifically noted. *See* CARES Act § 1102(a)(2) (providing that "[e]xcept as otherwise provided in this paragraph, the Administrator *may* guarantee covered loans under the same terms, conditions, and processes as a loan made under this subsection.") (emphasis added); 15 U.S.C. § 636(a)(36)(B). The bankruptcy exclusion reasonably reconciles the "shall" requirement concerning the sound value of loan-making under 15 U.S.C. § 636(a)(6) with the obligation to expeditiously process CARES Act PPP loans by replacing the case-by-case consideration of bankruptcy history with a bright line rule on the application form.

The Administrative Record demonstrates the SBA's decision to exclude debtors in bankruptcy from the PPP was rational, based on consideration of the relevant factors, and within

the scope of the authority delegated to the agency by statute. Judge Ludwig summarized the

SBA's satisfactory explanation of its action:

> That the SBA chose to use a broad and blunt instrument—flatly excluding bankrupt debtors from PPP participation—does not make the SBA's rule arbitrary and capricious. The law does not require precision or perfection, particularly at the expense of other valid and competing Congressional goals.
>
> The record shows that the SBA has considered the relevant factors, including the goals of the CARES Act and those statutory provisions that the CARES Act left intact. The denial of PPP application to entities that have already resorted to bankruptcy, while reserving PPP loans to those whose financial troubles have not yet gotten to the point (and perhaps never will) is a rational policy choice. The agency's policy choice is consistent with the CARES Act and the SBA's preexisting statutory mandate. . . . Using the bankruptcy exclusion question on the PPP application has the obvious benefit of being easy to administer. This is not a small matter, given the speed with which Congress and the President directed the SBA to implement the CARES Act and PPP.
>
> The SBA's explanation is consistent with the record . . . . That one could have adopted a different approach or policy—perhaps even a better one—does not make the SBA's policy choice invalid. It is not this court's role to order the SBA to replace its own policy judgment with that of the plaintiffs.

*Schuessler*, 2020 WL 2621186, at *12.

Because Plaintiff claims that the SBA acted in a manner that is arbitrary, capricious, or an

abuse of discretion, fails as a matter of law, this claim too should be dismissed.

## II.   PLAINTIFF'S SECTION 525(a) CLAIM FAILS AS A MATTER OF LAW BECAUSE THE ANTI-DISCRIMINATION PROVISION DOES NOT COVER LOAN GUARANTEES

Count III of plaintiff's complaint also fails as a matter of law. Plaintiff alleges that the

SBA's denial of a PPP loan—based on plaintiff's status as a debtor in bankruptcy—violates 11

U.S.C. § 525(a)'s anti-discrimination provision. (Compl. ¶¶ 87−102). Section 525(a) provides:

> [A] governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, [or] discriminate with respect to such a grant against . . . a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act . . . solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act . . . .

21

First, the facts show PPP proceeds are loans and not grants. Second, section 525(a) does not

cover loans. Third, even if PPP loans are considered grants, they are by no means "similar."

### A.    PPP Proceeds Are Loans.

Contrary to Plaintiff's contention, PPP loans are, in fact, loans. Congress refers to PPP

proceeds as "Paycheck protection *loans*" and grants the SBA authority to "guarantee *covered*

*loans* under same terms, conditions, and processes as a *loan* made under this subsection." 15

U.S.C. § 636(a)(36)(B) (emphasis added). In turn, Congress defined "covered loan" to mean "*a*

*loan* made under this paragraph during the covered period." 15 U.S.C. § 636(a)(36)(A)(ii)

(emphasis added). Congress also refers to PPP proceeds as a "loan" in setting forth the

"Maximum loan amount," 15 U.S.C. § 636(a)(36)(E), in authorizing the SBA "to make loans

under this paragraph" to additional lenders, 15 U.S.C § 636(a)(36)(F)(iii), in allowing

refinancing of "a loan made under subsection (b)(2)," 15 U.S.C. § 636(a)(36)(F)(iv), in setting

forth the "[m]aturity for loans with [a] remaining balance," 15 U.S.C. § 636(a)(37)(K), and in

describing "Loan deferment" for PPP borrowers. 15 U.S.C. § 636(a)(36)(M). And Congress sets

forth the necessary certifications PPP applicants must make under the heading "Borrower

requirements." 15 U.S.C. § 636(a)(36)(G).

Further relevant is where Congress chose to place the CARES Act legislation,

specifically by adding a new paragraph (36) to section 7(a) of the Small Business Act. As noted

earlier, section 7(a) is the SBA's primary loan program, under which the SBA is empowered to

make loans to small business concerns. 15 U.S.C. § 636(a). That Congress repeatedly refers to

PPP proceeds as loans and established the PPP under section 7(a) is strong evidence PPP

proceeds are loans. Just recently, moreover, Congress continued to refer to PPP loans in the

Paycheck Protection Program Flexibility Act of 2020, P.L. No. 116-142, entitling section 2

"Maturity for Loans with Remaining Balance After Application of Forgiveness" and section 3

"Amendments to Paycheck Protection Program Loan Forgiveness."

