**Approved as modified by the Court.**

**Dated: June 12, 2020**

**Paul Sala, Bankruptcy Judge**

# IN THE UNITED STATES BANKRUPTCY COURT

## THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 Proceedings |
| ANDES INDUSTRIES, INC., | Case No.: 2:19-bk-14585-PS<br>Joint Administration With |
| PCT INTERNATIONAL, INC., | Case No. 2:19-bk-14586-PS |
|    Debtors. | Adv. No: 2:20-ap-00118-PS |
| This filing applies to:<br>   ___ Both Debtors<br>    X  PCT International<br>   ___ Andes International | **DECLARATORY JUDGMENT FINDING THAT DEFENDANT SMALL BUSINESS ADMINISTRATION'S PROHIBITION AGAINST DEBTORS IN BANKRUPTCY FROM PARTICIPATING IN THE PAYCHECK PROTECTION PROGRAM IS UNENFORCEABLE AND IS SET ASIDE** |
| PCT INTERNATIONAL, INC.,<br>   Plaintiff,<br><br>v.<br><br>JOVITA CARRANZA, IN HER CAPACITY AS ADMINISTRATOR FOR THE U.S. SMALL BUSINESS ADMINISTRATION,<br><br>   Defendant. | |

     Based upon the Court's findings of fact and conclusions of law placed on the record at the hearing held on June 12, 2020 at 12:30 p.m., which are incorporated herein by this

1 | reference,

2 | IT IS HEREBY ORDERED AND JUDGMENT IS HEREBY ENTERED as follows:

3 | A. This Court has jurisdiction over this adversary proceeding pursuant to 28

4 | U.S.C. §§ 157 and 1334(b) because it arises under 11 U.S.C. §§ 101 et seq. (the "Bankruptcy

5 | Code") and arises in a case under the Bankruptcy Code.

6 | B. This is a core matter pursuant to 28 U.S.C. § 157(b)(2)(A), (D), and (O).

7 | C. The rules, regulations and forms adopted, posted and/or promulgated by

8 | Defendant Small Business Administration ("SBA"), which prevent or preclude entities that

9 | are in a bankruptcy proceeding or are "presently involved in any bankruptcy" (collectively,

10 | the "No Bankruptcy Requirement") from participating in the "Paycheck Protection Program"

11 | ("PPP") implemented as part of the Coronavirus Aid, Relief, and Economic Security Act,

12 | H.R. 748 (the "CARES Act") are "in excess of statutory jurisdiction, authority, or

13 | limitations, or short of statutory right" (5 U.S.C. § 706(2)(A)).

14 | D. The No Bankruptcy Requirement is, therefore, unlawful and is hereby set

15 | aside.

16 | E. The SBA, and anyone acting in concert with or at the direction of the SBA,

17 | including any lender from whom PCT International, Inc. ("PCT" or "Plaintiff") seeks a PPP

18 | loan may not deny Plaintiff a loan under the PPP based on Plaintiff's status as a chapter 11

19 | debtor or based on the words "or presently in bankruptcy" on Plaintiff's PPP Application or

20 | the PPP lender's application.

21 | F. All references to Plaintiff's status as being involved in any bankruptcy shall be

22 | removed from its PPP Application, and from any PPP loan policies and procedures and PPP

23 | loan agreements relating to Plaintiff.

24 | G. All lending institutions administering PPP loans to which Plaintiff has

25 | submitted a PPP Application are instructed that Plaintiff is not excluded from the PPP

26 | loan program on account of Plaintiff's involvement in this Bankruptcy Case.

27 |
28 | H. Plaintiff is authorized to submit a PPP Application, and/or any other

documents necessary for the processing of the PPP Application, to a participating lender of its choosing with the words "or presently involved in any bankruptcy" stricken from the PPP Application and without any reference to this Bankruptcy Case, and any lender shall consider such PPP Application and other documentation to be complete and accurate.

I.      This declaratory judgment is a final judgment and order and there is no just reason for delaying its implementation.

SO ORDERED AND ADJUDGED as of the date set forth above.

ORDERED.

Dated:  June 08, 2020

*Michael G. Williamson*

Michael G. Williamson
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Case No. 8:19-bk-04971-MGW |
| | Chapter 11 |
| Gateway Radiology Consultants, P.A., | |
| Debtor. | |
| _____/ | |
| | |
| Gateway Radiology Consultants, P.A., | Adv. No. 8:20-ap-00330-MGW |
| Plaintiff, | |
| v. | |
| Jovita Carranza, in her capacity as Administrator for the U.S. Small Business Administration, et al., | |
| Defendants. | |
| _____/ | |

## MEMORANDUM OPINION ON CHAPTER 11 DEBTOR'S ELIGIBLITY FOR PAYCHECK PROTECTION PROGRAM LOANS

Because of the economic uncertainty caused by COVID-19, more than 20

million Americans have lost their jobs. To keep American workers employed, and to

make sure they get paid, Congress passed the CARES Act, the largest stimulus
package in history. At the heart of the CARES Act is the Paycheck Protection
Program, which provides hundreds of billions of dollars in funding to small
businesses to cover payroll, mortgage interest, rent, and utility costs.

Although referred to as PPP "loans," the Paycheck Protection Program
functions like a grant. So long as a PPP borrower uses the "loan" for covered
expenses (payroll, mortgage interest, rent, and utilities) the entire "loan" is forgiven.
Because the loans are designed to be forgiven, both Congress and the SBA
Administrator have dispensed with the underwriting typically required for SBA
loans.

Even so, the SBA has promulgated a rule disqualifying debtors from
participating in the Paycheck Protection Program because they supposedly pose an
unacceptably high risk of using PPP "loans" for noncovered expenses, as well as an
unacceptably high risk of not repaying any unforgiven amounts. Gateway Radiology
Consultants, P.A., a chapter 11 debtor, asks the Court to enjoin the SBA
Administrator from disqualifying it from participating in the Paycheck Protection
Program.

The Court concludes that the SBA Administrator exceeded her authority when
she promulgated the rule disqualifying Gateway Radiology from the Paycheck
Protection Program. In order for a borrower to be eligible for a PPP Loan, Congress
could have required borrowers to certify that they are not in bankruptcy. But
Congress chose not to. By engrafting onto the Paycheck Protection Program a

2

requirement that Congress chose not to insist on, the SBA Administrator exceeded her statutory authority.

Even if the SBA Administrator had not exceeded her authority, the rule disqualifying Gateway Radiology from participating in the Paycheck Protection Program is arbitrary and capricious because:

- the SBA Administrator considered factors Congress did not intend her to consider (i.e., collectability);

- the SBA Administrator failed to consider an important aspect of the problem (i.e., how the bankruptcy process promotes the same public policy as the CARES Act and how it makes it unlikely a chapter 11 debtor will use a PPP "loan" for noncovered expenses); and

- the SBA Administrator's explanation for her rule is contrary to the evidence before her (i.e., chapter 11 debtors are less likely to use PPP "loans" for noncovered expenses and more likely to repay PPP "loans").

The Court will therefore enjoin the SBA Administrator from disqualifying Gateway Radiology from participating in the Payroll Protection Program.

# I.   BACKGROUND[1]

## A.   COVID-19 caused the loss of more than 20 million jobs and threatened the loss of millions more.

On March 13, 2020, the President declared a national emergency.[2] Just three months earlier, Chinese officials detected an outbreak of a novel strain of coronavirus (known as COVID-19) in Wuhan, China.[3] The disease quickly spread to the United States and other countries. By mid-March, when the President declared a national emergency, the United States had almost 2,000 confirmed COVID-19 cases,[4] and the disease's rapid spread—thousands of new cases were being reported each day—was threatening to strain the nation's healthcare system.[5]

---

[1] The background section of this opinion recounts the fallout from the COVID-19 pandemic. Under Federal Rule of Evidence 201, the Court may, on its own, take judicial notice of facts that are generally known within its territorial jurisdiction or facts that can accurately and readily be determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b), (c). That includes publicly available data, such as labor statistics. *Tuttle v. Educ. Credit Mgmt. Corp. (In re Tuttle)*, 600 B.R. 783, 806 (E.D. Wis. 2019). It can also include other statistics compiled by government agencies, such as the number of COVID-19 cases when the parties don't dispute the number (or, if they do, the existence of publications containing the number of cases) and public statements about COVID-19, such as the President's declaration of a national emergency. *McGhee v. City of Flagstaff*, 2020 WL 2309881, at *3 – 4 (D. Ariz. May 8, 2020).

[2] https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

[3] https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/q-a-coronaviruses.

[4] https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

[5] https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

To keep our country's healthcare system from being overwhelmed, and to stem

the tide of what had become a global pandemic, the United States started

implementing social distancing measures. Those measures included statewide Stay-

at-Home orders; closing schools; closing non-essential businesses; banning large

gatherings; and limiting restaurants to takeout or delivery.[6] While necessary to

"flatten the curve,"[7] the social distancing measures came with a cost.

Personal consumption in March 2020 fell by 7.5%—the largest recorded drop

in history.[8] And nonfarm employment dropped by almost 900,000 jobs, before

plummeting by more than 20 million jobs in April.[9] Those job losses were

widespread: the leisure and hospitality industry lost 7.7 million jobs (almost half the

industry), while the education and health services industry; the professional and

business services industry; and the retail trade industry each lost more than 2 million

---

[6] https://www.kff.org/health-costs/issue-brief/state-data-and-policy-actions-to-address-coronavirus/.

[7] "The term "flatten the curve," originating from the Centers for Disease Control and Prevention, has been used widely to describe the effects of social distancing interventions." Laura Matrajt & Tiffany Leung, *Evaluating the Effectiveness of Social Distancing Interventions to Delay or Flatten the Epidemic Curve of Coronavirus Disease*, Emerging Infectious Diseases, August 2020, *available at* https://wwwnc.cdc.gov/eid/article/26/8/20-1093_article#r26.

[8] https://www.bea.gov/news/2020/personal-income-and-outlays-march-2020; *see also* Carlie Porterfield, *U.S. Consumer Spending Sees Sharpest Monthly Drop Ever Recorded*, Forbes, Apr. 30, 2020, *available at* https://www.forbes.com/sites/carlieporterfield/2020/04/30/us-consumer-spending-sees-sharpest-monthly-drop-ever-recorded/#469a619420da ("Consumer spending—which drives around 70% of the U.S. economy—dropped by 7.5% in March, the steepest drop in history since records began being kept in 1959 according to the U.S. Commerce Department, as businesses close, layoffs abound and Americans shelter-in-place during the coronavirus pandemic").

[9] https://www.bls.gov/news.release/empsit.nr0.htm.

jobs.[10] As a result, the unemployment rate skyrocketed from 4.4% to 14.7%—the largest single-month increase in history.[11]

### B. Congress provided nearly $350 billion in funding for forgivable loans so small businesses could make payroll.

To provide emergency relief to American workers and small businesses, Congress passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act").[12] Although the CARES Act was intended, in part, to help American workers who had already lost their job, much of the $2 trillion in relief provided for under the CARES Act was intended to preserve American jobs.[13] Two of the ways it did so are relevant here.

First, as part of a $454 billion relief package, Congress directed the Treasury Department to provide financing to lenders who make direct loans to mid-size businesses (businesses with between 500 and 10,000 employees).[14] In exchange for

---

[10] https://www.bls.gov/news.release/empsit.nr0.htm.

[11] https://www.bls.gov/news.release/empsit.nr0.htm.

[12] Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020).

[13] *Id.* at §§ 1102, 4003; *see also* 166 Cong. Rec. E349-04 (daily ed. Mar. 27, 2020) (speech of Rep. McHenry) ("My ultimate goal for this legislation is to keep Americans employed. Specifically, this bill will provide relief to our small businesses to help them keep employees on payroll and prepare those businesses to be up and running as soon as America is open for business again"); 166 Cong. Rec. E339-01 (daily ed. Mar. 27, 2020) (speech of Rep. Jayapal) ("One of the most important things I heard from my district was the pain and suffering of small business owners and non-profits of all sizes. The CARES Act creates a Payment Protection Program that helps businesses keep workers on payroll, through $350 billion in forgivable loans that can also be used for payroll, rent, utilities, and other necessary costs that will help small businesses weather the crisis.").

[14] CARES Act, Pub. L. No. 116-136, § 4003(b)(4), 134 Stat. 281 (2020) (to be codified at 15 U.S.C. § 9042).

favorable repayment terms, borrowers have to agree to retain or restore 90% of their workforce.[15] To be eligible for the mid-size loan program, a borrower has to certify (among other things) that it is not a debtor in bankruptcy.[16]

Second, for small businesses (those with 500 employees or fewer), Congress initially provided $349 billion in funding for the Paycheck Protection Program.[17] Under the Paycheck Protection Program, eligible small businesses can borrow up to two and a half times their average monthly payroll.[18] The loan proceeds can be used to pay:

- payroll costs;
- group health benefits and insurance premiums; and
- mortgage interest, rent, and utilities.[19]

Although the Paycheck Protection Program refers to the financing as a "loan," in all respects it operates as a grant. That's because the Paycheck Protection Program provides generous loan forgiveness: if the borrower uses the loan proceeds for payroll

---

[15] *Id.* at § 4003(c)(3)(D).

[16] *Id.* at § 4003(c)(3)(D)(i)(V).

[17] *Id.* at §§ 1102, 1107; *see also DV Diamond Club of Flint, LLC v. U.S. SBA*, 2020 WL 2315880, at *3 (E.D. Mich. May 11, 2020) ("The SBA quickly exhausted the initial $349 billion in loan guarantees, and Congress then appropriated an additional $310 billion for loan guarantees under the PPP.") (citing The Paycheck Protection and Health Care Enhancement Act, Pub. L. No. 116-139, 134 Stat. 620, § 101(a)(1)." *Id.*

[18] 15 U.S.C. § 636(a)(36)(E).

[19] 15 U.S.C. § 636(a)(36)(F)(i). The proceeds can also be used to pay interest on certain debt obligations incurred before February 15, 2020. *Id.*

and other approved expenses (referred to as "covered expenses"), the entire loan will

be forgiven.[20]

Congress imposed few requirements on borrowers and lenders participating in

the Paycheck Protection Program. To be eligible for a PPP Loan, a borrower need

only be a small business concern or a nonprofit organization, veterans organization,

or Tribal business concern with fewer than 500 employees.[21] When applying for a

PPP Loan, a borrower must also certify that:

- because of the economic uncertainty caused by COVID-19, the business needs the PPP Loan for its ongoing operations;
- the business will use the PPP Loan proceeds to retain workers and maintain payroll or make mortgage interest, lease, and utility payments; and
- between February 15, 2020 and December 31, 2020, the business has not and will not receive another PPP Loan.[22]

Unlike it does for the mid-size loan program, the CARES Act does not require a

small business applying for a PPP Loan to certify that it is not a debtor in

bankruptcy.

In deciding whether to approve a PPP Loan, SBA lenders need only consider

two criteria: (1) Was the borrower operating on February 15, 2020?; and (2) Did the

employer have employees for whom it paid salaries and payroll taxes (or did it have

---

[20] CARES Act, Pub. L. No. 116-136, § 1106, 134 Stat. 281 (2020) (to be codified at 15 U.S.C. § 9005). The bulk of the loan proceeds, though, must be used for payroll: no more than 25% of the amount forgiven may be for non-payroll expenses.

[21] 15 U.S.C. § 636(D).

[22] 15 U.S.C. § 636(G)(i)(I) – (IV).

paid independent contractors)?[23] Congress did not direct SBA lenders, to whom

Congress delegated the SBA Administrator's authority to make and approve PPP

Loans, to consider whether a borrower was in bankruptcy.[24]

### C. Congress authorizes the Small Business Administration to implement the Paycheck Protection Program.

More than 65 years ago, Congress created the Small Business Administration

to aid, assist, and protect the interests of small businesses.[25] Because the country's

security and economic well-being hinges on maximizing the potential of small

businesses,[26] Congress has committed to using all reasonable means to create and

sustain programs that promote investment in small businesses—including

investments that expand employment opportunities.[27]

This is mainly accomplished by the SBA providing financial assistance to

small businesses—in the form of direct loans, joint loans with a lender, or loan

guarantees—under § 7(a) of the Small Business Act. Under § 7(a), loans must be of

"such sound value or so secured as reasonably to assure repayment."[28]

---

[23] 15 U.S.C. § 636(F)(ii)(II).

[24] *Id.*

[25] 15 U.S.C. § 631(a) (declaring that "[i]t is the declared policy of the Congress that the Government should aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns in order to preserve free competitive enterprise").

[26] *Id.*

[27] 15 U.S.C. § 631a(b).

[28] 15 U.S.C. § 636(a)(6).

To determine whether a loan is sound, the SBA ordinarily considers the following criteria set forth in 13 C.F.R. § 120.150: the applicant's character, reputation, and credit history; the experience and depth of management; the strength of the business; past earnings, projected cash flow, and future prospects; the ability to repay the loan with business earnings; whether the business has sufficient equity to operate on a sound basis; the potential for long-term success; and the nature and value of collateral securing the loan.[29]

When Congress passed the CARES Act, it placed the Paycheck Protection Program under § 7(a) of the Small Business Act and authorized the Administrator to issue regulations to carry out the Paycheck Protection Program.[30]

### D. The SBA Administrator's interim final rule clarified that PPP Loans do not require underwriting.

On April 15, 2020, the Administrator promulgated an interim final rule for the Paycheck Protection Program. As you might expect in the case in which a loan is designed to be forgiven, the SBA's interim final rule clarified that its normal underwriting guidelines have gone by the wayside for PPP Loans:

> [F]or loans made under the PPP, SBA will not require the lenders to comply with section 120.150.[31]

---

[29] 13 C.F.R. § 120.150.

[30] CARES Act, Pub. L. No. 116-136, § 1102(a), 134 Stat. 281 (2020).

[31] Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20,811, 20,812 (Apr. 15, 2020) (to be codified at 13 C.F.R. pt. 120).

Under the SBA's interim final rule, lenders need only do five things to underwrite a PPP Loan: (1) confirm receipt of the borrower's certifications; (2) confirm receipt of information showing that a borrower had employees for whom the employer paid salaries and payroll taxes; (3) confirm the dollar amount of the business' average monthly payroll costs; (4) follow Bank Secrecy Act requirements; and (5) review the "Paycheck Protection Application Form."[32] That's it.

The interim final rule also confirmed the CARES Act's minimal certification requirements for PPP Loans. Like the CARES Act, the SBA's interim rule did not require borrowers to certify that they were not involved in a bankruptcy case.

### E.    The SBA decides that debtors are ineligible for PPP Loans.

On April 28, 2020, the SBA issued another interim final rule supplementing its previous one ("Supplemental Rule"). In the Supplemental Rule, the SBA declared for the first time that debtors in bankruptcy are ineligible for PPP Loans.[33] The SBA's meager justification for the Supplemental Rule's new eligibility requirement was that debtors are more likely to use a PPP Loan for noncovered expenses and less likely to be able to repay an unforgiven loan:

> The Administrator, in consultation with the Secretary, determined that providing PPP loans to debtors in bankruptcy would present an unacceptably high risk of an unauthorized use of funds or non-repayment of unforgiven

---

[32] *Id.* at 20,815.

[33] Business Loan Program Temporary Changes; Paycheck Protection Program—Requirements—Promissory Notes, Authorization, Affiliation, and Eligibility, 85 Fed. Reg. 23450, 23,451 (Apr. 28, 2020) (to be codified at 13 C.F.R. pts. 120 and 121).

loans. In addition, the Bankruptcy Code does not require
any person to make a loan or a financial accommodation
to a debtor in bankruptcy. . . .[34]

### F.   Even though Gateway Radiology is in bankruptcy, its PPP Loan Application was approved.

Gateway Radiology Consultants operates an outpatient imaging, diagnostic, and interventional radiology center in St. Petersburg, Florida.[35] In May 2019, Gateway Radiology was forced into chapter 11 bankruptcy because of a failed expansion in Lake Wales, which snowballed into litigation with its medical equipment supplier, as well as its primary lender. A year after filing for bankruptcy, Gateway Radiology applied online for a PPP Loan through USF Federal Credit Union.

The first question on the PPP Loan application asked whether Gateway Radiology was in bankruptcy. Gateway Radiology claims it answered "yes." But Gateway Radiology says when it received a hard copy of its PPP Loan application to sign, it discovered the answer to the first question had been changed to "no." It says the Credit Union admitted that one of its employees had to "upload the application," with the implication being a Credit Union employee changed the answer to Question No. 1. For its part, the Credit Union provided an audit summary that appears to

---

[34] *Id.*

[35] Doc. No. 2 at 1 – 2.

show that Gateway Radiology incorrectly answered that it was not involved in a bankruptcy proceeding.[36]

The Court need not decide whether Gateway Radiology truthfully answered Question No. 1. It's irrelevant to the ultimate issue this Court must decide. Suffice it to say the Credit Union approved Gateway Radiology's PPP Loan application in the amount of $527,710 based on its mistaken understanding that Gateway Radiology was not in bankruptcy.

### G.    The SBA objects to Gateway Radiology's PPP Loan.

Two weeks later, Gateway Radiology asked the Court to approve the PPP Loan under Bankruptcy Code § 364, which requires a debtor to obtain court approval of postpetition financing outside the ordinary course of business.[37] In its postpetition financing motion, Gateway Radiology explained that it needs the PPP Loan proceeds to fund its operations. Gateway Radiology represented that it intended to use the loan proceeds for covered—i.e., forgivable—expenses.[38]

Although the SBA did not object to Gateway Radiology applying for a PPP Loan or otherwise obtaining postpetition financing, it did object to the entry of any order finding that Gateway Radiology is eligible to participate in the Paycheck Protection Program, that the loan approved by the Credit Union is entitled to loan

---

[36] Adv. Doc. No. 9-1.

[37] 11 U.S.C. § 364.

[38] Doc. No. 238 at ¶ 9.

forgiveness, or that the SBA is required to guarantee the loan.[39] According to the SBA Administrator, the Supplemental Rule bars Gateway Radiology from obtaining a PPP Loan because Gateway Radiology is a debtor in bankruptcy.

## II.   CONCLUSIONS OF LAW

Gateway Radiology filed this proceeding seeking a declaration that the Supplemental Rule is unenforceable for three reasons: First, Gateway Radiology contends that the SBA Administrator exceeded her authority in promulgating the Supplemental Rule.[40] Second, even if the SBA Administrator did not exceed her authority, Gateway Radiology contends that the Supplemental Rule is arbitrary and capricious.[41] Third, Gateway Radiology contends that the Supplemental Rule violates Bankruptcy Code § 525, which generally forbids a governmental entity from discriminating against a person because the person is a debtor in bankruptcy.[42] Because it contends that the Supplemental Rule is unenforceable, Gateway Radiology asks the Court to enjoin the SBA Administrator from enforcing the Supplemental Rule to the extent that it disqualifies Gateway Radiology from obtaining PPP Loans.[43]

---

[39] Doc. No. 249.

[40] Adv. Doc. No. 3 at ¶¶ 13, 29.

[41] *Id.* at ¶¶ 13.

[42] *Id.* at ¶¶ 19 – 21.

[43] *Id.* at ¶¶ 29.

14

The SBA Administrator maintains that injunctive relief is inappropriate for two reasons.[44] First, as a threshold matter, the SBA Administrator says sovereign immunity bars this Court from enjoining her from enforcing the Supplemental Rule. Second, the SBA Administrator says Gateway Radiology cannot show a substantial likelihood of success on the merits of its claims; that it will suffer irreparable harm if the Court does not enjoin the SBA Administrator from enforcing the Supplemental Rule; or that enjoining enforcement of the Supplemental Rule would promote the public interest. The Court disagrees.

### A. Sovereign immunity does not bar this Court from enjoining the SBA Administrator from enforcing the Supplemental Rule.

There is no question that when Congress created the SBA, it waived sovereign immunity so that the SBA "could sue and be sued."[45] But there was a caveat: even though Congress provided that the SBA could sue or be sued, 15 U.S.C. § 634(b)(1)

---

[44] The SBA also raises a third reason—lack of standing. According to the SBA Administrator, Gateway Radiology merely seeks an order requiring her to find that Gateway Radiology cannot be excluded from the Paycheck Protection Program. Because the Credit Union has approved the loan, Gateway Radiology has not been excluded from the Paycheck Protection Program. Thus, the SBA Administrator reasons, Gateway Radiology has suffered no injury-in-fact. That argument borders on frivolous. The loan that was approved is eligible for loan forgiveness and is guaranteed by the SBA. Unless the SBA Administrator is willing to stipulate that Gateway Radiology's PPP Loan is guaranteed by the SBA and eligible for loan forgiveness, which so far she has been unwilling to do, then the Credit Union will not unfreeze the loan proceeds. It is self-evident, then, that Gateway Radiology has suffered an injury-in-fact. The SBA Administrator's standing argument deserves no further discussion.

[45] 15 U.S.C. § 634(b)(1) (providing that "[i]n the performance of, and with respect to, the functions, powers, and duties vested in [her] by this chapter the Administrator may . . . sue and be sued in any court of record of a State having general jurisdiction, or in any United States district court, and jurisdiction is conferred upon such district court to determine such controversies without regard to the amount in controversy").

provides that "no attachment, *injunction*, garnishment, or other similar process . . .
shall be issued against the Administrator."[46]

At first glance, § 634(b)(1) appears plain and unambiguous. "No injunction"
means no injunction. And many courts have read § 634(b)(1) that way.[47] But that
view is far from universal.[48] Indeed, courts are split over whether the scope of the
"no injunction" language in § 634(b)(1). Some courts hold that § 634(b)(1) bars
injunctions in all circumstances, while other courts hold that § 634(b)(1) does not bar
a court from enjoining an agency that has exceeded its statutory authority.[49]

So far, the Eleventh Circuit has not weighed in on the debate. But, according
to the SBA, the Fifth Circuit has twice held—first in *Romeo v. U.S.*[50] and later in

---

[46] *Id.* (emphasis added).

[47] *Ulstein Maritime, Ltd. v. U.S.*, 833 F.2d 1052, 1056 (1st Cir. 1987) ("Some courts have read the wording in this way, and concluded that all injunctive relief directed at the SBA is absolutely prohibited.") (citing *Valley Constr. Co. v. Marsh,* 714 F.2d 26, 29 (5th Cir. 1983); *Mar v. Kleppe,* 520 F.2d 867, 869 (10th Cir. 1975); *Romeo v. United States,* 462 F.2d 1036, 1038 (5th Cir. 1972), *cert. denied,* 410 U.S. 928 (1973); *Expedient Servs., Inc. v. Weaver,* 614 F.2d 56, 58 (5th Cir. 1980); *Jets Servs., Inc. v. Hoffman,* 420 F. Supp. 1300, 1308–09 (M.D. Fla. 1976)).

[48] *Ulstein Maritime*, 833 F.2d at 1056 ("However, other courts have found that § 634(b)(1) does not bar injunctions in all circumstances.") (citing *Cavalier Clothes v. United States,* 810 F.2d 1108, 1112 (Fed. Cir. 1987); *Okla. Aerotronics v. United States,* 661 F.2d 976, 977 (D.C. Cir. 1981); *Related Indus. v. United States,* 2 Cl. Ct. 517, 522 (1983); *Dubrow v. SBA,* 345 F. Supp. 4, 7 (C.D. Cal. 1972)).

[49] *DV Diamond Club of Flint, LLC v. U.S. SBA,* 2020 WL 2315880, at *3 – 4 (E.D. Mich. May 11, 2020) (ruling that the "Court is persuaded that injunctive relief is available to Plaintiffs" because "Plaintiffs here seek only to 'set aside unlawful agency action'"); *Camelot Banquet Rooms, Inc. v. U.S. SBA,* 2020 WL 2088637, at *3 – 4 (E.D. Wis. May 1, 2020); *see also Elks Assocs. Funding Corp. v. U.S. SBA,* 858 F. Supp. 2d 1, 20 (explaining that courts in the D.C. Circuit "have strongly intimated that injunctive relief is available, at a minimum, when the SBA exceeds its statutory authority").

[50] 462 F.2d 1036, 1038 (5th Cir. 1972).

16

*Expedient Services, Inc. v. Weaver*[51]—that § 634(b)(1) bars plaintiffs from suing the SBA

for injunctive relief. Because *Romeo* and *Expedient Services* were both decided before

October 1, 1981, those decisions would be binding on this Court under *Bonner v. City*

*of Prichard, Alabama*, which held that Fifth Circuit cases decided before October 1,

1981 are binding on the Eleventh Circuit.[52]

While *Romeo* and *Expedient Services* are binding precedent, neither decided the

narrow issue here: does § 634(b)(1) bar a court from enjoining an agency from

exceeding its statutory authority? In fact, the *Expedient Services* Court acknowledged it

sidestepped that issue:

> As pointed out by the plaintiff, there are some decisions
> indicating that injunctive relief against the Administrator
> may be available when he exceeds his authority. *However, it*
> *is not necessary for us to decide this issue* because the
> Administrator clearly did not exceed his authority under
> 15 U.S.C. § 637(a).[53]

Thus, this Court is not bound by *Romeo* and *Expedient Services*.

---

[51] 614 F.2d 56, 58 (5th Cir. 1980).

[52] 661 F.2d 1206, 1209 (11th Cir. 1981) ("To decide this case, and later Eleventh Circuit cases, we
must decide whether this court shall adopt some established body of law as its body of precedent,
and if so, effective as of its coming into existence, what established body of law will be chosen. For
several reasons we choose the decisions of the United States Court of Appeals for the Fifth Circuit,
as that court existed on September 30, 1981, handed down by that court prior to close of business on
that date. We consider that body of law worthy for governance of legal affairs within the jurisdiction
of this new circuit.") (footnote omitted).

[53] *Expedient Servs.*, 614 F.2d at 58 n.2 (citations omitted) (emphasis added).

Writing on a clean slate, this Court concludes that § 634(b)(1) does not bar this Court from enjoining the SBA Administrator from exceeding her statutory authority for two reasons.

First, § 634's legislative history confirms that Congress did not intend the statute to have such a broad scope. The First Circuit, in *Ulstein Maritime, Ltd. v. United States*, did yeoman's work tracing the origin of § 634(b)(1)'s "no injunction" language back 80 years to the Supreme Court's decision in *Federal Housing Administration v. Burr*.[54]

There, the Supreme Court considered whether an employee could garnish the FHA to collect on a judgment for unpaid wages.[55] At the time, the National Housing Act provided that the FHA Administrator was authorized "to sue and be sued in any court of competent jurisdiction."[56] "Sue and be sued," the Supreme Court said, must be given its ordinary meaning, which would "embrace all civil process," including garnishments.[57] Because Congress had established an agency, authorized it to engage in commercial transactions, and permitted it to sue or be sued, the Supreme Court

---

[54] 833 F.2d 1052, 1056 (1st Cir. 1987) (explaining that the "origin and purpose of the language in § 634(b)(1) goes back to the decision in *FHA v. Burr*").

[55] *FHA v. Burr*, 309 U.S. 242, 243 (1940) ("The question presented here is whether the Federal Housing Administration is subject to garnishment for moneys due to an employee.").

[56] *Id.* at 244 (explaining that Congress amended the National Housing Act in 1935 by "by adding thereto the provision that 'The Administrator shall, in carrying out the provisions of this title and titles II and III, be authorized, in his official capacity, to sue and be sued in any court of competent jurisdiction, State or Federal.'").

[57] *Id.* at 245.

18

was unwilling to assume Congress implicitly limited the meaning of "sue and be sued" to preclude garnishments.[58] Had Congress intended to prohibit the FHA from being garnished, the Supreme Court reasoned, Congress would have said so.

After *Burr*, Congress added language like that found in § 634(b)(1)—language barring attachment, injunctions, garnishments, and other similar process—to enabling statutes for other agencies.[59] The legislative history for these other statutes—for example, ones creating the Federal Crop Insurance Corporation and Commodity Credit Corporation—clarifies that Congress added the language to prevent creditors and others from interfering with an agency's operations by suing the agency and then attaching its funds.[60] As the First Circuit points out, there is no indication Congress intended to give the SBA any broader immunity than it did to other agencies.[61]

Second, it would have been absurd for Congress to have intended to bar courts from enjoining agencies that have exceeded their statutory authority. Were that the case, courts would be powerless to stop a constitutional violation:

> [Section 634(b)(1)] was not intended to render the agency immune from injunctive relief in situations where the agency has exceeded its statutory authority and where an

---

[58] *Id.*

[59] *Ulstein Maritime, Ltd. v. U.S.*, 833 F.2d 1052, 1056 (1st Cir. 1987) (explaining that "language such as that in § 634(b)(1) was added to enabling statutes to bar the attachment of agency funds and other interference with agency functioning").

[60] *Id.* ("While the specific legislative history of § 634(b)(1) is silent on the purpose of this language, the legislative history of earlier statutes containing the identical wording indicates that it was intended to keep creditors or others suing the government from hindering and obstructing agency operations through mechanisms such as attachment of funds.").

[61] *Id.* at 1057.

> injunction would not interfere with the agency's internal
> operations. Indeed, if provisions such as § 634(b)(1) meant
> that the agency could never be enjoined, then an agency
> could adopt unconstitutional policies and continue to
> follow them even after a court declared them
> unconstitutional. For example, the SBA could adopt a
> policy stating that it will extend small business loans only
> to companies owned by white men. If § 634(b)(1) means
> that the SBA may never be enjoined, then a court could
> not enjoin this policy, even though it would be blatantly
> unconstitutional.[62]

The Supreme Court has instructed courts to avoid interpreting statutes in a

way that would produce absurd results if there is an alternative interpretation that is

consistent with the legislative purpose.[63] Here, there is an interpretation of §

634(b)(1) that is consistent with the legislative purpose (i.e., preventing creditors from

interfering with an agency's internal workings) yet does not lead to an absurd result

(rendering courts powerless to enjoin unlawful action): § 634(b)(1) does not bar this

Court from enjoining the SBA Administrator from exceeding her statutory authority.

### B. Gateway Radiology is entitled to enjoin the SBA Administrator from enforcing the Supplemental Rule.

To enjoin the SBA Administrator from enforcing the Supplemental Rule,

Gateway Radiology must show that (1) it has a substantial likelihood of success on

the merits of its claims; (2) it will suffer irreparable harm if the Court does not enjoin

---

[62] *Camelot Banquet Rooms, Inc. v. SBA*, 2020 WL 2088637, at *4 (E.D. Wis. May 1, 2020) (citations omitted).

[63] *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("It is true that interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available").

the SBA Administrator from enforcing the Supplemental Rule; (3) the harm it will suffer if the Court does not grant injunctive relief outweighs the harm the SBA will suffer if the Court does; and (4) enjoining the SBA from enforcing the Supplemental Rule is not adverse to the public interest.[64] Gateway Radiology has carried its burden here.

### 1.    Gateway Radiology has a substantial likelihood of success on the merits.[65]

The Administrative Procedure Act authorizes this Court to find that the SBA's Supplemental Rule is unlawful—and therefore may be set aside—on any one of six enumerated grounds.[66] Grounds for setting aside the Supplemental Rule include where the SBA Administrator exceeded her authority in promulgating the Supplemental Rule and where the Supplemental Rule is arbitrary and capricious.[67] Both grounds are present here.

---

[64] *Harbourside Place, LLC v. Town of Jupiter, Florida*, 958 F.3d 1308, 1313 – 14 (11th Cir. 2020).

[65] Gateway Radiology has challenged the Supplemental Rule on three grounds. First, Gateway Radiology says the SBA Administrator exceeded her authority in promulgating the Supplemental Rule. Second, Gateway Radiology says the Supplemental Rule is arbitrary and capricious. Third, Gateway Radiology says the Supplemental Rule violates Bankruptcy Code § 525. Because Gateway Radiology has substantial likelihood of success on the first two grounds, the Court declines to address the third ground—that the Supplemental Rule violates Bankruptcy Code § 525—on a preliminary basis.

[66] 5 U.S.C. § 706(2)(A) – (F) (providing that a reviewing court shall hold unlawful and set aside agency action, findings, and conclusions that are found to be arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege or immunity; in excess of statutory jurisdiction, authority or limitations, or short of statutory right; without observance of procedure required by law; unsupported by substantial evidence in a case subject to 5 U.S.C. §§ 556 and 557; or unwarranted by the facts to the extent the facts are subject to trial de novo by the reviewing court).

[67] *Id.* at § 706(2)(A), (C).

### a.    The SBA Administrator exceeded her authority when she promulgated the Supplemental Rule.

The SBA Administrator says that this Court, in determining whether she exceeded her statutory authority, must be guided by *Chevron*'s two-step framework.[68] Under the two-step *Chevron* framework, this Court would first ask whether the statute at issue is ambiguous; if it is, this Court would then ask whether the agency's interpretation of the statute is reasonable.[69] The *Chevron* framework presumes that when a statute is ambiguous, Congress must have implicitly delegated to the agency the authority to fill in the statutory gaps.[70]

The Supreme Court, however, has recognized that in extraordinary cases, courts should hesitate to find that Congress implicitly delegated authority to an agency to fill in statutory gaps.[71] Take, for example, the Supreme Court's decision five years ago in *King v. Burwell*.[72]

*King* involved a challenge to the Affordable Care Act. One of the Affordable Care Act's key reforms was the creation of "exchanges"—marketplaces that allowed

---

[68] Adv. Doc. No. 11 at 20.

[69] *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 – 43 (1984).

[70] *Id.* at 843 ("If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation.").

[71] *King v. Burwell*, 135 S. Ct. 2480, 2488 – 89 (2015) ("'In extraordinary cases, however, there may be reason to hesitate before concluding that Congress has intended such an implicit delegation.' This is one of those cases.").

[72] *Id.*

people to compare and buy insurance plans. The Affordable Care Act required states
to create their own exchanges. If a state refused to do so, the Affordable Care Act
required the federal government to create one.

The Affordable Care Act then provided tax credits to taxpayers to buy
insurance plans—but only for taxpayers who bought an insurance plan through "an
Exchange established by the State." Even though the Affordable Care Act limited tax
credits to insurance plans bought through an exchange "established by the state," the
IRS interpreted "an exchange established by the state" to mean an exchange
established by the state or federal government. The petitioners in *King* challenged the
IRS's interpretation.

After acknowledging that it often applies the *Chevron* two-step framework
when analyzing an agency's interpretation of a statute, the Supreme Court concluded
*King* was one of those extraordinary cases when it should decline to do so.[73]
According to the Supreme Court, the tax credits were one of the Affordable Care
Act's key reforms. Because the availability of credits involved billions of dollars in
spending each year and affected the price of health insurance for millions of people,
whether credits were available on federal exchanges was a "question of deep
'economic and political significance' that [was] central to [the] statutory scheme."[74]

---

[73] *Id.*

[74] *Id.* at 2489.

The Supreme Court concluded that "had Congress wished to assign that question to an agency, it surely would have done so expressly."[75]

So too here. Like the Affordable Care Act, the Paycheck Protection Program involves billions of dollars of spending ($349 billion to be precise). And, as with the interpretation of the eligibility for Affordable Care Act tax credits, how eligibility for PPP Loans is determined could affect millions of Americans. Here, like in *King*, it is unlikely that Congress intended to delegate a question of such "economic and political significance" to the SBA. Thus, it is for this Court to determine the correct reading of the CARES Act.

In determining the correct reading of the CARES Act, this Court must begin where the *King* Court did—with the language of the statute itself. If the statutory language is plain, courts must enforce it according to its terms.[76] To determine whether language is plain, courts must "read the words 'in their context and with a view to their place in the overall statutory scheme.'"[77] Here, reading the words of the CARES Act in context and with a view to the Paycheck Protection Program's place in the overall statutory scheme, it is plain Congress did not intend to exclude chapter 11 debtors from the Paycheck Protection Program.

---

[75] *Id.*

[76] *Id.* ("If the statutory language is plain, we must enforce it according to its terms.").

[77] *Id.* (quoting *FDA v. Brown & Williamson*, 529 U.S. 120, 133 (2000)).

Let's start with the context of the CARES Act. When Congress passed the CARES Act, the President had already declared a state of emergency because COVID-19 was threatening to strain the nation's healthcare systems; half the nation's states had implemented Stay-at-Home orders to "flatten the curve" in hopes of minimizing the strain on the nation's healthcare system; close to one million people had already lost their jobs; and millions more (more than 20 million, as it turns out) were about to lose theirs.

Now let's turn to the Paycheck Protection Program's place in the overall statutory scheme. In passing the CARES Act, Congress intended the Paycheck Protection Program to (among other things) help keep American workers employed and paid. Lest there be any doubt, Congress included the Paycheck Protection Program (as well as the mid-size loan program) in Title I of the CARES Act, which it named the "Keeping Workers Paid and Employed Act."[78]

Finally, let's consider the words of the CARES Act itself. In the CARES Act, Congress specified minimal—yet expansive—eligibility requirements for the Paycheck Protection Program. Under a subsection titled "*Increased Eligibility* for Certain Small Businesses and Organizations," Congress provided that any small business concern, other business concern, nonprofit organization, veterans

---

[78] Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020).

organization, or Tribal business concern that has 500 employees or fewer "*shall be eligible*" for a PPP Loan.[79]

And Congress specified that all an eligible borrower needs to do to apply for a PPP Loan is to certify that the loan is necessary because of the economic uncertainty caused by COVID-19; the proceeds will be used to retain workers and make payroll or pay mortgage interest, lease, or utility payments; and the borrower has not or will not receive another PPP Loan.[80] Although it could have done so, Congress chose not to require borrowers to certify that they were not involved in a bankruptcy case when applying for a PPP Loan.[81]

It's also worth noting that Congress delegated the SBA Administrator's decision to make or approve PPP Loans to SBA lenders.[82] In delegating that authority to SBA lenders, Congress instructed lenders to consider only two factors when making or approving a PPP Loan: (1) Was the business operating on February 15, 2020? (2) Did the borrower have employees for whom it was paying salaries and payroll taxes?[83] Congress did not instruct SBA lenders—who are exercising authority

---

[79] 15 U.S.C. § 636(a)(36)(D)(i)(I) – (II).

[80] *Id.* at § 636(a)(36)(G)(i)(I) – (IV).

[81] *Id.*

[82] *Id.* at § 636(a)(36)(F)(ii)(I).

[83] *Id.* at § 636(a)(36)(F)(ii)(I) – (II)(bb).

delegated from the SBA Administrator—to consider whether a borrower is in bankruptcy.[84]

To recap, even though Congress specified who is eligible for PPP Loans, the criteria lenders must consider when approving a PPP Loan, and the certifications a borrower must make to obtain one, Congress did not disqualify chapter 11 debtors from being eligible for PPP Loans, insist that lenders determine whether a borrower is in bankruptcy before approving a PPP Loan, or require a borrower to certify that it isn't involved in a bankruptcy proceeding to obtain a PPP Loan. Congress' silence ought to be conclusive that Congress did not intend to exclude an entire class of small businesses—chapter 11 debtors—from the Paycheck Protection Program.

The SBA Administrator, however, claims Congress' silence authorizes her to engraft an additional eligibility requirement onto the Paycheck Protection Program.[85] Not so.

To see why that's not the case, consider the mid-size loan program. Unlike the Paycheck Protection Program, which functions like a grant, the mid-size loan program is a true loan program. Loans made under the mid-size program, unlike those made under the Paycheck Protection Program, cannot be forgiven. For the mid-size loan program, Congress required borrowers to certify that they are not a debtor in bankruptcy.

---

[84] *Id.*

[85] Adv. Doc. No. 11 at 21 – 23.

So Congress knew how to disqualify debtors from eligibility if it wanted to.
Yet it chose not to do so for PPP Loans. As the SBA Administrator concedes, when
"Congress includes particular language in one section of a statute but omits it in
another section of the same Act, it is generally presumed that Congress act[ed]
intentionally and purposely in the disparate inclusion or exclusion."[86] Because
Congress chose not to require PPP Loan applicants to certify that they were not
involved in a bankruptcy case, this Court concludes that Congress purposely chose
not to disqualify chapter 11 debtors from the Paycheck Protection Program.[87]

That makes sense for (at least) two reasons. First, while a borrower's status as
a debtor matters for the mid-size loan program, it does not for the Paycheck
Protection Program because PPP Loans are designed to be forgiven. Second, the
purpose of the Paycheck Protection Program was to keep American workers
employed and paid. Chapter 11 debtors need PPP Loans as much, if not more than,
other small businesses to retain workers and pay them.

---

[86] Adv. Doc. No. 11 at 20 (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

[87] The SBA Administrator argues that this conclusion is undermined by Congress' recent passage of
the HEROES Act, which (among other things) makes critical-access hospitals eligible for PPP Loans
"regardless of the status of such a hospital as a debtor" in a chapter 11 case. Adv. Doc. No. 11 at 23
n.11 (citing The Heroes Act, H.R. 6800, 116th Cong., § 9001(c) (2020)). The SBA says this language
shows the House of Representatives believes additional legislation is required to make a specific
subset of borrowers—chapter 11 debtors—eligible to apply for PPP Loans. *Id.* That's one way to
read that language. It's equally, if not more, likely that the House of Representatives was clarifying
its intent that—contrary to the Supplemental Rule—chapter 11 debtors are eligible for PPP Loans.
In any event, the reference to debtors in the HEROES Act does not change the fact that in one
section of the CARES Act (the mid-size loan program), Congress required borrowers to certify they
were not involved in a bankruptcy proceeding, but in another section of the same Act (the Paycheck
Protection Program), Congress chose not to require borrowers to certify that they were not involved
in a bankruptcy proceeding.

By promulgating the Supplemental Rule, the SBA Administrator disqualified chapter 11 debtors from the Paycheck Protection Program, thereby denying an entire class of small businesses the very relief Congress intended to provide. Excluding chapter 11 debtors from the Paycheck Protection Program conflicts with Congress' intent in enacting the CARES Act. More important, doing so violates the CARES Act's plain language. The SBA Administrator therefore exceeded her authority when she promulgated the Supplemental Rule.

### b. The Supplemental Rule is arbitrary and capricious.

Even if the SBA Administrator hadn't exceeded her authority when she promulgated the Supplemental Rule, the Supplemental Rule is still arbitrary and capricious. To be sure, the scope of review under the "arbitrary and capricious" standard is narrow.[88] This Court is mindful that it is not to substitute its own judgment for the SBA Administrator's judgment.[89]

Rather, in reviewing whether agency action is "arbitrary and capricious," this Court is limited to considering whether the SBA Administrator considered the relevant factors when promulgating the Supplemental Rule and whether her decision to exclude chapter 11 debtors from the Paycheck Protection Program was a clear

---

[88] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[89] *Id.*; *see also Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1254 (11th Cir. 2007) (citing *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 43).

error of judgment.[90] Under this standard of review, the Supplemental Rule is "arbitrary and capricious" if:

- the SBA Administrator relied on factors that Congress did not intend her to consider;

- the SBA Administrator failed to consider an important aspect of the problem;

- the SBA Administrator's explanation for her decision runs counter to the evidence before the agency; or

- the SBA Administrator's explanation is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Here, the SBA Administrator's decision to exclude chapter 11 debtors from the Paycheck Protection Program is based on her determination that "debtors in bankruptcy would present an unacceptably high risk of an unauthorized use of funds or non-repayment of unforgiven loans."[91] Putting aside that the basis for the SBA Administrator's determination is unclear, the Court concludes that she relied on factors Congress had not intended her to consider and failed to consider important aspects of the problem—not to mention her decision is counter to the evidence before the SBA.

---

[90] *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 ("In reviewing [an agency's] explanation, we must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'") (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 285 (1974)).

[91] Business Loan Program Temporary Changes; Paycheck Protection Program—Requirements—Promissory Notes, Authorization, Affiliation, and Eligibility, 85 Fed. Reg. 23450, 23,451 (Apr. 28, 2020) (to be codified at 13 C.F.R. pts. 120 and 121).

### i. Congress did not intend for the SBA Administrator to focus on collectability.

The SBA Administrator relies on 15 U.S.C. § 636(a)(6) as a talisman to ward off any claim she exceeded her statutory authority. Section 636(a)(6) mandates that "[a]ll loans made under this subsection shall be of such sound value or so secured as to reasonably reassure repayment."[92] Because § 636(a)(6) requires loans to be of "sound value," the SBA Administrator insists she is authorized to disqualify chapter 11 debtors from the Paycheck Protection Program.[93]

But that argument ignores the very nature of the Paycheck Protection Program. Under the Paycheck Protection Program, PPP Loans are structured so that they don't have to be repaid. For a loan to be forgiven, all a borrower has to do is use the loan proceeds for payroll or mortgage interest, lease, or utility payments. Because PPP Loans are designed to be forgiven, Congress did not intend for the SBA Administrator to focus on collectability.

In fact, Congress delineated the two "underwriting" factors SBA lenders (who are exercising authority delegated from the SBA Administrator to make and approve loans) should consider when making PPP Loans. Neither factor has anything to do with collectability—much less whether a borrower is in bankruptcy. By taking into

---

[92] 15 U.S.C. § 636(a)(6).

[93] Adv. Doc. No. 11 at 25.

31

account a borrower's status as a chapter 11 debtor, the SBA Administrator has considered a factor Congress did not intend her to consider.

One final note: it's hard not to notice the SBA talking out of both sides of its mouth when it comes to its obligations under § 636(a)(6). On the one hand, the SBA tries to convince the Court that the Paycheck Protection Program's generous loan forgiveness features has done nothing to displace § 636(a)(6)'s general mandate to ensure loans made under § 7(a) of the Small Business Act, where the Paycheck Protection Program is housed, are of sound value. On the other hand, the SBA Administrator has excused SBA lenders from complying with 13 C.F.R. § 120.150, which enumerates the factors the SBA considers to ensure that any loan made under § 7(a) is of "sound value."[94] In reality, the SBA Administrator's reliance on § 636(a)(6) is an after-the-fact justification for an arbitrary and capricious rule.

### ii.    The SBA Administrator failed to consider protections afforded by the chapter 11 bankruptcy process.

Not only did the SBA Administrator consider factors she shouldn't have, she also failed to consider factors she should have. Recall that the Supplemental Rule is premised entirely on the SBA Administrator's determination that debtors pose an unacceptably high risk of using PPP Loan proceeds for noncovered expenses, as well as an unacceptably high risk of nonpayment if the PPP Loan is not forgiven. Yet, in

---

[94] Business Loan Program Temporary Changes; Paycheck Protection Program, 85 C.F.R. 20,811, 20,812 (Apr. 15, 2020) (to be codified at 13 C.F.R. pt. 120).

making that determination, the SBA Administrator failed to consider an important aspect of the problem: how chapter 11 bankruptcy functions.

Begin with the policy behind chapter 11 bankruptcy. The policy of chapter 11 is to provide a forum where troubled businesses can rehabilitate.[95] "Chapter 11 embodies a policy that it is generally preferable to enable a debtor to continue to operate and to reorganize or sell its business as a going concern rather than simply to liquidate a troubled business."[96] Continued operation of a business is preferable to liquidation not only because it preserves going-concern value, but because it "can save the jobs of employees and the tax base of communities, and generally reduce the upheaval that can result from termination of a business."[97] The SBA Administrator failed to consider that chapter 11 bankruptcy and the Paycheck Protection Program share the same policy goal: keeping American workers employed and paid.

Now let's turn to specific Bankruptcy Code provisions that would eliminate the "unacceptably high risk" that a chapter 11 debtor would use PPP Loan proceeds for noncovered expenses. As a starting point, Bankruptcy Code § 364 bars a debtor

---

[95] *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 527 (1984); *see also In re Paris Indus. Corp.*, 106 B.R. 339, 341 (Bankr. D. Maine 1989) ("The Bankruptcy Code embodies a governmental policy favoring reorganization and a fresh start.").

[96] 7 Collier on Bankruptcy ¶ 1100.01 (Matthew Bender & Co. 16th ed.).

[97] *Id.*

33

from borrowing money outside the ordinary course of business—such as obtaining a PPP Loan—without court approval.[98]

Before a bankruptcy court can allow a debtor to borrow money outside the ordinary course of business, the debtor must give notice to interested parties in the case, who have a right to object to the proposed financing.[99] If the bankruptcy court is inclined to allow the debtor to borrow money, it can impose conditions on the debtor doing so. In addition to restricting the debtor's use of the loan proceeds to paying expenses set forth in an approved budget, those conditions can also include requiring the chapter 11 debtor to disclose to the Court and creditors what the loan proceeds were used for.

What's more, on top of any narrowly tailored reporting requirements the court may impose when approving a postpetition loan, chapter 11 debtors in general are required to file monthly operating reports.[100] Those reports, which detail a debtor's receipts and disbursements, are scrubbed by skilled professionals at the U.S. Trustee's

---

[98] 11 U.S.C. § 364(b).

[99] *Id.* (providing that court may authorize postpetition financing "after notice and a hearing").

[100] 11 U.S.C. § 1106(a)(1); *see also* Fed. R. Bankr. P. 2015. Bankruptcy Code § 1106(a)(1) incorporates Bankruptcy Code § 704(a)(8), which requires a debtor in possession operating a business to file periodic reports and summaries of the business' operations, including a statement of receipts and disbursements. The monthly operating reports allow a bankruptcy court and parties in interest to ascertain (among other things) whether a debtor in possession is grossly mismanaging the bankruptcy estate, violating cash collateral or other court order, or engaging in unauthorized disposition of estate assets. Procedures for Completing Uniform Periodic Reports in Non-Small Business Cases Filed Under Chapter 11 of Title 11, 79 Fed. Reg. 66,659, 66,660 (Nov. 10, 2014) (to be codified at 28 C.F.R. pt. 58).

Office. And because they are filed electronically, the monthly operating reports can

be scrutinized by creditors in the case.

So the SBA Administrator has failed to consider that by restricting a debtor's

use of PPP Loan proceeds to covered expenses and subjecting the debtor's use of the

funds to scrutiny by creditors and the U.S. Trustee, bankruptcy courts can reduce the

risk that a chapter 11 debtor will use PPP Loan proceeds for noncovered expenses.

Last, consider the extra protections afforded to lenders who loan money to

debtors postpetition, which greatly reduce the risk of nonpayment. If a bankruptcy

court approves a debtor's postpetition financing motion, the lender is entitled to an

administrative expense claim under Bankruptcy Code § 503(b)(1).[101] Administrative

expense claims—such as one for a PPP Loan—must be paid in full by the effective

date of confirmation. The SBA Administrator therefore failed to consider that the

Bankruptcy Code would give priority to repayment of PPP Loans made to chapter

11 debtors (to the extend funds were used for noncovered expenses).

### iii.    The SBA's explanation runs counter to the evidence before the agency.

Imagine Gateway Radiology was not in chapter 11 bankruptcy. In that

hypothetical world, Hypothetical Gateway Radiology would apply to the Credit

Union for a PPP Loan by filling out a two-page application in which it would answer

---

[101] 11 U.S.C. § 364(b) ("The court, after notice and a hearing, may authorize the trustee to obtain
unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable
under section 503(b)(1) of this title as an administrative expense").

eight questions (none of which have to do with creditworthiness); disclose the number of employees it has, its average monthly payroll, and its loan request; and check a box indicating how it intends to use the funds (payroll, lease or mortgage interest, utilities, or other).

Hypothetical Gateway Radiology would have also had to certify that it was operating on February 15, 2020; it had employees for whom it was paying salaries and payroll taxes; it needs the loan because of the economic uncertainty caused by COVID-19; it will use the loan proceeds for covered expenses; it will provide documentation showing it used the loan for covered expenses; it understands the loan will be forgiven if it is used for covered expenses (though nonpayroll expenses can only account for 25% of the forgiven amount); and it has not and will not seek another PPP Loan.

After confirming receipt of the certifications, the information demonstrating Hypothetical Gateway Radiology had employees, and the dollar amount of Hypothetical Gateway Radiology's payroll, the Credit Union would have then approved the loan. In the hypothetical world, the Credit Union would have done no investigation of Hypothetical Gateway Radiology's creditworthiness, its ability to repay the loan, or what it intended to use the PPP Loan for.

And once the PPP Loan was approved, the Credit Union would not truly monitor how Hypothetical Gateway Radiology used the money. Instead, the Credit Union would rely on the carrot-and-stick approach Congress provided to ensure repayment: the carrot, of course, is that the loan will be forgiven if it is used for

covered expenses; the "stick" is that Hypothetical Gateway Radiology would have to

repay the loan if it was not used for covered expenses.

Sure, Hypothetical Gateway Radiology would be required to provide the

Credit Union documentation showing it used the loan proceeds for covered expenses.

But the Credit Union would not need to verify the documentation so long as

Hypothetical Gateway Radiology attested that it verified the payments it made were

for eligible costs.[102]

Now let's see how that story is playing out in the real world, where Gateway

Radiology is in chapter 11 bankruptcy. Unlike a non-debtor, who can take out a PPP

Loan with little to no oversight, Gateway Radiology had to first ask for this Court's

approval, even though the PPP Loan had already been approved.

In seeking this Court's approval, Gateway Radiology (like a typical debtor

seeking a PPP Loan) had to attach a copy of its loan application, along with a

proposed budget detailing how it intends to use the loan proceeds.[103] According to its

budget, Gateway Radiology proposes to use $445,000 of the $527,710 in loan

proceeds for payroll, while the remaining $82,710 will be used for rent, health

insurance premiums, and utilities—all of which are covered expenses. Unlike

---

[102] Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20,811, 20,815 (Apr. 15, 2020) (to be codified at 13 C.F.R. pt. 120) ("The lender does not need to conduct any verification if the borrower submits documentation supporting its request for loan forgiveness and attests that it has accurately verified the payments for eligible costs. The Administrator will hold harmless any lender that relies on such borrower documents and attestation from a borrower.").

[103] Doc. No. 238; Adv. Doc. No. 3.

Hypothetical Gateway Radiology, whose certification that it would use the loan for covered expenses was given only a perfunctory review by the Credit Union, the real Gateway Radiology's intention to use the PPP Loan for covered expenses is scrutinized by creditors, the U.S. Trustee, and (most important) the Court.

If any creditor doubts that the loan will be used for covered expenses, it has the right to object to the proposed PPP Loan. Indeed, one creditor has already done so. Philips Healthcare, one of the major creditors in this case, contends that unless this Court determines that the proposed PPP Loan is eligible for loan forgiveness and will be used for covered expenses, the Court should deny the motion because Gateway Radiology hasn't showed why the funds are necessary or how they will be repaid.

In effect, Philips Healthcare has raised the same concerns the SBA Administrator raised in her Supplemental Rule. Philips Healthcare wants to make sure that the loan proceeds are used for covered expenses and, if not, that Gateway Radiology can repay the loan. Outside bankruptcy there would be no one to raise those issues. Because Gateway Radiology is in bankruptcy, however, this Court can consider and address both those concerns.

To ensure that the loan proceeds are used for covered expenses, the Court can (if it approves the loan) order Gateway Radiology to use the proceeds only for payroll, health insurance, rent, and utilities. The Court can also require Gateway Radiology to file reports with supporting documentation so the Court and interested parties can verify that Gateway Radiology is using the loan proceeds for covered

expenses. This would be in addition to the Debtor's monthly operating reports, which would also show what the loan proceeds were being used for.

Outside bankruptcy, the Credit Union could rely on Hypothetical Gateway Radiology's attestation that it used the proceeds for covered expenses. Because Gateway Radiology is in bankruptcy, however, there will be, as one court aptly put it, a hundred-eyed Argus watching how Gateway Radiology uses the money.[104]

What happens if the hundred-eyed Argus spots Gateway Radiology using the loan proceeds for noncovered expenses? Outside bankruptcy, there would be nothing anyone could do about it. The loan would simply be subject to repayment. Of course, there would be no way to know if Hypothetical Gateway Radiology could repay the loan since there was no underwriting. Because the real Gateway Radiology is in bankruptcy, the Court can take steps to minimize the amount that will not be forgiven and increase the chances that the unforgiven amounts are repaid.

The Court can minimize the amount that has to be repaid by turning off the spigot as soon as the proceeds start flowing out for noncovered expenses. Whereas outside bankruptcy, the "stick" to prevent a non-debtor from using a PPP Loan for noncovered expenses is that the money has to be repaid. Inside bankruptcy, the "stick" is not just that the loan has to be paid—the "stick" also includes possible contempt or other sanctions for violating a court order barring a debtor from using

---

[104] *In re Roman Catholic Church of Archdiocese of Santa Fe*, ___ B.R. ___, 2020 WL 2096113, at *6 (Bankr. D. N.M. May 1, 2020) ("In short, the chapter 11 bankruptcy system is a hundred-eyed Argus.").

PPP Loan proceeds for noncovered expenses. Putting that aside, once the amount that must be repaid has been minimized, the Court can increase the chances it will be repaid by according the amount owed administrative expense status, which means it gets paid before other unsecured claims.

Having compared the safeguards in place for PPP Loans made to a chapter 11 debtor with the lack of any similar safeguards for PPP Loans to non-debtors, the Court cannot find any rational connection between the evidence before the SBA and the SBA's Supplemental Rule. Quite the opposite: to the extent that the SBA Administrator was concerned about PPP Loans being used for noncovered expenses or not being repaid, her Supplemental Rule is "illogical on its own terms." When agency action is "illogical on its own terms," as is the case here, the agency action is arbitrary and capricious.[105]

### 2. Unless an injunction is issued, Gateway Radiology will suffer irreparable harm.

In its motion for temporary injunction, Gateway Radiology alleges that it has seen a 55 – 60% decrease in patient volume at its outpatient imaging, diagnostic, and interventional radiology center since the start of the COVID-19 pandemic; that it needs the PPP Loan to shore up its finances so that it can continue serving the

---

[105] *Am. Fed'n. of Gov't Emps. v. Fed. Labor Relations Auth.*, 470 F.3d 375, 381 (D.C. 2006).

community as a front-line medical services provider during the pandemic; and

without the PPP Loan, it may not survive as a going concern.[106]

The SBA suggests that such a "meager showing is purely speculative, and in no

way imminent."[107] The Court is unpersuaded that the harm is as speculative and

remote as the SBA cavalierly suggests. In any event, the SBA's argument is

misplaced: to prove irreparable harm, Gateway Radiology need not prove that it will

go out of business if it doesn't get the PPP Loan. To establish irreparable harm,

Gateway Radiology must show that remedies at law—such as money damages—are

inadequate.[108]

Here, Gateway Radiology cannot be compensated by money damages. Under

the Paycheck Protection Program, Gateway Radiology is eligible for more than

$500,000 in financing that is designed to—and almost certainly will be—forgiven.

But funding under the Paycheck Protection Program, as the SBA has acknowledged,

is "first-come, first-served."[109] If the Court does not enjoin the Supplemental Rule,

the funding allocated to Gateway Radiology will be used for a PPP Loan to another

borrower.

---

[106] Adv. Doc. No. 3 at ¶ 29(b).

[107] Adv. Doc. No. 11 at 28.

[108] *Council v. Dep't of Veterans Affairs*, 2010 WL 98984, at *3 (M.D. Fla. Jan. 6, 2010) (citing *Ebay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)).

[109] Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20,811, 20,813 (Apr. 15, 2020) (to be codified at 13 C.F.R. pt. 120).

By the time it is determined that debtors are eligible for PPP Loans, all the

Paycheck Protection Program funding will be gone. And Gateway Radiology will not

have access to another $500,000 in funding that basically functions like a grant. That

is classic irreparable harm.

> **3.**    **The harm Gateway Radiology will suffer if no
> injunction is issued far outweighs any harm the
> SBA will suffer if an injunction is issued.**

In its opposition, the SBA Administrator does not bother arguing that the SBA

will suffer any harm if the Court enjoins her from enforcing the Supplemental

Rule—much less that any harm it will suffer will outweigh the harm Gateway

Radiology will suffer if the Court does not enjoin her from enforcing the

Supplemental Rule. Presumably that's because it's unlikely the SBA will suffer any

harm.

Admittedly, the SBA has a theoretical risk of harm. If Gateway Radiology

does not use the PPP Loan for covered expenses, the PPP Loan will not be forgiven,

which means what is essentially a grant will convert to a loan. If Gateway Radiology

is unable to repay any unforgiven amounts, the SBA will be on the hook for the

unpaid balance (which, theoretically, could be the entire $527,710). That risk,

however, can be mitigated—basically to zero.

As the Court has already pointed out, it must first approve the PPP Loan. As

part of the approval process, creditors and the U.S. Trustee have an opportunity to

object if there is reason to believe Gateway Radiology will not use the PPP Loan

42

proceeds for covered expenses or if Gateway Radiology does not have the ability to repay the loan in the unlikely event it is not forgiven. To ensure that Gateway Radiology uses the PPP Loan for covered expenses, the Court can order Gateway Radiology to restrict its use of funds to covered expenses. And to increase the likelihood that any unforgiven amount will be repaid, the Court can award the Credit Union an administrative expense for any noncovered expenses. All of this will be overseen by the hundred-eyed Argus.

Thus, it's unlikely the SBA will suffer any harm. To the extent it does, that harm would be far outweighed by the harm Gateway Radiology will suffer if the Court does not enjoin the SBA from enforcing the Supplemental Rule (at least to the extent it disqualifies Gateway Radiology from the Paycheck Protection Program).

### 4. Enjoining the SBA Administrator from disqualifying debtors from the Paycheck Protection Program will further Congress' objective in passing the CARES Act.

The SBA contends that enjoining the Supplemental Rule would disserve the public interest because the proposed injunction would: (1) short-circuit the rapidly evolving political and administrative landscape in response to COVID-19; (2) substitute Gateway Radiology's preferred policy for the SBA's stated policy; and (3) "throw a wrench into policymakers' evolving responses to COVID-19."[110]

---

[110] Doc. No. 11 at 29 – 30.

Throw a wrench into policymakers' evolving responses? It's hard not to be flabbergasted by the SBA Administrator's (pardon the banal expression) "through the looking glass" approach to promoting the public interest: in what world does disqualifying an entire class of troubled small businesses—perhaps those who need it the most—from obtaining grants to pay employees so their workers don't lose their jobs somehow promote the public interest, but ensuring that the $349 billion in relief flows to those who need it the most constitute "throwing a wrench" into Congress' response to COVID-19?

Congress passed the CARES Act "[t]o provide emergency assistance . . . for individuals, families, and businesses affected by the 2020 coronavirus pandemic."[111] In doing so, Congress created the Paycheck Protection Program, which basically provides $349 billion in grants so small businesses can pay their employees, and made sure as many small businesses were eligible for the grants as possible. By enjoining the Supplemental Rule, at least to the extent it disqualifies Gateway Radiology from the Paycheck Protection Program, the injunction would be promoting the public interest by giving effect to Congress' intent. Far from throwing a wrench into Congress' response to COVID-19, the Court would be preventing the SBA from inexplicably doing so.

---

[111] Coronavirus Aid, Relief, and Economic Security Act, S. 3548, 116th Cong. (2020).

44

## III.  CONCLUSION

"When an administrative agency sets policy, it must provide a reasoned explanation for its action. That is not a high bar, but it is an unwavering one."[112] It is up to this Court to ensure that the SBA Administrator has cleared that bar by engaging in reasoned decision-making."[113]

The SBA Administrator's decision-making here was anything but reasoned. Although Congress chose to require mid-size businesses to certify they were not in bankruptcy to participate in the mid-size loan program, it chose not to impose a similar requirement on small businesses wanting to participate in the Paycheck Protection Program.

The SBA Administrator concedes that when Congress knows how to say something but chooses not to, its silence is controlling."[114] But rather than treating Congress' silence as controlling, the SBA treats it as a dog whistle to exclude chapter 11 debtors from the Paycheck Protection Program because of the supposed unacceptably high risk that PPP Loans will be not be forgiven or collectable.

Any reasonable person would see that Congress was not concerned about collectability. PPP Loans are designed to be forgiven, which is why Congress and the

---

[112] *Judulang v. Holder*, 565 U.S. 42, 45 (2011).

[113] *Id.* at 53 ("[C]ourts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking.")

[114] *CBS Inc. v. PrimeTime24 Joint Venture*, 245 F.3d 1217, 1226 (11th Cir. 2001) (internal quotations omitted) (quoting *Griffith v. United States (In re Griffith)*, 206 F.3d 1389, 1394 (11th Cir. 2000)).

SBA have dispensed with traditional underwriting requirements. And in any event,
the chapter 11 process makes it more—not less—likely chapter 11 debtors would use
PPP Loans for covered expenses, in which case the loans would be forgiven. Thus,
the SBA Administrator's explanation for the Supplemental Rule is contrary to the
evidence before her.

Although the bar for agency action is not a high one, the SBA Administrator
failed to clear it here. This Court will therefore enjoin the SBA Administrator from
enforcing the Supplemental Rule to the extent it disqualifies Gateway Radiology
from participating in the Paycheck Protection Program.

> Attorney Joel Aresty is directed to serve a copy of this Memorandum Opinion on
> interested parties who are non-CM/ECF users and file a proof of service within
> three days of entry of this Memorandum Opinion.

**Joel M. Aresty, Esq.**
**Joel M. Aresty P.A.**
   *Counsel for the Debtor*

**Christopher J. Emden**
   *Counsel for Jovita Carranza,*
   *in her capacity as*
   *Administrator for the U.S. Small*
   *Business Administration*

**Dated: June 02, 2020**
**The following is ORDERED:**

_Jennie D. Latta_
**Jennie D. Latta**
**UNITED STATES BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

In re
JAMES JERRY SKEFOS, et al.[1]                    Case No. 19-29718-L
     Debtors.                                    Chapter 11 (Jointly Administered)

Alpha Visions Learning Academy, Inc.,
     Plaintiff,
v.                                               Adv. Proc. No. 20-00071
Jovita Carranza, in her Capacity
as Administrator for the United States
Small Business Administration,
     Defendant.

**OPINION AND ORDER GRANTING REQUEST
FOR PRELIMINARY INJUNCTION AND RELATED RELIEF**

BEFORE THE COURT are the "Complaint and Verified Emergency Application for

Temporary Restraining Order and Preliminary Injunction" (the "Complaint"), and the "Emergency

---

[1] The other Debtors in these jointly administered cases are Skefco Properties, Inc., Case No. 19-26580, and
Eleftheria, LLC, Case No. 19-26603.

Motion for Temporary Restraining Order" (the "Motion"), filed by Plaintiff, Alpha Visions Learning Academy, Inc. ("Alpha"), on May 14, 2020 [Dkt. Nos. 1 and 2], concerning the United States Small Business Administration's (the "SBA") implementation of the Paycheck Protection Program ("PPP"), a federal loan program that was authorized by Congress in the wake of the global COVID-19 pandemic. The Motion and Complaint allege that the SBA has made approval of any PPP loan expressly contingent on the applicant or any owner of the applicant not being "presently involved in any bankruptcy," even though this condition is not articulated in the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") that enacts the PPP, or in the Small Business Act, 15 U.S.C. § 631, *et seq*. The Motion and Complaint allege that the PPP is in reality a support or grant program rather than a loan program. The Motion and Complaint seek entry of a temporary restraining order, preliminary injunction, and permanent injunction pursuant to 11 U.S.C. § 105 and Federal Rule of Bankruptcy Procedure 7065 directing the Defendant, Jovita Carranza, in her capacity as Administrator for the SBA, and all its agents, servants, employees, and any parties acting in concert with them (the "Targeted Parties") to consider Alpha's Paycheck Protection Borrower Application Form (the "Borrower PPP Application") and any related forms, applications, or other documents without consideration of James Jerry Skefos's status as a Chapter 11 debtor. Alpha also seeks an order requiring the Targeted Parties from making or conditioning approval of any PPP loan to Alpha contingent upon Alpha or any owner of Alpha not being "presently involved in any bankruptcy." In addition, Alpha seeks a declaration that SBA violated the Administrative Procedures Act ("APA") and 11 U.S.C. § 525(a) in excluding applications from entities who are in bankruptcy or who have an owner who is in bankruptcy.

In order to maintain the status quo pending a hearing, the parties submitted the "Agreed Order Regarding Scheduling and Reservation of PPP Funds," which was entered May 22, 2020

(the "Agreed Scheduling Order"). [Dkt. No. 8]. Pursuant to the Agreed Scheduling Order, the SBA voluntarily agreed to set aside $68,417.65 from the PPP, an amount equal to the funding applied for by Alpha; the court set a combined hearing on the Motion and Complaint for May 28, 2020; the SBA was given until 5:00 p.m. on May 22, 2020, to file a response to the Motion and request for preliminary injunction; the Plaintiff was given until 5:00 p.m. on May 26, 2020, to file any reply.

SBA filed its "United States' Opposition to Plaintiff's Request for a Preliminary Injunction" on May 26, 2020 (late-filed with leave of court). [Dkt. No. 11]. Alpha filed its "Reply in Further Support of Motion for Temporary Restraining Order" on May 27, 2020. [Dkt. No. 14]. The court conducted a telephonic hearing on May 28, 2020, at which Alpha was represented by Robert W. Miller, of Manier & Herod, PC, and the SBA was represented by Marc S. Sacks, of the United States Department of Justice. The court has reviewed the excellent briefs with accompanying exhibits and carefully considered the arguments of counsel. It now enters this opinion and order granting the request for preliminary injunction and other relief for the reasons set out below.

### THE PARTIES

According to the verified Complaint, Alpha is a corporation organized under the laws of the state of Tennessee with its principal place of business in Memphis, Tennessee.

James Jerry Skefos (the "Debtor") is the debtor in the underlying Chapter 11 bankruptcy case pending since the filing of his voluntary petition on December 10, 2019 [Bankr. Dkt. No. 1].

According to the Complaint, the Debtor holds all the equity interests in Alpha as well as other companies.

On March 5, 2020, this court ordered the joint administration of the Debtor's bankruptcy case with two others, Skefco Properties, Inc. ("Skefco"), and Eleftheria, LLC ("Eleftheria").

Michael E. Collins (the "Trustee") was appointed Chapter 11 trustee in these three bankruptcy cases and is currently serving in that capacity.

The Trustee asserts that upon his appointment as trustee for the Debtor, he succeeded to all the rights of the Debtor as sole shareholder in Alpha.

Defendant Jovita Carranza is the Administrator for the SBA.

### JURISDICTION, VENUE, AND CONSTITUTIONAL AUTHORITY

Jurisdiction over a complaint arising under the Bankruptcy Code lies with the district court. 28 U.S.C. § 1334(b). Pursuant to authority granted to the district courts at 28 U.S.C. § 157(a), the district court for the Western District of Tennessee has referred to the bankruptcy judges of this district all cases arising under title 11 and all proceedings arising under title 11 or arising in or related to a case under title 11. *In re Jurisdiction and Proceedings Under the Bankruptcy Amendments Act of 1984*, Misc. No. 81-30 (W.D. Tenn. July 10, 1984). The Trustee asserts that this is a core proceeding pursuant to 28 U.S.C. § 157(b) because it is based upon an alleged violation of 11 U.S.C. § 525 and because the alleged discrimination by the Defendant against Alpha, an entity wholly-owned by the Debtor, "has significant prejudicial impact on [the Debtor's] bankruptcy estate and its administration by the Trustee." Complaint, ¶ 10.

Section 525(a) of the Bankruptcy Code provides:

Except as provided in the Perishable Agricultural Commodities Act, 1930, the Packers and Stockyards Act, 1921, and section 1 of the Act entitled "An Act making appropriations for the Department of Agriculture for the fiscal year ending June 30, 1944, and for other purposes," approved July 12, 1943, **a governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against,** a person

that is or has been a debtor under this title or a bankrupt or a debtor under the
Bankruptcy Act, **or another person with whom such bankrupt or debtor has
been associated, solely because such bankrupt or debtor is or has been a debtor
under this title or a bankrupt or debtor under the Bankruptcy Act**, has been
insolvent before the commencement of the case under this title, or during the case
but before the debtor is granted or denied a discharge, or has not paid a debt that is
dischargeable in the case under this title or that was discharged under the
Bankruptcy Act.

11 U.S.C. § 525(a) (emphasis added). The Trustee alleges that the PPP is in the nature of a grant

rather than a loan and that Alpha is a person with whom the Debtor is associated. Section 525 is

somewhat unusual in that it grants protection under the Bankruptcy Code to persons who are not

debtors. It does, however, create a cause of action that arises solely under the Bankruptcy Code.

As a result, actions under section 525 fall squarely within the bankruptcy jurisdiction granted to

the district courts and are core proceedings over which a bankruptcy judge may preside and enter

a final order subject only to appellate review. 28. U.S.C. 157(b)(1) and (b)(2). See *Bradley v.

Barnes (In re Bradley)*, 989 F.2d 802, 804 (5th Cir. 1993) (If there is a potential violation of § 525,

then the court must take jurisdiction.); *Mayo v. Union Bank (In re Mayo)*, 321 B.R. 759 (Bank. D.

Vt. 2005) (Action seeking redress of allegedly discriminatory conduct that is actionable by the

language of the Bankruptcy Code itself is a core proceeding "arising under" title 11.).

The SBA argues that this bankruptcy court's authority to adjudicate Alpha's section 525(a)

claim does not extend to its APA claims, which do not arise under the Bankruptcy Code. SBA

does not consent to the entry of a final judgment on the APA claims. The court finds below that

the SBA violated the Bankruptcy Code's anti-discrimination provision when it directed lenders to

refuse to accept PPP applications from entities owned by bankruptcy debtors. This violation is

sufficient to support the entry of an injunction by the bankruptcy court. The court has also made

extensive findings and conclusions concerning Alpha's APA claims. Alpha alleges that SBA

violated the APA by exceeding its statutory authority and by acting arbitrarily and capriciously in

excluding entities owned by bankruptcy debtors from participation in the PPP. These causes of action only arise as the result of the filing of the bankruptcy petition of Mr. Skefos. Thus, they arise in a bankruptcy case. Moreover, the acts of SBA, which resulted in the refusal of Alpha's application, will directly impact the bankruptcy estate of Mr. Skefos if an injunction is not issued. This court thus concludes that this proceeding is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(A) and (O); *Roman Cath. Church of Archdiocese of Santa Fe v. SBA (In re Roman Cath. Church of Archdiocese of Santa Fe)*, __ B.R. __, 2020 WL 2096113, *4 (Bankr. D. N.M. 2020). This bankruptcy court thus has authority to issue final orders subject only to appellate review pursuant to 28 U.S.C. § 158(a).

Venue is proper in the Western District of Tennessee because this proceeding relates to a bankruptcy case pending in this district. 28 U.S.C. § 1409(a).

## SOVEREIGN IMMUNITY

SBA asserts that the Small Business Act's narrow waiver of sovereign immunity precludes the injunctive relief that Alpha seeks. Alpha disagrees.

The Small Business Act provides in pertinent part:

(b) Powers of Administrator. In the performance of, and with respect to, the functions, powers, and duties vested in him by this chapter the Administrator may—

(1) sue and be sued in any court of record of a State having general jurisdiction, or in any United States district court, and jurisdiction is conferred upon such district court to determine such controversies without regard to the amount in controversy; **but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Administrator or his property**;

15 U.S.C. § 634(b) (emphasis added). SBA relies upon the decision of the United States Court of Appeals for the Sixth Circuit, *Graves v. Unites States,* 1987 WL 38965, at *4 (6th Cir. 1987) (unpublished), which states:

> In our view, the rights of the SBA cannot be affected outside of the consent statute. Section 634(b)(1) waives sovereign immunity to a limited extent. It provides basically that parties may proceed against the SBA but only as Congress has provided. We hold that where, as in the present case, plaintiffs bring an action against a private party, and where that private party brings a counterclaim that implicates the SBA's rights, the SBA's rights are unaffected unless it is made a party to that action pursuant to the consent statute.

SBA asserts that upon this authority, the suit of Alpha must be dismissed.

Alpha counters that the Sixth Circuit's recent ruling in *DV Diamond Club of Flint, LLC v. Small Business Administration,* No. 20-1437 (6th Cir. May 16, 2020), resolves this and many other issues raised in the Motion and Complaint.[2] With respect to the issue of sovereign immunity, Alpha notes that the Eastern District of Michigan stated that section 634(b) '"was not intended to render the agency immune from injunctive relief in situations where the agency has exceeded its statutory authority and where an injunction would not interfere with the agencies internal operations.'" *DV Diamond Club of Flint, LLC v. United States Small Bus. Admin.,* __ F. Supp. 3d __, 2020 WL 2315880, at *7 (E.D. Mich. May 11, 2020) (quoting *Camelot Banquet Rooms, Inc. v. United States Small Bus. Admin.,* No. 20-C-0601, 2020 WL 2088637 at *3-4 (E.D. Wis. May 1, 2020)). In deciding whether to issue a stay pending appeal, neither the majority opinion nor the dissent in *DV Diamond Club* addressed the sovereign immunity question. The court denied the SBA's motion for stay pending appeal (meaning that the district court injunction remains in

---

[2] The Sixth Circuit's decision in *DV Diamond Club* was directed only to the question of whether the court should stay the preliminary injunction against SBA issued by the United States District Court for the Eastern District of Michigan. In connection with that, the panel also addressed many of the substantive issues raised in the Motion and Complaint in this case. Though not a decision on the merits, the court of appeals' decision is the best indication available at this time concerning how the Sixth Circuit will ultimately rule on many of the issues raised in this proceeding.

effect). Alpha argues that these facts strongly indicate that the Sixth Circuit will ultimately rule that sovereign immunity does not prevent a declaratory judgment action against the SBA concerning its interpretation of the PPP.

Alpha also argues that section 106 of the Bankruptcy Code abrogates sovereign immunity for purposes of the anti-discrimination provision, section 525. Section 106 provides in pertinent part:

> (a) Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to the following:
> (1) Sections … 525 … of this title.
> (2) The court may hear and determine any issue arising with respect to the application of such sections to governmental units.

11 U.S.C. § 106(a).

This court is convinced that the refusal of the court of appeals to disturb the injunction issued by the district court in *DV Diamond Club* is the best indication of how the court of appeals will rule on the merits. Relying on *Camelot Banquet Rooms,* which in turn relied upon *Ulstein Maritime, Ltd. v. United States,* 833 F.2d 1052, 1056-57 (1st Cir. 1987), the district court held that section 634(b)(1) does not preclude SBA from being enjoined to set aside unlawful agency action. Here, as there, all that SBA will be enjoined to do is to direct the Plaintiff's chosen lender to process its loan application and to guarantee any PPP loan to which Alpha is otherwise entitled. This court is persuaded that injunctive relief is available to Alpha in the context of this adversary proceeding.

The court is further convinced that injunctive relief is available to Alpha pursuant to the Bankruptcy Code. Section 106(a) unmistakably abrogates a governmental unit's sovereign immunity. *Hunsaker v. United States*, 902 F.3d 963, 966 (9th Cir. 2018); *In re Reed*, 2020 WL 1451565 (Bankr. N.D. Miss. 2020). The SBA is a governmental unit within the meaning of

section 106.  11 U.S.C. § 101(27).  The acts of SBA complained of by Alpha fall precisely within the abrogation of sovereign immunity provided by section 106(a).  Thus, pursuant to the plain language of the statute, the SBA does not enjoy sovereign immunity in this proceeding which involves the determination of issues arising under section 525 of the Bankruptcy Code.  *See, Penobscot Valley Hospital v. Carranza,* 2020 WL 2201943, \*2 (Bankr. D. Me. 2020).

## BACKGROUND

### *The Impact of the Pandemic on Alpha's Business*

The factual allegations of the Complaint are sworn by the Debtor, James Jerry Skefos, as President of Alpha.  The Complaint alleges that Alpha is a childcare center for children ages six weeks to 12 years located in Memphis, Tennessee.  Alpha employs 20 individuals and ordinarily has a census of 60-70 children.  As a result of the COVID-19 pandemic, the census has dropped over 80% to only 8-10 children per day.  Alpha's revenue has likewise dropped precipitously.  Thus, the Complaint alleges, Alpha needs PPP funding to allow it to continue to fund its personnel payroll, which is critical to its survival.  The "Second Declaration of James Jerry Skefos in Support of Verified Emergency Application for Temporary Restraining Order and Preliminary Injunction" was attached as Exhibit B to Alpha's Reply.  [Dkt. No. 14-2].  It states that prior to the filing of his bankruptcy petition, Mr. Skefos was the sole shareholder of Alpha and that he continues to serve as President of Alpha and to oversee its operations.  Mr. Skefos states that Alpha employs 20 individuals and normally has a census of between 60-70 children.  He states that as a result of the COVID-19 pandemic, Alpha's census has dropped to approximately 10-12 children, and its revenue has dropped precipitously.  As result, Alpha has laid off 13 of its employees.  Mr. Skefos says that, if permitted to do so, Alpha will reapply for PPP funds and use those funds "in complete compliance with the program's criteria for forgiveness of any obligation to repay them."

9

The Complaint further alleges that on April 15, 2020, Alpha submitted a completed Borrower PPP Application to Community Bank. On May 7, 2020, Community Bank called Morgan Matheson, an employee of the Debtor, to inform her that the application had not been processed due to Question 1 on the application being marked "yes," indicating that the owner of the applicant is presently involved in bankruptcy. *See Declaration of Morgan Matheson*, Complaint, Ex. 4. Later the same day, Todd Chapman, Senior Vice President of Community Bank, sent an email explaining the denial of Alpha's application and ineligibility for the PPP on the grounds that it is affiliated with a Chapter 11 debtor. *See Email from Todd Chapman*, Complaint, Ex. 5, and *Declaration of Robert Miller,* Complaint, Ex. 6. Mr. Chapman explicitly references the language of the application form which states, "*If questions (1) or (2) below are answered 'Yes,' the loan will not be approved."*

The Complaint alleges that if it were allowed to apply for a PPP loan with the bankruptcy exclusion removed and/or ignored, Alpha would be entitled to PPP funds totaling over $68,417.65, and that it intends to use the funds to pay wages, benefits, and certain taxes, all of which are permissible uses under either section 1102 of the CARES Act or 15 U.S.C. § 636(a).

### The CARES Act and the PPP

The CARES Act was signed into law March 27, 2020. The PPP is a program created by the CARES Act to extend the funding program created under section 7(a), 15 U.S.C. § 636, of the Small Business Act to any business with fewer than 500 employees who apply for funds through a federally-insured lending institution. *See generally* §§ 1101-1109, CARES Act. The CARES Act initially authorized the SBA to guarantee up to $349 billion in PPP loans. These funds were quickly exhausted, and Congress increased the authorized amount to $659 billion in April 2020. The PPP increases eligibility for small business loans:

(D) Increased eligibility for certain small businesses and organizations. —

    (i) In general. — During the covered period, in addition to small business concerns, any business concern, nonprofit organization, veterans organization, or Tribal business concern described in section 657a(b)(2)(C) of this title shall be eligible to receive a covered loan if the business concern, nonprofit organization, veterans organization, or Tribal business concern employs not more than the greater of—

        (I)    500 employees; or
        (II)   if applicable, the size standard in number of employees established by the Administration for the industry in which the business concern, nonprofit organization, veterans organization, or Tribal business concern operates.

15 U.S.C. § 636(a)(36)(D)(i). The PPP allows covered businesses to receive funds equal to 2.5 times their average monthly payroll, up to $10 million. PPP loans may be fully forgiven if the money is used for payroll and related expenses (subject to certain caps), rent, utilities, and interest on certain costs incurred and payments made during the covered period.[3]

    In furtherance of emergency rule-making authority granted by the CARES Act, the SBA issued a series of Interim Final Rules in order to implement the PPP. The first Interim Final Rule was published April 15, 2020. It adopted the ineligibility standards set forth in 13 C.F.R. 120.110 as further described in the SBA's Standard Operating Procedure 50-10, subpart B, Chapter 2, effective April 1, 2019 (the "SOP 50-10"). A "Small Business Applicant" must, among other things: (i) be an operating business; (ii) be organized for profit; (iii) be located in the United States; (iv) be small (as defined by the SBA); and (v) demonstrate the need for the desired credit. *See* SOP 50-10, pp. 91-104. Neither the SOP 50-10 nor the first Interim Final Rule specify that chapter 11 debtors and entities owned by a chapter 11 debtor are ineligible to receive a small business loan.

---

[3] "Definition of covered period. —In this section, the term 'covered period' means the period beginning on March 1, 2020, and ending on December 31, 2020." CARES Act § 1102(a).

In response to the question, "What do lenders have to do in terms of loan underwriting?" the first Interim Final Rule provides:

Each lender shall:

i. Confirm receipt of borrower certifications contained in Paycheck Protection Program Application form issued by the Administration;

ii. Confirm receipt of information demonstrating that a borrower had employees for whom the borrower paid salaries and payroll taxes on or around February 15, 2020;

iii. Confirm the dollar amount of average monthly payroll costs for the preceding calendar year by reviewing the payroll documentation submitted with the borrower's application; and

iv. Follow applicable BSA requirements ….

First Interim Final Rule, 85 Fed. Reg. at 20,815. The form issued by the Administration (the one completed by Alpha), however, includes the notice: "*If questions (1) or (2) below are answered 'Yes,' the loan will not be approved.*" Question 1 asks, "Is the Applicant or any owner of the Applicant presently suspended, debarred, proposed for debarment, declared ineligible, voluntarily excluded from participation in this transaction by any Federal department or agency, or presently involved in any bankruptcy?" Complaint, Ex. 2; SBA Opposition, Ex. 1.

The second Interim Final Rule issued April 15, 2020, and the third Interim Final Rule issued April 20, 2020, are likewise silent with respect to the eligibility of debtors in bankruptcy and entities owned by debtors in bankruptcy. The third Interim Final Rule makes explicit that creditworthiness is not a factor to be considered by lenders in making PPP loans: "[t]he Administrator recognizes that, unlike other SBA loan programs, the financial terms for PPP Loans are uniform for all borrowers, and the standard underwriting process does not apply because no creditworthiness assessment is required for PPP loans." Third Interim Final Rule, 13 CFR 120, 85 Fed. Reg. at 21,750. On April 24, 2020, however, the SBA issued a fourth Interim Final Rule,

which directly addresses the eligibility of entities owned by an entity "involved in any bankruptcy" to receive a PPP loan:

> 4. Eligibility of Businesses Presently Involved in Bankruptcy Proceedings
>
> Will I be approved for a PPP loan if my business is in bankruptcy?
>
> No. If the applicant or the owner of the applicant is the debtor in a bankruptcy proceeding, either at the time it submits the application or at any time before the loan is disbursed, the applicant is ineligible to receive a PPP loan. If the applicant or the owner of the applicant becomes the debtor in a bankruptcy proceeding after submitting a PPP application but before the loan is disbursed, it is the applicant's obligation to notify the lender and request cancellation of the application. Failure by the applicant to do so will be regarded as a use of PPP funds for unauthorized purposes.
>
> The Administrator, in consultation with the Secretary, determined that providing PPP loans to debtors in bankruptcy would present an unacceptably high risk of an unauthorized use of funds or non-repayment of unforgiven loans. In addition, the Bankruptcy Code does not require any person to make a loan or a financial accommodation to a debtor in bankruptcy. The Borrower Application Form for PPP loans (SBA Form 2483), which reflects this restriction in the form of a borrower certification, is a loan program requirement. Lenders may rely on an applicant's representation concerning the applicant's or an owner of the applicant's involvement in a bankruptcy proceeding.

Fourth Interim Final Rule, 85 Fed. Reg. at 23,451.

## ISSUES PRESENTED

Alpha, which is not a debtor in bankruptcy, made its application on April 15, 2020. There seems no dispute that its application was denied because Mr. Skefos answered question 1 on the PPP Application truthfully – indicating that he, the owner of Alpha, is presently a debtor in bankruptcy. No argument is advanced by the SBA for the denial of Alpha's application other than the rulemaking of the SBA. Alpha meets the other streamlined eligibility requirements for the PPP: it is a business with not more than 500 employees. In the context of the pending Motion and request for preliminary injunction, the court must balance the following four factors in determining whether to grant injunctive relief: (1) whether the movant has a strong likelihood of success on

the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Am. Civil Liberties Union Fund of Michigan v. Livingston Cty.*, 796 F.3d 636, 642 (6th Cir. 2015).

### Likelihood of Success on the Merits

Substantively, the Motion and Complaint raise the following issues:

1. Did SBA exceed its statutory authority under the Administrative Procedures Act (the "APA") 5 U.S.C. § 706(2)(C) when it imposed a policy disqualifying a business owned by a debtor in bankruptcy from participating in the PPP?

2. Did SBA violate the APA, 5 U.S.C. § 706(2)(A), when it arbitrarily and capriciously imposed a policy disqualifying a business owned by a bankruptcy debtor from participating in the PPP?

3. Did SBA violate the Bankruptcy Code's antidiscrimination provision, 11 U.S.C. § 525, when it imposed a policy disqualifying a business owned by a bankruptcy debtor from participating in the PPP?

Alpha asks for declaratory and injunctive relief with respect to each of these issues. Alpha cannot be granted injunctive relief unless it can show a strong likelihood of success on at least one of these issues.

### SBA Exceeded Its Authority in Excluding Entities Owned by Bankruptcy Debtors from the PPP

Alpha argues that SBA exceeded its authority under the APA when it imposed a policy disqualifying a business owned by a debtor in bankruptcy from participating in the PPP. Title 5 section 706(C) of the United States Code directs a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be … in excess of statutory jurisdiction,

14

authority, or limitations, or short of statutory right."  Alpha relies heavily upon the analysis of the

Eastern District of Michigan in *DV Diamond Club* in support of its argument.  The court there

applied the two-step framework for evaluating agency actions announced in *Chevron, U.S.A., Inc.*

*v. Natural Res. Defense Council, Inc.,* 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984).  In

*Chevron*, the Court said:

> When a court reviews an agency's construction of the statute which it administers,
> it is confronted with two questions.  First, always, is the question whether Congress
> has directly spoken to the precise question at issue.  If the intent of Congress is
> clear, that is the end of the matter; for the court, as well as the agency, must give
> effect to the unambiguously expressed intent of Congress.  If, however, the court
> determines Congress has not directly addressed the precise question at issue, the
> court does not simply impose its own construction on the statute, as would be
> necessary in the absence of an administrative interpretation.  Rather, if the statute
> is silent or ambiguous with respect to the specific issue, the question for the court
> is whether the agency's answer is based on a permissible construction of the statute.

*Chevron,* 467 U.S. at 842-43.  In *DV Diamond Club* the applicants were denied PPP loans because

they were sexually-oriented businesses, businesses that were rendered ineligible for PPP loans by

the Interim Adult Entertainment Ineligibility Rule adopted by the SBA.  The District Court in *DV*

*Diamond Club* identified the "precise question" posed by the cases before it as:

> May the SBA exclude from eligibility for a PPP loan guaranty a business concern
> that (1) during the covered period (2) has less than 500 employees or less than the
> size standard in number of employees established by the Administration for the
> industry in which the business operates?

*DV Diamond Club,* 2020 WL 2315880, at *10.  The District Court concluded that it could not

because Congress established only two criteria for loan guaranty eligibility and emphasized that

"'*any* business … shall be eligible to receive a covered [i.e., SBA guaranteed] loan' if it meets

those criteria."  *Id.*  The District Court concluded that SBA exceeded its statutory authority when

it adopted the Interim Adult Entertainment Ineligibility Rule and granted the plaintiffs' motion for

preliminary injunction.  In denying SBA's request for a stay pending appeal, the Sixth Circuit

stated:

> The term "any" carries an expansive meaning.  *See SAS Inst., Inc. v. Iancu,* 138
> S. Ct. 1348, 1354 (2018).  It "refer[s] to a member of a particular group or class
> without distinction or limitation" and, in this way, "impl[ies] *every* member of the
> class or group."  *Id.*  (quoting Oxford English Dictionary (3d ed., Mar. 2016)).
> Thus, the Act's specification that "any business concern" is eligible, so long as it
> meets the size criteria, is a reasonable interpretation.  That broad interpretation also
> comports with Congress's intent to provide support to as many displaced American
> workers as possible and, in doing so, does not lead to an "absurd result" as the SBA
> claims.  Finally, by specifying "any business concern," Congress made clear that
> the SBA's longstanding ineligibility rules are inapplicable given the current
> circumstances.  Neither may the SBA continue to apply these rules pursuant to
> [15 U.S.C.] § 636(a)(36)(B), which states: "Except as otherwise provided in this
> paragraph, the [SBA] may guarantee covered loans under the same terms,
> conditions, and processes as a loan made under this subsection."  15 U.S.C.
> § 636(a)(36)(B). This provision likely constitutes a catch-all governing procedures
> otherwise unaffected by the mandate of the CARES Act and the PPP and does not
> detract from the broad grant of eligibility.

*DV Diamond Club,* No. 20-1437, slip op. at * 4-5.  In response to SBA's argument that if Congress

wanted sexually-oriented businesses to be eligible for PPP loan guarantees, it would have said so,

the court said,

> This specification, however, supports the district court's analysis.  It was necessary
> to specify non-profits because they are not businesses, whereas the Act's
> specification that eligibility is conferred on "any business concern" encompasses
> sexually-oriented businesses such as strip clubs that would ordinarily be ineligible
> for loans.

*Id.* at *5.

Alpha argues that the analysis employed by the District Court and confirmed by the Sixth

Circuit applies directly to its Application.  Alpha, it says, meets all the criteria for eligibility under

the PPP.  The only impediment to Alpha receiving PPP funding, it says, is the SBA's improper

exclusion of bankruptcy debtors and their affiliates from the program.

SBA counters that by placing the PPP with the pre-existing section 7(a) lending program, Congress intended that the Administrator exercise broad discretion over the PPP. Indeed, SBA says that the CARES Act expanded the Administrator's authority by enabling her to issue new regulations and rules to implement the PPP without complying with typical notice and comment requirements. United States' Opposition, Dkt. No. 11, p. 24. The Administrator, it says, exercised this authority by incorporating the PPP application form into the first Interim Final Rule and by directly addressing "the ineligibility of entities in active bankruptcy" in the fourth Interim Final Rule. *Id.*

SBA also argues that the bankruptcy exclusion is substantially different from the Interim Adult Entertainment Ineligibility Rule at issue in *DV Diamond Club* because the bankruptcy exclusion "arises out of the existing section 7(a) *statutory* requirement (unaltered by and thus applicable to the PPP) that all loans 'shall be of such sound value … as reasonably to assure repayment.'" 15 U.S.C. § 636(a)(6)." United States' Opposition, Dkt. No. 11, p. 31. SBA argues that when this requirement is read alongside the *DV Diamond Club* court's interpretation of "any business," there is a statutory ambiguity not present in *DV Diamond Club*, whose exclusion was based solely upon a regulation. As a result, SBA urges the court to move to *Chevron* step two and determine whether the bankruptcy exclusion is "a permissible construction of the statute." Here, the SBA says that in order to process PPP applications expeditiously as possible, the SBA eliminated the requirement to perform individual credit review for each PPP while streamlining the pre-existing bankruptcy questions of section 7(a) into the bankruptcy exclusion. In support of this explanation, SBA points to the first and fourth Interim Final Rules, 85 Fed. Reg. at 20,811 and 23,451. At oral argument, counsel for the SBA indicated that in its effort to activate the PPP as quickly as possible, SBA used pre-existing Form 1919 for the application process, a form that

included the question concerning the applicant's or owner's being "presently involved in any bankruptcy," and simply incorporated it into the first Interim Final Rule.[4]  Counsel also argued that the SBA was under tremendous pressure to make decisions that could be implemented easily by lenders.  The exclusion of bankruptcy debtors and their affiliates, he argued, provides a bright line.  The alternative would have been a more conventional underwriting process with concomitant delays in funding.

Alpha argues to the contrary that the PPP drastically altered the underwriting standards for the SBA in Congress's effort to increase access to funding.  Congress expressed this intent, Alpha argues, in 15 U.S.C. § 636(a)(36)(D), which is entitled "Increased eligibility for certain small businesses and organizations," and which sets forth the criteria for PPP eligibility in order to "provide support to as many displaced American workers as possible. *DV Diamond Club,* No. 20-1437, slip op. at * 4.

The SBA's arguments are unpersuasive for three reasons.  First, for the reasons stated by the District Court and the Sixth Circuit panel, Congress expressed its intent through the CARES Act and the PPP that emergency support be provided to American workers facing the loss of income and, in many cases, health insurance, in the face of the worst global pandemic in more than 100 years.  Within that framework, the Administrator was not authorized to exclude American workers on the basis that they happened to be employed by a debtor in bankruptcy or even more remotely, as in this case, by an entity whose owner is a debtor in bankruptcy. Second, the initial "ruling" by the Administrator to include the pre-existing 1919 application form cannot be said to reflect a conscious decision by the Administrator for the reason that it is inconsistent with her later statement to the effect that "unlike other SBA loan programs, the financial terms for PPP Loans

---

[4]  *See* "SBA 7(a) Borrower Information Form," OMB Control No.: 3245-0348, Expiration Date: 07/31/2020, available at https://www.sba.gov/document/sba-form-1919-borrower-information-form.

are uniform for all borrowers, and the standard underwriting process does not apply because no creditworthiness assessment is required for PPP loans." Third Interim Final Rule, 13 CFR 120, 85 Fed. Reg. at 21,750. The statement that no creditworthiness assessment is required for PPP loans is consistent with the reading of the District Court and Sixth Circuit panel that Congress intended "any business" to mean exactly that. The Administrator's later statement that she, "in consultation with the Secretary, determined that providing PPP loans to debtors in bankruptcy would present an unacceptably high risk of an unauthorized use of funds or non-repayment of unforgiven loans" is inconsistent with Congress's statement. For reasons stated below, it is also illogical. Third, the exclusion of entities whose owner is "presently involved in a bankruptcy" is even further removed from Congress's expressed intent of providing payroll support to struggling Americans. No explanation was provided by SBA for the exclusion of applicants such as Alpha, which was operating successfully prior to the COVID-19 pandemic, based solely on the status of its owner.

The Administrator exceeded the authority granted to her in the CARES Act by excluding businesses from the PPP on the basis that their owners are "presently involved in a bankruptcy."[5]

### SBA Acted Arbitrarily and Capriciously in Excluding Entities Owned by Debtors in Bankruptcy from the PPP

Alpha argues that SBA acted arbitrarily and capriciously when it imposed a policy disqualifying a business owned by a debtor in bankruptcy from participating in the PPP. Title 5 section 706(C) of the United States Code directs a reviewing court to "hold unlawful and set aside

---

[5] This was the "rule" (expressed through Form 1919) when Alpha applied. As one court has explained, it is a standard so vague as to be almost meaningless. *See, Roman Cath. Church of Archdiocese of Santa Fe v. SBA (In re Roman Cath. Church of Archdiocese of Santa Fe)*, __ B.R. __, 2020 WL 2096113, *6 (Bankr. D. N.M. 2020)*. The Administrator's later clarification that SBA intends to exclude applicants or entities owned by an applicant that "is the debtor in a bankruptcy proceeding, either at the time it submits the application or at any time before the loan is disbursed" is more precise but still exceeds the Administrator's authority for the reasons stated.

agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." An agency rule is "arbitrary and capricious if the agency relied on factors [that] Congress has not intended it to consider, entirely failed to consider important an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983). The Supreme Court has explained this standard:

> Even under *Chevron*'s deferential framework, agencies must operate "within the bounds of reasonable interpretation." *Arlington*, 569 U.S., at ——, 133 S. Ct., at 1868. And reasonable statutory interpretation must account for both "the specific context in which ... language is used" and "the broader context of the statute as a whole." *Robinson v. Shell Oil Co*., 519 U.S. 337, 341, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997). A statutory "provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme ... because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *United Sav. Assn. of Tex. v. Timbers of Inwood Forest Associates*, *Ltd.*, 484 U.S. 365, 371, 108 S. Ct. 626, 98 L. Ed. 2d 740 (1988). Thus, an agency interpretation that is "inconsisten[t] with the design and structure of the statute as a whole," *University of Tex. Southwestern Medical Center v. Nassar*, 570 U.S. ——, ——, 133 S. Ct. 2517, 2529, 186 L. Ed. 2d 503 (2013), does not merit deference.

*Util. Air Regulatory Group v. E.P.A.,* 573 U.S. 302, 321, 134 S. Ct. 2427, 189 L. Ed. 2d 372 (2014).

In support of its argument that the SBA acted arbitrarily and capriciously in excluding bankruptcy debtors and their affiliates from the PPP, Alpha relies upon the bankruptcy court's decision in *Roman Catholic Church of the Archdiocese of Sante Fe v. United States* (*In re Roman Catholic Church of Archdiocese of Santa Fe),* 2020 WL 2096113 (Bankr. D. N.M. May 1, 2020). Faced with exclusion of its employees from the help provided by the PPP, the Archdiocese sued the SBA raising similar arguments to those raised by Alpha. The court specifically found the SBA's decision to exclude bankruptcy debtors to be arbitrary and capricious, saying:

The Court finds that Defendant's decision to exclude bankruptcy debtors from the PPP is arbitrary and capricious. While a borrower's bankruptcy status clearly is relevant for a normal loan program, the PPP is the opposite of that. It is not a loan program at all. It is a grant or support program. The statute's eligibility requirements do not include creditworthiness. Quite the contrary, the CARES Act makes PPP money available regardless of financial distress. Financial distress is presumed. Given the effect of the lockdown, many, perhaps most, applicants would not be able to repay their PPP loans. They don't have to, because the "loans" are really grants. Repayment is not a significant part of the program. That is why Congress did not include creditworthiness as a requirement.

Considering the unprecedent[ed] nature of the PPP and the circumstances underlying its enactment, there is no reason to assume that Congress intended to cede to Defendant discretion to exclude bankruptcy debtors from the PPP. Rather, a review of the CARES Act in its entirety shows the opposite. *E.P.A.*, 573 U.S. at 321, 134 S. Ct. 2427 (Congress's intent may be discerned by examining the enactment in its entirety); *[Food & Drug Admin. v.] Brown & Williamson [Tobacco Corp.*, 529 U.S. [120] at 133, 120 S. Ct. 1291 (2000) (same). As discussed below, another CARES Act program (direct loans to mid-sized businesses) specifically excludes bankruptcy debtors. The unmistakable implication is that Congress did not intend to exclude bankruptcy debtors from the PPP.

The structure of the PPP is simple: PPP funds must be used for payroll, mortgage interest, rent, or utilities. If the funds are used as required, they do not have to be repaid. Given the obvious purpose of the PPP, it was arbitrary and capricious for Defendant to engraft a creditworthiness test where none belonged.

*Archdiocese of Santa Fe,* 2020 WL 2096113, at *6.

SBA argues to the contrary that "nothing in the CARES Act precludes excluding bankruptcy entities from the PPP; the law instead gives the Administrator broad discretion." United States' Opposition, p. 26. In support, SBA points to 15 U.S.C. § 636(a)(6) (the pre-existing 7(a) lending program required lenders to ensure that loans be of "sound value … as reasonably to assure repayment") and Form 1919, questions 6 and 24. Question 6 asks, "Has the Small Business Applicant and/or its Affiliates ever filed for bankruptcy protection?" and Question 24, which is directed to the applicant's principal, asks, "Have you, or any business you controlled, ever filed for bankruptcy protection?" In each case, if the applicant or principal answers, "yes," they are permitted to provide details on a separate sheet. SBA explains that:

> The bankruptcy exclusion in the PPP stems from these pre-existing section 7(a) requirements. The pre-existing bankruptcy questions of section 7(a) were "streamlined" for the PPP to meet SBA's determination that PPP loans must be processed "expeditiously." First Interim Final Rule, 85 Fed. Reg. at 20,811. To streamline the processing, the SBA eliminated the requirement to perform individual credit review for each PPP loan, as with other 7(a) loans. Instead, the PPP program imposed a bright line rule to exclude those in bankruptcy through its official application form.

United States' Opposition, p. 26.

Perhaps nothing illustrates the arbitrariness and caprice of the bankruptcy exclusion rule better than SBA's explanation. In order to implement a Congressional program intended to protect American workers from unemployment and loss of health insurance, SBA arbitrarily eliminated all workers employed by debtors in bankruptcy and all workers employed by entities whose owners are debtors in bankruptcy. Under pre-existing Form 7(a), a truthful answer to questions 6 or 24 opened the opportunity for the applicant or principal to provide additional information. It did not result in automatic disqualification. In attempting to expedite the PPP application process, SBA chose a path that was diametrically opposed to its prior practice and the stated intention of Congress to provide funds for payroll, mortgage interest, rent, and utilities to struggling businesses. As the Administrator herself explained "no creditworthiness assessment is required for PPP Loans," yet the explanation offered by SBA in its Opposition to Alpha's Motion and Complaint is that it excluded bankruptcy debtors in order "reasonably to assure repayment." The bankruptcy exclusion clearly was intended as a creditworthiness determination, but a creditworthiness determination based on nothing more than the bankruptcy status of the applicant or the owner of the applicant. This court agrees with the decision of the bankruptcy judge in *Archdiocese of Santa Fe:* "Given the obvious purpose of the PPP, it was arbitrary and capricious for Defendant to engraft a creditworthiness test where none belonged." 2020 WL 2096113, at *6.

SBA acted arbitrarily and capriciously in excluding applicants whose owners are debtors in bankruptcy from the PPP.

### SBA Discriminated Against Alpha in Violation of Bankruptcy Code Section 525(a)

Alpha argues that in excluding applicants whose owners are debtors in bankruptcy from the PPP, the SBA violated section 525(a) of the Bankruptcy Code. That section provides in pertinent part:

> [A] governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, … a person that is or has been a debtor under this title … or another person with whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title ….

11 U.S.C. § 525(a). Alpha argues that the PPP is in substance a government grant program rather than a government loan program, and thus that the SBA's exclusion of applicants solely on the basis of their status as bankruptcy debtors or affiliates of bankruptcy debtors clearly violates this section. Significantly, it notes, Alpha is not being denied the opportunity to apply for PPP funds due to any analysis of its creditworthiness. That analysis was foreclosed by the rejection of Alpha's application on the basis of Mr. Skefos's status as a debtor in bankruptcy. In the fourth Interim Final Rule, Alpha says, SBA attempted to justify the exclusion of debtors in bankruptcy on the basis that "PPP loans to debtors in bankruptcy would present an unacceptably high risk of an unauthorized use of funds or non-payment of unforgiven funds." 85 C.F.R. at 23,451. Alpha characterizes these "post-hock justifications" as "thin, revisionist, contradictory, and offered in bad faith." Complaint, ¶ 47.

The SBA responds that by its plain language, section 525(a) does not apply to lending or loan guarantees. It claims that the Sixth Circuit directly addressed this issue in *Toth v. Michigan State Housing Dev. Auth.,* 126 F.3d 477 (6th Cir. 1998), in which the court rejected the plaintiff's

claim that Michigan's denial of her application for a low income home improvement loan based upon a recent discharge in bankruptcy was discriminatory. SBA notes that other circuit, district, and bankruptcy courts have reached the same conclusion. United States' Opposition, pp. 15-16. SBA notes that section 525 was "intended to codify the rule of *Perez v. Campbell,* 402 U.S. 637 (1971), which held that a state could not frustrate the Congressional policy of a fresh start for a bankrupt by refusing to renew a driver's license based on a discharged judgment resulting from an automobile accident." *In re Rees,* 61 B.R. 114, 116-124 (Bankr. D. Utah 1986). SBA argues that the PPP is in no way like the driver's license in *Perez,* but instead operates to provide emergency funding to eligible businesses. "Businesses that are excluded from funding are not prohibited from operating, as with a refusal to provide a license, permit, charter or franchise," it says, and "entities in active bankruptcy may be eligible for other relief under the CARES Act itself, including an Emergency Economic Injury Disaster Claim. United States' Opposition, pp. 17-18. The SBA points to two decisions that have rejected debtor's claims that the PPP is not a loan but a grant for purposes of section 525(a). *See Cosi, Inc. v. SBA,* Adv. Proc. No. 20-50591 (BLS) (Bankr. D. Del. April 30, 2020) (Neither the case law, nor section 525 precludes the SBA from imposing a bankruptcy-related condition or criteria within the context of the PPP.); and *Trudy's Texas Star, Inc. v. Carranza,* Adv. Proc. No. 20-10260-hmc (Bankr. W.D. Tex. May 7, 2020) ("The PPP program, under the CARES Act is a loan…. The PPP loan program is not similar to a license, permit, charter, or franchise.").

Alpha replies that although SBA has attempted to argue in this and similar cases that the PPP does not fall within section 525(a) because SBA treats the program as a loan and uses language associated with traditional loans, in fact, the SBA is not the lender but the loan guarantor. Alpha concedes that a true commercial loan does not fall within the prohibition of section 525(a), but

argues that when a subsidy is cast in the form of a loan, even though it is in reality a grant, it falls within the protection of section 525, citing *In re Haffner,* 25 B.R. 882 (N.D. Ind. 1982) (although technically a "loan," the program was a sale support mechanism, i.e., a subsidy, and was therefore covered by section 525). SBA's argument, Alpha says, elevates form over substance, ignoring the intent of Congress that the PPP provide relief to small businesses affected by the economic downturn.

It seems to this court that the PPP is unlike any other government program previously analyzed under section 525, and understandably so. It is intended to meet an unprecedented crisis using whatever tools were ready to hand. The fact that SBA had existing relationships with lenders and their small-business customers throughout the United States provided a structure for distributing congressionally appropriated funds. The fact that notwithstanding the Affordable Care Act's expansion of the availability of health insurance to Americans, many if not most Americans who have health insurance receive it as a benefit of their employment. Thus, maintaining employees' status as employees was important for reasons other than merely providing income replacement. This may have accounted for some of the more unusual provisions of this "loan" program, most importantly, the fact that no underwriting function is anticipated and the fact that the "loan" will be completely forgiven if the applicant simply uses 75% of the loan proceeds to keep its employees employed.

This was the conclusion of Bankruptcy Judge David Jones in *Hidalgo County Emergency Service Foundation v. Carranza (In re Hidalgo County Emergency Service Foundation),* Case No. 19-20497; Adv. Pro. No. 20-2006, 2020 WL 2029252 (Bankr. S.D. Tex.) (transcript of oral ruling rendered April 24, 2020), who said:

> And in fact there really isn't an underwriting function…. There's no evaluation of ability to repay, there's no evaluation of collateral…. The entire intent of the

program is for people not to pay this back. It's a way of getting money from the government to people who are being harmed. And so long as they use it the right way, they don't have to pay it back.

\*\*\*

This isn't a loan program. This is a support program.

Complaint, Ex. 10, transcript of April 24, 2020, TRO hearing, pp. 22-23. This was also the conclusion of Bankruptcy Judge David T. Thuma in *Archdiocese of Santa Fe:*

> Plaintiff argues that Defendant's decision to exclude debtors from the PPP violates § 525(a). The Court agrees. *In Stoltz v. Brattleboro Housing Auth. (In re Stoltz),* 315 F.3d 80 (2d Cir. 2002), the Second Circuit analyzed the term "other similar grant:"
>
> > The term "other similar grant" is not defined by the code. In common parlance, a grant is "a transfer of property by deed or writing." Merriam Webster's Collegiate Dictionary 507 (10th ed. 2000). As a legal term, a grant is "[a]n agreement that creates a right of any description other than the one held by the grantor. Examples include leases, easements, charges, patents, franchises, powers, and licenses." Black's Law Dictionary 707 (7th ed. 1999) (emphasis added). Similarly, a lease is "[a] contract by which a rightful possessor of real property conveys the right to use and occupy that property in exchange for consideration." *Id.* at 898.
> > ...
> > The common qualities of the property interests protected under section 525(a), i.e., "license[s], permit[s], charter[s], franchise[s], and other similar grants," are that these property interests are unobtainable from the private sector and essential to a debtor's fresh start. *Id.* at 88-90.
>
> \*\*\*
>
> As shown above, the PPP is not a loan program. It is a grant or support program. The target grant recipients are small businesses in financial distress. The PPP could only be offered by the government; private lenders do not give away money. PPP funds "are unobtainable from the private sector." *Stoltz,* 315 F.3d at 90. They also are essential to Plaintiff's fresh start. *Id.* Of all the benefits a government can grant, free money might be the best of all. Denying Plaintiff access to PPP funds solely because it is a debtor violates § 525(a).

*Archdiocese of Santa Fe,* 2020 WL 2096113, at \*8.

This court joins Judges Jones and Thuma in finding that the PPP "loan" is in the nature of a "license, permit, charter, franchise, or similar grant" without which a debtor's fresh start would be impeded. As there is no question that the only reason that Alpha's application was turned away

by Community Bank was the ruling by SBA that entities owned by debtors in bankruptcy are ineligible for the PPP program, the court finds and concludes that the SBA's bankruptcy exclusion violates section 525(a) of the Bankruptcy Code.

### Remaining Preliminary Injunction Factors

The court has determined that Alpha will succeed on the merits of the Complaint. The remaining preliminary injunction factors require little discussion. First, Alpha (and its employees) will suffer irreparable injury absent the injunction. According to the Declaration of Mr. Skefos, Alpha has laid off 13 of its employees. If permitted to do so, Alpha will reapply for PPP funds and intends to use those funds to repay those employees in compliance with the program's criteria for loan forgiveness. Second, the requested injunction directing the SBA not to exclude entities owned by debtors in bankruptcy would cause no harm to others. The SBA has not argued that it would, and the court has been unable to conceive of any possible harm. Fourth, the public interest would be served by the issuance of the injunction. As expressed by the District Court in *DV Diamond Club:*

> [T]he purpose of the PPP is to protect the employment and livelihood of employees who, through no fault of their own, have found their places of employment closed due to the COVID-19 pandemic. That purpose would be frustrated if the Court did not grant the requested preliminary injunction. "Guaranteeing the plaintiffs' loans now, rather than months from now when this case is over, furthers the public interest in helping all small businesses and their employees get through the pandemic." *Camelot Banquet Rooms,* __ F. Supp. 3d at __, 2020 WL 2088637 (E.D. Wis. May 1, 2020).

*DV Diamond Club,* 2020 WL 2315880 at *17. The same rationale applies to Alpha's business if not more so since a PPP grant to Alpha would not only provide employment to its own employees but would also support the childcare needs of other workers.

27

## Preliminary Injunction

In lieu of a temporary restraining order, Alpha has asked that the court issue a preliminary injunction if it finds that relief to be warranted. It does. *See* Fed. R. Civ. P. 65, made applicable in bankruptcy by Fed. R. Bankr. P. 7065.

## No Bond is Required

Because the request for injunction is made by the Trustee acting on behalf of the bankruptcy estate of Mr. Skefos, no bond shall be required. Fed. R. Bankr. P. 7065 ("Rule 65 applies in adversary proceedings, except that a temporary restraining order or preliminary injunction may be issued on application of a debtor, trustee, or debtor in possession without compliance with Rule 65(c).").

## CONCLUSION

For the foregoing reasons, the court finds, concludes, and declares that:

1. SBA violated the Administrative Procedures Act, 5 U.S.C. § 706(C), when it exceeded its rulemaking authority by excluding entities owned by bankruptcy debtors from the PPP program.

2. SBA violated the Administrative Procedures Act, 5 U.S.C. § 706(B), when it arbitrarily and capriciously excluded entities owned by bankruptcy debtors from the PPP program.

3. SBA violated the Bankruptcy Code's anti-discrimination provision, 11 U.S.C. § 525(a), when it directed lenders to refuse to accept PPP applications from entities owned by bankruptcy debtors.

4. Alpha's Request for Preliminary and Permanent Injunction is **GRANTED**.

5. By 5:00 p.m. C.D.T, on **Friday, June 5, 2020**, Alpha shall provide to counsel for SBA the name and full contact information (including email address) for their contact at Community Bank (or other lender of Alpha's choice).

6. By 12:00 p.m., C.D.T., on **Friday, June 12, 2020**, SBA shall notify the lender representative in writing that (a) the application of Alpha for a PPP loan shall not be denied based upon the fact that Mr. Skefos is a debtor in bankruptcy; and (b) that if Alpha meets all other eligibility requirements for a PPP loan, the SBA will guarantee it.

7. In the event that Alpha otherwise meets the requirements for a PPP loan, SBA shall guarantee the loan for which it has applied or attempted to apply.

**Further Proceedings**

At the hearing to consider the Motion and request for preliminary injunction, the court asked counsel whether the hearing might be converted to one on the merits as there seemed to be no material factual dispute.[6] Counsel for Alpha agreed, but counsel for the SBA objected saying that it would prefer to make its administrative record. The court indicated that it would carefully consider the arguments of counsel and the extensive record already before the court to determine whether any additional material factual issues remain for trial. Having carefully reviewed the record and knowing that time is of the essence in Alpha's quest to obtain funds to support its daycare business (a business, by the way, that is among those that are essential to the reopening that communities across the country are attempting), this court joins Judge Thuma in finding no reason to delay entry of a final judgment in this cause.

---

[6] *See* Fed. R. Civ. P. 65(a)(2) ("Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing.")

There is one remaining matter, however.  Alpha has asked that it be awarded its attorney fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.  Alpha shall file a motion and affidavit in support of its request within thirty days of the entry of this order.  SBA will be given fourteen days to respond.  Upon conclusion of the consideration of Alpha's motion, the court will enter a separate judgment consistent with this opinion.


cc:     Debtors
        Attorney for Debtors
        Trustee
        Attorney for Chapter 11 Trustee
        Plaintiff
        Attorney for Plaintiff
        Defendant
        Attorney(s) for Defendant
        United States Trustee

```
 1          IN RE:

 2          ASTRIA HEALTH, et al.

 3           Debtors. 1

 4          Lead Case No. 19-01189-11

 5          Adv. Pro. Case No. 20-80016 - WLH

 6          AGREED ORDER REGARDING

 7          SCHEDULING AND

 8          RESERVATION OF PPP FUNDS

 9          ASTRIA HEALTH, et al.,

10           Plaintiffs,

11          V.

12          UNITED STATES SMALL

13          BUSINESS ADMINISTRATION and

14          JOVITA CARRANZA, in her capacity

15          As Administrator for the United States

16          Small Business Administration,

17           Defendants.

18          THE COURT:  I appreciate it.  I appreciate

19     both you and Mr. Sachs arguments and counsel today

20     and your advocacy.  I understand both sides.  If

21     you give me a two or three minutes, I just want to

22     dot my I's and cross my T's, then I'll come back

23     with a ruling for everyone.  Give me just a couple

24     minutes.

25          (Whereupon a recess was taken)
```

```
1              THE COURT:  All right.  Mr. Maizel, are
2    you still on?
3              MR. MAIZEL:  Yes, Your Honor.
4              THE COURT:  Mr. Sachs?
5              MR. SACHS:  Yes, Your Honor.
6              THE COURT:  Okay.  I guess it's now
7    afternoon; we started in the morning and I'll say
8    good afternoon to both of you.
9              All right, so we're here today on the
10   debtor's motion for preliminary injunction on
11   an -- in an adversary proceeding commenced against
12   the Small Business Association relating to the
13   debtors' request and the denial of their requests
14   for paycheck protection program or PPP funding
15   under the recently passed Cares Act.  The Court's
16   reviewed the debtor's motion, the supporting
17   declaration, the government's brief in opposition,
18   along with the request for judicial notice and
19   attachments thereto, and the Court has also
20   reviewed the debtor's reply.
21             During the break, the Court read the
22   recent decision issued today by bankruptcy judge
23   (inaudible) in the district of Maine, so the
24   Court's reviewed that decision as well.
25             The Court's now prepared to rule on the
```

Astria Health vs SBA, et al.

```
 1   debtors' request.  In doing so, the Court utilizes
 2   the familiar four factors, which largely collapsed
 3   to three in this context, regarding whether a
 4   preliminary injunction should issue.  Although the
 5   debtors contested to some extent, I agree with the
 6   articulation of the legal standard as set forth on
 7   pages 14 to 15 of the government's brief and am
 8   applying that heightened standard today.  Turning
 9   to the factors:  Factor one is whether the moving
10   parties or the debtors will probably, or very
11   likely, prevail on the merits.  I'm going to break
12   this into two parts and discuss, first, section
13   525, and then second, the Administrative
14   Procedures Act issue.
15          Regarding section 525, the debtors contend
16   that the exclusion of entities in bankruptcy from
17   PPP funding violates bankruptcy code section
18   225(a).  Section 225(a) bars bankruptcy-related
19   discrimination involving, "A license, permit,
20   charter, franchise, or other similar grant."  The
21   parties disagree about whether PPP funding fits
22   within this phrase.  In answering this question,
23   the Court is bound by the text of the statute.
24   The statutory text of the bankruptcy code reflects
25   an area of issues considered by Congress and the
```



Central Court Reporting   800.442.3376

1    code is not for you to ignore the plain meaning of

2    the text even if the policy outcome is

3    unfavorable.  Many recent Supreme court opinions

4    make this crystal clear.  See, for example, Puerto

5    Rico versus Franklin, California, Tax Free Trust

6    136 Supreme Court Reporter in 1938 at pages 1946

7    to 49, a 2016 decision in which the Court held

8    that Puerto Rican municipalities were

9    categorically precluded from any form of

10   bankruptcy relief because of the plain text

11   section 903 of the bankruptcy code, a decision

12   that Congress subsequently addressed by passing

13   the (inaudible) litigation.  Baker Box LLP versus

14   (inaudible) LLP 135 Supreme Court Reporter 2158 at

15   page 2169, 2015, in which the Court held that the

16   plain text of the bankruptcy code prevents fees on

17   fees in defending professional fee applications

18   and noted that perhaps that's a bad policy

19   decision, but policy decisions are left to

20   Congress.  Rabax (phonetic) Gateway Hotel, LLC

21   versus Amalgamated Bank 566, U.S. Reporter, 639 at

22   page 649, a 2012 decision authored by Justice

23   Scalia, noting that the pros and cons of credit

24   bidding in bankruptcy are left strictly to

25   Congress.  Pole versus United States, 566, U.S.



1    506 at pages 522 to 23, a 2012 decision, authored

2    by Justice (inaudible) finding that Chapter 12

3    debtors cannot protect tax on the sale of a family

4    farm in the context that's attracted to Chapter 12

5    case from administrative priority, a decision that

6    Congress subsequently overruled through

7    legislation.  Moreover, as Justice Keegan recently

8    explained all of the bankruptcy code generally,

9    "names to make reorganizations possible, it does

10   not commit to anything and everything that might

11   accomplish that goal."  And Mission Products

12   Holding, Inc., versus Technology 139 Supreme Court

13   Reporter 1652 at page 1665.  That's the decision

14   from last year, 2019.

15        This court is also duty-bound to apply the

16   statute Congress has provided and simply cannot

17   rewrite the text or advance a desirable result in

18   a particular case.  Keeping those foundational

19   principles in mind, the Court cannot conclude that

20   the debtors are likely to prevail on the theory

21   that section 525 is violated here.

22        First, the Court agrees with the

23   government that PPP loans are properly classified

24   as just that, loans.  To be (inaudible) these are

25   highly unusual loans that may openly and



1    functionally provide free money, but that doesn't

2    matter.  They're not loans in the first instance.

3    There's a borrower, a lender, a promissory note, a

4    promise to repay, and the like.

5         As other -- as many other courts have

6    noted, we certainly are not quote unquote market

7    terms, but there can be many loans in society that

8    are not done on market terms or even economically

9    rational terms.  But nevertheless, are loans.  For

10   example, private equity sponsors sometimes lend

11   troubled portfolio companies money on highly

12   favorable terms, terms no (inaudible) lender would

13   ever offer.  Sometimes this leads to bankruptcy

14   fights about re-characterization, but the equity

15   sponsors win most of those fights.  Why?  Because

16   there was a loan, even if it is an off-market or

17   friendly loan.  (Inaudible), I might loan money to

18   my brother or a good friend on off-market terms,

19   perhaps even on terms that will result in total

20   forgiveness of the loan, such as performing

21   charitable work or donating the money to a worthy

22   cause.  The point is that in these contexts, there

23   is still some sort of extension of credit with a

24   corresponding obligation.

25        I ultimately agree with the various other



```
 1    bankruptcy judges who have concluded that's the
 2    better way to classify PPP loans.  Moreover, even
 3    if I could conclude the PPP loans -- or I could
 4    construe PPP loans as a form of financial grant,
 5    I still not -- I still do not think the debtors
 6    are likely to succeed on their section 525
 7    argument.  I agree with bankruptcy Judge Brendan
 8    Shannon from Delaware, that section 525 (a) does
 9    not apply to, "money grants."  The statute's use
10    of the word similar to modify the word grant has
11    to be given meaning and it plainly functions to
12    limit grants to those that are in the permits
13    licenses and the like.  To be sure, many things
14    could fall with (inaudible) increase.  The ability
15    to use the FCC spectrum, specified real property
16    (inaudible) and the (inaudible) real property as
17    in the Stoltz case, perhaps patents or trademarks.
18    But an affirmative money grant is different in
19    kind from what are essentially forms of permission
20    or access that are uniquely granted by the
21    government.  Access to money, even free money, is
22    not subject to governmental controls or
23    unattainable elsewhere.  For example, private
24    parties also give money grants.  Every time I turn
25    on and listen to NPR, there's a long list of
```



1   different foundations that have issued free money

2   grants to -- to NPR, demonstrating that free money

3   is, at least in some instances, is available from

4   parties other than the government.

5        The limited reach of section 525 (a) is

6   illustrated perhaps most clearly by contrasting

7   section 525 (a) with section 525 (c).  Section

8   525 (c) prevents discriminatory treatment

9   involving, among other things, "a student grant."

10  A student grant being a Pell grant or University

11  grant is, of course, free money.  But it's section

12  525 (a)  already encompassed an economic grant,

13  then there would be no need to include student

14  grants in section 525.  The Court must interpret

15  the statute as a whole and avoid a reading that

16  would render any provisions superfluous.  The

17  interpretation that best does that as Judge

18  Shannon's exclusion of "money grants" from the

19  scope of 525 (a).  So even if it is not truly a

20  loan, and is some variety of grant, section 525

21  (a) just doesn't stretch far enough to encompass

22  PPP funding.

23       To the extent there's any ambiguity in

24  section 525, itself.  I agree with the SBA's

25  point, that the legislative history plainly states



1    that the purpose of the provision is to codify the

2    result of Perez versus Candle 402 U.S. 637, a 1971

3    Supreme Court decision.  The Perez case about

4    denial of the driver's license due to nonpayment

5    of a debt owed the State in a bankruptcy case.

6    The Supreme Court held it improperly limited the

7    debtor's fresh start because of the basic need for

8    driver's licenses and the exclusive control of the

9    state over such licensing.  This is consistent

10   with section 525 (a) applying to permit the grants

11   of access or privileges controlled by the

12   government, but not consistent with expanding into

13   affirmative economics payments.

14        As I said, I'm ultimately constrained by

15   the statute that Congress gave me and I don't

16   think that statute gets the debtors where they

17   need to go in order to ultimately prevail on this

18   issue.

19        Since I'm not sure where this litigation

20   is going after my ruling today, I do note that if

21   section 525 were applicable, there's zero doubt

22   that the SBA cannot claim sovereign immunity

23   protection.  Bankruptcy code section 106 (a) very

24   plainly waives sovereign immunity regarding the

25   entirety of section 525 and section 106 (a) is



1    consistently interpreted and applied in a

2    comprehensive fashion by the Ninth Circuit Court

3    of Appeals, perhaps more so than in any other

4    circuit.  See, for example, Huntsinger (phonetic)

5    versus United States 902 F 3rd, 963, Ninth Circuit

6    from 2018, the Valley (phonetic) versus United

7    States in re DBSI, Inc., 1869 F 3rd 1004, a Ninth

8    Circuit decision from 2017.

9         The Court now turns to address the

10   Administrative Procedures Act issue.  The debtors

11   argue that the SBA's bankruptcy exclusion can be

12   classified under the Administrative Procedures

13   Act, which allows judicial nullification of agency

14   action when that action is, among other things,

15   arbitrary, capricious an abusive discretion, or

16   otherwise not in accordance with law -- with law 5

17   USC section 7062A.  Before turning to the

18   substance of this APA argument, the Court first

19   addresses threshold issues raised by the

20   government; I first talk about bankruptcy

21   jurisdiction and power.  There's federal subject

22   matter jurisdiction under 28, USC 1334 (b).  This

23   is a civil proceeding, "Arising under Title 11,"

24   in part the last, including the APA claims or

25   claims, "Arising in a bankruptcy case.  And then



1    the question, (inaudible) related to the Chapter

2    11 cases."  To the extent that there's any doubt,

3    although I don't believe there is, I note that the

4    Court can exercise supplemental jurisdiction under

5    28 USC section 1367, over any ancillary issues

6    related to bankruptcy.  See Montana versus Golden

7    in re Pegasus Gold Corp, 394, F 3rd 1189 at pages

8    1194 to 95, Ninth Circuit, 2005.

9         Bankruptcy jurisdiction in the Ninth

10    Circuit is exceptionally broad.  All matters

11    within the broad scope of federal bankruptcy

12    jurisdiction have been referred to me by the

13    United States district court for the Eastern

14    District of Washington pursuant to 28 United

15    States code section 157 (a).  See the Eastern

16    District's, local civil rule, 83 spot 5 a.  That

17    is the end of the jurisdictional analysis.

18         The next question relates to the

19    allocation of decisional power between this court

20    and the district court.  This is the article three

21    issue discussing Stern versus Marshall.  To be

22    clear, this has nothing to do with jurisdiction,

23    but rather only relates to whether I can enter a

24    final judgment or need to do a report and

25    recommendation to the district court.  Stern



1    itself makes this point, C 564, U.S. 462 at page

2    480.  And the Ninth Circuit Court of Appeals just

3    recently underscored the exact same point in a

4    case called Hanky versus Grubstiene (phonetic) in

5    re Point Center Financial, Inc., 2020 US app Lexis

6    13743 at pages star 15 to 16; that's a Ninth

7    Circuit opinion from April 29th of this year

8    that's been designated for publication.

9         The APA claim is statutorily "core" under

10   28 USC section 157 B 2 B A, because it's a matter

11   concerning the administration of this bankruptcy

12   estate.  Thus, as a statutory matter, I have both

13   subject matter jurisdiction and the power to

14   finally resolve the claim.  That now turns to the

15   Stern question.  Does this create a constitutional

16   issue?  The Court's, the answer to that is no.

17   This is a dispute within the final adjudicatory

18   power of this court.  The entire dispute "at issue

19   stems from the bankruptcy itself," which means

20   this court can properly exercise the judicial

21   power needed to resolve it.  See Stern at page

22   499.  To be sure that the claim at issue in Stern

23   was quoting the state tort action that exists

24   without regard to any bankruptcy proceedings.  The

25   same is not true here.  It's not sensible to say



Astria Health vs SBA, et al.

```
1    that a claim challenging the SBA's exclusion of

2    bankrupt entities for PPP loans could ever exist

3    "without regard to any bankruptcy proceeding" is

4    contemplated and Stern.  Such an action couldn't

5    ever be brought in any other context or court

6    because the plaintiff wouldn't have standing and

7    wouldn't have suffered any harm.  This dispute

8    exists only because of the bankruptcy filing and

9    the fact that we're in a bankruptcy case.  It

10   depends on and flows entirely from a bankruptcy

11   and could never exist outside of the bankruptcy

12   context.  The analysis in Stern versus Marshall

13   makes clear that any claims in stemming from the

14   bankruptcy itself are properly within the

15   adjudicatory powers of the bankruptcy judge.  And

16   that's what we have before me today.

17        The Court next addresses the

18   anti-injunctive provisions cited by the SBA as a

19   defense.  The Court agrees with the distinction

20   drawn by several other bankruptcy and district

21   judges about why section 634 B 1 of the Small

22   Business Act is not violated in this context.

23   Those courts cogently frame a distinction based on

24   the decision in Olstein (phonetic) Marine limited

25   versus United States, 833 F 2nd 1052, a first
```

Central Court Reporting   800.442.3376

1   circuit decision from 1987.  And the Court has not

2   been pointed to any contrary Ninth Circuit Court

3   of Appeals case law.  The debtors here seek to

4   enforce the law against the SBA.  They seek no

5   relief that would interfere with the SBA's

6   internal workings and therefore do not run afoul

7   of the statute.  As such, the Court now has

8   (inaudible) incorporates by reference the analysis

9   contained in Diamond DB Diamond Club of

10  (inaudible) LLC versus United States SBA 2020 U.S.

11  district Lexus 82213 at pages star 19 to 23, a May

12  11th, 2020 decision by the Eastern District of

13  Michigan.  Also Springfield Medical Care Systems

14  versus Kuranda (phontic) in re Springfield Medical

15  Care Systems, 2020 bankruptcy Lexus 11238 at pages

16  star 1669, a bankruptcy court for the District of

17  Vermont decision from May, 2020.

18       I think the analysis in these decisions is

19  sufficient to resolve this issue, but to the

20  extent there's some lingering doubts, the Court

21  does believe that the debtors have a compelling

22  plain textual argument that the scope of the

23  statutory bar is limited to the property of the

24  SBA administrator in her personal capacity, not

25  against the government more generally, although it



1    doesn't appear any court had directly endorsed

2    this conclusion.  Even so, that plain textual

3    statutory interpretation is an alternative basis

4    supporting the Court's ruling today.

5         The Court now turns to the substance of

6    the APA claim.  Under the Administrative

7    Procedures Act and the Supreme Court's Chevron

8    decision, which I note is subject to some serious

9    questions, but at least as of today remains

10   binding, courts adopt a deferential standard of

11   review regarding decisions in rulemaking by

12   administrative agencies.  The level of Chevron

13   deference, however, is reduced when, as is the

14   case here, at the agency action was not subject to

15   formal process see Reno versus Corey 515 U.S. 50

16   at page 61.  That's a Supreme Court decision from

17   1995.  I'd say see, also, a case called Crozlick

18   (phonetic) versus Republic Title Co.  314, F 3rd

19   875 at page 8 -- 881.  This is the Seventh Circuit

20   decision by 2002, written by then circuit Judge

21   Richard Posner.  And his decision explains that

22   Chevron deference requires, "something more than a

23   formal -- something more formal, more deliberate

24   than a simple announcement,"  because, "a simple

25   announcement is too far removed from the process



```
 1    by which courts interpret statutes to earn

 2    deference."  The decision further ultimately

 3    provides no difference when, "the simple

 4    announcement is all we have here.  One fine day,

 5    the policy statement simply appeared in the

 6    federal register."  Regardless, courts will find

 7    an action to the arbitrary and capricious, "if an

 8    agency has relied on factors, which Congress has

 9    not intended to consider entirely failed to

10    consider an important aspect of the problem,

11    offered an explanation for its decision that runs

12    counter to the evidence before the agency, or

13    (inaudible) possible that it could not be ascribed

14    to a difference in view or the product of agency

15    expertise."  That's from Motor Vehicle

16    Manufacturer Association v. United States versus

17    State Farm Mutual Auto Insurance Company, 463 U.S.

18    29 at page 43, 1983 Supreme Court decision.

19    Moreover, the agency must articulate a rational

20    connection between the facts found and the

21    conclusions made.  See, for example, Latino Issues

22    Forum versus United States, EPA 558 at 3rd, 936 at

23    page 941, Ninth Circuit 20 -- 2009.  Although a

24    court is not entitled to substitute its own

25    judgment for the agency's judgment, the court must
```



1    the ultimately act as a rubber stamp and is

2    obligated to, "ensure that agency decisions are

3    founded on a reasoned devaluation of relevant

4    facts and circumstances.  See, for example,

5    Arizona Cattle Growers Association versus United

6    States Fish and Wildlife Bureau of Land Management

7    273 F 3rd, 1229 at page 1236, a 2001 decision from

8    the Ninth Circuit.

9         The Court should not go beyond the

10   agency's administrative record, which means, "the

11   basis for the decision must come from the agency.

12   The reviewing court may not substitute regions for

13   agency action that are not contained in the

14   record."  That's also Arizona Cattle Growers

15   Association, the same page.

16        Here, the SBA's decision to categorically

17   exclude all bankrupt debtors from PPP loan

18   eligibility falls far short of the standards.

19   Among other problems, first, there essentially is

20   no administrative record supporting the ultimate

21   conclusion whatsoever.  The entirety of the SBA's

22   discussion regarding this matter is encapsulated

23   in paragraph four of the SBA's interim final --

24   fourth interim final rule, which flatly states

25   that, "the administrator determined that providing



```
 1   PPP loans to debtors in bankruptcy would prevent
 2   -- present an unacceptably high risk of an
 3   unauthorized use of funds or non repayment of
 4   unforgiven loans."  That's it.  A nonexistent
 5   record, by definition, cannot be sufficient to
 6   support any conclusion.  This is the problem I
 7   described at the last hearing as a failure to,
 8   "show your work."  There's basically nothing
 9   explaining or developing how the SBA's conclusion
10   was reached, let alone anything supporting it is a
11   substantive policy matter.  Second, there,
12   likewise, there's nothing indicating a, "reasoned
13   evaluation," of anything.  There was no material
14   suggesting the SBA considered the relative pros
15   and cons of excluding bankrupt debtors or
16   evaluated whether anything less than a categorical
17   ban might accomplish whatever goals the SBA did
18   have in mind.  It's the show your work problem yet
19   again.  The Court see nothing indicating a process
20   of analysis, reasoning, deliberation, debate,
21   study, or consideration.  There's just nothing
22   here other than an insignificant conclusion.
23   Third, the Court further believes the SBA has
24   entirely failed to consider important aspects of
25   this problem.  The Cares Act was intended to
```



 1    provide rapid funding to businesses in difficulty.

 2    The PPP loans are forgivable if used to pay

 3    employees or utilities.  Some of the very

 4    businesses that are most in need of such relief

 5    are going to be operating Chapter 11 debtors.

 6    Providing financial support for those debtors so

 7    they can, in turn, pay innocent employees,

 8    landlords and utilities, is completely consistent

 9    with the legislative goal behind the Cares Act,

10    yet nothing indicates the SBA even considered this

11    important aspect of the legislation.  Rather, the

12    SBA appears to have unilaterally imposed a

13    categorical ban in the clumsiest way possible.

14         Furthermore, the SBA appears to have

15    (inaudible) an important aspect of the problem in

16    so far as the Cares Act can make certification

17    that, "the uncertainty of economic conditions

18    makes necessary the loan request to support the

19    ongoing operations of the eligible recipient."  No

20    healthy business is likely to certify under

21    penalties, penalties of perjury or corporate

22    criminal action, that the loan is, "necessary if

23    it's otherwise able to operate without it:  Thus,

24    it's the debtor's note Congress created a

25    framework under which every PPP applicant must



 1   certify that it is concerned that it is going to

 2   go out of business under the current economic

 3   conditions.  The SBA blunderbuss exclusion some of

 4   these troubled businesses simply disregards that

 5   entire backdrop assumption, that there is a

 6   business that's in trouble, which is the "problem"

 7   that motivated enactment of the Cares Act.  The

 8   court sees absolutely no consideration of this

 9   important aspect of the -- of the problem

10   whatsoever.

11          As I noted earlier, under the APA is the

12   SBA's burden to articulate the basis for its

13   decision.  Ninth Circuit case law makes clear,

14   here are the articulation is flimsy at best.  It

15   is an implausible and insufficient justification

16   for the conclusion.  There was no explanation

17   about why the administrator determined debtors in

18   bankruptcy have an "unacceptably high risk of an

19   unauthorized use of funds," and this conclusion

20   flies in the face of the expansive and persistent

21   supervision of such debtors by the bankruptcy

22   court, the United States Trustee Program via the

23   Department of Justice, creditors.  And in a case

24   like the Astria case, the entire public and

25   (inaudible).  Chapter 11 debtors need to be more



```
 1    transparent about what they're doing with cash
 2    than virtually any other debtors.  This
 3    perfunctory SBA explanation is wholly conclusory
 4    and falls to anyone with even a passing
 5    familiarity with the bankruptcy process.  It is
 6    simply impossible for me to call this a reasoned
 7    premise.  Likewise, there is no explanation of why
 8    Chapter 11 debtors pose a high risk of, "non
 9    repayment of unforgiven loans."  The bankruptcy
10    code contains an array of tools that can make
11    repayment more likely, including finding leans or
12    lanes or administrative priority claims.  These
13    tools are part of the law that every person in the
14    country, including the SBA and everyone who works
15    there, is presumed to know, but there was nothing
16    indicating any consideration of these tools by the
17    SBA.  There, similarly, is not discussion or even
18    citation of any academic SBA studies of empirical
19    rates of non repayment of DIP loans versus other
20    kinds of loans.  Instead, there's just a blanket
21    unsupported and unsightly uncited statement that
22    is dubious -- that is of dubious veracity, if not
23    wholly implausible.  Nothing anywhere in the SBA's
24    published rule, or any other record before me,
25    which is scant at best, provides any reasoned
```



Astria Health vs SBA, et al.

1    explanation for this conclusion.

2         I understand and appreciate there's a

3    massive burden that was placed on the SBA by

4    Congress.  Congress, for whatever reason, chose to

5    use the SBA as the funnel to convey this

6    particular allocated money for the public and the

7    businesses that needed it.  At the same time

8    however, the Court cannot act as a rubber stamp

9    for something as weak as the analysis and

10   justification offered by the SBA for this

11   categorical PPP bankruptcy exclusion.  Members of

12   the public, including the Astria debtors, are

13   entitled to ensure that their government agencies

14   proceed a careful, considered, and a reasoned way.

15   To use the same phrase yet again, the agencies

16   have to both do the work and show the work to the

17   public.  Here, there is nothing indicating the SBA

18   actually did any work to show, and they certainly

19   don't show them work.  As a result, the apparent

20   knee-jerk conclusion that was reached is not the

21   product of any reasoned agency decision-making,

22   cannot sustain any judicial inquiry whatsoever,

23   and must be nullified as arbitrary and capricious.

24        The Court notes that other judges have

25   reached the same conclusion.  The Court now adopts

1    and incorporates by reference the further

2    discussion contained in Roman Catholic Church of

3    the Archdiocese of Santa Fe versus United States

4    SBA in re Roman Catholic Church of the Archdiocese

5    of Santa Fe 2020 Bankruptcy Lexis 1211 and pages

6    star 12 through 16 by the decision by the

7    Bankruptcy Court District of New Mexico, May 1st,

8    2020.  In sum, I conclude that the debtors are

9    highly likely to succeed on their administrative

10   procedure act claim that the SBA's bankruptcy

11   exclusion from PPP loan eligibility is subject to

12   invalidation as arbitrary and capricious.  As

13   such, this first factor weighed strongly in the

14   debtor.

15        The second factor that the Court

16   considered is whether the moving parties will

17   suffer immediate and irreparable injury if the

18   relief is denied.  Here, the record has

19   established a irreparable harm sufficient to

20   support a preliminary injunction.  As set forth in

21   Mr. Gallagher's declaration and discussed in the

22   briefing, the COVID-19 situation is having an

23   adverse impact on the debtors business and

24   financial affairs, which, as we all know, is not

25   in the greatest shape to begin with.  I had to



Central Court Reporting   800.442.3376

```
 1   close the hospital in January that I didn't want
 2   to do because of the debtors financial affairs.
 3   To continue to provide healthcare services and pay
 4   frontline nurses for the benefit of community
 5   access, money is essential.  Without PPP funding
 6   there's a threat to the viability of the debtors
 7   trader business.  Moreover, why this is -- this is
 8   ultimately a dispute about money, there's a
 9   significant risk that all PPP money will be gone
10   as a result of the pressing June 30th deadline and
11   at the SBA will then assert that it cannot be
12   liable for damages, leaving the debtors with no
13   remedy whatsoever at the end of this litigation,
14   even if their rights have been violated.  Several
15   other courts have noted that this prospect of no
16   adequate remedy against the government constitutes
17   irreparable harm for purposes of an injunctive
18   relief analysis.  See, for example, DB Diamond
19   Club of Flint, LLC versus United States SBA 2020
20   U.S. District Lexus 82213 pages, star 43 to 45,
21   May 11th, 2020 decision by the Eastern District of
22   Michigan.  I note that a subsequent SBA request
23   for a state pending appeal was denied by the Sixth
24   Circuit Court of Appeals, including based on the
25   Sixth Circuit finding that, and agreeing with the
```



 1   district court, that there was a prospect of a

 2   reputable harm to the plaintiffs.  I also cite

 3   Camelot Banquet Rooms, Inc., versus United States

 4   SBA 2020 U.S. District Lexus 76713 t pages star 34

 5   to 36.  That's a decision from the Eastern

 6   District of Washington.  Again, a district judge

 7   May 1st, 2020.  See, also, General United States

 8   versus Cal Allman, Inc. 102 F 3rd 999 at pages

 9   1002 to 2003.  It's a Ninth Circuit decision from

10   1996.

11        Finally, I turned to the remaining factors

12   that collapsed together into a balance and the

13   consideration of the public interest and whether

14   there was favor granting the relief requested.  As

15   previewed at the prior hearing, the Court now

16   takes judicial notice of the following facts.

17   First, COVID-19 cases are increasing at an

18   inexplicably high rate in Yakima County.  For

19   whatever reason we are doing worse than the rest

20   of Washington State at this point in the process.

21   This is a very troubling situation.  In fact,

22   things today are even worse than they were at the

23   prior hearing in May.  Governor Inslee just last

24   Friday called Yakima County, "the most dangerous

25   place in Washington State," from a COVID-19 virus



```
 1    perspective.  Again, I don't know why this is the

 2    case, but the problem is not getting better here.

 3    Second, the Court takes judicial notice that many

 4    of the new cases are in the lower Valley,

 5    including around Sunnyside and Toppenish.  This

 6    also continues to be true today as it was in May.

 7    Third, the Court takes judicial notice of the fact

 8    that there's limited access to healthcare other

 9    than at the Astria hospitals.  That was true in

10    May; it's true today.  Fourth, the Court takes

11    judicial notice that these PPP funds will be used

12    to pay frontline medical staff, including nurses.

13    The Court further takes judicial notice that the

14    nurses are the people who are being correctly

15    recognized in the local and national press as the

16    heros dealing with this virus in the trenches.

17    That was true in May and it true today.  It will

18    be true forever.  Perhaps there could be a more

19    compelling public interest case, but, again, it's

20    hard to think of one.  As I said at the prior

21    hearing, we're clearly in the 99th percentile of

22    public interest cases here.  And this context is

23    -- it (inaudible) weight on the scales as it comes

24    to the third factor.  I agree with the government,

25    it doesn't affect the first and second factor, but
```



1   certainly the third factor is relevant.  The

2   balancing here is overwhelming and lopsided and

3   favors the debtors.  The government's claim,

4   public interest consideration, simply If we do not

5   have counterbalance.  Yes, SBA funds are limited,

6   and this is something of a zero sum exercise where

7   PPP borrowers are competing with each other, but I

8   think we cannot imagine other borrowers, in

9   bankruptcy or out, that would be more deserving of

10  this money than these particular borrowers.

11  Certainly there are many borrowers less deserving.

12  I know there are law firms throughout the country

13  that have received PPP money.  Money, as I said a

14  the last hearing, some of my best friends are

15  lawyers, but I don't think law firms need this

16  money while hospitals, particularly critical

17  hospitals in rural areas, are denied the money.

18  So the overwhelming public interest and community

19  interest and the debtors receiving this money is

20  manifests.

21       So to summarize, all of the factors

22  individually, weigh in favor of the debtors here.

23  And collectively, they weighed in favor with great

24  force.  Therefore issuance of a preliminary

25  injunction is warranted.



1          The details in the process here should

2    resemble what Judge David Jones described in his

3    Hildago County Emergency Services Foundation oral

4    ruling with the exception that I do want the

5    debtors to provide and pin down the stipulations

6    they described with Lapis and other parties

7    regarding segregation of the money.  As framed by

8    the debtors, the Court agrees that the debtors

9    have the right to have their PPP applications

10   submitted without being discriminated against on

11   the basis of their status as Chapter 11 debtors

12   should the debtors otherwise be eligible for PPP

13   loans.

14          I'm not affirmatively ordering the SBA to

15   make any loans that the SBA cannot rely on an

16   eligibility criterion, that must be set aside

17   under the Administrative Procedures Act.  I do

18   however, strongly agree with the SBA that any

19   suggestion by the debtors that the Court enter

20   relief beyond this particular cases is

21   inappropriate.  So those in question, when

22   "nationwide injunctions" are ever appropriate, but

23   I have a very hard time thinking of when that

24   would be in this bankruptcy court, and certainly

25   this isn't the case for it.  My ruling and the

```
 1    relief I'm granting here is solely related to

 2    these particular debtors in this particular case.

 3           Finally, to the extent this is an

 4    appealable decision, the Court now on its own

 5    motion invokes 28 USC section 158 D2, to certify

 6    this dispute for direct appeal to the Ninth

 7    Circuit Court of Appeals.

 8           More specifically, the Court now finds and

 9    certifies that each of the three alternative

10    connect conditions in section 158 D 2 A are met.

11    More specifically, first, the judgment order

12    decree involves a question of law as to which

13    there's no controlling decision of the Court of

14    Appeals for the Circuit or the Supreme Court of

15    the United States.  Although they're controlling

16    decisions about the legal standards, there's

17    certainly nothing involving facts like this.

18    Moreover, for purposes of this first prong, this

19    also involves a matter of public importance.  So

20    those are the disruptive factors are satisfied.

21           Second, the order of judgment or decree

22    involves the question of law requiring resolution

23    of conflicting decisions.  Bankruptcy judges are

24    all over the map here.  There are decisions that

25    have held section 525 applies.  There are courts
```

Astria Health vs SBA, et al.

```
 1   that have held that it doesn't.  There are courts
 2   that have held that the decision is arbitrary and
 3   capricious, including this court today.  There are
 4   courts that are, apparently, although a few of
 5   them expressly, rule the other way.  So there's
 6   certainly a patchwork and conflicting decisions
 7   that weren't resolution at the circuit level.
 8          Third and finally, an immediate appeal
 9   from the judgment order decree may materially
10   advance the progress of the case of proceeding in
11   which this appeal is taken.  The Court's confident
12   in the strength of its decision today.  But if the
13   Court's wrong for some reason, it's better to get
14   the final word on that from the Ninth Circuit
15   Court of Appeals than doing a two-tier appeal
16   through the district court of the (inaudible) if
17   the appeal were to go there.
18          So all three of these -- moreover the
19   policy considerations when Congress added this
20   provision to the judicial code are satisfied here.
21   This is important.  It's conflicting.  It's time
22   to get a final word.  It's time this should go up
23   to the Court of Appeals as I think one of these
24   questions already has to the Fifth Circuit.
25   Counsel for the debtor should include their
```

Central Court Reporting   800.442.3376

1   certification in their proposed form of order and

2   getting clear.  And to be clear, I certified the

3   entirety of the issues.  So if the debtors intend

4   to cross -- cross appeal me regarding the section

5   525 issue, which you're certainly free to do, I

6   think -- I think that appeal would satisfy the

7   conditions for certification of a direct appeal as

8   much as the Administrative Procedures Act.

9         I ask that the debtor's prepares the form

10  of judgment that they wish me to enter consistent

11  with -- with the hearing today.  And I then leave

12  it for the parties where -- where things go from

13  there.

14        MR. MAIZEL:  Your Honor, we'll run the

15  proposed form of order by Mr. Sachs and by Mr.

16  Donovan before we send it to.

17        THE COURT:  Thank you, Mr. Maizel.  Mr.

18  Sachs, anything further today?

19        MR. SACHS:  I have two points, Your Honor,

20  if you would allow me for a second.  Certainly not

21  challenging the legal basis for the injunction,

22  but actually the relief that you're granting.

23        I think what Mr. Maizel said before,

24  talking about what they're asking for, is he said

25  that he wanted the application to be held in



```
1    abeyance and the funds escrowed.  And so I'd like
2    to propose something for the Court, if the Court
3    would be willing to consider this.  I think the
4    relief you just granted essentially allows them to
5    go out this afternoon and get a loan.  And if a
6    bank will process it, then the SBA has no
7    authority to -- to not get enter the guarantee.  I
8    understand that's the Court's ruling.  And it
9    would be very difficult to unscramble that egg if
10   in deed -- I certainly have no idea what might
11   happen if this case will be appealed or if there
12   is an appeal, but an alternative may be this.  If
13   I understand the Court's ruling, the Court found
14   for the plaintiffs on the APA issue in part
15   because the agency could not do its work, show its
16   work, and (inaudible) work.  So one alternative
17   may be is if the Court were willing to make the
18   relief that the agency continues to set the money
19   aside and that the application is still held in
20   abeyance -- it's not processed -- and the Court
21   says there's short deadline for the government to
22   produce an administrative records.  And then if
23   the government doesn't, then the Court can rule on
24   that.  And if the government does then the Court
25   could hold a trial on the merits with that record,
```

1    and then enter relief based on that.  Obviously

2    the Court has suggested is it has the ability

3    under the APA claims to enter upon a relief from

4    there.  So it will not take the fee (inaudible) a

5    this point but I understand the Court's ruling.

6    That would really keep the status (inaudible) om

7    place.  And we understand there's a short

8    deadline.  June 30th is the statutory cut off and

9    so we understand there'll be short deadlines from

10   the Court on that, but it might allow us to get a

11   ruling on the APA with a record.  And the Court

12   may find the record doesn't show the work or do

13   the work or doesn't address the concerns the Court

14   made, or the Court may feel differently once it's

15   seen the record.

16        The alternative is they go out and get the

17   money today and we have appeal rights, but that

18   money is now within the bankruptcy and what can be

19   done with that question I'm not sure of the answer

20   to.  So I'd like the first propose that and see if

21   the Court is willing to entertain that.

22        THE COURT:  Mr. Sachs, I appreciate the

23   proposal.  I'm going to deny that, I think for two

24   reasons.  First, I think the record supports that

25   the debtors that have (inaudible) business needs



1    to access the money.  You know, you made the point

2    and I don't think Mr. Maizel contested it, that,

3    you know, the record doesn't indicate that the

4    business dies and the hospital's close tomorrow,

5    so they don't get the money.  But I think the

6    record does substantiate a logical continuing harm

7    as a result of the orders that Governor Inslee has

8    entered relating to elective surgeries.  I think

9    the debtors have -- have a need for the money.

10   And I think that that's established and supported

11   by the record.  And that's the request they

12   entered.

13        Second, I hear you on your point about the

14   administrative record, but, just in all candor and

15   fairness, I -- when we were here in May, I think

16   15 days ago, I did my best to -- you know, I

17   wasn't deciding anything then.  I spent a lot of

18   time thinking about this since then, but I think I

19   fairly, even strongly, outlined my concerns about

20   the administrative record.  I think I used the

21   phrase, show your work.  I don't know, I haven't

22   really read the transcripts that the debtors filed

23   yesterday, but I think I used it three or four

24   times.  I think I outlined -- you know, I Mr.

25   Donald, I'm not going to tell the government how



```
 1    to litigate his case, but I don't think there can

 2    be any claim of sandbagging since -- you've have

 3    15 days to put that together and it's not there.

 4    I mean, I gave you that opportunity already.

 5         MR. SACHS:  I understand, Your Honor.

 6    We're not at all disputing that and I understand

 7    the Court's ruling on that request.

 8         If I could make a second request under

 9    rule 8007, if the Court would be willing to

10    entertain an oral motion for a state pending

11    appeal?

12         THE COURT:  I will entertain that motion.

13    And as Judge Jones said in Texas, that motion is

14    denied.  I think I stayed pending appeal would be

15    inconsistent with my findings on the preliminary

16    injunction factors that stay pending appeal

17    factors are the same.  Largely other than a, you

18    know, ground for differences of opinion, but I'm

19    competent in the strength of my decision today.

20    If you want -- if you want to stay, you're going

21    to have to go get it somewhere else.

22         MR. SACHS:  Thanks, Your Honor.  That's

23    all I have.

24         THE COURT:  Okay.  All right.  Anything

25    further, Mr. Maizel?
```



1          MR. MAIZEL:  No.  Thank you, Your Honor.

2          THE COURT:  Okay.  Thank you, both.  I,

3     again, appreciate the time and argument today.

4     We'll look for the judgment and, you know, this

5     will go wherever it goes.

6          (Whereupon, hearing concluded)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Central Court Reporting   800.442.3376

**(**

**(a)** 7:8 8:5,7,12,19,21 9:10,23,25 11:15

**(b)** 10:22

**(c)** 8:7,8

---

**1**

**1** 13:21

**1002** 25:9

**1004** 10:7

**102** 25:8

**1052** 13:25

**106** 9:23,25

**11** 10:23 11:2 19:5 20:25 21:8 28:11

**11238** 14:15

**1189** 11:7

**1194** 11:8

**11th** 14:12 24:21

**12** 5:2,4 23:6

**1211** 23:5

**1229** 17:7

**1236** 17:7

**1334** 10:22

**135** 4:14

**136** 4:6

**1367** 11:5

**13743** 12:6

**139** 5:12

**14** 3:7

**15** 3:7 12:6

**157** 11:15 12:10

**158** 29:5,10

**16** 12:6 23:6

**1652** 5:13

**1665** 5:13

**1669** 14:16

**1869** 10:7

**19** 14:11

**1938** 4:6

**1946** 4:6

**1971** 9:2

**1983** 16:18

**1987** 14:1

**1995** 15:17

**1996** 25:10

**1st** 23:7 25:7

---

**2**

**2** 12:10 29:10

**20** 16:23

**2001** 17:7

**2002** 15:20

**2003** 25:9

**2005** 11:8

**2009** 16:23

**2012** 4:22 5:1

**2015** 4:15

**2016** 4:7

**2017** 10:8

**2018** 10:6

**2019** 5:14

**2020** 12:5 14:10,12,15,17 23:5,8 24:19,21 25:4,7

**2158** 4:14

**2169** 4:15

**225(a)** 3:18

**23** 5:1 14:11

**273** 17:7

**28** 10:22 11:5,14 12:10 29:5

**29** 16:18

**29th** 12:7

**2nd** 13:25

---

**3**

**30th** 24:10

**314** 15:18

**34** 25:4

**36** 25:5

**394** 11:7

**3rd** 10:5,7 11:7 15:18 16:22 17:7 25:8

---

**4**

**402** 9:2

**43** 16:18 24:20

**45** 24:20

**462** 12:1

**463** 16:17

**480** 12:2

**49** 4:7

**499** 12:22

---

**5**

**5** 10:16 11:16

**50** 15:15

**506** 5:1

**515** 15:15

**522** 5:1

**525** 3:13,15 5:21 7:6,8 8:5,7,8,12, 14,19,20,24 9:10,21,25 29:25 31:5

**558** 16:22

**564** 12:1

**566** 4:21,25

---

**6**

**61** 15:16



**634** 13:21

**637** 9:2

**639** 4:21

**649** 4:22

---

**7**

**7062A** 10:17

**76713** 25:4

---

**8**

**8** 15:19

**82213** 14:11 24:20

**83** 11:16

**833** 13:25

**875** 15:19

**881** 15:19

---

**9**

**902** 10:5

**903** 4:11

**936** 16:22

**941** 16:23

**95** 11:8

**963** 10:5

**999** 25:8

**99th** 26:21

---

**A**

**ability** 7:14

**absolutely** 20:8

**abusive** 10:15

**academic** 21:18

**access** 7:20,21 9:11 24:5 26:8

**accomplish** 5:11 18:17

**accordance** 10:16

**act** 2:15 3:14 10:10,13 13:22 15:7

17:1 18:25 19:9,16 20:7 22:8
23:10 28:17 31:8

**action** 10:14 12:23 13:4 15:14
16:7 17:13 19:22

**added** 30:19

**address** 10:9

**addressed** 4:12

**addresses** 10:19 13:17

**adequate** 24:16

**adjudicatory** 12:17 13:15

**administration** 12:11

**administrative** 3:13 5:5 10:10,
12 15:6,12 17:10,20 21:12 23:9
28:17 31:8

**administrator** 14:24 17:25
20:17

**adopt** 15:10

**adopts** 22:25

**advance** 5:17 30:10

**adversary** 2:11

**adverse** 23:23

**affairs** 23:24 24:2

**affect** 26:25

**affirmative** 7:18 9:13

**affirmatively** 28:14

**afoul** 14:6

**afternoon** 2:7,8

**agencies** 15:12 22:13,15

**agency** 10:13 15:14 16:8,12,14,
19 17:2,11,13 22:21

**agency's** 16:25 17:10

**agree** 3:5 6:25 7:7 8:24 26:24
28:18

**agreeing** 24:25

**agrees** 5:22 13:19 28:8

**Allman** 25:8

**allocated** 22:6

**allocation** 11:19

**alternative** 15:3 29:9

**Amalgamated** 4:21

**ambiguity** 8:23

**analysis** 11:17 13:12 14:8,18
18:20 22:9 24:18

**ancillary** 11:5

**announcement** 15:24,25 16:4

**answering** 3:22

**anti-injunctive** 13:18

**APA** 10:18,24 12:9 15:6 20:11

**app** 12:5

**apparent** 22:19

**apparently** 30:4

**appeal** 24:23 29:6 30:8,11,15,17
31:4,6,7

**appealable** 29:4

**Appeals** 10:3 12:2 14:3 24:24
29:7,14 30:15,23

**appeared** 16:5

**appears** 19:12,14

**applicable** 9:21

**applicant** 19:25

**application** 31:25

**applications** 4:17 28:9

**applied** 10:1

**applies** 29:25

**apply** 5:15 7:9

**applying** 3:8 9:10

**April** 12:7

**arbitrary** 10:15 16:7 22:23 23:12
30:2

**Archdiocese** 23:3,4

**area** 3:25

**areas** 27:17

**argue** 10:11

**argument** 7:7 10:18 14:22

**Arising** 10:23,25



Astria Health vs SBA, et al.

**Arizona** 17:5,14

**array** 21:10

**article** 11:20

**articulate** 16:19 20:12

**articulation** 3:6 20:14

**ascribed** 16:13

**aspect** 16:10 19:11,15 20:9

**aspects** 18:24

**assert** 24:11

**Association** 2:12 16:16 17:5,15

**assumption** 20:5

**Astria** 20:24 22:12 26:9

**attachments** 2:19

**attracted** 5:4

**authored** 4:22 5:1

**Auto** 16:17

**avoid** 8:15

**B**

**backdrop** 20:5

**bad** 4:18

**Baker** 4:13

**balance** 25:12

**balancing** 27:2

**ban** 18:17 19:13

**Bank** 4:21

**bankrupt** 13:2 17:17 18:15

**bankruptcy** 2:22 3:16,17,24
4:10,11,16,24 5:8 6:13 7:1,7 9:5,
23 10:11,20,25 11:6,9,11 12:11,
19,24 13:3,8,9,10,11,14,15,20
14:15,16 18:1 20:18,21 21:5,9
22:11 23:5,7,10 27:9 28:24 29:23

**bankruptcy-related** 3:18

**Banquet** 25:3

**bar** 14:23

**bars** 3:18

**based** 13:23 24:24

**basic** 9:7

**basically** 18:8

**basis** 15:3 17:11 20:12 28:11
31:21

**begin** 23:25

**believes** 18:23

**benefit** 24:4

**bidding** 4:24

**binding** 15:10

**blanket** 21:20

**blunderbuss** 20:3

**borrower** 6:3

**borrowers** 27:7,8,10,11

**bound** 3:23

**Box** 4:13

**break** 2:21 3:11

**Brendan** 7:7

**briefing** 23:22

**broad** 11:10,11

**brother** 6:18

**brought** 13:5

**burden** 20:12 22:3

**Bureau** 17:6

**business** 2:12 13:22 19:20 20:2,
6 23:23 24:7

**businesses** 19:1,4 20:4 22:7

**C**

**Cal** 25:8

**California** 4:5

**call** 21:6

**called** 12:4 15:17 25:24

**Camelot** 25:3

**Candle** 9:2

**capacity** 14:24

**capricious** 10:15 16:7 22:23
23:12 30:3

**Care** 14:13,15

**careful** 22:14

**Cares** 2:15 18:25 19:9,16 20:7

**case** 5:5,18 7:17 9:3,5 10:25 12:4
13:9 14:3 15:14,17 20:13,23,24
26:2,19 28:25 29:2 30:10

**cases** 11:2 25:17 26:4,22 28:20

**cash** 21:1

**categorical** 18:16 19:13 22:11

**categorically** 4:9 17:16

**Catholic** 23:2,4

**Cattle** 17:5,14

**Center** 12:5

**certification** 19:16 31:1,7

**certified** 31:2

**certifies** 29:9

**certify** 19:20 20:1 29:5

**challenging** 13:1 31:21

**Chapter** 5:2,4 11:1 19:5 20:25
21:8 28:11

**charitable** 6:21

**charter** 3:20

**Chevron** 15:7,12,22

**chose** 22:4

**Church** 23:2,4

**circuit** 10:2,4,5,8 11:8,10 12:2,7
14:1,2 15:19,20 16:23 17:8 20:13
24:24,25 25:9 29:7,14 30:7,14,24

**circumstances** 17:4

**citation** 21:18

**cite** 25:2

**cited** 13:18

**civil** 10:23 11:16

**claim** 9:22 12:9,14,22 13:1 15:6
23:10 27:3

**claims** 10:24,25 13:13 21:12

**classified** 5:23 10:12

**classify** 7:2



**clear** 4:4 11:22 13:13 20:13 31:2

**close** 24:1

**Club** 14:9 24:19

**clumsiest** 19:13

**code** 3:17,24 4:1,11,16 5:8 9:23
11:15 21:10 30:20

**codify** 9:1

**cogently** 13:23

**collapsed** 3:2 25:12

**collectively** 27:23

**commenced** 2:11

**commit** 5:10

**community** 24:4 27:18

**companies** 6:11

**Company** 16:17

**compelling** 14:21 26:19

**competing** 27:7

**completely** 19:8

**comprehensive** 10:2

**concerned** 20:1

**conclude** 5:19 7:3 23:8

**concluded** 7:1

**conclusion** 15:2 17:21 18:6,9,22
20:16,19 22:1,20,25

**conclusions** 16:21

**conclusory** 21:3

**conditions** 19:17 20:3 29:10
31:7

**confident** 30:11

**conflicting** 29:23 30:6,21

**Congress** 3:25 4:12,20,25 5:6,16
9:15 16:8 19:24 22:4 30:19

**connect** 29:10

**connection** 16:20

**cons** 4:23 18:15

**consideration** 18:21 20:8 21:16
25:13 27:4

**considerations** 30:19

**considered** 3:25 18:14 19:10
22:14 23:16

**consistent** 9:9,12 19:8 31:10

**consistently** 10:1

**constitutes** 24:16

**constitutional** 12:15

**constrained** 9:14

**construe** 7:4

**contained** 14:9 17:13 23:2

**contemplated** 13:4

**contend** 3:15

**contested** 3:5

**context** 3:3 5:4 13:5,12,22 26:22

**contexts** 6:22

**continue** 24:3

**continues** 26:6

**contrary** 14:2

**contrasting** 8:6

**control** 9:8

**controlled** 9:11

**controlling** 29:13,15

**controls** 7:22

**convey** 22:5

**core** 12:9

**Corey** 15:15

**Corp** 11:7

**corporate** 19:21

**correctly** 26:14

**Counsel** 30:25

**counter** 16:12

**counterbalance** 27:5

**country** 21:14 27:12

**County** 25:18,24 28:3

**court** 2:1,4,6,19,21 3:1,23 4:3,6,
7,14,15 5:12,15,19,22 8:14 9:3,6
10:2,9,18 11:4,13,19,20,25 12:2,
18,20 13:5,17,19 14:1,2,7,16,20
15:1,5,16 16:18,24,25 17:9,12

18:19,23 20:8,22 22:8,24,25 23:7,
15 24:24 25:1,15 26:3,7,10,13
28:8,19,24 29:4,7,8,13,14 30:3,
15,16,23 31:17

**Court's** 2:15,24,25 12:16 15:4,7
30:11,13

**courts** 6:5 13:23 15:10 16:1,6
24:15 29:25 30:1,4

**COVID-19** 23:22 25:17,25

**create** 12:15

**created** 19:24

**credit** 4:23 6:23

**creditors** 20:23

**criminal** 19:22

**criterion** 28:16

**critical** 27:16

**cross** 31:4

**Crozlick** 15:17

**crystal** 4:4

**current** 20:2

---

**D**

**D2** 29:5

**damages** 24:12

**dangerous** 25:24

**David** 28:2

**day** 16:4

**DB** 14:9 24:18

**DBSI** 10:7

**deadline** 24:10

**dealing** 26:16

**debate** 18:20

**debt** 9:5

**debtor** 23:14 30:25

**debtor's** 2:10,16,20 9:7 19:24
31:9

**debtors** 3:5,10,15 5:3,20 7:5
9:16 10:10 14:3,21 17:17 18:1,15
19:5,6 20:17,21,25 21:2,8 22:12



23:8,23 24:2,6,12 27:3,19,22
28:5,8,11,12,19 29:2 31:3

**debtors'** 2:13 3:1

**decision** 2:22,24 4:7,11,19,22
5:1,5,13 9:3 10:8 13:24 14:1,12,
17 15:8,16,20,21 16:2,11,18 17:7,
11,16 20:13 23:6 24:21 25:5,9
29:4,13 30:2,12

**decision-making** 22:21

**decisional** 11:19

**decisions** 4:19 14:18 15:11 17:2
29:16,23,24 30:6

**declaration** 2:17 23:21

**decree** 29:12,21 30:9

**defending** 4:17

**defense** 13:19

**deference** 15:13,22 16:2

**deferential** 15:10

**definition** 18:5

**Delaware** 7:8

**deliberate** 15:23

**deliberation** 18:20

**demonstrating** 8:2

**denial** 2:13 9:4

**denied** 23:18 24:23 27:17

**Department** 20:23

**depends** 13:10

**deserving** 27:9,11

**designated** 12:8

**desirable** 5:17

**details** 28:1

**determined** 17:25 20:17

**devaluation** 17:3

**developing** 18:9

**Diamond** 14:9 24:18

**difference** 16:3,14

**difficulty** 19:1

**DIP** 21:19

**direct** 29:6 31:7

**directly** 15:1

**disagree** 3:21

**discretion** 10:15

**discriminated** 28:10

**discrimination** 3:19

**discriminatory** 8:8

**discuss** 3:12

**discussed** 23:21

**discussing** 11:21

**discussion** 17:22 21:17 23:2

**dispute** 12:17,18 13:7 24:8 29:6

**disregards** 20:4

**disruptive** 29:20

**distinction** 13:19,23

**district** 2:23 11:13,14,20,25
13:20 14:11,12,16 23:7 24:20,21
25:1,4,6 30:16

**District's** 11:16

**donating** 6:21

**Donovan** 31:16

**doubt** 9:21 11:2

**doubts** 14:20

**drawn** 13:20

**driver's** 9:4,8

**dubious** 21:22

**due** 9:4

**duty-bound** 5:15

---

**E**

---

**earlier** 20:11

**earn** 16:1

**Eastern** 11:13,15 14:12 24:21
25:5

**economic** 8:12 19:17 20:2

**economically** 6:8

**economics** 9:13

**eligibility** 17:18 23:11 28:16

**eligible** 19:19 28:12

**Emergency** 28:3

**empirical** 21:18

**employees** 19:3,7

**enactment** 20:7

**encapsulated** 17:22

**encompass** 8:21

**encompassed** 8:12

**end** 11:17 24:13

**endorsed** 15:1

**enforce** 14:4

**ensure** 17:2 22:13

**enter** 11:23 28:19 31:10

**entire** 12:18 20:5,24

**entirety** 9:25 17:21 31:3

**entities** 3:16 13:2

**entitled** 16:24 22:13

**EPA** 16:22

**equity** 6:10,14

**essential** 24:5

**essentially** 7:19 17:19

**established** 23:19

**estate** 12:12

**evaluated** 18:16

**evaluation** 18:13

**evidence** 16:12

**exact** 12:3

**exception** 28:4

**exceptionally** 11:10

**exclude** 17:17

**excluding** 18:15

**exclusion** 3:16 8:18 10:11 13:1
20:3 22:11 23:11

**exclusive** 9:8

**exercise** 11:4 12:20 27:6



exist 13:2,11

exists 12:23 13:8

expanding 9:12

expansive 20:20

expertise 16:15

explained 5:8

explaining 18:9

explains 15:21

explanation 16:11 20:16 21:3,7 22:1

expressly 30:5

extension 6:23

extent 3:5 8:23 11:2 14:20 29:3

**F**

face 20:20

fact 13:9 25:21 26:7

factor 3:9 23:13,15 26:24,25 27:1

factors 3:2,9 16:8 25:11 27:21 29:20

facts 16:20 17:4 25:16 29:17

failed 16:9 18:24

failure 18:7

fall 7:14

falls 17:18 21:4

familiar 3:2

familiarity 21:5

family 5:3

farm 5:4 16:17

fashion 10:2

favor 25:14 27:22,23

favorable 6:12

favors 27:3

FCC 7:15

Fe 23:3,5

federal 10:21 11:11 16:6

fee 4:17

fees 4:16,17

fights 6:14,15

filing 13:8

final 11:24 12:17 17:23,24 30:14, 22

finally 12:14 25:11 29:3 30:8

financial 7:4 12:5 19:6 23:24 24:2

find 16:6

finding 5:2 21:11 24:25

finds 29:8

fine 16:4

firms 27:12,15

Fish 17:6

fits 3:21

flatly 17:24

flies 20:20

flimsy 20:14

Flint 24:19

flows 13:10

force 27:24

forever 26:18

forgivable 19:2

forgiveness 6:20

form 4:9 7:4 31:1,9,15

formal 15:15,23

forms 7:19

Forum 16:22

found 16:20

Foundation 28:3

foundational 5:18

foundations 8:1

founded 17:3

fourth 17:24 26:10

frame 13:23

framed 28:7

framework 19:25

franchise 3:20

Franklin 4:5

free 4:5 6:1 7:21 8:1,2,11 31:5

fresh 9:7

Friday 25:24

friend 6:18

friendly 6:17

friends 27:14

frontline 24:4 26:12

functionally 6:1

functions 7:11

funding 2:14 3:17,21 8:22 19:1 24:5

funds 18:3 20:19 26:11 27:5

funnel 22:5

**G**

Gallagher's 23:21

Gateway 4:20

gave 9:15

General 25:7

generally 5:8 14:25

give 7:24

goal 5:11 19:9

goals 18:17

Gold 11:7

Golden 11:6

good 2:8 6:18

government 5:23 7:21 8:4 9:12 10:20 14:25 22:13 24:16 26:24

government's 2:17 3:7 27:3

governmental 7:22

Governor 25:23

grant 3:20 7:4,10,18 8:9,10,11, 12,20

granted 7:20

granting 25:14 29:1 31:22



**grants** 7:9,12,24 8:2,14,18 9:10

**great** 27:23

**greatest** 23:25

**Growers** 17:5,14

**Grubstiene** 12:4

**guess** 2:6

**H**

**Hanky** 12:4

**hard** 26:20 28:23

**harm** 13:7 23:19 24:17 25:2

**healthcare** 24:3 26:8

**healthy** 19:20

**hearing** 18:7 25:15,23 26:21 27:14 31:11

**heightened** 3:8

**held** 4:7,15 9:6 29:25 30:1,2 31:25

**heros** 26:16

**high** 18:2 20:18 21:8 25:18

**highly** 5:25 6:11 23:9

**Hildago** 28:3

**history** 8:25

**Holding** 5:12

**Honor** 2:3,5 31:14,19

**hospital** 24:1

**hospitals** 26:9 27:16,17

**Hotel** 4:20

**Huntsinger** 10:4

**I**

**ignore** 4:1

**illustrated** 8:6

**imagine** 27:8

**immunity** 9:22,24

**impact** 23:23

**implausible** 20:15 21:23

**importance** 29:19

**important** 16:10 18:24 19:11,15 20:9 30:21

**imposed** 19:12

**impossible** 21:6

**improperly** 9:6

**inappropriate** 28:21

**inaudible** 2:23 4:13,14 5:2,24 6:12,17 7:14,16 11:1 14:8,10 16:13 19:15 20:25 26:23 30:16

**include** 8:13 30:25

**including** 10:24 21:11,14 22:12 24:24 26:5,12 30:3

**incorporates** 14:8 23:1

**increase** 7:14

**increasing** 25:17

**indicating** 18:12,19 21:16 22:17

**individually** 27:22

**inexplicably** 25:18

**injunction** 2:10 3:4 23:20 27:25 31:21

**injunctions** 28:22

**injunctive** 24:17

**injury** 23:17

**innocent** 19:7

**inquiry** 22:22

**insignificant** 18:22

**Inslee** 25:23

**instance** 6:2

**instances** 8:3

**insufficient** 20:15

**Insurance** 16:17

**intend** 31:3

**intended** 16:9 18:25

**interest** 25:13 26:19,22 27:4,18, 19

**interfere** 14:5

**interim** 17:23,24

**internal** 14:6

**interpret** 8:14 16:1

**interpretation** 8:17 15:3

**interpreted** 10:1

**invalidation** 23:12

**invokes** 29:5

**involves** 29:12,19,22

**involving** 3:19 8:9 29:17

**irreparable** 23:17,19 24:17

**issuance** 27:24

**issue** 3:4,14 9:18 10:10 11:21 12:16,18,22 14:19 31:5

**issued** 2:22 8:1

**issues** 3:25 10:19 11:5 16:21 31:3

**J**

**January** 24:1

**Jones** 28:2

**judge** 2:22 7:7 8:17 13:15 15:20 25:6 28:2

**judges** 7:1 13:21 22:24 29:23

**judgment** 11:24 16:25 29:11,21 30:9 31:10

**judicial** 2:18 10:13 12:20 22:22 25:16 26:3,7,11,13 30:20

**June** 24:10

**jurisdiction** 10:21,22 11:4,9,12, 22 12:13

**jurisdictional** 11:17

**Justice** 4:22 5:2,7 20:23

**justification** 20:15 22:10

**K**

**Keegan** 5:7

**Keeping** 5:18

**kind** 7:19



Astria Health vs SBA, et al.

**kinds** 21:20

**knee-jerk** 22:20

**Kuranda** 14:14

---

**L**

---

**Land** 17:6

**landlords** 19:8

**lanes** 21:12

**Lapis** 28:6

**largely** 3:2

**Latino** 16:21

**law** 10:16 14:3,4 20:13 21:13
27:12,15 29:12,22

**lawyers** 27:15

**leads** 6:13

**leans** 21:11

**leave** 31:11

**leaving** 24:12

**left** 4:19,24

**legal** 3:6 29:16 31:21

**legislation** 5:7 19:11

**legislative** 8:25 19:9

**lend** 6:10

**lender** 6:3,12

**let alone** 18:10

**level** 15:12 30:7

**Lexis** 12:5 23:5

**Lexus** 14:11,15 24:20 25:4

**liable** 24:12

**license** 3:19 9:4

**licenses** 7:13 9:8

**licensing** 9:9

**likewise** 18:12 21:7

**limit** 7:12

**limited** 8:5 9:6 13:24 14:23 26:8
27:5

**lingering** 14:20

**list** 7:25

**listen** 7:25

**litigation** 4:13 9:19 24:13

**LLC** 4:20 14:10 24:19

**LLP** 4:13,14

**loan** 6:16,17,20 8:20 17:17 19:18,
22 23:11

**loans** 5:23,24,25 6:2,7,9 7:2,3,4
13:2 18:1,4 19:2 21:9,19,20
28:13,15

**local** 11:16 26:15

**long** 7:25

**lopsided** 27:2

**lower** 26:4

---

**M**

---

**made** 16:21

**Maine** 2:23

**Maizel** 2:1,3 31:14,17,23

**make** 4:4 5:9 19:16 21:10 28:15

**makes** 12:1 13:13 19:18 20:13

**Management** 17:6

**manifests** 27:20

**Manufacturer** 16:16

**map** 29:24

**Marine** 13:24

**market** 6:6,8

**Marshall** 11:21 13:12

**massive** 22:3

**material** 18:13

**materially** 30:9

**matter** 6:2 10:22 12:10,12,13
17:22 18:11 29:19

**matters** 11:10

**meaning** 4:1 7:11

**means** 12:19 17:10

**medical** 14:13,14 26:12

---

**Members** 22:11

**merits** 3:11

**met** 29:10

**Mexico** 23:7

**Michigan** 14:13 24:22

**mind** 5:19 18:18

**Mission** 5:11

**modify** 7:10

**money** 6:1,11,17,21 7:9,18,21,24
8:1,2,11,18 22:6 24:5,8,9 27:10,
13,16,17,19 28:7

**Montana** 11:6

**morning** 2:7

**motion** 2:10,16 29:5

**motivated** 20:7

**Motor** 16:15

**moving** 3:9 23:16

**municipalities** 4:8

**Mutual** 16:17

---

**N**

---

**names** 5:9

**national** 26:15

**nationwide** 28:22

**needed** 12:21 22:7

**Ninth** 10:2,5,7 11:8,9 12:2,6 14:2
16:23 17:8 20:13 25:9 29:6 30:14

**nonexistent** 18:4

**nonpayment** 9:4

**note** 6:3 9:20 11:3 15:8 19:24
24:22

**noted** 4:18 6:6 20:11 24:15

**notes** 22:24

**notice** 2:18 25:16 26:3,7,11,13

**noting** 4:23

**NPR** 7:25 8:2

**nullification** 10:13



**nullified** 22:23

**nurses** 24:4 26:12,14

---

### O

**obligated** 17:2

**obligation** 6:24

**off-market** 6:16,18

**offer** 6:13

**offered** 16:11 22:10

**Olstein** 13:24

**ongoing** 19:19

**openly** 5:25

**operate** 19:23

**operating** 19:5

**operations** 19:19

**opinion** 12:7

**opinions** 4:3

**opposition** 2:17

**oral** 28:3

**order** 9:17 29:11,21 30:9 31:1,15

**ordering** 28:14

**outcome** 4:2

**overruled** 5:6

**overwhelming** 27:2,18

**owed** 9:5

---

### P

**pages** 3:7 4:6 5:1 11:7 12:6
14:11,15 23:5 24:20 25:4,8

**paragraph** 17:23

**part** 10:24 21:13

**parties** 3:10,21 7:24 8:4 23:16
28:6 31:12

**parts** 3:12

**passed** 2:15

**passing** 4:12 21:4

**patchwork** 30:6

**patents** 7:17

**pay** 19:2,7 24:3 26:12

**paycheck** 2:14

**payments** 9:13

**Pegasus** 11:7

**Pell** 8:10

**penalties** 19:21

**pending** 24:23

**people** 26:14

**percentile** 26:21

**Perez** 9:2,3

**performing** 6:20

**perfunctory** 21:3

**perjury** 19:21

**permission** 7:19

**permit** 3:19 9:10

**permits** 7:12

**persistent** 20:20

**person** 21:13

**personal** 14:24

**perspective** 26:1

**phonetic** 4:20 10:4,6 12:4 13:24
15:18

**phontic** 14:14

**phrase** 3:22 22:15

**pin** 28:5

**place** 25:25

**plain** 4:1,10,16 14:22 15:2

**plainly** 7:11 8:25 9:24

**plaintiff** 13:6

**plaintiffs** 25:2

**point** 6:22 8:25 12:1,3,5 25:20

**pointed** 14:2

**points** 31:19

**Pole** 4:25

**policy** 4:2,18,19 16:5 18:11
30:19

**portfolio** 6:11

**pose** 21:8

**Posner** 15:21

**power** 10:21 11:19 12:13,18,21

**powers** 13:15

**PPP** 2:14 3:17,21 5:23 7:2,3,4
8:22 13:2 17:17 18:1 19:2,25
22:11 23:11 24:5,9 26:11 27:7,13
28:9,12

**precluded** 4:9

**preliminary** 2:10 3:4 23:20
27:24

**premise** 21:7

**prepared** 2:25

**prepares** 31:9

**present** 18:2

**press** 26:15

**pressing** 24:10

**presumed** 21:15

**prevail** 3:11 5:20 9:17

**prevent** 18:1

**prevents** 4:16 8:8

**previewed** 25:15

**principles** 5:19

**prior** 25:15,23 26:20

**priority** 5:5 21:12

**private** 6:10 7:23

**privileges** 9:11

**problem** 16:10 18:6,18,25 19:15
20:6,9 26:2

**problems** 17:19

**procedure** 23:10

**Procedures** 3:14 10:10,12 15:7
28:17 31:8

**proceed** 22:14

**proceeding** 2:11 10:23 13:3
30:10



proceedings 12:24

process 15:15,25 18:19 21:5
25:20 28:1

product 16:14 22:21

Products 5:11

professional 4:17

program 2:14 20:22

progress 30:10

promise 6:4

promissory 6:3

prong 29:18

properly 5:23 12:20 13:14

property 7:15,16 14:23

proposed 31:1,15

pros 4:23 18:14

prospect 24:15 25:1

protect 5:3

protection 2:14 9:23

provide 6:1 19:1 24:3 28:5

provided 5:16

providing 17:25 19:6

provision 9:1 30:20

provisions 8:16 13:18

public 20:24 22:6,12,17 25:13
26:19,22 27:4,18 29:19

publication 12:8

published 21:24

Puerto 4:4,8

purpose 9:1

purposes 24:17 29:18

pursuant 11:14

Q

question 3:22 11:1,18 12:15
28:21 29:12,22

questions 15:9 30:24

quote 6:6

quoting 12:23

R

Rabax 4:20

raised 10:19

rapid 19:1

rate 25:18

rates 21:19

rational 6:9 16:19

re-characterization 6:14

reach 8:5

reached 18:10 22:20,25

read 2:21

reading 8:15

real 7:15,16

reason 22:4 25:19 30:13

reasoned 17:3 18:12 21:6,25
22:14,21

reasoning 18:20

received 27:13

receiving 27:19

recent 2:22 4:3

recently 2:15 5:7 12:3

recipient 19:19

recognized 26:15

recommendation 11:25

record 17:10,14,20 18:5 21:24
23:18

reduced 15:13

reference 14:8 23:1

referred 11:12

reflects 3:24

regard 12:24 13:3

regions 17:12

register 16:6

related 11:1,6 29:1

relates 11:18,23

relating 2:12

relative 18:14

relevant 17:3 27:1

relied 16:8

relief 4:10 14:5 19:4 23:18 24:18
25:14 28:20 29:1 31:22

rely 28:15

remaining 25:11

remains 15:9

remedy 24:13,16

removed 15:25

render 8:16

Reno 15:15

reorganizations 5:9

repay 6:4

repayment 18:3 21:9,11,19

reply 2:20

report 11:24

Reporter 4:6,14,21 5:13

Republic 15:18

reputable 25:2

request 2:13,18 3:1 19:18 24:22

requested 25:14

requests 2:13

requires 15:22

requiring 29:22

resemble 28:2

resolution 29:22 30:7

resolve 12:14,21 14:19

rest 25:19

result 5:17 6:19 9:2 22:19 24:10

review 15:11

reviewed 2:16,20,24

reviewing 17:12

rewrite 5:17

Rican 4:8



**Richard** 15:21

**Rico** 4:5

**rights** 24:14

**risk** 18:2 20:18 21:8 24:9

**Roman** 23:2,4

**Rooms** 25:3

**rubber** 17:1 22:8

**rule** 2:25 11:16 17:24 21:24 30:5

**rulemaking** 15:11

**ruling** 9:20 15:4 28:4,25

**run** 14:6 31:14

**runs** 16:11

**rural** 27:17

### S

**Sachs** 2:4,5 31:15,18,19

**sale** 5:3

**Santa** 23:3,5

**satisfied** 29:20 30:20

**satisfy** 31:6

**SBA** 9:22 13:18 14:4,10,24 18:14,
17,23 19:10,12,14 20:3 21:3,14,
17,18 22:3,5,10,17 23:4 24:11,19,
22 25:4 27:5 28:14,15,18

**SBA's** 8:24 10:11 13:1 14:5
17:16,21,23 18:9 20:12 21:23
23:10

**scales** 26:23

**Scalia** 4:23

**scant** 21:25

**scope** 8:19 11:11 14:22

**section** 3:12,15,17,18 4:11 5:21
7:6,8 8:5,7,11,14,20,24 9:10,21,
23,25 10:17 11:5,15 12:10 13:21
29:5,10,25 31:4

**seek** 14:3,4

**sees** 20:8

**segregation** 28:7

**send** 31:16

**services** 24:3 28:3

**set** 3:6 23:20 28:16

**Seventh** 15:19

**Shannon** 7:8

**Shannon's** 8:18

**shape** 23:25

**short** 17:18

**show** 18:8,18 22:16,18,19

**significant** 24:9

**similar** 3:20 7:10

**similarly** 21:17

**simple** 15:24 16:3

**simply** 5:16 16:5 20:4 21:6 27:4

**situation** 23:22 25:21

**Sixth** 24:23,25

**Small** 2:12 13:21

**society** 6:7

**solely** 29:1

**sort** 6:23

**sovereign** 9:22,24

**specifically** 29:8,11

**spectrum** 7:15

**sponsors** 6:10,15

**spot** 11:16

**Springfield** 14:13,14

**staff** 26:12

**stamp** 17:1 22:8

**standard** 3:6,8 15:10

**standards** 17:18 29:16

**standing** 13:6

**star** 12:6 14:11,16 23:6 24:20
25:4

**start** 9:7

**started** 2:7

**state** 9:5,9 12:23 16:17 24:23
25:20,25

**statement** 16:5 21:21

**states** 4:25 8:25 10:5,7 11:13,15
13:25 14:10 16:16,22 17:6,24
20:22 23:3 24:19 25:3,7 29:15

**status** 28:11

**statute** 3:23 5:16 8:15 9:15,16
14:7

**statute's** 7:9

**statutes** 16:1

**statutorily** 12:9

**statutory** 3:24 12:12 14:23 15:3

**stemming** 13:13

**stems** 12:19

**Stern** 11:21,25 12:15,21,22 13:4,
12

**stipulations** 28:5

**Stoltz** 7:17

**strength** 30:12

**stretch** 8:21

**strictly** 4:24

**strongly** 23:13 28:18

**student** 8:9,10,13

**studies** 21:18

**study** 18:21

**subject** 7:22 10:21 12:13 15:8,14
23:11

**submitted** 28:10

**subsequent** 24:22

**subsequently** 4:12 5:6

**substance** 10:18 15:5

**substantive** 18:11

**substitute** 16:24 17:12

**succeed** 7:6 23:9

**suffer** 23:17

**suffered** 13:7

**sufficient** 14:19 18:5 23:19

**suggesting** 18:14

**suggestion** 28:19

**sum** 23:8 27:6



Astria Health vs SBA, et al.

summarize 27:21

**Sunnyside** 26:5

superfluous 8:16

supervision 20:21

**supplemental** 11:4

support 18:6 19:6,18 23:20

supporting 2:16 15:4 17:20
18:10

**Supreme** 4:3,6,14 5:12 9:3,6
15:7,16 16:18 29:14

sustain 22:22

**Systems** 14:13,15

---

**T**

takes 25:16 26:3,7,10,13

talk 10:20

talking 31:24

tax 4:5 5:3

Technology 5:12

terms 6:7,8,9,12,18,19

text 3:23,24 4:2,10,16 5:17

textual 14:22 15:2

theory 5:20

thereto 2:19

things 7:13 8:9 10:14 25:22
31:12

thinking 28:23

threat 24:6

threshold 10:19

time 7:24 22:7 28:23 30:21,22

**Title** 10:23 15:18

today 2:9,22 3:8 9:20 13:16 15:4,
9 25:22 26:6,10,17 30:3,12 31:11,
18

tools 21:10,13,16

**Toppenish** 26:5

tort 12:23

total 6:19

trademarks 7:17

trader 24:7

transparent 21:1

treatment 8:8

trenches 26:16

trouble 20:6

troubled 6:11 20:4

troubling 25:21

true 12:25 26:6,9,10,17,18

**Trust** 4:5

**Trustee** 20:22

turn 7:24 19:7

turned 25:11

turning 3:8 10:17

turns 10:9 12:14 15:5

two-tier 30:15

---

**U**

**U.S.** 4:21,25 9:2 12:1 14:10 15:15
16:17 24:20 25:4

ultimate 17:20

ultimately 6:25 9:14,17 16:2
17:1 24:8

unacceptably 18:2 20:18

unattainable 7:23

unauthorized 18:3 20:19

uncertainty 19:17

uncited 21:21

underscored 12:3

understand 22:2

unfavorable 4:3

unforgiven 18:4 21:9

unilaterally 19:12

uniquely 7:20

**United** 4:25 10:5,6 11:13,14
13:25 14:10 16:16,22 17:5 20:22
23:3 24:19 25:3,7 29:15

University 8:10

unquote 6:6

unsightly 21:21

unsupported 21:21

unusual 5:25

**USC** 10:17,22 11:5 12:10 29:5

utilities 19:3,8

utilizes 3:1

---

**V**

**Valley** 10:6 26:4

variety 8:20

**Vehicle** 16:15

veracity 21:22

**Vermont** 14:17

versus 4:5,13,21,25 5:12 9:2
10:5,6 11:6,21 12:4 13:12,25
14:10,14 15:15,18 16:16,22 17:5
21:19 23:3 24:19 25:3,8

viability 24:6

view 16:14

violated 5:21 13:22 24:14

violates 3:17

virtually 21:2

virus 25:25 26:16

---

**W**

waives 9:24

wanted 31:25

warranted 27:25

**Washington** 11:14 25:6,20,25

weak 22:9

weigh 27:22

weighed 23:13 27:23

weight 26:23

whatsoever 17:21 20:10 22:22
24:13



**wholly**  21:3,23

**Wildlife**  17:6

**win**  6:15

**word**  7:10 30:14,22

**work**  6:21 18:8,18 22:16,18,19

**workings**  14:6

**works**  21:14

**worse**  25:19,22

**worthy**  6:21

**written**  15:20

**wrong**  30:13

---

Y

---

**Yakima**  25:18,24

**year**  5:14 12:7



ORDERED.

**Dated:  May 27, 2020**

Cynthia C. Jackson
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

| | |
|---|---|
| In re | Case Nos.: 3:19-bk-4607-CJJ through 3:19-bk-4622-CJJ |
| NRP LEASE HOLDINGS, LLC, et al., | |
| Debtors. | Chapter 11 |
| _____/ | Jointly Administered Under Case No.: 3:19-bk-4607-CJJ |
| NRP LEASE HOLDINGS, LLC, et al., | |
| Plaintiff, | Adversary No.:  3:20-ap-55-CJJ |
| v. | |
| JOVITA CARRANZA, IN HER CAPACITY AS ADMINISTRATOR FOR THE U.S. SMALL BUSINESS ADMINISTRATION, | |
| Defendant. | |
| _____/ | |

## PRELIMINARY INJUNCTION

This Adversary Proceeding came before the Court on May 20, 2020, for a hearing

on the Plaintiffs' Emergency Application for a Preliminary Injunction.  (Doc. No. 8).  At

the hearing, counsel for both sides presented legal argument in support of their respective positions, and the Plaintiffs' representative, Henry P. Woodburn, III, testified.  At the conclusion of the hearing, the Court took the matter under advisement.  On May 26, 2020, the Court issued an oral ruling in which the Court found that the Defendant, the United States Small Business Administration (the "SBA"), does not have sovereign immunity from injunctive relief, and that the Plaintiffs meet the four prerequisites considered when determining whether a preliminary injunction should be issued.[1]  For the reasons stated on the record in open court, which constitutes the Court's findings of fact and conclusions of law, and which are incorporated into this order by reference, the Court enters this preliminary injunction pursuant to Fed. R. Bankr. P. 7065.  It is

**ORDERED:**

1.   The Plaintiffs' Emergency Application for a Preliminary Injunction is granted in the manner set forth below.

2.   By 12:00 p.m. Eastern Standard Time on Friday, May 29, 2020, Plaintiffs shall transmit to counsel for the SBA the name and full contact information (including an email address) for the employee of their lender who has responsibility for their PPP loan application.

---

[1] The Court supplements its oral findings of fact and conclusions of law to hold that the Plaintiffs are likely to succeed on the merits of their complaint because the SBA's actions violated the Administrative Procedure Act by exceeding its statutory authority and by adopting rules that are both arbitrary and capricious.  The SBA argues that its actions are sound because it determined that "providing PPP loans to debtors in bankruptcy would present an unacceptably high risk of unauthorized use of funds or nonrepayment of unforgiven loan."  As the Court stated at the hearing, the Court concludes that Chapter 11 debtors will be much *less* likely to misuse PPP loan funds because the debtor is being supervised by the Court and the United States Trustee. The Court is confident that it can assure this debtors' proper use of the PPP loan proceeds.

3.    By 5:00 p.m. Eastern Standard Time on Monday, June 1, 2020, the SBA shall notify the identified representatives in writing that (a) the Plaintiffs' application for a PPP loan shall not be denied based on the Plaintiffs' status as a debtor in bankruptcy, (b) the Plaintiffs are authorized to submit a PPP loan application to any lender with the words "or presently involved in bankruptcy" stricken from the form, and if the Plaintiff satisfies all the other conditions in question #1 on the loan application form and it still must mark a box indicating it is in bankruptcy, it may mark the box "no," and (c) in the event that Plaintiffs otherwise meet the eligibility requirements for a PPP loan, the SBA will guarantee the loan for which the Plaintiffs have applied or attempted to apply.

4.    The SBA shall not make or condition the approval of any PPP loan to the Plaintiffs, or its forgiveness, contingent on the Plaintiffs not being involved in a bankruptcy proceeding.  To the extent any bank or lender requires the Plaintiffs to execute any other forms, applications or other documents for a PPP loan which include any language about whether the Plaintiffs are involved in a bankruptcy proceeding, the Plaintiffs are authorized to strike that portion of any such language, and the SBA shall process the forms, applications or other documents without any consideration of the involvement of the Plaintiffs in a bankruptcy proceeding.

5.    This is not a "nationwide injunction" and does not affect in any way actions that the SBA may take in connection with applications for PPP loans by any other entity other than the Plaintiffs in this action.

6.    Pursuant to Fed. R. Bankr. P. 7065, the Debtors are not required to post a bond.

7.    The SBA's oral motion to stay the preliminary injunction is denied.

8.   The Court reserves the right to enter a separate memorandum opinion consistent with the oral findings of fact and conclusions of law announced on the record in open court.

9.   This Order is effective as of 2:00 p.m. on May 26, 2020, when the Court read its oral ruling into the record.  It shall remain effective until this Court issues a final judgment at the conclusion of this adversary proceeding, unless this Order is modified or lifted by subsequent court order.

# In The Matter Of:

*WEATHER KING HEATING & AIR, INC. v.*
*U.S. SMALL BUSINESS ADMINISTRATION*

---

*May 21, 2020*

---

*LEGAL ELECTRONIC RECORDING, INC.*
*216-881-8000*
*www.lerinc.com*

Original File 20E7060B.prn
Min-U-Script® with Word Index

1

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION (AKRON)
                                    *
IN RE:                              *
                                    *
WEATHER KING HEATING & AIR,   *      Case No. 19-52957
INC.                                *
     Debtor.                        *
* * * * * * * * * * * * * * *  *
WEATHER KING HEATING & AIR,   *
INC.                                *
     Plaintiff,                *      Adv. No. 20-5023
          v.                        *
U.S. SMALL BUSINESS                 *
ADMINISTRATION, et al.        *
     Defendants.               *
* * * * * * * * * * * * * *  *

TRANSCRIPT OF HEARING HELD MAY 21, 2020
BEFORE THE HONORABLE ALAN M. KOSCHIK
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

STEVEN HEIMBERGER, ESQ.
TODD MAZZOLA, ESQ.
For the Debtor/Plaintiff

MARC SACKS, ESQ.
SUZANA KOCH, ESQ.
For the Defendants

KATE BRADLEY, ESQ.
For the U.S. Trustee

Transcribed by:
- - - - - - - - - - - - - - -
Legal Electronic Recording, Inc.
5230 St. Clair Avenue
Cleveland, Ohio 44103
(216) 881-8000
www.lerinc.com

Proceeding recorded by electronic sound recording,
transcript produced by transcription service.
Job #20E7060B

2

1              (Proceedings begin at 3:48 p.m.)

2              THE COURT:  All right, good afternoon.  This

3    is Judge Koschik in the Bankruptcy Court in Akron.

4    We're on the record in In re Weather King Heating & Air

5    versus United States Small Business Administration,

6    Adversary Proceeding Number 20-05023, and also in case

7    I make sure I don't forget, also in the main case of In

8    re Weather King Heating & Air, 19-52957.  I hope you

9    can forgive me for the delay in beginning.

10             The following is the Court's oral ruling --

11   could I have appearances of counsel to make sure I know

12   who's on the call?

13             MR. HEIMBERGER:  Attorney Steve Heimberger

14   and Todd Mazzola on behalf of the Debtor.

15             THE COURT:  Thank you.

16             MR. SACKS:  And Marc Sacks and Suzana Koch

17   for the United States.

18             THE COURT:  Thank you.

19             MS. BRADLEY:  And Kate Bradley from the

20   United States Trustee's Office is on as well.

21             THE COURT:  All right.  Thank you, Ms.

22   Bradley.

23             All right.  The following is the Court's oral

24   ruling on the Plaintiff's motion for preliminary

25   injunction.  The following are the Court's findings and

3

1  conclusions, pursuant to Rule 7052 of the Rules of

2  Civil Procedure, as well as Rule 7052 of the Federal

3  Rules of Bankruptcy Procedure.

4       Weather King Heating & Air is a Chapter 11

5  Debtor-in-Possession in the underlying bankruptcy case,

6  19-52957, and is the Plaintiff in this adversary

7  proceeding.

8       It seeks declaratory and injunctive relief

9  against the United States Small Business Administration

10  and its administrator, Jovita Corranza, in her official

11  capacity only.  I will refer to them collectively as

12  the SBA.

13       The Debtor filed its bankruptcy petition on

14  December 16, 2019.  The Debtor is continuing in

15  possession of its property and is operating and

16  managing its business as a Debtor-in-Possession,

17  pursuant to Sections 1107 and 1108 of the Bankruptcy

18  Code.

19       The Debtor is in the heating, ventilation and

20  air conditioning or HVAC business.  Based on the

21  uncontested declaration of the Debtor's president and

22  sole shareholder, Rajbinder S. Rai, since the onset of

23  the COVID-19 pandemic in mid-March, the Debtor's sales

24  have plummeted due to its customers delaying HVAC work,

25  unless absolutely necessary.

4

1         The Debtor reduced its staff from nine to six

2    employees from mid-March to the end of April, with the

3    remaining employees working only reduced hours.  The

4    Debtor's workforce is highly-skilled in the HVAC field,

5    and the Debtor is at risk of not being able to maintain

6    its employee base through the downturn caused by the

7    COVID-19 pandemic.

8         Without the source of emergency liquidity to

9    maintain its employee base, the Debtor's survival as a

10   going concern is in question.

11        Prior to the onset of the COVID-19 pandemic,

12   the Debtor commenced its Chapter 11 case with the

13   expectation of improving the efficiency of its

14   operations and negotiating a consensual plan with its

15   creditors.  Indeed, during the months of January and

16   February 2019, the Debtor's monthly operating reports

17   filed with the Bankruptcy Court show a net operating

18   income of over $6,800 and $5,300 respectively.  Total

19   income increased from 52,000 in January to a little

20   more than 70,000 in February.

21        However, in March 2020, the Debtor's income

22   substantially eroded, jeopardizing its chances of

23   reorganization.  Monthly income for March fell to

24   $59,000, with essentially zero net income.  Mr. Rai

25   suggested that the decline in the Debtor's business

5

1  occurred virtually overnight in mid to late March, as

2  concern over the pandemic suddenly became acute and

3  Ohio Governor DeWine issued his stay-at-home order.

4         Mr. Rai testified that the Debtor has reduced

5  costs by furloughing its employees, in an effort to

6  stave off a potential liquidation, an event that would

7  result in a permanent loss of employment for its

8  employees.

9         In order to survive, the Debtor applied for

10  an SBA guaranteed Paycheck Protection Program, or PPP

11  loan, through Dollar Bank.  The PPP is a new program

12  created by the United States Congress, pursuant to the

13  Coronavirus Aid Relief and Economic Security Act, or

14  the CARES Act, published at Public Law 116 to 136 at

15  134 Statute 281, 2020.

16         As noted by the United States District Court

17  for the Eastern District of Michigan in DV Diamond Club

18  of Flint, LLC versus United States Small Business

19  Administration, Case Number 20-CV-10899, in an opinion

20  and order granting motions for preliminary injunction

21  on May 11, 2020, a primary purpose of the CARES Act is

22  ensuring continued employment and income for employees

23  of American small businesses.

24         To that end, Congress created the PPP as part

25  of the CARES Act.  That program authorizes the SBA to

6

1    guarantee hundreds of billions of dollars in loans to

2    small businesses.  See 15 USC Section 636(a)(36) and 15

3    USC Sections 9005 and 9006.

4           The Debtor's PPP application was submitted on

5    April 14, 2020.  The Debtor reports that the process

6    was frantic, as a result of overwhelming demand for

7    this program.  The application documents were provided

8    to the Debtor electronically and were e-signed by the

9    Debtor's representative.

10          In the course of doing so, the Debtor's

11   representative reports that "he did not take note of

12   the question on the form inquiring about the Debtor's

13   bankruptcy status."  The application was approved and

14   was funded on Saturday, April 25, 2020.

15          The Debtor became aware shortly thereafter,

16   after consulting with bankruptcy counsel, that the SBA

17   maintains a position that bankruptcy debtors are not

18   eligible for PPP loans.  The Debtor contends that with

19   the exception of its status as a bankruptcy debtor, the

20   certifications it made on its PPP application were

21   accurate.

22          On May 5, 2020, the Debtor filed this

23   adversary proceeding against the SBA, seeking a

24   declaration that the SBA's bankruptcy debtor exclusion

25   violates 11 USC Section 525(a), which prohibits

7

1   governmental units from engaging in discrimination

2   against bankruptcy debtors, with respect to certain

3   governmental acts.  The Debtor also seeks a declaratory

4   judgment that the SBA's implementation of the PPP in

5   this manner is unlawful because it is in excess of the

6   SBA's statutory jurisdiction, authority, or

7   limitations, or short of statutory right, in violation

8   of the Administrative Procedures Act, and is further in

9   violation of the SBA's own regulations that were in

10  force when the Debtor's PPP application was filed,

11  approved and funded.

12          The Debtor further claims that the SBA's

13  regulations regarding the bankruptcy debtor exclusion

14  to the PPP is unlawful because that rule is arbitrary,

15  capricious and/or an abuse of discretion.

16          In addition to declaratory relief, the Debtor

17  seeks preliminary and permanent injunctive relief

18  enjoining the SBA from denying the Debtor from

19  participating in the PPP, either by revoking its

20  approval of the Debtor's PPP application, rescinding

21  the loan, or taking other punitive steps against the

22  Debtor because the Debtor is a debtor in a Chapter 11

23  bankruptcy case.

24          On May 7, 2020, the Plaintiff/Debtor filed

25  its motion for a temporary restraining order and

8

1    preliminary injunction.  In support of that motion the

2    Debtor alleged that it was likely to succeed on the

3    merits of its 525 claim and its two claims under the

4    APA.

5              The Debtor further contends that absent

6    injunctive relief, it would suffer irreparable harm in

7    the current economic environment, caused by the COVID-

8    19 pandemic, that the balance of harms weighs heavily

9    in favor of granting the Plaintiff/Debtor injunctive

10   relief, and that such injunctive relief is in the

11   public interest.

12             The Plaintiff/Debtor's motion for a TRO and

13   preliminary injunction were set for emergency hearing

14   on May 12, 2020.  Because of the emergency nature of

15   the hearing and the fact that the SBA was involved in

16   numerous lawsuits regarding the Paycheck Protection

17   Program, including one set for a hearing at the same

18   date and time before Bankruptcy Judge Jessica Price

19   Smith in Cleveland, the SBA was not able to file a

20   written response until the early morning hours of May

21   12.  As a result, the Court had not yet had an

22   opportunity to fully read the Government's submission

23   before the May 12 hearing.

24             At the conclusion of the May 12 hearing the

25   Court entered a temporary restraining order, with

9

1    limited purpose.  The Plaintiff/Debtors had advised the

2    Court that the SBA had created an amnesty program for

3    PPP applicants to return funds in the event that the

4    funds were advanced inappropriately.

5            As of May 12, the deadline was set to expire

6    on May 14, 2020.  The Court's limited TRO extended that

7    deadline to May 20, 2020, in order to provide an

8    opportunity for a further hearing with additional

9    counsel and after the Court had an opportunity to fully

10   read the submissions of the SBA and the

11   Plaintiff/Debtor.

12           The second hearing was held on Monday, May

13   18, 2020.  Yesterday, on May 20, the Court entered an

14   amended TRO, extending it through tomorrow, May 22,

15   2020.

16           The SBA opposes the Plaintiff/Debtor's motion

17   on a variety of grounds.  The SBA contends that the

18   Debtor lacks standing to seek an injunction, or even

19   declaratory relief in this action, because unlike other

20   Plaintiffs in other PPP lawsuits against the SBA

21   currently pending, this Debtor's PPP application has

22   already been approved and funded.

23           Secondly, the SBA argues that injunctive

24   relief against the SBA is barred by the doctrine of

25   sovereign immunity.  The SBA further contends that

10

1    Section 525 of the Bankruptcy Code does not apply to

2    the PPP program for two reasons.

3              First, it contends that the PPP is a loan,

4    and that Section 525 does not apply to loans.

5              Second, even if the PPP were characterized as

6    a grant or some monetary benefit other than a loan

7    requiring repayment, Section 525(a) is limited only to

8    "licenses, permits, charters, franchises or other

9    similar grants or employment."

10             The SBA contends that a monetary grant

11   program is not covered by the statute.  The SBA also

12   contends that the Bankruptcy Court has no jurisdiction

13   over the APA claims because those claims are not core

14   bankruptcy matters.  Further, the SBA contends that it

15   and its administrator acted within its statutory

16   authority in adopting regulations, including the

17   prohibition against bankruptcy debtors utilizing the

18   PPP program.

19             It contends that it did not engage in

20   retroactive rule making, that the Plaintiff/Debtor did

21   not provide sufficient evidence proving irreparable

22   harm, and finally, that the public interest is

23   furthered by a court upholding the SBA's policy

24   decision to exclude bankruptcy debtors from the PPP.

25             The Court finds that it has subject matter

11

1   jurisdiction over the claims asserted by the Debtor in

2   its adversary proceeding against the SBA.  Jurisdiction

3   is found at 28 USC Section 1334, on the grounds that

4   the claims either arise under Title 11 of the United

5   States Code, i.e., the Bankruptcy Code, or are related

6   to a case filed under the Bankruptcy Code.

7         All bankruptcy cases and related adversary

8   proceedings in the Northern District of Ohio have been

9   referred to the Bankruptcy Court by the District Court,

10  pursuant to general order.  Claims based on alleged

11  discrimination of the SBA under Section 525 of the

12  Bankruptcy Code arise under Title 11 and, therefore,

13  are core proceedings within the Bankruptcy Court's

14  jurisdiction to enter final orders because they concern

15  the administration of the Debtor's estate, 28 USC

16  Section 157(b)(2)(A).

17        The claims based on the alleged violations of

18  the Administrative Procedures Act, however, are not

19  core proceedings.  Therefore, unlike the Section 525

20  claim, the Bankruptcy Court lacks authority to enter

21  final judgments with respect to the APA claims.

22        The SBA asserts that it enjoys sovereign

23  immunity from any claim seeking injunctive relief.  It

24  argues that any waiver of the sovereign immunity must

25  be explicit and that while 15 USC Section 634 waives

12

1    sovereign immunity, generally, it expressly excludes

2    from that waiver any claim for injunctive relief.

3         The Court disagrees.  With respect to the

4    Plaintiff/Debtor's claims under Bankruptcy Code Section

5    525, sovereign immunity is waived by the Bankruptcy

6    Code itself.  This waiver is found in Bankruptcy Code

7    Section 106, which abrogates the sovereign immunity as

8    to governmental units with respect to matters arising

9    under specific sections of the Bankruptcy Code.

10         Among the sections included are matters

11   arising under Section 525.  See 11 USC Section

12   106(a)(1).  "The Court may hear and determine any issue

13   arising with respect to the implication of such

14   sections to governmental units."  That's at Section

15   106(a)(2).

16         Furthermore, the Bankruptcy Court may issue

17   against the government unit an order, process or

18   judgment under such sections, including an order or

19   judgment awarding monetary recovery.  That's at Section

20   106(a)(3).  The only exclusion from this authorization

21   are awards of punitive damages.

22         The reference to a monetary recovery does not

23   exclude other forms of equitable relief because the

24   word "including" in Section 106(a)(3) is not a phrase

25   of limitation under the rules of construction of the

13

1    Bankruptcy Code.  See 11 USC Section 102, Subpart 3.

2           Other courts have recently addressed Section

3    525 claims in the context of PPP applications and have

4    ruled in a similar fashion.  See, for example, In re

5    Hidalgo County Emergency Services Foundation, Adversary

6    20-02006, from the Bankruptcy Court for the Southern

7    District of Texas, on April 25; St. Alexius Hospital

8    Corporation Number 1, 20-06005, from the Bankruptcy

9    Court, Eastern District of Kentucky, May 8; and In re

10   Roman Catholic Church of the Archdiocese of Sante Fe,

11   Adversary Number 20-01026, from the Bankruptcy Court,

12   the District of New Mexico, on May 1.

13          Other recent opinions have relied on the

14   waiver of sovereign immunity for Section 525 claims,

15   more broadly based on interpretation of the SBA's own

16   sovereign immunity waiver provision, codified at 15 USC

17   634.

18          Recent bankruptcy opinions addressing a

19   bankrupt debtor's eligibility to submit PPP

20   applications, notwithstanding the SBA's bankruptcy

21   exception, that rely on this interpretation, include

22   Penobscot Valley Hospital, Adversary 20-01005,

23   Bankruptcy District of Maine; In re Calais Regional

24   Hospital from the same district, published at 2020

25   Westlaw 2201947; and In re Organic Power, LLC,

14

1   Adversary Number 20-00055, Bankruptcy Court for the

2   District of Puerto Rico, on May 8.

3          These opinions rely on the First Circuit's

4   opinion in Ulstein Maritime, Limited versus United

5   States, 833 F.2d 1052, First Circuit opinion from 1987.

6   Also following Ulstein, and persuasive to this Court,

7   are the holdings of DV Diamond Club of Flint, LLC

8   versus United States Small Business Administration,

9   cited previously, on May 11, and a case from the

10   Eastern District of Wisconsin, Camelot Banquet Rooms,

11   published at 2020 Westlaw 2088637, at Pages 3 and 4, on

12   May 1.

13          Neither DV Diamond Club nor Camelot Banquet

14   concerned bankruptcy cases or the bankruptcy exception.

15   But both concern PPP applications and the impact of the

16   CARES Act on the regulations promulgated by the SBA,

17   with respect to the PPP.  DV Diamond Club noted that

18   Section 634(b)(1) provides that the Administration may

19   sue and be sued in any court of record in any United

20   States District Court and jurisdiction is conferred

21   upon such District Court, without regard to the amount

22   of controversy, but no attachment, injunction,

23   garnishment or other similar process shall be issued

24   against the Administrator or his property.  That is

25   cited in Section 634(b)(1).

15

1          DV Diamond Club goes on to hold, quoting

2     Camelot Banquet Rooms, that "Section 634(b)(1) does not

3     preclude injunctive relief against the SBA in a case

4     such as this.  Provisions like it are found in other

5     federal statutes creating agencies that participate in

6     commercial activity.

7               Congress began including such language in its

8     statutes after the Supreme Court decided in Federal

9     Housing Administration versus Burr, 301 U.S. 242 in

10    1940, in which the Supreme Court held that a clause

11    allowing a federal agency to sue and be sued rendered

12    it subject to state law garnishment action.  After

13    Burr, Congress began specifying that "certain agencies

14    that participated in commerce are not subject to

15    attachment, injunction, garnishment and other similar

16    process."  That's close quote.

17               Citing Ulstein Maritime, both Camelot Banquet

18    Rooms and DV Diamond Club noted that Section 634's

19    anti-injunction limitation was "intended to keep

20    creditors or others suing the government from hindering

21    and obstructing agency operations through mechanisms

22    such as attachment of funds.  It was not intended to

23    render the agency immune from injunctive relief in a

24    situation where the agency has exceeded its statutory

25    authority and where an injunction would not interfere

16

1   with the agency's internal operation."

2                DV Diamond Club and Camelot Banquet Rooms

3   thereby held that an action under the APA seeking to

4   declare the SBA's PPP regulations inconsistent with the

5   CARES Act provisions creating the PPP and further

6   enjoining the SBA from enforcing those regulations are

7   not prohibited by the anti-injunction exception found

8   in the SBA's own sovereign immunity waiver statute.

9                For these reasons the Court finds that the

10  SBA has waived its sovereign immunity as to the claims

11  raised by the Plaintiff/Debtor in this case and that

12  the Court has jurisdiction to consider the claims

13  seeking injunctive relief within its related-to

14  bankruptcy jurisdiction.

15               The parties -- turning to the legal standard

16  for injunctive relief, the parties agree that the four

17  factors determine whether the Court may grant a

18  preliminary injunction.  They are whether the party

19  moving for the injunction faces immediate irreparable

20  harm, the likelihood that the movant will succeed on

21  the merits of its claim, the balance of the equities

22  between the parties and the public interest.

23               Let's start with the likelihood of success on

24  the merits.

25               The Court concludes that the Plaintiff/Debtor

Case:20-00055-EAG Doc#:56-1 Filed:06/15/20 Entered:06/15/20 17:40:37 Desc:
Exhibit 1 Page 150 of 194
**5-21-20 (19-52957 & 20-5023)**

17

1  is not likely to succeed on the merits with respect to

2  Count 1, which alleges a violation of Section 525(a)

3  and discriminatory treatment by the SBA. However, the

4  Court does conclude that the Plaintiff/Debtor is likely

5  to succeed on the merits of its claim in Count 2 of the

6  complaint, which asserts that the SBA exceeded its

7  statutory authority and promulgated regulations in

8  excess of its statutory authority under the CARES Act,

9  in violation of the APA, when it imposed the bankruptcy

10  debtor exclusion in its administration of the PPP.

11          The Plaintiff/Debtor also contends in Count 2

12  that the SBA relied inappropriately on retroactive rule

13  making in order to invalidate the PPP award advanced to

14  the Debtor in this case.

15          Finally, the Court concludes that in

16  consideration of the motion for a preliminary

17  injunction, it need not consider the likelihood of the

18  Plaintiff/Debtor's success under Count 3 of its

19  complaint, asserting under the APA that the SBA's

20  regulations were arbitrary, capricious and an abuse of

21  discretion.

22          All right. Now I'd like to discuss why the

23  Debtor is unlikely to succeed on the merits of its

24  Section 525 claim.

25          The Court concludes for purposes of

Case:20-00055-EAG   Doc#:56-1   Filed:06/15/20   Entered:06/15/20 17:40:37   Desc:
Exhibit 1   Page 151 of 194
**5-21-20 (19-52957 & 20-5023)**

18

1  considering the motion for preliminary injunction that

2  the Plaintiff/Debtor is unlikely to succeed on the 525

3  claim against the SBA.  The Court is persuaded that

4  Section 525 prevents discrimination against bankruptcy

5  debtors by governmental units with respect to a narrow

6  set of governmental actions.

7        The statute demands that "a governmental unit

8  may not deny, revoke, suspend or refuse to renew a

9  license, permit, charter, franchise or other similar

10  grant to, condition such a grant to, discriminate with

11  respect to such a grant against, deny employment to,

12  terminate the employment of, or discriminate with

13  respect to the employment against a person that is or

14  has been a bankruptcy debtor."

15        The Debtor seizes upon the reference to the

16  word "grant" and argues that the PPP is not so much a

17  loan as it is a grant program, wherein an applicant can

18  with ease obtain loan forgiveness, assuming its own

19  good faith.  The applicant need only clear a very low

20  bar to achieve this result by assuring that the funds

21  are used primarily for payroll expenses, along with

22  other urgent expenses designed to allow a business to

23  survive a brief period of time during the pending

24  COVID-19 pandemic, such as rent, mortgage, interest and

25  utility expenses.

19

1          The Court tends to agree with the

2    Plaintiff/Debtor's characterization of the PPP and

3    disagrees with the SBA that it is simply a loan, with a

4    possible forgiveness contingency.  However, the Section

5    525 claim depends on not merely a broad reading of the

6    PPP, but also a broad interpretation of Section 525(a).

7    The SBA noted in its brief that a variety of courts

8    rely on the interpretative principle of, and I will now

9    mangle Latin, ejusdem generis, which holds that a

10   general term following a specific list can apply only

11   to things similar to the list.

12          This Court recently had the opportunity to

13   apply a similar canon of construction known as noscitur

14   a sociis, which may be translated into English as "a

15   word is known by the company it keeps," and which

16   demands that terms contained in a list be given related

17   meaning.

18          It has been observed that the specific list

19   in Section 525(a) refers to privileges of citizens to

20   exercise their livelihood, such as obtaining building

21   permits, state contracts or liquor licenses, or

22   exercise a personal freedom, such as driving a car.  In

23   re Elter, 95 B.R. 618 at 622, Bankruptcy, Eastern

24   District of Wisconsin, 1989.

25          Indeed, the Sixth Circuit has addressed this

20

1    issue directly.  In Toth versus Michigan State Housing

2    Development Authority, 136 F.3d 477, Sixth Circuit,

3    1998, the Court rejected a former debtor's claim that

4    the denial of an application for a low-income home

5    improvement loan, based upon a recent bankruptcy

6    discharge, was discriminatory under Section 525(a).

7    Toth held that "the court of appeals that have

8    approached the question have read the statute's reach

9    narrowly, focused on the specific language of the

10   statute."  That's at Pages 479 and 80.  Toth concluded

11   that the target of Section 525(a) is the government's

12   role as a gatekeeper in determining who may pursue

13   certain livelihoods.  It is directed at governmental

14   entities that might be inclined to discriminate against

15   former bankruptcy debtors in a manner that frustrates

16   the fresh start policy of the Bankruptcy Code by

17   denying them permission to pursue certain occupations

18   or endeavors.  The intent of Congress incorporated into

19   the plain language of Section 525(a) should not be

20   transformed by employing an expansive understanding of

21   the fresh start policy to insulate a debtor from all

22   adverse consequences of a bankruptcy filing or

23   discharge.

24           Based on these authorities, the Court

25   concludes that the Plaintiff/Debtor is unlikely to

Case:20-00055-EAG  Doc#:56-1  Filed:06/15/20  Entered:06/15/20 17:40:37  Desc:
Exhibit 1  Page 154 of 194
**5-21-20 (19-52957 & 20-5023)**

21

1  succeed on the merits of a Section 525(a) claim, so as

2  to invalidate the SBA regulations concerning the

3  bankruptcy exclusion to the PPP on grounds of

4  bankruptcy discrimination.

5       Turning to the APA claims, the Debtor is

6  likely to succeed on the merits of those claims.  The

7  Debtor's claims under the APA are based on Counts 2 and

8  3 of the Plaintiff/Debtor's complaint in this adversary

9  proceeding.  In Count 2 the Plaintiff contends that the

10  SBA bankruptcy exclusion regulation exceeds the SBA's

11  statutory authority under the CARES Act, and

12  furthermore, that even the SBA's own regulation as of

13  the time its APA application was filed, approved and

14  funded, did not contain such an exclusion.

15       Rather, the bankruptcy exclusion was

16  formalized by a regulation first published several days

17  after the funding of the Debtor's PPP loan or grant.

18  The Plaintiff/Debtor contends that the SBA is not

19  entitled, by the terms of its own regulations, to apply

20  new regulations retroactively.  The Court finds that

21  the Debtor is likely to succeed on the merits of these

22  claims under Count 2.

23       The Plaintiff/Debtors argue that the SBA's

24  regulation in place as of the sudden commencement of

25  the PPP under the CARES Act did not include a strict

Case:20-00055-EAG   Doc#:56-1   Filed:06/15/20   Entered:06/15/20 17:40:37   Desc:
Exhibit 1   Page 155 of 194
**5-21-20 (19-52957 & 20-5023)**

22

1   prohibition against applications made by bankruptcy

2   debtors.  The parties refer to regulations published in

3   the Federal Register on a variety of dates in April

4   2020, including those published at 85 Fed. Reg. 20811.

5   That's on April 15.  And at 85 Fed. Reg. 21747, on

6   April 20, and 85 Fed. Reg. 23450, on April 28, 2020,

7   most of which referred to an original posting by the

8   SBA of an interim final rule on April 2, 2020.

9          The April 2 regulations do not appear on the

10  record, and the Court has been unable to locate it in

11  the Federal Register independently.  The District Court

12  for the Eastern District of Michigan in DV Diamond Club

13  noted that the prior existing SBA rules, which that

14  court referred to as the original SBA ineligibility

15  rule, were issued by the SBA in its standard operating

16  procedures for lender and development company loan

17  programs, 50 10 5(K), defined as the 2019 SOP.

18         The 2019 SOP is cited by the

19  Plaintiff/Debtors in their complaint.  The Debtor's

20  point, which is supported by the Court's review of the

21  2019 SOP, is that there is no exclusion for bankruptcy

22  debtors from any SBA loan program prior to the creation

23  of the PPP.  Indeed, the only reference to bankruptcy

24  in the 2019 SOP relates to standards for evaluating

25  creditworthiness of borrowers, with respect to other

Case:20-00055-EAG   Doc#:56-1   Filed:06/15/20   Entered:06/15/20 17:40:37   Desc:
Exhibit 1   Page 156 of 194
**5-21-20 (19-52957 & 20-5023)**

23

1    SBA loan programs and also a description regarding

2    possible ways in which an applicant may be excluded as

3    having caused a prior loss to the government, which

4    could include an applicant who had previously obtained

5    a bankruptcy discharge and resulted in a discharge of

6    an SBA guaranteed loan.

7            Interim rules published by the SBA on April

8    15 and April 20 provide a variety of information about

9    the PPP.  These regulations include details regarding

10   the application process and the streamlined duties of

11   lenders in facilitating PPP applications and loans.

12   These regulations provide that eligibility is based on

13   an applicant being any business with 500 or fewer

14   employees or otherwise qualified under existing SBA

15   employee-based size standards for a particular

16   industry.  An applicant may be a small business concern

17   or a tax-exempt non-profit organization.  It must have

18   been in operation on February 15, 2020, with either

19   employees for whom the applicant pays salaries and

20   payroll taxes or independent contractors as reported on

21   a Form 1099 Miscellaneous.

22           The only parties identified as ineligible for

23   the PPP under these regulations are those that are

24   engaged in illegal activity, who are household

25   employees, i.e., individuals who employ household

Case:20-00055-EAG  Doc#:56-1  Filed:06/15/20  Entered:06/15/20 17:40:37  Desc:
Exhibit 1  Page 157 of 194
**5-21-20 (19-52957 & 20-5023)**

24

1   employees, such as nannies and housekeepers, an

2   applicant for whom an owner of 20 percent or more of

3   the equity is incarcerated, on probation, parole, under

4   indictment, or having been convicted of a felony within

5   the last five years, or an applicant that had ever

6   obtained a direct or guaranteed loan from the SBA, or

7   any other federal agency, and that was currently

8   delinquent or had defaulted within the previous seven

9   years, causing a loss to the government.

10          Those are the only exceptions to the SBA

11  regulations imposed on the PPP program through and

12  including the dates on which the Plaintiff/Debtor

13  submitted its PPP application, received approval of

14  that application, and had that application funded.

15          Three days after the Plaintiff/Debtor's PPP

16  application was funded on Saturday, April 25, 2020, the

17  SBA published further interim rules on April 28, 2020,

18  at 85 Fed. Reg. 23450.  In those regulations for the

19  first time the SBA provided that "businesses presently

20  involved in bankruptcy proceedings" were ineligible for

21  the PPP program.  Those regulations explain that the

22  Administrator of the SBA had determined that providing

23  PPP loans to debtors in bankruptcy would present an

24  unacceptably high risk of an unauthorized use of funds

25  or nonpayment of unforgiven loans.

25

1          Wholly aside from the Plaintiff/Debtor's

2    other arguments, that such concerns were not supported

3    by the CARES Act, and would be arbitrary and

4    capricious, the fact remains that those regulations

5    were not in place when this Plaintiff/Debtor's PPP

6    application was submitted, considered and approved.

7    Indeed, the April 28, 2020 interim rules published by

8    the SBA state, as do other interim rules, that pursuant

9    to Executive Order 12988, the rule had no preemptive or

10   retroactive effect.

11          Therefore, the Court concludes that for this

12   basis alone, the Plaintiff/Debtor is likely to succeed

13   on the merits with respect to its claim for declaratory

14   and injunctive relief regarding the inapplicability of

15   the SBA's bankruptcy debtor exclusion to the PPP

16   application it made and loan it obtained.

17          The subsequent April 28, 2020 regulation

18   prohibiting bankruptcy debtors from submitting PPP

19   applications, regardless of its ultimate validity, was

20   inapplicable to this Plaintiff/Debtor's application.

21          The SBA argues that the earlier regulations

22   in place at the time the Plaintiff/Debtors filed their

23   PPP application required applicants to use an existing

24   SBA loan form, or application form, that contained a

25   certification that the Debtor was not a bankruptcy

26

1    debtor or, more specifically, was not "involved in a

2    bankruptcy case."

3         The Court is unpersuaded that a reference to

4    a form not printed in the published regulation could

5    impose a term or condition not apparent in the Federal

6    Register itself.  Counsel for the SBA confirms that he

7    did not believe that the form was actually published.

8    Indeed, the Court cannot locate any reference to the

9    form application at all, although it does not doubt

10   that a reference to an application form may very well

11   exist.

12        Even if the regulations did incorporate all

13   the terms and conditions contained in an application

14   form, such that those conditions might be considered

15   SBA regulations binding on the Plaintiff/Debtor at the

16   time its PPP application was submitted, the Court

17   agrees with the analysis of DV Diamond Club, as well as

18   Camelot Banquet Rooms, that the conditions and

19   restrictions in excess of the ones imposed by the CARES

20   Act for purposes of the PPP are non-enforceable by the

21   SBA.

22        While those two District Courts concern an

23   entirely different exclusion to the PPP, the analysis

24   of DV Diamond Club is quite applicable here.

25        Under Chevron USA, Inc. versus Natural

Case:20-00055-EAG   Doc#:56-1   Filed:06/15/20   Entered:06/15/20 17:40:37   Desc:
Exhibit 1   Page 160 of 194
**5-21-20 (19-52957 & 20-5023)**

27

1   Resources Defense Council, 467 U.S. 837 in 1984, courts

2   review the propriety of agency action in a two-step

3   framework.  In the first step, the court determines

4   whether Congress has directly spoken to the precise

5   question at issue.  That's Chevron at 845.

6           This inquiry is one where the court must

7   determine whether the statute is ambiguous, applying

8   the ordinary tools of statutory construction.  If the

9   statute is unambiguous, then the court applies it as

10  written.  That is the end of the matter.  That is a

11  Sixth Circuit opinion that I can barely pronounce,

12  Arangure versus Whitaker, 911 F.3d 333 at 337 and 38, a

13  2018 opinion.

14          Only if a statute is ambiguous does the court

15  move on to step 2 of the Chevron analysis, where a

16  court must "defer to the agency's construction if it is

17  permissible, i.e., within the balance of reasonable

18  interpretation."  That is at Page 338 of the Sixth

19  Circuit opinion.

20          DV Diamond Club held that the eligibility

21  criteria of the PPP under the CARES Act was unambiguous

22  and found that the PPP had only two criteria for any

23  business concern.  It must have been in business during

24  the covered period, in other words, in business from

25  February 15, 2020 until June 30, 2020, and it must have

28

1   less than 500 employees or less than the specific size

2   of a standard established by the SBA Administrator for

3   an industry which the business operated.

4          DV Diamond Club held that this narrow list of

5   eligibility criteria indicated that Congress did not

6   intend there to be any other criteria for a loan

7   guarantee eligibility.

8          During the two hearings on the

9   Plaintiff/Debtor's motions for preliminary injunction,

10  counsel for the United States argued on behalf of the

11  SBA that in the CARES Act Congress chose to append the

12  PPP to existing Section 7(a) SBA loan programs.  From a

13  codification perspective, in fact, the PPP has been

14  included within 15 USC Section 636(a), which

15  constitutes the so-called Section 7(a) SBA loan

16  programs.

17         However, just as DV Diamond Club and Camelot

18  Banquet Rooms found that the extensive regulation

19  exceptions and exclusions from the prior SBA loan

20  programs were not imputed into the PPP, this Court's

21  own statutory analysis suggests that the bankruptcy

22  exception should not be imputed either.  It is true

23  that the PPP statute does include a provision stating

24  that "except as otherwise provided in this paragraph,

25  the Administrator may guarantee covered loans under the

Case:20-00055-EAG   Doc#:56-1   Filed:06/15/20   Entered:06/15/20 17:40:37   Desc:
Exhibit 1   Page 162 of 194
**5-21-20 (19-52957 & 20-5023)**

29

1    same terms, conditions and processes as a loan made

2    under this subsection."  That's 15 USC Section

3    636(a)(36)(B).

4           The word "paragraph" refers to Paragraph 36,

5    which is the PPP statute.  The Administrator refers to

6    the SBA Administrator.  The phrase "this subsection"

7    refers to the entire SBA Section 7 loan program,

8    codified in 15 USC Section 636(a), including but not

9    limited to the PPP program in Paragraph 36.

10          The SBA argues that among the many terms

11   contained in the Section 7(a) program, writ large, is a

12   provision requiring that "all loans made under this

13   subsection shall be of sound value or so secured as

14   reasonably to assure repayment."  That's at 15 USC

15   Section 636(a)(6).

16          The Government argues that sound value

17   suggests that the SBA has discretion to assess each

18   loan application and to determine whether its terms,

19   the creditworthiness of the applicant, the value of the

20   assets offered as collateral, et cetera, would cause

21   the proposed loan to be of sufficiently adequate

22   creditworthiness.

23          The Court is skeptical that the PPP

24   contemplates any such analysis, since it appears to be

25   an emergency program to push money out the door to

Case:20-00055-EAG  Doc#:56-1  Filed:06/15/20  Entered:06/15/20 17:40:37  Desc:
Exhibit 1  Page 163 of 194
**5-21-20 (19-52957 & 20-5023)**

30

1   businesses in order to save them and to ensure that

2   their employees receive a paycheck during an emergency

3   time.  The PPP loans will be forgiven unless they are

4   abused.  A program designed to forgive loans does not

5   appear to be one that should reasonably concern the

6   quality of the sound value of the loan.

7          However, even giving the SBA the benefit of

8   the doubt regarding the proper characterization of the

9   PPP, the Court observes that the statute on its own

10  terms does not support the construction.

11         First, Subparagraph B of PPP provides that

12  the various terms, conditions and processes of the

13  remainder of the section would only be applicable

14  "unless otherwise provided in this paragraph."  In

15  other words, in the PPP statute itself.

16         Indeed, in addition to the limited criteria

17  noted by DV Diamond Club for applicants to qualify for

18  a PPP loan, the PPP paragraph or statute codified in

19  the Section 7(a) statute, and derived from the CARES

20  Act, provides that a private lender seeking to make a

21  loan under the SBA program "shall be deemed to have

22  been delegated authority by the Administrator to make

23  and approve covered loans, subject to the provisions of

24  this paragraph."  15 USC Section 636(a)(36)(F)(ii)(I).

25  Indeed, the considerations for the private lenders in

Case:20-00055-EAG   Doc#:56-1   Filed:06/15/20   Entered:06/15/20 17:40:37   Desc:
Exhibit 1   Page 164 of 194
**5-21-20 (19-52957 & 20-5023)**

31

1    evaluating an applicant's eligibility for a covered

2    loan under the PPP are limited to the considerations of

3    whether that applicant was in operation on February 15,

4    2020, and either had employees for whom the borrower

5    paid salaries and payroll taxes or paid independent

6    contractors as reported by a Form 1099.  That's at the

7    related statute, Section 636(a)(36)(F)(ii)(II).

8             Indeed, this portion of the statute echoes

9    the regulations that the SBA adopted that were in place

10   at the time the Plaintiff/Debtor submitted its

11   application and received its funds.

12            The Court is satisfied that these provisions

13   demonstrate that the general concern for sound value

14   loans by the SBA generally are inapplicable to the PPP.

15   Therefore, just as the SBA's previous restrictions on a

16   variety of other SBA loan programs were deemed

17   inapplicable to the PPP in DV Diamond Club, so is the

18   bankruptcy exclusion inapplicable to any PPP applicant,

19   including the Plaintiff/Debtor here.

20            The Court concludes that the Plaintiff/Debtor

21   is likely to succeed on its claim for this reason, as

22   well.

23            Now, let me turn to other injunctive relief

24   factors, and those are irreparable harm, the balance of

25   harms, and the public interest.

32

1          With respect to irreparable harm, the Debtor

2    has through its declarations offered reasonable and

3    believable testimony that the COVID-19 pandemic has

4    dramatically threatened its business, as it has done to

5    so much of the American economy in the last two months.

6    Just as with the applicant in DV Diamond Club, there

7    may be no legal remedy or any remedy at all available

8    if a preliminary injunction is not granted.

9          The finding in DV Diamond Club concerned a

10   business that was not even in Chapter 11 and already

11   facing difficult challenges in restructuring its debt

12   and stabilizing its business.

13         The Plaintiff/Debtor in this case is, of

14   course, in Chapter 11, and notwithstanding the moderate

15   success it was having for the first several months of

16   its bankruptcy case, has now been threatened with

17   liquidation by the economic catastrophe caused by the

18   health pandemic.

19         Simply waiting and hoping for a legal remedy

20   later is not a viable option for this Debtor under

21   these circumstances.  A well-capitalized, well-financed

22   business can absorb losses and live to litigate over

23   damages later, assuming that a legal remedy to compel

24   the SBA to advance a loan would ever be available in a

25   court of law.

33

1          But where a business venture is threatened

2    with liquidation or simply going out of business, once

3    that step is taken, the revival of the business entity

4    is almost always irretrievable.  It is the epitome of a

5    irreparable harm situation.

6          The SBA argues that this case is different

7    than most of the other PPP litigation cases, whether in

8    bankruptcy or not.  The distinctive fact is that the

9    Plaintiff/Debtor not only submitted a PPP application,

10   but it was granted and funded.  The SBA argues that

11   because the Plaintiff/Debtor already has its money, it

12   cannot be irreparably harmed by being denied

13   preliminary injunctive relief.

14          This is an interesting argument.  But the

15   Court quickly observes that it puts the

16   Plaintiff/Debtor into a catch-22 situation.  The SBA

17   and its counsel refuse to concede that the already

18   funded PPP loan to the Plaintiff/Debtor cannot be

19   rescinded by the SBA because of the error in the

20   Plaintiff/Debtor's PPP application, an error that only

21   is relevant if the bankruptcy exclusion is upheld and

22   made enforceable.

23          This puts the Plaintiff/Debtor and its

24   principal in the unenviable position of threatened

25   civil or criminal sanctions and the obligation to

34

1  return the funds even if they are properly used for

2  payroll or other permitted uses.

3         Nor will the SBA concede that the

4  consideration of the forgiveness of the

5  Plaintiff/Debtor's loan will be considered on the same

6  criteria as all other successful PPP applicants,

7  namely, whether sufficient portion of the funds were

8  used for payroll and that the remainder of the funds

9  are properly used for other permitted business

10  stabilization purposes and that those funds are

11  expended within the permitted eight-week time frame.

12         Indeed, the eight-week time frame required by

13  the regulations is another pressing concern for the

14  Plaintiff/Debtor with respect to its irreparable harm.

15  The clock is ticking and the Plaintiff/Debtor needs to

16  use these funds very soon in order to qualify for the

17  loan forgiveness that it depends on.

18         Waiting for the SBA to act or perhaps not act

19  at some time in the future with respect to the

20  bankruptcy debtor exception may be a pyrrhic victory if

21  the SBA were to then conclude that the failure to

22  timely expend the funds results in their forfeiture.

23         For all of these reasons, there's a

24  significant risk that the Plaintiff/Debtor will suffer

25  irreparable harm, absent appropriate preliminary

Case:20-00055-EAG Doc#:56-1 Filed:06/15/20 Entered:06/15/20 17:40:37 Desc:
Exhibit 1 Page 168 of 194
**5-21-20 (19-52957 & 20-5023)**

35

1    injunctive relief barring the SBA from rescinding the

2    approval of Plaintiff/Debtor's PPP application, or

3    processing the forgiveness application in any

4    prejudicial way, based on the Debtor's status as a

5    bankruptcy debtor, notwithstanding the lack of any

6    statutory or regulatory basis for such a prohibition.

7            Turning to the balance of the harms and the

8    public interest factors, these also favor granting the

9    preliminary injunction requested here.  As eloquently

10   noted by DV Diamond Club, the PPP's purpose is to

11   protect employment, employees and small businesses that

12   have been impacted, through no fault of their own, by

13   the COVID-19 pandemic.

14           This purpose would be frustrated if the

15   preliminary injunction were not granted here.  The

16   public interest is fulfilled by enforcing Congress's

17   intent in the CARES Act and adopting the PPP and the

18   preliminary injunctive relief sought by the Debtor,

19   Plaintiff/Debtor, here fulfills that goal.

20           The Court disagrees that the public interest

21   would be better served by the SBA exercising its agency

22   discretion in determining who does or does not qualify

23   for the PPP.

24           Congress acted in an emergency situation in

25   which all manner of small businesses and their

36

1   employees needed assistance.  Time is of the essence

2   and bureaucratic quibbling, while it might better

3   protect an agency's administrative turf, does not

4   advance the interest of the public in this time of

5   emergency and urgency any better, and indeed far worse

6   than the imperative of Congress's own legislative act.

7           As for the balance of harms, the potential

8   harm to the Plaintiff/Debtor is self-evident and has

9   already been discussed with respect to irreparable

10  harm.  Meanwhile, the United States is not injured in

11  any way by fulfilling Congressional intent.  Moreover,

12  the injury to the SBA caused by the agency being

13  compelled by judicial action to guarantee a loan

14  already obtained by the Plaintiff/Debtor may well be of

15  zero consequence.  At the very least, it's a small

16  consequence and vastly outweighed by the potential

17  harms that would otherwise be suffered by the

18  Plaintiff/Debtor.

19          For these reasons, the Bankruptcy Court will

20  enter a preliminary injunction constraining the SBA

21  from rescinding the Plaintiff/Debtor's PPP loan or

22  prohibiting the Plaintiff/Debtor from expending the

23  loan proceeds as permitted and required by the terms of

24  the SBA loan and the SBA's own regulations and the

25  CARES Act.  For as long as this preliminary injunction

Case:20-00055-EAG Doc#:56-1 Filed:06/15/20 Entered:06/15/20 17:40:37 Desc:
Exhibit 1 Page 170 of 194
**5-21-20 (19-52957 & 20-5023)**

37

1   remains in force, the Plaintiff/Debtor will be free to

2   use its PPP loan proceeds, consistent with all other

3   legal obligations and regulations, without any concern

4   of retribution or negative action by the SBA.

5          The terms and conditions of the PPP, other

6   than the bankruptcy debtor's exclusion, including the

7   laws and regulations governing forgiveness of PPP

8   loans, are not affected by the Bankruptcy Court's

9   preliminary injunction in any way.  The SBA is directed

10  to consider any such forgiveness application by the

11  Plaintiff/Debtor on the same standards and regulations

12  governing any successful PPP applicant, as if it were

13  not a bankruptcy debtor.

14         The Court will issue a separate preliminary

15  injunction order incorporating these findings and

16  conclusions, which are made pursuant to Rule 52 of the

17  Federal Rules of Civil Procedure and Rule 7052 of the

18  Federal Rules of Bankruptcy Procedure.

19         This order will be effective as of 4:30 this

20  afternoon, May 21, 2020.  No bond shall be required

21  from the Plaintiff/Debtors pursuant to Bankruptcy Rule

22  7065, which excludes or makes inapplicable Rule 65(c)

23  of the Federal Civil Rules to debtors-in-possession in

24  bankruptcy.

25         Let me go on to comment on the question of a

Case:20-00055-EAG   Doc#:56-1   Filed:06/15/20   Entered:06/15/20 17:40:37   Desc:
Exhibit 1   Page 171 of 194
**5-21-20 (19-52957 & 20-5023)**

38

1  report and recommendation or the lack of jurisdiction

2  over a final order.

3         This Court has already observed that while

4  the claims arising under Section 525 of the Bankruptcy

5  Code are matters in which this Bankruptcy Court has

6  core jurisdiction, but that the claims arising under

7  the APA are not core.  The preliminary injunction is

8  being issued based on the Plaintiff/Debtor's likelihood

9  of success on the merits of that APA claim.  Any final

10  order that might ultimately be entered by this Court on

11  that claim would have to be submitted as a report and

12  recommendation to the United States District Court for

13  the Northern District of Ohio for consideration, review

14  and entering a final order.

15         However, we are not at that stage.  The

16  complaint has been filed.  No answer has been filed or

17  served.  No trial on the merits has been held.  Because

18  this Court's decision today is to enter an

19  interlocutory preliminary injunction, it is not

20  necessary or appropriate for the Court to issue any

21  report or recommendation to the District Court.

22  Because a preliminary injunction is not a final order,

23  a Bankruptcy Court can issue such preliminary

24  injunction even in a non-core matter or claim.  And

25  I'll cite a few cases: In re Reliable Air, 2007 Westlaw

39

1    7143407, from the Bankruptcy Court, Northern District

2    of Georgia, 2007.  In re Wingspread Corporation, 92

3    Bankruptcy Reporter 87, from the Bankruptcy Court,

4    Southern District of New York, 1988.  In re Guy C.

5    Long, Inc., 74 B.R. 939, Bankruptcy Court, Eastern

6    District of Pennsylvania, 1987, and In re Lion Capital

7    Group, 46 B.R. 850, Bankruptcy Court, Southern District

8    of New York, 1985.

9           The Court observes that notwithstanding this

10   conclusion, the SBA has rights to appeal an

11   interlocutory order such as this.  As a result, the

12   Bankruptcy Court believes that the SBA and the

13   Government is adequately protected with respect to the

14   opportunity for appellate review by a Federal District

15   Court, if it so chooses.

16          All right.  That is the conclusion of the

17   Court's reasoning for granting a preliminary

18   injunction.  As I mentioned, the Court will prepare a

19   form of order and enter it.  At this late hour on

20   Thursday, it's likely that it will not be entered until

21   tomorrow.  Of course, the amended TRO runs through

22   tomorrow, but you should have the written preliminary

23   injunction order tomorrow.

24          I will circle back here and ask if there's

25   any housekeeping issues that anybody would like to

40

1    raise.  But I also want to remind you that this is also

2    an adjourned hearing on the main case, In re Weather

3    King, 19-52957, and specifically the -- I'm trying to

4    find it here -- the emergency motion for an interim

5    order authorizing the Debtor to obtain PPP loan from

6    the SBA.  In other words, a motion under Section 364 of

7    the Bankruptcy Code, to authorize the Debtor to enter

8    into a financing or a loan.

9         There have been no objections to that motion.

10    Either Mr. Heimberger or Mr. Mazzola, is there any --

11    we haven't talked about this motion very much in the

12    last couple hearings.  Is there anything further that

13    the Court needs to consider with respect to that

14    motion, now that the Court has decided to grant your

15    motion for preliminary injunction in the adversary

16    proceeding?

17         MR. HEIMBERGER:  Your Honor, Steve Heimberger

18    on behalf of the Debtor.  I would note that the SBA did

19    file, I believe, a limited objection to the Debtor's

20    request.

21         THE COURT:  All right.  Let me just take a

22    brief look at that.  I think I did note that, but for

23    obvious reasons, I've been so busy that I'm not sure I

24    processed it completely.  I need to log in.  Well,

25    let's see if my password works.  All right, it does.

41

1    I'm in the wrong case.  Bear with me.

2           All right.  I think I did look at this.  Mr.

3    Sacks, without me reading this whole thing again -- I

4    think I read it a week ago or a couple days ago -- is

5    there anything in this objection to -- the limited

6    objection to the motion under Section 364 that is

7    really in addition to your objections because you

8    believe that the Debtor doesn't -- it doesn't qualify,

9    in other words, the issues that were raised and have

10   now been resolved on a very preliminary basis, in the

11   adversary proceeding?

12          MR. SACKS:  Your Honor, this is Mr. Sacks.

13   If you don't mind, I'm going to let Ms. Koch, if she's

14   able to, speak to that.  I'm trying to pull up our

15   objection and the proposed order from the Debtor again,

16   but my computer, unfortunately, is frozen and I'm

17   having difficulty doing that.

18          THE COURT:  Okay.

19          MS. KOCH:  Judge, this is AUSA Koch for the

20   Government.

21          THE COURT:  Thank you.

22          MS. KOCH:  No, there isn't anything

23   additional or different.  The limited objection was no

24   objection to post-petition financing.  The only

25   objection was to the extent that this Court was

Case:20-00055-EAG  Doc#:56-1  Filed:06/15/20  Entered:06/15/20 17:40:37  Desc:
Exhibit 1  Page 175 of 194
**5-21-20 (19-52957 & 20-5023)**

42

1   intending to enjoin the SBA in any way by directing the

2   SBA to provide the funds or -- even though they've

3   already been provided, or to enjoin the SBA in any

4   other respect.

5           So it matches and mirrors the briefing that

6   you've seen for the TRO.

7           THE COURT:  Okay.  All right.  Thank you.

8   And so, Mr. Heimberger, anything else going on that I

9   need to be aware of, since this motion was filed?  It's

10  only been a little over two weeks, so not much has

11  happened, but maybe everything has happened.  Any other

12  change that I need to consider, or is there any reason

13  that I shouldn't just simply grant the motion at this

14  time?

15          MR. HEIMBERGER:  No, Your Honor, other than

16  at the time the motion was filed, the Debtor was

17  seeking relief on an interim and then subsequent final

18  basis, at this point in time we would request that the

19  order be entered on a final basis.

20          THE COURT:  All right.  Is there a

21  restriction for a time period for it to be on a final

22  basis?  I know with cash collateral motions, I think

23  it's got to be at least 15 days.  Is there any time

24  line for a 364 motion?

25          MR. HEIMBERGER:  Yes, Your Honor.  I believe

Case:20-00055-EAG  Doc#:56-1  Filed:06/15/20  Entered:06/15/20 17:40:37  Desc:
Exhibit 1  Page 176 of 194
**5-21-20 (19-52957 & 20-5023)**

43

1   a final order cannot be entered until after 14 days

2   following the filing the motion.

3           THE COURT:  Okay.  Well, I guess we're there

4   at this point.  All right.  Would anyone else like to

5   be heard on the emergency motion for an interim and

6   final order authorizing the Debtor to obtain the PPP

7   loan from the SBA or from Dollar Bank, as guaranteed by

8   the SBA?

9           MS. BRADLEY:  Your Honor, this is Kate

10  Bradley.

11          THE COURT:  Yes.

12          MS. BRADLEY:  The United States Trustee's

13  Office.  I would like the opportunity to review a

14  proposed order.  The order that was filed with the

15  motion was an interim order, so I would like to see a

16  version of the final proposed order.

17          THE COURT:  All right.  Mr. Heimberger, I

18  assume you have no objection to that.

19          MR. HEIMBERGER:  No, Your Honor.

20          THE COURT:  All right.  That motion will be

21  granted.  Please prepare a form of order and have Ms.

22  Bradley review it at the U.S. Trustee's Office.  And

23  then once you are done, please upload it.  Obviously

24  you probably want it sooner rather than later, but I

25  realize that you're going to take a little time to put

Case:20-00055-EAG   Doc#:56-1   Filed:06/15/20   Entered:06/15/20 17:40:37   Desc:
Exhibit 1   Page 177 of 194
**5-21-20 (19-52957 & 20-5023)**

44

1   it together and to get the U.S. Trustee's review.  So

2   just keep us posted on where that stands.

3           MR. HEIMBERGER:  I will, Your Honor.  Thank

4   you.

5           THE COURT:  And I guess I would only say, if

6   there's any delay, like if putting together the final

7   order creates a delay, but there's no objection to the

8   form of the interim approval, you may want to consider

9   having me sign the interim order, just so that you have

10  something in place, but discuss that with Ms. Bradley.

11          MR. HEIMBERGER:  Thank you, Your Honor.

12          THE COURT:  All right.  Anything -- all

13  right.  So now turning back to housekeeping, is there

14  anything else with respect to this motion for

15  preliminary injunction and the Court's decision to

16  grant preliminary injunction that I need to be made

17  aware of?  There's a lot of moving pieces here and it

18  was kind of a deep dive for me to get through this, but

19  by the same token, there might be some loose ends that

20  are unintentionally left hanging.  And I'm asking

21  either the Debtor or the Defendant, SBA, you know, is

22  there something that I have forgotten to address that I

23  really should address at this time?

24          MR. SACKS:  Your Honor, this is Marc Sacks

25  for the United States.  I don't think you've forgotten

45

1    anything, but I wanted to ask the Court whether it

2    would entertain a Rule 8007 oral motion for stay of the

3    injunction, pending appeal.  Obviously, as Your Honor

4    knows, I have no authority to grant or promise appeal.

5    I don't know if we will be appealing, but in case we

6    might choose to do so, I wanted to ask the Court if it

7    would entertain an oral motion at this time.

8              THE COURT:  All right.  Well, Mr. Heimberger

9    or Mr. Mazzola, I'm going to assume that you may oppose

10   that, but could you please speak to that?

11             MR. HEIMBERGER:  I haven't reviewed the

12   propriety of asking for it at this time, but we would

13   ultimately oppose the request for a stay.  To the

14   extent that the motion is going to be made orally, I

15   think we'd be in a position after hearing it to

16   respond.

17             THE COURT:  All right.  So are you saying --

18   I'm sorry, I didn't totally follow that.  Are you

19   opposing that oral motion or do you suggest the motion

20   needs to be written and served on you?  Or --

21             MR. HEIMBERGER:  We would oppose it on the

22   basis ultimately on the merits, that the Debtor needs

23   immediate use of the funds.  But I wasn't sure if the

24   question is just being asked, can he present it at this

25   time.  I mean, are we being asked to comment on the

46

1    merits of the motion for --

2              THE COURT:  Well, I guess -- I mean, this is

3    kind of sudden, so I guess any comment that you have --

4    you know, oral motions generally are permitted, but I

5    mean, I just granted a preliminary injunction and so

6    the request has been to stay the effectiveness of that,

7    and I guess I want to know whether the Debtor is

8    willing to consent to that, or whether the Debtor does

9    not have a position on that yet because it is too

10   abrupt.  Or whether the Debtor opposes it for --

11   because it wants the injunction to be in place.

12             MR. HEIMBERGER:  Substantively, we oppose it.

13   I'm sorry.

14             THE COURT:  All right.  In light of the fact

15   that -- for the urgency that I already outlined in my

16   ruling, I think it would be inappropriate for this

17   Court to stay the effectiveness of the preliminary

18   injunction that I have outlined.  And so I will deny

19   the oral motion.  I guess that's without prejudice to

20   reconsideration on a written motion.

21             As we were discussing this here, I was

22   flipping through the pages of my book, but I didn't

23   have immediate access to the statute in 20 USC

24   regarding the appeals of interlocutory orders from

25   Bankruptcy Courts to District Courts.

**5-21-20 (19-52957 & 20-5023)**

47

1          I seem to recall, having looked at this in

2     the last couple of days, that perhaps differently than

3     an interlocutory appeal from a District Court to a

4     Court of Appeals, I think it specifically says that the

5     party filing the appeal does not have to seek, or maybe

6     even shouldn't seek a stay pending appeal from the

7     Bankruptcy Court, but they can proceed directly to the

8     District Court.

9          I could have those rules a bit garbled, but I

10    certainly am not standing in the way of the SBA seeking

11    such a stay from the District Court, obviously, and I

12    don't think you have to in the first instance seek it

13    from the Bankruptcy Court.  I think the rule may be

14    somewhat different going from Bankruptcy Court to

15    District Court than it is from District Court to Court

16    of Appeals, so for whatever that's worth.

17          Anything else?

18          MR. SACKS:  No, thank you, Your Honor.

19          THE COURT:  All right.  Thank you to all

20    lawyers working on this matter.  It's a very

21    challenging issue.  Excellent briefs provided me with

22    excellent materials to work off of, and I appreciate

23    the excellent arguments, both on the 12th and the 18th,

24    from everybody.  I want to compliment all of you for

25    your professionalism and your skill.

**5-21-20 (19-52957 & 20-5023)**

48

1           Thank you very much.  Court is adjourned.

2           (End of proceedings at 4:50 p.m.)

49

State of Ohio          )

Cuyahoga County        )


CERTIFICATE


        I, Marc Eppler, a Notary Public, within and for

the State of Ohio, do hereby certify that the above

transcript is a true and accurate record of the hearing

held before the HONORABLE ALAN M. KOSCHIK.  This record

was prepared from an audio recording provided by the

Court.

        IN WITNESS WHEREOF, I have hereunto set my hand

and seal of office in Cleveland, Ohio on this 30th day

of May, A.D., 2020.

                    _____
                          MARC EPPLER
                    Notary Public - State of Ohio
                    My Commission expires 9-14-2023

**$**

**$5,300 (1)**
4:18
**$59,000 (1)**
4:24
**$6,800 (1)**
4:18

**A**

**able (3)**
4:5;8:19;41:14
**abrogates (1)**
12:7
**abrupt (1)**
46:10
**absent (2)**
8:5;34:25
**absolutely (1)**
3:25
**absorb (1)**
32:22
**abuse (2)**
7:15;17:20
**abused (1)**
30:4
**access (1)**
46:23
**accurate (1)**
6:21
**achieve (1)**
18:20
**Act (21)**
5:13,14,21,25;7:8;
11:18;14:16;16:5;
17:8;21:11,25;25:3;
26:20;27:21;28:11;
30:20;34:18,18;
35:17;36:6,25
**acted (2)**
10:15;35:24
**action (6)**
9:19;15:12;16:3;
27:2;36:13;37:4
**actions (1)**
18:6
**activity (2)**
15:6;23:24
**acts (1)**
7:3
**actually (1)**
26:7
**acute (1)**
5:2
**addition (3)**
7:16;30:16;41:7
**additional (2)**
9:8;41:23
**address (2)**
44:22,23
**addressed (2)**

13:2;19:25
**addressing (1)**
13:18
**adequate (1)**
29:21
**adequately (1)**
39:13
**adjourned (2)**
40:2;48:1
**Administration (8)**
2:5;3:9;5:19;11:15;
14:8;18;15:9;17:10
**Administrative (3)**
7:8;11:18;36:3
**administrator (9)**
3:10;10:15;14:24;
24:22;28:2,25;29:5,6;
30:22
**adopted (1)**
31:9
**adopting (2)**
10:16;35:17
**advance (2)**
32:24;36:4
**advanced (2)**
9:4;17:13
**Adversary (12)**
2:6;3:6;6:23;11:2,
7;13:5,11,22;14:1;
21:8;40:15;41:11
**adverse (1)**
20:22
**advised (1)**
9:1
**affected (1)**
37:8
**afternoon (2)**
2:2;37:20
**again (2)**
41:3,15
**against (17)**
3:9;6:23;7:2,21;
9:20,24;10:17;11:2;
12:17;14:24;15:3;
18:3,4,11,13;20:14;
22:1
**agencies (2)**
15:5,13
**agency (8)**
15:11,21,23,24;
24:7;27:2;35:21;
36:12
**agency's (3)**
16:1;27:16;36:3
**ago (2)**
41:4,4
**agree (2)**
16:16;19:1
**agrees (1)**
26:17
**Aid (1)**
5:13
**Air (5)**

2:4,8;3:4,20;38:25
**Akron (1)**
2:3
**Alexius (1)**
13:7
**alleged (3)**
8:2;11:10,17
**alleges (1)**
17:2
**allow (1)**
18:22
**allowing (1)**
15:11
**almost (1)**
33:4
**alone (1)**
25:12
**along (1)**
18:21
**although (1)**
26:9
**always (1)**
33:4
**ambiguous (2)**
27:7,14
**amended (2)**
9:14;39:21
**American (2)**
5:23;32:5
**amnesty (1)**
9:2
**Among (2)**
12:10;29:10
**amount (1)**
14:21
**analysis (5)**
26:17,23;27:15;
28:21;29:24
**and/or (1)**
7:15
**anti-injunction (2)**
15:19;16:7
**APA (11)**
8:4;10:13;11:21;
16:3;17:9,19;21:5,7,
13;38:7,9
**apparent (1)**
26:5
**appeal (6)**
39:10;45:3,4;47:3,
5,6
**appealing (1)**
45:5
**appeals (4)**
20:7;46:24;47:4,16
**appear (2)**
22:9;30:5
**appearances (1)**
2:11
**appears (1)**
29:24
**appellate (1)**
39:14

**append (1)**
28:11
**applicable (2)**
26:24;30:13
**applicant (14)**
18:17,19;23:2,4,13,
16,19;24:2,5;29:19;
31:3,18;32:6;37:12
**applicants (4)**
9:3;25:23;30:17;
34:6
**applicant's (1)**
31:1
**application (30)**
6:4,7,13,20;7:10,
20;9:21;20:4;21:13;
23:10;24:13,14,14,16;
25:6,16,20,23,24;
26:9,10,13,16;29:18;
31:11;33:9,20;35:2,3;
37:10
**applications (6)**
13:3,20;14:15;22:1;
23:11;25:19
**applied (1)**
5:9
**applies (1)**
27:9
**apply (5)**
10:1,4;19:10,13;
21:19
**applying (1)**
27:7
**appreciate (1)**
47:22
**approached (1)**
20:8
**appropriate (2)**
34:25;38:20
**approval (4)**
7:20;24:13;35:2;
44:8
**approve (1)**
30:23
**approved (5)**
6:13;7:11;9:22;
21:13;25:6
**April (16)**
4:2;6:5,14;13:7;
22:3,5,6,6,8,9;23:7,8;
24:16,17;25:7,17
**Arangure (1)**
27:12
**arbitrary (3)**
7:14;17:20;25:3
**Archdiocese (1)**
13:10
**argue (1)**
21:23
**argued (1)**
28:10
**argues (8)**
9:23;11:24;18:16;

25:21;29:10,16;33:6,
10
**argument (1)**
33:14
**arguments (2)**
25:2;47:23
**arise (2)**
11:4,12
**arising (5)**
12:8,11,13;38:4,6
**aside (1)**
25:1
**asserted (1)**
11:1
**asserting (1)**
17:19
**asserts (2)**
11:22;17:6
**assess (1)**
29:17
**assets (1)**
29:20
**assistance (1)**
36:1
**assume (2)**
43:18;45:9
**assuming (2)**
18:18;32:23
**assure (1)**
29:14
**assuring (1)**
18:20
**attachment (3)**
14:22;15:15,22
**Attorney (1)**
2:13
**AUSA (1)**
41:19
**authorities (1)**
20:24
**authority (10)**
7:6;10:16;11:20;
15:25;17:7,8;20:2;
21:11;30:22;45:4
**authorization (1)**
12:20
**authorize (1)**
40:7
**authorizes (1)**
5:25
**authorizing (2)**
40:5;43:6
**available (2)**
32:7,24
**award (1)**
17:13
**awarding (1)**
12:19
**awards (1)**
12:21
**aware (3)**
6:15;42:9;44:17

Case:20-00055-EAG   Doc#:56-1   Filed:06/15/20   Entered:06/15/20 17:40:37   Desc:
WEATHER KING HEATING & AIR, INC.   Exhibit 1   Page 184 of 194
U.S. SMALL BUSINESS ADMINISTRATION

May 21, 2020

# B

**back (2)**
39:24;44:13
**balance (6)**
8:8;16:21;27:17;
31:24;35:7;36:7
**Bank (2)**
5:11;43:7
**bankrupt (1)**
13:19
**Bankruptcy (93)**
2:3;3:3,5,13,17;
4:17;6:13,16,17,19,
24;7:2,13,23;8:18;
10:1,12,14,17,24;
11:5,6,7,9,12,13,20;
12:4,5,6,9,16;13:1,6,
8,11,18,20,23;14:1,
14,14;16:14;17:9;
18:4,14;19:23;20:5,
15,16,22;21:3,4,10,
15;22:1,21,23;23:5;
24:20,23;25:15,18,25;
26:2;28:21;31:18;
32:16;33:8,21;34:20;
35:5;36:19;37:6,8,13,
18,21,24;38:4,5,23;
39:1,3,3,5,7,12;40:7;
46:25;47:7,13,14
**Banquet (7)**
14:10,13;15:2,17;
16:2;26:18;28:18
**bar (1)**
18:20
**barely (1)**
27:11
**barred (1)**
9:24
**barring (1)**
35:1
**base (2)**
4:6,9
**Based (10)**
3:20;11:10,17;
13:15;20:5,24;21:7;
23:12;35:4;38:8
**basis (7)**
25:12;35:6;41:10;
42:18,19,22;45:22
**Bear (1)**
41:1
**became (2)**
5:2;6:15
**began (2)**
15:7,13
**begin (1)**
2:1
**beginning (1)**
2:9
**behalf (3)**
2:14;28:10;40:18

**believable (1)**
32:3
**believes (1)**
39:12
**benefit (2)**
10:6;30:7
**better (3)**
35:21;36:2,5
**billions (1)**
6:1
**binding (1)**
26:15
**bit (1)**
47:9
**bond (1)**
37:20
**book (1)**
46:22
**borrower (1)**
31:4
**borrowers (1)**
22:25
**both (3)**
14:15;15:17;47:23
**BR (3)**
19:23;39:5,7
**Bradley (8)**
2:19,19,22;43:9,10,
12,22;44:10
**brief (3)**
18:23;19:7;40:22
**briefing (1)**
42:5
**briefs (1)**
47:21
**broad (2)**
19:5,6
**broadly (1)**
13:15
**building (1)**
19:20
**bureaucratic (1)**
36:2
**Burr (2)**
15:9,13
**Business (22)**
2:5;3:9,16,20;4:25;
5:18;14:8;18:22;
23:13,16;27:23,23,24;
28:3;32:4,10,12,22;
33:1,2,3;34:9
**businesses (6)**
5:23;6:2;24:19;
30:1;35:11,25
**busy (1)**
40:23

# C

**Calais (1)**
13:23
**call (1)**
2:12

**Camelot (7)**
14:10,13;15:2,17;
16:2;26:18;28:17
**can (8)**
2:9;18:17;19:10;
27:11;32:22;38:23;
45:24;47:7
**canon (1)**
19:13
**capacity (1)**
3:11
**Capital (1)**
39:6
**capricious (3)**
7:15;17:20;25:4
**car (1)**
19:22
**CARES (15)**
5:14,21,25;14:16;
16:5;17:8;21:11,25;
25:3;26:19;27:21;
28:11;30:19;35:17;
36:25
**case (18)**
2:6,7;3:5;4:12;
5:19;7:23;11:6;14:9;
15:3;16:11;17:14;
26:2;32:13,16;33:6;
40:2;41:1;45:5
**cases (4)**
11:7;14:14;33:7;
38:25
**cash (1)**
42:22
**catastrophe (1)**
32:17
**catch-22 (1)**
33:16
**Catholic (1)**
13:10
**cause (1)**
29:20
**caused (5)**
4:6;8:7;23:3;32:17;
36:12
**causing (1)**
24:9
**certain (4)**
7:2;15:13;20:13,17
**certainly (1)**
47:10
**certification (1)**
25:25
**certifications (1)**
6:20
**cetera (1)**
29:20
**challenges (1)**
32:11
**challenging (1)**
47:21
**chances (1)**
4:22

**change (1)**
42:12
**Chapter (5)**
3:4;4:12;7:22;
32:10,14
**characterization (2)**
19:2;30:8
**characterized (1)**
10:5
**charter (1)**
18:9
**charters (1)**
10:8
**Chevron (3)**
26:25;27:5,15
**choose (1)**
45:6
**chooses (1)**
39:15
**chose (1)**
28:11
**Church (1)**
13:10
**circle (1)**
39:24
**Circuit (5)**
14:5;19:25;20:2;
27:11,19
**Circuit's (1)**
14:3
**circumstances (1)**
32:21
**cite (1)**
38:25
**cited (3)**
14:9,25;22:18
**Citing (1)**
15:17
**citizens (1)**
19:19
**Civil (4)**
3:2;33:25;37:17,23
**claim (16)**
8:3;11:20,23;12:2;
16:21;17:5,24;18:3;
19:5;20:3;21:15;23;
31:21;38:9,11,24
**claims (20)**
7:12;8:3;10:13,13;
11:1,4,10,17,21;12:4;
13:3,14;16:10,12;
21:5,6,7,22;38:4,6
**clause (1)**
15:10
**clear (1)**
18:19
**Cleveland (1)**
8:19
**clock (1)**
34:15
**close (1)**
15:16
**Club (18)**

**5:**17;14:7,13,17;
15:1,18;16:2;22:12;
26:17,24;27:20;28:4,
17;30:17;31:17;32:6,
9;35:10
**Code (14)**
3:18;10:1;11:5,5,6,
12;12:4,4,6,6,9;13:1;
20:16;38:5;40:7
**codification (1)**
28:13
**codified (3)**
13:16;29:8;30:18
**collateral (2)**
29:20;42:22
**collectively (1)**
3:11
**commenced (1)**
4:12
**commencement (1)**
21:24
**comment (3)**
37:25;45:25;46:3
**commerce (1)**
15:14
**commercial (1)**
15:6
**company (2)**
19:15;22:16
**compel (1)**
32:23
**compelled (1)**
36:13
**complaint (5)**
17:6,19;21:8;22:19;
38:16
**completely (1)**
40:24
**compliment (1)**
47:24
**computer (1)**
41:16
**concede (2)**
33:17;34:3
**concern (11)**
4:10;5:2;11:14;
14:15;23:16;26:22;
27:23;30:5;31:13;
34:13;37:3
**concerned (2)**
14:14;32:9
**concerning (1)**
21:2
**concerns (1)**
25:2
**conclude (2)**
17:4;34:21
**concluded (1)**
20:10
**concludes (6)**
16:25;17:15,25;
20:25;25:11;31:20
**conclusion (3)**

WEATHER KING HEATING & AIR, INC.
U.S. SMALL BUSINESS ADMINISTRATION                                              May 21, 2020

8:24;39:10,16
**conclusions (2)**
   3:1;37:16
**condition (2)**
   18:10;26:5
**conditioning (1)**
   3:20
**conditions (6)**
   26:13,14,18;29:1;
   30:12;37:5
**conferred (1)**
   14:20
**confirms (1)**
   26:6
**Congress (9)**
   5:12,24;15:7,13;
   20:18;27:4;28:5,11;
   35:24
**Congressional (1)**
   36:11
**Congress's (2)**
   35:16;36:6
**consensual (1)**
   4:14
**consent (1)**
   46:8
**consequence (2)**
   36:15,16
**consequences (1)**
   20:22
**consider (6)**
   16:12;17:17;37:10;
   40:13;42:12;44:8
**consideration (3)**
   17:16;34:4;38:13
**considerations (2)**
   30:25;31:2
**considered (3)**
   25:6;26:14;34:5
**considering (1)**
   18:1
**consistent (1)**
   37:2
**constitutes (1)**
   28:15
**constraining (1)**
   36:20
**construction (5)**
   12:25;19:13;27:8,
   16;30:10
**consulting (1)**
   6:16
**contain (1)**
   21:14
**contained (4)**
   19:16;25:24;26:13;
   29:11
**contemplates (1)**
   29:24
**contends (12)**
   6:18;8:5;9:17,25;
   10:3,10,12,14,19;
   17:11;21:9,18

**context (1)**
   13:3
**contingency (1)**
   19:4
**continued (1)**
   5:22
**continuing (1)**
   3:14
**contractors (2)**
   23:20;31:6
**contracts (1)**
   19:21
**controversy (1)**
   14:22
**convicted (1)**
   24:4
**core (5)**
   10:13;11:13,19;
   38:6,7
**Coronavirus (1)**
   5:13
**Corporation (2)**
   13:8;39:2
**Corranza (1)**
   3:10
**costs (1)**
   5:5
**Council (1)**
   27:1
**counsel (6)**
   2:11;6:16;9:9;26:6;
   28:10;33:17
**Count (6)**
   17:2,5,11,18;21:9,
   22
**Counts (1)**
   21:7
**County (1)**
   13:5
**couple (2)**
   40:12;41:4;47:2
**course (3)**
   6:10;32:14;39:21
**COURT (114)**
   2:2,3,15,18,21;
   4:17;5:16;8:21,25;
   9:2,9,13;10:12,23,25;
   11:9,9,20;12:3,12,16;
   13:6,9,11;14:1,6,19,
   20,21;15:8,10;16:9,
   12,17,25;17:4,15,25;
   18:3;19:1,12;20:3,7,
   24;21:20;22:10,11,
   14;25:11;26:3,8,16;
   27:3,6,9,14,16;29:23;
   30:9;31:12,20;32:25;
   33:15;35:20;36:19;
   37:14;38:3,5,10,12,
   20,21,23;39:1,3,5,7,9,
   12,15,18;40:13,14,21;
   41:18,21,25;42:7,20;
   43:3,11,17,20;44:5,
   12;45:1,6,8,17;46:2,

14,17;47:3,4,7,8,11,
13,14,15,15,15,19;
48:1
**courts (6)**
   13:2;19:7;26:22;
   27:1;46:25,25
**Court's (11)**
   2:10,23,25;9:6;
   11:13;22:20;28:20;
   37:8;38:18;39:17;
   44:15
**covered (5)**
   10:11;27:24;28:25;
   30:23;31:1
**COVID- (1)**
   8:7
**COVID-19 (6)**
   3:23;4:7,11;18:24;
   32:3;35:13
**created (3)**
   5:12,24;9:2
**creates (1)**
   44:7
**creating (2)**
   15:5;16:5
**creation (1)**
   22:22
**creditors (2)**
   4:15;15:20
**creditworthiness (3)**
   22:25;29:19,22
**criminal (1)**
   33:25
**criteria (6)**
   27:21,22;28:5,6;
   30:16;34:6
**current (1)**
   8:7
**currently (2)**
   9:21;24:7
**customers (1)**
   3:24

**D**

**damages (2)**
   12:21;32:23
**date (1)**
   8:18
**dates (2)**
   22:3;24:12
**days (6)**
   21:16;24:15;41:4;
   42:23;43:1;47:2
**deadline (2)**
   9:5,7
**debt (1)**
   32:11
**Debtor (57)**
   2:14;3:13,14,19;
   4:1,5,12;5:4,9;6:5,8,
   15,18,19,22,24;7:3,
   12,13,16,18,22,22,22;

8:2,5;9:18;11:1;
17:10,14,23;18:14,15;
20:21;21:5,21;25:15,
25;26:1;32:1,20;
34:20;35:5,18;37:13;
40:5,7,18;41:8,15;
42:16;43:6;44:21;
45:22;46:7,8,10
**Debtor-in-Possession (2)**
   3:5,16
**debtors (10)**
   6:17;7:2;10:17,24;
   18:5;20:15;22:2,22;
   24:23;25:18
**Debtor's (23)**
   3:21,23;4:4,9,16,21,
   25;6:4,9,10,12;7:10,
   20;9:21;11:15;13:19;
   20:3;21:7,17;22:19;
   35:4;37:6;40:19
**debtors-in-possession (1)**
   37:23
**December (1)**
   3:14
**decided (2)**
   15:8;40:14
**decision (3)**
   10:24;38:18;44:15
**declaration (2)**
   3:21;6:24
**declarations (1)**
   32:2
**declaratory (5)**
   3:8;7:3,16;9:19;
   25:13
**declare (1)**
   16:4
**decline (1)**
   4:25
**deemed (2)**
   30:21;31:16
**deep (1)**
   44:18
**defaulted (1)**
   24:8
**Defendant (1)**
   44:21
**Defense (1)**
   27:1
**defer (1)**
   27:16
**defined (1)**
   22:17
**delay (3)**
   2:9;44:6,7
**delaying (1)**
   3:24
**delegated (1)**
   30:22
**delinquent (1)**
   24:8
**demand (1)**
   6:6

**demands (2)**
   18:7;19:16
**demonstrate (1)**
   31:13
**denial (1)**
   20:4
**denied (1)**
   33:12
**deny (3)**
   18:8,11;46:18
**denying (2)**
   7:18;20:17
**depends (2)**
   19:5;34:17
**derived (1)**
   30:19
**description (1)**
   23:1
**designed (2)**
   18:22;30:4
**details (1)**
   23:9
**determine (4)**
   12:12;16:17;27:7;
   29:18
**determined (1)**
   24:22
**determines (1)**
   27:3
**determining (2)**
   20:12;35:22
**Development (2)**
   20:2;22:16
**DeWine (1)**
   5:3
**Diamond (18)**
   5:17;14:7,13,17;
   15:1,18;16:2;22:12;
   26:17,24;27:20;28:4,
   17;30:17;31:17;32:6,
   9;35:10
**different (4)**
   26:23;33:6;41:23;
   47:14
**differently (1)**
   47:2
**difficult (1)**
   32:11
**difficulty (1)**
   41:17
**direct (1)**
   24:6
**directed (2)**
   20:13;37:9
**directing (1)**
   42:1
**directly (3)**
   20:1;27:4;47:7
**disagrees (3)**
   12:3;19:3;35:20
**discharge (4)**
   20:6,23;23:5,5
**discretion (4)**

7:15;17:21;29:17;
35:22
**discriminate (3)**
18:10,12;20:14
**discrimination (4)**
7:1;11:11;18:4;
21:4
**discriminatory (2)**
17:3;20:6
**discuss (2)**
17:22;44:10
**discussed (1)**
36:9
**discussing (1)**
46:21
**distinctive (1)**
33:8
**District (31)**
5:16,17;11:8,9;
13:7,9,12,23,24;14:2,
10,20,21;19:24;22:11,
12;26:22;38:12,13,
21;39:1,4,6,7,14;
46:25;47:3,8,11,15,15
**dive (1)**
44:18
**doctrine (1)**
9:24
**documents (1)**
6:7
**Dollar (2)**
5:11;43:7
**dollars (1)**
6:1
**done (2)**
32:4;43:23
**door (1)**
29:25
**doubt (2)**
26:9;30:8
**downturn (1)**
4:6
**dramatically (1)**
32:4
**driving (1)**
19:22
**due (1)**
3:24
**during (5)**
4:15;18:23;27:23;
28:8;30:2
**duties (1)**
23:10
**DV (18)**
5:17;14:7,13,17;
15:1,18;16:2;22:12;
26:17,24;27:20;28:4,
17;30:17;31:17;32:6,
9;35:10

**E**

**earlier (1)**

25:21
**early (1)**
8:20
**ease (1)**
18:18
**Eastern (6)**
5:17;13:9;14:10;
19:23;22:12;39:5
**echoes (1)**
31:8
**Economic (3)**
5:13;8:7;32:17
**economy (1)**
32:5
**effect (1)**
25:10
**effective (1)**
37:19
**effectiveness (2)**
46:6,17
**efficiency (1)**
4:13
**effort (1)**
5:5
**eight-week (2)**
34:11,12
**either (7)**
7:19;11:4;23:18;
28:22;31:4;40:10;
44:21
**ejusdem (1)**
19:9
**electronically (1)**
6:8
**eligibility (6)**
13:19;23:12;27:20;
28:5,7;31:1
**eligible (1)**
6:18
**eloquently (1)**
35:9
**else (4)**
42:8;43:4;44:14;
47:17
**Elter (1)**
19:23
**emergency (10)**
4:8;8:13,14;13:5;
29:25;30:2;35:24;
36:5;40:4;43:5
**employ (1)**
23:25
**employee (2)**
4:6,9
**employee-based (1)**
23:15
**employees (14)**
4:2,3;5:5,8,22;
23:14,19,25;24:1;
28:1;30:2;31:4;35:11;
36:1
**employing (1)**
20:20

**employment (7)**
5:7,22;10:9;18:11,
12,13;35:11
**end (4)**
4:2;5:24;27:10;
48:2
**endeavors (1)**
20:18
**ends (1)**
44:19
**enforceable (1)**
33:22
**enforcing (1)**
16:6;35:16
**engage (1)**
10:19
**engaged (1)**
23:24
**engaging (1)**
7:1
**English (1)**
19:14
**enjoin (2)**
42:1,3
**enjoining (2)**
7:18;16:6
**enjoys (1)**
11:22
**ensure (1)**
30:1
**ensuring (1)**
5:22
**enter (6)**
11:14,20;36:20;
38:18;39:19;40:7
**entered (6)**
8:25;9:13;38:10;
39:20;42:19;43:1
**entering (1)**
38:14
**entertain (2)**
45:2,7
**entire (1)**
29:7
**entirely (1)**
26:23
**entities (1)**
20:14
**entitled (1)**
21:19
**entity (1)**
33:3
**environment (1)**
8:7
**epitome (1)**
33:4
**equitable (1)**
12:23
**equities (1)**
16:21
**equity (1)**
24:3
**eroded (1)**

4:22
**error (2)**
33:19,20
**e-signed (1)**
6:8
**essence (1)**
36:1
**essentially (1)**
4:24
**established (1)**
28:2
**estate (1)**
11:15
**et (1)**
29:20
**evaluating (2)**
22:24;31:1
**even (10)**
9:18;10:5;21:12;
26:12;30:7;32:10;
34:1;38:24;42:2;47:6
**event (2)**
5:6;9:3
**everybody (1)**
47:24
**evidence (1)**
10:21
**example (1)**
13:4
**exceeded (2)**
15:24;17:6
**exceeds (1)**
21:10
**Excellent (3)**
47:21,22,23
**except (1)**
28:24
**exception (6)**
6:19;13:21;14:14;
16:7;28:22;34:20
**exceptions (2)**
24:10;28:19
**excess (3)**
7:5;17:8;26:19
**exclude (2)**
10:24;12:23
**excluded (1)**
23:2
**excludes (2)**
12:1;37:22
**exclusion (14)**
6:24;7:13;12:20;
17:10;21:3,10,14,15;
22:21;25:15;26:23;
31:18;33:21;37:6
**exclusions (1)**
28:19
**Executive (1)**
25:9
**exercise (2)**
19:20,22
**exercising (1)**
35:21

**exist (1)**
26:11
**existing (4)**
22:13;23:14;25:23;
28:12
**expansive (1)**
20:20
**expectation (1)**
4:13
**expend (1)**
34:22
**expended (1)**
34:11
**expending (1)**
36:22
**expenses (3)**
18:21,22,25
**expire (1)**
9:5
**explain (1)**
24:21
**explicit (1)**
11:25
**expressly (1)**
12:1
**extended (1)**
9:6
**extending (1)**
9:14
**extensive (1)**
28:18
**extent (2)**
41:25;45:14

**F**

**F2d (1)**
14:5
**F3d (2)**
20:2;27:12
**faces (1)**
16:19
**facilitating (1)**
23:11
**facing (1)**
32:11
**fact (5)**
8:15;25:4;28:13;
33:8;46:14
**factors (3)**
16:17;31:24;35:8
**failure (1)**
34:21
**faith (1)**
18:19
**far (1)**
36:5
**fashion (1)**
13:4
**fault (1)**
35:12
**favor (2)**
8:9;35:8

WEATHER KING HEATING & AIR INC.
U.S. SMALL BUSINESS ADMINISTRATION

May 21, 2020

**Fe (1)**
13:10

**February (5)**
4:16,20;23:18;
27:25;31:3

**Fed (4)**
22:4,5,6;24:18

**Federal (12)**
3:2;15:5,8,11;22:3,
11;24:7;26:5;37:17,
18,23;39:14

**fell (1)**
4:23

**felony (1)**
24:4

**few (1)**
38:25

**fewer (1)**
23:13

**field (1)**
4:4

**file (2)**
8:19;40:19

**filed (13)**
3:13;4:17;6:22;
7:10,24;11:6;21:13;
25:22;38:16,16;42:9,
16;43:14

**filing (3)**
20:22;43:2;47:5

**final (14)**
11:14,21;22:8;38:2,
9,14,22;42:17,19,21;
43:1,6,16;44:6

**finally (2)**
10:22;17:15

**financing (2)**
40:8;41:24

**find (1)**
40:4

**finding (1)**
32:9

**findings (2)**
2:25;37:15

**finds (3)**
10:25;16:9;21:20

**First (9)**
10:3;14:3,5;21:16;
24:19;27:3;30:11;
32:15;47:12

**five (1)**
24:5

**Flint (2)**
5:18;14:7

**flipping (1)**
46:22

**focused (1)**
20:9

**follow (1)**
45:18

**following (6)**
2:10,23,25;14:6;
19:10;43:2

**force (2)**
7:10;37:1

**forfeiture (1)**
34:22

**forget (1)**
2:7

**forgive (2)**
2:9;30:4

**forgiven (1)**
30:3

**forgiveness (7)**
18:18;19:4;34:4,17;
35:3;37:7,10

**forgotten (2)**
44:22,25

**form (13)**
6:12;23:21;25:24,
24;26:4,7,9,10,14;
31:6;39:19;43:21;
44:8

**formalized (1)**
21:16

**former (2)**
20:3,15

**forms (1)**
12:23

**found (6)**
11:3;12:6;15:4;
16:7;27:22;28:18

**Foundation (1)**
13:5

**four (1)**
16:16

**frame (2)**
34:11,12

**framework (1)**
27:3

**franchise (1)**
18:9

**franchises (1)**
10:8

**frantic (1)**
6:6

**free (1)**
37:1

**freedom (1)**
19:22

**fresh (2)**
20:16,21

**frozen (1)**
41:16

**frustrated (1)**
35:14

**frustrates (1)**
20:15

**fulfilled (1)**
35:16

**fulfilling (1)**
36:11

**fulfills (1)**
35:19

**fully (2)**
8:22;9:9

**funded (8)**
6:14;7:11;9:22;
21:14;24:14,16;
33:10,18

**funding (1)**
21:17

**funds (14)**
9:3,4;15:22;18:20;
24:24;31:11;34:1,7,8,
10,16,22;42:2;45:23

**furloughing (1)**
5:5

**further (9)**
7:8,12;8:5;9:8,25;
10:14;16:5;24:17;
40:12

**furthered (1)**
10:23

**Furthermore (2)**
12:16;21:12

**future (1)**
34:19

## G

**garbled (1)**
47:9

**garnishment (3)**
14:23;15:12,15

**gatekeeper (1)**
20:12

**general (3)**
11:10;19:10;31:13

**generally (3)**
12:1;31:14;46:4

**generis (1)**
19:9

**Georgia (1)**
39:2

**given (1)**
19:16

**giving (1)**
30:7

**goal (1)**
35:19

**goes (1)**
15:1

**good (2)**
2:2;18:19

**governing (2)**
37:7,12

**government (7)**
12:17;15:20;23:3;
24:9;29:16;39:13;
41:20

**governmental (8)**
7:1,3;12:8,14;18:5,
6,7;20:13

**Government's (2)**
8:22;20:11

**Governor (1)**
5:3

**grant (13)**

10:6,10;16:17;
18:10,10,11,16,17;
21:17;40:14;42:13;
44:16;45:4

**granted (5)**
32:8;33:10;35:15;
43:21;46:5

**granting (4)**
5:20;8:9;35:8;
39:17

**grants (1)**
10:9

**grounds (3)**
9:17;11:3;21:3

**Group (1)**
39:7

**guarantee (4)**
6:1;28:7,25;36:13

**guaranteed (4)**
5:10;23:6;24:6;
43:7

**guess (6)**
43:3;44:5;46:2,3,7,
19

**Guy (1)**
39:4

## H

**hanging (1)**
44:20

**happened (2)**
42:11,11

**harm (10)**
8:6;10:22;16:20;
31:24;32:1;33:5;
34:14,25;36:8,10

**harmed (1)**
33:12

**harms (5)**
8:8;31:25;35:7;
36:7,17

**health (1)**
32:18

**hear (1)**
12:12

**heard (1)**
43:5

**hearing (9)**
8:13,15,17,23,24;
9:8,12;40:2;45:15

**hearings (2)**
28:8;40:12

**Heating (4)**
2:4,8;3:4,19

**heavily (1)**
8:8

**Heimberger (16)**
2:13,13;40:10,17,
17;42:8,15,25;43:17,
19;44:3,11;45:8,11,
21;46:12

**held (7)**

9:12;15:10;16:3;
20:7;27:20;28:4;
38:17

**Hidalgo (1)**
13:5

**high (1)**
24:24

**highly-skilled (1)**
4:4

**hindering (1)**
15:20

**hold (1)**
15:1

**holdings (1)**
14:7

**holds (1)**
19:9

**home (1)**
20:4

**Honor (11)**
40:17;41:12;42:15,
25;43:9,19;44:3,11,
24;45:3;47:18

**hope (1)**
2:8

**hoping (1)**
32:19

**Hospital (3)**
13:7,22,24

**hour (1)**
39:19

**hours (2)**
4:3;8:20

**household (2)**
23:24,25

**housekeepers (1)**
24:1

**housekeeping (2)**
39:25;44:13

**Housing (2)**
15:9;20:1

**hundreds (1)**
6:1

**HVAC (3)**
3:20,24;4:4

## I

**identified (1)**
23:22

**ie (3)**
11:5;23:25;27:17

**illegal (1)**
23:24

**immediate (3)**
16:19;45:23;46:23

**immune (1)**
15:23

**immunity (10)**
9:25;11:23,24;12:1,
5,7;13:14,16;16:8,10

**impact (1)**
14:15

impacted (1)
  35:12
imperative (1)
  36:6
implementation (1)
  7:4
implication (1)
  12:13
impose (1)
  26:5
imposed (3)
  17:9;24:11;26:19
improvement (1)
  20:5
improving (1)
  4:13
imputed (2)
  28:20,22
inapplicability (1)
  25:14
inapplicable (5)
  25:20;31:14,17,18;
  37:22
inappropriate (1)
  46:16
inappropriately (2)
  9:4;17:12
Inc (2)
  26:25;39:5
incarcerated (1)
  24:3
inclined (1)
  20:14
include (5)
  13:21;21:25;23:4,9;
  28:23
included (2)
  12:10;28:14
including (19)
  8:17;10:16;12:18,
  24;15:7;22:4;24:12;
  29:8;31:19;37:6
income (6)
  4:18,19,21,23,24;
  5:22
inconsistent (1)
  16:4
incorporate (1)
  26:12
incorporated (1)
  20:18
incorporating (1)
  37:15
increased (1)
  4:19
Indeed (10)
  4:15;19:25;22:23;
  25:7;26:8;30:16,25;
  31:8;34:12;36:5
independent (2)
  23:20;31:5
independently (1)
  22:11

indicated (1)
  28:5
indictment (1)
  24:4
individuals (1)
  23:25
industry (2)
  23:16;28:3
ineligibility (1)
  22:14
ineligible (2)
  23:22;24:20
information (1)
  23:8
injunction (33)
  2:25;5:20;8:1,13;
  9:18;14:22;15:15,25;
  16:18,19;17:17;18:1;
  28:9;32:8;35:9,15;
  36:20,25;37:9,15;
  38:7,19,22,24;39:18,
  23;40:15;44:15,16;
  45:3;46:5,11,18
injunctive (17)
  3:8;7:17;8:6,9,10;
  9:23;11:23;12:2;15:3,
  23;16:13,16;25:14;
  31:23;33:13;35:1,18
injured (1)
  36:10
injury (1)
  36:12
inquiring (1)
  6:12
inquiry (1)
  27:6
instance (1)
  47:12
insulate (1)
  20:21
intend (1)
  28:6
intended (2)
  15:19,22
intending (1)
  42:1
intent (3)
  20:18;35:17;36:11
interest (9)
  8:11;10:22;16:22;
  18:24;31:25;35:8,16,
  20;36:4
interesting (1)
  33:14
interfere (1)
  15:25
interim (11)
  22:8;23:7;24:17;
  25:7,8;40:4;42:17;
  43:5,15;44:8,9
interlocutory (4)
  38:19;39:11;46:24;
  47:3

internal (1)
  16:1
interpretation (4)
  13:15,21;19:6;
  27:18
interpretative (1)
  19:8
into (5)
  19:14;20:18;28:20;
  33:16;40:8
invalidate (2)
  17:13;21:2
involved (3)
  8:15;24:20;26:1
irreparable (9)
  8:6;10:21;16:19;
  31:24;32:1;33:5;
  34:14,25;36:9
irreparably (1)
  33:12
irretrievable (1)
  33:4
issue (8)
  12:12,16;20:1;27:5;
  37:14;38:20,23;47:21
issued (4)
  5:3;14:23;22:15;
  38:8
issues (2)
  39:25;41:9

J

January (2)
  4:15,19
jeopardizing (1)
  4:22
Jessica (1)
  8:18
Jovita (1)
  3:10
Judge (3)
  2:3;8:18;41:19
judgment (3)
  7:4;12:18,19
judgments (1)
  11:21
judicial (1)
  36:13
June (1)
  27:25
jurisdiction (10)
  7:6;10:12;11:1,2,
  14;14:20;16:12,14;
  38:1,6

K

Kate (2)
  2:19;43:9
keep (2)
  15:19;44:2
keeps (1)

19:15
Kentucky (1)
  13:9
kind (2)
  44:18;46:3
King (4)
  2:4,8;3:4;40:3
known (2)
  19:13,15
knows (1)
  45:4
Koch (5)
  2:16;41:13,19,19,
  22
Koschik (1)
  2:3

L

lack (2)
  35:5;38:1
lacks (2)
  9:18;11:20
language (3)
  15:7;20:9,19
large (1)
  29:11
last (4)
  24:5;32:5;40:12;
  47:2
late (2)
  5:1;39:19
later (3)
  32:20,23;43:24
Latin (1)
  19:9
Law (3)
  5:14;15:12;32:25
laws (1)
  37:7
lawsuits (2)
  8:16;9:20
lawyers (1)
  47:20
least (2)
  36:15;42:23
left (1)
  44:20
legal (5)
  16:15;32:7,19,23;
  37:3
legislative (1)
  36:6
lender (2)
  22:16;30:20
lenders (2)
  23:11;30:25
less (2)
  28:1,1
license (1)
  18:9
licenses (2)
  10:8;19:21

light (1)
  46:14
likelihood (4)
  16:20,23;17:17;
  38:8
likely (8)
  8:2;17:1,4;21:6,21;
  25:12;31:21;39:20
limitation (2)
  12:25;15:19
limitations (1)
  7:7
limited (10)
  9:1,6;10:7;14:4;
  29:9;30:16;31:2;
  40:19;41:5,23
line (1)
  42:24
Lion (1)
  39:6
liquidation (3)
  5:6;32:17;33:2
liquidity (1)
  4:8
liquor (1)
  19:21
list (5)
  19:10,11,16,18;
  28:4
litigate (1)
  32:22
litigation (1)
  33:7
little (3)
  4:19;42:10;43:25
live (1)
  32:22
livelihood (1)
  19:20
livelihoods (1)
  20:13
LLC (3)
  5:18;13:25;14:7
loan (41)
  5:11;7:21;10:3,6;
  18:17,18;19:3;20:5;
  21:17;22:16,22;23:1,
  6;24:6;25:16,24;28:6,
  12,15,19;29:1,7,18,
  21;30:6,18,21;31:2,
  16;32:24;33:18;34:5,
  17;36:13,21,23,24;
  37:2;40:5,8;43:7
loans (13)
  6:1,18;10:4;23:11;
  24:23,25;28:25;
  29:12;30:3,4,23;
  31:14;37:8
locate (2)
  22:10;26:8
log (1)
  40:24
long (2)

36:25;39:5
**look (2)**
40:22;41:2
**looked (1)**
47:1
**loose (1)**
44:19
**loss (3)**
5:7;23:3;24:9
**losses (1)**
32:22
**lot (1)**
44:17
**low (1)**
18:19
**low-income (1)**
20:4

**M**

**main (2)**
2:7;40:2
**Maine (1)**
13:23
**maintain (2)**
4:5,9
**maintains (1)**
6:17
**makes (1)**
37:22
**making (2)**
10:20;17:13
**managing (1)**
3:16
**mangle (1)**
19:9
**manner (3)**
7:5;20:15;35:25
**many (1)**
29:10
**Marc (2)**
2:16;44:24
**March (3)**
4:21,23;5:1
**Maritime (2)**
14:4;15:17
**matches (1)**
42:5
**materials (1)**
47:22
**matter (4)**
10:25;27:10;38:24;
47:20
**matters (4)**
10:14;12:8,10;38:5
**May (36)**
5:21;6:22;7:24;
8:14,20,23,24;9:5,6,7,
12,13,14;12:12,16;
13:9,12;14:2,9,12,18;
16:17;18:8;19:14;
20:12;23:2,16;26:10;
28:25;32:7;34:20;

36:14;37:20;44:8;
45:9;47:13
**maybe (2)**
42:11;47:5
**Mazzola (3)**
2:14;40:10;45:9
**mean (3)**
45:25;46:2,5
**meaning (1)**
19:17
**Meanwhile (1)**
36:10
**mechanisms (1)**
15:21
**mentioned (1)**
39:18
**merely (1)**
19:5
**merits (14)**
8:3;16:21,24;17:1,
5,23;21:1,6,21;25:13;
38:9,17;45:22;46:1
**Mexico (1)**
13:12
**Michigan (3)**
5:17;20:1;22:12
**mid (1)**
5:1
**mid-March (2)**
3:23;4:2
**might (6)**
20:14;26:14;36:2;
38:10;44:19;45:6
**mind (1)**
41:13
**mirrors (1)**
42:5
**Miscellaneous (1)**
23:21
**moderate (1)**
32:14
**Monday (1)**
9:12
**monetary (4)**
10:6,10;12:19,22
**money (2)**
29:25;33:11
**monthly (2)**
4:16,23
**months (3)**
4:15;32:5,15
**more (4)**
4:20;13:15;24:2;
26:1
**Moreover (1)**
36:11
**morning (1)**
8:20
**mortgage (1)**
18:24
**most (2)**
22:7;33:7
**motion (31)**

2:24;7:25;8:1,12;
9:16;17:16;18:1;40:4,
6,9,11,14,15;41:6;
42:9,13,16,24;43:2,5,
15,20;44:14;45:2,7,
14,19,19;46:1,19,20
**motions (4)**
5:20;28:9;42:22;
46:4
**movant (1)**
16:20
**move (1)**
27:15
**moving (2)**
16:19;44:17
**much (5)**
18:16;32:5;40:11;
42:10;48:1
**must (6)**
11:24;23:17;27:6,
16,23,25

**N**

**namely (1)**
34:7
**nannies (1)**
24:1
**narrow (2)**
18:5;28:4
**narrowly (1)**
20:9
**Natural (1)**
26:25
**nature (1)**
8:14
**necessary (2)**
3:25;38:20
**need (6)**
17:17;18:19;40:24;
42:9,12;44:16
**needed (1)**
36:1
**needs (4)**
34:15;40:13;45:20,
22
**negative (1)**
37:4
**negotiating (1)**
4:14
**Neither (1)**
14:13
**net (2)**
4:17,24
**new (5)**
5:11;13:12;21:20;
39:4,8
**nine (1)**
4:1
**non-core (1)**
38:24
**non-enforceable (1)**
26:20

**nonpayment (1)**
24:25
**non-profit (1)**
23:17
**nor (2)**
14:13;34:3
**Northern (3)**
11:8;38:13;39:1
**noscitur (1)**
19:13
**note (3)**
6:11;40:18,22
**noted (7)**
5:16;14:17;15:18;
19:7;22:13;30:17;
35:10
**notwithstanding (4)**
13:20;32:14;35:5;
39:9
**Number (5)**
2:6;5:19;13:8,11;
14:1
**numerous (1)**
8:16

**O**

**objection (9)**
40:19;41:5,6,15,23,
24,25;43:18;44:7
**objections (2)**
40:9;41:7
**obligation (1)**
33:25
**obligations (1)**
37:3
**observed (2)**
19:18;38:3
**observes (3)**
30:9;33:15;39:9
**obstructing (1)**
15:21
**obtain (3)**
18:18;40:5;43:6
**obtained (4)**
23:4;24:6;25:16;
36:14
**obtaining (1)**
19:20
**obvious (1)**
40:23
**Obviously (3)**
43:23;45:3;47:11
**occupations (1)**
20:17
**occurred (1)**
5:1
**off (2)**
5:6;47:22
**offered (2)**
29:20;32:2
**Office (3)**
2:20;43:13,22

**official (1)**
3:10
**Ohio (3)**
5:3;11:8;38:13
**once (2)**
33:2;43:23
**one (3)**
8:17;27:6;30:5
**ones (1)**
26:19
**only (17)**
3:11;4:3;10:7;
12:20;18:19;19:10;
22:23;23:22;24:10;
27:14,22;30:13;33:9,
20;41:24;42:10;44:5
**onset (2)**
3:22;4:11
**operated (1)**
28:3
**operating (4)**
3:15;4:16,17;22:15
**operation (3)**
16:1;23:18;31:3
**operations (2)**
4:14;15:21
**opinion (6)**
5:19;14:4,5;27:11,
13,19
**opinions (3)**
13:13,18;14:3
**opportunity (6)**
8:22;9:8,9;19:12;
39:14;43:13
**oppose (4)**
45:9,13,21;46:12
**opposes (2)**
9:16;46:10
**opposing (1)**
45:19
**option (1)**
32:20
**oral (7)**
2:10,23;45:2,7,19;
46:4,19
**orally (1)**
45:14
**order (34)**
5:3,9,20;7:25;8:25;
9:7;11:10;12:17,18;
17:13;25:9;30:1;
34:16;37:15,19;38:2,
10,14,22;39:11,19,23;
40:5;41:15;42:19;
43:1,6,14,14,15,16,
21;44:7,9
**orders (2)**
11:14;46:24
**ordinary (1)**
27:8
**Organic (1)**
13:25
**organization (1)**

23:17
**original (2)**
22:7,14
**others (1)**
15:20
**otherwise (4)**
23:14;28:24;30:14;
36:17
**out (2)**
29:25;33:2
**outlined (2)**
46:15,18
**outweighed (1)**
36:16
**over (7)**
4:18;5:2;10:13;
11:1;32:22;38:2;
42:10
**overnight (1)**
5:1
**overwhelming (1)**
6:6
**own (11)**
7:9;13:15;16:8;
18:18;21:12,19;
28:21;30:9;35:12;
36:6,24
**owner (1)**
24:2

**P**

**Page (1)**
27:18
**Pages (3)**
14:11;20:10;46:22
**paid (2)**
31:5,5
**pandemic (9)**
3:23;4:7,11;5:2;
8:8;18:24;32:3,18;
35:13
**paragraph (7)**
28:24;29:4,4,9;
30:14,18,24
**parole (1)**
24:3
**part (1)**
5:24
**participate (1)**
15:5
**participated (1)**
15:14
**participating (1)**
7:19
**particular (1)**
23:15
**parties (5)**
16:15,16,22;22:2;
23:22
**party (2)**
16:18;47:5
**password (1)**

40:25
**Paycheck (3)**
5:10;8:16;30:2
**payroll (5)**
18:21;23:20;31:5;
34:2,8
**pays (1)**
23:19
**pending (4)**
9:21;18:23;45:3;
47:6
**Pennsylvania (1)**
39:6
**Penobscot (1)**
13:22
**percent (1)**
24:2
**perhaps (2)**
34:18;47:2
**period (3)**
18:23;27:24;42:21
**permanent (2)**
5:7;7:17
**permissible (1)**
27:17
**permission (1)**
20:17
**permit (1)**
18:9
**permits (2)**
10:8;19:21
**permitted (5)**
34:2,9,11;36:23;
46:4
**person (1)**
18:13
**personal (1)**
19:22
**perspective (1)**
28:13
**persuaded (1)**
18:3
**persuasive (1)**
14:6
**petition (1)**
3:13
**phrase (2)**
12:24;29:6
**pieces (1)**
44:17
**place (6)**
21:24;25:5,22;31:9;
44:10;46:11
**plain (1)**
20:19
**Plaintiff (2)**
3:6;21:9
**Plaintiff/Debtor (33)**
7:24;8:9;9:11;
10:20;16:11,25;17:4,
11;18:2;20:25;21:18;
24:12;25:12;26:15;
31:10,19,20;32:13;

33:9,11,16,18,23;
34:14,15,24;35:19;
36:8,14,18,22;37:1,11
**Plaintiff/Debtors (5)**
9:1;21:23;22:19;
25:22;37:21
**Plaintiff/Debtor's (16)**
8:12;9:16;12:4;
17:18;19:2;21:8;
24:15;25:1,5,20;28:9;
33:20;34:5;35:2;
36:21;38:8
**Plaintiffs (1)**
9:20
**Plaintiff's (1)**
2:24
**plan (1)**
4:14
**Please (3)**
43:21,23;45:10
**plummeted (1)**
3:24
**pm (2)**
2:1;48:2
**point (3)**
22:20;42:18;43:4
**policy (3)**
10:23;20:16,21
**portion (2)**
31:8;34:7
**position (4)**
6:17;33:24;45:15;
46:9
**possession (1)**
3:15
**possible (2)**
19:4;23:2
**posted (1)**
44:2
**posting (1)**
22:7
**post-petition (1)**
41:24
**potential (3)**
5:6;36:7,16
**Power (1)**
13:25
**PPP (83)**
5:10,11,24;6:4,18,
20;7:4,10,14,19,20;
9:3,20,21;10:2,3,5,18,
24;13:3,19;14:15,17;
16:4,5;17:10,13;
18:16;19:2,6;21:3,17,
25;22:23;23:9,11,23;
24:11,13,15,21,23;
25:5,15,18,23;26:16,
20,23;27:21,22;28:12,
13,20,23;29:5,9,23;
30:3,9,11,15,18,18;
31:2,14,17,18;33:7,9,
18,20;34:6;35:2,17,
23;36:21;37:2,5,7,12;

40:5;43:6
**PPP's (1)**
35:10
**precise (1)**
27:4
**preclude (1)**
15:3
**preemptive (1)**
25:9
**prejudice (1)**
46:19
**prejudicial (1)**
35:4
**preliminary (31)**
2:24;5:20;7:17;8:1,
13;16:18;17:16;18:1;
28:9;32:8;33:13;
34:25;35:9,15,18;
36:20,25;37:9,14;
38:7,19,22,23;39:17,
22;40:15;41:10;
44:15,16;46:5,17
**prepare (2)**
39:18;43:21
**present (2)**
24:23;45:24
**presently (1)**
24:19
**president (1)**
3:21
**pressing (1)**
34:13
**prevents (1)**
18:4
**previous (2)**
24:8;31:15
**previously (2)**
14:9;23:4
**Price (1)**
8:18
**primarily (1)**
18:21
**primary (1)**
5:21
**principal (1)**
33:24
**principle (1)**
19:8
**printed (1)**
26:4
**Prior (5)**
4:11;22:13,22;23:3;
28:19
**private (1)**
30:20,25
**privileges (1)**
19:19
**probably (1)**
43:24
**probation (1)**
24:3
**Procedure (4)**
3:2,3;37:17,18

**Procedures (3)**
7:8;11:18;22:16
**proceed (1)**
47:7
**Proceeding (7)**
2:6;3:7;6:23;11:2;
21:9;40:16;41:11
**Proceedings (6)**
2:1;11:8,13,19;
24:20;48:2
**proceeds (2)**
36:23;37:2
**process (5)**
6:5;12:17;14:23;
15:16;23:10
**processed (1)**
40:24
**processes (2)**
29:1;30:12
**processing (1)**
35:3
**professionalism (1)**
47:25
**Program (19)**
5:10,11,25;6:7;
8:17;9:2;10:2,11,18;
18:17;22:22;24:11,
21;29:7,9,11,25;30:4,
21
**programs (6)**
22:17;23:1;28:12,
16,20;31:16
**prohibited (1)**
16:7
**prohibiting (2)**
25:18;36:22
**prohibition (3)**
10:17;22:1;35:6
**prohibits (1)**
6:25
**promise (1)**
45:4
**promulgated (2)**
14:16;17:7
**pronounce (1)**
27:11
**proper (1)**
30:8
**properly (2)**
34:1,9
**property (2)**
3:15;14:24
**proposed (4)**
29:21;41:15;43:14,
16
**propriety (2)**
27:2;45:12
**protect (2)**
35:11;36:3
**protected (1)**
39:13
**Protection (2)**
5:10;8:16

WEATHER KING HEATING & AIR, INC.
U.S. SMALL BUSINESS ADMINISTRATION

May 21, 2020

**provide (5)**
9:7;10:21;23:8,12;
42:2
**provided (6)**
6:7;24:19;28:24;
30:14;42:3;47:21
**provides (3)**
14:18;30:11,20
**providing (1)**
24:22
**proving (1)**
10:21
**provision (3)**
13:16;28:23;29:12
**Provisions (4)**
15:4;16:5;30:23;
31:12
**Public (9)**
5:14;8:11;10:22;
16:22;31:25;35:8,16,
20;36:4
**published (11)**
5:14;13:24;14:11;
21:16;22:2,4;23:7;
24:17;25:7;26:4,7
**Puerto (1)**
14:2
**pull (1)**
41:14
**punitive (2)**
7:21;12:21
**purpose (4)**
5:21;9:1;35:10,14
**purposes (3)**
17:25;26:20;34:10
**pursuant (7)**
3:1,17;5:12;11:10;
25:8;37:16,21
**pursue (2)**
20:12,17
**push (1)**
29:25
**put (1)**
43:25
**puts (2)**
33:15,23
**putting (1)**
44:6
**pyrrhic (1)**
34:20

**Q**

**qualified (1)**
23:14
**qualify (4)**
30:17;34:16;35:22;
41:8
**quality (1)**
30:6
**quibbling (1)**
36:2
**quickly (1)**

33:15
**quite (1)**
26:24
**quote (1)**
15:16
**quoting (1)**
15:1

**R**

**Rai (3)**
3:22;4:24;5:4
**raise (1)**
40:1
**raised (2)**
16:11;41:9
**Rajbinder (1)**
3:22
**Rather (2)**
21:15;43:24
**re (12)**
2:4,8;13:4,9,23,25;
19:23;38:25;39:2,4,6;
40:2
**reach (1)**
20:8
**read (4)**
8:22;9:10;20:8;
41:4
**reading (2)**
19:5;41:3
**realize (1)**
43:25
**really (2)**
41:7;44:23
**reason (2)**
31:21;42:12
**reasonable (2)**
27:17;32:2
**reasonably (2)**
29:14;30:5
**reasoning (1)**
39:17
**reasons (5)**
10:2;16:9;34:23;
36:19;40:23
**recall (1)**
47:1
**receive (1)**
30:2
**received (2)**
24:13;31:11
**recent (3)**
13:13,18;20:5
**recently (2)**
13:2;19:12
**recommendation (3)**
38:1,12,21
**reconsideration (1)**
46:20
**record (3)**
2:4;14:19;22:10
**recovery (2)**

12:19,22
**reduced (3)**
4:1,3;5:4
**refer (2)**
3:11;22:2
**reference (6)**
12:22;18:15;22:23;
26:3,8,10
**referred (3)**
11:9;22:7,14
**refers (4)**
19:19;29:4,5,7
**refuse (2)**
18:8;33:17
**Reg (4)**
22:4,5,6;24:18
**regard (1)**
14:21
**regarding (7)**
7:13;8:16;23:1,9;
25:14;30:8;46:24
**regardless (1)**
25:19
**Regional (1)**
13:23
**Register (3)**
22:3,11;26:6
**regulation (7)**
21:10,12,16,24;
25:17;26:4;28:18
**regulations (29)**
7:9,13;10:16;14:16;
16:4,6;17:7,20;21:2,
19,20;22:2,9;23:9,12,
23;24:11,18,21;25:4,
21;26:12,15;31:9;
34:13;36:24;37:3,7,
11
**regulatory (1)**
35:6
**rejected (1)**
20:3
**related (4)**
11:5,7;19:16;31:7
**related-to (1)**
16:13
**relates (1)**
22:24
**relevant (1)**
33:21
**Reliable (1)**
38:25
**relied (2)**
13:13;17:12
**relief (22)**
3:8;5:13;7:16,17;
8:6,10,10;9:19,24;
11:23;12:2,23;15:3,
23;16:13,16;25:14;
31:23;33:13;35:1,18;
42:17
**rely (3)**
13:21;14:3;19:8

**remainder (2)**
30:13;34:8
**remaining (1)**
4:3
**remains (2)**
25:4;37:1
**remedy (4)**
32:7,7,19,23
**remind (1)**
40:1
**render (1)**
15:23
**rendered (1)**
15:11
**renew (1)**
18:8
**rent (1)**
18:24
**reorganization (1)**
4:23
**repayment (2)**
10:7;29:14
**report (3)**
38:1,11,21
**reported (2)**
23:20;31:6
**Reporter (1)**
39:3
**reports (3)**
4:16;6:5,11
**representative (2)**
6:9,11
**request (4)**
40:20;42:18;45:13;
46:6
**requested (1)**
35:9
**required (4)**
25:23;34:12;36:23;
37:20
**requiring (2)**
10:7;29:12
**rescinded (1)**
33:19
**rescinding (3)**
7:20;35:1;36:21
**resolved (1)**
41:10
**Resources (1)**
27:1
**respect (20)**
7:2;11:21;12:3,8,
13;14:17;17:1;18:5,
11,13;22:25;25:13;
32:1;34:14,19;36:9;
39:13;40:13;42:4;
44:14
**respectively (1)**
4:18
**respond (1)**
45:16
**response (1)**
8:20

**remainder (2)**
**restraining (2)**
7:25;8:25
**restriction (1)**
42:21
**restrictions (2)**
26:19;31:15
**restructuring (1)**
32:11
**result (5)**
5:7;6:6;8:21;18:20;
39:11
**resulted (1)**
23:5
**results (1)**
34:22
**retribution (1)**
37:4
**retroactive (3)**
10:20;17:12;25:10
**retroactively (1)**
21:20
**return (2)**
9:3;34:1
**review (7)**
22:20;27:2;38:13;
39:14;43:13,22;44:1
**reviewed (1)**
45:11
**revival (1)**
33:3
**revoke (1)**
18:8
**revoking (1)**
7:19
**Rico (1)**
14:2
**right (20)**
2:2,21,23;7:7;
17:22;39:16;40:21,
25;41:2;42:7,20;43:4,
17,20;44:12,13;45:8,
17;46:14;47:19
**rights (1)**
39:10
**risk (3)**
4:5;24:24;34:24
**role (1)**
20:12
**Roman (1)**
13:10
**Rooms (6)**
14:10;15:2,18;16:2;
26:18;28:18
**Rule (14)**
3:1,2;7:14;10:20;
17:12;22:8,15;25:9;
37:16,17,21,22;45:2;
47:13
**ruled (1)**
13:4
**Rules (12)**
3:1,3;12:25;22:13;
23:7;24:17;25:7,8,

37:17,18,23;47:9
**ruling (3)**
    2:10,24;46:16
**runs (1)**
    39:21

## S

**Sacks (8)**
    2:16,16;41:3,12,12;
    44:24,24;47:18
**salaries (2)**
    23:19;31:5
**sales (1)**
    3:23
**same (4)**
    8:17;13:24;29:1;
    34:5;37:11;44:19
**sanctions (1)**
    33:25
**Sante (1)**
    13:10
**satisfied (1)**
    31:12
**Saturday (2)**
    6:14;24:16
**save (1)**
    30:1
**saying (1)**
    45:17
**SBA (95)**
    3:12;5:10,25;6:16,
    23;7:18;8:15,19;9:2,
    10,16,17,20,23,24,25;
    10:10,11,14;11:2,11,
    22;14:16;15:3;16:6,
    10;17:3,6,12;18:3;
    19:3,7;21:2,10,18;
    22:8,13,14,15,22;
    23:1,6,7,14;24:6,10,
    17,19,22;25:8,21,24;
    26:6,15,21;28:2,11,
    12,15,19;29:6,7,10,
    17;30:7,21;31:9,14,
    16;32:24;33:6,10,16,
    19;34:3,18,21;35:1,
    21;36:12,20,24;37:4,
    9;39:10,12;40:6,18;
    42:1,2,3;43:7,8;
    44:21;47:10
**SBA's (17)**
    6:24;7:4,6,9,12;
    10:23;13:15,20;16:4,
    8;17:19;21:10,12,23;
    25:15;31:15;36:24
**second (2)**
    9:12;10:5
**Secondly (1)**
    9:23
**Section (49)**
    6:2,25;10:1,4,7;
    11:3,11,16,19,25;
    12:4,7,11,11,14,19,

24;13:1,2,14;14:18,
25;15:2,18;17:2,24;
18:4;19:4,6,19;20:6,
11,19;21:1;28:12,14,
15;29:2,7,8,11,15;
30:13,19,24;31:7;
38:4;40:6;41:6
**Sections (6)**
    3:17;6:3;12:9,10,
    14,18
**secured (1)**
    29:13
**Security (1)**
    5:13
**seek (4)**
    9:18;47:5,6,12
**seeking (7)**
    6:23;11:23;16:3,13;
    30:20;42:17;47:10
**seeks (3)**
    3:8;7:3,17
**seem (1)**
    47:1
**seizes (1)**
    18:15
**self-evident (1)**
    36:8
**separate (1)**
    37:14
**served (3)**
    35:21;38:17;45:20
**Services (1)**
    13:5
**set (4)**
    8:13,17;9:5;18:6
**seven (1)**
    24:8
**several (2)**
    21:16;32:15
**shall (4)**
    14:23;29:13;30:21;
    37:20
**shareholder (1)**
    3:22
**short (1)**
    7:7
**shortly (1)**
    6:15
**show (1)**
    4:17
**sign (1)**
    44:9
**significant (1)**
    34:24
**similar (7)**
    10:9;13:4;14:23;
    15:15;18:9;19:11,13
**simply (4)**
    19:3;32:19;33:2;
    42:13
**situation (4)**
    15:24;33:5,16;
    35:24

**six (1)**
    4:1
**Sixth (4)**
    19:25;20:2;27:11,
    18
**size (2)**
    23:15;28:1
**skeptical (1)**
    29:23
**skill (1)**
    47:25
**Small (10)**
    2:5;3:9;5:18,23;
    6:2;14:8;23:16;35:11,
    25;36:15
**Smith (1)**
    8:19
**so-called (1)**
    28:15
**sociis (1)**
    19:14
**sole (1)**
    3:22
**somewhat (1)**
    47:14
**soon (1)**
    34:16
**sooner (1)**
    43:24
**SOP (4)**
    22:17,18,21,24
**sorry (2)**
    45:18;46:13
**sought (1)**
    35:18
**sound (4)**
    29:13,16;30:6;
    31:13
**source (1)**
    4:8
**Southern (3)**
    13:6;39:4,7
**sovereign (10)**
    9:25;11:22,24;12:1,
    5,7;13:14,16;16:8,10
**speak (2)**
    41:14;45:10
**specific (5)**
    12:9;19:10,18;20:9;
    28:1
**specifically (3)**
    26:1;40:3;47:4
**specifying (1)**
    15:13
**spoken (1)**
    27:4
**St (1)**
    13:7
**stabilization (1)**
    34:10
**stabilizing (1)**
    32:12
**staff (1)**

4:1
**stage (1)**
    38:15
**standard (3)**
    16:15;22:15;28:2
**standards (3)**
    22:24;23:15;37:11
**standing (2)**
    9:18;47:10
**stands (1)**
    44:2
**start (3)**
    16:23;20:16,21
**state (4)**
    15:12;19:21;20:1;
    25:8
**States (16)**
    2:5,17,20;3:9;5:12,
    16,18;11:5;14:5,8,20;
    28:10;36:10;38:12;
    43:12;44:25
**stating (1)**
    28:23
**status (3)**
    6:13,19;35:4
**Statute (17)**
    5:15;10:11;16:8;
    18:7;20:10;27:7,9,14;
    28:23;29:5;30:9,15,
    18,19;31:7,8;46:23
**statutes (2)**
    15:5,8
**statute's (1)**
    20:8
**statutory (10)**
    7:6,7;10:15;15:24;
    17:7,8;21:11;27:8;
    28:21;35:6
**stave (1)**
    5:6
**stay (6)**
    45:2,13;46:6,17;
    47:6,11
**stay-at-home (1)**
    5:3
**step (3)**
    27:3,15;33:3
**steps (1)**
    7:21
**Steve (2)**
    2:13;40:17
**streamlined (1)**
    23:10
**strict (1)**
    21:25
**subject (3)**
    10:25;15:12,14;
    30:23
**submission (1)**
    8:22
**submissions (1)**
    9:10
**submit (1)**

13:19
**submitted (7)**
    6:4;24:13;25:6;
    26:16;31:10;33:9;
    38:11
**submitting (1)**
    25:18
**Subparagraph (1)**
    30:11
**Subpart (1)**
    13:1
**subsection (3)**
    29:2,6,13
**subsequent (2)**
    25:17;42:17
**substantially (1)**
    4:22
**Substantively (1)**
    46:12
**succeed (11)**
    8:2;16:20;17:1,5,
    23;18:2;21:1,6,21;
    25:12;31:21
**success (4)**
    16:23;17:18;32:15;
    38:9
**successful (2)**
    34:6;37:12
**sudden (2)**
    21:24;46:3
**suddenly (1)**
    5:2
**sue (2)**
    14:19;15:11
**sued (2)**
    14:19;15:11
**suffer (2)**
    8:6;34:24
**suffered (1)**
    36:17
**sufficient (2)**
    10:21;34:7
**sufficiently (1)**
    29:21
**suggest (1)**
    45:19
**suggested (1)**
    4:25
**suggests (2)**
    28:21;29:17
**suing (1)**
    15:20
**support (2)**
    8:1;30:10
**supported (2)**
    22:20;25:2
**Supreme (2)**
    15:8,10
**sure (4)**
    2:7,11;40:23;45:23
**survival (1)**
    4:9
**survive (2)**

5:9;18:23
**suspend (1)**
18:8
**Suzana (1)**
2:16

**T**

**talked (1)**
40:11
**target (1)**
20:11
**taxes (2)**
23:20;31:5
**tax-exempt (1)**
23:17
**temporary (2)**
7:25;8:25
**tends (1)**
19:1
**term (2)**
19:10;26:5
**terminate (1)**
18:12
**terms (10)**
19:16;21:19;26:13;
29:1,10,18;30:10,12;
36:23;37:5
**testified (1)**
5:4
**testimony (1)**
32:3
**Texas (1)**
13:7
**thereafter (1)**
6:15
**thereby (1)**
16:3
**therefore (4)**
11:12,19;25:11;
31:15
**though (1)**
42:2
**threatened (4)**
32:4,16;33:1,24
**Three (1)**
24:15
**Thursday (1)**
39:20
**ticking (1)**
34:15
**timely (1)**
34:22
**Title (2)**
11:4,12
**today (1)**
38:18
**Todd (1)**
2:14
**together (2)**
44:1,6
**token (1)**
44:19

**tomorrow (4)**
9:14;39:21,22,23
**tools (1)**
27:8
**Total (1)**
4:18
**totally (1)**
45:18
**Toth (3)**
20:1,7,10
**transformed (1)**
20:20
**translated (1)**
19:14
**treatment (1)**
17:3
**trial (1)**
38:17
**TRO (5)**
8:12;9:6,14;39:21;
42:6
**true (1)**
28:22
**Trustee's (4)**
2:20;43:12,22;44:1
**trying (2)**
40:3;41:14
**turf (1)**
36:3
**turn (1)**
31:23
**turning (4)**
16:15;21:5;35:7;
44:13
**two (7)**
8:3;10:2;26:22;
27:22;28:8;32:5;
42:10
**two-step (1)**
27:2

**U**

**Ulstein (3)**
14:4,6;15:17
**ultimate (1)**
25:19
**ultimately (3)**
38:10;45:13,22
**unable (1)**
22:10
**unacceptably (1)**
24:24
**unambiguous (2)**
27:9,21
**unauthorized (1)**
24:24
**uncontested (1)**
3:21
**under (34)**
8:3;11:4,6,11,12;
12:4,9,11,18,25;16:3;
17:8,18,19;20:6;21:7,

11,22,25;23:14,23;
24:3;26:25;27:21;
28:25;29:2,12;30:21;
31:2;32:20;38:4,6;
40:6;41:6
**underlying (1)**
3:5
**unenviable (1)**
33:24
**unforgiven (1)**
24:25
**unfortunately (1)**
41:16
**unintentionally (1)**
44:20
**unit (2)**
12:17;18:7
**United (16)**
2:5,17,20;3:9;5:12,
16,18;11:4;14:4,8,19;
28:10;36:10;38:12;
43:12;44:25
**units (4)**
7:1;12:8,14;18:5
**unlawful (2)**
7:5,14
**unless (3)**
3:25;30:3,14
**unlike (2)**
9:19;11:19
**unlikely (3)**
17:23;18:2;20:25
**unpersuaded (1)**
26:3
**up (1)**
41:14
**upheld (1)**
33:21
**upholding (1)**
10:23
**upload (1)**
43:23
**upon (3)**
14:21;18:15;20:5
**urgency (2)**
36:5;46:15
**urgent (1)**
18:22
**USA (1)**
26:25
**USC (15)**
6:2,3,25;11:3,15,
25;12:11;13:1,16;
28:14;29:2,8,14;
30:24;46:23
**use (5)**
24:24;25:23;34:16;
37:2;45:23
**used (4)**
18:21;34:1,8,9
**uses (1)**
34:2
**utility (1)**

18:25
**utilizing (1)**
10:17

**V**

**validity (1)**
25:19
**Valley (1)**
13:22
**value (5)**
29:13,16,19;30:6;
31:13
**variety (5)**
9:17;19:7;22:3;
23:8;31:16
**various (1)**
30:12
**vastly (1)**
36:16
**ventilation (1)**
3:19
**venture (1)**
33:1
**version (1)**
43:16
**versus (8)**
2:5;5:18;14:4,8;
15:9;20:1;26:25;
27:12
**viable (1)**
32:20
**victory (1)**
34:20
**violates (1)**
6:25
**violation (4)**
7:7,9;17:2,9
**violations (1)**
11:17
**virtually (1)**
5:1

**W**

**waiting (2)**
32:19;34:18
**waived (2)**
12:5;16:10
**waiver (6)**
11:24;12:2,6;13:14,
16;16:8
**waives (1)**
11:25
**wants (1)**
46:11
**way (5)**
35:4;36:11;37:9;
42:1;47:10
**ways (1)**
23:2
**Weather (4)**
2:4,8;3:4;40:2

**week (1)**
41:4
**weeks (1)**
42:10
**weighs (1)**
8:8
**well-capitalized (1)**
32:21
**well-financed (1)**
32:21
**Westlaw (3)**
13:25;14:11;38:25
**wherein (1)**
18:17
**Whitaker (1)**
27:12
**whole (1)**
41:3
**Wholly (1)**
25:1
**who's (1)**
2:12
**willing (1)**
46:8
**Wingspread (1)**
39:2
**Wisconsin (2)**
14:10;19:24
**within (8)**
10:15;11:13;16:13;
24:4,8;27:17;28:14;
34:11
**Without (5)**
4:8;14:21;37:3;
41:3;46:19
**word (4)**
12:24;18:16;19:15;
29:4
**words (4)**
27:24;30:15;40:6;
41:9
**work (2)**
3:24;47:22
**workforce (1)**
4:4
**working (2)**
4:3;47:20
**works (1)**
40:25
**worse (1)**
36:5
**worth (1)**
47:16
**writ (1)**
29:11
**written (5)**
8:20;27:10;39:22;
45:20;46:20
**wrong (1)**
41:1

**Y**

WEATHER KING HEATING & AIR, INC.
U.S. SMALL BUSINESS ADMINISTRATION

May 21, 2020

**years (2)**
24:5,9
**Yesterday (1)**
9:13
**York (2)**
39:4,8

**Z**

**zero (2)**
4:24;36:15

**1**

**1 (4)**
13:8,12;14:12;17:2
**10 (1)**
22:17
**102 (1)**
13:1
**1052 (1)**
14:5
**106 (1)**
12:7
**106a1 (1)**
12:12
**106a2 (1)**
12:15
**106a3 (2)**
12:20,24
**1099 (2)**
23:21;31:6
**11 (12)**
3:4;4:12;5:21;6:25;
7:22;11:4,12;12:11;
13:1;14:9;32:10,14
**1107 (1)**
3:17
**1108 (1)**
3:17
**116 (1)**
5:14
**12 (5)**
8:14,21,23,24;9:5
**12988 (1)**
25:9
**12th (1)**
47:23
**1334 (1)**
11:3
**134 (1)**
5:15
**136 (2)**
5:14;20:2
**14 (3)**
6:5;9:6;43:1
**15 (15)**
6:2,2;11:25;13:16;
22:5;23:8,18;27:25;
28:14;29:2,8,14;
30:24;31:3;42:23
**157b2A (1)**
11:16

**16 (1)**
3:14
**18 (1)**
9:13
**18th (1)**
47:23
**19 (1)**
8:8
**1940 (1)**
15:10
**19-52957 (3)**
2:8;3:6;40:3
**1984 (1)**
27:1
**1985 (1)**
39:8
**1987 (2)**
14:5;39:6
**1988 (1)**
39:4
**1989 (1)**
19:24
**1998 (1)**
20:3

**2**

**2 (8)**
17:5,11;21:7,9,22;
22:8,9;27:15
**20 (6)**
9:7,13;22:6;23:8;
24:2;46:23
**20-00055 (1)**
14:1
**20-01005 (1)**
13:22
**20-01026 (1)**
13:11
**20-02006 (1)**
13:6
**20-05023 (1)**
2:6
**20-06005 (1)**
13:8
**2007 (2)**
38:25;39:2
**2018 (1)**
27:13
**2019 (6)**
3:14;4:16;22:17,18,
21,24
**2020 (26)**
4:21;5:15,21;6:5,
14,22;7:24;8:14;9:6,
7,13,15;13:24;14:11;
22:4,6,8;23:18;24:16,
17;25:7,17;27:25,25;
31:4;37:20
**20811 (1)**
22:4
**2088637 (1)**
14:11

**20-CV-10899 (1)**
5:19
**21 (1)**
37:20
**21747 (1)**
22:5
**22 (1)**
9:14
**2201947 (1)**
13:25
**23450 (2)**
22:6;24:18
**242 (1)**
15:9
**25 (3)**
6:14;13:7;24:16
**28 (6)**
11:3,15;22:6;24:17;
25:7,17
**281 (1)**
5:15

**3**

**3 (4)**
13:1;14:11;17:18;
21:8
**3:48 (1)**
2:1
**30 (1)**
27:25
**301 (1)**
15:9
**333 (1)**
27:12
**337 (1)**
27:12
**338 (1)**
27:18
**36 (2)**
29:4,9
**364 (3)**
40:6;41:6;42:24
**38 (1)**
27:12

**4**

**4 (1)**
14:11
**4:30 (1)**
37:19
**4:50 (1)**
48:2
**46 (1)**
39:7
**467 (1)**
27:1
**477 (1)**
20:2
**479 (1)**
20:10

**5**

**5 (1)**
6:22
**50 (1)**
22:17
**500 (2)**
23:13;28:1
**52 (1)**
37:16
**52,000 (1)**
4:19
**525 (14)**
8:3;10:1,4;11:11,
19;12:5,11;13:3,14;
17:24;18:2,4;19:5;
38:4
**525a (9)**
6:25;10:7;17:2;
19:6,19;20:6,11,19;
21:1
**5K (1)**
22:17

**6**

**618 (1)**
19:23
**622 (1)**
19:23
**634 (2)**
11:25;13:17
**634b1 (3)**
14:18,25;15:2
**634's (1)**
15:18
**636a (2)**
28:14;29:8
**636a36 (1)**
6:2
**636a36B (1)**
29:3
**636a36FiiI (1)**
30:24
**636a36FiiII (1)**
31:7
**636a6 (1)**
29:15
**65c (1)**
37:22

**7**

**7 (2)**
7:24;29:7
**70,000 (1)**
4:20
**7052 (3)**
3:1,2;37:17
**7065 (1)**
37:22
**7143407 (1)**

**39:1**
**74 (1)**
39:5
**7a (4)**
28:12,15;29:11;
30:19

**8**

**8 (2)**
13:9;14:2
**80 (1)**
20:10
**8007 (1)**
45:2
**833 (1)**
14:5
**837 (1)**
27:1
**845 (1)**
27:5
**85 (4)**
22:4,5,6;24:18
**850 (1)**
39:7
**87 (1)**
39:3

**9**

**9005 (1)**
6:3
**9006 (1)**
6:3
**911 (1)**
27:12
**92 (1)**
39:2
**939 (1)**
39:5
**95 (1)**
19:23