# EXHIBIT A

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**CAMELOT BANQUET ROOMS, INC.,**
**DOWNTOWN JUNEAU INVESTMENTS, LLC,**
**MIDRAD, LLC, and**
**PPH PROPRTIES I, LLC**
                        **Plaintiffs,**

      **v.**                                                  **Case No. 20-C-0601**

**UNITED STATES SMALL BUSINESS**
**ADMINISTRATION; JOVITA CARRANZA,**
**in her Official Capacity as Administrator of**
**the Small Business Administration;**
**UNITED STATES OF AMERICA; and**
**STEVEN MNUCHIN, in his Official Capacity**
**as United State Secretary of Treasury,**
                        **Defendants.**

---

**J.R. SCHUSTER, LLC,**
                        **Plaintiff,**

**v.**                                                  **Case No. 20-C-634**

**UNITED STATES SMALL BUSINESS**
**ADMINISTRATION; JOVITA CARRANZA,**
**in her Official Capacity as Administrator of**
**the Small Business Administration;**
**UNITED STATES OF AMERICA; and**
**STEVEN MNUCHIN, in his Official Capacity**
**as United State Secretary of Treasury,**
                        **Defendants.**

---

## <u>DECISION AND ORDER</u>

Each of the plaintiffs in these cases runs a nightclub in Wisconsin that features

nude and/or semi-nude erotic dance entertainment, which are forms of expression

protected by the Free Speech Clause of the First Amendment. *See, e.g., Schad v.*

*Borough of Mount Ephraim*, 452 U.S. 61, 66 (1981). Because of the COVID-19 pandemic and the "safer at home" order issued by Wisconsin officials, each nightclub is closed and will remain closed for weeks, maybe months. On March 27, 2020, the United States enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020). Among its provisions is a program known as the Paycheck Protection Program ("PPP"), which authorizes the U.S. Small Business Administration ("SBA") to guarantee loans to small businesses to help them pay employees during the economic crisis caused by the response to the pandemic. *Id.* § 702 Each plaintiff applied for a loan through this program. However, each plaintiff's bank, in conjunction with the SBA, determined that they were not eligible for relief through the PPP. This decision was based on a regulation enacted by the SBA in 1996, under which small businesses that "[p]resent live performances of a prurient sexual nature" are not eligible to participate in any SBA business loan program. *See* 13 C.F.R. § 120.110(p).

The plaintiffs promptly commenced these actions against the United States, Treasury Secretary Steven Mnuchin, the SBA, and SBA Administrator Jovita Carranza, and filed motions for a temporary restraining order and preliminary injunction. They allege that the SBA regulation, as applied to them through the PPP, violates their rights under the Free Speech Clause of the First Amendment and the equal-protection component of the Fifth Amendment's Due Process Clause. Because PPP funds are limited and distributed on a first-come, first-served basis, the plaintiffs requested temporary restraining orders to preserve their spots in the application queue. I held a telephonic proceeding on that request, at which the defendants appeared through counsel, and then granted the request. Pursuant to the restraining orders, the defendants set aside enough

2

reserve authority to guarantee the PPP loans sought by the plaintiffs and prepared internal loan numbers that, if transmitted to the plaintiffs' bank, would allow the bank to complete the loans.

In this order, I address the plaintiffs' motions for a preliminary injunction, in which they seek to enjoin the defendants from continuing to use the SBA regulation to exclude them from the PPP.

## I. BACKGROUND

Each plaintiff in Case No. 20-C-0601 (the "Camelot" case) operates a nightclub in Wisconsin under the name Silk Exotic Gentlemen's Club. Three of the clubs are located in Milwaukee, and the fourth is located in Middleton. Each club is licensed by the municipality in which it operates to present erotic dance entertainment. The dancers at the clubs in Milwaukee wear a costume made of nontransparent material that covers the areola and nipple of the breasts, their pubic hair, and the cleavage of their buttocks, as is required by local ordinance. The dancers at the club in Middleton appear nude or semi-nude. The plaintiffs allege that all the entertainment they provide "is non-obscene (and not prurient), appeals to healthy human interests and desires, and is in full compliance with [local law]." Compl. ¶ 404.

The plaintiff in Case No. 20-C-634 (the "Schuster" case) operates "The Vegas Gentlemen's Club" in Darien, Wisconsin. It is licensed by the municipality to present erotic dance entertainment. The entertainment provided by The Vegas Club consists of semi-nude performers on a stage with a vertical pole that spins. The entertainers use the pole during their performances, which are colloquially referred to as "pole dancing." Compl. ¶ 41. The plaintiff alleges that all the entertainment it provides is non-obscene, appeals

3

to healthy human interests and desires, and is in compliance with the numerous licenses and permits that it holds which are annually reviewed by the Town of Darien.

In late March 2020, the State of Wisconsin began issuing orders in response to the coronavirus pandemic and the disease COVID-19. Under the orders, many businesses were required to close, and Wisconsin residents were ordered to remain at home unless they were engaged in essential activities. As a result of these orders, each of the plaintiffs' clubs has been closed for business since 5:00 p.m. on March 17, 2020. They will remain closed at least until the orders expire. As of this writing, the orders are set to expire on May 26, 2020. It is not certain that the plaintiffs will be allowed to reopen on May 26, 2020. And even if they are permitted by law to reopen at that time, they likely will be subject to restrictions designed to minimize the spread of COVID-19.

To address the economic impact of COVID-19, Congress passed the CARES Act. Title I of the Act is the "Keeping Workers Paid and Employed Act." Among the provisions of this title is the "Paycheck Protection Program," or PPP. *See* CARES Act § 702, 15 U.S.C. § 636(a)(36). The PPP is a new loan program to be administered by the SBA under Section 7(a) of the Small Business Act (codified at 15 U.S.C. § 636(a)). Its purpose is to assist small businesses during the COVID-19 crisis by immediately extending them loans on favorable terms. The loans are made by the SBA's participating banks and guaranteed by the SBA itself.  Section 1106 of the CARES Act provides that a borrower's indebtedness under a PPP loan will be forgiven to the extent that the borrower uses the funds to pay expenses relating to payroll, mortgage interest, rent, and utilities during the eight-week period following the loan's origination. CARES Act § 1106. If a borrower qualifies for loan forgiveness, the SBA must pay the lender an amount equal to the

amount forgiven, plus any interest accrued through the date of payment. *Id.* § 1106(c)(3). However, the SBA has determined that not more than 25% of the loan forgiveness amount may be attributable to non-payroll costs. *See* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20,811, 20,813–14 (April 15, 2020).

The plaintiffs, like nearly all other businesses in the United States, have suffered significant losses because they cannot conduct business as usual. Thus, they applied for PPP loans through their banks. Each plaintiff's bank informed it that its application would be denied under an SBA regulation providing that businesses that "[p]resent live performances of a prurient sexual nature" are not eligible to participate in SBA loan programs. *See* 13 C.F.R. § 120.110(p). This regulation was not enacted in connection with the PPP. Instead, it is a regulation that the SBA issued in 1996 and that applies to all its business loan programs, including those under §7(a) of the Small Business Act— of which the PPP is now a part. *See* Business Loan Programs, 61 Fed. Reg. 3226, 3227 (Jan. 31, 1996).

Once the plaintiffs learned that their applications had been denied, they commenced these actions. They allege that the SBA regulation denying eligibility to businesses that present live performances of a prurient sexual nature is unconstitutional to the extent that it applies to non-obscene nude or semi-nude dancing, which is a form of expression protected by the Free Speech Clause of the First Amendment. Because the PPP is "first-come, first-served," *see* 85 Fed. Reg. at 20,813, and funding for the program was expected to be exhausted quickly, the plaintiffs immediately filed motions for a

temporary restraining order and preliminary injunction to preserve their ability to obtain PPP loans if they succeed on the merits of their claims.

As noted, I granted the plaintiffs' motions for a temporary restraining order, and the government has since reserved guarantee authority for the PPP loans the plaintiffs applied for. However, I allowed the government to instruct the plaintiffs' bank to refrain from funding the loans until I decided the plaintiffs' motions for a preliminary injunction. The parties have completed briefing on those motions, and I address them below.

## II. INJUNCTIVE RELIEF AGAINST THE SMALL BUSINESS ADMINISTRATION

Before turning to the traditional preliminary injunction factors, I first address the defendants' suggestion that injunctive relief is not available against the SBA. They point to the "sue and be sued" provision of the Small Business Act, which provides that the SBA Administrator may

> sue and be sued in any court of record of a State having general jurisdiction, or in any United States district court, and jurisdiction is conferred upon such district court to determine such controversies without regard to the amount in controversy; *but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Administrator or his property*.

15 U.S.C. § 634(b)(1) (emphasis added).

Initially, I note that this provision applies only to the SBA and its Administrator, who are not the sole defendants. The plaintiffs have also sued the United States and Steven Mnuchin in his official capacity as Secretary of the Treasury. These defendants do not claim to be immune from injunctive relief; nor do they claim that they could not grant the plaintiffs access to the PPP unless the SBA were also enjoined. Moreover, the government has only half-heartedly asserted that the sue-and-be-sued provision blocks injunctive relief against the SBA and its Administrator. The government notes that various

6

lower courts have reached different conclusions on this issue, but it does not argue that the courts that have interpreted § 634(b)(1) to preclude all injunctive relief against the SBA are correct. Rather, the government only suggests that the split of authority on this issue "casts further doubt" on the plaintiffs' likelihood of success. Br. in Opp. at 25.

In any event, I conclude that § 634(b)(1) does not preclude injunctive relief against the SBA in a case such as this. Provisions like it are found in other federal statutes creating agencies that participate in commercial activity. These statutes allow the agency to be sued but specifically provide that "no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the [agency] or [its] property." *See* 19 U.S.C. § 1920; 42 U.S.C. § 3211(a)(13); 15 U.S.C. § 714b(c); 19 U.S.C. § 2350; 7 U.S.C. 1506(d); 20 U.S.C. § 1082(a)(2). As the United States Claims Court explained, *see Related Industries, Inc. v. United States*, 2 Cl.Ct. 517, 522 (1983), Congress began including such language in its statutes after the Supreme Court decided *Federal Housing Administration v. Burr*, 309 U.S. 242 (1940). In that case, the Court held that a clause allowing the Federal Housing Administration to sue and be sued rendered it subject to a state-law garnishment action. The Court reasoned that "it must be presumed that when Congress launched a governmental agency into the commercial world and endowed it with authority to 'sue or be sued', that agency is not less amenable to judicial process than a private enterprise under like circumstances would be." *Id.* at 245. The Court indicated that, if Congress intends to limit the kinds of relief available against an agency that acts in commerce, it must do so clearly. *Id.* Thus, after *Burr*, Congress began specifying that certain agencies that participated in commerce are not subject to attachment, injunction, garnishment, and similar process.

As the First Circuit has recognized, this limitation on garnishment and similar process was "intended to keep creditors or others suing the government from hindering and obstructing agency operations through mechanisms such as attachment of funds." *Ulstein Maritime, Ltd. v. United States*, 833 F.2d 1052, 1056–57 (1st Cir. 1987). It was not intended to render the agency immune from injunctive relief in situations where the agency has exceeded its statutory authority and where an injunction would not interfere with the agency's internal operations. *Id.* at 1057. Indeed, if provisions such as § 634(b)(1) meant that the agency could never be enjoined, then an agency could adopt unconstitutional policies and continue to follow them even after a court declared them unconstitutional. For example, the SBA could adopt a policy stating that it will extend small business loans only to companies owned by white men. If § 634(b)(1) means that the SBA may never be enjoined, then a court could not enjoin this policy, even though it would be blatantly unconstitutional.

In the present case, the plaintiffs only seek to set aside unlawful agency action. They do not seek to attach the SBA's assets or otherwise interfere with its internal operations. Under the injunction the plaintiffs seek, the SBA would have to do no more than process the plaintiffs' loan applications in the same manner that it processes the applications of other small businesses. Section 634(b)(1) does preclude the court from entering such an injunction.

### III. PRELIMINARY INJUNCTION

To obtain a preliminary injunction, a plaintiff must first show that: (1) without such relief, it will suffer irreparable harm before final resolution of its claims; (2) traditional legal remedies would be inadequate; and (3) it has some likelihood of success on the merits.

*E.g., Courthouse News Service v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018). If a plaintiff makes such a showing, the court must weigh the harm the plaintiff will suffer without an injunction against the harm the defendant will suffer with one. *Id.* This assessment is made on a sliding scale: The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor. *Id.* Finally, the court must ask whether the preliminary injunction is in the public interest, which means considering what effect an injunction will have on non-parties. *Id.* Ultimately, the moving party bears the burden of showing that a preliminary injunction is warranted. *Id.*

## A.      Likelihood of Success on the Merits

The merits of this case present three key questions: (1) Does the SBA regulation rendering businesses that present live performances of a "prurient sexual nature" ineligible for SBA loans apply to the plaintiffs? (2) Is that regulation within the scope of the authority Congress delegated to the SBA under the CARES Act or the Small Business Act? (3) Assuming that the answer to the first two questions is yes, does the regulation violate either the Free Speech Clause of the First Amendment or the equal-protection component of the Fifth Amendment's Due Process Clause?

To answer these questions, the court must know something about why the SBA decided to exclude businesses that present live performances of a prurient sexual nature from its business loan programs—programs in which nearly every other form of small business in the United States may participate. The SBA's purpose in enacting this exclusionary regulation informs its meaning, and it would shed light on whether the regulation coincides with the goals Congress had in mind when it passed the enabling

statutes. The SBA's purpose is also relevant to the constitutional issues. Under the First Amendment, the SBA may not refuse to fund an otherwise eligible business simply because the business engages in a disfavored form of protected expression. However, the SBA may refuse to extend loans to businesses that do not fit within the purpose of the loan program. And under an equal-protection analysis, the SBA may make distinctions among small businesses only if the distinctions are rationally related to a legitimate governmental purpose.

Although the purpose of the SBA regulation is highly relevant to this case, the government has made no serious effort to identify it. Instead, the government vaguely asserts that "[t]he SBA adopted this rule in furtherance of its statutory mandate to consider the public interest when directing its limited resources." Br. in Opp. at 1–2., ECF No. 11. But presumably everything the government does is in the public interest. Thus, a naked reference to the public interest says nothing about the regulation's purpose. To understand the regulation's purpose, we must know *why* the SBA thinks that it serves the public interest. The government's brief is silent on that point.

The government has, however, identified the purposes of the Paycheck Protection Program and the Small Business Act—the laws that confer authority on the SBA to enact regulations such as the one at issue here. As every contemporary reader of this opinion likely knows, the PPP was "enacted to extend relief to small businesses experiencing economic hardship as a result of the public-health measures being taken to minimize the public's exposure to the COVID-19 virus." Br. in Opp. at 6 (citing PPP Interim Final Rule, 85 Fed. Reg. at 20,811). And the purpose of the Small Business Act "is to 'aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns,' in

10

order to preserve the system of free competitive enterprise that is 'essential' to the economic well-being and security of the Nation." *Id.* at 3 (quoting 15 U.S.C. § 631(a)).

The plaintiffs are small businesses experiencing economic hardship because of COVID-19. Like any other small business forced to close its doors to prevent the virus from spreading, the plaintiffs will find it harder to make payroll and pay their rent and utility bills now that their usual sources of revenue are temporarily unavailable. Thus, the broad purposes of both the CARES Act and the Small Business Act would be served by allowing the plaintiffs to participate in the program on the same terms as any other small business. Moreover, neither the CARES Act nor the Small Business Act creates classifications of small businesses or deems certain forms of small businesses to be less deserving of the government's "limited resources" than others. Indeed, the SBA understands the PPP to be "first-come, first-served" and has made no attempt to prioritize loans to certain types of small businesses. *See* 85 Fed. Reg. at 20,813. In short, one can find nothing in either the CARES Act or the Small Business Act to suggest that Congress wanted to exclude the plaintiffs from the PPP because of the nature of their business.

With these observations in mind, I turn to the specific legal questions this case presents.

**1.  Whether the plaintiffs present performances of a "prurient sexual nature"**

The parties agree that the only reason the plaintiffs' applications for PPP loans were denied was because they were deemed ineligible for loans under the SBA regulation at issue. In relevant part, that regulation provides as follows:

The following types of businesses are ineligible:

. . . .

11

(p) Businesses which:

    (1) Present live performances of a prurient sexual nature; or

    (2) Derive directly or indirectly more than de minimis gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature.

13 C.F.R. § 120.110(p).

The plaintiffs contend that the erotic dance entertainment they offer is not "prurient." More specifically, they allege that their entertainment is "non-obscene (and not prurient), appeals to healthy human interests and desires, and is in full compliance with the numerous licenses and permits" that they must hold under local law. See Camelot Compl. ¶ 404; Olson Decl. ¶ 10; *see also* Schuster Compl. ¶¶ 40–45. Thus, one of the central issues in this case is whether the plaintiffs' entertainment is of a "prurient sexual nature." If it is not, then the plaintiffs are certain to succeed on the merits of their claims, for the regulation would not disqualify them from loan eligibility. Oddly, however, the government states in its brief that it "takes no position at this time regarding whether the performances offered by Plaintiffs is [sic] obscene, prurient—or, as Plaintiffs put it, 'erotic but not obscene[.]'" Br. in Opp. at 14. But if the government takes no position on whether the plaintiffs' entertainment is "prurient," then it cannot take the position that the regulation disqualifies them from participation in the PPP.  Unless their entertainment is prurient, the regulation does not apply.

Perhaps what the government meant to say was that it believes the plaintiffs' entertainment is *at least* prurient, but it takes no position on whether the plaintiffs' entertainment is also obscene. (Obscenity receives no First Amendment protection. *See Miller v. California*, 413 U.S. 15, 23–24 (1973).) Still, the government makes no attempt

12

to show that the entertainment the plaintiffs offer is of a prurient sexual nature. Not one sentence of the government's brief is used to disagree with the plaintiffs' assertion that the entertainment they offer is not prurient. The government does not, for example, contend that all forms of nude and semi-nude dancing are prurient or that the kinds of nude and semi-nude performances the plaintiffs offer are prurient. Nor does the government respond to the plaintiffs' contention that, to be prurient, a work or performance must appeal to a shameful, morbid, and unhealthy interest in sex, as opposed to a normal, healthy sexual desire. Pl. Br. at 17, ECF No. 11-1 (citing *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 498–99 (1985); *Roth v. United States*, 354 U.S. 476, 487 n.20 (1957)). Essentially, the government strenuously argues that the Constitution allows the SBA to choose not to subsidize the plaintiffs' expression, but it does not pause to address the threshold issue of whether the SBA has actually made that choice through its regulation.

The government does note that, when the SBA published the regulation in the Federal Register, it stated that "an establishment featuring nude dancing . . . would not be eligible for SBA financial assistance" if such dancing was responsible for a significant portion of the establishment's gross revenue. 60 Fed Reg. at 64,360. But the government does not attempt to show that the meaning of "live performances of a prurient sexual nature" encompasses all forms of nude dancing or the specific forms of dancing offered by the plaintiffs. Indeed, some of the plaintiffs offer only semi-nude dancing—in which the dancers wear at least pasties and G-strings. *See Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 571 (1991) (holding that municipality may require erotic dancers to don pasties and

13

G-strings, which makes erotic expression "less graphic"). The government does not argue that this "less graphic" form of erotic dance entertainment is prurient.

Because the government has not developed an argument showing that the plaintiffs present live performances of a prurient sexual nature (or otherwise fit within the language of 15 C.F.R. § 120.110(p)), I conclude that, for this reason alone, the plaintiffs are likely to succeed on the merits of their claims.[1]

> **2.    Whether the regulation exceeds the statutory authority granted the SBA by the CARES Act and the Small Business Act**

The plaintiffs argue that the SBA lacks authority to limit the type of small businesses that are eligible for PPP loans. The plaintiffs correctly note that no provision of the CARES Act relating to the PPP creates classifications of small businesses or provides that certain kinds of small businesses are not within the scope of the PPP. Indeed, the purpose of the CARES Act, as stated in Title I, is "keeping workers paid and employed." To achieve that end, Congress decided to make favorable loans to all small businesses to assist them in making payroll and paying rent and utility bills. Congress did not single out any industry for ineligibility under the PPP, much less specify that sexually oriented businesses are ineligible for PPP loans. Such business must make payroll and pay rent and utility bills, just like any other business. Their contributions to the national

---

[1] The plaintiffs also contend that the regulation is unconstitutionally vague. Because the government has not developed an argument showing that the regulation applies to the plaintiffs, I do not discuss the vagueness claim in detail. However, the government's failure to define "prurient sexual nature" does present vagueness issues. Aside from the problem in identifying live performances of a prurient sexual nature, the regulation also presents the problem of identifying "products" that are of a prurient sexual nature. *See* 13 C.F.R. § 120.110(p)(2). For example, does this provision bar small businesses that sell adult sex toys from obtaining PPP loans?

14

economy are no different than the contributions made by small businesses in other industries.

The government contends that because Congress, in creating the PPP, specifically removed some conditions that would ordinarily apply to SBA loans under §7(a) of the Small Business Act, it must have intended for the SBA to enforce all other conditions, including the ineligibility of businesses that offer goods or services of a prurient sexual nature. However, most of the conditions that Congress removed were conditions that appeared in the Small Business Act itself, rather than in the SBA regulations. For example, the § 7(a) business loan program ordinarily applies only to "small business concern[s]." 15 U.S.C. § 636(a). For purposes of the PPP, however, Congress specified that "in addition to small business concerns," the PPP applies to nonprofits, sole proprietorships, and independent contractors, among other organizations that do not ordinarily qualify as small business concerns. *See* 15 U.S.C. § 636(a)(36)(D). Another example is the "credit elsewhere" provision of Section 7(a), 15 U.S.C. §§ 632(h), 636(a)(1)(A)(i). In the CARES Act, Congress provided that PPP loan applicants are not subject to the requirement that they demonstrate that they are unable to obtain credit elsewhere. 15 U.S.C. § 636(a)(36)(I).

To be sure, the CARES Act occasionally identifies specific provisions in the Code of Federal Regulations and states that they shall not apply to the PPP. For example, the CARES Act waives certain affiliation rules that would otherwise apply under 13 C.F.R. § 121.103. *See* 15 U.S.C. § 636(a)(36)(D)(iv). But this does not give rise to an inference that, when it enacted the PPP, Congress combed through all SBA regulations applicable to §7(a) and determined that any regulation that it did not expressly override was

15

consistent with the purposes of the CARES Act. And given Congress's clear intent to extend PPP loans to all small businesses affected by the pandemic and the government's failure to identify any legitimate purpose behind the SBA's exclusion of sexually oriented businesses, it seems highly unlikely that Congress intended the SBA to apply its exclusion to the PPP.

The same result obtains under the Small Business Act. Nothing in that Act suggests that Congress authorized the SBA to enact a regulation excluding small businesses in certain industries from the SBA's business loan program. To the contrary, the Small Business Act authorizes the SBA to "make loans to *any* qualified small business concern." 15 U.S.C. § 636(a). Congress then expressly identified the "restrictions, limitations, and provisions" that govern the SBA's power to make business loans to any small business. *Id.* No such restriction, limitation, or provision states that the SBA has power to render an entire class of small businesses ineligible for its business loan program.

Perhaps if the government had identified some purpose of either the CARES Act or the Small Business Act that is furthered by the SBA's exclusion of businesses that sell goods or services of a prurient sexual nature, I could find that Congress granted the SBA authority in one of these laws to enact the regulation at issue. But the government has not done so. Instead, it offers only the vague assertion that excluding such businesses from its loan programs serves the public interest. Accordingly, I conclude that 13 C.F.R. § 120.110(p) serves no statutory purpose and exceeds the scope of the regulatory authority Congress granted the SBA in the CARES Act and the Small Business Act. *See, e.g., Campbell v. Galeno Chem. Co.*, 281 U.S. 599, 610 (1930) ("The limits of the power

16

to issue regulations are well settled. They may not extend a statute or modify its provisions.").

### 3.     Whether the regulation is unconstitutional

As explained above, the SBA has not shown that its regulation applies to the plaintiffs or that, if it does, Congress granted the SBA authority to issue a regulation excluding sexually oriented businesses from the PPP or its other business loan programs. However, for purposes of addressing the plaintiffs' constitutional claims, I will assume that the regulation applies to the plaintiffs and that Congress granted the SBA authority to exclude sexually oriented businesses from its loan programs.

Turning to these constitutional claims, I begin by reiterating that nude dancing is a form of expression protected by the First Amendment. *See, e.g., Schad*, 452 U.S. at 66; *Schultz v. City of Cumberland*, 228 F.3d 831, 839 (7th Cir. 2000). Thus, Congress could not flatly prohibit the plaintiffs from offering erotic dance entertainment. As the government notes, however, under the Spending Clause of the Constitution, Congress may sometimes place speech-related conditions on the receipt of federal funds. *See, e.g., Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013). This is so, because, "[a]s a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds." *Id.* at 214. However, Congress's power to place conditions on federal funding is not limitless. The Supreme Court has held that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). The Court wrote that "if the government could deny a benefit to a person because of his constitutionally protected speech or

17

associations, his exercise of those freedoms would in effect be penalized and inhibited." *Id.* Moreover, Congress cannot "discriminate invidiously in its subsidies in such a way as to 'ai[m] at the suppression of dangerous ideas.'" *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 548 (1983) (quoting *Speiser v. Randall*, 357 U.S. 513, 519 (1958)).

In the present case, the plaintiffs contend that the SBA has denied them a benefit—participation in the PPP—on the ground that they have exercised their constitutional right to present erotic dance entertainment as part of their business. The government contends that this is not so. Instead, it contends, it has merely elected not to subsidize the plaintiffs' expressive activities. The government relies on the Supreme Court's statement that "although government may not place obstacles in the path of a [person's] exercise of . . . freedom of [speech], it need not remove those not of its own creation." *Regan*, 461 U.S. at 549–50 (quoting *Harris v. McRae*, 448 U.S. 297, 316 (1980)). Here, the government notes that the obstacle preventing the plaintiffs from presenting the quantity of erotic dance entertainment they wish to present is the COVID-19 pandemic, not the federal government. Therefore, the government contends, the government has no obligation to remove the obstacle by allowing the plaintiffs to participate in the PPP.

The obvious flaw in the government's reasoning is that it has chosen to remove the COVID-19 obstacle from the path of nearly every other small business in the United States. In leaving the obstacle in the plaintiffs' path, the government has singled them out for unfavorable treatment based solely on the content of their speech. Moreover, the government has not articulated any legitimate governmental interest that might be served by excluding the plaintiffs from the PPP. As explained below, in the cases on which the

18

government relies, the Supreme Court allowed Congress to make content-based distinctions in its funding programs only when those distinctions were either related to the purpose of the funding program or were rationally related to another legitimate governmental interest. Here, the purpose of the funding program is to make favorable loans to all small businesses to help them survive the economic crisis brought on by the COVID-19 pandemic. The funding program has no "message," and the government cannot point to any legitimate purpose that would be served by denying the plaintiffs access to the program. Thus, the Constitution does not permit the SBA to exclude the plaintiffs from the PPP based on the content of their speech.

One of the government's cases is *Rust v. Sullivan*, 500 U.S. 173 (1991). That case involved Title X of the Public Health Service Act, which provided federal funding for family-planning services. *Id.* at 178. The Act provided that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." *Id.* This provision was intended to ensure that Title X funds were used only to support "preventative family planning services, population research, infertility services, and other related medical, informational, and educational activities." *Id.* at 178–79. To implement this provision, the Department of Health and Human Services issued regulations that imposed certain conditions on the grant of federal funds. Among those conditions was a requirement that the fund recipient not provide counseling concerning the use of abortion as a method of family planning or otherwise "encourage, promote or advocate abortion as a method of family planning." *Id.* at 179–80. Some participants in the funding program challenged these regulations on the ground that they impermissibly discriminated on the basis of viewpoint by prohibiting all discussion about abortion and

19

requiring fund recipients to provide information about continuing a pregnancy to term. *Id.* at 192.

The Supreme Court held that the funding condition did not violate the First Amendment. Crucial to the Court's holding was its recognition that Congress had a specific, lawful purpose in mind when it set up the funding program, which was to promote "family planning services which will lead to conception and childbirth." *Id.* at 192–93. In the government's view, abortion was inconsistent with that purpose, and thus it chose not to authorize participants to use program funds to advocate for abortion. The Supreme Court recognized that the government had not discriminated on the basis of viewpoint but had "merely chosen to fund one activity to the exclusion of the other." *Id.* at 193. The regulations were "designed to ensure that the limits of the federal program [were] observed." *Id.* Said the Court: "This is not a case of the Government 'suppressing a dangerous idea,' but of a prohibition on a project grantee or its employees from engaging in activities outside the project's scope." *Id.* at 194. The Court noted that Congress could fund a program dedicated to advancing certain permissible goals without also funding alternative goals. Thus, when Congress established the National Endowment for Democracy to encourage other countries to adopt democratic principles, it was not constitutionally required to fund a program to encourage competing lines of political philosophy such as communism and fascism. *Id.* The Court observed that "we have here not a case of a general law singling out a disfavored group on the basis of speech content, but a case of the Government refusing to fund activities, including speech, which are specifically excluded from the scope of the project funded." *Id.* at 194–95.

Unlike the statute in *Rust*, neither the CARES Act nor the Small Business Act has a permissible goal that would be undermined by allowing sexually oriented small businesses to participate in the PPP on the same terms as other small businesses. The goal of the CARES Act is to extend a lifeline to all small businesses, not to promote or encourage any specific subset of small businesses. And the purpose of the Small Business Act is to strengthen the economy by assisting all small businesses. Thus, unlike in *Rust*, we have here "a case of a general law singling out a disfavored group on the basis of speech content." *Id.* at 194. For this reason, the SBA regulation appears to be aimed at suppressing what the government deems to be a dangerous (or at least disfavored) idea, namely, dancing that conveys an erotic message.

This is not to say that if the government chose to establish a small-business loan program designed to encourage a certain form of small business, it would be compelled to establish a similar program for sexually oriented businesses. For example, Congress or the SBA might establish a loan program designed to promote dinner theaters without being compelled to establish a similar program for strip clubs. But Congress has done nothing along those lines in either the CARES Act or the Small Business Act. Accordingly, the SBA's content discrimination cannot be upheld on the theory that the government is trying to "ensure that the limits of the federal program are observed." *Id.* at 193. As the Supreme Court has said, "Congress cannot recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic exercise." *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 547 (2001).

The case on which the government most heavily relies is *Regan v. Taxation with Representation of Washington*, 461 U.S. 540 (1983). In that case, a nonprofit organization

21

challenged § 501(c)(3) of the tax code to the extent that it prohibited tax-exempt organizations from using tax-deductible contributions to support lobbying activities. The plaintiff alleged that the prohibition on lobbying violated both the First Amendment and the equal-protection component of the Fifth Amendment's Due Process Clause.

In connection with its First Amendment argument, the plaintiff argued that the ban on lobbying imposed an unconstitutional condition on the receipt of tax-deductible contributions. The Court disagreed, reasoning that "Congress has merely refused to pay for lobbying out of public moneys." *Id.* at 545. The Court stated that it "has never held that [Congress] must grant a benefit . . . to a person who wishes to exercise a constitutional right." *Id.* However, the Court made clear that "[t]he case would be different if Congress were to discriminate invidiously in its subsidies in such a way as to 'ai[m] at the suppression of dangerous ideas.'" *Id.* at 548. The Court recognized that because Congress prohibited all lobbying (with the exception of lobbying by veterans' organizations), it had not engaged in viewpoint discrimination or tried to suppress a particular idea.

The present case is different from *Regan* because, here, the SBA has targeted a much narrower form of expressive activity. Lobbying, of course, embraces a wide variety of viewpoints. Although it is perhaps inaccurate to say that nude dancing is a viewpoint, it is a form of expression that, unlike lobbying, inherently conveys a specific message. *See Schultz v. City of Cumberland*, 228 F.3d 831, 847 (7th Cir. 2000) ("The dominant theme of nude dance is 'an emotional one; it is one of eroticism and sensuality.'"). Thus, excluding erotic entertainment from a generally available loan program could well be characterized as an attempt to suppress a disfavored expressive message. Indeed, if the

SBA could target sexually oriented businesses in the way it has here, then Congress could revise the tax code to exclude them from every deduction available to other businesses, such as the deduction for ordinary and necessary business expenses. *See* 26 U.S.C. § 162(a). Such a revision would undoubtedly be an attempt to suppress a disfavored form of protected expression rather than a mere refusal to subsidize the exercise of a constitutional right. The same is true of the SBA's attempt to exclude sexually oriented businesses from its loan programs.

A related point is that the SBA has not pointed to any legitimate governmental purpose to justify its singling out of sexually oriented businesses. In *Regan*, the plaintiff advanced an equal-protection claim in addition to a First Amendment claim. To resolve the equal-protection claim, the Court examined whether the exclusion of lobbying bore "a rational relation to a legitimate governmental purpose." 461 U.S. at 547. The Court found that the law did serve such a purpose, which was preventing tax-exempt organizations from using "tax-deductible contributions to lobby to promote the private interests of their members." *Id.* at 550.[2] Here, however, the government has not identified a legitimate governmental purpose for its exclusion. As noted, the government only vaguely refers to the public interest without explaining how its exclusion serves the public interest.

The government also states that it was "not irrational of the SBA to decide that it would not be worth the commitment of its finite resources to subsidize additional speech of a prurient sexual nature, which lies at the outer perimeters of the First Amendment." Br. in Opp. at 222. But the PPP and the Small Business Act do not subsidize speech, they

---

[2] The Court also determined that Congress's decision to allow veterans' organizations to deduct contributions used for lobbying did not violate equal-protection principles because favoring veterans is a legitimate governmental purpose. *Regan*, 461 U.S. at 550–51.

23

subsidize small businesses. The fact that the plaintiffs engage in speech as part of their small business is not relevant to the purposes of either program. Neither the CARES Act nor the Small Business Act directs the SBA to determine whether some expression is more deserving of the government's assistance than others. *Cf. Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 585 (1998) (noting that Congress must take artistic merit into account when making grants under the National Foundation on the Arts and the Humanities Act). By using the plaintiffs' expression as a reason to exclude them from the program, the SBA has introduced content discrimination into programs that were designed to be indifferent to speech. If the SBA could identify some legitimate governmental purpose for doing this, then perhaps the regulation could withstand an equal-protection challenge. But the only apparent purpose for this regulation is to exclude small businesses that express a disfavored message from programs that were created to assist all small businesses. Because that is not a *legitimate* governmental purpose, the SBA's distinction violates equal-protection principles.[3]

---

[3] The failure of the SBA to demonstrate a rational connection to a legitimate purpose is also a reason to invalidate the SBA regulation under the Administrative Procedure Act. *See* 5 U.S.C. § 706. Indeed, the case under the APA is even stronger than the case under the Constitution, for under the APA it is not enough that the court be able to conceive of a rational basis for the regulation, which is usually enough to sustain a statute evaluated under rational-basis review. *See Schurz Commc'ns, Inc. v. FCC*, 982 F.2d 1043, 1049 (7th Cir. 1992). Under the APA, the statement accompanying the regulation "must demonstrate that a reasonable person upon consideration of all the points urged pro and con the rule would conclude that it was a reasonable response to a problem that the agency was charged with solving." *Id.* In the present case, the SBA's statement accompanying the regulation says nothing more than that it considers the rule "to be consistent with its obligation to direct its limited resources and financial assistance to small businesses in ways which will best accomplish SBA's mission, serve its constituency, and serve the public interest." 60 Fed. Reg. at 64,360. Again, however, the SBA fails to explain *why* singling out sexually oriented businesses for unfavorable treatment best accomplishes its mission, serves it constituency, or serves the public

24

For these reasons, I conclude that the plaintiffs have a high likelihood of success on their claim that § 120.110(p) violates the First Amendment and the equal-protection component of the Fifth Amendment's Due Process Clause.