PPP loans share many characteristics of typical loans. They carry an interest rate, mature

after two years, and may be refinanced. 85 Fed. Reg. 20,811. They are secured with a promissory

note and may include amortization terms and conditions. 85 Fed. Reg. 23,450. Borrowers,

moreover, must comply with specific and mandatory requirements to be eligible for forgiveness,

and their compliance will be evaluated by lenders or the SBA months after loans are funded;

unless and until compliance is determined, borrowers have a payment obligation. According to

Judge Ludwig for the U.S. Bankruptcy Court for the Eastern District of Wisconsin:

> The record is clear that Congress created the PPP as an amendment to the SBA's
> pre-existing *loan* program and both the statute and agency regulations refer to the
> funds distributed as "loans." The PPP loans are made through private lenders and
> participants sign promissory notes, subject to SBA guarantees. While it is certainly
> true that Congress created the program to make the funds readily available, even
> where market loans would not be, and the SBA has adopted regulations allowing
> the loans to be made with little-to-no underwriting, these attributes do not alter the
> fact that the program results in an actual loan. It is also true that Congress provided
> for loan forgiveness if the funds are used in certain ways, but the loan forgiveness
> is just that – it is a *loan* forgiveness.

*Schuessler*, 2020 WL 2621186, at *9. Judge Fagone for the U.S. Bankruptcy Court for the

District of Maine likewise concluded: "Certain features of PPP loans make them highly desirable

from a borrower's perspective . . . . But, a distribution of PPP funds initially assumes the form of

a loan." *Penobscot*, 2020 WL 3032939, at *9. Judge Fagone also highlighted that Congress

"knows how to distribute aid without strings attached"—citing 26 U.S.C. § 6428, where

Congress authorized up to $1,200 in direct payments following COVID-19—but "elected to

establish a loan program. . . . These loans may function as a grant of aid during a crisis, but they

are still—at least at their inception—loans." *Id.*

23

## B.     Loans Are Not Covered By Section 525(a).

Each other court of appeals that has addressed this issue has determined that a government entity conditioning a loan on whether the party receiving the loan is in bankruptcy *does not* violate section 525 because a loan is not "grant" that is similar to a "license, permit, charter, [or] franchise." *Ayes v. U.S. Dep't of Veterans Affairs*, 473 F.3d 104, 110 (4th Cir. 2006) (holding section 525 does not cover a state's refusal to extend home loan guarantees to veterans following discharge in bankruptcy); *Watts v. Pa. Hous. Fin. Co.*, 876 F.2d 1090, 1094 (3d Cir. 1989) (holding that a state's suspension of emergency home loan assistance program to bankruptcy debtors did not violate section 525); *cf. In re Exquisito Servs., Inc.*, 823 F.2d 151, 153 (5th Cir. 1987) (interpreting section 525 narrowly to include only "situations analogous to those enumerated in the statute."). The first court of appeals to consider the issue held that the omission of credit arrangements from section 525(a) was intentional and declined to extend section 525 to student loan guarantees, explaining: "*A credit guarantee is not a license, permit, charter or franchise; nor is it in any way similar to those grants.* Had Congress intended to extend this section to cover loans or other forms of credit, it could have included some term that would have supported such an extension." *In re Goldrich*, 771 F.2d at 30 (emphasis added).[13]

A number of district and bankruptcy courts have reached the same conclusion.  In *In re Elter*, 95 B.R. 618, 622 (Bankr. E.D. Wis. 1989), the court held that the state's denial of a guaranteed student loan did not violate section 525. The court explained that it "is not persuaded that the granting of credit is sufficiently similar to licenses, permits, charters and franchises to fall within the aegis of 11 U.S.C. § 525(a).  Even with a broad construction, the court cannot, by

---

[13] *In re Goldrich* was decided prior to the 1994 amendment of section 525 to include the student loan provision at section 525(c).

liberal interpretation, expand the scope of a statute beyond the words contained in it." *Id.* at 622 (citation omitted). The court relied upon "the principle of *ejusdem generis,* which is that a general term following a specific list can apply only to things similar to the list." *Id.* ("The specific list in [section] 525(a) refers to privileges of citizens to exercise their livelihood, such as obtaining building permits, state contracts or liquor licenses, or to the exercise of personal freedom, such as driving a car"); s*ee also United States v. Cleasby*, 139 B.R. 897, 900 (Bankr. W.D. Wis. 1992) (holding a loan is not a "similar grant" within the meaning of § 525 and declining to extend § 525 protection to applications for debt restructuring); *In re Jasper*, 325 B.R. 50, 55 (Bankr. D. Me. 2005) (revoking credit union privileges on the basis of filing for bankruptcy did not violate section 525); *Lee v. Yuetter*, 106 B.R. 588, 592 (Bankr. D. Minn.1989) (declining to extend § 525 protection to applications for debt restructuring program and analogizing program to extensions of credit), *aff'd*, 917 F.2d 1104 (8th Cir.1990).