**B.      Irreparable Harm/Lack of an Adequate Remedy at Law**

I also find that the plaintiffs lack an adequate remedy at law and that they would suffer irreparable harm without an injunction. Harm is irreparable if it "cannot be prevented or fully rectified by the final judgment after trial." *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1045 (7th Cir. 2017) (quoting *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.*, 549 F.3d 1079, 1089 (7th Cir. 2008)). To show that there is no adequate remedy at law, the plaintiff is not required to demonstrate that the remedy would be wholly ineffectual; the plaintiff must show only that any award would be seriously deficient as compared to the harm suffered. *Id.* at 1046 (citations and quotations omitted).

Initially, I note that the government does not concede that it could be held liable for damages at the end of this case. Ordinarily, the federal government and its officials sued in their official capacities (as they are sued here) have sovereign immunity from damages. *See, e.g., FDIC v. Meyer*, 510 U.S. 471, 475 (1994). No party has suggested that the federal government has waived its sovereign immunity from damages under the present circumstances. Moreover, the Tenth Circuit has held that the Small Business Act's sue-and-be-sued clause, 15 U.S.C. § 634(b)(1), does not render the SBA liable for damages in a suit involving the SBA's refusal to guarantee a small business loan. *See Ascot Dinner*

---

interest. Thus, even if I could conceive of a legitimate reason for the regulation (and I cannot), the regulation would be invalid under the APA.

*Theatre, Ltd. v. Small Bus. Admin.*, 887 F.2d 1024, 1027–28 (10th Cir. 1989). Thus, I assume for purposes of this motion that the plaintiffs could not obtain damages for any harm caused by the SBA's refusal to guarantee their loans. The plaintiffs therefore lack an adequate remedy at law. Moreover, the inability to obtain damages implies that any harm the plaintiffs suffer between now and the end of the case will be irreparable. *See Smith v. City of Hammond, Ind.*, 388 F.3d 304, 307 (7th Cir. 2004) (noting that in some cases "a defendant's immunity from damages liability might constitute irreparable harm entitling the plaintiff to preliminary relief").

The plaintiffs certainly will suffer irreparable harm if the SBA is not preliminarily enjoined to continue reserving guarantee authority for their loans. As noted, the PPP is administered on a first-come, first-served basis. Once the funds Congress appropriated for the PPP are exhausted, the SBA will be unable to guarantee further loans. Congress's initial allocation of $349 billion was exhausted in two weeks. Although the fund has been replenished, the current allocation will almost certainly be exhausted by the time this case is litigated to conclusion. And while the temporary restraining order currently in place preserves guarantee authority for the plaintiffs' loans, denying a preliminary injunction would necessarily involve dissolving that order. The SBA could then use the guarantee authority for other applicants. Thus, without a preliminary injunction, the plaintiffs will almost certainly suffer irreparable harm in the form of being permanently excluded from the PPP.

The plaintiffs have also shown that they will suffer irreparable harm if the SBA is not compelled to immediately transmit guarantee authority to their lenders so that the lenders can disburse the funds. The loss of First Amendment freedoms is presumed to

constitute irreparable injury for which money damages are inadequate. *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) (citing *Joelner v. Vill. of Washington Park, IL*, 378 F.3d 613, 620 (7th Cir. 2004)); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Brownsburg Area Patrons Affecting Change v. Baldwin*, 137 F.3d 503, 507 (7th Cir. 1998) ("[Plaintiff] lacks an adequate remedy at law as any post-election remedy would not compensate it for the loss of the freedom of speech."). Here, the *Camelot* plaintiffs have shown that their inability to obtain a loan through the PPP will prevent them from exercising their First Amendment right to present erotic dance entertainment. They filed a declaration stating that they are currently presenting such entertainment through a live streaming platform three nights a week for three hours at a time. *See* Zubke Decl., ECF No. 24. The plaintiffs themselves receive no income from the live stream. However, individual dancers (who are not employees of the plaintiffs) perform on these live streams, and they receive tips from viewers. To present this streaming service, the plaintiffs invested in equipment and web-hosting services. They also pay three employees (a DJ, a manager, and an IT person) an hourly wage to facilitate the live stream. With their current lack of revenue, the plaintiffs can afford to live stream the entertainment on only three evenings a week for three hours at a time. They assert that if they do not receive a PPP loan soon, they will have to discontinue even this limited amount of expression. Based on this evidence, I conclude that, without an injunction requiring the SBA to guarantee their loans, the plaintiffs will suffer irreparable harm in the form of being unable to engage in protected expression between now and when the case is finally resolved on the merits.

The plaintiff in *Schuster* has not presented erotic dance entertainment through a live stream, and it does not express an intent to do so. Thus, it does not propose to use PPP funds to facilitate such expression. However, I conclude that it will suffer irreparable harm if it does not receive a PPP loan soon. Although economic loss generally will not sustain a preliminary injunction, an award of damages can be inadequate if the damage award would come "too late to save the plaintiff's business." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984); *see also*, *Girl Scouts of Manitou Council*, 549 F.3d at 1090, 1095 (finding "the potential loss of property, employees, or its entire business" to pose enough risk of irreparable harm); *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994) (irreparable harm found where potential losses "would drive [movant] out of business within six months"). In accordance with Wisconsin's "Safer at Home" order, the plaintiff's club has been closed since March 17. Under Wisconsin's current plan for reopening the economy, the earliest the club could reopen (at reduced capacity) is May 26. Since March 17, the plaintiff has earned no revenue; any revenues earned after reopening will likely be a small fraction of what they would have been under normal circumstances. Revenue and sales for the months of March, April, and May will likely be just 10% of revenue generated for the same months in 2019. The plaintiff intends to use funds received through the PPP to pay payroll, benefits, rent/mortgage, and utilities. It has been unable to obtain a loan from another lender. The plaintiff expects that, without a PPP loan, its business will not survive.

Based on these facts, I am satisfied that the *Schuster* plaintiff has demonstrated irreparable harm based on the likelihood that it will go out of business without a PPP loan. While the current pandemic has been harsh on the entire economy, restaurants and

businesses that present live entertainment have been hit especially hard because in-person gatherings are forbidden. These businesses will be among the last to return to full and normal operations. Finally, as a general matter, it is reasonable to infer that *any* small business, regardless of the services and/or products it provides, would have trouble surviving if forced to close its doors for two months followed by a limited, piecemeal reopening.

**C.    Balance of Harms & Public Interest**

Under the balance of harms, I must consider any harm that the defendants might suffer from an injunction. Here, the only conceivable harm the defendants could suffer would be guaranteeing a loan to a small business that turned out not to be eligible for such a guarantee because it engaged in a form of expression that the SBA did not wish to fund. But, in the context of the PPP, this is not a substantial harm. The purpose of the PPP is to extend loans to small businesses so that they can pay employees and otherwise finance their operations until the mass closures required by the COVID-19 pandemic have ended. As I have explained in this opinion, that purpose would be served by the SBA's guaranteeing the plaintiffs' loans. Moreover, if the SBA did not guarantee the plaintiffs' loans, it almost certainly would immediately use the same guarantee authority on loans for other small businesses. Thus, an injunction requiring the SBA to guarantee the plaintiffs' loans would not cause the SBA any financial loss. With or without an injunction, the SBA would be using the same appropriations to guarantee loans during the same time period. The only difference would be the identity of the borrower. But so long as the borrower is a small business, the SBA should not care about its identity. Perhaps being required to guarantee a loan to a business that the SBA would rather not fund is a harm,

29

but in the context of the PPP, this could only be described as *de minimis* harm. It certainly does not outweigh the harm that the plaintiffs would suffer without an injunction, especially considering that they are highly likely to succeed on the merits of their claims.

Moreover, I conclude that the public interest favors an injunction. As noted, the purpose of the PPP is to extend help to small businesses now, while the mass closures caused by the COVID-19 pandemic are in effect. Guaranteeing the plaintiffs' loans now, rather than months from now when this case is over, furthers the public interest in helping all small businesses and their employees get through the pandemic. The government notes that because PPP appropriations are limited, guaranteeing the plaintiffs' loans will necessarily prevent the SBA from guaranteeing loans to third parties using the same appropriations. The government contends that these third parties would be harmed by an injunction. Although that is true, the plaintiffs' high likelihood of success on the merits makes up for this potential harm. That is, because the plaintiffs have shown that they likely should have received PPP loans when they applied, any harm to the third parties who applied after them and who would have received loans if the plaintiffs' applications were denied is warranted.

**D.    Bond**

Finally, I must consider whether the plaintiffs are required to post a bond under Federal Rule of Civil Procedure 65(c), which provides that the Court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." However, if there is "no danger that the opposing party will

30

incur any damages from the injunction," then the court does may dispense with the bond. *See Habitat Educ. Ctr v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010).

Here, I find that the defendants will not incur damages from the injunction. As explained above, the purpose of the PPP is to extend loans to small businesses now, while the mass closures required by the COVD-19 pandemic are ongoing. But for the injunction, the defendants would use the guarantee authority reserved for the plaintiffs to guarantee loans to other small businesses. The total cost to the defendants of guaranteeing the loans is the same whether the borrowers are the plaintiffs or third parties. Thus, the injunction does not require the defendants to incur costs that they would not incur in the absence of the injunction. Only the identity of the borrower is different. But the identity of the borrower does not increase the government's costs.

If the plaintiffs ultimately lose this case, the defendants might demand that the plaintiffs immediately repay the amount of the loans rather than receive loan forgiveness under Section 1106 of the CARES Act. If, at that point, the COVID-19 crisis was over and the PPP had expired, then the SBA might reap a financial benefit because it could return the money to its general appropriations or to the United States treasury rather than lend it to a different PPP applicant. However, requiring the plaintiffs to repay the loans after they used the proceeds in a way that qualified them for loan forgiveness would be a windfall to the government, not compensation for harm caused by the injunction. In that case, the plaintiffs would have used the loan proceeds during the COVID-19 crisis and, in doing so, have furthered the governmental purpose behind the PPP. The government thus would have received the desired "return" on its investment—small businesses would have used PPP loans to stay in business and pay employees during the crisis. But if, after

31

the crisis was over, the government insisted that the plaintiffs repay the loans rather than receive loan forgiveness, the government would receive an additional benefit. This additional benefit would be made possible only by the injunction—for, as noted, but for the injunction the government would have immediately guaranteed a loan to another applicant who would have been eligible for loan forgiveness. Thus, the loss of this additional benefit would not be a loss caused by the injunction.

For these reasons, I conclude that there is no danger of the defendants' incurring costs or damages from the injunction, and therefore I will not require the plaintiffs to post a bond.

## IV. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the plaintiffs' motions for a preliminary injunction (ECF No. 8 in Case No. 20-C-0601 and ECF No. 3 in Case No. 20-C-0634) are **GRANTED**. The Administrator of the U.S. Small Business Administration and the Secretary of the Treasury, as well as their employees, agents and representatives, including the SBA's lending banks, are preliminarily enjoined from using 13 C.F.R. § 120.110(p) and the associated SBA Standard Operating Procedure (SOP 50 10 5(K) § III.A.15) in making eligibility determinations for loans under 15 U.S.C. § 636(a)(36). By **Monday, May 4, 2020, at 12:00 p.m.**, the Administrator of the U.S. Small Business Administration and the Secretary of the Treasury shall transmit guarantee authority to the plaintiffs' lenders so that those lenders may finish processing the plaintiffs' applications for PPP loans and immediately fund the loans.

**IT IS FURTHER ORDERED** that J.R. Schuster LLC's motion for leave to file excess pages is **GRANTED**.

Dated at Milwaukee, Wisconsin, this 1st day of May, 2020.

s/Lynn Adelman
LYNN ADELMAN
District Judge

33

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


| | | |
|---|---|---|
| HIDALGO COUNTY EMERGENCY | ) | CASE NO:  20-02006 |
| SERVICE FOUNDATION, | ) | ADVERSARY |
| | ) | |
| Plaintiff, | ) | Houston, Texas |
| | ) | |
| vs. | ) | Friday, April 24, 2020 |
| | ) | |
| JOVITA CARRANZA, | ) | (9:01 a.m. to 10:04 a.m.) |
| | ) | |
| Defendant. | ) | |


HEARING

BEFORE THE HONORABLE DAVID R. JONES,
UNITED STATES BANKRUPTCY JUDGE


REMOTE AND TELEPHONIC APPEARANCES:

For Plaintiff:            NATHANIEL PETER HOLZER, ESQ.
                          Jordan Holzer & Ortiz
                          500 N. Shoreline Drive
                          Suite 900
                          Corpus Christi, TX 78401


Also present:            DAVID ELLIOTT

For Defendant:           RICHARD A. KINCHELOE, ESQ.
                         United States Attorney's Office
                         1000 Louisiana Street
                         Suite 2300
                         Houston, TX 77002


Court Reporter:          Recorded; FTR-Mobile

Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXCEPTIONAL REPORTING SERVICES, INC

1          **Houston, Texas; Friday, April 24, 2020; 9:01 a.m.**

2            **(Remote and telephonic appearances)**

3                   **(Call to order)**

4          **THE COURT:** All right, good morning, everyone.  This

5    is Judge Jones.  Today is Friday, April the 24th, 2020, which

6    is the docket for Corpus Christi, Texas.

7          First matter on this morning's docket is Adversary

8    Number 20-2006, Hidalgo County Emergency Services versus the

9    director of the Small Business Administration.  Take

10   appearances, please.

11         Mr. Holzer, I see you there, you want to lead us off,

12   please.

13         **MR. HOLZER:** Pete Holzer, your Honor, for the

14   Plaintiff, Hidalgo County Emergency Service Foundation.  I

15   believe my co-counsel, Kay Walker, is on the line, and also

16   believe the Chief Restructuring Officer of the Debtor,

17   Mr. Romero, was going to call in.

18         **THE COURT:** All right, thank you.  Good morning to

19   everyone.

20         Mr. Kincheloe, and I look at the official title, I

21   said director of the SBA.  I see that the title is

22   administrator.  I meant nothing by it, my apologies.  Do you

23   want to go ahead and make your appearance, please?

24         **MR. KINCHELOE:** Thank you, your Honor, Rick Kincheloe

25   for the Defendant.

1        **THE COURT:**  All right, thank you.  Anyone else wish

2  to make an appearance?

3        **MR. ELLIOTT:**  This is David Elliott (indisc.) for

4  Hidalgo County.

5        **THE COURT:**  All right, thank you, Mr. Elliott.  Good

6  morning to you.  Anyone else?

7        **MR. ELLIOTT:**  Good morning (indisc.)

8        **THE COURT:**  All right, thank you, Mr. Castillo.  Let

9  me -- Mr. Holzer and Mr. Kincheloe, let me sort of bring you

10  sort of full circle in my thoughts since yesterday.  I spent a

11  good part of the night reading the entirety of the CARES Act.

12  I have come to conclude it is a very long and often complicated

13  document to work your way through, but I spent a lot of time

14  with it.  I also have spent significant time reviewing the

15  SBA's final interim (indisc.) I believe the number is 2020-

16  0015.  I have also looked at relevant provisions governing --

17  and, again, I will apologize if I don't get the title right,

18  but SBA 7(A) loans.  I have also thought a great deal about the

19  jurisdictional issues that are present.  And I have gone back

20  and reviewed some recent decisions by my circuit.  And I am --

21  it is very clear to me that my circuit has concerns as to just

22  how far the jurisdiction of an Article One court goes.  And I

23  don't want to entertain that argument today.  And so to the

24  extent that I grant any relief, it will be as to this debtor

25  only in this adversary only.  And to the extent that there are

1   what I'm going to call class-like issues, I do not want Rule 23

2   or anything close to Rule 23 to become part of this discussion.

3   I -- for a couple of reasons.  Number one, it's my belief that

4   by the time that we were able to work through all of those

5   issues, the Debtor's economic situation might probably have

6   dictated the outcome.  And that shouldn't be anyone's goal.  I

7   also think that to the extent that there are (indisc.) 23

8   issues in a case like this, they are better left to my Article

9   Three colleagues.  I think that's all I wanted to say in terms

10  of what I've done in preparation.  Obviously I've read

11  everything.  Mr. Kincheloe, I have read your brief.  I have had

12  a time -- I have had an opportunity to review the authorities

13  cited in that brief.  I've had a chance to do my own research.

14  So I feel like as though I'm fairly well-educated on the

15  applicable law.  I think I understand the issue.  That doesn't

16  mean that you shouldn't take the opportunity to advance any

17  position that you think.  But I am prepared to talk about a

18  number of issues as we work our way through that.  Any

19  questions before we get started?

20          **MR. HOLZER:**  No, your Honor.

21          **MR. KINCHELOE:**  No, your Honor.

22          **THE COURT:**  All right, thank you.  Mr. Holzer, I

23  think that it is your burden so if you'd like to lead off,

24  please.

25          **MR. HOLZER:**  Thank you, your Honor.  Pete Holzer for

1    the Plaintiff, Hidalgo County Emergency Services Foundation.  I

2    know the Court is up to speed.  I'm not going to belabor the

3    facts that have before you in the three sworn declarations.

4    The one of Mr. Romero in the sworn complaint, certain

5    paragraphs of that factual basis.  There is a sworn declaration

6    of Mr. Elliott that was filed last night.  And then just a few

7    moments ago Mr. Ponce's declaration hit the docket.  I don't

8    know if the Court has had a chance to see Mr. Elliott and

9    Mr. Ponce's declarations.

10            **THE COURT:**  I've read Mr. Elliott's.  I did not see

11    Mister you said Ponce, I've not seen (indisc.) --

12            **MR. HOLZER:**  Mr. Ponce.

13            **THE COURT:**  Yes, I have not seen that one.  I am

14    reading it as you talk.  So go ahead.

15            **MR. HOLZER:**  I was going to let you finish reading,

16    Judge.

17            **THE COURT:**  Pretty short, direct, four paragraphs, I

18    got it.

19            **MR. HOLZER:**  Okay, so Mr. Ponce really talks about

20    the background of the company and where it is and touches on

21    the impact of the coronavirus problem.

22            Mr. Elliott is certainly much more specific addressed

23    a few things that may have not been in the complaint that we

24    talked about yesterday, that is the process by which we got to

25    where we are and what we think happened and so forth.

1          So I think what I really want to do is talk sort of

2     in general about some of the issues that Mr. Kincheloe raised

3     in his brief, which is actually quite helpful in my thinking

4     about how things go together and what the administrator does

5     and how the government looks at these kind of issues.  I think

6     one very important thing is that despite what we now know from

7     Mr. Kincheloe's brief, we still don't know who, where, why, or

8     how the bankruptcy exclusion came to be -- came about as part

9     of the application form.  There's no doubt that it's there in

10    the form.  And I do see the I'll call it a tenuous connection

11    that the government makes between the implementing rule and

12    that there's a form, okay, so there is a connection.  But it

13    doesn't really tell us -- we just have no understanding and no

14    knowledge or any idea how, who, where, or why this exception

15    language showed up in this application on the PPP loan program.

16    I can speculate, and here's what my speculation is.  First of

17    all, I think we're all aware that there are other lawsuits now,

18    a lot of them from what I've read in the papers, where the SBA

19    is being sued about giving these PPP loans to a larger

20    corporation, Fortune 500 companies, that really didn't make any

21    sense to be allowed under the PPP loan program and wound up

22    exhausting it, all these big-monied corporations.  And so

23    that's ongoing.  That's not really before this Court but it's

24    certainly out there.  But it looks to me like what happened in

25    this agency is they took this CARES Act, which I agree, I've

1   read the whole thing, too, and it's, you know, about what you'd

2   expect from legislation that occurred over just a period of a

3   few days and weeks.  There is a section that has loans for

4   large companies and like the airlines and so on and so forth

5   that does have a bankruptcy exclusion, it's a specific one in

6   there.  And then there's the paycheck protection loan under --

7   in Section 1100, 1102, that does not.  And so it looks to me

8   like what the SBA has done is they then drafted the bankruptcy

9   exclusion in the large company section and they've applied it

10  also to the PPP loan protection.  And then conversely they let

11  the --

12          **THE COURT:**  (Indisc.)

13          **MR. HOLZER:**  -- large companies into the PPP

14  (indisc.) --

15          **THE COURT:**  Mr. Holzer, if I could just interrupt you

16  because I want to make sure that the record is clear.  The

17  bankruptcy exclusion is actually in the section for midsized

18  businesses defined those companies with more than 500, less

19  than 10,000 employees, can be found at page 193 of the Act.  I

20  have read it, I'm familiar with it.  I just -- I don't think

21  there necessarily is a section that I read with respect to

22  large-sized businesses.  The actual subtitle of the provision

23  are loans for midsized businesses.

24          **MR. HOLZER:**  All right, (indisc.) --

25          **THE COURT:**  (Indisc.)

1      **MR. HOLZER:**  -- then I apologize, Judge.  I conflated

2   those two and I've done the same mistake that I'm accusing the

3   SBA of.  So I'm not -- I guess the point being, there's no ill

4   will.  This is not a intentional ill will, they're out to get

5   the bankrupt companies.  I think it's just a mistake in a badly

6   implemented process that they've done here, as evidenced by the

7   lawsuits for the big companies getting into this program and

8   exhausting it.  In any event, I think it's an abuse of

9   discretion the way they've handled this and the way they've put

10  this bankruptcy exception.  They've conflated these two

11  different programs.  And then we're faced with this form that

12  has this exception and bank lenders that look at the form and

13  say, well, here's the exception, it's right here in the form I

14  have to use so I can't give you a loan.  So with respect to the

15  abuse of discretion, and we are arguing, Judge, both Section

16  525, 523, I forget the number, is discrimination and a exercise

17  of authority that doesn't comply with the statute.  And then so

18  I want to jump down to some cases Mr. Kincheloe has.  His brief

19  talks about the Anti-Injunction Act in section -- in the Small

20  Business Act.  And I looked at those cases.  I have a couple of

21  cases, your Honor, if you need them that explain why in a

22  situation like this, the -- in a situation where the

23  administrator of a government agency exceeds the scope of their

24  authority like they're arguing here, that Anti-Injunction Act

25  doesn't apply.  And I would start with the Supreme Court.  It's

1    the case is -- oh, where'd it go?  *South Carolina versus Regan*

2    at 465 U.S. 367 from 1984.  That case is a holding where the

3    anti-injunction provisions are inapplicable where Congress

4    didn't provide the plaintiff with an alternative legal way to

5    challenge the administration's ruling.  And that was a case

6    related to taxes.  We have *Canterbury Career School versus*

7    *Riley*, District of New Jersey, 1993, 833 F.Supp. 1097 basically

8    saying the same thing.  This is a Secretary of Department of

9    Education has a similar anti-injunction provision in their

10   statute.  The court said if the defendant, the Secretary of

11   Department of Education, has exceeded the scope of his

12   authority, then this court has jurisdiction to grant

13   appropriate injunctive relief, notwithstanding the anti-

14   injunction provision.  And then, lastly, a case out of this

15   court from Judge Schmidt back in 1992, an unreported case, it's

16   a 1992 Westlaw 551256 pointing out that the Fifth Circuit has

17   left (indisc.) by implication recognizing that injunctive

18   relief is permissible where the government agency exceeds its

19   statutory authority.  So with those cases and my arguments, I

20   think the question of whether or not this Court has

21   jurisdiction authority to enter an injunction, I think it does.

22   And I think it's well-supported in the law and under the facts

23   of this case.

24          So I wanted to talk about next a -- what I think is

25   why this statute does exceed the administrator's authority.

1    And it's partly a policy argument.  So let's talk about a

2    hypothetical.  So let's say you have a loan applicant who's

3    preparing for bankruptcy, hired bankruptcy counsel, hired the -

4    - hired a -- hired bankruptcy lawyer, paid them a retainer,

5    they're working on the schedules, but they haven't filed

6    bankruptcy yet.  And so would that company -- would that

7    potential debtor qualify for these loans?  Yes, because they

8    could answer that question "no."  Let's talk about another

9    company (indisc.) --

10         **THE COURT:**  Could they?  I mean, Mr. Holzer, could

11   they?

12         **MR. HOLZER:**  Could they --

13         **THE COURT:**  (Indisc.)

14         **MR. HOLZER:**  Could they?

15         **THE COURT:**  I mean, if you look at the -- if you

16   compare the wording in the portion of the statute involving

17   midsized debtors, it actually says you aren't eligible if you

18   are a debtor in a case.  The words in the form are:  "presently

19   involved in a bankruptcy case."  What does that mean?  Does

20   that mean that if you (indisc.) a claim against someone in

21   bankruptcy, that you're not eligible under the Act?  Does it

22   mean that if you consult with a bankruptcy (indisc.)

23   contemplated bankruptcy that you are not eligible for

24   participation (indisc.).  What do the words "presently

25   involved" actually mean in your mind?

1          **MR. HOLZER:**  Yes, I don't know because you're right,

2     a creditor in a bankruptcy could be presently involved.  A

3     (indisc.) --

4          **THE COURT:**  What if you're (indisc.) who has a lease,

5     are you presently involved in a bankruptcy case?

6          **MR. HOLZER:**  Right.  I do think the most natural

7     construction there is that you're a debtor in bankruptcy.  I'm

8     not sure that there's any difference in the way I look at that

9     language and the way the government looks at the language.  But

10    I do agree with the Court that there is some ambiguity.  But

11    that's -- if you look at that language, a company that's

12    preparing to file bankruptcy is not presently involved in a

13    bankruptcy.  It's just thinking about it.  And if it hasn't

14    already, would it qualify for this loan, could it check the

15    "no" box on that form?  I think there's no doubt it could and

16    should and would qualify for a loan.  So let's talk about

17    another company that's insolvent and hasn't hired a bankruptcy

18    lawyer, but they're broke, they (indisc.) business, all the

19    employees have gone home, they're out of money, and they have

20    no idea whether they're going to survive, and can they apply

21    for a loan, you know, get the employees (indisc.) and the

22    answer is, yes, they would check that box "no."  And so another

23    company that's virtually shut down, it's overdrawn on its bank

24    account, and would they be able to check the "no" box?  The

25    answer is of course, they check the "no" box.  And so all three

1   of those hypotheticals are ways where a company who is

2   completely uncreditworthy can get one of these PPP loans.  So

3   compare that to a debtor in possession that's operating,

4   complying with all the rules, filing its monthly operating

5   reports, running its business, and not only that, it's a

6   systemically important business, particularly in the time of an

7   active pandemic, and operating, but they don't qualify.  It

8   simply makes no sense for the other companies that would

9   qualify to be able to get one of these forgivable loans and for

10  my client (indisc.) that I'm (indisc.) is not.

11          **THE COURT:**  Mr. Holzer, let me go back to your

12  example because I'm not sure you really vetted that example

13  out.  What if you have a company that is as you said

14  contemplating bankruptcy, and you have an owner in the business

15  who owns one percent of that company and is a creditor in a

16  large oil and gas bankruptcy case that's pending because they

17  own -- that person owns a small royalty interest, could the

18  company check the box or not?

19          **MR. HOLZER:**  Haven't though through that one, Judge.

20  I would think they could check the "no" box.  But, you know,

21  there's certainly a --

22          **THE COURT:**  (Indisc.)

23          **MR. HOLZER:**  -- (indisc.) of the language --

24          **THE COURT:**  Read the language --

25          **MR. HOLZER:**  -- that they would -- yeah.

1          **THE COURT:**  Read the language.  Is the business or

2    any owner presently involved in any bankruptcy?

3          **MR. HOLZER:**  That's right.  I think that you're

4    highlighting, your Honor, the flaws in this -- in what this

5    form says and all the ambiguities that are evidence of a poorly

6    instituted program beyond the administrator's authority.  All

7    right, so let's see.  So that's arbitrary and capricious is

8    what I think and gives you a basis to enter an injunction.

9          Let me just say that I do understand that the limit

10   on the jurisdiction.  We never intended to seek relief for

11   anybody but my client, the Plaintiff in this lawsuit.  Whether

12   it would be appropriate for a nationwide injunction or even a

13   Southern District injunction is not our concern.  I'm only

14   worried about my client.  My client only cares about its

15   survival.

16         So I wanted to then go to the question of whether or

17   not this is bankruptcy discrimination.  I do agree in reading

18   Mr. Kincheloe's brief, he cited the Exquisito (phonetic) case

19   out of the Fifth Circuit and the Ares (phonetic) case out of I

20   believe it's the Fourth Circuit.  And they're both in his brief

21   and those are cases that we came up in our research as well.

22   And I do think they -- those two cases are useful to compare

23   and contrast.  Exquisito involved a program that the court

24   said, well, this is really about the jobs, not about a loan.

25   And so the -- so it was discrimination.  Ares was more about a

1   loan than anything else and so that was not.  So the case law

2   does say that if it's just a loan program, then the anti-

3   injunction -- excuse me, the -- it's not bankruptcy

4   discrimination.

5          So let's look at what we have here.  Is this more

6   like the facts in Exquisito or more like the facts in Ares?  I

7   think it's clearly this is more about saving jobs, preventing

8   collapse of the economy.  It's not really about a company

9   borrowing money that under the statute it has to show its

10  ability to pay back.  And that's in fact if you read the

11  requirements for qualify for a loan, that's just not in there.

12  You just have to say what you're going to use it for and that's

13  what my client needs it for is to pay payroll and help with the

14  rent and the other permissible uses for the funds.  It's really

15  more of a grant to protect the economy, save jobs, than it is a

16  straightforward loan.  So I would say that the cases that say

17  loans don't apply really don't have any impact here.

18          There's another case Mr. Kincheloe cited in his

19  brief, the *Toth*, T-O-T-H, case, and that also involved an

20  extension of credit which is really not what's happening here.

21  This is a different animal.  So with that, Judge, I think I've

22  said everything I wanted to say for now.  I think the facts are

23  pretty clear what happened that we qualify, except for this

24  arbitrary inclusion of a bankruptcy exception on the

25  application form, and that it is bankruptcy discrimination and

15

1    the Court should grant an injunction.

2              **THE COURT:**  All right, thank you.  Mr. Kincheloe.

3              **MR. KINCHELOE:**  Yes, your Honor, Rick Kincheloe.

4    (Indisc.) start with Mr. Holzer's discussion of he -- the

5    reasons for the exclusion.  And I will say I really appreciate

6    Mr. Holzer sending me the cases he was going to discuss before

7    today.  It certainly was an extreme professional courtesy.

8              I have received a regulation that I understand is

9    going to be published imminently like Monday.  I can broadcast

10   it for the Court if the Court would like to read it because I

11   think it does explain (indisc.) saying about the wording of the

12   application but the regulation that's going to be published

13   does add some color to that.  So just this is going to be at 13

14   CFR (indisc.) and 121.  And then the bankruptcy exclusion

15   appears here.  And so this is that if an applicant is currently

16   a debtor in bankruptcy or if it files bankruptcy before the

17   loan is funded, then it is ineligible.  And this -- the second

18   paragraph explains kind of the rationale.  There's a concern

19   that the SBA loses control over the funds because they become

20   property of the estate.  There's also a concern the Court --

21   your Honor, is the Court done reading?  I'll stop sharing so I

22   can go back to video.

23             **THE COURT:**  Yeah, no, I read it.  Thank you.

24             **MR. KINCHELOE:**  Okay.

25             **MR. HOLZER:**  Mr. Kincheloe, I'm -- I didn't --

16

1          **MR. KINCHELOE:**  Oh, I --

2          **MR. HOLZER:**  -- (indisc.) second page.

3          **MR. KINCHELOE:**  The second page --

4          **MR. HOLZER:**  (Indisc.)

5          **MR. KINCHELOE:**  -- is just -- I can send it to you

6    shortly.

7          **MR. HOLZER:**  Okay, that'll be fine.

8          **MR. KINCHELOE:**  I don't think it was relevant.  But

9    the other concern is the pandemic has created a unique public

10   need with unprecedented unemployment to get loans funded

11   extremely quickly.  And in this need for speed, the traditional

12   underwriting is just not going to work.  it's going to take too

13   long.  And so to avoid that traditional underwriting and to get

14   this -- get these loans out guaranteed by SBA as quickly as

15   (indisc.) could, the decision was made to say if you're in

16   bankruptcy, you're excluded.  We certainly had maybe a good --

17   it can be argued whether that's a good or bad decision from

18   public policy standpoint but at least that was the motivation

19   is get these loans out quickly and minimize the amount of

20   underwriting that needs to be done.

21         **THE COURT:**  In fact there really is no underwriting

22   that's done, right?  I mean, aren't the lenders authorized to

23   simply accept what's on the form and act just on the form, and

24   so long as they rely on the form, then they are protected;

25   isn't that the way that it works?

1          **MR. KINCHELOE:**  From the interim rule I've read, yes.

2  But from the --

3          **THE COURT:**  (Indisc.)

4          **MR. KINCHELOE:**  -- regulation I just posted, I

5  haven't read the entire regulation.  I got it maybe five

6  minutes before we started.  And so unless something in the

7  regulation changes that, that's my understanding.

8          **THE COURT:**  Got it.

9          **MR. KINCHELOE:**  Turning to the jurisdictional issue,

10  admittedly the provision in the Small Business Act is unique.

11  I'm not aware of any other provision this broad.  And certainly

12  there are other anti-injunctive language that appears in

13  various statutes.  You know, the Anti-Injunction Act deals

14  (indisc.) I think that's a little different.  The one thing I -

15  - there's a case -- well, it's -- there's so many other cases

16  out there, and one that Mr. Holzer shared, where there's a

17  statute that said except as otherwise provided herein, you

18  can't issue an injunction.  And certainly that language seems

19  to suggest that, well, okay, if you violate the statute, we can

20  enjoin you, we just can't enjoin you otherwise.  For 634, 15

21  USC 634, I don't see any similar condition.  I mean, it just is

22  (indisc.) the Fifth Circuit (indisc.) decision I cite at

23  footnote six which, you know, I suppose we could, you know,

24  dispute whether it's holding or dicta, but it's a pretty

25  blanket assertion, thou shalt not enjoin the SBA.  And again we

1    can argue whether Congress made a good or bad policy decision

2    in enacting that but I think that's the law.  And so turning to

3    106, honestly 106 waives sovereign immunity for the entire

4    Federal government for purposes of 525.  But (a)(4) states that

5    waiver is only to the extent it's consistent with applicable

6    non-bankruptcy law, and so I think we have to turn to this

7    likely unique provision applicable to the SBA administrator and

8    say, courts can't enjoin the SBA.  Whether that's a good or bad

9    idea, so be it but that's what it says.  And so I think

10   106(a)(4) coupled with 15 USC 634 I think means that there is

11   not a waiver of sovereign immunity for an injunction against

12   the SBA, depriving the Court of jurisdiction.

13          On -- moving to the 525(a) argument, it -- in the

14   Exquisito case, as I read it, it seemed to -- one thing that

15   was distinguishable is there was a preexisting relationship

16   between the SBA and the Air Force.  That's one thing that's --

17   is noteworthy.  The injunction in that case was not against the

18   SBA, it was against the Air Force.  The -- there was a pre-

19   bankruptcy relationship in that case.  And the Fifth Circuit

20   kind of thought through it and said, you know what, this

21   program is really designed to train minority-owned businesses

22   and so we view it more in the nature of a franchise.  Fine, if

23   you're going to call it a franchise then, yeah, it's covered

24   under 525(a).  What the Fifth Circuit has not decided, at least

25   as far as I can find, which the (indisc.) court, the *Toth* court

1  and I believe the (indisc.) Watts (phonetic) court in the Third

2  Circuit, and then the Second Circuit in Goldrich (phonetic) --

3  well, Goldrich dealt with student loans which has been

4  abrogated by 525(c), --

5          **THE COURT:** Right.

6          **MR. KINCHELOE:** -- those courts look at the decision

7  to extend credit, more specifically in the (indisc.) case

8  extend a guarantee of credit. That's something totally

9  different. It doesn't trigger this traditional gatekeeper

10 function of the government. Like, you know, for example, state

11 bar licensing, 525 expresses this desire that we don't want

12 lawyers to file bankruptcy, then they'd be unable to practice

13 law because they filed bankruptcy. No, we want them to be able

14 to continue to engage in the profession. Real estate brokers,

15 any other number of professions, we want them to continue being

16 able to engage in that profession and we don't want the

17 government's gatekeeper role to be influenced by bankruptcy.