The courts of appeals' holdings are consistent with fundamental principles of statutory interpretation. *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253−54 (1992) ("[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others"; namely "courts must presume that a legislature says in a statute what it means and means in a statute what it says there."). Section 525(a) prohibits certain discrimination by the government against debtors in awarding or denying only "a license, permit, charter, franchise, or other similar grant." The absence of loans makes clear Congress's exclusion was intentional. *See Barnhard v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) ("[W]hen the items expressed are members of an associated group or series, [it] justif[ies] the inference that items not mentioned were excluded by deliberate choice, not inadvertence.").

25

The language in section 525(a), moreover, contrasts sharply with language from the very same section, just several provisions down, where Congress amended section 525 to prohibit governmental units from denying "a student grant, loan, loan guarantee, or loan insurance to a person that is or has been a debtor." 11 U.S.C. § 525(c)(1). *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."). Clearly, then, Congress knows how and when to include loans in enumerating applicable categories. *See Ayes*, 473 F.3d at 110 (4th Cir. 2006) ("That Congress chose . . . to narrowly amend § 525 . . . is strong evidence that its failure to mention other kinds of loan guaranties in § 525(c) was intentional."). Its specific inclusion of both grants and loans in section 525(c) also demonstrates it understands the distinction between "grants" and "loans."

### C.    PPP Loans Are Not Similar To Licenses, Permits, Charters, Or Franchises.

Any argument that loan guarantees are a type of "similar grant" is unavailing. Since *Exquisito*, the other courts of appeals to have considered the issue "refuse to venture beyond the confines of the statutory language to broadly construe § 525(a)'s specific 'other similar grant' language.'" *Ayes*, 473 F.3d at 111. In *Ayes*, the Fourth Circuit affirmed a district court's dismissal of a complaint accusing the United States of violating section 525(a) for refusing to extend home loan guarantees to veterans following their discharges in bankruptcy. 473 F.3d at 107. Relying on the provision's plain language, *Ayes* reasoned the loan guarantee at issue bore no "family resemblance" to the items listed in section 525(a): those items "are all governmental authorizations that typically permit an individual to pursue some occupation or endeavor aimed at economic betterment." *Id.* at 108 (citing *Watts*, 876 F.2d at 1093). According to *Ayes*, section

26

525(a) implicates "government's role as a gatekeeper in determining who may pursue certain livelihoods," 473 F.3d at 109 (quoting *Toth*, 136 F.3d at 480), and "is composed solely of benefits conferred by the state." *Ayes*, 473 F.3d at 110 (quoting *Goldrich*, 771 F.2d at 30.) A home loan guarantee, though, "does not implicate the government's gate-keeping role . . . because . . . a person can obtain a home loan or guaranty from the private sector," a refusal does not mean that person is "doomed to homelessness," and "governmental units do not exercise exclusive or even pervasive control over the 'world' of home loans." *Ayes*, 473 F.3d at 109.

Guarantees of business loans—even more so than housing loans—bear no semblance to licenses, permits, charters, or franchises. First, they do not do not provide a right to engage in a specific activity or profession, and therefore do not implicate "government's role as a gatekeeper in determining who may pursue certain livelihoods." *Ayes*, 473 F.3d at 109 (quoting *Toth*, 136 F.3d at 480). Second, "governmental units do not exercise exclusive or even pervasive control" over them. *Ayes*, 473 F.3d at 109. Third, they are not "benefits conferred by the state that are unrelated to credit." *Id.* at 110. As Judge Fagone explained, "Each of the enumerated items . . . . involves some permission for the holder of the grant to act in a particular way. . . . Withholding a permission to engage in activity that is essential to the enjoyment of the benefits of a fresh start . . . is different from declining to provide assistance in the form of a loan . . . that might be useful to obtaining a fresh start." *Penobscot Valley Hosp.*, 2020 WL 3032939, at *10–11. At bottom, "[h]ad Congress intended to extend § 525's protections to other government loan guaranties besides student loans, it easily could have revised § 525(a) . . . ." *Id.* Alternatively, Congress "could have included some term in § 525(c) that would have supported extension of § 525(a)'s protections to all government loan guaranties, not just those of the student loan variety." *Id.*

Even assuming PPP loans may be characterized as grants, for all the reasons explained

above, they are not grants similar to "licenses, permits, charters, or franchises," as required by

section 525(a). Businesses excluded from PPP loans are not, by law, prohibited from operating,

as with a refusal to provide a license, permit, charter, or franchise. The SBA thus is not acting

"as a gatekeeper in determining who may pursue certain livelihoods." *Ayes*, 473 F.3d at 109. Nor

does SBA "exercise exclusive or even pervasive control over the world" of business loans, as the

opportunity to seek funds elsewhere is still possible. *Id.* ("If a governmental entity refuses to

guarantee a home loan for a bankrupt individual . . . that individual is not doomed to

homelessness; [they] may seek a guaranty from family or friends, may seek another private loan,

perhaps on less favorable terms, or [they] may rent.").