18 That doesn't mean the government is not allowed to discriminate

19 in other ways. Again, maybe right, maybe wrong, but 525(a)

20 says it only bars discrimination in the context of licenses,

21 permits, charters, franchises, or other similar grant. The

22 (indisc.) case and the other ones, *Toth* and Watts, say that a

23 loan guaranteeing a loan is not really similar to these other

24 claims because it doesn't implicate this gatekeeper function.

25 And because it's not similar, it's not covered by 525(a) so we

1    don't even need to get to the question of whether the

2    government was motivated by the bankruptcy.  It's just not

3    covered.

4           On the -- I heard -- as I understand the complaint,

5    there's not an APA claim asserted and so it's just whether

6    statutory authority was exceeded.  The language in the CARES

7    Act is very broad.  I mean, it's just the language for 1102

8    implementing the PPP loan guarantees (indisc.) may and that

9    leaves a very broad, open-ended grant of authority, leaves a

10   lot of discretion in the administrator which makes sense given

11   the context.  I mean, this is imagine probably one of the

12   fastest pieces of legislation ever to make it through House,

13   Senate, and White House.  And --

14           **THE COURT:**  Well, wouldn't you agree that that

15   discretion has certain boundaries on it?  For instance, that

16   discretion shouldn't be allowed to frustrate the purpose of the

17   Act itself, agreed?

18           **MR. KINCHELOE:**  (No audible response)

19           **THE COURT:**  (Indisc.) there are limits.  You simply

20   can't say that you can implement rules and make an argument

21   that says, well, that discretion allows me to implement rules

22   that frustrate the application of the law.

23           **MR. KINCHELOE:**  So, your Honor, --

24           **THE COURT:**  (Indisc.)

25           **MR. KINCHELOE:**  -- I agree that there are limits but

1    I think the use of the word "may," as I read the statute now

2    (indisc.) didn't happen and no one intends for this to happen

3    but if we're just taking the thought experiment to the extreme,

4    I think the use of the word "may," the administrator can say,

5    okay, I've got this authority, I don't have to exercise it.

6    And I think Congress would probably come back and put a shell

7    in there.  But I think the way the statute's written, it's

8    pretty broad.  Now, there are other limits in the Small

9    Business Act, like the administrator has to ensure that the,

10   you know, loans made under this section are of such sound value

11   or so secured as reasonably to assure repayment.  So (indisc.)

12   administrator doesn't do that, the administrator violates the

13   statute.  But because Congress prohibited injunctions on the

14   SBA, it really creates this strange space where, yeah, the

15   statute says the administrator has limits but I don't think the

16   statutory -- the statute authorized an injunction against the

17   administrator if the administrator exceeds those limits.

18          **THE COURT:**  All right, so let me ask you this.  And

19   we're going to come back to that issue in a second.  But do I

20   even need to get there?  Didn't the SBA effectively delegate

21   the authority to determine who's eligible to the participating

22   financial institutions?

23          **MR. KINCHELOE:**  I don't (indisc.)

24          **THE COURT:**  Let's take a practical example.

25   Mr. Holzer comes into his local financial institution for a PPE

1  -- I'm sorry, a PPP loan.  He fills out the application.  Who

2  makes the decision of whether or not he's eligible?

3        **MR. KINCHELOE:**  So the -- as I read (indisc.) then

4  the bank has to receive the form, and as long as the bank

5  follows the form and the guidance, it may issue the loan and

6  it's going to be guaranteed by SBA.  But it is still SBA who

7  decided those parameters that go into the form.

8        **THE COURT:**  I'm not arguing with you on that.  I'm

9  just saying who makes the decision of who's eligible and who's

10  not?  The bank.  Has to be that way.  SBA couldn't do it.  SBA

11  doesn't have enough employees, it doesn't have enough local

12  offices.  It had to delegate part of that process to financial

13  institutions; otherwise, it would have been a program with

14  absolutely no ability to implement.  I'm not complaining.  I'm

15  just trying to be practical about it.

16        **MR. KINCHELOE:**  Right, yeah.  So again with the need

17  for speed, the analysis of whether a borrower meets the

18  appropriate criteria is sent to the banks.

19        **THE COURT:**  Right.  And in fact there really isn't an

20  underwriting function.  I mean, if your instruction is

21  (indisc.) this form and you make the decision off the form,

22  there really isn't an underwriting function.  There's no

23  evaluation of ability to repay, there's no evaluation of

24  collateral.  And you know what I'm doing, I'm undermining your

25  argument that it's consistent with the (indisc.) power of SBA

 1    7(A).  You know, that just doesn't exist in this program.  In

 2    fact, let's just be practical.  The entire intent of the

 3    program is for people not to pay this back.  It's a way of

 4    getting money from the government to people that are being

 5    harmed.  And so long as they use it in the right way, they

 6    don't have to pay it back.  Am I -- tell me where I'm wrong

 7    about that.

 8         **MR. KINCHELOE:**  Your Honor, I (indisc.) agree with

 9    the Court that the intent was to get money to people who needed

10    it quickly.  And certainly to the extent it's used for the

11    proper purpose, it is intended to be forgiven.  And, you know,

12    I think the Court's correct, I mean, the amount of underwriting

13    is virtually nil.  I mean, the SBA set up parameters and said

14    banks (indisc.) somebody meets these parameters, that's the

15    amount of underwriting we're going to do.  And one of the

16    decisions made by SBA was, well, since we can't really -- we

17    don't have the time to go through and do a traditional credit

18    inquiry, we're going to exclude companies in bankruptcy, you

19    know, together with this purpose of we can't control the money

20    once it goes into the bankruptcy estate (indisc.)

21         **THE COURT:**  (Indisc.) said that, I mean, (indisc.)

22    hundred and eighty degrees wrong, I mean, isn't part of my job

23    to ensure that debtors act in accordance with the law?  I mean,

24    I would think, I mean, assuming that I'm doing my job, and I

25    try really hard to do my job every day, isn't there actually a

24

1    greater level of oversight than for someone who's not in

2    bankruptcy who can simply theoretically do what they want to

3    with the money once they get it?

4         **MR. KINCHELOE:**  I disagree, your -- I disagree with

5    your Honor's point.  It's not a question of oversight.  I think

6    it's a question of the way the statute is written, if Hidalgo

7    receives a PPP loan outside of bankruptcy, they are free to

8    choose how to use those funds.  Now, --

9         **THE COURT:**  Are they?

10        **MR. KINCHELOE:**  -- (indisc.) they use -- well, I

11   think they are.  But if they use it for certain purposes,

12   they're required to repay it.  If they use it for payroll

13   (indisc.) gets forgiven but if let's say company receives a

14   loan, a week later files bankruptcy.  Well, all of those funds

15   then become property of the estate, subject to administrative

16   claims.  And I don't think there's anything in the CARES Act

17   which would cause the proceeds of a PPP guaranteed loan to be

18   excluded from property of the estate or to be immune from the

19   claim of (indisc.) creditors or priority creditors.

20        **THE COURT:**  Okay.

21        **MR. KINCHELOE:**  So that's the motivation.  Again, the

22   statutory authority is broad.  I hear the Court's comment about

23   underwriting and the requirement to make sound loans.  This is

24   the administrator's decision.  But I go back to the anti-

25   injunction language in the Small Business Act that even to the

1  extent the administrator is wrong, the United States has not

2  waived sovereign immunity for an injunction to be issued

3  against the administrator.

4      THE COURT:  And tell me why I can't issue -- because

5  it -- there's no doubt that the financial institution is

6  (indisc.) participation with the SBA.  I think you just told me

7  they are given follow the form and process these loans.  And

8  Rule 65 gives me the ability to issue injunctive relief against

9  anyone acting in participation with the parties, agreed?

10     MR. KINCHELOE:  Would the Court give me a moment?

11     THE COURT:  Of course.  It would be 65(d)(2).

12  Actually (d)(2)(C).

13     MR. KINCHELOE:  So, your Honor, I don't think the

14  Court can enjoin the bank.  As I read this and I -- the Court

15  knows it way better than I do, but at least my quick reading of

16  the language of the rule is this would be if the Court enjoined

17  the administrator and anyone acting in concert with her, that

18  would capture this.  I don't know that this lets the Court

19  enjoin the bank without also enjoining the administrator;

20  because without an injunction against the administrator, the

21  administrator doesn't have to guarantee the loan.

22     THE COURT:  Well, I think -- I agree with you that I

23  can't order the SBA to guarantee a loan.  I 100 percent agree

24  with that.  The issue is can I order that the application be

25  considered without those four or five words.  And if you're

1  telling me the person making that decision is, what was it,

2  PlainsCapital Bank, Mr. Holzer?

3       **MR. HOLZER:**  Yes, your Honor.

4       **THE COURT:**  You're telling me that I can't order

5  PlainsCapital Bank to consider the application without giving

6  any consideration for those words in the form?

7       **MR. KINCHELOE:**  Then again I don't know that it

8  becomes a can't.  I think it becomes a question of should or

9  should not.  And with that question of whether or not the Court

10  should enjoin PlainsCapital Bank, I think there is a

11  substantial threat of irreparable injury to the bank because if

12  the bank --

13       **THE COURT:**  (Indisc.)

14       **MR. KINCHELOE:**  Well, because I think if the bank

15  follows the Court's order, ignores that line, and then issues

16  the loan, I think they are at risk if the SBA says we weren't

17  ordered to guarantee it, we're not guaranteeing it.

18       **THE COURT:**  Okay, so you just say that I need to

19  order the SBA to comply with the law if I find discrimination.

20       **MR. KINCHELOE:**  No, your Honor.

21       **THE COURT:**  Is that it?

22       **MR. KINCHELOE:**  I -- that -- your Honor, on that one

23  I think it's a question of can or cannot.

24       **THE COURT:**  All right.  So you're telling me that I

25  took an oath to uphold the statute, and if I find the statute's

1  been violated by the SBA, that I can do nothing about it?

2          **MR. KINCHELOE:**  I think the Court is unable to issue

3  an injunction against the SBA, even if the statute has been

4  violated.

5          **THE COURT:**  So tell me what it is I can do.

6          **MR. KINCHELOE:**  I don't know, your Honor.  For today

7  (indisc.) TRO, I do not think the Court can enter a TRO.

8          **THE COURT:**  Got it, okay.  Anything else?

9          **MR. HOLZER:**  Your Honor, briefly.

10          **THE COURT:**  No, I don't need anything else.

11          **MR. HOLZER:**  Okay (indisc.)

12          **THE COURT:**  Anything else, Mr. Kincheloe?

13          **MR. KINCHELOE:**  Yes, your Honor.  Just in closing, I

14  do dispute that the public policy considerations weigh in favor

15  of enjoining -- of issuing an injunction allowing this loan to

16  go -- to be made and guaranteed -- and/or guaranteed due to the

17  policy considerations.  If the SBA is required to implement

18  traditional underwriting requirements, it is likely to slow

19  down this program and likely to delay proceeds to other

20  applicants.

21          **THE COURT:**  Well how can it implement traditional

22  underwriting when it's been told what to do?

23          **MR. KINCHELOE:**  Your Honor, I mean --

24          **THE COURT:**  Simply because if I were to say that

25  there has been discrimination, that doesn't require the SBA to

1    do anything other than to not discriminate.

2         **(Pause)**

3         **MR. KINCHELOE:**  Your Honor, I -- sorry, I don't think

4    I understand the Court's point.

5         **THE COURT:**  I got it.  Anything else?

6         **MR. KINCHELOE:**  No, your Honor.

7         **THE COURT:**  All right.  So I have before me the

8    Debtor's request for a temporary restraining order against the

9    administrator of the SBA.  I do find that I have jurisdiction

10   over the matter pursuant to (indisc.) Section 1334.  I do find

11   that the adversary and the request for injunctive relief

12   constitutes a core proceeding under 28 USC Section 157.  I

13   further find that I have the requisite constitutional authority

14   under the guidance given by our Supreme Court to enter, to the

15   extent it is a final order, and I'm not sure it is, but it may

16   practically be a final order, I do find that I have the

17   requisite constitutional authority to enter final order.

18        I want to go through a couple of the arguments

19   because, again, I spent a lot of time reading all of the

20   relevant wording.  And there are certainly the arguments that I

21   simply -- they need to be addressed and I simply think that

22   they just have no foundation in logic or law or fact.  I want

23   to start with the argument that (indisc.) that there remains

24   intact, and I wrote it down as a quote, that there's this

25   (indisc.) ensuring that there is sound value or so secure as to

1    reasonably assure repayment.  That is so out of context in this

2    program that it's a frivolous argument.  The entire --

3    everything said by our President, everything put out by our

4    administration, everything put out by our Congress reflects

5    that this was an emergency reaction to a series of events that

6    had never before been experienced.  This isn't a loan program.

7    This is a support program.  It is phrased the way it is to try

8    and ensure that the money ends up in the right hands and used

9    for the right purposes.  It is intended to protect tax-paying

10   citizens from the effects of government shutdowns, stay-at-home

11   orders, and simply the public not being able to engage in

12   ongoing commerce.  To suggest that this is a program that

13   enjoys underwriting and scrutiny in terms of who receives the

14   money is to simply ignore the obvious.  The SBA's own rules

15   (indisc.) effectively look at the form, make the loans.  You

16   make the loans, and so long as they're used for the right

17   purposes, there's no need to pay it back.  That is not a

18   traditional loan program.  There is no collateral valuation,

19   there is no credit worthiness test.  And, again, to make that

20   argument is simply frivolous.

21         I also want to talk about the 525 argument.  And I

22   take a quote out of the briefs.  It says that issues under 525

23   (indisc.) the gatekeeper role of the governments or a

24   government entity in determining who may pursue certain

25   livelihoods.  All of the cases cited have dealt with the

1    government engaging in regulated commerce.  There were

2    commercial alternatives, there were private sector

3    opportunities.  Practically speaking, this program isn't

4    designed to be a commercial product; it is a support product.

5    The only entity that would ever engage in this type of activity

6    is the government because, again, it's a support for citizens.

7    I can think of no greater example of the government performing

8    its gatekeeping role as to who can engage in commerce and

9    pursue certain livelihoods than this particular program;

10   because if we didn't have this program, there would be no

11   ambulance services, there would be no nail salons, there would

12   be no convenience stores.  Society would be in a very difficult

13   (indisc.) so I do think the requirements of Section 525(a) are

14   absolutely in play.  I do think that the choice of the words in

15   the form -- and, again, I made the example with Mr. Holzer, and

16   I am bothered by the use of the words.  I disagree with

17   Mr. Holzer that, well, of course everybody knows what that

18   means, it's simply if you're a debtor.  Couldn't be further

19   from the truth.  Congress knew how to say we don't give these

20   loans to debtors.  They did it within the CARES Act itself.

21   And then to have a form that simply says if an owner or a

22   business is presently involved in a bankruptcy, I have zero

23   idea what that means.  It means if you have filed a proof of

24   claim in the General Motors bankruptcy umpteen years ago and

25   haven't yet received a final distribution on your claim, you

1   have to check that box "no."  That's silly.  It's even sillier

2   in light of the purpose of this program.

3           I also have found but I've not been cited to any

4   legitimate basis for including that language in the form.  I

5   take umbrage of the fact that if I look at question one and I

6   look at the list and I think just rules of normal construction,

7   and I realize that this is not a statute but it's a form that

8   is derived from a statute, it says if a business or owner is

9   presently suspended, debarred, proposed to be debarred declared

10  ineligible, voluntarily excluded from participation in this

11  transaction by any (indisc.) department or agency all conduct

12  which society frowns upon, involves potentially wrongful acts,

13  involves potentially criminal conduct.  And then as an add-on,

14  it says:  "Or presently involved in any bankruptcy."  Plain

15  meaning:  as a creditor, as a landlord, as a partner in another

16  business, as a shareholder in another business.  It's entirely

17  inappropriate that those words were added into that form in

18  that list in that manner.  And I see no authority anywhere for

19  including those words in that form.  It serves no purpose.  I

20  do find that by including the words "or presently involved in

21  any bankruptcy," they are intended to be discriminatory.  They

22  are intended to be discriminatory toward debtors for reasons

23  offered that somehow we lose control of the money, again I find

24  to be completely frivolous.  I cannot imagine anything less

25  controlling than to simply give out money with no underwriting,

1    with no oversight, and then complain that if I have a Federal

2    judge who makes sure that the debtor complies with the law,

3    ensures that the debtors file monthly operating reports, ensure

4    that copies of bank statements are filed on the docket every

5    month, that they somehow lost control.  I simply don't buy it.

6    I find the arguments to lack any good faith.

7            I am worried about the argument that I cannot enjoin

8    the administrator of the SBA.  I agree I can't tell the SBA

9    administrator what loans to guarantee, what loans to grant.  I

10   simply do not accept that when I have evidence of bankruptcy

11   discrimination that I can do nothing about it.  And if I am

12   wrong about that, I am very certain that my Article Three

13   colleagues will tell me that I am wrong, and I will accept that

14   criticism.  But this can't be what Congress intended.  This

15   can't be the way that we are supposed to treat our fellow man

16   in this time.  It's inconceivable to me that this distinction

17   could be drawn.  The people that need the most help and who

18   have sought protection under our laws are the people who are

19   the targets of discrimination in a government support program;

20   can't possibly be.

21           So I am going to grant the TRO.  I am going to enjoin

22   the administrator of the SBA and all those acting in concert

23   with her, which includes PlainsCapital Bank, in the following

24   manner.  I am requiring that the application form for the

25   paycheck protection program submitted by Hidalgo County

1    Emergency Service Foundation be considered in accordance with

2    the program without the words in question one:  "or presently

3    involved in any bankruptcy."  They are stricken from

4    consideration.  The application shall be considered on its

5    merits and in accordance with the law with those six words

6    stricken.  It is my hope that my government that I serve will

7    realize the error that it has made and that it will act

8    appropriately and ensure that all of our citizens have access

9    to the support they needed.

10            Mr. Holzer, I want you to prepare a revised TRO in

11    accordance with the ruling that I've made on the record

12    pursuant to 7052.  Also want to go through in accordance with

13    Rule 65, I am required to state, and I am incorporating my

14    comments on the record, into the form of order to be submitted

15    pursuant to 7052.  I have stated the reasons why the temporary

16    restraining order should issue.  I have specifically stated its

17    terms.  I have specifically described in reasonable detail the

18    limits of the TRO and those acts that are required under the

19    TRO.  I will find that pursuant to Bankruptcy Rule 7065, there

20    is no security required.  I am also required to set a hearing

21    for issuance of a preliminary injunction.  I don't know that it

22    will be necessary because this may all become moot by then.

23    And I recognize, Mr. Kincheloe, that at a preliminary

24    injunction hearing, you may tell me that the law has changed.

25    But as I sit here today, the CFR that you showed me, I'm not

1   aware it's actually governing law; is that correct?

2          **MR. KINCHELOE:**  That's correct, your Honor.  It has

3   not been published in the register.

4          **THE COURT:**  All right, thank you.  Let's see,

5   Mr. Kincheloe, Mr. Holzer, can you look at your collective

6   schedules?

7          **MR. HOLZER:**  Have it in front of me, Judge.

8          **THE COURT:**  All right, today's the 24th.  My guess is

9   it's probably, and please tell me if you think I'm wrong, it's

10  probably a better use of everyone's time if we simply go as

11  close to the 14 days as possible to see what actually happens.

12  It may very well be that without waiving any right of review or

13  appeal that the SBA may have, it may make sense to extend the

14  original time.  But obviously we're not going to decide that

15  today.  Let me ask the parties, does it make sense to set this

16  -- I'm issuing this at 10:00 o'clock on Friday, can we set this

17  for 9:30 on Friday, May the 8th; does that make sense?

18         **MR. KINCHELOE:**  Yes, your Honor.  I was going to ask

19  for May 8th so perfect.

20         **THE COURT:**  Okay, fair enough.  And, Mr. Holzer, does

21  that work for your calendar?

22         **MR. HOLZER:**  It does, your Honor.

23         **THE COURT:**  All right, thank you.  What I would like

24  for you to do is once you finish drafting the TRO, I'd like for

25  you to send it to Mr. Kincheloe to review as to form only.

1    Mr. Kincheloe, consistent with my normal practice, by agreement

2    as to form only, you're not waiving any right of review or

3    complaint that you may have, you're simply acknowledging that

4    the paper is consistent with the ruling that I've made on the

5    record.  Is that enough of a (indisc.) that you feel

6    comfortable looking at the document?

7            **MR. KINCHELOE:**  Absolutely, your Honor.  And I'll

8    remain at my computer until I receive it from Mr. Holzer so

9    there's no delay.

10           **THE COURT:**  Terrific, thank you.  Gentlemen, I very

11   much appreciate the argument.  Yes, sir.

12           **MR. HOLZER:**  Just a clarification, and I'm trying to

13   think practically about the next two weeks, I understand your

14   ruling and I think I'll be able to get the TRO drafted

15   correctly, but is my client authorized to resubmit an

16   application form striking out that language about the

17   bankruptcy and checking the "no" box in question one?

18           **THE COURT:**  Yes.  What I would envision, so that

19   there is -- I don't want anyone at the bank to have an issue, I

20   don't want anyone within the SBA to have an issue, is that what

21   I would suggest that we do until this -- until we have an order

22   to the contrary is that your client's authorized to strike

23   through that language, check the box assuming that it (indisc.)

24   and it satisfies all of the other requirements of question one,

25   and then simply attach a copy of the TRO so that it's in the

1    file and everyone understands exactly what the issues are.  I

2    would hate for someone to --

3        **(Automated telephone recording played)**

4        **THE COURT:**  I don't -- I have 50 people on the

5    telephone so I'm not going to try to spend the time to figure

6    out who that was.  You're absolutely authorized to strike

7    through the question.  I can't remember where I stopped.

8    Attach a copy of the TRO, that way there is absolutely no

9    chance for error as to why the application was submitted the

10   way it was.  And if the Debtor doesn't need -- I want to make

11   it very clear, if the Debtor doesn't meet the requirements,

12   then I'm not changing that.  All I'm simply requiring is the

13   application be considered consistent with the (indisc.)

14   practices and governing (indisc.) as all other applications

15   with simply (indisc.) those six words stricken.

16       **MR. HOLZER:**  Understood, your Honor.  Thank you.

17       **THE COURT:**  All right, Mr. Kincheloe, anything else

18   that I -- any lack of clarification or any issues that we need

19   to talk about?

20       **MR. KINCHELOE:**  One issue, your Honor.

21       **THE COURT:**  Certainly.

22       **MR. KINCHELOE:**  (Indisc.) carry out instructions I

23   need to ask the Court if it will entertain an oral motion for

24   stay pending appeal.

25       **THE COURT:**  Of course.  And that's denied.

1              **MR. KINCHELOE:**  Thank you, your Honor.

2              **THE COURT:**  All right, anything else, folks?  I very

3       much appreciate the argument.  Mr. Holzer, I appreciate the way

4       in which you conducted yourself on behalf of the Debtor.  And,

5       Mr. Kincheloe, you know that I think you're the greatest thing

6       ever and I very much appreciate what you do for our country.

7              **MR. KINCHELOE:**  Thank you, your Honor.

8              **THE COURT:**  Thank you, gentlemen.

9              **MR. HOLZER:**  (Indisc.) have a good weekend.

10             **THE COURT:**  (Indisc.)

11             **MR. KINCHELOE:**  You, too, your Honor.

12             **(This proceeding was adjourned at 10:04 a.m.)**

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    <u>April 25, 2020</u>

            Signed                                       Dated


                    *TONI HUDSON, TRANSCRIBER*

# U.S. DISTRICT COURT
## U.S. District Court, Western District of New York (Buffalo)
## CIVIL DOCKET FOR CASE #: 1:20-cv-00665-LJV

| | |
|---|---|
| Pharaohs GC, Inc. v. United States Small Business Administration et al | Date Filed: 06/02/2020 |
| Assigned to: Hon. Lawrence J. Vilardo | Jury Demand: Plaintiff |
| Cause: 28:1331 Federal Question: Other Civil Rights | Nature of Suit: 440 Civil Rights: Other |
| | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

**Pharaohs GC, Inc.**      represented by   **Edward P. Yankelunas**
HoganWillig
2410 North Forest Road
Suite 301
Getzville, NY 14068
716-636-7600
Fax: 716-636-7606
Email: eyankelunas@hoganwillig.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**United States Small Business Administration**      represented by   **Michael S. Cerrone**
U.S. Attorney's Office
Federal Centre
138 Delaware Avenue
Buffalo, NY 14202
716-843-5851
Fax: 716-551-3196
Email: michael.cerrone@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jovita Carranza**
*in her Official Capacity as Administrator of the Small Business Administration*      represented by   **Michael S. Cerrone**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**United States of America**      represented by   **Michael S. Cerrone**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Steve Mnuchin**      represented by   **Michael S. Cerrone**

*in his Official Capacity as United States Secretary of Treasury*

(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/02/2020 | 1 | COMPLAINT against All Defendants $ 400, filed by Pharaohs GC, Inc.. (Attachments: # 1 Civil Cover Sheet)(Yankelunas, Edward) (Entered: 06/02/2020) |
| 06/02/2020 | 2 | Original Summons Filed. (Yankelunas, Edward) (Entered: 06/02/2020) |
| 06/02/2020 | 3 | Emergency MOTION for Temporary Restraining Order by Pharaohs GC, Inc.. (Attachments: # 1 Affidavit Edward P. Yankelunas, # 2 Exhibit A, # 3 Affidavit Peter G. Gerace, # 4 Exhibit 1, # 5 Affidavit Scott Meacham, # 6 Memorandum in Support, # 7 Text of Proposed Order)(Yankelunas, Edward) (Entered: 06/02/2020) |
| 06/03/2020 | | Case assigned to Hon. Lawrence J. Vilardo. Notification to Chambers of on-line civil case opening. (CGJ) (Entered: 06/03/2020) |
| 06/03/2020 | | AUTOMATIC REFERRAL to Mediation The ADR Plan is available for download at http://www.nywd.uscourts.gov/alternative-dispute-resolution.(CGJ) (Entered: 06/03/2020) |
| 06/03/2020 | | Notice of Availability of Magistrate Judge: A United States Magistrate of this Court is available to conduct all proceedings in this civil action in accordance with 28 U.S.C. 636c and FRCP 73. The Notice, Consent, and Reference of a Civil Action to a Magistrate Judge form (AO-85) is available for download at http://www.uscourts.gov/services-forms/forms. (CGJ) (Entered: 06/03/2020) |
| 06/03/2020 | 4 | Summons Issued as to Jovita Carranza, Steve Mnuchin, United States Small Business Administration and United States of America. (CGJ) (Entered: 06/03/2020) |
| 06/03/2020 | 5 | NOTICE of Appearance by Michael S. Cerrone on behalf of Jovita Carranza, Steve Mnuchin, United States Small Business Administration, United States of America (Cerrone, Michael) (Entered: 06/03/2020) |
| 06/03/2020 | 6 | TEXT ORDER. Telephonic Status Conference set for 6/4/2020 at 11:00 AM in U.S. Courthouse, 2 Niagara Square, Buffalo, NY 14202-3350 before Hon. Lawrence J. Vilardo. Dial-in instructions will be emailed directly to the parties. PLEASE NOTE: The proceeding described herein will be held remotely. Public access to the proceeding can be obtained by viewing Judge Vilardo's calendar on the public website at www.nywd.uscourts.gov, or by contacting Judge Vilardo's chambers at (716) 551-1621. SO ORDERED. Issued by Hon. Lawrence J. Vilardo on 6/3/2020. (CMD) (Entered: 06/03/2020) |
| 06/04/2020 | 7 | Letter filed by United States of America, Jovita Carranza, United States Small Business Administration, Steve Mnuchin as to United States of America, Jovita Carranza, United States Small Business Administration, Steve Mnuchin . (Cerrone, Michael) (Entered: 06/04/2020) |
| 06/04/2020 | 11 | Minute Entry for proceedings held before Hon. Lawrence J. Vilardo: Status Conference/Oral Argument re: 2 Emergency Motion for TRO held on 6/4/2020. Court ordered that this proceeding is not to be recorded, or taped in any way. If someone does record it, they will be found in contempt of court. Parties agree to reserve $345,067.50 in PPP loan guarantee authority, and a stipulation will be submitted to Court. Response to Preliminary Injunction Motion due by 6/15/2020. Reply due by 6/22/2020. Oral Argument set for 6/24/2020 at 1:00 PM in U.S. Courthouse, 2 Niagara Square, Buffalo, NY 14202-3350 before Hon. Lawrence J. Vilardo. A determination as to whether the oral argument |

| | | will be held by ZOOM for Government video conference, or in person, will be made closer to oral argument date. Appearances by teleconference: For plaintiff: Edward P. Yankelunas. For defendants: AUSA Michael Cerrone and Special Litigation Counsel James Gilligan. (Court Reporter Ann M. Sawyer.) (CMD) (Entered: 06/10/2020) |
|---|---|---|
| 06/05/2020 | 8 | TEXT ORDER re 7 Letter, filed by United States Small Business Administration, Jovita Carranza, Steve Mnuchin, United States of America. The Court GRANTS the parties' request to extend the page limit on their forthcoming briefs to 40 pages. SO ORDERED. Issued by Hon. Lawrence J. Vilardo on 6/5/2020. (RFI) (Entered: 06/05/2020) |
| 06/08/2020 | 9 | STIPULATION *and Proposed Order* by Pharaohs GC, Inc.. (Yankelunas, Edward) (Entered: 06/08/2020) |
| 06/10/2020 | 10 | TEXT ORDER re 9 Stipulation filed by Pharaohs GC, Inc., IS HEREBY SO ORDERED. Issued by Hon. Lawrence J. Vilardo on 6/10/2020. (RFI) (Entered: 06/10/2020) |
| 06/10/2020 | 12 | SUMMONS Returned Executed by Pharaohs GC, Inc.. All Defendants. (Attachments: # 1 Affidavit of Service by Mail)(Yankelunas, Edward) (Entered: 06/10/2020) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 06/12/2020 15:48:00 | | | |
| **PACER Login:** | Gglaw0049:4861877:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:20-cv-00665-LJV |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

─────────────────────────────────────────

PHARAOHS GC, INC.

                              Plaintiff,                    20-CV-665

              v.

UNITED STATES SMALL BUSINESS
ADMINISTRATION;

JOVITA CARRANZA, in her Official Capacity
as Administrator of the Small Business Administration;

UNITED STATES OF AMERICA

STEVE MNUCHIN, in his Official Capacity as United
States Secretary of Treasury,

                              Defendants.

─────────────────────────────────────────

### STIPULATION AND [PROPOSED] ORDER

WHEREAS, on May 21, 2020, the above named Plaintiff applied for a loan in the amount

of $345,067.50 under the Payroll Protection Program ("PPP") (15 U.S.C § 636 (a)(36)) created by

the Coronavirus, Aid, Relief, and Economic Security Act (the "CARES Act") (Pub. L. No. 116-

136, 134 Stat. 281 (2020)), from Live Oak Bank of Wilmington, North Carolina, with the aforesaid

loan to be guaranteed by the United States Small Business Administration (the "SBA"),

WHEREAS, the Plaintiff was advised by Live Oak Bank that it is ineligible for a PPP loan

under the terms of 13 C.F.R. § 120.1109p), and

WHEREAS, the Plaintiff brought the above-entitled action and the Plaintiff's Emergency

Motion for a Temporary Restraining Order and Preliminary Injunction filed herein on June 2,

2020, seeking to enjoin application 13 C.F.R. § 120.110(p) as a basis for denying the Plaintiff's

application for a PPP loan,

IT IS HEREBY STIPULATED AND AGREED THAT:

1. In consideration of the Plaintiff's agreement in paragraph 2, below, to withdraw its

request for a temporary restraining order, Defendant SBA hereby agrees to reserve $345,067.50 in

PPP loan guarantee authority authorized under the Paycheck Protection Program and Health Care

Enhancement Act, Pub. L. No. 116-139, 134 Stat. 620 (2020), in order to guarantee the PP Loan

for which the Plaintiff has applied, in the event the Court grants the Plaintiff's motion for a

preliminary injunction, the Plaintiff is otherwise eligible for a PPP loan, and an authorized SBA

lender agrees to extend the Plaintiff a PPP loan.

2. In Consideration of the SBA's agreement to reserve $345,067.50 in PPP loan

guarantee authority as set forth in paragraph 1, above, the Plaintiff hereby withdraws its pending

request for a temporary restraining order. The foregoing is without prejudice to the Plaintiff's

request herein for preliminary and permanent injunctive relief, the right to which are expressly

reserved.

June 8, 2020

HOGANWILLIG, PLLC                                        UNITED STATES
                                                        ATTORNEY'S OFFICE


/s/ Edward P. Yankelunas, Esq.                          /s/ Michael S. Cerrone, Esq.
Edward P. Yankelunas, Esq.                              Michael S. Cerrone, Esq.
Attorneys for Plaintiff                                 Attorneys for Defendants
2410 N. Forest Road, Suite 301                          138 Delaware Avenue
Amherst, NY 14068                                       Buffalo, NY 14202
(716)636-7600                                           (716)843-5841

It is so Ordered.

June ___, 2020

_____

Hon. Lawrence J. Vilardo

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF VERMONT**

Filed & Entered
On Docket
05/08/2020

_____

In re:
     **Springfield Hospital, Inc.,**
        **Debtor-in-Possession.**
_____

     **Chapter 11 Case**
     **# 19-10283**

In re:
     **Springfield Hospital, Inc.,**
        **Plaintiff,**
        **v.**
**Jovita Carranza, in her capacity as**
**Administrator for the U.S. Small**
**Business Administration,**
        **Defendant.**
_____

     **Adversary Proceeding**
     **# 20-01003**

In re:
     **Springfield Medical Care Systems, Inc.,**
        **Debtor-in-Possession.**
_____

     **Chapter 11 Case**
     **# 19-10285**

In re:
     **Springfield Medical Care Systems, Inc.,**
        **Plaintiff,**
        **v.**
**Jovita Carranza, in her capacity as**
**Administrator for the U.S. Small**
**Business Administration,**
        **Defendant.**
_____

     **Adversary Proceeding**
     **# 20-01004**

## ORDER
### CONSOLIDATING TRIAL ON THE MERITS WITH PRELIMINARY INJUNCTION HEARING, DETERMINING COURT WILL HOLD A JOINT TRIAL ON THE MERITS OF PLAINTIFFS' § 525(A) CLAIMS, EXTENDING SMCS TRO AND DIRECTING SMCS TO FILE PROPOSED ORDER, PROVIDING OPPORTUNITY FOR SMCS AND SBA TO FILE REPORTS IN LIEU OF STATUS HEARING, AND SETTING SCHEDULE FOR TRIAL OF § 525(A) CLAIMS IN ADVERSARY PROCEEDINGS

The Court has entered a temporary restraining order ("TRO") in each of these adversary

proceedings, based on the Plaintiffs' §525(a) claims (AP # 20-1003, doc. # 19; AP # 20-1004, doc. # 18,

the "TRO Orders"). On May 7, 2020, the Court held a status hearing on the request of Plaintiff

Springfield Hospital ("SH") for a preliminary injunction, at which counsel for SH, Plaintiff Springfield

Medical Care Systems ("SMCS"), the Defendant, and creditor Berkshire Bank appeared.

1

The Court enters this Order to memorialize and expand upon the rulings it announced at that hearing.

### *Consolidating Trial on Merits with Preliminary Injunction Hearing*

As the Court indicated at that status hearing, given the urgency of the issues raised in these two adversary proceedings and the limited facts at issue, IT IS HEREBY ORDERED the Court will advance the trial on the merits and consolidate it with the preliminary injunction hearing in these proceedings, under Fed. R. Civ. P. 65(a)(2), see Fed. R. Bankr. P. 7065.