PPP loans simply are not "benefits conferred by the state that are unrelated to credit." *Id.*

at 110; *see also Penobscot*, 2020 WL 3032939, at *11 ("[E]ven if the Court were to conclude

that the PPP establishes a grant program, the benefits of particular program would not constitute

a license or a franchise. There is no suggestion that the PPP would authorize the Debtor to

undertake a particular act—an essential feature of a license—and the PPP would not confer a

special privilege on the Debtor to engage in a specific business or exercise corporate power—an

essential feature of a franchise."). Congress has unquestionably limited section 525(a)'s coverage

to those instances where debtors may experience discrimination in obtaining certain benefits

conferred by government—such as occupational licenses or permits—while not drafting section

525 so broadly as to insulate debtors from "any and all adverse consequences of a bankruptcy

filing." *Watts*, 876 F.2d at 1094.

Plaintiffs rely heavily on the decision of the Second Circuit *In re Stoltz*, 315 F.3d 80 (2d

Cir. 2002), in support of their section 525 claims.  But *Stoltz* is readily distinguishable from the

28

present case.  In *Stoltz*, the Second Circuit held that the public housing *lease* at issue fell within

the contours of section 525(a).  But nothing in *Stoltz* suggests that the Second Circuit was

receding from well-established case law developed above that *government loan programs and*

*extensions of credit* are outside the contours of section 525(a).  In particular, in *Stoltz*, the court

noted that Congress had extended the anti-discrimination protections to certain student loan

programs in section 525(c), but nowhere recedes from its previous holding in *Goldrich* that

section 525(a) does not apply to "extensions of credit."  315 F.3d at 86 n.2.  The Court in *Stoltz*

defined the subsidized housing lease as a "grant" because it found that the lease was a "property

interest."  *Id*. at 89-90.  A public housing lease, like a "license, permit, charter, or franchise"

obtained from a governmental unit, is a "grant" of a property right for "essential services," *i.e.*,

housing.  "An individual qualifies for public housing because he or she cannot afford housing at

prevailing market rates."  *Id*. at 90.  The *Stoltz* court extended Section 525(a) to a public housing

lease because that section was intended to protect debtors against discrimination by

governmental units that provide "property interests," such as a lease, for "essential services,"

such as housing and are akin to a driver's license, a real estate license or a transcript.  The loan

programs and extensions of credit, such as PPP, are not property interests, are excluded from the

reach of section 525 under *Goldrich*, and are therefore distinguishable from the public housing

lease that was at issue and determined to be "a similar grant" in *Stoltz*.  Likewise, Plaintiff's

contention that the Court should analogize the PPP to the lease at issue in *Stoltz* because the

generous terms of the PPP would not be available in private credit markets also misfires for all

the reasons explained above.  Thus, it is not surprising that courts in PPP cases have held that

*Stoltz* does not alter the conclusion that the PPP is outside the contours of Section 525.  As Judge

Farone explained:

> Even if the Court were to find *Stoltz* persuasive and follow it here, the PPP would not qualify as an "other similar grant" under the reasoning employed by the Second Circuit.  In *Stoltz*, the court concluded that public housing leases are items protected by section 525(a) because: (a) a lease is a type of grant and (b) public housing leases are similar to the items enumerated in the statute because they are items conferred only by the government and are essential to a debtor's fresh start.  315 F.3d at 89-90.  By contrast, a PPP loan is not a grant and even if it were, the Court cannot conclude on this record that it is essential to the Debtor's fresh start; it might be helpful but there has been no showing that it is necessary.

Fagone Order at 30.

In sum, in light of the plain meaning of section 525(a), as well as the conclusions of the many courts to have defined section 525(a)'s contours, the provision does not cover loans. Because the SBA's role in the PPP is to provide loan guarantees, the SBA's decision to exclude debtors in bankruptcy is not a violation of section 525(a).  Thus, this Count too fails as a matter of law and this Court should dismiss.[14]

## III.  PLAINTIFF'S CLAIM FOR WRIT OF MANDAMUS FAILS AS A MATTER OF LAW BECAUSE IT DOES NOT ALLEGE A CLEAR RIGHT OR DUTY OWED

Under Count IV, Plaintiff seeks a writ of mandamus to compel the SBA to remove the bankruptcy disqualification from its PPP applications. (Compl. ¶ 105.) A writ of mandamus is a "drastic" remedy reserved for "'extraordinary situations.'" *United States ex rel. Rahman v. Oncology Assocs., P.C.*, 198 F.3d 502, 511 (4th Cir. 1999) (quoting *Kerr v. U.S. Dist. Court for the N. Dist. Of Cal.*, 426 U.S. 394, 402 (1976)). The movant bears the burden of demonstrating

---

[14] Plaintiff relies on two cases for the proposition that it is entitled to PPP loans: *In re Asteria Education* and *In re Hidalgo County Emergency Service*. (Compl. ¶ 98 n.3.) The *Asteria* court ultimately denied plaintiff's claim that the SBA violated section 525(a). The *Hidalgo* court subsequently entered a preliminary injunction on the same basis as its temporary restraining order. However, on May 11, 2020, the U.S. District Court for the Southern District of Texas stayed the Bankruptcy Court's preliminary injunction order pending the United States' appeal, which is now before the Fifth Circuit.