### *Conducting a Joint Trial on Merits of the Plaintiffs' § 525(a) Claims*

Since the pleadings and other papers filed by the Plaintiffs and the Defendant in these two adversary proceedings involve common, and significantly overlapping, questions of law and fact, IT IS HEREBY ORDERED the Court will conduct a joint trial on the merits of the Plaintiffs' complaints, to the extent a trial of fact is necessary, under Fed. R. Civ. P. 42(a)(1), see Fed. R. Bankr. P. 7042.

To expedite and economize the litigation in these proceedings, the Court finds there is good cause to address first the issue on which there is the narrowest basis for dispute between the parties, as the Court did in the TRO Orders, namely the Plaintiffs' claims under § 525(a). Therefore, IT IS FURTHER ORDERED the Court will bifurcate the trial and try first the Plaintiffs' § 525(a) claims, under Fed. R. Civ. P. 42(b), see Fed. R. Bankr. P. 7042.

### *Extending the TRO in SMCS Adversary Proceeding and Directing SMCS to File Proposed Order*

At the May 7th status hearing, the Court modified the initial TRO in the SH proceeding to be in effect for 14 days, and then extended it for an additional 14 days, for a total of 28 days from the date the initial TRO was issued. The Court directed SH to file a proposed order to that effect, and to include a provision extending certain lender deadlines, as memorialized in the audio record of the hearing.

For the same reasons set forth at that hearing, IT IS HEREBY ORDERED the initial TRO in the SMCS proceeding is modified to be in effect for 14 days, and extended for an additional 14 days, for a total of 28 days from the date the initial TRO was issued.

IT IS FURTHER ORDERED that SMCS shall file a proposed order to that effect and may include the same provision regarding lender deadlines as the Court authorized in the SH proceeding.

2

*Providing SMCS and SBA the Opportunity to File Reports in Lieu of Appear at May 12th Status Hearing*

There is a status hearing set in the SMCS adversary proceeding at **10:00 a.m. on Tuesday, May 12, 2020**, for SMCS and SBA to report on the steps each has taken to implement the terms of the TRO Order, and other information, as detailed in the TRO in that proceeding (see AP # 20-1004, doc. # 18, p. 6). In light of the detailed record created at the SH status hearing, the Court finds it may not be necessary to hold a status hearing in the SMCS proceeding to address the identical issues the Court decided at the SH hearing, unless SMCS and SBA have additional or different questions to raise.

Accordingly, IT IS HEREBY ORDERED if, **by Monday, May 11, 2020, at 10:00 a.m.**, Plaintiff SMCS and the Defendant determine there is no need for the status hearing in the SMCS proceeding, and file either separate status reports or a joint status report on the matters detailed in the TRO (doc. # 18, p. 6), and Plaintiff SMCS files a proposed order as set forth above, the parties may include in their reports (or stipulated report) a request that the Court cancel the May 12th status hearing in the SMCS proceeding.

*Schedule for Trial of § 525(a) Claims in These Two Adversary Proceedings*

Based on the above, IT IS FURTHER ORDERED the following schedule shall govern trial of the Plaintiffs' § 525(a) claims in these two adversary proceedings:

1. **By Thursday, May 14, 2020**, the parties shall file any factual affidavits or other declarations they wish the Court to consider as facts material to the § 525(a) claims.

2. **By Monday, May 18, 2020, at 10:00 a.m.**, the parties shall file statements identifying any material facts each believes to be in dispute regarding the § 525(a) claims (or a joint stipulation if they agree on the list of material facts in dispute with respect to this claim).

3. **On Tuesday, May 19, 2020, at 9:45 a.m.**, the Court will hold a telephonic joint status conference in these proceedings, at which time the Court will issue a ruling determining which, if any, material facts are in dispute, and whether a trial is necessary on the § 525(a) claims.

4. **By Thursday, May 21, 2020, at 12:00 p.m. (noon)**, the parties shall file any supplemental memoranda of law they wish the Court to consider in connection with the § 525(a) claims.

5. If the Court determines a trial of fact is necessary on the Plaintiffs' § 525(a) claims, the trial will be held, by Zoom, **on Friday, May 22, 2020, at 9:00 a.m.**

SO ORDERED.

May 8, 2020                                             Colleen A. Brown
Rutland, Vermont                                       United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

ROMAN CATHOLIC CHURCH OF THE
ARCHDIOCESE OF SANTA FE,                                    No. 18-13027 t11

     Debtor.

ROMAN CATHOLIC CHURCH OF THE
ARCHDIOCESE OF SANTA FE,

     Plaintiff,

v.                                                         Adv. No. 20-1026 t

UNITED STATES OF AMERICA
SMALL BUSINESS ADMINISTRATION,

     Defendant.

## **FINAL JUDGMENT**

For the reasons set forth in the opinion entered herewith, it is hereby ORDERED, ADJUDGED AND DECREED:

1.     Pursuant to 5 U.S.C. § 706(2)(A), the Court holds unlawful Defendant's exclusion of Plaintiff from eligibility to participate in the Paycheck Protection Program (the "PPP"), enacted as part of the Coronavirus Aid, Relief, and Economic Security Act, H.R. 748, P.L. 115-136in that the exclusion is arbitrary and capricious.

2.     Pursuant to 5 U.S.C. § 706(2)(C), the Court holds unlawful Defendant's exclusion of Plaintiff from eligibility to participate in the PPP in that the exclusion is in excess of Defendant's statutory jurisdiction, authority, or limitations or short of statutory right.

3.     The Court declares that Defendant's attempt to exclude Plaintiff from the PPP solely on the ground that Plaintiff is a chapter 11 debtor-in-possession violates 11 U.S.C. § 525(a).

4.      Pursuant to 5 U.S.C. § 706(1), the Court hereby compels Defendant to act on Plaintiff's PPP loan application forthwith without regard to Plaintiff's status as a chapter 11 debtor in possession.

5.      If Defendant's actions, whether taken heretofore or in the future, are the proximate cause of Plaintiff losing its requested $900,000 in PPP funds, Plaintiff may file an adversary proceeding against Defendant for compensatory and, if appropriate, punitive damages.

_____
Hon. David T. Thuma
United States Bankruptcy Judge


Entered: May 1, 2020
Copies to: counsel of record

# Notice Recipients

| | | |
|---|---|---|
| District/Off: 1084−1 | User: admin | Date Created: 5/1/2020 |
| Case: 20−01026−t | Form ID: pdfor1 | Total: 4 |

**Recipients of Notice of Electronic Filing:**

aty     Kevin VanLandingham     kevin.p.vanlandingham@usdoj.gov
aty     Thomas D Walker     twalker@walkerlawpc.com

                                                                                    TOTAL: 2

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

pla     Roman Catholic Church of the Archdiocese of Santa Fe          4000 St. Josephs Place NW          Albuquerque, NM
        87120
ust     United States Trustee     PO Box 608     Albuquerque, NM 87103−0608

                                                                                    TOTAL: 2

ORDERED.

**Dated:  June 08, 2020**

Michael G. Williamson
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                    Case No. 8:19-bk-04971-MGW
                                          Chapter 11
Gateway Radiology Consultants, P.A.,

     Debtor.

_____/

Gateway Radiology Consultants, P.A.,        Adv. No. 8:20-ap-00330-MGW

     Plaintiff,

v.

Jovita Carranza, in her capacity as
Administrator for the U.S. Small
Business Administration, et al.,

     Defendants.

_____/

## MEMORANDUM OPINION ON CHAPTER 11 DEBTOR'S ELIGIBLITY FOR PAYCHECK PROTECTION PROGRAM LOANS

Because of the economic uncertainty caused by COVID-19, more than 20

million Americans have lost their jobs. To keep American workers employed, and to

make sure they get paid, Congress passed the CARES Act, the largest stimulus

package in history. At the heart of the CARES Act is the Paycheck Protection

Program, which provides hundreds of billions of dollars in funding to small

businesses to cover payroll, mortgage interest, rent, and utility costs.

Although referred to as PPP "loans," the Paycheck Protection Program

functions like a grant. So long as a PPP borrower uses the "loan" for covered

expenses (payroll, mortgage interest, rent, and utilities) the entire "loan" is forgiven.

Because the loans are designed to be forgiven, both Congress and the SBA

Administrator have dispensed with the underwriting typically required for SBA

loans.

Even so, the SBA has promulgated a rule disqualifying debtors from

participating in the Paycheck Protection Program because they supposedly pose an

unacceptably high risk of using PPP "loans" for noncovered expenses, as well as an

unacceptably high risk of not repaying any unforgiven amounts. Gateway Radiology

Consultants, P.A., a chapter 11 debtor, asks the Court to enjoin the SBA

Administrator from disqualifying it from participating in the Paycheck Protection

Program.

The Court concludes that the SBA Administrator exceeded her authority when

she promulgated the rule disqualifying Gateway Radiology from the Paycheck

Protection Program. In order for a borrower to be eligible for a PPP Loan, Congress

could have required borrowers to certify that they are not in bankruptcy. But

Congress chose not to. By engrafting onto the Paycheck Protection Program a

2

requirement that Congress chose not to insist on, the SBA Administrator exceeded her statutory authority.

Even if the SBA Administrator had not exceeded her authority, the rule disqualifying Gateway Radiology from participating in the Paycheck Protection Program is arbitrary and capricious because:

- the SBA Administrator considered factors Congress did not intend her to consider (i.e., collectability);

- the SBA Administrator failed to consider an important aspect of the problem (i.e., how the bankruptcy process promotes the same public policy as the CARES Act and how it makes it unlikely a chapter 11 debtor will use a PPP "loan" for noncovered expenses); and

- the SBA Administrator's explanation for her rule is contrary to the evidence before her (i.e., chapter 11 debtors are less likely to use PPP "loans" for noncovered expenses and more likely to repay PPP "loans").

The Court will therefore enjoin the SBA Administrator from disqualifying Gateway Radiology from participating in the Payroll Protection Program.

## I.    BACKGROUND[1]

### A.    COVID-19 caused the loss of more than 20 million jobs and threatened the loss of millions more.

On March 13, 2020, the President declared a national emergency.[2] Just three months earlier, Chinese officials detected an outbreak of a novel strain of coronavirus (known as COVID-19) in Wuhan, China.[3] The disease quickly spread to the United States and other countries. By mid-March, when the President declared a national emergency, the United States had almost 2,000 confirmed COVID-19 cases,[4] and the disease's rapid spread—thousands of new cases were being reported each day—was threatening to strain the nation's healthcare system.[5]

---

[1] The background section of this opinion recounts the fallout from the COVID-19 pandemic. Under Federal Rule of Evidence 201, the Court may, on its own, take judicial notice of facts that are generally known within its territorial jurisdiction or facts that can accurately and readily be determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b), (c). That includes publicly available data, such as labor statistics. *Tuttle v. Educ. Credit Mgmt. Corp. (In re Tuttle)*, 600 B.R. 783, 806 (E.D. Wis. 2019). It can also include other statistics compiled by government agencies, such as the number of COVID-19 cases when the parties don't dispute the number (or, if they do, the existence of publications containing the number of cases) and public statements about COVID-19, such as the President's declaration of a national emergency. *McGhee v. City of Flagstaff*, 2020 WL 2309881, at *3 – 4 (D. Ariz. May 8, 2020).

[2] https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

[3] https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/q-a-coronaviruses.

[4] https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

[5] https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

To keep our country's healthcare system from being overwhelmed, and to stem the tide of what had become a global pandemic, the United States started implementing social distancing measures. Those measures included statewide Stay-at-Home orders; closing schools; closing non-essential businesses; banning large gatherings; and limiting restaurants to takeout or delivery.[6] While necessary to "flatten the curve,"[7] the social distancing measures came with a cost.

Personal consumption in March 2020 fell by 7.5%—the largest recorded drop in history.[8] And nonfarm employment dropped by almost 900,000 jobs, before plummeting by more than 20 million jobs in April.[9] Those job losses were widespread: the leisure and hospitality industry lost 7.7 million jobs (almost half the industry), while the education and health services industry; the professional and business services industry; and the retail trade industry each lost more than 2 million

---

[6] https://www.kff.org/health-costs/issue-brief/state-data-and-policy-actions-to-address-coronavirus/.

[7] "The term "flatten the curve," originating from the Centers for Disease Control and Prevention, has been used widely to describe the effects of social distancing interventions." Laura Matrajt & Tiffany Leung, *Evaluating the Effectiveness of Social Distancing Interventions to Delay or Flatten the Epidemic Curve of Coronavirus Disease*, Emerging Infectious Diseases, August 2020, *available at* https://wwwnc.cdc.gov/eid/article/26/8/20-1093_article#r26.

[8] https://www.bea.gov/news/2020/personal-income-and-outlays-march-2020; *see also* Carlie Porterfield, *U.S. Consumer Spending Sees Sharpest Monthly Drop Ever Recorded*, Forbes, Apr. 30, 2020, *available at* https://www.forbes.com/sites/carlieporterfield/2020/04/30/us-consumer-spending-sees-sharpest-monthly-drop-ever-recorded/#469a619420da ("Consumer spending—which drives around 70% of the U.S. economy—dropped by 7.5% in March, the steepest drop in history since records began being kept in 1959 according to the U.S. Commerce Department, as businesses close, layoffs abound and Americans shelter-in-place during the coronavirus pandemic").

[9] https://www.bls.gov/news.release/empsit.nr0.htm.

jobs.[10] As a result, the unemployment rate skyrocketed from 4.4% to 14.7%—the largest single-month increase in history.[11]

### B. Congress provided nearly $350 billion in funding for forgivable loans so small businesses could make payroll.

To provide emergency relief to American workers and small businesses, Congress passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act").[12] Although the CARES Act was intended, in part, to help American workers who had already lost their job, much of the $2 trillion in relief provided for under the CARES Act was intended to preserve American jobs.[13] Two of the ways it did so are relevant here.

First, as part of a $454 billion relief package, Congress directed the Treasury Department to provide financing to lenders who make direct loans to mid-size businesses (businesses with between 500 and 10,000 employees).[14] In exchange for

---

[10] https://www.bls.gov/news.release/empsit.nr0.htm.

[11] https://www.bls.gov/news.release/empsit.nr0.htm.

[12] Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020).

[13] *Id.* at §§ 1102, 4003; *see also* 166 Cong. Rec. E349-04 (daily ed. Mar. 27, 2020) (speech of Rep. McHenry) ("My ultimate goal for this legislation is to keep Americans employed. Specifically, this bill will provide relief to our small businesses to help them keep employees on payroll and prepare those businesses to be up and running as soon as America is open for business again"); 166 Cong. Rec. E339-01 (daily ed. Mar. 27, 2020) (speech of Rep. Jayapal) ("One of the most important things I heard from my district was the pain and suffering of small business owners and non-profits of all sizes. The CARES Act creates a Payment Protection Program that helps businesses keep workers on payroll, through $350 billion in forgivable loans that can also be used for payroll, rent, utilities, and other necessary costs that will help small businesses weather the crisis.").

[14] CARES Act, Pub. L. No. 116-136, § 4003(b)(4), 134 Stat. 281 (2020) (to be codified at 15 U.S.C. § 9042).

favorable repayment terms, borrowers have to agree to retain or restore 90% of their

workforce.[15] To be eligible for the mid-size loan program, a borrower has to certify

(among other things) that it is not a debtor in bankruptcy.[16]

Second, for small businesses (those with 500 employees or fewer), Congress

initially provided $349 billion in funding for the Paycheck Protection Program.[17]

Under the Paycheck Protection Program, eligible small businesses can borrow up to

two and a half times their average monthly payroll.[18] The loan proceeds can be used

to pay:

- payroll costs;
- group health benefits and insurance premiums; and
- mortgage interest, rent, and utilities.[19]

Although the Paycheck Protection Program refers to the financing as a "loan,"

in all respects it operates as a grant. That's because the Paycheck Protection Program

provides generous loan forgiveness: if the borrower uses the loan proceeds for payroll

---

[15] *Id.* at § 4003(c)(3)(D).

[16] *Id.* at § 4003(c)(3)(D)(i)(V).

[17] *Id.* at §§ 1102, 1107; *see also DV Diamond Club of Flint, LLC v. U.S. SBA*, 2020 WL 2315880, at *3 (E.D. Mich. May 11, 2020) ("The SBA quickly exhausted the initial $349 billion in loan guarantees, and Congress then appropriated an additional $310 billion for loan guarantees under the PPP.") (citing The Paycheck Protection and Health Care Enhancement Act, Pub. L. No. 116-139, 134 Stat. 620, § 101(a)(1)." *Id.*

[18] 15 U.S.C. § 636(a)(36)(E).

[19] 15 U.S.C. § 636(a)(36)(F)(i). The proceeds can also be used to pay interest on certain debt obligations incurred before February 15, 2020. *Id.*

and other approved expenses (referred to as "covered expenses"), the entire loan will be forgiven.[20]

Congress imposed few requirements on borrowers and lenders participating in the Paycheck Protection Program. To be eligible for a PPP Loan, a borrower need only be a small business concern or a nonprofit organization, veterans organization, or Tribal business concern with fewer than 500 employees.[21] When applying for a PPP Loan, a borrower must also certify that:

- because of the economic uncertainty caused by COVID-19, the business needs the PPP Loan for its ongoing operations;
- the business will use the PPP Loan proceeds to retain workers and maintain payroll or make mortgage interest, lease, and utility payments; and
- between February 15, 2020 and December 31, 2020, the business has not and will not receive another PPP Loan.[22]

Unlike it does for the mid-size loan program, the CARES Act does not require a small business applying for a PPP Loan to certify that it is not a debtor in bankruptcy.

In deciding whether to approve a PPP Loan, SBA lenders need only consider two criteria: (1) Was the borrower operating on February 15, 2020?; and (2) Did the employer have employees for whom it paid salaries and payroll taxes (or did it have

---

[20] CARES Act, Pub. L. No. 116-136, § 1106, 134 Stat. 281 (2020) (to be codified at 15 U.S.C. § 9005). The bulk of the loan proceeds, though, must be used for payroll: no more than 25% of the amount forgiven may be for non-payroll expenses.

[21] 15 U.S.C. § 636(D).

[22] 15 U.S.C. § 636(G)(i)(I) – (IV).

paid independent contractors)?[23] Congress did not direct SBA lenders, to whom

Congress delegated the SBA Administrator's authority to make and approve PPP

Loans, to consider whether a borrower was in bankruptcy.[24]

### C.    Congress authorizes the Small Business Administration to implement the Paycheck Protection Program.

More than 65 years ago, Congress created the Small Business Administration

to aid, assist, and protect the interests of small businesses.[25] Because the country's

security and economic well-being hinges on maximizing the potential of small

businesses,[26] Congress has committed to using all reasonable means to create and

sustain programs that promote investment in small businesses—including

investments that expand employment opportunities.[27]

This is mainly accomplished by the SBA providing financial assistance to

small businesses—in the form of direct loans, joint loans with a lender, or loan

guarantees—under § 7(a) of the Small Business Act. Under § 7(a), loans must be of

"such sound value or so secured as reasonably to assure repayment."[28]

---

[23] 15 U.S.C. § 636(F)(ii)(II).

[24] *Id.*

[25] 15 U.S.C. § 631(a) (declaring that "[i]t is the declared policy of the Congress that the Government should aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns in order to preserve free competitive enterprise").

[26] *Id.*

[27] 15 U.S.C. § 631a(b).

[28] 15 U.S.C. § 636(a)(6).

To determine whether a loan is sound, the SBA ordinarily considers the following criteria set forth in 13 C.F.R. § 120.150: the applicant's character, reputation, and credit history; the experience and depth of management; the strength of the business; past earnings, projected cash flow, and future prospects; the ability to repay the loan with business earnings; whether the business has sufficient equity to operate on a sound basis; the potential for long-term success; and the nature and value of collateral securing the loan.[29]

When Congress passed the CARES Act, it placed the Paycheck Protection Program under § 7(a) of the Small Business Act and authorized the Administrator to issue regulations to carry out the Paycheck Protection Program.[30]

## D. The SBA Administrator's interim final rule clarified that PPP Loans do not require underwriting.

On April 15, 2020, the Administrator promulgated an interim final rule for the Paycheck Protection Program. As you might expect in the case in which a loan is designed to be forgiven, the SBA's interim final rule clarified that its normal underwriting guidelines have gone by the wayside for PPP Loans:

> [F]or loans made under the PPP, SBA will not require the lenders to comply with section 120.150.[31]

---

[29] 13 C.F.R. § 120.150.

[30] CARES Act, Pub. L. No. 116-136, § 1102(a), 134 Stat. 281 (2020).

[31] Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20,811, 20,812 (Apr. 15, 2020) (to be codified at 13 C.F.R. pt. 120).

10

Under the SBA's interim final rule, lenders need only do five things to underwrite a PPP Loan: (1) confirm receipt of the borrower's certifications; (2) confirm receipt of information showing that a borrower had employees for whom the employer paid salaries and payroll taxes; (3) confirm the dollar amount of the business' average monthly payroll costs; (4) follow Bank Secrecy Act requirements; and (5) review the "Paycheck Protection Application Form."[32] That's it.

The interim final rule also confirmed the CARES Act's minimal certification requirements for PPP Loans. Like the CARES Act, the SBA's interim rule did not require borrowers to certify that they were not involved in a bankruptcy case.

### E.    The SBA decides that debtors are ineligible for PPP Loans.

On April 28, 2020, the SBA issued another interim final rule supplementing its previous one ("Supplemental Rule"). In the Supplemental Rule, the SBA declared for the first time that debtors in bankruptcy are ineligible for PPP Loans.[33] The SBA's meager justification for the Supplemental Rule's new eligibility requirement was that debtors are more likely to use a PPP Loan for noncovered expenses and less likely to be able to repay an unforgiven loan:

> The Administrator, in consultation with the Secretary, determined that providing PPP loans to debtors in bankruptcy would present an unacceptably high risk of an unauthorized use of funds or non-repayment of unforgiven

---

[32] *Id.* at 20,815.

[33] Business Loan Program Temporary Changes; Paycheck Protection Program—Requirements—Promissory Notes, Authorization, Affiliation, and Eligibility, 85 Fed. Reg. 23450, 23,451 (Apr. 28, 2020) (to be codified at 13 C.F.R. pts. 120 and 121).

loans. In addition, the Bankruptcy Code does not require
any person to make a loan or a financial accommodation
to a debtor in bankruptcy. . . .[34]

## F.    Even though Gateway Radiology is in bankruptcy, its PPP Loan Application was approved.

Gateway Radiology Consultants operates an outpatient imaging, diagnostic, and interventional radiology center in St. Petersburg, Florida.[35] In May 2019, Gateway Radiology was forced into chapter 11 bankruptcy because of a failed expansion in Lake Wales, which snowballed into litigation with its medical equipment supplier, as well as its primary lender. A year after filing for bankruptcy, Gateway Radiology applied online for a PPP Loan through USF Federal Credit Union.

The first question on the PPP Loan application asked whether Gateway Radiology was in bankruptcy. Gateway Radiology claims it answered "yes." But Gateway Radiology says when it received a hard copy of its PPP Loan application to sign, it discovered the answer to the first question had been changed to "no." It says the Credit Union admitted that one of its employees had to "upload the application," with the implication being a Credit Union employee changed the answer to Question No. 1. For its part, the Credit Union provided an audit summary that appears to

---

[34] *Id.*

[35] Doc. No. 2 at 1 – 2.

show that Gateway Radiology incorrectly answered that it was not involved in a

bankruptcy proceeding.[36]

The Court need not decide whether Gateway Radiology truthfully answered

Question No. 1. It's irrelevant to the ultimate issue this Court must decide. Suffice it

to say the Credit Union approved Gateway Radiology's PPP Loan application in the

amount of $527,710 based on its mistaken understanding that Gateway Radiology

was not in bankruptcy.

### G.    The SBA objects to Gateway Radiology's PPP Loan.

Two weeks later, Gateway Radiology asked the Court to approve the PPP

Loan under Bankruptcy Code § 364, which requires a debtor to obtain court approval

of postpetition financing outside the ordinary course of business.[37] In its postpetition

financing motion, Gateway Radiology explained that it needs the PPP Loan

proceeds to fund its operations. Gateway Radiology represented that it intended to

use the loan proceeds for covered—i.e., forgivable—expenses.[38]

Although the SBA did not object to Gateway Radiology applying for a PPP

Loan or otherwise obtaining postpetition financing, it did object to the entry of any

order finding that Gateway Radiology is eligible to participate in the Paycheck

Protection Program, that the loan approved by the Credit Union is entitled to loan

---

[36] Adv. Doc. No. 9-1.

[37] 11 U.S.C. § 364.

[38] Doc. No. 238 at ¶ 9.

forgiveness, or that the SBA is required to guarantee the loan.[39] According to the

SBA Administrator, the Supplemental Rule bars Gateway Radiology from obtaining

a PPP Loan because Gateway Radiology is a debtor in bankruptcy.

## II.    CONCLUSIONS OF LAW

Gateway Radiology filed this proceeding seeking a declaration that the

Supplemental Rule is unenforceable for three reasons: First, Gateway Radiology

contends that the SBA Administrator exceeded her authority in promulgating the

Supplemental Rule.[40] Second, even if the SBA Administrator did not exceed her

authority, Gateway Radiology contends that the Supplemental Rule is arbitrary and

capricious.[41] Third, Gateway Radiology contends that the Supplemental Rule

violates Bankruptcy Code § 525, which generally forbids a governmental entity from

discriminating against a person because the person is a debtor in bankruptcy.[42]

Because it contends that the Supplemental Rule is unenforceable, Gateway

Radiology asks the Court to enjoin the SBA Administrator from enforcing the

Supplemental Rule to the extent that it disqualifies Gateway Radiology from

obtaining PPP Loans.[43]

---

[39] Doc. No. 249.

[40] Adv. Doc. No. 3 at ¶¶ 13, 29.

[41] *Id.* at ¶¶ 13.

[42] *Id.* at ¶¶ 19 – 21.

[43] *Id.* at ¶¶ 29.

The SBA Administrator maintains that injunctive relief is inappropriate for two reasons.[44] First, as a threshold matter, the SBA Administrator says sovereign immunity bars this Court from enjoining her from enforcing the Supplemental Rule. Second, the SBA Administrator says Gateway Radiology cannot show a substantial likelihood of success on the merits of its claims; that it will suffer irreparable harm if the Court does not enjoin the SBA Administrator from enforcing the Supplemental Rule; or that enjoining enforcement of the Supplemental Rule would promote the public interest. The Court disagrees.

### A.    Sovereign immunity does not bar this Court from enjoining the SBA Administrator from enforcing the Supplemental Rule.

There is no question that when Congress created the SBA, it waived sovereign immunity so that the SBA "could sue and be sued."[45] But there was a caveat: even though Congress provided that the SBA could sue or be sued, 15 U.S.C. § 634(b)(1)

---

[44] The SBA also raises a third reason—lack of standing. According to the SBA Administrator, Gateway Radiology merely seeks an order requiring her to find that Gateway Radiology cannot be excluded from the Paycheck Protection Program. Because the Credit Union has approved the loan, Gateway Radiology has not been excluded from the Paycheck Protection Program. Thus, the SBA Administrator reasons, Gateway Radiology has suffered no injury-in-fact. That argument borders on frivolous. The loan that was approved is eligible for loan forgiveness and is guaranteed by the SBA. Unless the SBA Administrator is willing to stipulate that Gateway Radiology's PPP Loan is guaranteed by the SBA and eligible for loan forgiveness, which so far she has been unwilling to do, then the Credit Union will not unfreeze the loan proceeds. It is self-evident, then, that Gateway Radiology has suffered an injury-in-fact. The SBA Administrator's standing argument deserves no further discussion.

[45] 15 U.S.C. § 634(b)(1) (providing that "[i]n the performance of, and with respect to, the functions, powers, and duties vested in [her] by this chapter the Administrator may . . . sue and be sued in any court of record of a State having general jurisdiction, or in any United States district court, and jurisdiction is conferred upon such district court to determine such controversies without regard to the amount in controversy").

provides that "no attachment, *injunction*, garnishment, or other similar process . . .
shall be issued against the Administrator."[46]

At first glance, § 634(b)(1) appears plain and unambiguous. "No injunction"
means no injunction. And many courts have read § 634(b)(1) that way.[47] But that
view is far from universal.[48] Indeed, courts are split over whether the scope of the
"no injunction" language in § 634(b)(1). Some courts hold that § 634(b)(1) bars
injunctions in all circumstances, while other courts hold that § 634(b)(1) does not bar
a court from enjoining an agency that has exceeded its statutory authority.[49]

So far, the Eleventh Circuit has not weighed in on the debate. But, according
to the SBA, the Fifth Circuit has twice held—first in *Romeo v. U.S.*[50] and later in

---

[46] *Id.* (emphasis added).

[47] *Ulstein Maritime, Ltd. v. U.S.*, 833 F.2d 1052, 1056 (1st Cir. 1987) ("Some courts have read the
wording in this way, and concluded that all injunctive relief directed at the SBA is absolutely
prohibited.") (citing *Valley Constr. Co. v. Marsh,* 714 F.2d 26, 29 (5th Cir. 1983); *Mar v. Kleppe,* 520 F.2d
867, 869 (10th Cir. 1975); *Romeo v. United States,* 462 F.2d 1036, 1038 (5th Cir. 1972), *cert. denied,* 410
U.S. 928 (1973); *Expedient Servs., Inc. v. Weaver,* 614 F.2d 56, 58 (5th Cir. 1980); *Jets Servs., Inc. v.
Hoffman,* 420 F. Supp. 1300, 1308–09 (M.D. Fla. 1976)).

[48] *Ulstein Maritime,* 833 F.2d at 1056 ("However, other courts have found that § 634(b)(1) does not bar
injunctions in all circumstances.") (citing *Cavalier Clothes v. United States,* 810 F.2d 1108, 1112 (Fed.
Cir. 1987); *Okla. Aerotronics v. United States,* 661 F.2d 976, 977 (D.C. Cir. 1981); *Related Indus. v. United
States,* 2 Cl. Ct. 517, 522 (1983); *Dubrow v. SBA,* 345 F. Supp. 4, 7 (C.D. Cal. 1972)).

[49] *DV Diamond Club of Flint, LLC v. U.S. SBA,* 2020 WL 2315880, at *3 – 4 (E.D. Mich. May 11,
2020) (ruling that the "Court is persuaded that injunctive relief is available to Plaintiffs" because
"Plaintiffs here seek only to 'set aside unlawful agency action'"); *Camelot Banquet Rooms, Inc. v. U.S.
SBA,* 2020 WL 2088637, at *3 – 4 (E.D. Wis. May 1, 2020); *see also Elks Assocs. Funding Corp. v. U.S.
SBA,* 858 F. Supp. 2d 1, 20 (explaining that courts in the D.C. Circuit "have strongly intimated that
injunctive relief is available, at a minimum, when the SBA exceeds its statutory authority").

[50] 462 F.2d 1036, 1038 (5th Cir. 1972).

*Expedient Services, Inc. v. Weaver*[51]—that § 634(b)(1) bars plaintiffs from suing the SBA for injunctive relief. Because *Romeo* and *Expedient Services* were both decided before October 1, 1981, those decisions would be binding on this Court under *Bonner v. City of Prichard, Alabama*, which held that Fifth Circuit cases decided before October 1, 1981 are binding on the Eleventh Circuit.[52]

While *Romeo* and *Expedient Services* are binding precedent, neither decided the narrow issue here: does § 634(b)(1) bar a court from enjoining an agency from exceeding its statutory authority? In fact, the *Expedient Services* Court acknowledged it sidestepped that issue:

> As pointed out by the plaintiff, there are some decisions indicating that injunctive relief against the Administrator may be available when he exceeds his authority. *However, it is not necessary for us to decide this issue* because the Administrator clearly did not exceed his authority under 15 U.S.C. § 637(a).[53]

Thus, this Court is not bound by *Romeo* and *Expedient Services*.

---

[51] 614 F.2d 56, 58 (5th Cir. 1980).

[52] 661 F.2d 1206, 1209 (11th Cir. 1981) ("To decide this case, and later Eleventh Circuit cases, we must decide whether this court shall adopt some established body of law as its body of precedent, and if so, effective as of its coming into existence, what established body of law will be chosen. For several reasons we choose the decisions of the United States Court of Appeals for the Fifth Circuit, as that court existed on September 30, 1981, handed down by that court prior to close of business on that date. We consider that body of law worthy for governance of legal affairs within the jurisdiction of this new circuit.") (footnote omitted).

[53] *Expedient Servs.*, 614 F.2d at 58 n.2 (citations omitted) (emphasis added).

Writing on a clean slate, this Court concludes that § 634(b)(1) does not bar this Court from enjoining the SBA Administrator from exceeding her statutory authority for two reasons.

First, § 634's legislative history confirms that Congress did not intend the statute to have such a broad scope. The First Circuit, in *Ulstein Maritime, Ltd. v. United States*, did yeoman's work tracing the origin of § 634(b)(1)'s "no injunction" language back 80 years to the Supreme Court's decision in *Federal Housing Administration v. Burr*.[54]

There, the Supreme Court considered whether an employee could garnish the FHA to collect on a judgment for unpaid wages.[55] At the time, the National Housing Act provided that the FHA Administrator was authorized "to sue and be sued in any court of competent jurisdiction."[56] "Sue and be sued," the Supreme Court said, must be given its ordinary meaning, which would "embrace all civil process," including garnishments.[57] Because Congress had established an agency, authorized it to engage in commercial transactions, and permitted it to sue or be sued, the Supreme Court

---

[54] 833 F.2d 1052, 1056 (1st Cir. 1987) (explaining that the "origin and purpose of the language in § 634(b)(1) goes back to the decision in *FHA v. Burr*").

[55] *FHA v. Burr*, 309 U.S. 242, 243 (1940) ("The question presented here is whether the Federal Housing Administration is subject to garnishment for moneys due to an employee.").

[56] *Id.* at 244 (explaining that Congress amended the National Housing Act in 1935 by "by adding thereto the provision that 'The Administrator shall, in carrying out the provisions of this title and titles II and III, be authorized, in his official capacity, to sue and be sued in any court of competent jurisdiction, State or Federal.'").

[57] *Id.* at 245.

18

was unwilling to assume Congress implicitly limited the meaning of "sue and be sued" to preclude garnishments.[58] Had Congress intended to prohibit the FHA from being garnished, the Supreme Court reasoned, Congress would have said so.

After *Burr*, Congress added language like that found in § 634(b)(1)—language barring attachment, injunctions, garnishments, and other similar process—to enabling statutes for other agencies.[59] The legislative history for these other statutes— for example, ones creating the Federal Crop Insurance Corporation and Commodity Credit Corporation—clarifies that Congress added the language to prevent creditors and others from interfering with an agency's operations by suing the agency and then attaching its funds.[60] As the First Circuit points out, there is no indication Congress intended to give the SBA any broader immunity than it did to other agencies.[61]

Second, it would have been absurd for Congress to have intended to bar courts from enjoining agencies that have exceeded their statutory authority. Were that the case, courts would be powerless to stop a constitutional violation:

> [Section 634(b)(1)] was not intended to render the agency immune from injunctive relief in situations where the agency has exceeded its statutory authority and where an

---

[58] *Id.*

[59] *Ulstein Maritime, Ltd. v. U.S.*, 833 F.2d 1052, 1056 (1st Cir. 1987) (explaining that "language such as that in § 634(b)(1) was added to enabling statutes to bar the attachment of agency funds and other interference with agency functioning").

[60] *Id.* ("While the specific legislative history of § 634(b)(1) is silent on the purpose of this language, the legislative history of earlier statutes containing the identical wording indicates that it was intended to keep creditors or others suing the government from hindering and obstructing agency operations through mechanisms such as attachment of funds.").

[61] *Id.* at 1057.