"a clear right to the relief sought" and that "the responding party has a clear duty to perform the act amounting to the relief sought." *Id.* The clear duty "must be a specific, plain ministerial act devoid of the exercise of judgment or discretion." *Harmon Cove Condominium Assoc. v. Marsh*, 815 F.2d 949, 951 (3d Cir. 1987). Ministerial means "performance is positively commanded and so plainly prescribed as to be free from doubt." *Id.* The SBA exercised the judgment and discretion Congress granted it in excluding debtors in bankruptcy. Plaintiff makes no allegation that it had a clear right, that the SBA had a clear duty, or that the SBA's duty was ministerial. *See Copake*, 490 F. Supp. at 389 (denying writ of mandamus to the SBA on the grounds that "the decision concerning the granting of a [disaster relief] loan by the SBA is one firmly committed to agency discretion" and "it cannot be said that plaintiff has a clear right to the relief sought or defendants have a plainly defined and peremptory duty to the act in question").

## IV.  PLAINTIFF'S CLAIMS ALSO FAIL AS A MATTER OF LAW BECAUSE THE INJUNCTIVE RELIEF IT SEEKS IS PRECLUDED BY THE DOCTRINE OF SOVEREIGN IMMUNITY

This Court lacks the jurisdiction to issue injunctive relief against SBA unless it concludes that Congress has waived the agency's sovereign immunity for actions seeking such relief. *See Hercules, Inc. v. United States*, 516 U.S. 417, 422 (1996); *Millares Guiraldes de Tineo v. United States*, 137 F.3d 715, 719 (2d Cir. 1998). Any such waiver of sovereign immunity must be strictly construed in favor of the government. *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 685-86 (1983); *Millares Guiraldes*, 137 F.3d at 719. If the government has not waived its sovereign immunity, or if the conditions under which the government has agreed to waive that immunity have not been met, federal subject matter jurisdiction does not exist. *United States v. Sherwood*, 312 U.S. 584, 586-87 (1941).

While the Small Business Act does contain a waiver of sovereign immunity, that waiver is limited.  It provides that the SBA may:

31

> sue and be sued in any court of record of a State having general
> jurisdiction, or in any United States district court, and jurisdiction is
> conferred upon such district court to determine such controversies without
> regard to the amount in controversy; *but no attachment, injunction,*
> *garnishment, or other similar process, mesne or final, shall be issued*
> *against the [agency] or [its] property[.]*

15 U.S.C. § 634(b)(1) (emphasis added).

By its plain terms, this statute waives sovereign immunity for suits seeking damages or

declaratory relief, but precludes suits seeking injunctive or any similar relief against the SBA.

*Enplanar, Inc. v. Marsh*, 11 F.3d 1284, 1290 (5th Cir. 1994); *J.C. Driskill, Inc. v. Abdnor*, 901

F.2d 383, 386 (4th Cir. 1990); *Mar v. Kleppe*, 520 F.2d 867, 869 (10th Cir. 1975) ("The

decisions have uniformly considered that this statute effectively precludes injunctive relief

against the Administrator.") (collecting cases); *United States v. Mel's Lockers, Inc.*, 346 F.2d

168, 170 (10th Cir. 1965) (waiver of sovereign immunity in Bankruptcy Act did not override

prohibition on injunctions, because the language of the sovereign immunity waiver in the Small

Business Act "is too clear for misunderstanding that there is no waiver by Congress as to

injunction suits"); *Keita v. U.S. Small Business Admin.*, No. 07-CV-4958 (ENV)(LB), 2010 WL

395980, at *4 (E.D.N.Y. Feb. 3 2010) (holding that plaintiff's "request that the Court review and

reverse SBA's denial of his loan applications and to order SBA to approve them instead is

beyond the Court's subject matter jurisdiction," as the SBA "prohibits district courts from

entering orders of . . . injunction" (internal quotation marks omitted)).

As the Fourth Circuit explained in *Driskill*, "courts have no jurisdiction to award

injunctive relief against the SBA.  Congress apparently included *this limitation to avoid*

*potential interference with and obstruction of the SBA's operations*, and the prohibition extends

not only to attachment, injunction, and garnishment, but also to 'other similar process.'"  901

F.2d at 386 (emphasis added).  The Fourth Circuit distinguished the language in the SBA waiver

of immunity from other agencies sovereign immunity waiver provisions, such as the Postal

Service, which did not exempt such injunctions.  *Id.*  Like the Fourth Circuit, the Second Circuit

has broadly interpreted this kind of anti-injunction provision. *See Volges v. Resolution Tr. Corp.*,

32 F.3d 50 (2d Cir. 1994). In *Volges*, the Second Circuit held that an analogous anti-injunction

provision in the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 barred

claims for injunctive relief against the Resolution Trust Company in the exercise of its statutory

powers. *Id.* As explained by the court of appeals, such an anti-injunction provision was "a direct

manifestation of Congress's intent to prevent courts from interfering with [that agency] in the

exercise of their statutory powers," and the fact that the agency's action "might violate some

other provision of law does not render the anti-injunction provision inapplicable." *Id.* at 52.