19

injunction would not interfere with the agency's internal operations. Indeed, if provisions such as § 634(b)(1) meant that the agency could never be enjoined, then an agency could adopt unconstitutional policies and continue to follow them even after a court declared them unconstitutional. For example, the SBA could adopt a policy stating that it will extend small business loans only to companies owned by white men. If § 634(b)(1) means that the SBA may never be enjoined, then a court could not enjoin this policy, even though it would be blatantly unconstitutional.[62]

The Supreme Court has instructed courts to avoid interpreting statutes in a way that would produce absurd results if there is an alternative interpretation that is consistent with the legislative purpose.[63] Here, there is an interpretation of § 634(b)(1) that is consistent with the legislative purpose (i.e., preventing creditors from interfering with an agency's internal workings) yet does not lead to an absurd result (rendering courts powerless to enjoin unlawful action): § 634(b)(1) does not bar this Court from enjoining the SBA Administrator from exceeding her  statutory authority.

### B.    Gateway Radiology is entitled to enjoin the SBA Administrator from enforcing the Supplemental Rule.

To enjoin the SBA Administrator from enforcing the Supplemental Rule, Gateway Radiology must show that (1) it has a substantial likelihood of success on the merits of its claims; (2) it will suffer irreparable harm if the Court does not enjoin

---

[62] *Camelot Banquet Rooms, Inc. v. SBA*, 2020 WL 2088637, at *4 (E.D. Wis. May 1, 2020) (citations omitted).

[63] *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("It is true that interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available").

the SBA Administrator from enforcing the Supplemental Rule; (3) the harm it will

suffer if the Court does not grant injunctive relief outweighs the harm the SBA will

suffer if the Court does; and (4) enjoining the SBA from enforcing the Supplemental

Rule is not adverse to the public interest.[64] Gateway Radiology has carried its burden

here.

### 1. Gateway Radiology has a substantial likelihood of success on the merits.[65]

The Administrative Procedure Act authorizes this Court to find that the SBA's

Supplemental Rule is unlawful—and therefore may be set aside—on any one of six

enumerated grounds.[66] Grounds for setting aside the Supplemental Rule include

where the SBA Administrator exceeded her authority in promulgating the

Supplemental Rule and where the Supplemental Rule is arbitrary and capricious.[67]

Both grounds are present here.

---

[64] *Harbourside Place, LLC v. Town of Jupiter, Florida*, 958 F.3d 1308, 1313 – 14 (11th Cir. 2020).

[65] Gateway Radiology has challenged the Supplemental Rule on three grounds. First, Gateway Radiology says the SBA Administrator exceeded her authority in promulgating the Supplemental Rule. Second, Gateway Radiology says the Supplemental Rule is arbitrary and capricious. Third, Gateway Radiology says the Supplemental Rule violates Bankruptcy Code § 525. Because Gateway Radiology has substantial likelihood of success on the first two grounds, the Court declines to address the third ground—that the Supplemental Rule violates Bankruptcy Code § 525—on a preliminary basis.

[66] 5 U.S.C. § 706(2)(A) – (F) (providing that a reviewing court shall hold unlawful and set aside agency action, findings, and conclusions that are found to be arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege or immunity; in excess of statutory jurisdiction, authority or limitations, or short of statutory right; without observance of procedure required by law; unsupported by substantial evidence in a case subject to 5 U.S.C. §§ 556 and 557; or unwarranted by the facts to the extent the facts are subject to trial de novo by the reviewing court).

[67] *Id.* at § 706(2)(A), (C).

### a. The SBA Administrator exceeded her authority when she promulgated the Supplemental Rule.

The SBA Administrator says that this Court, in determining whether she exceeded her statutory authority, must be guided by *Chevron*'s two-step framework.[68] Under the two-step *Chevron* framework, this Court would first ask whether the statute at issue is ambiguous; if it is, this Court would then ask whether the agency's interpretation of the statute is reasonable.[69] The *Chevron* framework presumes that when a statute is ambiguous, Congress must have implicitly delegated to the agency the authority to fill in the statutory gaps.[70]

The Supreme Court, however, has recognized that in extraordinary cases, courts should hesitate to find that Congress implicitly delegated authority to an agency to fill in statutory gaps.[71] Take, for example, the Supreme Court's decision five years ago in *King v. Burwell*.[72]

*King* involved a challenge to the Affordable Care Act. One of the Affordable Care Act's key reforms was the creation of "exchanges"—marketplaces that allowed

---

[68] Adv. Doc. No. 11 at 20.

[69] *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 – 43 (1984).

[70] *Id.* at 843 ("If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation.").

[71] *King v. Burwell*, 135 S. Ct. 2480, 2488 – 89 (2015) ("'In extraordinary cases, however, there may be reason to hesitate before concluding that Congress has intended such an implicit delegation.' This is one of those cases.").

[72] *Id.*

22

people to compare and buy insurance plans. The Affordable Care Act required states

to create their own exchanges. If a state refused to do so, the Affordable Care Act

required the federal government to create one.

     The Affordable Care Act then provided tax credits to taxpayers to buy

insurance plans—but only for taxpayers who bought an insurance plan through "an

Exchange established by the State." Even though the Affordable Care Act limited tax

credits to insurance plans bought through an exchange "established by the state," the

IRS interpreted "an exchange established by the state" to mean an exchange

established by the state or federal government. The petitioners in *King* challenged the

IRS's interpretation.

     After acknowledging that it often applies the *Chevron* two-step framework

when analyzing an agency's interpretation of a statute, the Supreme Court concluded

*King* was one of those extraordinary cases when it should decline to do so.[73]

According to the Supreme Court, the tax credits were one of the Affordable Care

Act's key reforms. Because the availability of credits involved billions of dollars in

spending each year and affected the price of health insurance for millions of people,

whether credits were available on federal exchanges was a "question of deep

'economic and political significance' that [was] central to [the] statutory scheme."[74]

---

[73] *Id.*

[74] *Id.* at 2489.

The Supreme Court concluded that "had Congress wished to assign that question to an agency, it surely would have done so expressly."[75]

So too here. Like the Affordable Care Act, the Paycheck Protection Program involves billions of dollars of spending ($349 billion to be precise). And, as with the interpretation of the eligibility for Affordable Care Act tax credits, how eligibility for PPP Loans is determined could affect millions of Americans. Here, like in *King*, it is unlikely that Congress intended to delegate a question of such "economic and political significance" to the SBA. Thus, it is for this Court to determine the correct reading of the CARES Act.

In determining the correct reading of the CARES Act, this Court must begin where the *King* Court did—with the language of the statute itself. If the statutory language is plain, courts must enforce it according to its terms.[76] To determine whether language is plain, courts must "read the words 'in their context and with a view to their place in the overall statutory scheme.'"[77] Here, reading the words of the CARES Act in context and with a view to the Paycheck Protection Program's place in the overall statutory scheme, it is plain Congress did not intend to exclude chapter 11 debtors from the Paycheck Protection Program.

---

[75] *Id.*

[76] *Id.* ("If the statutory language is plain, we must enforce it according to its terms.").

[77] *Id.* (quoting *FDA v. Brown & Williamson*, 529 U.S. 120, 133 (2000)).

Let's start with the context of the CARES Act. When Congress passed the CARES Act, the President had already declared a state of emergency because COVID-19 was threatening to strain the nation's healthcare systems; half the nation's states had implemented Stay-at-Home orders to "flatten the curve" in hopes of minimizing the strain on the nation's healthcare system; close to one million people had already lost their jobs; and millions more (more than 20 million, as it turns out) were about to lose theirs.

Now let's turn to the Paycheck Protection Program's place in the overall statutory scheme. In passing the CARES Act, Congress intended the Paycheck Protection Program to (among other things) help keep American workers employed and paid. Lest there be any doubt, Congress included the Paycheck Protection Program (as well as the mid-size loan program) in Title I of the CARES Act, which it named the "Keeping Workers Paid and Employed Act."[78]

Finally, let's consider the words of the CARES Act itself. In the CARES Act, Congress specified minimal—yet expansive—eligibility requirements for the Paycheck Protection Program. Under a subsection titled "*Increased Eligibility* for Certain Small Businesses and Organizations," Congress provided that any small business concern, other business concern, nonprofit organization, veterans

---

[78] Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020).

organization, or Tribal business concern that has 500 employees or fewer "*shall be eligible*" for a PPP Loan.[79]

And Congress specified that all an eligible borrower needs to do to apply for a PPP Loan is to certify that the loan is necessary because of the economic uncertainty caused by COVID-19; the proceeds will be used to retain workers and make payroll or pay mortgage interest, lease, or utility payments; and the borrower has not or will not receive another PPP Loan.[80] Although it could have done so, Congress chose not to require borrowers to certify that they were not involved in a bankruptcy case when applying for a PPP Loan.[81]

It's also worth noting that Congress delegated the SBA Administrator's decision to make or approve PPP Loans to SBA lenders.[82] In delegating that authority to SBA lenders, Congress instructed lenders to consider only two factors when making or approving a PPP Loan: (1) Was the business operating on February 15, 2020? (2) Did the borrower have employees for whom it was paying salaries and payroll taxes?[83] Congress did not instruct SBA lenders—who are exercising authority

---

[79] 15 U.S.C. § 636(a)(36)(D)(i)(I) – (II).

[80] *Id.* at § 636(a)(36)(G)(i)(I) – (IV).

[81] *Id.*

[82] *Id.* at § 636(a)(36)(F)(ii)(I).

[83] *Id.* at § 636(a)(36)(F)(ii)(I) – (II)(bb).

delegated from the SBA Administrator—to consider whether a borrower is in bankruptcy.[84]

To recap, even though Congress specified who is eligible for PPP Loans, the criteria lenders must consider when approving a PPP Loan, and the certifications a borrower must make to obtain one, Congress did not disqualify chapter 11 debtors from being eligible for PPP Loans, insist that lenders determine whether a borrower is in bankruptcy before approving a PPP Loan, or require a borrower to certify that it isn't involved in a bankruptcy proceeding to obtain a PPP Loan. Congress' silence ought to be conclusive that Congress did not intend to exclude an entire class of small businesses—chapter 11 debtors—from the Paycheck Protection Program.

The SBA Administrator, however, claims Congress' silence authorizes her to engraft an additional eligibility requirement onto the Paycheck Protection Program.[85] Not so.

To see why that's not the case, consider the mid-size loan program. Unlike the Paycheck Protection Program, which functions like a grant, the mid-size loan program is a true loan program. Loans made under the mid-size program, unlike those made under the Paycheck Protection Program, cannot be forgiven. For the mid-size loan program, Congress required borrowers to certify that they are not a debtor in bankruptcy.

---

[84] *Id.*

[85] Adv. Doc. No. 11 at 21 – 23.

So Congress knew how to disqualify debtors from eligibility if it wanted to. Yet it chose not to do so for PPP Loans. As the SBA Administrator concedes, when "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress act[ed] intentionally and purposely in the disparate inclusion or exclusion."[86] Because Congress chose not to require PPP Loan applicants to certify that they were not involved in a bankruptcy case, this Court concludes that Congress purposely chose not to disqualify chapter 11 debtors from the Paycheck Protection Program.[87]

That makes sense for (at least) two reasons. First, while a borrower's status as a debtor matters for the mid-size loan program, it does not for the Paycheck Protection Program because PPP Loans are designed to be forgiven. Second, the purpose of the Paycheck Protection Program was to keep American workers employed and paid. Chapter 11 debtors need PPP Loans as much, if not more than, other small businesses to retain workers and pay them.

---

[86] Adv. Doc. No. 11 at 20 (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

[87] The SBA Administrator argues that this conclusion is undermined by Congress' recent passage of the HEROES Act, which (among other things) makes critical-access hospitals eligible for PPP Loans "regardless of the status of such a hospital as a debtor" in a chapter 11 case. Adv. Doc. No. 11 at 23 n.11 (citing The Heroes Act, H.R. 6800, 116th Cong., § 9001(c) (2020)). The SBA says this language shows the House of Representatives believes additional legislation is required to make a specific subset of borrowers—chapter 11 debtors—eligible to apply for PPP Loans. *Id.* That's one way to read that language. It's equally, if not more, likely that the House of Representatives was clarifying its intent that—contrary to the Supplemental Rule—chapter 11 debtors are eligible for PPP Loans. In any event, the reference to debtors in the HEROES Act does not change the fact that in one section of the CARES Act (the mid-size loan program), Congress required borrowers to certify they were not involved in a bankruptcy proceeding, but in another section of the same Act (the Paycheck Protection Program), Congress chose not to require borrowers to certify that they were not involved in a bankruptcy proceeding.

By promulgating the Supplemental Rule, the SBA Administrator disqualified chapter 11 debtors from the Paycheck Protection Program, thereby denying an entire class of small businesses the very relief Congress intended to provide. Excluding chapter 11 debtors from the Paycheck Protection Program conflicts with Congress' intent in enacting the CARES Act. More important, doing so violates the CARES Act's plain language. The SBA Administrator therefore exceeded her authority when she promulgated the Supplemental Rule.

### b.    The Supplemental Rule is arbitrary and capricious.

Even if the SBA Administrator hadn't exceeded her authority when she promulgated the Supplemental Rule, the Supplemental Rule is still arbitrary and capricious. To be sure, the scope of review under the "arbitrary and capricious" standard is narrow.[88] This Court is mindful that it is not to substitute its own judgment for the SBA Administrator's judgment.[89]

Rather, in reviewing whether agency action is "arbitrary and capricious," this Court is limited to considering whether the SBA Administrator considered the relevant factors when promulgating the Supplemental Rule and whether her decision to exclude chapter 11 debtors from the Paycheck Protection Program was a clear

---

[88] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[89] *Id.*; *see also Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1254 (11th Cir. 2007) (citing *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 43).

error of judgment.[90] Under this standard of review, the Supplemental Rule is "arbitrary and capricious" if:

- the SBA Administrator relied on factors that Congress did not intend her to consider;

- the SBA Administrator failed to consider an important aspect of the problem;

- the SBA Administrator's explanation for her decision runs counter to the evidence before the agency; or

- the SBA Administrator's explanation is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Here, the SBA Administrator's decision to exclude chapter 11 debtors from the Paycheck Protection Program is based on her determination that "debtors in bankruptcy would present an unacceptably high risk of an unauthorized use of funds or non-repayment of unforgiven loans."[91] Putting aside that the basis for the SBA Administrator's determination is unclear, the Court concludes that she relied on factors Congress had not intended her to consider and failed to consider important aspects of the problem—not to mention her decision is counter to the evidence before the SBA.

---

[90] *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 ("In reviewing [an agency's] explanation, we must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'") (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 285 (1974)).

[91] Business Loan Program Temporary Changes; Paycheck Protection Program—Requirements— Promissory Notes, Authorization, Affiliation, and Eligibility, 85 Fed. Reg. 23450, 23,451 (Apr. 28, 2020) (to be codified at 13 C.F.R. pts. 120 and 121).

###### i. Congress did not intend for the SBA Administrator to focus on collectability.

The SBA Administrator relies on 15 U.S.C. § 636(a)(6) as a talisman to ward off any claim she exceeded her statutory authority. Section 636(a)(6) mandates that "[a]ll loans made under this subsection shall be of such sound value or so secured as to reasonably reassure repayment."[92] Because § 636(a)(6) requires loans to be of "sound value," the SBA Administrator insists she is authorized to disqualify chapter 11 debtors from the Paycheck Protection Program.[93]

But that argument ignores the very nature of the Paycheck Protection Program. Under the Paycheck Protection Program, PPP Loans are structured so that they don't have to be repaid. For a loan to be forgiven, all a borrower has to do is use the loan proceeds for payroll or mortgage interest, lease, or utility payments. Because PPP Loans are designed to be forgiven, Congress did not intend for the SBA Administrator to focus on collectability.

In fact, Congress delineated the two "underwriting" factors SBA lenders (who are exercising authority delegated from the SBA Administrator to make and approve loans) should consider when making PPP Loans. Neither factor has anything to do with collectability—much less whether a borrower is in bankruptcy. By taking into

---

[92] 15 U.S.C. § 636(a)(6).

[93] Adv. Doc. No. 11 at 25.

account a borrower's status as a chapter 11 debtor, the SBA Administrator has considered a factor Congress did not intend her to consider.

One final note: it's hard not to notice the SBA talking out of both sides of its mouth when it comes to its obligations under § 636(a)(6). On the one hand, the SBA tries to convince the Court that the Paycheck Protection Program's generous loan forgiveness features has done nothing to displace § 636(a)(6)'s general mandate to ensure loans made under § 7(a) of the Small Business Act, where the Paycheck Protection Program is housed, are of sound value. On the other hand, the SBA Administrator has excused SBA lenders from complying with 13 C.F.R. § 120.150, which enumerates the factors the SBA considers to ensure that any loan made under § 7(a) is of "sound value."[94] In reality, the SBA Administrator's reliance on § 636(a)(6) is an after-the-fact justification for an arbitrary and capricious rule.

### ii. The SBA Administrator failed to consider protections afforded by the chapter 11 bankruptcy process.

Not only did the SBA Administrator consider factors she shouldn't have, she also failed to consider factors she should have. Recall that the Supplemental Rule is premised entirely on the SBA Administrator's determination that debtors pose an unacceptably high risk of using PPP Loan proceeds for noncovered expenses, as well as an unacceptably high risk of nonpayment if the PPP Loan is not forgiven. Yet, in

---

[94] Business Loan Program Temporary Changes; Paycheck Protection Program, 85 C.F.R. 20,811, 20,812 (Apr. 15, 2020) (to be codified at 13 C.F.R. pt. 120).

making that determination, the SBA Administrator failed to consider an important aspect of the problem: how chapter 11 bankruptcy functions.

Begin with the policy behind chapter 11 bankruptcy. The policy of chapter 11 is to provide a forum where troubled businesses can rehabilitate.[95] "Chapter 11 embodies a policy that it is generally preferable to enable a debtor to continue to operate and to reorganize or sell its business as a going concern rather than simply to liquidate a troubled business."[96] Continued operation of a business is preferable to liquidation not only because it preserves going-concern value, but because it "can save the jobs of employees and the tax base of communities, and generally reduce the upheaval that can result from termination of a business."[97] The SBA Administrator failed to consider that chapter 11 bankruptcy and the Paycheck Protection Program share the same policy goal: keeping American workers employed and paid.

Now let's turn to specific Bankruptcy Code provisions that would eliminate the "unacceptably high risk" that a chapter 11 debtor would use PPP Loan proceeds for noncovered expenses. As a starting point, Bankruptcy Code § 364 bars a debtor

---

[95] *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 527 (1984); *see also In re Paris Indus. Corp.*, 106 B.R. 339, 341 (Bankr. D. Maine 1989) ("The Bankruptcy Code embodies a governmental policy favoring reorganization and a fresh start.").

[96] 7 Collier on Bankruptcy ¶ 1100.01 (Matthew Bender & Co. 16th ed.).

[97] *Id.*

from borrowing money outside the ordinary course of business—such as obtaining a
PPP Loan—without court approval.[98]

Before a bankruptcy court can allow a debtor to borrow money outside the
ordinary course of business, the debtor must give notice to interested parties in the
case, who have a right to object to the proposed financing.[99] If the bankruptcy court
is inclined to allow the debtor to borrow money, it can impose conditions on the
debtor doing so. In addition to restricting the debtor's use of the loan proceeds to
paying expenses set forth in an approved budget, those conditions can also include
requiring the chapter 11 debtor to disclose to the Court and creditors what the loan
proceeds were used for.

What's more, on top of any narrowly tailored reporting requirements the court
may impose when approving a postpetition loan, chapter 11 debtors in general are
required to file monthly operating reports.[100] Those reports, which detail a debtor's
receipts and disbursements, are scrubbed by skilled professionals at the U.S. Trustee's

---

[98] 11 U.S.C. § 364(b).

[99] *Id.* (providing that court may authorize postpetition financing "after notice and a hearing").

[100] 11 U.S.C. § 1106(a)(1); *see also* Fed. R. Bankr. P. 2015. Bankruptcy Code § 1106(a)(1) incorporates
Bankruptcy Code § 704(a)(8), which requires a debtor in possession operating a business to file
periodic reports and summaries of the business' operations, including a statement of receipts and
disbursements. The monthly operating reports allow a bankruptcy court and parties in interest to
ascertain (among other things) whether a debtor in possession is grossly mismanaging the
bankruptcy estate, violating cash collateral or other court order, or engaging in unauthorized
disposition of estate assets. Procedures for Completing Uniform Periodic Reports in Non-Small
Business Cases Filed Under Chapter 11 of Title 11, 79 Fed. Reg. 66,659, 66,660 (Nov. 10, 2014) (to
be codified at 28 C.F.R. pt. 58).

Office. And because they are filed electronically, the monthly operating reports can be scrutinized by creditors in the case.

So the SBA Administrator has failed to consider that by restricting a debtor's use of PPP Loan proceeds to covered expenses and subjecting the debtor's use of the funds to scrutiny by creditors and the U.S. Trustee, bankruptcy courts can reduce the risk that a chapter 11 debtor will use PPP Loan proceeds for noncovered expenses.

Last, consider the extra protections afforded to lenders who loan money to debtors postpetition, which greatly reduce the risk of nonpayment. If a bankruptcy court approves a debtor's postpetition financing motion, the lender is entitled to an administrative expense claim under Bankruptcy Code § 503(b)(1).[101] Administrative expense claims—such as one for a PPP Loan—must be paid in full by the effective date of confirmation. The SBA Administrator therefore failed to consider that the Bankruptcy Code would give priority to repayment of PPP Loans made to chapter 11 debtors (to the extend funds were used for noncovered expenses).

### iii.    The SBA's explanation runs counter to the evidence before the agency.

Imagine Gateway Radiology was not in chapter 11 bankruptcy. In that hypothetical world, Hypothetical Gateway Radiology would apply to the Credit Union for a PPP Loan by filling out a two-page application in which it would answer

---

[101] 11 U.S.C. § 364(b) ("The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(1) of this title as an administrative expense").

eight questions (none of which have to do with creditworthiness); disclose the number of employees it has, its average monthly payroll, and its loan request; and check a box indicating how it intends to use the funds (payroll, lease or mortgage interest, utilities, or other).

Hypothetical Gateway Radiology would have also had to certify that it was operating on February 15, 2020; it had employees for whom it was paying salaries and payroll taxes; it needs the loan because of the economic uncertainty caused by COVID-19; it will use the loan proceeds for covered expenses; it will provide documentation showing it used the loan for covered expenses; it understands the loan will be forgiven if it is used for covered expenses (though nonpayroll expenses can only account for 25% of the forgiven amount); and it has not and will not seek another PPP Loan.

After confirming receipt of the certifications, the information demonstrating Hypothetical Gateway Radiology had employees, and the dollar amount of Hypothetical Gateway Radiology's payroll, the Credit Union would have then approved the loan. In the hypothetical world, the Credit Union would have done no investigation of Hypothetical Gateway Radiology's creditworthiness, its ability to repay the loan, or what it intended to use the PPP Loan for.

And once the PPP Loan was approved, the Credit Union would not truly monitor how Hypothetical Gateway Radiology used the money. Instead, the Credit Union would rely on the carrot-and-stick approach Congress provided to ensure repayment: the carrot, of course, is that the loan will be forgiven if it is used for

covered expenses; the "stick" is that Hypothetical Gateway Radiology would have to repay the loan if it was not used for covered expenses.

Sure, Hypothetical Gateway Radiology would be required to provide the Credit Union documentation showing it used the loan proceeds for covered expenses. But the Credit Union would not need to verify the documentation so long as Hypothetical Gateway Radiology attested that it verified the payments it made were for eligible costs.[102]

Now let's see how that story is playing out in the real world, where Gateway Radiology is in chapter 11 bankruptcy. Unlike a non-debtor, who can take out a PPP Loan with little to no oversight, Gateway Radiology had to first ask for this Court's approval, even though the PPP Loan had already been approved.

In seeking this Court's approval, Gateway Radiology (like a typical debtor seeking a PPP Loan) had to attach a copy of its loan application, along with a proposed budget detailing how it intends to use the loan proceeds.[103] According to its budget, Gateway Radiology proposes to use $445,000 of the $527,710 in loan proceeds for payroll, while the remaining $82,710 will be used for rent, health insurance premiums, and utilities—all of which are covered expenses. Unlike

---

[102] Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20,811, 20,815 (Apr. 15, 2020) (to be codified at 13 C.F.R. pt. 120) ("The lender does not need to conduct any verification if the borrower submits documentation supporting its request for loan forgiveness and attests that it has accurately verified the payments for eligible costs. The Administrator will hold harmless any lender that relies on such borrower documents and attestation from a borrower.").

[103] Doc. No. 238; Adv. Doc. No. 3.

Hypothetical Gateway Radiology, whose certification that it would use the loan for covered expenses was given only a perfunctory review by the Credit Union, the real Gateway Radiology's intention to use the PPP Loan for covered expenses is scrutinized by creditors, the U.S. Trustee, and (most important) the Court.

If any creditor doubts that the loan will be used for covered expenses, it has the right to object to the proposed PPP Loan. Indeed, one creditor has already done so. Philips Healthcare, one of the major creditors in this case, contends that unless this Court determines that the proposed PPP Loan is eligible for loan forgiveness and will be used for covered expenses, the Court should deny the motion because Gateway Radiology hasn't showed why the funds are necessary or how they will be repaid.

In effect, Philips Healthcare has raised the same concerns the SBA Administrator raised in her Supplemental Rule. Philips Healthcare wants to make sure that the loan proceeds are used for covered expenses and, if not, that Gateway Radiology can repay the loan. Outside bankruptcy there would be no one to raise those issues. Because Gateway Radiology is in bankruptcy, however, this Court can consider and address both those concerns.

To ensure that the loan proceeds are used for covered expenses, the Court can (if it approves the loan) order Gateway Radiology to use the proceeds only for payroll, health insurance, rent, and utilities. The Court can also require Gateway Radiology to file reports with supporting documentation so the Court and interested parties can verify that Gateway Radiology is using the loan proceeds for covered

38

expenses. This would be in addition to the Debtor's monthly operating reports, which would also show what the loan proceeds were being used for.

Outside bankruptcy, the Credit Union could rely on Hypothetical Gateway Radiology's attestation that it used the proceeds for covered expenses. Because Gateway Radiology is in bankruptcy, however, there will be, as one court aptly put it, a hundred-eyed Argus watching how Gateway Radiology uses the money.[104]

What happens if the hundred-eyed Argus spots Gateway Radiology using the loan proceeds for noncovered expenses? Outside bankruptcy, there would be nothing anyone could do about it. The loan would simply be subject to repayment. Of course, there would be no way to know if Hypothetical Gateway Radiology could repay the loan since there was no underwriting. Because the real Gateway Radiology is in bankruptcy, the Court can take steps to minimize the amount that will not be forgiven and increase the chances that the unforgiven amounts are repaid.

The Court can minimize the amount that has to be repaid by turning off the spigot as soon as the proceeds start flowing out for noncovered expenses. Whereas outside bankruptcy, the "stick" to prevent a non-debtor from using a PPP Loan for noncovered expenses is that the money has to be repaid. Inside bankruptcy, the "stick" is not just that the loan has to be paid—the "stick" also includes possible contempt or other sanctions for violating a court order barring a debtor from using

---

[104] *In re Roman Catholic Church of Archdiocese of Santa Fe*, ___ B.R. ___, 2020 WL 2096113, at *6 (Bankr. D. N.M. May 1, 2020) ("In short, the chapter 11 bankruptcy system is a hundred-eyed Argus.").

PPP Loan proceeds for noncovered expenses. Putting that aside, once the amount that must be repaid has been minimized, the Court can increase the chances it will be repaid by according the amount owed administrative expense status, which means it gets paid before other unsecured claims.

Having compared the safeguards in place for PPP Loans made to a chapter 11 debtor with the lack of any similar safeguards for PPP Loans to non-debtors, the Court cannot find any rational connection between the evidence before the SBA and the SBA's Supplemental Rule. Quite the opposite: to the extent that the SBA Administrator was concerned about PPP Loans being used for noncovered expenses or not being repaid, her Supplemental Rule is "illogical on its own terms." When agency action is "illogical on its own terms," as is the case here, the agency action is arbitrary and capricious.[105]

### 2.    Unless an injunction is issued, Gateway Radiology will suffer irreparable harm.

In its motion for temporary injunction, Gateway Radiology alleges that it has seen a 55 – 60% decrease in patient volume at its outpatient imaging, diagnostic, and interventional radiology center since the start of the COVID-19 pandemic; that it needs the PPP Loan to shore up its finances so that it can continue serving the

---

[105] *Am. Fed'n. of Gov't Emps. v. Fed. Labor Relations Auth.*, 470 F.3d 375, 381 (D.C. 2006).

community as a front-line medical services provider during the pandemic; and

without the PPP Loan, it may not survive as a going concern.[106]

The SBA suggests that such a "meager showing is purely speculative, and in no

way imminent."[107] The Court is unpersuaded that the harm is as speculative and

remote as the SBA cavalierly suggests. In any event, the SBA's argument is

misplaced: to prove irreparable harm, Gateway Radiology need not prove that it will

go out of business if it doesn't get the PPP Loan. To establish irreparable harm,

Gateway Radiology must show that remedies at law—such as money damages—are

inadequate.[108]

Here, Gateway Radiology cannot be compensated by money damages. Under

the Paycheck Protection Program, Gateway Radiology is eligible for more than

$500,000 in financing that is designed to—and almost certainly will be—forgiven.

But funding under the Paycheck Protection Program, as the SBA has acknowledged,

is "first-come, first-served."[109] If the Court does not enjoin the Supplemental Rule,

the funding allocated to Gateway Radiology will be used for a PPP Loan to another

borrower.

---

[106] Adv. Doc. No. 3 at ¶ 29(b).

[107] Adv. Doc. No. 11 at 28.

[108] *Council v. Dep't of Veterans Affairs*, 2010 WL 98984, at *3 (M.D. Fla. Jan. 6, 2010) (citing *Ebay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)).

[109] Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20,811, 20,813 (Apr. 15, 2020) (to be codified at 13 C.F.R. pt. 120).

By the time it is determined that debtors are eligible for PPP Loans, all the Paycheck Protection Program funding will be gone. And Gateway Radiology will not have access to another $500,000 in funding that basically functions like a grant. That is classic irreparable harm.

**3.    The harm Gateway Radiology will suffer if no injunction is issued far outweighs any harm the SBA will suffer if an injunction is issued.**

In its opposition, the SBA Administrator does not bother arguing that the SBA will suffer any harm if the Court enjoins her from enforcing the Supplemental Rule—much less that any harm it will suffer will outweigh the harm Gateway Radiology will suffer if the Court does not enjoin her from enforcing the Supplemental Rule. Presumably that's because it's unlikely the SBA will suffer any harm.

Admittedly, the SBA has a theoretical risk of harm. If Gateway Radiology does not use the PPP Loan for covered expenses, the PPP Loan will not be forgiven, which means what is essentially a grant will convert to a loan. If Gateway Radiology is unable to repay any unforgiven amounts, the SBA will be on the hook for the unpaid balance (which, theoretically, could be the entire $527,710). That risk, however, can be mitigated—basically to zero.

As the Court has already pointed out, it must first approve the PPP Loan. As part of the approval process, creditors and the U.S. Trustee have an opportunity to object if there is reason to believe Gateway Radiology will not use the PPP Loan

42

proceeds for covered expenses or if Gateway Radiology does not have the ability to

repay the loan in the unlikely event it is not forgiven. To ensure that Gateway

Radiology uses the PPP Loan for covered expenses, the Court can order Gateway

Radiology to restrict its use of funds to covered expenses. And to increase the

likelihood that any unforgiven amount will be repaid, the Court can award the Credit

Union an administrative expense for any noncovered expenses. All of this will be

overseen by the hundred-eyed Argus.

Thus, it's unlikely the SBA will suffer any harm. To the extent it does, that

harm would be far outweighed by the harm Gateway Radiology will suffer if the

Court does not enjoin the SBA from enforcing the Supplemental Rule (at least to the

extent it disqualifies Gateway Radiology from the Paycheck Protection Program).

### 4. Enjoining the SBA Administrator from disqualifying debtors from the Paycheck Protection Program will further Congress' objective in passing the CARES Act.

The SBA contends that enjoining the Supplemental Rule would disserve the

public interest because the proposed injunction would: (1) short-circuit the rapidly

evolving political and administrative landscape in response to COVID-19; (2)

substitute Gateway Radiology's preferred policy for the SBA's stated policy; and (3)

"throw a wrench into policymakers' evolving responses to COVID-19."[110]

---

[110] Doc. No. 11 at 29 – 30.

Throw a wrench into policymakers' evolving responses? It's hard not to be flabbergasted by the SBA Administrator's (pardon the banal expression) "through the looking glass" approach to promoting the public interest: in what world does disqualifying an entire class of troubled small businesses—perhaps those who need it the most—from obtaining grants to pay employees so their workers don't lose their jobs somehow promote the public interest, but ensuring that the $349 billion in relief flows to those who need it the most constitute "throwing a wrench" into Congress' response to COVID-19?

Congress passed the CARES Act "[t]o provide emergency assistance . . . for individuals, families, and businesses affected by the 2020 coronavirus pandemic."[111] In doing so, Congress created the Paycheck Protection Program, which basically provides $349 billion in grants so small businesses can pay their employees, and made sure as many small businesses were eligible for the grants as possible. By enjoining the Supplemental Rule, at least to the extent it disqualifies Gateway Radiology from the Paycheck Protection Program, the injunction would be promoting the public interest by giving effect to Congress' intent. Far from throwing a wrench into Congress' response to COVID-19, the Court would be preventing the SBA from inexplicably doing so.

---

[111] Coronavirus Aid, Relief, and Economic Security Act, S. 3548, 116th Cong. (2020).

## III. CONCLUSION

"When an administrative agency sets policy, it must provide a reasoned explanation for its action. That is not a high bar, but it is an unwavering one."[112] It is up to this Court to ensure that the SBA Administrator has cleared that bar by engaging in reasoned decision-making."[113]

The SBA Administrator's decision-making here was anything but reasoned. Although Congress chose to require mid-size businesses to certify they were not in bankruptcy to participate in the mid-size loan program, it chose not to impose a similar requirement on small businesses wanting to participate in the Paycheck Protection Program.

The SBA Administrator concedes that when Congress knows how to say something but chooses not to, its silence is controlling."[114] But rather than treating Congress' silence as controlling, the SBA treats it as a dog whistle to exclude chapter 11 debtors from the Paycheck Protection Program because of the supposed unacceptably high risk that PPP Loans will be not be forgiven or collectable.

Any reasonable person would see that Congress was not concerned about collectability. PPP Loans are designed to be forgiven, which is why Congress and the

---

[112] *Judulang v. Holder*, 565 U.S. 42, 45 (2011).

[113] *Id.* at 53 ("[C]ourts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking.")

[114] *CBS Inc. v. PrimeTime24 Joint Venture*, 245 F.3d 1217, 1226 (11th Cir. 2001) (internal quotations omitted) (quoting *Griffith v. United States (In re Griffith)*, 206 F.3d 1389, 1394 (11th Cir. 2000)).

SBA have dispensed with traditional underwriting requirements. And in any event,
the chapter 11 process makes it more—not less—likely chapter 11 debtors would use
PPP Loans for covered expenses, in which case the loans would be forgiven. Thus,
the SBA Administrator's explanation for the Supplemental Rule is contrary to the
evidence before her.

Although the bar for agency action is not a high one, the SBA Administrator
failed to clear it here. This Court will therefore enjoin the SBA Administrator from
enforcing the Supplemental Rule to the extent it disqualifies Gateway Radiology
from participating in the Paycheck Protection Program.

---

Attorney Joel Aresty is directed to serve a copy of this Memorandum Opinion on
interested parties who are non-CM/ECF users and file a proof of service within
three days of entry of this Memorandum Opinion.