Given the mandate of *Volges*, district courts have held that Section 1082 of the the Higher

Education Act—which includes an anti-injunction provision with identical language to that in the

Small Business Act[15]—precludes "any" injunctive relief against the Secretary of Education, even

when the Secretary is alleged to have violated nondiscretionary duties. *Calise Beauty Sch., Inc. v.

Riley*, 941 F. Supp. 425, 430 (S.D.N.Y. 1996) ("[o]n its face, Section 1082 flatly prohibits the

issuance of any injunction against the Secretary in relation to his powers and duties under the

HEA" and collecting cases that have strictly applied the prohibitions of § 1082); *accord De La

Mota v. U.S. Dep't of Educ.*, No. 02 CIV. 4276 (LAP), 2003 WL 21919774, at *4 (S.D.N.Y.

Aug. 12, 2003).

---

[15] In pertinent part, the Higher Education Act provides that the Secretary of Education may be
"sue and be sued ... in any district court of the United States, and such district courts shall have
jurisdiction of civil actions arising under this part without regard to the amount in controversy
. . . ; but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be
issued against the Secretary or property under the Secretary's control." 20 U.S.C. § 1082(a)(2).

Nor do the decisions in *Dubrow v. Small Bus. Admin.*, 345 F.Supp. 4, 7 (C.D. Cal. 1972),

*Ulstein Mar., Ltd. v. United States*, 833 F.2d 1052 (1st Cir. 1987), or *DV Diamond Club of Flint,

LLC v. SBA*, 2020 WL 2315880 (E.D. Mich. May 11, 2020), provide a basis for departing from a

plain-reading of the text of Section 634(b).  *Dubrow* is inapposite.  To be sure, the district court,

in considering a motion for a preliminary injunction and a competing motion to dismiss, stated,

"when the Administrator acts beyond the scope of his authority 15 U.S.C. § 634(b) does not

preclude injunctive relief."  *Dubrow*, 345 F. Supp. at 7.  Yet this statement is merely dicta, as the

district court ultimately dismissed the action after concluding that the Administrator acted within

his authority.  *Id.* at 7, 8 ("I cannot conclude that the Administrator abused his discretion," and

"this Court would have to find that the Administrator abused his discretion . . . before I could

conclude that 15 U.S.C. § 634(b) does not preclude injunctive relief").[16]

Although the United States recognizes that this Court relied upon it in its TRO order, the

United States submits that *Ulstein* is similarly unpersuasive.  In that case, the plaintiff—a

disappointed bidder for a Navy contract—filed an action against the SBA and the Navy, seeking

judicial review of the SBA's decision to certify the competency of winning bidder and the

Navy's award of the contract.  *Ulstein*, 833 F.2d at 1053-54.  After a trial on the merits, the

district court set aside the SBA's certificate of competency for the winning bidder and ordered

the Navy to consider the next low bid.  *Id.* at 1054.  The Government then appealed, arguing that

"the declaratory judgment invalidating the SBA's certificate of competency, coupled with the

orders to the Navy . . ., are equivalent to an injunction against the SBA, and that such an

injunction is forbidden by 15 U.S.C. § 634(b)(1)."

---

[16] Indeed, it is curious that any plaintiff in this litigation would rely on *Dubrow*, as the case
primarily stands for the proposition that the Administrator of the SBA is afforded broad discretion
in developing rules for administering post-disaster loan programs.  *See id.*, at 8-9.

In affirming the district court's decision, the First Circuit first questioned whether the district court's order could properly be characterized as an injunction against the SBA, as opposed to a declaratory relief judgment. *Id*. at 1055 ("The only injunction issued by the district court was directed against the Navy," and it "need not be accepted" that the order was "the functional equivalent of an injunction against the SBA"). The First Circuit then cautioned against an overbroad interpretation of Section 634(b)(1). "To accept the government's argument [that Section 634(b)(1) bars declaratory relief when it operates as an indirect injunction] would mean that the SBA would be virtually immune from any judicial review, since practically any specific remedy (except pure money damages) can be recharacterized as equivalent, at least indirectly, to some sort of injunction." *Id*. at 1056. Such was not the purpose of the limitation on the waiver of immunity in Section 634(b)(1) according to the First Circuit. Instead, the purpose was to bar relief that interferes with "internal agency operations." *Id.* at 1057. Because the order declaring invalid the SBA's certificate of competency did not require that the SBA take action or otherwise interfere with internal agency operations, the First Circuit held that the district court acted within its jurisdiction. *Id*. at 1058. In addition, the First Circuit's rationale underlying the *Ulstein* decision does not apply here because in *Ulstein*, the dispute arose out of a government contract dispute for which it was determined that the Tucker Act provided an independent sovereign immunity waiver that should be applied to avoid an "irrational anomaly" between the sovereign immunity waiver in the Court of Federal Claims and the district courts. *Id.* at 1058; *Turner v. U.S. Small Business Admin.*, No. 4:00-CV-833 CAS, 2001 WL 1346016 (E.D. Mo. Sept. 10, 2001) (distinguishing *Ulstein*).