---

**Joel M. Aresty, Esq.**
**Joel M. Aresty P.A.**
   *Counsel for the Debtor*

**Christopher J. Emden**
   *Counsel for Jovita Carranza,*
   *in her capacity as*
   *Administrator for the U.S. Small*
   *Business Administration*

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

ROMAN CATHOLIC CHURCH OF THE
ARCHDIOCESE OF SANTA FE,                                No. 18-13027 t11

     Debtor.

ROMAN CATHOLIC CHURCH OF THE
ARCHDIOCESE OF SANTA FE,

     Plaintiff,

v.                                                      Adv. No. 20-1026 t

UNITED STATES OF AMERICA
SMALL BUSINESS ADMINISTRATION,

     Defendant.

## **OPINION**

The Court held a preliminary injunction hearing in this proceeding on April 30, 2020.

During the hearing, the Court converted it to a trial on the merits, as allowed by Fed. R. Civ. P.

65(a)(2).[1] For the reasons stated herein, Plaintiff is entitled to relief under its complaint.

I.     <u>FINDINGS OF FACT</u>[2]

The Court finds:

---

[1] Rule 65 is incorporated by reference by Fed. R. Bankr. P. 7065. The Court took this admittedly unusual step for two reasons. First, there is enormous time pressure in this proceeding, for the reasons stated below. To provide any effective relief, and/or to avoid a substantial damages claim from accruing, an immediate decision was necessary. Second, the factual issues in the proceeding were few and noncontroversial.

[2] The Court took judicial notice of the docket in the main case and this adversary proceeding. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (holding that a court may sua sponte take judicial notice of its docket); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1999) (same).

Plaintiff is a catholic archdiocese in New Mexico and a New Mexico corporation. Its principal place of business is at 4000 St. Josephs Place NW, Albuquerque, New Mexico. Plaintiff has 70 employees. On December 3, 2018, Plaintiff filed this chapter 11 case. Since then Plaintiff has been operating as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

Defendant (sometimes referred to as the "SBA") is an agency of the United States of America. Its central office is located at 409 Third Street, S.W., Washington DC 20416.

On or about March 27, 2020, the President signed the Coronavirus Aid, Relief, and Economic Security Act, H.R. 748, P.L. 115-136 (the "CARES Act"). The CARES Act is intended, among other things, to provide stimulus to the economy by distributing approximately $2.3 trillion to various industries, programs, and individuals.

The CARES Act temporarily added a new "Paycheck Protection Program" (the "PPP") to be administered by Defendant. The CARES Act provisions relating to the PPP provide in pertinent part:

### Section 1102. Paycheck Protection Program

(a) IN GENERAL.—Section 7(a) of the Small Business Act (15 U.S.C. 636(a)) is amended—
(1) in paragraph (2)—
(A) in subparagraph (A), in the matter preceding clause (i), by striking "and (E)" and inserting "(E), and (F)"; and
(B) by adding at the end the following:
"(F) PARTICIPATION IN THE PAYCHECK PROTECTION PROGRAM.—In an agreement to participate in a loan on a deferred basis under paragraph (36), the participation by the Administration shall be 100 percent."; and
(2) by adding at the end the following:
"(36) PAYCHECK PROTECTION PROGRAM.—
"(A) DEFINITIONS.—In this paragraph—
. . .
 "(iv) the term 'eligible recipient' means an individual or entity that is eligible to receive a covered loan;
. . .

 "(B) PAYCHECK PROTECTION LOANS.—Except as otherwise provided in this paragraph, the Administrator may guarantee covered loans under the same terms, conditions, and processes as a loan made under this subsection.
. . .

 "(D) INCREASED ELIGIBILITY FOR CERTAIN SMALL BUSINESSES AND ORGANIZATIONS.—
"(i) IN GENERAL.—During the covered period, in addition to small business concerns, any business concern, nonprofit organization, veterans organization, or Tribal business concern described in section 31(b)(2)(C) shall be eligible to receive a covered loan if the business concern, nonprofit organization, veterans organization, or Tribal business concern employs not more than the greater of—
"(I) 500 employees; or
"(II) if applicable, the size standard in number of employees established by the Administration for the industry in which the business concern, nonprofit organization, veterans organization, or Tribal business concern operates.


. . .


(F) ALLOWABLE USES OF COVERED LOANS.—
"(i) IN GENERAL.—During the covered period, an eligible recipient may, in addition to the allowable uses of a loan made under this subsection, use the proceeds of the covered loan for—
"(I) payroll costs;
"(II) costs related to the continuation of group health care benefits during periods of paid sick, medical, or family leave, and insurance premiums;
"(III) employee salaries, commissions, or similar compensations;
"(IV) payments of interest on any mortgage obligation (which shall not include any prepayment of or payment of principal on a mortgage obligation);
"(V) rent (including rent under a lease agreement);
"(VI) utilities; and
"(VII) interest on any other debt obligations that were incurred before the covered period.
"(ii) DELEGATED AUTHORITY.—
"(I) IN GENERAL.—For purposes of making covered loans for the purposes described in clause (i), a lender approved to make loans under this subsection shall be deemed to have been delegated authority by the Administrator to make and approve covered loans, subject to the provisions of this paragraph.
"(II) CONSIDERATIONS.—In evaluating the eligibility of a borrower for a covered loan with the terms described in this paragraph, a lender shall consider whether the borrower—
"(aa) was in operation on February 15, 2020; and
"(bb)(AA) had employees for whom the borrower paid salaries and payroll taxes; or
"(BB) paid independent contractors, as reported on a Form 1099–MISC.
. . .

SEC. 1106. <u>Loan Forgiveness</u>.

(a) DEFINITIONS.—In this section—
(1) the term "covered loan" means a loan guaranteed under paragraph (36) of section 7(a) of the Small Business Act (15 U.S.C. 636(a)), as added by section 1102;
. . .
 (7) the term "expected forgiveness amount" means the amount of principal that a lender reasonably expects a borrower to expend during the covered period on the sum of any—
(A) payroll costs;
(B) payments of interest on any covered mortgage obligation (which shall not include any prepayment of or payment of principal on a covered mortgage obligation);
(C) payments on any covered rent obligation; and
(D) covered utility payments; and
(8) the term "payroll costs" has the meaning given that term in paragraph (36) of section 7(a) of the Small Business Act (15 U.S.C. 636(a)), as added by section 1102 of this Act.
(b) FORGIVENESS.—An eligible recipient shall be eligible for forgiveness of indebtedness on a covered loan in an amount equal to the sum of the following costs incurred and payments made during the covered period:
(1) Payroll costs.
(2) Any payment of interest on any covered mortgage obligation (which shall not include any prepayment of or payment of principal on a covered mortgage obligation).
(3) Any payment on any covered rent obligation.
(4) Any covered utility payment.

SEC. 1114. <u>Emergency Rulemaking Authority</u>.

Not later than 15 days after the date of enactment of this Act, the Administrator shall issue regulations to carry out this title and the amendments made by this title without regard to the notice requirements under section 553(b) of title 5, United States Code.

As can be seen from the statute, funds from the PPP have the following extremely favorable

terms:

- No collateral or personal guarantees are required;
- Funds are available regardless of the applicant's creditworthiness.
- No fees are charged;
- The loans mature in 2 years;
- The interest rate is 1%; and
- *The loans are fully forgiven if the funds are used as required.*

-4-

The PPP has very few eligibility requirements. Applicants must:

     1.  Be a small business concern or any business concern, nonprofit organization, veterans organization, or Tribal business concern described in section 31(b)(2)(C) of the Small Business Act;

     2.  Have fewer than 500 employees or, if applicable, the size standard in number of employees established by the Administration for the industry in which the business concern, nonprofit organization, veterans organization, or Tribal business concern operates;

     3.  Have been in operation on February 15, 2020; and

     4.  Have had employees to whom the applicant pays salaries and payroll taxes.

Faith-based organizations like Plaintiff are eligible to receive PPP loans. Plaintiff clearly met all eligibility requirements under the CARES Act.

Funds available under the PPP are limited and administered on a first-come, first-served basis. Demand for the PPP funds has been overwhelming. The funds were exhausted once, but were replenished by Congress on or about April 24, 2020. The Court does not know the current status of PPP fund availability or whether Congress will replenish the fund again.

On April 2, 2020, Defendant issued Official SBA Form 2484, which is the form applicants must use to apply for a PPP loan. The form states that the applicants "presently are involved in any bankruptcy" are not eligible.[3]

---

[3] Defendant introduced into evidence its form of application for a regular 7(a) loan. The application has sixteen questions, including whether the applicant or any affiliate has ever filed for bankruptcy protection. The application asks for details on a separate sheet if the question is answered "yes."

On April 15, 2020, Defendant published in the Code of Federal Regulations an "interim final rule" implementing the PPP (the "First Rule"). The First Rule, like the CARES Act, says nothing about bankruptcy debtors being ineligible for the PPP.[4]

Plaintiff filed a loan application on April 20, 2020, for a $900,000 PPP loan. The lender, Wells Fargo, did not act on the application because of the bankruptcy ineligibility provision.

On April 28, 2020, the SBA issued another interim final rule (the "Second Rule"). The Second Rule purports to disqualify bankruptcy debtors from the PPP:

> *Will I be approved for a PPP loan if my business is in bankruptcy?*
> No. If the applicant or the owner of the applicant is the debtor in a bankruptcy proceeding, either at the time it submits the application or at any time before the loan is disbursed, the applicant is ineligible to receive a PPP loan. . . .The Administrator, in consultation with the Secretary, determined that providing PPP loans to debtors in bankruptcy would present an unacceptably high risk for an unauthorized use of funds or non-repayment of unforgiven loans.

Like many New Mexico businesses, Plaintiff has been severely financially affected by the federal, state, and local government "lockdown" orders issued in response to the coronavirus pandemic. On March 23, 2020, the New Mexico Department of Health issued a "stay at home" order, prohibiting mass gatherings and requiring all non-essential businesses to cease in-person operations. On April 6, 2020, the Governor issued Executive Order 2020-22, which extended the

---

[4] The First Rule adopts the ineligibility standards in section 120.110, title 13 of the Code of Federal Regulations ("CFR 120.110"), as further described in SBA's Standard Operating Procedure 50-10, Subpart B, Chapter 2 ("SOP 50-10"). *See* First Interim Rule, 2(c) ("Businesses that are not eligible for PPP loans are identified in 13 CFR 120.110 and further described in SBA's Standard Operating Procedure"). The SOP 50-10 provides that a "Small Business Applicant" must, among other things: be an operating business; be located in the United States; be "small" (as defined by the SBA); and demonstrate the need for the desired credit. *See* SOP 50-10, pg. 85. The SOP 50-10 also provides that the businesses listed in CFR 120.110 are not eligible for an SBA loan. Bankruptcy debtors are not among the listed ineligible businesses. Nothing in the SOP 50-10 makes the Plaintiff ineligible for a PPP loan.

stay at home order through April 30, 2020. The Governor recently announced that she will further extend the stay at home order through at least May 15, 2020.

A major source of Plaintiff's income is revenue derived from monthly parish assessments. The parishes, in turn, derive a significant portion of their revenue from money collected during masses. Furthermore, a significant portion of the collections occur during Holy Week, which coincided with the lockdown. Because the parishes have been closed to their parishioners and the public, Plaintiff is losing about $300,000 a month in revenue it otherwise would realize from normal operations. This loss of income will continue until, at a minimum, the Governor's lockdown orders are lifted. Without a PPP loan, the Plaintiff's operations and reorganization effort will be substantially adversely affected. The PPP funds are essential to Plaintiff's "fresh start."

Plaintiff has the financial and accounting ability to follow the PPP rules about use of the funds. Plaintiff is careful in its accounting, files complete and detailed monthly operating reports in this case, and is more than willing to separately account for how it would use PPP funds.

On April 28, 2020, Plaintiff filed a motion to approve its proposed PPP loan as post-petition financing under 11 U.S.C. § 364.

With the Second Rule, Defendant made a final determination that Plaintiff's application will be denied. There are no administrative appeals or remedies available to Plaintiff to seek review of Defendant's decision to exclude it from the PPP.

## II.   DISCUSSION

A.   Jurisdiction and Venue.

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. Jurisdiction is proper under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 701 et seq. (the "APA"). This is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2)(A). Defendant's decision to exclude Plaintiff from the PPP is core: it goes to the heart of case administration, as the funds were intended by Congress to replace Plaintiff's lost revenue caused by the government lockdowns. In addition, the Court concludes that a proceeding to determine whether a governmental unit has violated 11 U.S.C. § 525(a) is core.

Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1) and 28 U.S.C. § 1409(a).

B.    The Administrative Procedure Act.

This proceeding is brought in part under the APA. 5 U.S.C. § 706 provides:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
  (1) compel agency action unlawfully withheld or unreasonably delayed; and
  (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
    (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
    (B) contrary to constitutional right, power, privilege, or immunity;
    (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
    (D) without observance of procedure required by law;
    (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
    (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

In *New Mexico Health Connections v. United States Department of Health & Human Services*, 946 F.3d 1138, 1161 (10th Cir. 2019), the Tenth Circuit held that "[i]n reviewing an APA challenge to agency action, a district court acts as an appellate court." The scope of the court's "review under this standard is "narrow'" and the court "is not to substitute its judgment for that of

the agency." *Judulang v. Holder*, 565 U.S. 42, 52-53 (2011) (citation omitted). Nevertheless, courts retain an important role "in ensuring the agencies have engaged in reasoned decisionmaking" by examining the reasons for the agency decisions, or lack thereof, and determining "whether the decision was based on consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 53 (citation omitted); *Dep't of Commerce v. N.Y.*, 139 S. Ct. 2551, 2569 (2019) (although a court may not substitute its judgment for that of the agency, it must ensure that the agency remained "within the bounds of reasoned decisionmaking").

Here, the question is whether Plaintiff is entitled to relief under § 706(2)(A) (arbitrary and capricious) and/or (C) (in excess of authority).

1.   Arbitrary and Capricious. Plaintiff argues that Defendant's prohibition against bankruptcy debtors is arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A). "Under the arbitrary and capricious standard, we must determine whether the agency considered all relevant factors and whether there has been a clear error of judgment." *IMC Kalium Carlsbad Inc. v. Interior Bd. of Land Appeals*, 206 F.3d 1003, 1012 (10th Cir. 2000) (internal quotation marks omitted). An agency rule is "arbitrary and capricious if the agency has relied on factors [that] Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). While the APA's arbitrary and capricious standard is generally deferential, prohibiting the court from substituting its judgment for the agency's, *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1164 (10th Cir. 2002), this principle is borne of the notion that an agency typically has "greater familiarity with the ever-changing facts and circumstances

surrounding the subjects" it regulates. *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000). No such deference is given to an action taken without statutory authority. *Util. Air Regulatory Group v. E.P.A.*, 573 U.S. 302, 321 (2014).

The Court finds that Defendant's decision to exclude bankruptcy debtors from the PPP is arbitrary and capricious. While a borrower's bankruptcy status clearly is relevant for a normal loan program, the PPP is the opposite of that. It is not a loan program at all. It is a grant or support program. The statute's eligibility requirements do not include creditworthiness. Quite the contrary, the CARES Act makes PPP money available regardless of financial distress. Financial distress is presumed. Given the effect of the lockdown, many, perhaps most, applicants would not be able to repay their PPP loans. They don't have to, because the "loans" are really grants. Repayment is not a significant part of the program. That is why Congress did not include creditworthiness as a requirement.

Considering the unprecedent nature of the PPP and the circumstances underlying its enactment, there is no reason to assume that Congress intended to cede to Defendant discretion to exclude bankruptcy debtors from the PPP. Rather, a review of the CARES Act in its entirety shows the opposite. *E.P.A.*, 573 U.S. at 321 (Congress's intent may be discerned by examining the enactment in its entirety); *Brown & Williamson*, 529 U.S. at 133 (2000) (same). As discussed below, another CARES Act program (direct loans to mid-sized businesses)[5] specifically excludes bankruptcy debtors. The unmistakable implication is that Congress did not intend to exclude bankruptcy debtors from the PPP.

The structure of the PPP is simple: PPP funds must be used for payroll, mortgage interest, rent, or utilities. If the funds are used as required, they do not have to be repaid. Given the obvious

---

[5] § 4003(c)(3)(D).

-10-

purpose of the PPP, it was arbitrary and capricious for Defendant to engraft a creditworthiness test where none belonged.

Furthermore, the test itself (are you a bankruptcy debtor?) is arbitrary and capricious. Why that eligibility criterion and not one of the many others that would more accurately gauge a borrower's likelihood of complying with the PPP?[6] It makes no sense, and it is unsupported by the terms of the CARES Act. *See E.P.A.*, 573 U.S. 302, 324 (2014). ("We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'") (citation omitted).

Defendant's only articulated justification for the bankruptcy disqualification is that bankruptcy debtors "present an unacceptably high risk for an unauthorized use of funds or non-repayment of unforgiven loans." As Judge David Jones said last week in ruling on a similar issue, the justification "is completely frivolous."[7] It is also arbitrary and capricious. Plaintiff, like all chapter 11 debtors in possession, is under the supervision of the Court and the United States Trustee's office. It must file detailed monthly operating reports, attaching bank statements. The unsecured creditors committee appointed in the case is very active and watches how Plaintiff spends money. All creditors have access to the docket and the monthly operating reports. In short, the chapter 11 bankruptcy system is a hundred-eyed Argus. In contrast, nondebtors can spend their

---

[6] Other possible underwriting criteria include: balance sheet insolvency; inability to pay debts as they become due; recent profitability; credit score; pending collection actions; current default on secured or unsecured debts; increases in credit card or other debt to pay bills; current ration of accounts receivable to accounts payable; and presence or absence of cash flow problems. There are many more.

[7] *Hidalgo County Emergency Service Foundation v. Jovita Carranza (In re Hidalgo County Emergency Service Foundation)*, Case no. 19-20497; Adv. pro. No. 20-2006, (Bankr. S.D. Tex.); (transcript of oral ruling rendered April 24, 2020).

-11-

PPP funds without any oversight. Defendant's justification for excluding bankruptcy debtors is so weak the Court has to wonder if Defendant really believes it.

The Court concludes that Defendant's decision to insert underwriting criteria into the PPP, and then to use the bankruptcy debtor test as the sole underwriting criterion, is both arbitrary and capricious.

2. <u>Exceeds Statutory Authority</u>. Plaintiff also argues that the prohibition against debtors exceeds Defendant's authority under the CARES Act, in violation of 5 U.S.C. § 706(2)(C). The Court agrees.

> In determining whether an agency's regulations are valid under a particular statute, as the Supreme Court's decision in *Chevron* instructs, we begin with the question of whether the statute unambiguously addresses the "precise question at issue." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *accord United Keetoowah Band of Cherokee Indians of Okla. v. U.S. Dep't of Hous. & Urban Dev.*, 567 F.3d 1235, 1239–40 (10th Cir. 2009); *see also Keller Tank Servs. II, Inc. v. Comm'r*, 848 F.3d 1251, 1269 (10th Cir. 2017) (noting that "[t]he *Chevron*-deference analysis proceeds in two steps," and explicating them both). "If Congress has spoken *directly* to the issue, that is the end of the matter; the court, as well as the agency, must give effect to Congress's unambiguously expressed intent." *Keetoowah Band*, 567 F.3d at 1240 (emphasis added). However, if the statute is silent or ambiguous as to the precise question at issue, a court must determine whether to afford the agency's interpretation *Chevron* deference. *Id.* Such deference is appropriate if " 'Congress delegated authority to the agency generally to make rules carrying the force of law' and the agency's interpretation of the statute was issued pursuant to that authority." *Carpio v. Holder*, 592 F.3d 1091, 1096–97 (10th Cir. 2010) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001)). If these conditions are satisfied, then we defer to the agency's interpretation of the statute as long as it is not "arbitrary, capricious, [n]or manifestly contrary to the statute," *id.* at 1096 (alteration in original) (quoting *Herrera–Castillo v. Holder*, 573 F.3d 1004, 1007 (10th Cir. 2009)).

*New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1221 (10th Cir. 2017).

The CARES Act directly addresses the PPP eligibility requirements. It charged Defendant with issuing "regulations to carry out this title. . . ." Section 1114. Defendant had no authority under this charge to change the eligibility requirements. That, however, is exactly what it did.

Defendant exceeded its authority by trying to prohibit bankruptcy debtors from getting PPP funds.

It is not entitled to *Chevron* deference.

Defendant's unlawful behavior is made clear by the CARES Act § 4003(c)(3)(D), which

relates to loans to "mid-sized businesses." Unlike PPP loans, the loans to mid-size businesses are

intended to be repaid. For that reason, Congress specified *in the statute* that bankruptcy debtors

are not eligible. Defendant should have read and understood the fundamental differences between

the mid-size business loan program (real loans) and the PPP (grants or support payments).

Defendant's refusal to abide by this simple distinction constitutes a usurpation of Congressional

authority to determine which business are eligible for PPP funds. Without question, Defendant

lacked the authority to change the PPP eligibility requirements and exclude Plaintiff.

C.    Protection Against Discriminatory Treatment.

11 U.S.C. § 525(a) provides:

(a) . . . a governmental unit may not deny, revoke, suspend, or refuse to renew a
license, permit, charter, franchise, or other similar grant to, condition such a grant
to, discriminate with respect to such a grant against, deny employment to, terminate
the employment of, or discriminate with respect to employment against, a person
that is or has been a debtor under this title or a bankrupt or a debtor under the
Bankruptcy Act, or another person with whom such bankrupt or debtor has been
associated, solely because such bankrupt or debtor is or has been a debtor under
this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent
before the commencement of the case under this title, or during the case but before
the debtor is granted or denied a discharge, or has not paid a debt that is
dischargeable in the case under this title or that was discharged under the
Bankruptcy Act.

Plaintiff argues that Defendant's decision to exclude debtors from the PPP violates

§ 525(a). The Court agrees. In *Stolz v. Brattleboro Housing Auth. (In re Stoltz)*, 315 F.3d 80 (2d

Cir. 2002), the Second Circuit analyzed the term "other similar grant:"

The term "other similar grant" is not defined by the code. In common parlance, a
grant is "a transfer of property by deed or writing." *Merriam Webster's Collegiate
Dictionary* 507 (10th ed. 2000). As a legal term, a grant is "[a]n agreement that

-13-

creates a right of any description other than the one held by the grantor. Examples include *leases,* easements, charges, patents, franchises, powers, and licenses." *Black's Law Dictionary* 707 (7th ed.1999) (emphasis added). Similarly, a lease is "[a] contract by which a rightful possessor of real property conveys the right to use and occupy that property in exchange for consideration." *Id.* at 898.

. . .

The common qualities of the property interests protected under section 525(a), i.e., "license[s], permit[s], charter[s], franchise[s], and other similar grants," are that these property interests are unobtainable from the private sector and essential to a debtor's fresh start.

*Id.* at 88-90. *See also In re Saunders*, 105 B.R. 781, 788 (Bankr. E.D. Pa. 1989) (government refusal to give debtor an education grant because of her bankruptcy could violate § 525(a), although the court decided that it did not need to reach the issue); *In re Oksentowicz*, 314 B.R. 638 (Bankr. E.D. Mich. 2004), affirmed, 2005 WL 7466596 (E.D. Mich. 2005) (landlord's rejection of a chapter 7 debtor housing application violated § 525(a) because the housing complex was considered a governmental unit); *In re Haffner*, 25 B.R. 882, 887 (Bankr. N.D. Ind. 1982) (government refusal to include debtor in a price support program because of debtor's refusal to repay pre-petition debts violated § 525(a)); *In re Howren*, 10 B.R. 303 (Bankr. D. Kan. 1980) (state university withholding transcript unless debtor paid its prepetition loan violated § 525(a)).

As shown above, the PPP is not a loan program.[8] It is a grant or support program. The target grant recipients are small businesses in financial distress. The PPP could only be offered by the government; private lenders do not give away money. PPP funds "are unobtainable from the private sector." *Stolz*, 315 F.3d at 90. They also are essential to Plaintiff's fresh start. *Id.* Of all the benefits a government can grant, free money might be the best of all. Denying Plaintiff access to PPP funds solely because it is a debtor violates § 525(a).

---

[8] The government does not violate § 525(a) by taking borrower's bankruptcy status into account when considering a loan application. *See, e.g., Watts v. Pennsylvania Housing Fin. Co.*, 876 F.2d 1090, 1094 (3d Cir. 1989); *Ayes v. U.S. Department of Veterans Affairs*, 473 F.3d 104, 110 (4th Cir. 2006).

-14-

III.    <u>CONCLUSION</u>

With only the flimsiest of justifications Defendant took one of many underwriting criteria from its "normal" loan programs (bankruptcy status of the borrower), changed it to an eligibility condition, and then applied it to an emergency grant program where it clearly had no place. Defendant's inexplicable and highhanded decision to rewrite the PPP's eligibility requirements in this way was arbitrary and capricious, beyond its statutory authority, and in violation of 11 U.S.C. § 525(a). By a separate final judgment, the Court will grant Plaintiff the relief it requests. If Defendant's actions result in Plaintiff not obtaining the $900,000 it requested, Plaintiff may file an adversary proceeding for compensatory and, if appropriate, punitive damages.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: May 1, 2020
Copies to: counsel of record

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

ROMAN CATHOLIC CHURCH OF THE
ARCHDIOCESE OF SANTA FE,                                  No. 18-13027 t11

     Debtor.

ROMAN CATHOLIC CHURCH OF THE
ARCHDIOCESE OF SANTA FE,

     Plaintiff,

v.                                                       Adv. No. 20-1026 t

UNITED STATES OF AMERICA
SMALL BUSINESS ADMINISTRATION,

     Defendant.

**<u>OPINION</u>**

     The Court held a preliminary injunction hearing in this proceeding on April 30, 2020.

During the hearing, the Court converted it to a trial on the merits, as allowed by Fed. R. Civ. P.

65(a)(2).[1] For the reasons stated herein, Plaintiff is entitled to relief under its complaint.

I.     <u>FINDINGS OF FACT</u>[2]

     The Court finds:

---

[1] Rule 65 is incorporated by reference by Fed. R. Bankr. P. 7065. The Court took this admittedly unusual step for two reasons. First, there is enormous time pressure in this proceeding, for the reasons stated below. To provide any effective relief, and/or to avoid a substantial damages claim from accruing, an immediate decision was necessary. Second, the factual issues in the proceeding were few and noncontroversial.

[2] The Court took judicial notice of the docket in the main case and this adversary proceeding. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (holding that a court may sua sponte take judicial notice of its docket); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1999) (same).

Plaintiff is a catholic archdiocese in New Mexico and a New Mexico corporation. Its principal place of business is at 4000 St. Josephs Place NW, Albuquerque, New Mexico. Plaintiff has 70 employees. On December 3, 2018, Plaintiff filed this chapter 11 case. Since then Plaintiff has been operating as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

Defendant (sometimes referred to as the "SBA") is an agency of the United States of America. Its central office is located at 409 Third Street, S.W., Washington DC 20416.

On or about March 27, 2020, the President signed the Coronavirus Aid, Relief, and Economic Security Act, H.R. 748, P.L. 115-136 (the "CARES Act"). The CARES Act is intended, among other things, to provide stimulus to the economy by distributing approximately $2.3 trillion to various industries, programs, and individuals.

The CARES Act temporarily added a new "Paycheck Protection Program" (the "PPP") to be administered by Defendant. The CARES Act provisions relating to the PPP provide in pertinent part:

Section 1102. Paycheck Protection Program

(a) IN GENERAL.—Section 7(a) of the Small Business Act (15 U.S.C. 636(a)) is amended—
(1) in paragraph (2)—
(A) in subparagraph (A), in the matter preceding clause (i), by striking "and (E)" and inserting "(E), and (F)"; and
(B) by adding at the end the following:
"(F) PARTICIPATION IN THE PAYCHECK PROTECTION PROGRAM.—In an agreement to participate in a loan on a deferred basis under paragraph (36), the participation by the Administration shall be 100 percent."; and
(2) by adding at the end the following:
"(36) PAYCHECK PROTECTION PROGRAM.—
"(A) DEFINITIONS.—In this paragraph—
. . .
 "(iv) the term 'eligible recipient' means an individual or entity that is eligible to receive a covered loan;
. . .

 "(B) PAYCHECK PROTECTION LOANS.—Except as otherwise provided in this paragraph, the Administrator may guarantee covered loans under the same terms, conditions, and processes as a loan made under this subsection.
. . .

 "(D) INCREASED ELIGIBILITY FOR CERTAIN SMALL BUSINESSES AND ORGANIZATIONS.—
"(i) IN GENERAL.—During the covered period, in addition to small business concerns, any business concern, nonprofit organization, veterans organization, or Tribal business concern described in section 31(b)(2)(C) shall be eligible to receive a covered loan if the business concern, nonprofit organization, veterans organization, or Tribal business concern employs not more than the greater of—
"(I) 500 employees; or
"(II) if applicable, the size standard in number of employees established by the Administration for the industry in which the business concern, nonprofit organization, veterans organization, or Tribal business concern operates.

. . .

(F) ALLOWABLE USES OF COVERED LOANS.—
"(i) IN GENERAL.—During the covered period, an eligible recipient may, in addition to the allowable uses of a loan made under this subsection, use the proceeds of the covered loan for—
"(I) payroll costs;
"(II) costs related to the continuation of group health care benefits during periods of paid sick, medical, or family leave, and insurance premiums;
"(III) employee salaries, commissions, or similar compensations;
"(IV) payments of interest on any mortgage obligation (which shall not include any prepayment of or payment of principal on a mortgage obligation);
"(V) rent (including rent under a lease agreement);
"(VI) utilities; and
"(VII) interest on any other debt obligations that were incurred before the covered period.
"(ii) DELEGATED AUTHORITY.—
"(I) IN GENERAL.—For purposes of making covered loans for the purposes described in clause (i), a lender approved to make loans under this subsection shall be deemed to have been delegated authority by the Administrator to make and approve covered loans, subject to the provisions of this paragraph.
"(II) CONSIDERATIONS.—In evaluating the eligibility of a borrower for a covered loan with the terms described in this paragraph, a lender shall consider whether the borrower—
"(aa) was in operation on February 15, 2020; and
"(bb)(AA) had employees for whom the borrower paid salaries and payroll taxes; or
"(BB) paid independent contractors, as reported on a Form 1099–MISC.
. . .

SEC. 1106. <u>Loan Forgiveness</u>.

(a) DEFINITIONS.—In this section—
(1) the term "covered loan" means a loan guaranteed under paragraph (36) of section 7(a) of the Small Business Act (15 U.S.C. 636(a)), as added by section 1102;
. . .
 (7) the term "expected forgiveness amount" means the amount of principal that a lender reasonably expects a borrower to expend during the covered period on the sum of any—
(A) payroll costs;
(B) payments of interest on any covered mortgage obligation (which shall not include any prepayment of or payment of principal on a covered mortgage obligation);
(C) payments on any covered rent obligation; and
(D) covered utility payments; and
(8) the term "payroll costs" has the meaning given that term in paragraph (36) of section 7(a) of the Small Business Act (15 U.S.C. 636(a)), as added by section 1102 of this Act.
(b) FORGIVENESS.—An eligible recipient shall be eligible for forgiveness of indebtedness on a covered loan in an amount equal to the sum of the following costs incurred and payments made during the covered period:
(1) Payroll costs.
(2) Any payment of interest on any covered mortgage obligation (which shall not include any prepayment of or payment of principal on a covered mortgage obligation).
(3) Any payment on any covered rent obligation.
(4) Any covered utility payment.

SEC. 1114. <u>Emergency Rulemaking Authority</u>.

Not later than 15 days after the date of enactment of this Act, the Administrator shall issue regulations to carry out this title and the amendments made by this title without regard to the notice requirements under section 553(b) of title 5, United States Code.

As can be seen from the statute, funds from the PPP have the following extremely favorable

terms:

- No collateral or personal guarantees are required;
- Funds are available regardless of the applicant's creditworthiness.
- No fees are charged;
- The loans mature in 2 years;
- The interest rate is 1%; and
- *The loans are fully forgiven if the funds are used as required.*

The PPP has very few eligibility requirements. Applicants must:

     1.  Be a small business concern or any business concern, nonprofit organization, veterans organization, or Tribal business concern described in section 31(b)(2)(C) of the Small Business Act;

     2.  Have fewer than 500 employees or, if applicable, the size standard in number of employees established by the Administration for the industry in which the business concern, nonprofit organization, veterans organization, or Tribal business concern operates;

     3.  Have been in operation on February 15, 2020; and

     4.  Have had employees to whom the applicant pays salaries and payroll taxes.

Faith-based organizations like Plaintiff are eligible to receive PPP loans. Plaintiff clearly met all eligibility requirements under the CARES Act.

Funds available under the PPP are limited and administered on a first-come, first-served basis. Demand for the PPP funds has been overwhelming. The funds were exhausted once, but were replenished by Congress on or about April 24, 2020. The Court does not know the current status of PPP fund availability or whether Congress will replenish the fund again.

On April 2, 2020, Defendant issued Official SBA Form 2484, which is the form applicants must use to apply for a PPP loan. The form states that the applicants "presently are involved in any bankruptcy" are not eligible.[3]

---

[3] Defendant introduced into evidence its form of application for a regular 7(a) loan. The application has sixteen questions, including whether the applicant or any affiliate has ever filed for bankruptcy protection. The application asks for details on a separate sheet if the question is answered "yes."

On April 15, 2020, Defendant published in the Code of Federal Regulations an "interim final rule" implementing the PPP (the "First Rule"). The First Rule, like the CARES Act, says nothing about bankruptcy debtors being ineligible for the PPP.[4]

Plaintiff filed a loan application on April 20, 2020, for a $900,000 PPP loan. The lender, Wells Fargo, did not act on the application because of the bankruptcy ineligibility provision.

On April 28, 2020, the SBA issued another interim final rule (the "Second Rule"). The Second Rule purports to disqualify bankruptcy debtors from the PPP:

> *Will I be approved for a PPP loan if my business is in bankruptcy?*
> No. If the applicant or the owner of the applicant is the debtor in a bankruptcy proceeding, either at the time it submits the application or at any time before the loan is disbursed, the applicant is ineligible to receive a PPP loan. . . .The Administrator, in consultation with the Secretary, determined that providing PPP loans to debtors in bankruptcy would present an unacceptably high risk for an unauthorized use of funds or non-repayment of unforgiven loans.

Like many New Mexico businesses, Plaintiff has been severely financially affected by the federal, state, and local government "lockdown" orders issued in response to the coronavirus pandemic. On March 23, 2020, the New Mexico Department of Health issued a "stay at home" order, prohibiting mass gatherings and requiring all non-essential businesses to cease in-person operations. On April 6, 2020, the Governor issued Executive Order 2020-22, which extended the

---

[4] The First Rule adopts the ineligibility standards in section 120.110, title 13 of the Code of Federal Regulations ("CFR 120.110"), as further described in SBA's Standard Operating Procedure 50-10, Subpart B, Chapter 2 ("SOP 50-10"). *See* First Interim Rule, 2(c) ("Businesses that are not eligible for PPP loans are identified in 13 CFR 120.110 and further described in SBA's Standard Operating Procedure"). The SOP 50-10 provides that a "Small Business Applicant" must, among other things: be an operating business; be located in the United States; be "small" (as defined by the SBA); and demonstrate the need for the desired credit. *See* SOP 50-10, pg. 85. The SOP 50-10 also provides that the businesses listed in CFR 120.110 are not eligible for an SBA loan. Bankruptcy debtors are not among the listed ineligible businesses. Nothing in the SOP 50-10 makes the Plaintiff ineligible for a PPP loan.

stay at home order through April 30, 2020. The Governor recently announced that she will further extend the stay at home order through at least May 15, 2020.

A major source of Plaintiff's income is revenue derived from monthly parish assessments. The parishes, in turn, derive a significant portion of their revenue from money collected during masses. Furthermore, a significant portion of the collections occur during Holy Week, which coincided with the lockdown. Because the parishes have been closed to their parishioners and the public, Plaintiff is losing about $300,000 a month in revenue it otherwise would realize from normal operations. This loss of income will continue until, at a minimum, the Governor's lockdown orders are lifted. Without a PPP loan, the Plaintiff's operations and reorganization effort will be substantially adversely affected. The PPP funds are essential to Plaintiff's "fresh start."