Put another way, the relief at issue in *Ulstein* is quite different than the relief sought here. In *Ulstein*, the plaintiff was awarded a declaratory judgment after a trial on the merits,

whereas Plaintiff in this case seeks a preliminary injunction through a motion.  In *Ulstein*, the district court's order did not direct the SBA to do anything.  Here, the injunction at issue requires that SBA change its rules for reviewing and processing Plaintiff's PPP Loan.  In *Ulstein*, the relief at issue did not interfere with internal agency operations.  Here, the proposed order includes detailed instructions on how internal operations are to be conducted.  Given these clear differences, *Ulstein* provides no support for the Plaintiff in this case.

That leaves *DV Diamond Club*.  *DV Diamond Club* is a district court decision out of Michigan that is not binding on this Court, does not address the bankruptcy exclusion at issue here, and, in any event, was wrongly decided.  While *DV Diamond Club* cited *Ulstein* as a basis for a waiver of sovereign immunity, the district court offered no independent analysis as to whether the injunctive relief would or would not interfere with internal agency operations.  *DV Diamond Club*, 2020 WL 2315880 at *7-8 (concluding without explanation that plaintiffs "do not seek to . . . interfere with [the SBA's] internal operations").  Remarkably, the district court also suggested that the SBA's defense was somehow rendered moot by the fact that the plaintiffs also sued the United States and Steven Mnuchin "and those Defendants 'do not claim to be immune from injunctive relief.'"  *Id*. at 8.  Here, the SBA and its Administrator is the only defendant, and the SBA is immune to injunctive relief that interferes with internal operations.  Accordingly, this Court lacks subject matter jurisdiction to address Plaintiff's claim.

Finally, although this Court concluded with respect to the TRO that 11 U.S.C. § 106 waives sovereign immunity for claims under section 525, that waiver could not possibly apply to Plaintiff's claims under the APA.  Moreover, even with respect to the claims under section 525, any sovereign immunity waiver cannot be said to "unequivocally" permit claims for injunctions that would not be permissible under 15 U.S.C. § 634(b), because section 106(a)(4) limits that

sovereign immunity waiver to exclude claims for relief that would not be available against a

governmental agency outside of bankruptcy.[17]  11 U.S.C. § 106(a)(4) ("The enforcement of any

such order, process, or judgment against any governmental unit shall be consistent with

appropriate nonbankruptcy law applicable to such governmental unit."); *see Kuhl v. United

States*, 467 F.3d 145, 148-49 (2d Cir. 2006) (limitations on sovereign immunity waiver under

the Tax Code barred suit in bankruptcy court brought by debtor against IRS); *In re Rivera

Torres*, 432 F.3d 20 (1st Cir. 2005) (noting that types of relief encompassed in the sovereign

immunity waiver may be limited by section 106(a)(4) in determining that sovereign immunity

barred award of emotional distress damages against IRS).  Notably, Congress also purposely

excluded section 541 from the list of Bankruptcy Code sections falling within the waiver of

sovereign immunity under section 106(a)(1), clarifying that the waiver does not broadly permit

suits against the government just because the claims may constitute property of the estate.  140

Cong. Rec. H10, 766 (daily ed. Oct. 4, 1994) ("This allows the assertion of bankruptcy causes of

action, but specifically excludes causes of action belonging to the debtor that become property

of the estate under section 541.").  Plaintiff's contention that section 105 of the Bankruptcy

Code provides authority for this Court is also unavailing that section 105 does not provide for a

sovereign immunity waiver, because sovereign immunity waivers must be explicit  and section

106 is the only explicit sovereign immunity waiver in the Bankruptcy Code. Accordingly,

Plaintiff cannot obtain injunctive relief on any of its claims.

---

[17] Also, section 106(a)(5) clearly provides that this sovereign immunity waiver does not provide
a substantive claim for relief or subject matter jurisdiction where it does not otherwise lie.  11
U.S.C. § 106(a)(5) ("Nothing in this section shall create any substantive claim for relief or cause
of action not otherwise existing under this title, the Federal Rules of Bankruptcy Procedure, or
nonbankruptcy law.").

**V.      PLAINTIFF'S CLAIMS ALSO FAIL BECAUSE IT HAS NOT SATISFIED THE REQUIREMENTS FOR A PERMANENT INJUNCTION**

Even if the Court were to hold that Plaintiff's claims did not fail on the merits as a matter of law or under the doctrine of sovereign immunity did not apply, Plaintiff still would not be entitled to a permanent injunction because it has not established the required elements for such relief.

To obtain a permanent injunction, a plaintiff must demonstrate:

(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-57 (2010); *see also CoxCom, Inc. v. Chaffee*, 536 F.3d 101, 112 (1st Cir. 2008) (similar).  Plaintiff has not come close to meeting its burden.