Plaintiff has the financial and accounting ability to follow the PPP rules about use of the funds. Plaintiff is careful in its accounting, files complete and detailed monthly operating reports in this case, and is more than willing to separately account for how it would use PPP funds.

On April 28, 2020, Plaintiff filed a motion to approve its proposed PPP loan as post-petition financing under 11 U.S.C. § 364.

With the Second Rule, Defendant made a final determination that Plaintiff's application will be denied. There are no administrative appeals or remedies available to Plaintiff to seek review of Defendant's decision to exclude it from the PPP.

## II.   DISCUSSION

### A.   Jurisdiction and Venue.

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. Jurisdiction is proper under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 701 et seq. (the "APA"). This is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2)(A). Defendant's decision to exclude Plaintiff from the PPP is core: it goes to the heart of case administration, as the funds were intended by Congress to replace Plaintiff's lost revenue caused by the government lockdowns. In addition, the Court concludes that a proceeding to determine whether a governmental unit has violated 11 U.S.C. § 525(a) is core.

Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1) and 28 U.S.C. § 1409(a).

B.    The Administrative Procedure Act.

This proceeding is brought in part under the APA. 5 U.S.C. § 706 provides:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
>   (1) compel agency action unlawfully withheld or unreasonably delayed; and
>   (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
>     (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>     (B) contrary to constitutional right, power, privilege, or immunity;
>     (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>     (D) without observance of procedure required by law;
>     (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>     (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
>
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

In *New Mexico Health Connections v. United States Department of Health & Human Services*, 946 F.3d 1138, 1161 (10th Cir. 2019), the Tenth Circuit held that "[i]n reviewing an APA challenge to agency action, a district court acts as an appellate court." The scope of the court's "review under this standard is "narrow"" and the court "is not to substitute its judgment for that of

the agency." *Judulang v. Holder*, 565 U.S. 42, 52-53 (2011) (citation omitted). Nevertheless, courts retain an important role "in ensuring the agencies have engaged in reasoned decisionmaking" by examining the reasons for the agency decisions, or lack thereof, and determining "whether the decision was based on consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 53 (citation omitted); *Dep't of Commerce v. N.Y.*, 139 S. Ct. 2551, 2569 (2019) (although a court may not substitute its judgment for that of the agency, it must ensure that the agency remained "within the bounds of reasoned decisionmaking").

Here, the question is whether Plaintiff is entitled to relief under § 706(2)(A) (arbitrary and capricious) and/or (C) (in excess of authority).

1.    <u>Arbitrary and Capricious</u>. Plaintiff argues that Defendant's prohibition against bankruptcy debtors is arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A). "Under the arbitrary and capricious standard, we must determine whether the agency considered all relevant factors and whether there has been a clear error of judgment." *IMC Kalium Carlsbad Inc. v. Interior Bd. of Land Appeals*, 206 F.3d 1003, 1012 (10th Cir. 2000) (internal quotation marks omitted). An agency rule is "arbitrary and capricious if the agency has relied on factors [that] Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). While the APA's arbitrary and capricious standard is generally deferential, prohibiting the court from substituting its judgment for the agency's, *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1164 (10th Cir. 2002), this principle is borne of the notion that an agency typically has "greater familiarity with the ever-changing facts and circumstances

surrounding the subjects" it regulates. *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000). No such deference is given to an action taken without statutory authority. *Util. Air Regulatory Group v. E.P.A.*, 573 U.S. 302, 321 (2014).

The Court finds that Defendant's decision to exclude bankruptcy debtors from the PPP is arbitrary and capricious. While a borrower's bankruptcy status clearly is relevant for a normal loan program, the PPP is the opposite of that. It is not a loan program at all. It is a grant or support program. The statute's eligibility requirements do not include creditworthiness. Quite the contrary, the CARES Act makes PPP money available regardless of financial distress. Financial distress is presumed. Given the effect of the lockdown, many, perhaps most, applicants would not be able to repay their PPP loans. They don't have to, because the "loans" are really grants. Repayment is not a significant part of the program. That is why Congress did not include creditworthiness as a requirement.

Considering the unprecedent nature of the PPP and the circumstances underlying its enactment, there is no reason to assume that Congress intended to cede to Defendant discretion to exclude bankruptcy debtors from the PPP. Rather, a review of the CARES Act in its entirety shows the opposite. *E.P.A.*, 573 U.S. at 321 (Congress's intent may be discerned by examining the enactment in its entirety); *Brown & Williamson*, 529 U.S. at 133 (2000) (same). As discussed below, another CARES Act program (direct loans to mid-sized businesses)[5] specifically excludes bankruptcy debtors. The unmistakable implication is that Congress did not intend to exclude bankruptcy debtors from the PPP.

The structure of the PPP is simple: PPP funds must be used for payroll, mortgage interest, rent, or utilities. If the funds are used as required, they do not have to be repaid. Given the obvious

---

[5] § 4003(c)(3)(D).

-10-

purpose of the PPP, it was arbitrary and capricious for Defendant to engraft a creditworthiness test where none belonged.

Furthermore, the test itself (are you a bankruptcy debtor?) is arbitrary and capricious. Why that eligibility criterion and not one of the many others that would more accurately gauge a borrower's likelihood of complying with the PPP?[6] It makes no sense, and it is unsupported by the terms of the CARES Act. *See E.P.A.*, 573 U.S. 302, 324 (2014). ("We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'") (citation omitted).

Defendant's only articulated justification for the bankruptcy disqualification is that bankruptcy debtors "present an unacceptably high risk for an unauthorized use of funds or non-repayment of unforgiven loans." As Judge David Jones said last week in ruling on a similar issue, the justification "is completely frivolous."[7] It is also arbitrary and capricious. Plaintiff, like all chapter 11 debtors in possession, is under the supervision of the Court and the United States Trustee's office. It must file detailed monthly operating reports, attaching bank statements. The unsecured creditors committee appointed in the case is very active and watches how Plaintiff spends money. All creditors have access to the docket and the monthly operating reports. In short, the chapter 11 bankruptcy system is a hundred-eyed Argus. In contrast, nondebtors can spend their

---

[6] Other possible underwriting criteria include: balance sheet insolvency; inability to pay debts as they become due; recent profitability; credit score; pending collection actions; current default on secured or unsecured debts; increases in credit card or other debt to pay bills; current ration of accounts receivable to accounts payable; and presence or absence of cash flow problems. There are many more.

[7] *Hidalgo County Emergency Service Foundation v. Jovita Carranza (In re Hidalgo County Emergency Service Foundation)*, Case no. 19-20497; Adv. pro. No. 20-2006, (Bankr. S.D. Tex.); (transcript of oral ruling rendered April 24, 2020).

-11-

PPP funds without any oversight. Defendant's justification for excluding bankruptcy debtors is so weak the Court has to wonder if Defendant really believes it.

The Court concludes that Defendant's decision to insert underwriting criteria into the PPP, and then to use the bankruptcy debtor test as the sole underwriting criterion, is both arbitrary and capricious.

2.   <u>Exceeds Statutory Authority</u>. Plaintiff also argues that the prohibition against debtors exceeds Defendant's authority under the CARES Act, in violation of 5 U.S.C. § 706(2)(C). The Court agrees.

> In determining whether an agency's regulations are valid under a particular statute, as the Supreme Court's decision in *Chevron* instructs, we begin with the question of whether the statute unambiguously addresses the "precise question at issue." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *accord United Keetoowah Band of Cherokee Indians of Okla. v. U.S. Dep't of Hous. & Urban Dev.*, 567 F.3d 1235, 1239–40 (10th Cir. 2009); *see also Keller Tank Servs. II, Inc. v. Comm'r*, 848 F.3d 1251, 1269 (10th Cir. 2017) (noting that "[t]he *Chevron*-deference analysis proceeds in two steps," and explicating them both). "If Congress has spoken *directly* to the issue, that is the end of the matter; the court, as well as the agency, must give effect to Congress's unambiguously expressed intent." *Keetoowah Band*, 567 F.3d at 1240 (emphasis added). However, if the statute is silent or ambiguous as to the precise question at issue, a court must determine whether to afford the agency's interpretation *Chevron* deference. *Id.* Such deference is appropriate if " 'Congress delegated authority to the agency generally to make rules carrying the force of law' and the agency's interpretation of the statute was issued pursuant to that authority." *Carpio v. Holder*, 592 F.3d 1091, 1096–97 (10th Cir. 2010) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001)). If these conditions are satisfied, then we defer to the agency's interpretation of the statute as long as it is not "arbitrary, capricious, [n]or manifestly contrary to the statute," *id.* at 1096 (alteration in original) (quoting *Herrera–Castillo v. Holder*, 573 F.3d 1004, 1007 (10th Cir. 2009)).

*New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1221 (10th Cir. 2017).

The CARES Act directly addresses the PPP eligibility requirements. It charged Defendant with issuing "regulations to carry out this title. . . ." Section 1114. Defendant had no authority under this charge to change the eligibility requirements. That, however, is exactly what it did.

Defendant exceeded its authority by trying to prohibit bankruptcy debtors from getting PPP funds.

It is not entitled to *Chevron* deference.

Defendant's unlawful behavior is made clear by the CARES Act § 4003(c)(3)(D), which

relates to loans to "mid-sized businesses." Unlike PPP loans, the loans to mid-size businesses are

intended to be repaid. For that reason, Congress specified *in the statute* that bankruptcy debtors

are not eligible. Defendant should have read and understood the fundamental differences between

the mid-size business loan program (real loans) and the PPP (grants or support payments).

Defendant's refusal to abide by this simple distinction constitutes a usurpation of Congressional

authority to determine which business are eligible for PPP funds. Without question, Defendant

lacked the authority to change the PPP eligibility requirements and exclude Plaintiff.

C.    <u>Protection Against Discriminatory Treatment</u>.

11 U.S.C. § 525(a) provides:

(a) . . . a governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act.

Plaintiff argues that Defendant's decision to exclude debtors from the PPP violates

§ 525(a). The Court agrees. In *Stolz v. Brattleboro Housing Auth. (In re Stoltz)*, 315 F.3d 80 (2d

Cir. 2002), the Second Circuit analyzed the term "other similar grant:"

The term "other similar grant" is not defined by the code. In common parlance, a grant is "a transfer of property by deed or writing." *Merriam Webster's Collegiate Dictionary* 507 (10th ed. 2000). As a legal term, a grant is "[a]n agreement that

> creates a right of any description other than the one held by the grantor. Examples include *leases,* easements, charges, patents, franchises, powers, and licenses." *Black's Law Dictionary* 707 (7th ed.1999) (emphasis added). Similarly, a lease is "[a] contract by which a rightful possessor of real property conveys the right to use and occupy that property in exchange for consideration." *Id.* at 898.
>
> . . .
>
> The common qualities of the property interests protected under section 525(a), i.e., "license[s], permit[s], charter[s], franchise[s], and other similar grants," are that these property interests are unobtainable from the private sector and essential to a debtor's fresh start.

*Id.* at 88-90. *See also In re Saunders*, 105 B.R. 781, 788 (Bankr. E.D. Pa. 1989) (government refusal to give debtor an education grant because of her bankruptcy could violate § 525(a), although the court decided that it did not need to reach the issue); *In re Oksentowicz*, 314 B.R. 638 (Bankr. E.D. Mich. 2004), affirmed, 2005 WL 7466596 (E.D. Mich. 2005) (landlord's rejection of a chapter 7 debtor housing application violated § 525(a) because the housing complex was considered a governmental unit); *In re Haffner*, 25 B.R. 882, 887 (Bankr. N.D. Ind. 1982) (government refusal to include debtor in a price support program because of debtor's refusal to repay pre-petition debts violated § 525(a)); *In re Howren*, 10 B.R. 303 (Bankr. D. Kan. 1980) (state university withholding transcript unless debtor paid its prepetition loan violated § 525(a)).

As shown above, the PPP is not a loan program.[8] It is a grant or support program. The target grant recipients are small businesses in financial distress. The PPP could only be offered by the government; private lenders do not give away money. PPP funds "are unobtainable from the private sector." *Stolz*, 315 F.3d at 90. They also are essential to Plaintiff's fresh start. *Id.* Of all the benefits a government can grant, free money might be the best of all. Denying Plaintiff access to PPP funds solely because it is a debtor violates § 525(a).

---

[8] The government does not violate § 525(a) by taking borrower's bankruptcy status into account when considering a loan application. *See, e.g., Watts v. Pennsylvania Housing Fin. Co.*, 876 F.2d 1090, 1094 (3d Cir. 1989); *Ayes v. U.S. Department of Veterans Affairs*, 473 F.3d 104, 110 (4th Cir. 2006).

-14-

III.   <u>CONCLUSION</u>

With only the flimsiest of justifications Defendant took one of many underwriting criteria from its "normal" loan programs (bankruptcy status of the borrower), changed it to an eligibility condition, and then applied it to an emergency grant program where it clearly had no place. Defendant's inexplicable and highhanded decision to rewrite the PPP's eligibility requirements in this way was arbitrary and capricious, beyond its statutory authority, and in violation of 11 U.S.C. § 525(a). By a separate final judgment, the Court will grant Plaintiff the relief it requests. If Defendant's actions result in Plaintiff not obtaining the $900,000 it requested, Plaintiff may file an adversary proceeding for compensatory and, if appropriate, punitive damages.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: May 1, 2020
Copies to: counsel of record



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

ENTERED
05/08/2020

| | | |
|---|---|---|
| IN RE: | § | CASE NO.  19-20497 |
| HIDALGO COUNTY EMERGENCY | § | |
| SERVICE FOUNDATION, | § | |
| Debtor. | § | CHAPTER 11 |
| | § | |
| | § | |
| HIDALGO COUNTY EMERGENCY | § | |
| SERVICE FOUNDATION, | § | |
|     Plaintiff | § | ADVERSARY NO. 20-2006 |
| v. | § | |
| JOVITA CARRANZA, IN HER | § | |
| CAPACITY AS ADMINISTRATOR FOR | § | |
| THE U.S. SMALL BUSINESS | § | |
| ADMINISTRATION, | § | |
|     Defendant. | § | |

## PRELIMINARY INJUNCTION

On Friday May 8, 2020, the Court considered the Plaintiff's Application For Preliminary

Injunction with due notice to the parties.

1.      The Court finds that the Plaintiff has proven it would suffer immediate and

irreparable harm without issuance of a preliminary injunction.

2.      Plaintiff has shown a substantial likelihood of success on the merits on its claim

that Jovita Carranza in her capacity as Administrator for the United States Small Business

Administration ("**SBA**") has acted in a manner that is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law," 5 U.S.C.§706(2)(A); and "in excess of

statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C.§706(2)(C),

and therefore the Court "shall compel agency action unlawfully withheld or unreasonably

delayed." 5 U.S.C.§706(1).

3.      Plaintiff has also shown a substantial likelihood of success on the merits on its

claim that the SBA's conduct is a violation of 11 USC §525(a), enforceable under 11 USC

§105(a) and the government's waiver of sovereign immunity in 11 USC §106.

4.      Both of Plaintiff's causes of action arise from the SBA's categorical exclusion of the Plaintiff from participation in the PPP support program solely because it is a debtor in bankruptcy, and because it is an applicant who is "presently involved in any bankruptcy".

5.      Plaintiff has proven that the risk of harm to Plaintiff if a preliminary injunction is not granted outweighs the harm to SBA and other Restrained Parties (as defined below).

6.      Plaintiff has proven that issuance of this preliminary injunction is in the public interest.

7.      The Court incorporates by reference into this preliminary injunction all its oral findings and rulings made on the record at the temporary restraining order hearing on April 24, 2020, the contents of its temporary restraining order entered on April 25, 2020, and also all oral findings and rulings made on the record at this hearing.  The Court further adopts the legal reasoning set forth by Judge Thuma in *Roman Catholic Church of the Archdiocese of Santa Fe v. United States of America Small Business Administration*, Adv. P. No. 20-1026, (Bankr. D.N.M. May 1, 2020).

8.      The Plaintiff is a debtor-in-possession and so no bond is required.

Based on the findings and conclusions as set forth and referenced above, it is hereby ORDERED, AJDUDGED AND DECREED as follows:

1.      The Plaintiff's request for a preliminary injunction is GRANTED as set forth herein.

2.      A preliminary injunction is hereby issued, with notice, and directed to SBA, all her officers, agents, servants, employees and attorneys, and all other persons who are in active concert with any of the foregoing persons; the Court considers any lender that is eligible to make

Preliminary Injunction – HCEMS vs. SBA            - 2 -

PPP loans and that has actual knowledge of this order to be "in active concert" with SBA in any of their dealings with the Plaintiff in connection with the PPP process and so bound by this preliminary injunction (collectively "**Restrained Parties**").

3. Until the expiration of this preliminary injunction, all the Restrained Parties are hereby ENJOINED, RESTRAINED, and/or COMMANDED as follows—

 a. From directly or indirectly interfering with Plaintiff's submission of any PPP application form to any lender, with the words "or presently involved in any bankruptcy" stricken from the form (or ignored with respect to an on-line application), and, if Plaintiff satisfies all the other conditions in question #1 to the application form, Plaintiff may mark the box answering question #1 "no."

 b. From refusing to accept and promptly process in accordance with all other applicable PPP program rules and regulations the Plaintiff's PPP application forms dated April 3, 2020, and April 28, 2020.

 c. The Restrained Parties shall consider all of Plaintiff's PPP application forms, and shall fully implement all aspects of the PPP with respect to Plaintiff, without any consideration of the involvement of Plaintiff or any owner of Plaintiff in any bankruptcy.

 d. All lenders considering a PPP application form submitted by the Plaintiff are entitled to rely at all times on this order and the SBA sworn statement as set for below with respect to any lawful action they may take in reliance thereon.

 e. To the extent any lender requires Hidalgo County EMS to execute any other forms, applications, or other documents for PPP funding that include any language about whether Hidalgo County EMS or any owner of Hidalgo County EMS is involved in any bankruptcy, Hidalgo County EMS is authorized to strike the portion of such language about involvement in any bankruptcy and the Restrained Parties shall process the forms, applications, or other documents without any consideration of the involvement of Hidalgo County EMS or any owner of Hidalgo County EMS in any bankruptcy.

 f. The Restrained Parties shall not make or condition the approval of any PPP loan or loan guaranty involving the Plaintiff contingent on the Debtor or any owner of the Debtor not being "presently involved in any bankruptcy."

4. No later than 5:00 p.m. (prevailing Central time) on Monday, May 11, 2020, Jovita Carranza in her capacity as Administrator for the United States Small Business Administration, shall file a sworn declaration that confirms that the SBA will honor any right,

guaranty, inducement or other privilege extended to any participating lender in the Paycheck Protection Program that complies with this preliminary injunction.  The failure to timely comply with this paragraph will result in the issuance of a show cause order, a requirement for personal appearance and the potential imposition of compensatory and coercive sanctions.



   **Signed:  May 08, 2020.**



**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

*Formatted for Electronic Distribution*                                                    *Not for Publication*

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF VERMONT



Filed & Entered
On Docket
05/04/2020

_____

**In re:**

 **Springfield Hospital, Inc.,**                              **Chapter 11 Case**
  **Debtor-in-Possession.**                                   **# 19-10283**

_____

**In re:**

 **Springfield Hospital, Inc.,**
  **Plaintiff,**
   **v.**                                                     **Adversary Proceeding**
 **Jovita Carranza, in her capacity as**                      **# 20-01003**
 **Administrator for the U.S. Small**
 **Business Administration,**
  **Defendant.**

_____

*Appearances:  Andrew Helman, Esq.*                          *Michael Tye, Esq.*
*               Murray, Plumb & Murray*                       *U.S. Department of Justice*
*               Portland, ME*                                 *Washington, DC*
*               For the Plaintiff*                            *For the Defendant*

## <u>ORDER</u>
### GRANTING PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND SETTING STATUS CONFERENCE ON THE PLAINTIFF'S REQUEST FOR A PRELIMINARY INJUNCTION

Upon consideration of the Emergency Motion for Temporary Restraining Order and Request for Hearing Date and Briefing Schedule with Respect to the Debtor's Request For A Preliminary Injunction (doc. # 2, the "TRO Motion")[1] filed by the Plaintiff, the responses and memoranda of law the parties filed thereafter (doc. ## 10,11, 15, 16), and the arguments the parties presented at the May 1, 2020 hearing; and for the reasons set forth in the memorandum of decision of even date, the TRO Motion is granted and the Court shall convene a status conference to address the Plaintiff's request for a preliminary injunction.

_____

[1] Capitalized terms not defined here shall have the meaning given to them in the TRO Motions and memorandum of decision.

With respect to the evidentiary and statutory basis the Court has considered:

1. The Court grants the Plaintiff's request, which the Defendant did not oppose, to treat the verified statements in the Amended Verified Complaint (doc. # 3, the "Complaint") as admitted evidence in support of the TRO Motion.

2. The Court relies additionally on the text and purpose of the Coronavirus Aid, Relief and Economic Security Act (the "CARES Act"); the Paycheck Protection Program ("PPP"), enacted in § 1102 of the CARES Act; § 7(a) of the Small Business Act (15 U.S.C. § 636(a)); other sections of the CARES Act directly addressing the Bankruptcy Code and lending to bankruptcy debtors, specifically §§ 1103(3), 1113, and 4003(c)(3)(D)(i)(V) of the CARES Act; and the Administrator's interim final rules promulgated on April 15, 2020, and April 24, 2020, Docket Nos. SBA-2020-0015 and SBA-2020-0021.

Based on these sources, pertinent case law, and the record in this proceeding and the Plaintiff's chapter 11 case, as more fully articulated in the memorandum of decision, **THE COURT FINDS**

3. The Plaintiff has properly served, and given adequate notice of, the TRO Motion.

4. This Court has jurisdiction over this adversary proceeding and both statutory and constitutional authority to enter a final judgment in this proceeding.

5. The Plaintiff is entitled to issuance of a temporary restraining order pursuant to Rule 65 of the Federal Rules of Civil Procedure, which is applicable to this adversary proceeding pursuant to Rule 7065 of the Federal Rules of Bankruptcy Procedure.

6. The Plaintiff submitted as an exhibit to the Motion – and as an exhibit to its Complaint – its Application in which it answered "yes" to question 1 of the official form of application promulgated by the SBA.

7. The Plaintiff has shown a substantial likelihood of success on the merits on the discrimination claim alleged in the Complaint, and in particular, the Administrator is in violation of § 525(a) of the Bankruptcy Code by requiring lenders participating in PPP to consider loan applications on a form that says PPP loans will not be approved if the applicant or any owner is presently involved in any bankruptcy.

8. The Plaintiff is a critical access hospital providing services in the Springfield, VT area. The Plaintiff's business operations have been significantly impacted by COVID-19 as many non-essential elective and office visits have been rescheduled or canceled and a significant percentage of the Plaintiff's revenue is derived from non-essential and elective procedures.

9. In the absence of funding from PPP or another source, the Plaintiff may be forced to discontinue business operations by early June and would not have sufficient funds for an orderly liquidation under those circumstances. This timeline could accelerate depending on the spread of COVID-19 in Springfield area.

10. The Plaintiff has several hundred employees who may lose their jobs if the Plaintiff's business operations cease. Due to the nature of the Plaintiff's business operations, it must continue to employ staff in order to meet its charitable mission and provide health care services.

11. The risk of harm to the Plaintiff if a temporary restraining order is not granted outweighs the risk of any harm to the Administrator if a temporary restraining order is granted.

12. Given the nature of the Plaintiff's business operations and the purpose Congress had in enacting the CARES Act and establishing the PPP, the public interest is served by issuing a temporary restraining order.

13. The CARES Act constitutes a grant of economic aid in response to the pandemic.

14. The Plaintiff has sustained its burden of proof, having prevailed in its arguments on all four prongs of the test for determining whether a temporary restraining order is warranted.

15. This Court makes no determination on the question of whether the Plaintiff qualifies for a PPP loan or whether Plaintiff's PPP application should be granted. Rather, the Court only grants the relief set forth in this Order and it specifically does not obligate Berkshire Bank or any other participating lender to approve a PPP application on behalf of the Plaintiff.

16. The Plaintiff is a debtor-in-possession and therefore no bond is required under Rule 65.

   Based on these findings, **IT IS HEREBY ORDERED**:

(A) The Motion is **GRANTED** pursuant to the terms of this Order, without need of a bond.

(B) A temporary restraining order is hereby **ISSUED**, with notice, and directed to the Administrator and all agents, servants, employees, and any parties acting in concert with any of the foregoing parties with respect to a PPP application from the Plaintiff (collectively, the "Restrained Parties"). The Court intends that Berkshire Bank or any other lender participating in PPP, to whom the Plaintiff submits a PPP application, shall be one of the Restrained Parties upon the Plaintiff's service of this Order on such lender.[2]

(C) Until the expiration of this temporary restraining order, its scope shall be as follows:

---

[2] The Plaintiff may provide notice of this Order by e-mail to counsel of record for Berkshire Bank in Plaintiff's chapter 11 case.

(i)  The Restrained Parties shall not deny, or cause any commercial lender to deny, a PPP application of the Plaintiff solely on the basis that the Plaintiff is a debtor in bankruptcy, or to deny it based on the words "or presently in bankruptcy" on the Administrator's official form of the PPP application.

(ii)  The Restrained Parties shall not refuse to guaranty a loan sought by the Plaintiff under PPP on the basis that the Plaintiff is a debtor in bankruptcy or because of a "yes" answer in response to question 1 on the official form of PPP application promulgated by the Administrator.

(iii)  Effective upon entry of this Order, the Restrained Parties, other than any participating lender, shall not authorize, guaranty, or disburse funds appropriated for loans under PPP without reserving sufficient funds or guaranty authority within the scope of the second appropriation to fund PPP to provide the Plaintiff with access to funds under PPP if the Plaintiff is eligible after implementation of the terms of this temporary restraining order, and its amendment with respect to question 2 of the Plaintiff's Application,[3] and any appellate or judicial process with respect to any application filed by the Plaintiff. Nothing in this subparagraph is intended to limit the ability of a commercial lender that is one of the Restrained Parties from issuing PPP loans to borrowers. Rather, it requires the Administrator to ensure she has sufficient authority within the scope of amounts appropriated for PPP as of April 27, 2020, to guaranty a loan to the Plaintiff in an amount the Plaintiff may be qualified to obtain, if the Plaintiff is eligible subject to the terms of this Order and after consideration of any administrative and judicial appeals and resolution of the claims in the Plaintiff's Complaint.

(iv)  The Plaintiff shall be authorized to submit a PPP application to a participating lender of its choosing – and a participating lender may consider any pending application of the Plaintiff – with the words "or presently involved in any bankruptcy" stricken from the official form of application and, if the Plaintiff satisfies all other conditions in question 1 to the official loan application form, to mark the box answering question 1 "no" or, with respect to any pending application, for the participating lender to treat question 1 as if it was answered "no." The Restrained Parties shall consider the application submitted by the Plaintiff and shall fully implement all aspects of the PPP with respect to the Plaintiff without consideration of the involvement of the Plaintiff or any of its owners in any bankruptcy case.

---

[3] In the TRO Motion, the Plaintiff noted it had initially answered "yes" to question 2, which asks whether the applicant is delinquent or has defaulted on certain types of loans, but on review of SBA guidance the Plaintiff has or will correct its response (doc. # 2, pp. 4–5).

The application shall be considered an initial application if the submission of a subsequent application would adversely impact the Plaintiff's ability to qualify for a PPP loan.

(v)     To the extent that any lender requires the Plaintiff to execute other forms, applications, or other documents for a PPP loan that include language about whether the Plaintiff or any owner of the Plaintiff is involved in a bankruptcy case, the Plaintiff is authorized to strike the language about involvement in a bankruptcy case and the Restrained Parties shall process the forms, applications, or other documents without consideration of the involvement of the Plaintiff or any owner of the Plaintiff in a bankruptcy case.

(vi)    The Restrained Parties shall not make or condition the approval of any PPP loan guaranty to the Plaintiff contingent on the Plaintiff or any owner of the Plaintiff not being "presently involved in any bankruptcy."

(vii)   Upon receipt of any PPP funds, the Plaintiff must:

(a)   deposit those funds in a specially designated, interest bearing account, titled as a DIP account;

(b)   immediately file a notice on the docket of this adversary proceeding and the docket of the Plaintiff's chapter 11 case, stating its PPP application has been granted, and disclosing both the name of the lender that granted the application and the amount of the funds it has received;

(c)   refrain from disbursing any of the PPP funds until it has Court approval to do so; and

(d)   within two days after receipt of the PPP funds, file either a motion on shortened (seven-days') notice to all secured creditors, or a stipulation showing the consent of the U.S. Trustee, that (i) requests authority to disburse PPP funds, (ii) sets forth the Plaintiff's proposed distribution of the PPP funds, and (iii) affirms the proposed distribution meets all requirements for forgiveness of the PPP loan.

(viii)  If the Court authorizes the Plaintiff to disburse the PPP funds, the Plaintiff must:

(a)   create a spreadsheet showing how PPP funds have been disbursed, that includes

(1)   the date and purpose of each disbursement (e.g., payroll, interest payment),

(2)   the section of the CARES Act which authorizes forgiveness of the PPP loan used for that purpose,

(3)   the remaining balance of PPP funds, and

(4)   any other information the Plaintiff would find useful for its record keeping or for purposes of demonstrating the entire PPP loan is eligible for forgiveness if / when the SBA audits the Plaintiff's use of the PPP loan; and

(b)    file on the docket of this adversary proceeding and the docket of the Plaintiff's chapter
11 case an updated version of the PPP funds spreadsheet within three business days of
each disbursement of PPP funds.

**IT IS FURTHER ORDERED** the parties shall appear at a status hearing at **10:00 a.m. on
Thursday, May 7, 2020**,[4] on the Plaintiff's request for a preliminary injunction. At that status hearing,

(A)    the Defendant shall describe, in reasonable detail, the steps she has taken to comply with the
terms of this TRO;

(B)    the Plaintiff shall report on the status of its efforts to implement the terms of this TRO and shall
present, in reasonable detail, the contours of the relief it seeks in the form of a preliminary
injunction, based on the current status of this proceeding and any pending PPP application;

(C)    the parties shall present to the Court any additional conditions they propose with respect to the
Plaintiff's receipt, distribution, or recording of PPP funds, in order to ensure maximum protection
of the Plaintiff's bankruptcy estate, its creditors, and the Defendant/lender; and

(D)    the parties shall jointly propose a timeline and litigation schedule (if needed) for a determination
of whether this temporary restraining order should be converted to a preliminary injunction and
final adjudication of this adversary proceeding. (If the parties cannot reach agreement on these
terms, each party shall certify they have made a diligent effort to do so and present their
competing proposals.)

**IT IS FURTHER ORDERED** this temporary restraining order shall remain in full force and
effect until it expires at the conclusion of the status hearing scheduled to begin at 10 a.m. on May 7, 2020,
unless (A) terminated earlier by the Court, or (B) further extended by law, Court order, or agreement of
the parties.

**SO ORDERED.**

May 4, 2020 at 11:30 a.m.                                            Colleen A. Brown
Burlington, Vermont                                                 United States Bankruptcy Judge

---

[4] This hearing shall be conducted via the Court's Zoom account and the courtroom deputy will provide the meeting ID and
other access information to counsel for the parties. Any other attorney or interested party who wishes to attend, or participate
in, this hearing may obtain the access information by contacting the courtroom deputy one day prior to the hearing.



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

ENTERED
04/25/2020

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 19-20497 |
| HIDALGO COUNTY EMERGENCY | § | |
| SERVICE FOUNDATION, | § | |
| Debtor. | § | CHAPTER 11 |
| | § | |
| | § | |
| HIDALGO COUNTY EMERGENCY | § | |
| SERVICE FOUNDATION, | § | |
| Plaintiff | § | ADVERSARY NO. 20-2006 |
| v. | § | |
| JOVITA CARRANZA, IN HER | § | |
| CAPACITY AS ADMINISTRATOR FOR | § | |
| THE U.S. SMALL BUSINESS | § | |
| ADMINISTRATION, | § | |
| Defendant. | § | |

## TEMPORARY RESTRAINING ORDER

On Friday April 24, 2020, the Court considered the Plaintiff's Emergency Application

For Temporary Restraining Order And Preliminary Injunction (the "**Application**"), and the

request in the Application for issuance of a temporary restraining order; and having considered

certain facts set forth in the Application and supplemental declarations as being sworn to as true

and within the personal knowledge of Plaintiff's representatives Omar Romero, David Elliot, and

Kenneth Ponce; and having considered the text and purpose of the Coronavirus Aid, Relief, and

Economic Security Act" ("**CARES Act**"), the Paycheck Protection Program ("**PPP**") in the

CARES Act, and Section 7(a) of the Small Business Act (15 U.S.C. 636(a)); and having

considered the arguments and briefing of counsel for the Plaintiff and counsel for Defendant

Jovita Carranza, In Her Capacity As Administrator For The U.S. Small Business Administration

("**SBA**"); and having considered the SBA's Interim Final Rule for implementing the PPP,

Docket No. SBA-2020-0015, and an as-yet unpublished proposed revision to the Interim Final

Rule that was presented by SBA's counsel at the hearing, this Court finds and concludes that the

Plaintiff would suffer immediate and irreparable harm without issuance of a temporary restraining order.  The Court incorporates by reference all its oral findings and rulings made on the record at the hearing, and also finds as follows:

1.      Hidalgo County Emergency Service Foundation, the Debtor and Debtor-in-Possession in this Chapter 11 Proceeding ("**Debtor**", "**Plaintiff**", or "**Hidalgo County EMS**") is entitled to issuance of a temporary restraining order pursuant to Bankruptcy Rule 7065 (incorporating Rule 65, FRCP).

2.      Plaintiff has shown a substantial likelihood of success on the merits on both its claims that SBA has exceeded its statutory authority and that it is in violation of 11 USC §525(a) with respect to SBA requiring participating lenders to consider loan applications on a form that says PPP loans will not be approved if the applicant or any owner is presently involved in any bankruptcy.

3.      Hidalgo County EMS states that it otherwise meets all other requirements for receipt of a PPP loan, however the Court make no ruling on whether or not Hidalgo County EMS otherwise qualifies for a PPP loan.

4.      Hidalgo County EMS testified that it answered "yes" to Question #1 of the SBA loan application form only because of its pending bankruptcy.

5.      Hidalgo County EMS is the primary 911 patient transfer provider for a large part of its service area in South Texas that includes some of the poorest areas in the country.  It has approximately 250 highly-trained employees who may lose their jobs unless Debtor is permitted to apply for PPP loan.  Hidalgo County EMS is currently working to reorganize in Chapter 11 while maintaining 100% of its usual staffing levels in the midst of the Corona Virus pandemic and a significant decline in call volume which causes a revenue decline that has occurred despite

the Debtor's extensive and ongoing involvement as a "front line" health care provider for victims of COVID-19 in South Texas.  Debtor's business, along with nearly every other business in the United States, has become the economic victim of novel coronavirus SARS-CoV-2, which lead to the shutdown or severe curtailment of normal life in the United States.

6.       The first lockdown order in Hidalgo County, Texas, was on March 17, 2020, and it was subsequently extended on a weekly basis.  HCEMS call volume dropped off sharply a few days later.

7.       Debtor's daily "Treat and Transport" number was trending towards 140 per day prior to the first lockdown order in Hidalgo County, Texas, however HCEMS has been struggling to keep at 100 throughout the lock down, a declined of 30%.  Each call that results in a treat and transport typically results in a cash receipt approximately 4 – 6 weeks after the call.

8.       Based on the drop in call volume the Debtor projects a related drop in cash receipts beginning about now, and unless there is a liquidity event of some sort, the Debtor is concerned it may have insufficient cash to make payroll on May 7, 2020.