The First Circuit has "consistently emphasized the importance of a showing of irreparable harm in the calculus of injunctive relief." *E.E.O.C. v. Astra U.S.A.*, 94 F.3d 738, 743 (1st Cir.1996).  Furthermore, "[a] finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.,* 370 F.3d 151, 162 (1st Cir. 2004).  In addition, "[i]t is a longstanding axiom that 'economic harm in and of itself is not sufficient to constitute irreparable injury.'"  *Office Max Inc. v. County Qwik Print, Inc.*, 709 F. Supp. 2d 100, 113 (D. Me. 2010).

Plaintiff relies on the May 6, 2020 Unsworn Statement of Miguel Perez ("Statement"), which does not meet these exacting standards for demonstrating that irreparable harm.  The Statement simply speculates that Plaintiff's "business of manufacturing animal feed, recycling of

38

organic waste and generating electricity with propane gas," Statement ¶ 8, "could end up having

to cease operation," *id.* ¶14, if an injunction is not granted.  But, once again, Plaintiff has

attached no evidence to support this bare assertion.  Plaintiff does make vague assertions that

lay-offs may result or that the lack of employees could potentially lead to risks to the

environment.  Statement ¶ 14-16.  But no financial or other supporting data is attached to support

these statements.  Such vague assertions of potential harms are not the kind of tangible and

imminent harms required to meet the irreparable harm standard.  "The applicant must establish

more than a mere 'possibility' of irreparable harm."  *Shady v. Tyson*, F. Supp. 2d 102, 105

(S.D.N.Y. 1998).  "The party seeking injunctive relief must show that the injury complained of is

of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable

harm."  *Id.*

Plaintiff's submission also makes clear the financial difficulties referenced in the

Statement submitted pre-existed the COVID-19 crisis and were not directly caused by any failure

to obtain financing now from the PPP.  For instance, the Statement notes that the financial

problems stem in part from the breakdown of a generator that predated the COVID-19 crisis.

Statement ¶ 11.  Plaintiff has thus not demonstrated that the financial circumstances it references

were caused by its inability to obtain a PPP loan as opposed to pre-existing circumstances.

Moreover, if additional capital is what Plaintiff now needs to remain in business, the Statement

contain any details regarding what Plaintiff has done to seek funding from alternative sources.

Presumably, recognizing that even if deemed eligible for a PPP loan, Plaintiff might not receive

one, Plaintiff should be able to describe Herculean efforts to obtain alternative financing that

have left it no option but a PPP loan.  But, Plaintiff's submissions are silent as to such effort –

there is not even a discussion of Plaintiff seeking additional financing from any other lender.

Likewise, as the Court is aware, Plaintiff does not explain in any level of detail how failure to get a PPP loan will impact the bankruptcy estate or alter the Chapter 11 administration.

While Defendant is sympathetic to the fact that nearly all business are struggling as a result of the ongoing pandemic, Plaintiff's submission relies entirely on speculative assertions of future financial injury, which cannot satisfy the irreparable harm standard.  *See*, *e.g.*, *Charlesbank Equity Fund II*, 370 F.3d at 162 ("A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store."); *Ross-Simons of Warwick, Inc.*, 102 F.3d at 19 ("[A] preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm."); Therefore, Plaintiff has not met its burden with respect to the irreparable harm element. Furthermore, the balance of the hardship and public interest elements, weigh in favor of denying injunctive relief for all the reasons set forth in Defendant's previous briefing.  For this reason too, Plaintiff's claims should be barred as a matter of law.

## CONCLUSION

For the foregoing reasons, each of Plaintiff's Claims fails as a matter of law.

Dated: June 15, 2020                    Respectfully submitted,


                                        UNITED STATES OF AMERICA

                                        JOSEPH H. HUNT
                                        Assistant Attorney General
                                        Civil Division

                                        *W. STEPHEN MULDROW*
                                        United States Attorney

                                        *s/Rafael J. López-Rivera*
                                        Rafael J. López-Rivera
                                        Assistant United States Attorney
                                        USDC-PR No. 221213

UNITED STATES ATTORNEY'S OFICE
Torre Chardón, Suite 1201
350 Carlos Chardón Street
San Juan, Puerto Rico 00918
Phone Number: (787)766-5656
Facsimile: (787)766-6219
rafael.j.lopez@usdoj.gov

Pedro Jaime López-Bergollo
Special Assistant US Attorney
USDC No. 231412
273 Ponce de León Ave., Suite 510
Plaza 273
San Juan, PR 00917-1930
Tel.: 787-766-5269
Email: pedro.lopez-bergollo@sba.gov

RUTH A. HARVEY
Director
MARGARET M. NEWELL
Assistant Director
MICHAEL TYE
Trial Attorney (G03112)
United States Department of Justice
Commercial Litigation Branch,
Civil Division
P.O. Box 875, Ben Franklin Station
Washington, DC 20044-0875
 (202) 305-2419
Michael.Tye@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on June 15, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants.

<u>/s/ Michael Tye</u>

Commercial Litigation Branch
Civil Division
United States Department of Justice