9.       Debtor continues to maintain pre-Corona employment levels in order to serve the community during this pandemic.  Hidalgo County EMS needs the PPP loan to shore up its finances and allow it to continue to support the community as a front-line medical services provider during the crisis.  Without this source of liquidity the Debtor's survival as a going concern is in question.

10.      The risk of harm to Movant outweighs the harm to SBA if a TRO is granted.

11.      Issuance of this temporary restraining order is in the public interest.   The continued gainful employment of the Debtor's approximately 250 employees benefits the public interest as a whole.   The Debtor's business as a "front line" health care provider is vitally

important even in normal times, and even more so now for victims of COVID-19 in South Texas.
It is important to maintain a fully-staffed emergency response capability that serves the entire
South Texas region and all its citizens.  The public interest is clearly served by Debtor being able
to maintain 100% of its usual staffing levels in the midst of the Corona Virus pandemic and an
approximately 30% decline in its business since the onset of this crisis.

       12.    The Debtor is a debtor-in-possession, and it is not required to post a bond.  Fed.
R. Bankr. P. 7065, and so no bond is required.  *See, e.g. Mississippi Power & Light Co. v. United
Gas Pipe Line Co.*, 760 F.2d 618 (5th Cir 1985).   The Court made additional findings on the record which
are incorporated herein pursuant to Bankruptcy Rule 7052.

       Based on the findings and conclusions set forth above, it is hereby ORDERED,
AJDUDGED AND DECREED as follows:

       1.    The Plaintiffs' request for a temporary restraining order, is hereby GRANTED as
set forth herein.

       2.    A temporary restraining order is hereby issued, with notice, and directed to
Jovita Carranza in her capacity as Administrator for the United States Small Business
Administration, and all agents, servants, employees, and any parties acting in concert with any of
the foregoing parties (collectively "**Restrained Parties**").  Until the expiration of this temporary
restraining order, its scope is as follows:

       a.    Hidalgo County EMS is authorized to submit a PPP loan application to any lender
with the words "or presently involved in any bankruptcy" stricken from the SBA's form,
and, if Hidalgo County EMS satisfies all the other conditions in question #1 to the loan
application form, mark the box answering question #1 "no."  The Restrained Parties shall
consider the PPP application and fully implement all aspects of the PPP program with
respect to Hidalgo County EMS without any consideration of the involvement of Hidalgo

County EMS or any owner of Hidalgo County EMS in any bankruptcy.

b.      To the extent any bank requires Hidalgo County EMS to execute any other forms, applications, or other documents for a PPP loan that include any language about whether Hidalgo County EMS or any owner of Hidalgo County EMS is involved in any bankruptcy, Hidalgo County EMS is authorized to strike the portion of such language about involvement in any bankruptcy and the Restrained Parties shall process the forms, applications, or other documents without any consideration of the involvement of Hidalgo County EMS or any owner of Hidalgo County EMS in any bankruptcy.

c.      The Restrained Parties shall not make or condition the approval of any PPP loan guaranty to the Debtor contingent on the Debtor or any owner of the Debtor not being "presently involved in any bankruptcy."

IT IS FURTHER ORDERED that the Court will conduct a hearing on Plaintiff's Application for a Preliminary Injunction at 9:30 a.m., on the 8th day of May, 2020. The purpose of the hearing shall be to determine whether this Temporary Restraining Order should be made a Preliminary Injunction.

This temporary restraining order shall remain in full force and effect until it expires at 10:00 a.m. on May 8, 2020, unless either (a) terminated earlier by court order, or (b) further extended as provided by law or agreement of the parties.

SIGNED this the _____ day of April, 2020, at _____ a.m./p.m.

**Signed:  April 25, 2020.**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

Signed at 8:44 p.m. prevailing central time on 4/25/2020.

Temporary Restraining Order – HCEMS vs. SBA          - 5 -

**APPROVED AND ENTRY REQUESTED:**


_____/s/ Nathaniel Peter Holzer_
Nathaniel Peter Holzer
State Bar. No 00793971
***Jordan, Holzer & Ortiz, PC***
500 North Shoreline Blvd., Suite 900
Corpus Christi, TX 78401
Telephone: 361.884.5678
Facsimile: 361.888.5555
Email: pholzer@jhwclaw.com
**BANKRUPTCY CO-COUNSEL TO DEBTOR**


-and-

Kay B. Walker
State Bar No. 20713400
***Law Office of Kay B. Walker***
615 Leopard, Ste. 635
Corpus Christi, TX  78401
Telephone: 361.533.2476
Email: kaywalker@kaywalkerlaw.com
**BANKRUPTCY CO-COUNSEL TO DEBTOR**


**APPROVED ONLY AS TO FORM:**


RYAN K. PATRICK,
United States Attorney

By: _/s/ Richard A. Kincheloe by NP Holzer with permission_
Richard A. Kincheloe
Assistant United States Attorney
Attorney-in-Charge
United States Attorney's Office
Southern District of Texas
Texas Bar No. 24068107
S.D. Tex. ID No. 1132346
1000 Louisiana St., Suite 2300
Houston, Texas 77002
Telephone: (713) 567-9422
Facsimile: (713) 718-3033
Email: Richard.Kincheloe@usdoj.gov

**Attorney for the Defendant**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MAINE

| | |
|---|---|
| In re:<br><br>PENOBSCOT VALLEY HOSPITAL,<br><br>Debtor | Chapter 11<br>Case No. 19-10034 |
| PENOBSCOT VALLEY HOSPITAL,<br><br>Plaintiff,<br>  v.<br><br>JOVITA CARRANZA, in her capacity as<br>Administrator for the U.S. Small Business<br>Administration,<br><br>Defendant | Adv. Proc. No. 20-1005 |

## <u>TEMPORARY RESTRAINING ORDER</u>

On April 27, 2020, the Debtor filed the Emergency Motion for Temporary Restraining Order and Request for Hearing Date and Briefing Schedule with Respect to the Debtor's Request for a Preliminary Injunction [Dkt. No. 2] (the "Motion"). At a hearing on the Motion on April 30, 2020, the Court heard arguments from the parties and considered the contents of the Motion; the verified allegations in the Debtor's complaint; the objection to the Motion filed Jovita Carranza, in her capacity as Administrator for the U.S. Small Business Administration [Dkt. No. 11]; and the Debtor's Reply in Support of the Motion [Dkt. No. 12]. The Court further considered the text and purpose of the Coronavirus Aid, Relief and Economic Security Act (the "CARES Act"); the Paycheck Protection Program ("PPP"), enacted in § 1102 of the CARES Act; § 7(a) of the Small Business Act (15 U.S.C. § 636(a)); and the Administrator's interim final

rules promulgated on April 15, 2020, and April 24, 2020, Docket Nos. SBA-2020-0015 and SBA 2020-0021.

Before deciding whether the Debtor is entitled to a temporary restraining order ("TRO"), the Court must address a threshold question: is the Administrator immune from the Debtor's claims for preliminary and permanent injunctive relief? The analysis begins with the Bankruptcy Code, which, in relevant part, provides as follows:

(a) Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to . . .
(1) [11 U.S.C. §§ 105 and 525.]
(2) The court may hear and determine any issue arising with respect to the application of such sections to governmental units.
(3) The court may issue against a governmental unit an order, process, or judgment under such sections or the Federal Rules of Bankruptcy Procedure, including an order or judgment awarding a money recovery, but not including an award of punitive damages. . . .
(4) The enforcement of any such order, process, or judgment against any governmental unit shall be consistent with appropriate nonbankruptcy law applicable to such governmental unit[.]
(5) Nothing in this section shall create any substantive claim for relief or cause of action not otherwise existing under this title, the Federal Rules of Bankruptcy Procedure, or nonbankruptcy law.

11 U.S.C. § 106(a). In this proceeding, the Debtor seeks (among other things) injunctive relief against the Administrator to remedy an alleged violation of 11 U.S.C. § 525(a), invoking Fed. R. Bankr. P. 7065 and 11 U.S.C. § 105(a).[1] In isolation, section 106(a) of the Bankruptcy Code would appear to permit such an action. The Administrator, however, asserts immunity from injunctive relief under the following provisions of applicable nonbankruptcy law:

---

[1] To the extent that the claims are based on 11 U.S.C. § 525 and other provisions of the Bankruptcy Code, this is a proceeding arising in or under the Code, and as a result, is a core proceeding. *See* 28 U.S.C. § 157(b).

**(b) Powers of Administrator**

In the performance of, and with respect to, the functions, powers, and duties vested in him by this chapter the Administrator may —

    (1) sue and be sued . . . in any United States district court, and jurisdiction is conferred upon such district court to determine such controversies without regard to the amount in controversy; but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Administrator or his property[.]

15 U.S.C. § 634(b). In the Administrator's view, this anti-injunction provision bars any and all injunctive relief against her or her property.

The Administrator's perspective fails to account for binding caselaw interpreting 15 U.S.C. § 634(b) to permit certain forms of relief against the Small Business Administration ("SBA") that might be characterized as injunctive. In Ulstein Maritime, Ltd. v. United States, 833 F.2d 1052 (1st Cir. 1987), the First Circuit Court of Appeals affirmed an order invalidating a certificate issued by the SBA for failure to comply with applicable laws and regulations. In so doing, the Court indicated that the anti-injunction provision of 15 U.S.C. § 634(b) "protects the [SBA] from interference with its internal workings by judicial orders attaching agency funds, etc., but does not provide blanket immunity from every type of injunction." Ulstein, 833 F.2d at 1057. After examining the purposes of the statute, the Court suggested that the anti-injunction language "should not be interpreted as a bar to judicial review of agency actions that exceed agency authority where the remedies would not interfere with internal agency operations." Id.

In this proceeding, as in Ulstein, the plaintiff seeks an order invalidating an SBA decision due to the Administrator's asserted failure to comply with applicable law. The Debtor seeks no relief that would interfere with the SBA's "internal workings" as distinguished from the product of those workings. An award of preliminary injunctive relief directing the Administrator to reserve sufficient authority to grant the Debtor's application if the Debtor later prevails on the

merits will not interfere with the SBA's internal agency operations in the sense contemplated by

Ulstein. As such, the Court may enter a carefully tailored temporary restraining order against the

Administrator, notwithstanding the anti-injunction provision of 15 U.S.C. § 634(b). *See* 11

U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or

appropriate to carry out the provisions of this title."); 11 U.S.C. § 525(a) (providing in relevant

part that "a governmental unit may not deny, revoke, suspend, or refuse to renew a license,

permit, charter, franchise, or other similar grant to . . . a person that is or has been a debtor under

this title . . . solely because such . . . debtor is or has been a debtor under this title"). This

conclusion is consistent with the purpose of section 106(a)(4), which requires an order against a

governmental unit to be enforced in accordance with appropriate nonbankruptcy law. As

explained in the legislative history of section 106, although "an order against a governmental

unit will not be enforceable by attachment or seizure of government assets[,]" the court "retains

ample authority to enforce nonmonetary orders and judgments." 140 Cong. Rec. H10752-01, at

H10766, 1994 WL 545773 (Oct. 4, 1994).

At this juncture, the ultimate question is whether the Debtor is entitled to the TRO that it

seeks. The answer turns on the same four factors that govern a motion for a preliminary

injunction. *See* Animal Welfare Inst. v. Martin, 665 F. Supp. 2d 19, 22 (D. Me. 2009). Those

four factors are:

> [1] the probability of the movant's success on the merits, [2] the prospect of
> irreparable harm absent the injunction, [3] the balance of the relevant equities
> (focusing on the hardship to the movant if an injunction does not issue as
> contrasted with the hardship to the nonmovant if it does), and [4] the effect of the
> court's action on the public interest.

Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 221 (1st Cir. 2003). "As with a preliminary

injunction, the party seeking relief bears the burden of demonstrating that these factors weigh in

its favor." <u>Animal Welfare Inst.</u>, 665 F. Supp. 2d at 22 (quotation marks omitted).  Trial courts tasked with balancing these factors "have wide discretion in making judgments regarding the appropriateness of [preliminary injunctive] relief."  <u>Francisco Sanchez v. Esso Standard Oil Co.</u>, 572 F.3d 1, 14 (1st Cir. 2009).  Due to the preliminary nature of the relief and the undeveloped state of the record, the court's findings and conclusions on a request for a TRO do not represent an adjudication on the merits and are not binding on the parties in the later action.  *See* <u>Narragansett Indian Tribe v. Guilbert</u>, 934 F.2d 4, 6 (1st Cir. 1991) ("[A] court's conclusions as to the merits of the issues presented on preliminary injunction are to be understood as statements of probable outcomes."); Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2951 (3d ed.) ("[A] court's findings on an application for a temporary restraining order do not represent an adjudication on the merits.  Thus, they are not binding on the parties in the later action for a permanent injunction.") (footnotes omitted).

With these principles in mind, the Court FINDS and CONCLUDES as follows:

1.      The Debtor is entitled to issuance of a temporary restraining order under Fed. R. Civ. P. 65 and Fed. R. Bankr. P. 7065.

2.      The Debtor has shown a likelihood of success on the merits of the claim asserted in Count III of the complaint, namely that the Administrator acted in violation of 11 U.S.C. § 525(a) by refusing to permit the Debtor an opportunity to participate in the PPP solely because the Debtor is presently a debtor in a case under Title 11 (and therefore is unquestionably "involved in any bankruptcy").[2]  This conclusion rests on the following concessions and preliminary determinations:

---

[2]  Although the complaint also raises the issue of whether the Administrator exceeded the scope of her authority by issuing a rule and the official PPP application form that rendered the Debtor ineligible to

(A)   The Administrator concedes that the SBA falls within the definition of "governmental unit" in the Bankruptcy Code.

(B)   The Administrator also concedes that the SBA denied the Debtor the oppportunity to participate in the PPP solely because the Debtor is currently in chapter 11.

(C)   There is one remaining element of section 525(a) in play.  To determine whether the Debtor has shown a likelihood of success on Count III of its complaint, the Court must consider the following question:  does the Administrator's categorical exclusion of the Debtor from the term "eligible recipient," 15 U.S.C. § 636(a)(36)(A)(iv), constitute the denial of, or discrimination with respect to, a "license, permit, charter, franchise, or other similar grant" for purposes of section 525(a)?  There is no binding authority from the United States Supreme Court or the First Circuit Court of Appeals on this precise question.  There are, however, several decisions interpreting section 525(a) in other contexts, and many of those decisions consider the language of section 525(a) in light of the stated purpose of the statute.  *See, e.g.*, Stoltz v. Brattleboro Housing Auth. (In re Stoltz), 315 F.3d 80 (2d Cir. 2002) (holding that eviction of a debtor from public housing unit solely based on her failure to pay discharged, pre-petition rent constituted illegal discrimination under section 525(a)); In re The Bible Speaks, 69 B.R. 368, 374 (Bankr. D. Mass. 1987) ("Congress intended § 525(a) . . . to expand on and develop Perez so that the doctrine would extend to many forms of discrimination."); Rose v. Conn. Housing Fin. Auth. (In re Rose), 23 B.R. 662, 666-67 (Bankr. D. Conn. 1982) (construing section 525(a) in light of the fresh start policy

---

apply for a PPP loan due to the Debtor's status as a debtor in a chapter 11 case, the Court need not and does not address that issue at this point.

and concluding that a state may not exempt debtors from a state-sponsored home financing program solely because of bankruptcy); *see also* 4 Collier on Bankruptcy ¶ 525.02 (16th ed.) ("[S]ection 525(a) is designed to protect persons from discriminatory treatment based solely on past financial difficulty.") (footnote omitted).  While the answer is not free from all doubt, the Debtor has articulated a sufficient likelihood of success, when considered along with its showings on the balance of harms and the public interest, to warrant the issuance of a temporary restraining order.  Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2951 (3d ed.) (suggesting that the plaintiff must ordinarily demonstrate "at least a reasonable probability of prevailing on the merits" but that the "necessary persuasiveness of this showing" may vary, depending on the facts of the case and the other relevant factors).

(D)   There are cases holding that section 525(a) does not extend to loans or, stated differently, that a loan is not "a license, permit, charter, franchise, or other similar grant" within the meaning of section 525(a).  The Administrator correctly points out that the PPP describes "covered loans" and specifies loan features, such as an interest rate and a repayment term.  *See, e.g.,* 15 U.S.C. § 636(a)(36)(A)(ii), (B), (E), (F), (L).  True enough, but that fixation on the details loses the forest in the trees during a conflagration.  The CARES Act is a grant of aid necessitated by a public health crisis. It is one of many responses by federal, state, and local governments designed to help citizens weather an unprecedent storm.  Likening a covered loan under the PPP to a garden-variety loan that is not be protected under section 525(a) may miss the point.

(E)   Section 525(c), by its terms, applies to student loans and the Administrator argues that the existence of section 525(c) proves that Congress did not intend section 525(a)

to extend to loans: if section 525(a) extended to loans, why would Congress need to craft specific treatment for student loans in section 525(c)?  This is a fair question, but the Supreme Court has, at times, been skeptical of this type of inferential reasoning.  *See, e.g.*, Mission Prod. Holdings, Inc. v. Tempnology, LLC, 139 S. Ct. 1652, 1664-65 (2019).  The hoary canon of *expressio unius est exclusio alterius* does not, alone, doom the Debtor's preferred construction of section 525(a).  *See* Hewlett-Packard Co, Inc. v. Berg, 61 F.3d 101, 106 (1st Cir. 1995) (indicating that the canon "is an aid to construction and not an inflexible rule").

(F)  The Court's charge is to consider the language of the statute, the words that Congress did, in fact, use.  There is, at this early juncture in the litigation, enough of a showing that participation in the PPP could be characterized as an "other similar grant" such that the Debtor has met its burden on the likelihood of success on Count III.

(G)  The Court is sympathetic to the significant challenges faced by the Administrator in the implementation of measures taken by the federal government in response to the extraordinary public health crisis and the resulting economic devastation.  The SBA was under—and continues to be under—immense pressure to distribute aid without delay.  Time is truly of the essence.  That said, this country's laws cannot be pushed aside, even inadvertently, during times of crisis.

3.  The Debtor has demonstrated a risk of immediate and irreparable harm in the absence of a temporary restraining order.  This conclusion rests on the following preliminary findings:

(A)   PPP funds are available on a first come, first served basis.  The Debtor's application for funds under PPP was not processed and the Debtor did not receive funds prior to their exhaustion under the first tranche of PPP funding.

(B)   On or about April 23, 2020, Congress enacted legislation making additional funds available for PPP.

(C)   The Debtor is a critical access hospital providing services in Lincoln, Maine.  The Debtor's business operations have been significantly impacted by Covid-19 due to the fact that many non-essential elective and office visits have been rescheduled or canceled.  A significant percentage of the Debtor's revenue is derived from non-essential and elective procedures.  In the absence of funding from PPP or another source, the Debtor may be forced to discontinue business operations by the middle of June and may not have sufficient funds for an orderly liquidation under those circumstances.

(D)   According to the application attached to the complaint, the Debtor has approximately 120 employees who may lose their jobs if the Debtor's business operations cease.

(E)   Due to the nature of the Debtor's business operations, it must continue to employ staff in order to meet its charitable mission and provide health care services.

(F)   PPP funds are being exhausted quickly, in a matter of weeks (if not days).  If the Debtor is not permitted to submit an application for funding under PPP in the very near term, funding may be exhausted.  And, as previously mentioned, if the Debtor does not receive PPP funding, then it may be forced to close.  When this relatively concrete forecast is "juxtaposed and weighed in tandem" with the Debtor's showing

of a likelihood of success on the merits, the forecast possesses sufficient substance to meet the Debtor's burden of establishing a prospect of immediate and irreparable harm if the TRO does not issue.  *See* <u>Ross-Simons of Warwick v. Baccarat, Inc.</u>, 102 F.3d 12, 19 (1st Cir. 1996) (providing guideposts to measure the "quantum of . . . harm that will suffice to justify interim injunctive relief"); *see also* <u>Semmes Motors, Inc. v. Ford Motor Co.</u>, 429 F.2d 1197, 1205 (2d Cir. 1970) (indicating that the destruction of a business is an irreparable injury that may be properly remedied by injunctive relief).

4.      The risk of harm to the Debtor if a temporary restraining order is not granted outweighs the risk of any harm to the Administrator if a temporary restraining order is granted.

5.      Given the nature of the Debtor's business operations and the purpose Congress had in enacting the CARES Act and establishing PPP, the public interest is served by issuing a temporary restraining order.

6.      The Debtor is a debtor-in-possession and no bond is required under Rule 65.

7.      Based on the foregoing, it is hereby **<u>ORDERED</u>**, **<u>ADJUDGED</u>**, and **<u>DECREED</u>** as follows:

(A)  The motion is **<u>GRANTED</u>** on the terms and conditions set forth herein.

(B)  A temporary restraining order is hereby issued, with notice, and directed to the Administrator and all agents, servants, employees, and any persons acting in concert with any of the foregoing (collectively, the "<u>Restrained Parties</u>").  The Court intends that Machias Savings Bank or any other lender participating in PPP with respect to the Debtor shall be one of the Restrained Parties upon actual notice of this order being provided to such bank.  As to Machias Savings Bank, such notice may be

provided by e-mail to counsel of record for the bank in Case No. 19-10034. This

order does not extend to any Restrained Party that submits, considers, or takes any

other action with respect to an application under the PPP for any person or entity

other than the Debtor.

(C) Until the expiration of this temporary restraining order, its scope shall be as follows:

   (i)    The Restrained Parties shall not deny or cause any commercial lender to

          deny an application of the Debtor under PPP solely on the basis that the

          Debtor is a debtor in bankruptcy or based on the words "or presently in

          bankruptcy" on the Administrator's official form of application.

   (ii)   The Restrained Parties shall not refuse to guaranty a loan sought by the

          Debtor under PPP solely on the basis that the Debtor is a debtor in

          bankruptcy or because of a "yes" answer in response to question 1 on the

          official form of PPP application promulgated by the Administrator.

   (iii)  The Administrator shall not authorize, guaranty, or disburse funds

          appropriated for loans under PPP without reserving sufficient funds or

          guaranty authority within the scope of the second appropriation to fund

          PPP to provide the Debtor with access to funds under PPP if the Debtor is

          eligible after implementation of the terms of this temporary restraining

          order and any appellate or judicial process with respect to any application

          filed by the Debtor. Rather, the Administrator shall ensure that she has

          sufficient authority within the scope of amounts appropriated for PPP as of

          April 30, 2020, to guaranty a loan to the Debtor in an amount the Debtor

          may be qualified to obtain, if the Debtor is eligible subject to the terms of

this order and after consideration of any administrative and judicial appeals and resolution of the claims in the Debtor's complaint.

(iv)   The Debtor shall be authorized to submit a PPP application to a participating lender of its choosing—or a lender may consider any pending application—with the words "or presently involved in any bankruptcy" stricken from the official form of application and, if the Debtor satisfied all other conditions in question 1 to the official form, to mark the box answering question 1 "no" or, with respect to any pending application, for the participating lender to treat question 1 as if it was answered "no".  The Restrained Parties shall consider the application submitted by the Debtor and fully implement all aspects of the PPP program with respect to the Debtor without any consideration of the involvement of the Debtor in bankruptcy.  The application shall be considered an initial application of the submission if a subsequent application would adversely impact the Debtor's ability to qualify for a PPP loan.

(v)   To the extent that any bank requires the Debtor to execute other forms, applications, or other documents for a PPP loan that include any language about whether the Debtor is involved in bankruptcy, the Debtor is authorized to strike the portion of such language about involvement in bankruptcy and the Restraining Parties shall process the forms, applications, or other documents without any consideration of the involvement of the Debtor in bankruptcy.

    (vi)      Nothing in this order obligates Machias Savings Bank to accept or submit a PPP application on behalf of the Debtor.

    (vii)    To the extent that approval of the Court is required for the Debtor to obtain a PPP loan, the Debtor shall file a motion and seek entry of an order authorizing such relief. The Debtor must file any such motion within ten days after the date of this order.  Any deadline under the PPP program requiring disbursement of PPP loan proceeds is hereby extended in order to allow consideration of a motion by the Debtor seeking authority to obtain a PPP loan.

8.     The Court will conduct a status conference on the Debtor's request for a preliminary injunction consistent with the terms of this order on May 5, 2020 at 9:30 a.m.  At the status conference, the Administrator must be prepared to describe, in reasonable detail, the steps she has taken to comply with the terms of this order.

9.     This temporary restraining order shall remain in full force and effect until expires at 5:00 p.m. (eastern) on May 14, 2020 unless either (a) terminated earlier by the Court or (b) further extended by applicable law, by order of the Court, or by written agreement of the Debtor and the Administrator.

Dated:  May 1, 2020

_____

Michael A. Fagone
United States Bankruptcy Judge
District of Maine

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO.  19-20497 |
| HIDALGO COUNTY EMERGENCY | § | |
| SERVICE FOUNDATION, | § | |
| Debtor. | § | CHAPTER 11 |
| | § | |
| | § | |
| HIDALGO COUNTY EMERGENCY | § | |
| SERVICE FOUNDATION, | § | |
|     Plaintiff | § | ADVERSARY NO. 20-2006 |
| v. | § | |
| JOVITA CARRANZA, IN HER | § | |
| CAPACITY AS ADMINISTRATOR FOR | § | |
| THE U.S. SMALL BUSINESS | § | |
| ADMINISTRATION, | § | |
|     Defendant. | § | |

## <u>TEMPORARY RESTRAINING ORDER</u>

On Friday April 24, 2020, the Court considered the Plaintiff's Emergency Application

For Temporary Restraining Order And Preliminary Injunction (the "**Application**"), and the

request in the Application for issuance of a temporary restraining order; and having considered

certain facts set forth in the Application and supplemental declarations as being sworn to as true

and within the personal knowledge of Plaintiff's representatives Omar Romero, David Elliot, and

Kenneth Ponce; and having considered the text and purpose of the Coronavirus Aid, Relief, and

Economic Security Act" ("**CARES Act**"), the Paycheck Protection Program ("**PPP**") in the

CARES Act, and Section 7(a) of the Small Business Act (15 U.S.C. 636(a)); and having

considered the arguments and briefing of counsel for the Plaintiff and counsel for Defendant

Jovita Carranza, In Her Capacity As Administrator For The U.S. Small Business Administration

("**SBA**"); and having considered the SBA's Interim Final Rule for implementing the PPP,

Docket No. SBA-2020-0015, and an as-yet unpublished proposed revision to the Interim Final

Rule that was presented by SBA's counsel at the hearing, this Court finds and concludes that the

Plaintiff would suffer immediate and irreparable harm without issuance of a temporary restraining order.  The Court incorporates by reference all its oral findings and rulings made on the record at the hearing, and also finds as follows:

1.      Hidalgo County Emergency Service Foundation, the Debtor and Debtor-in-Possession in this Chapter 11 Proceeding ("**Debtor**", "**Plaintiff**", or "**Hidalgo County EMS**") is entitled to issuance of a temporary restraining order pursuant to Bankruptcy Rule 7065 (incorporating Rule 65, FRCP).

2.      Plaintiff has shown a substantial likelihood of success on the merits on both its claims that SBA has exceeded its statutory authority and that it is in violation of 11 USC §525(a) with respect to SBA requiring participating lenders to consider loan applications on a form that says PPP loans will not be approved if the applicant or any owner is presently involved in any bankruptcy.

3.      Hidalgo County EMS states that it otherwise meets all other requirements for receipt of a PPP loan, however the Court make no ruling on whether or not Hidalgo County EMS otherwise qualifies for a PPP loan.

4.      Hidalgo County EMS testified that it answered "yes" to Question #1 of the SBA loan application form only because of its pending bankruptcy.

5.      Hidalgo County EMS is the primary 911 patient transfer provider for a large part of its service area in South Texas that includes some of the poorest areas in the country.  It has approximately 250 highly-trained employees who may lose their jobs unless Debtor is permitted to apply for PPP loan.  Hidalgo County EMS is currently working to reorganize in Chapter 11 while maintaining 100% of its usual staffing levels in the midst of the Corona Virus pandemic and a significant decline in call volume which causes a revenue decline that has occurred despite

the Debtor's extensive and ongoing involvement as a "front line" health care provider for victims of COVID-19 in South Texas.  Debtor's business, along with nearly every other business in the United States, has become the economic victim of novel coronavirus SARS-CoV-2, which lead to the shutdown or severe curtailment of normal life in the United States.

6.      The first lockdown order in Hidalgo County, Texas, was on March 17, 2020, and it was subsequently extended on a weekly basis.  HCEMS call volume dropped off sharply a few days later.

7.      Debtor's daily "Treat and Transport" number was trending towards 140 per day prior to the first lockdown order in Hidalgo County, Texas, however HCEMS has been struggling to keep at 100 throughout the lock down, a declined of 30%.  Each call that results in a treat and transport typically results in a cash receipt approximately 4 – 6 weeks after the call.

8.      Based on the drop in call volume the Debtor projects a related drop in cash receipts beginning about now, and unless there is a liquidity event of some sort, the Debtor is concerned it may have insufficient cash to make payroll on May 7, 2020.

9.      Debtor continues to maintain pre-Corona employment levels in order to serve the community during this pandemic.  Hidalgo County EMS needs the PPP loan to shore up its finances and allow it to continue to support the community as a front-line medical services provider during the crisis.  Without this source of liquidity the Debtor's survival as a going concern is in question.

10.     The risk of harm to Movant outweighs the harm to SBA if a TRO is granted.

11.     Issuance of this temporary restraining order is in the public interest.  The continued gainful employment of the Debtor's approximately 250 employees benefits the public interest as a whole.  The Debtor's business as a "front line" health care provider is vitally

important even in normal times, and even more so now for victims of COVID-19 in South Texas. It is important to maintain a fully-staffed emergency response capability that serves the entire South Texas region and all its citizens.  The public interest is clearly served by Debtor being able to maintain 100% of its usual staffing levels in the midst of the Corona Virus pandemic and an approximately 30% decline in its business since the onset of this crisis.

12.    The Debtor is a debtor-in-possession, and it is not required to post a bond.  Fed. R. Bankr. P. 7065, and so no bond is required.  *See, e.g. Mississippi Power & Light Co. v. United Gas Pipe Line Co*., 760 F.2d 618 (5th Cir 1985).

Based on the findings and conclusions set forth above, it is hereby ORDERED, AJDUDGED AND DECREED as follows:

1.    The Plaintiffs' request for a temporary restraining order, is hereby GRANTED as set forth herein.

2.    A temporary restraining order is hereby issued, without notice, and directed to Jovita Carranza in her capacity as Administrator for the United States Small Business Administration, and all agents, servants, employees, and any parties acting in concert with any of the foregoing parties (collectively "**Restrained Parties**").  Until the expiration of this temporary restraining order, its scope is as follows:

a.    Hidalgo County EMS is authorized to submit a PPP loan application to any lender with the words "or presently involved in any bankruptcy" stricken from the SBA's form, and, if Hidalgo County EMS satisfies all the other conditions in question #1 to the loan application form, mark the box answering question #1 "no."  The Restrained Parties shall consider the PPP application and fully implement all aspects of the PPP program with respect to Hidalgo County EMS without any consideration of the involvement of Hidalgo

County EMS or any owner of Hidalgo County EMS in any bankruptcy.

b.      To the extent any bank requires Hidalgo County EMS to execute any other forms, applications, or other documents for a PPP loan that include any language about whether Hidalgo County EMS or any owner of Hidalgo County EMS is involved in any bankruptcy, Hidalgo County EMS is authorized to strike the portion of such language about involvement in any bankruptcy and the Restrained Parties shall process the forms, applications, or other documents without any consideration of the involvement of Hidalgo County EMS or any owner of Hidalgo County EMS in any bankruptcy.

c.      The Restrained Parties shall not make or condition the approval of any PPP loan guaranty to the Debtor contingent on the Debtor or any owner of the Debtor not being "presently involved in any bankruptcy."

IT IS FURTHER ORDERED that the Court will conduct a hearing on Plaintiff's Application for a Preliminary Injunction at 9:30 a.m., on the 8th day of May, 2020. The purpose of the hearing shall be to determine whether this Temporary Restraining Order should be made a Preliminary Injunction.

This temporary restraining order shall remain in full force and effect until it expires at 10:00 a.m. on May 8, 2020, unless either (a) terminated earlier by court order, or (b) further extended as provided by law or agreement of the parties.

SIGNED this the _____ day of April, 2020, at _____ a.m./p.m.


_____
DAVID R. JONES
CHIEF U.S. BANKRUPTCY JUDGE

**APPROVED AND ENTRY REQUESTED:**


_____*/s/ Nathaniel Peter Holzer*
Nathaniel Peter Holzer
State Bar. No 00793971
***Jordan, Holzer & Ortiz, PC***
500 North Shoreline Blvd., Suite 900
Corpus Christi, TX 78401
Telephone: 361.884.5678
Facsimile: 361.888.5555
Email: pholzer@jhwclaw.com
**BANKRUPTCY CO-COUNSEL TO DEBTOR**

-and-

Kay B. Walker
State Bar No. 20713400
***Law Office of Kay B. Walker***
615 Leopard, Ste. 635
Corpus Christi, TX  78401
Telephone: 361.533.2476
Email: kaywalker@kaywalkerlaw.com
**BANKRUPTCY CO-COUNSEL TO DEBTOR**


**APPROVED ONLY AS TO FORM:**


RYAN K. PATRICK,
United States Attorney

By: */s/ Richard A. Kincheloe by NP Holzer with permission*
Richard A. Kincheloe
Assistant United States Attorney
Attorney-in-Charge
United States Attorney's Office
Southern District of Texas
Texas Bar No. 24068107
S.D. Tex. ID No. 1132346
1000 Louisiana St., Suite 2300
Houston, Texas 77002
Telephone: (713) 567-9422
Facsimile: (713) 718-3033
Email: Richard.Kincheloe@usdoj.gov

**Attorney for the Defendant**

**Miscellaneous:**

20-02006 Hidalgo County Emergency Service Foundation v. Carranza et al
Type: ap                           Office: 2 (Corpus Christi)                 Judge: drj
Lead Case: 2-19-bk-20497

**U.S. Bankruptcy Court**

**Southern District of Texas**

Notice of Electronic Filing

The following transaction was received from Nathaniel Peter Holzer entered on 4/24/2020 at 4:56 PM CDT and filed on 4/24/2020
**Case Name:**         Hidalgo County Emergency Service Foundation v. Carranza et al
**Case Number:**       20-02006
**Document Number:** 16

**Docket Text:**
Proposed Order Submission After Hearing (Filed By Jovita Carranza, Hidalgo County Emergency Service Foundation ).(Related
document(s):[1] Complaint, [11] Courtroom Minutes) (Holzer, Nathaniel)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**v4 AGREED Jones TRO 4-24-20 HCEMS vs SBA[1].pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=996787432 [Date=4/24/2020] [FileNumber=45094198-0
] [967caa700eaa61832e39309e9ed554becdd7f3d5a8cd0afcc179c69132cf816b2cd
9290083309b25d86a7a90d7c8e40e723c662f065edc767c46f6ca267fd3a0]]

**20-02006 Notice will be electronically mailed to:**

Nathaniel Peter Holzer on behalf of Defendant Jovita Carranza
ecf@jhwclaw.com

Nathaniel Peter Holzer on behalf of Plaintiff Hidalgo County Emergency Service Foundation
ecf@jhwclaw.com

Richard A. Kincheloe on behalf of Defendant Jovita Carranza
Richard.Kincheloe@usdoj.gov,
caseview.ecf@usdoj.gov;sonja.mccoy@usdoj.gov;sydnie.kempen@usdoj.gov;Nicole.robbins@usdoj.gov;rhoma.romero@usdoj.gov

**20-02006 Notice will not be electronically mailed to:**

United States Small Business Administration c/o Attorney General, US Department of Justice

,

United States Small Business Administration, c/o Office of the U.S. Attorney, Southern District of Texas

,